1    STATE OF MICHIGAN

2    IN THE EIGHTH DISTRICT COURT FOR THE COUNTY OF KALAMAZOO

3

4    PEOPLE OF THE STATE OF MICHIGAN,

5    v                                    Case No.:  111983 FY

6    SAMUEL STEEL, III,

7                Defendant.
     _____/

8

9                    PRELIMINARY EXAMINATION

10     BEFORE THE HONORABLE PAUL J. BRIDENSTINE, DISTRICT JUDGE

11         Kalamazoo, Michigan – Tuesday, September 11, 2012

12

13   APPEARANCES

14   For the People:        **JOHN J. ANDEREGG, (P55588**)
                            Assistant Prosecuting Attorney
15                          227 West Michigan Avenue
                            Kalamazoo, Michigan  49007
16                          (269) 383-8900

17   For the Defendant:     **MICHAEL P. REISTERER, JR., (P58487**)
                            427 South Westnedge Avenue
18                          Kalamazoo, Michigan  49007
                            (269) 385-2500
19

20        RECORDED BY:     Ms. Liliana M. Klomparens, CER 6953
                            Certified Electronic Recorder
21                          (269) 384-8106

22

23

24

25

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1

FILED
Oct 10, 2012
9TH JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

1                          TABLE OF CONTENTS

2

WITNESSES:  PEOPLE:                                    PAGE

3

WALTER JOHNSON

4

5          Direct examination by Mr. Anderegg                    5
           Cross-examination by Mr. Reisterer                   40

6

7

HARRY MATTHEWS

8

9          Direct examination by Mr. Anderegg                   61
           Cross-examination by Mr. Reisterer                   93

10

11

12

13

14

15   EXHIBITS:                 IDENTIFIED           RECEIVED

16       None.

17

18

19

20

21

22

23

24

25

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1            Kalamazoo, Michigan

2            Tuesday, September 11, 2012 - 2:56 p.m.

3            THE COURT: All right, the Court calls the case of

4     the State of Michigan versus Samuel Steel, 111983FY.  The

5     matter is schedule for a preliminary examination this

6     afternoon.

7         Counsel, state their appearances for the record?

8            MR. ANDEREGG:  Good afternoon, your Honor, John

9     Anderegg on behalf of the People.

10           MR. REISTERER:  If it please the Court, Mike

11    Reisterer on behalf of Mr. Steel; he's present.

12           THE COURT:  I'm assuming that's him to your left?

13           MR. REISTERER:  Yes, it is.

14           THE COURT:  Are you ready to proceed, Mr. Anderegg?

15           MR. ANDEREGG:  I believe we are, Judge.  They'll be

16    bringing the witness down.

17           THE COURT:  Are you ready to defend, Mr. Reisterer?

18           MR. REISTERER:  Yes, I am.

19        Mr. Steel does have two cases set for preliminary hearing

20    today, one is for this open murder; I believe there is a dog

21    fighting case as well.

22           THE COURT:  Well, we're going to handle the April

23    24th, 2011 incident involving the allegation of the homicide

24    and the firearm issue and then we'll turn to the other one

25    when we are done.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

3

1        MR. REISTERER:  All right.

2        THE COURT:  I have received an amended felony

3    complaint; I'm assuming you've got a copy of it as well?  It

4    looks like it reduced the original complaint by counts three

5    and four?

6        MR. ANDEREGG:  That's correct, Judge.

7        MR. REISTERER:  That's correct; I'll acknowledge

8    receipt and waive its formal reading and not oppose the

9    reduction of charges.

10        THE COURT:  Very well.

11        MR. ANDEREGG:  I think we're ready, Judge, whenever

12    the Court is.

13        THE COURT:  Okay.  Do you want to call your first

14    witness then?

15        MR. ANDEREGG:  Thank you, sir.  If it pleases the

16    Court I'd call Walter Johnson.

17        THE COURT:  Mr. Johnson, if you'd come over here to

18    this chair to my right, please?  Before sitting down would you

19    face me and raise your right hand?  Do you swear or affirm the

20    testimony you will give is the truth, the whole truth and

21    nothing but the truth, so help you God?

22        MR. JOHNSON:  I do.

23        THE COURT:  Please have a seat in that chair.  If

24    you would please state your name; spelling both your first and

25    your last name?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

4

1              THE WITNESS:  Walter Johnson, W-a-l-t-e-r J-o-h-n-s-

2     o-n.

3              THE COURT:  All right.  Mr. Johnson, this gentleman

4     who is facing you right here, he is going to ask you a couple

5     of questions. If you'd please speak loud enough so that he can

6     hear you?  If you don't understand something, just let him

7     know.

8        When he's done, this gentleman over here to your right

9     wearing the suit and tie, he may -- sitting down, he may have

10    a few questions as well.  Please give him the same respect.

11    Again, if you don't understand something just let him know.

12       You can -- is it possible if you could put your hands up

13    so you can get captured by the microphone, you appear to be a

14    little soft spoken.  Understand?

15              THE WITNESS:  Yes, sir.

16              THE COURT:  All right.  Go ahead, Mr. Anderegg.

17              MR. ANDEREGG:  Thank you, Judge.

18                        WALTER JOHNSON

19              (At 2:57 p.m., sworn as a witness, testified as

20              follows)

21                        DIRECT EXAMINATION

22    BY MR. ANDEREGG:

23    Q.   Mr. Johnson, I want to ask you some questions about the date

24         of April 24th, 2011, okay?

25    A.   Yes, sir.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

5

1  Q.    All right.  At that time did you know a person by the name of

2        Milo Conklin?

3              MR. REISTERER:  I'm not -- just real quick, just as

4        a procedural matter, I believe that Mr. Walter Johnson is

5        represented by an Attorney Ray Kent out of Grand Rapids.

6        Procedurally is Mr. Kent necessary for his appearance here

7        today or no?

8              THE COURT:  Well, why don't you fill me in on the

9        status of Mr. Johnson, is he pending charges, is he in custody

10       as a sentence or what?

11             MR. ANDEREGG:  No, there's no charges pending

12       against Mr. -- well, there's federal charges pending against

13       Mr. Johnson.

14             THE COURT:  Okay, all right.

15             MR. ANDEREGG:  Mr. Kent represents him on the

16       federal charges.

17             THE COURT:  Okay.

18             MR. ANDEREGG:  He doesn't represent him on anything

19       to do with why he's before the Court today.

20             THE COURT:  Okay.  So as far as you understand the

21       only ongoing case that he has has nothing to do with what's

22       happening here?

23             MR. ANDEREGG:  That's correct, Judge.

24             THE COURT:  Do you have any reason to suspect

25       differently?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

6

1    MR. REISTERER:  I've been in receipt of a plea

2    agreement between the United State of America and Walter Lee

3    Johnson that simply indicates that he has to -- that was

4    signed on September 16th, 2011 with his name and Attorney Ray

5    Kent's name on it.

6        It's kind of a general, broad plea agreement that

7    indicates that the charge will be dismissed, he has to

8    testify, he has to give statements.  I don't know specifically

9    with respect to this incident if that's been discussed or not.

10   His felony -- his charges in Federal Court were for delivering

11   of heroin causing death and a number of other delivery of

12   heroin charges.

13           THE COURT:  Okay.  Did you want your lawyer here

14   before you testify?

15           THE WITNESS:  No, sir.

16           THE COURT:  Do you want to proceed without a lawyer

17   in answering these questions?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  All right.  If you're asked a question

20   at any point where you feel as though you want your lawyer

21   present, you need to let me know.

22           THE WITNESS:  Okay.

23           THE COURT:  And is your lawyer Ray Kent?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  And he's representing you in an ongoing

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

7

1    case?

2             THE WITNESS:  Yes, sir.

3             THE COURT:  Do you have any other counsel at all

4    other than Mr. Kent?

5             THE WITNESS:  No, sir.

6             THE COURT:  And does he know that you're testifying

7    here today?

8             THE WITNESS:  Yes, sir.

9             THE COURT:  When did you last speak to him to let

10    him know?

11             THE WITNESS:  I talked to his secretary last week.

12             THE COURT:  Okay.  And she was led to believe that

13    you were going to be testifying here?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  I'm satisfied he can testify but I've

16    left him the opportunity if he wants to not answer a question

17    or speak to his lawyer depending on where we are at with the

18    testimony, we may go down that path.

19        Thank you for bringing it to my attention, Mr. Reisterer.

20        Go ahead, Mr. Anderegg.

21  BY MR. ANDEREGG:

22  Q.  Mr. Johnson, on April 24th, 2011 did you know a gentleman by

23     the name of Milo Conklin?

24  A.  Yes, sir.

25  Q.  Okay.  How long did you know Mr. Conklin?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    Periodically, just off and on.

2    Q.    Okay.  Could you describe what your relationship was to Mr.

3          Conklin on April 24th, 2011?

4    A.    Just an associate.

5    Q.    Just an associate?

6    A.    Yes.

7    Q.    Someone you'd see around the town?

8    A.    Right.

9    Q.    Okay.  You would socialize once in a while?

10   A.    Yes.

11   Q.    Okay.  Did you know a person by the name of Sam Steel?

12   A.    Yes, sir.

13   Q.    How did you know Mr. Steel?

14   A.    I grew up with him.

15   Q.    All right.  What was your relationship to Mr. Sam Steel on

16         April 24th, 2011?

17   A.    A friend.

18   Q.    A friend?

19   A.    Yeah.

20   Q.    Did you actually see Mr. Steel on April 24th of 2011?

21   A.    Yes.

22   Q.    All right.  Can you remember when you first saw him on that

23         date?

24   A.    No, sir.

25   Q.    Well, let me ask you this; did you know a person on April

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

9

1    24th, 2011 by the name of Harry Matthews?

2  A.   Yes, sir.

3  Q.   How did you know Mr. Matthews?

4  A.   I grew up with him.

5  Q.   Okay.  What was your relationship to Mr. Matthew on April

6       24th of 2011?

7  A.   Associates.

8  Q.   Did you see -- did you become in the company of both Harry

9       Matthew and Sam Steel on the evening of April 24th, 2011?

10 A.   Yes, sir.

11 Q.   Okay.  How did you become -- come to be in their company?

12 A.   Just riding around.

13 Q.   Okay.  Did they come and get you at your residence?

14 A.   At my cousin's house.

15 Q.   Okay, at your cousin's house?

16 A.   Yeah.

17 Q.   All right.  Did both Harry Matthews and Sam Steel come to

18       your cousin's house to get you from your cousin's house and

19       pick you up?

20 A.   Yeah.

21 Q.   All right.  And did they pick you up in a motor vehicle?

22 A.   Yeah.

23 Q.   And do you know whose motor vehicle it was that they picked

24       you up in?

25 A.   Harry's.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    Q.    Harry's?

2    A.    Yeah.

3    Q.    And do you know what kind of motor vehicle it was?

4    A.    A white truck, I don't know; I know it's a white truck.

5    Q.    All right.  And who was driving the truck when they picked

6          you up?

7    A.    Harry.

8    Q.    All right.  Now after Mr. Steel and Harry picked you up from

9          your cousin's residence, where did you go from there?

10   A.    Just rode around.

11   Q.    Okay.  What was your understanding of the purpose of being

12         picked up by Sam Steel and Harry Matthews on April 24th, 2011?

13   A.    Just joy riding.

14   Q.    Just kind of go and have fun?

15   A.    Right.

16   Q.    Socialize with these two?

17   A.    Right.

18   Q.    Do you have an estimate about what time it was when they

19         picked you up?

20   A.    No; I don't know.

21   Q.    Was it sometime in the afternoon?

22   A.    Yeah, it was around there.

23   Q.    All right.  Did you travel to any locations within the City

24         of Kalamazoo once you were picked up?

25   A.    I think we stopped at a store.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    Q.    Okay.  And what was the purpose of stopping at the store?

2    A.    Probably to get something to drink.

3    Q.    Okay.  Like alcohol?

4    A.    Yeah.

5    Q.    All right.  Were you aware of where Sam Steel resided on

6          April 24th, 2011?

7    A.    Yes.

8    Q.    Okay.  What was your understanding of where Mr. Steel lived

9          on that day?

10   A.    Where he lived?

11   Q.    Yeah, where did you think he lived?

12   A.    On Douglas.

13   Q.    On Douglas?

14   A.    Yeah.

15   Q.    Okay.  Where you aware of any locations on -- any other

16         locations in Kalamazoo where Sam Steel resided or stayed or

17         relatives of his stayed?

18   A.    Yeah, on Mabel.

19   Q.    On Mabel Street?

20   A.    Yeah.

21   Q.    Okay.  Who was it that you were aware that lived on Mabel

22         Street?

23   A.    He has relatives, cousins.

24   Q.    Okay, all right.  Had you been to that home before?

25   A.    Yes.

1    Q.    With Mr. Steel?

2    A.    Yes.

3    Q.    Okay.  After you were picked up from your cousin's house and

4          went to get some alcohol, did you go to that location on Mabel

5          Street where Sam Steel had relatives living?

6    A.    Yes.

7    Q.    All right.  And Harry Matthews was with you at that time?

8    A.    Yes.

9    Q.    And you drove in the same vehicle to that location?

10   A.    Yes.

11   Q.    When you got to that location, what did you do on Mabel

12         Street?

13   A.    Just sat around.

14   Q.    Okay, you sat around with Sam Steel?

15   A.    Right.

16   Q.    You sat around with Harry Matthews?

17   A.    Yes.

18   Q.    Can you recall at all who else was at that location?

19   A.    No, it was quite a few people out there.

20   Q.    Okay.  Do you know what the address was?

21   A.    No.

22   Q.    Okay.  There were quite a few people at the residence?

23   A.    Yes.

24   Q.    Were there people in any other locations around that

25         residence at other residences, across the street for instance?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    Yes.

2    Q.    Okay.  Are you familiar with the residence of 626 Mabel

3          Street?

4    A.    I don't know the address but.

5    Q.    Okay.  Let me ask you this, you indicated that you knew Milo

6          Conklin, correct?

7    A.    Yes.

8    Q.    All right.  When you were at this residence on Mabel Street

9          with Harry Matthews and Sam Steel, did you see Milo Conklin?

10   A.    Yes.

11   Q.    Where was Milo Conklin when you saw him?

12   A.    He was across the street.

13   Q.    Across the street at another residence?

14   A.    Yeah.

15   Q.    Okay.  Could this residence have been 626 Mabel?

16   A.    I'm not sure with the address.

17   Q.    Okay.  Were there other people at this residence with Milo

18         Conklin?

19   A.    Yes.

20   Q.    All right.  When you saw Milo Conklin across from the --

21         across the street at this residence, was Sam Steel in your

22         presence?

23   A.    Yes.

24   Q.    Would Sam Steel have had an opportunity to have seen Milo

25         when you saw Milo?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

14

1    A.    Yes.

2    Q.    During the period of time that you were able to see Milo

3          Conklin at the residence and Sam Steel would have had an

4          opportunity to see Milo, did Sam Steel ever say anything about

5          Milo Conklin to you?

6    A.    Not directly.

7    Q.    Okay.  Did he say something indirectly about Milo?

8    A.    Yes.

9    Q.    What -- could you tell the Judge what it was he said?

10   A.    It was -- I can't recall exactly what it was, it was

11         profanity though.

12   Q.    It's okay, whatever -- you don't have to worry about cleaning

13         up your language in court, the Judge is more than accustomed

14         to hearing what is said outside of a courtroom.

15   A.    Right.

16   Q.    But you need to tell the Court exactly what you remember

17         hearing?

18   A.    I just remember he was upset with him.

19   Q.    You remember that Sam Steel was upset with Milo?

20   A.    Yeah.

21   Q.    Did you have any idea why Sam Steel was upset with Milo on

22         that date?

23   A.    I think he believed he broke in his house.

24   Q.    Okay.  Had you had any discussions with Sam Steel about the

25         fact that his house was broken into sometime prior to April

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

15

1    24th, 2011?

2  A.    I can't recall that.

3  Q.    You can't recall if you ever spoke with Sam about that?

4  A.    Oh, yeah, I have before; I don't know what date it was but.

5  Q.    Okay, you don't have to give me the exact day --

6  A.    Yeah

7  Q.    --but before April 24th, 2011, before you saw Milo --

8  A.    Right.

9  Q.    -- Sam had talked to you about the fact that his house was

10       broken into?

11 A.    Yes.

12 Q.    Okay.  And he had spoken with you about the fact that he

13       suspected that Milo might have done this break in?

14 A.    Yes.

15 Q.    Is that a yes?

16 A.    Yes

17 Q.    Okay.  Now you said he said something profane about Milo?

18 A.    Yes.

19 Q.    Did he seem angry with Milo?

20 A.    Yes.

21 Q.    Were you and Sam Steel at the residence still at a time when

22       Milo Conklin left 626 Mabel Street?

23 A.    Yes.

24 Q.    Okay.  Did he leave with other people?

25 A.    Yes.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.   Did you see him come back?

2   A.   Yes.

3   Q.   Okay.  So you actually saw him come back too?

4   A.   Yes.

5   Q.   Now did you stay for a very long time at that residence of

6        Sam Steel's relatives on Mabel Street --

7   A.   No.

8   Q.   -- before you left?

9   A.   No.

10  Q.   Okay.  So you ended up leaving?

11  A.   Yes.

12  Q.   When you left the residence, was Milo still at the residence

13       across the street?

14   A.   Yes.

15  Q.   When you left, who did you leave with?

16  A.   Harry and Sam.

17  Q.   Harry and Sam?

18  A.   Yeah.

19  Q.   And did you leave in the same vehicle?

20  A.   Yes.

21  Q.   Harry's vehicle?

22  A.   Yes.

23  Q.   Where did you go from there, do you remember?

24  A.   I think that's when we went to the store.

25  Q.   Okay, you went to the store again?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

17

1   A.   Yeah -- no, no, no, after that?

2   Q.   Right, when you left Sam's residence -- or his relative's

3        residence.

4   A.   We stopped at my cousin house.

5   Q.   Okay, your cousin's house?

6   A.   Yep.

7   Q.   Was this the same residence, the same cousin whose house you

8        had been at originally, got picked up from that night?

9   A.   Yes.

10  Q.   Okay.  Is this on Williams Street?

11  A.   Yes.

12  Q.   Okay.  Now whose idea was it to go to your cousin's house?

13  A.   I don't think nobody -- oh, it was -- we was close to there

14       so we stopped there.

15  Q.   Okay.  Did Sam say anything about you going to your cousin's

16       house?

17  A.   I can't recall.

18  Q.   You can't recall?

19  A.   No.

20  Q.   Well, why did you go there?

21  A.   I know we -- as a matter of fact we ended up -- he asked me

22       for my gun.

23  Q.   Who asked you for your gun?

24  A.   Sam.

25  Q.   When did he ask you for a gun?

```
1    A.   When we was close to my cousin's house.

2    Q.   Okay.  Were you already in route to your cousin's house when

3         he asked for it or did he ask you to go there and get it?

4    A.   I think we pulled up right outside so he asked me to get it.

5    Q.   Okay but did you understand my question?

6    A.   No.

7    Q.   My question was did you go to -- did he ask you to go to your

8         cousin's house to get the gun before you started going there

9         or were you heading there already and then he asked for it?

10   A.   Yeah, we was heading there already.

11   Q.   Okay.  But you can't remember exactly why you were heading

12        there?

13   A.   No, no.

14   Q.   It's hard to remember exactly?

15   A.   I think it is probably at the end of the joy ride, I think we

16        just ended up stopping there.

17   Q.   Okay.  All right, so when was Sam -- that you recall Sam

18        saying he wanted to get your gun?

19   A.   Right before we pulled up.

20   Q.   Okay.  Do you remember specifically what he said?

21   A.   He just told me to let him see it.

22   Q.   Okay.  And you had a gun?

23   A.   Yes.

24   Q.   What kind of a gun did you have?

25   A.   A .40 caliber.
```

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

19

1    Q.    A .40 caliber?

2    A.    Yeah.

3    Q.    What kind was this, a semi-automatic pistol?

4    A.    Yes, sir, I think so.

5    Q.    Okay.  Kind of a slide on top?

6    A.    Yep, yes.

7    Q.    Okay, slide action handgun?

8    A.    Right.

9    Q.    All right.  So you had possession of a gun of this nature?

10   A.    Right.

11   Q.    Where did you have this gun located at your residence or your

12         cousin's residence, I should say?

13   A.    I used to keep it outside sometimes.

14   Q.    Okay, where was it that you were keeping it on the date of

15         April 24th, 2011?

16   A.    It was outside but then I had it on me.

17   Q.    Okay.  It was outside?

18   A.    Yeah.

19   Q.    All right.  Was it outside in a certain location when Sam

20         asked you to get it?

21   A.    Actually I think I had it on me.

22   Q.    Do you?

23   A.    Yeah.

24   Q.    Okay, all right.  Do you remember specifically?

25   A.    Honestly, I don't, I think I was in possession of it.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1  Q.    Okay.  Do you remember being interviewed with Detective Brian

2        Beauchamp?

3  A.    Aha.

4  Q.    After you came forward with this information?

5  A.    Right.

6  Q.    Okay.  Is it possible you remember telling Detective

7        Beauchamp that you retrieved the gun --

8  A.    Occasionally --

9  Q.    -- from the location where you kept it?

10  A.    I'm not sure.

11  Q.    Okay.

12  A.    I'm not sure.

13  Q.    Can you testify with certainty whether or not you had it on

14        you or it was in the location where you kept it at this point?

15  A.    I can't say with certainty --

16  Q.    Okay.

17  A.    -- either way.

18  Q.    Is this because at times you would carry this handgun on your

19        person?

20  A.    Yes, sometimes I had it.

21  Q.    Okay.  Could you tell the Judge where it was in more

22        specifics where you kept it at your cousin's residence?

23  A.    Sometimes I kept it outside.

24  Q.    Okay, outside?

25  A.    In a bag, yeah.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.   Okay.  All right.  So you got to your cousin's residence --

2   A.   Uhum.

3   Q.   -- Sam had asked to see your gun --

4   A.   Uhum.

5   Q.   -- is that correct?

6   A.   Right.

7   Q.   You either retrieved your gun or you had it in your possession

8        but you don't recall which?

9   A.   Right.

10  Q.   All right.  What did you do once you received this request

11       from Sam to see your gun?

12  A.   I gave it to him.

13  Q.   Okay.  Ad what did Sam do with the gun once you gave it to

14       him?

15  A.   He -- we dropped him off on Elizabeth and Cobb and he got

16       out.

17  Q.   So you handed the gun to Sam?

18  A.   Uhum.

19  Q.   All right.  And where did you go after you handed the gun to

20       Sam?

21  A.   We went around the corner of Woodbury.

22  Q.   Okay.  Now after you gave the gun to Sam, did you have a

23       certain destination in mind that you were going to?

24  A.   Yeah, my dad's driveway.

25  Q.   Okay.  This is before you dropped Sam off?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

22

1   A.   Right.

2   Q.   Okay.  Let me put it this way, after you gave the gun to Sam,

3        did somebody tell Harry where to go, where to drive the car?

4   A.   I can't recall.

5   Q.   Okay.  Harry did take the car somewhere to a different

6        location though is that correct?

7   A.   Right, to my dad's driveway.

8   Q.   To your dad's driveway, and where is that located?

9   A.   On Woodbury.

10  Q.   On Woodbury?  Is that very far from your cousin's house?

11  A.   Two -- two, three streets.

12  Q.   Two or three streets?

13  A.   Yeah.

14  Q.   And once you got to your dad's house on Woodbury, what did

15       Harry do with the car?

16  A.   We just sat there and waited.

17  Q.   Okay.  Now was Sam with you?

18  A.   No, he got out.

19  Q.   All right.  Well, let's talk about when Sam got out, okay?

20  A.   Right.

21  Q.   Do you remember when Sam got out of the car?

22  A.   When he got out?

23  Q.   Yeah, when did he -- when did Sam get out of the car?

24  A.   I told you, he got out before we went on Woodbury.

25  Q.   Okay, all right.  I'm just trying to go through things one

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    step at a time, okay?

2  A.  Uhum.

3  Q.  So the Judge can see chronologically how things happened.  So

4      let's step back just a second, okay, so I can understand this

5      completely?  You're at your cousin's house, correct?

6  A.  Uhum.

7  Q.  Sam asked to see the gun, correct?

8  A.  Right.

9  Q.  You gave him the gun, correct?

10 A.  Right.

11 Q.  All right.  Now you're still at your cousin's house when you

12     gave the gun to Sam?

13 A.  No, we were driving down the street.

14 Q.  Okay.  So you had left your cousin's house?

15 A.  Right.

16 Q.  All right.  And you're driving down the street?

17 A.  Right.

18 Q.  And Sam asked to see your gun?

19 A.  Right.

20 Q.  And you give him the gun?

21 A.  Right.

22 Q.  He takes the gun?

23 A.  Uhum.

24         MR. REISTERER:  Your Honor --

25         MR. ANDEREGG:  I'm sorry --

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

24

1   　　　　MR. REISTERER:  -- I'm going to have to object, this

2   is very similar to cross-examination and leading.  I

3   understand he's trying to get to it quickly but we need to ask

4   questions rather than lead the witness --

5   　　　　THE COURT:  It would be leading other than the fact

6   that he's already asked the questions and the individual has

7   made the statements, he's just trying to put it in some order.

8   But as soon as it becomes leading over an issue that hasn't

9   been asked yet, then you can announce your objection there.

10  So I'll overrule the objection.

11  　　　　MR. ANDEREGG:  Thank you, Judge, for your patience.

12  BY MR. ANDEREGG:

13  Q.   Are you with me, Mr. Johnson?

14  A.   Yes.

15  Q.   Okay.  So Sam has the gun.  Did Sam get out of the car?

16  A.   Yes.

17  Q.   Okay.  Why did the car stop before Sam got out?

18  A.   To let him out.

19  Q.   Okay.  Did Sam ask to be let out?

20  A.   Yes.

21  Q.   Okay.  Could you tell the Judge where it was that Sam asked

22  　　　 to be let out of the car?

23  A.   On Elizabeth and Cobb.

24  Q.   Elizabeth and Cobb?  Okay.  Did Sam say anything about where

25  　　　 he was going?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    Yes.

2    Q.    Where did he say he was going?

3    A.    He was going to get Milo.

4    Q.    He was going to get Milo?

5    A.    Yeah.

6    Q.    Did he tell you and Harry to do anything while he was gone?

7    A.    To go around the corner and wait.

8    Q.    Okay.  At your father's house?

9    A.    Right.

10   Q.    Okay.  Was that very far from the location where you had
11         dropped Sam off?

12   A.    No.

13   Q.    All right.  The location where you had dropped Sam off, was
14         that very far from the location where you had seen Milo
15         Conklin on Mabel Street?

16   A.    No.

17   Q.    Could you tell the Judge approximately how far you thought it
18         was or you think it was?

19   A.    Two streets over.

20   Q.    Two streets over?

21   A.    Right.

22   Q.    Okay.  But pretty close?

23   A.    Yeah.

24   Q.    Now your father's house where you went and sat with Harry --

25   A.    Right.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.    -- in the driveway, was that very far from where you dropped
2         Sam off?
3   A.    Three streets over.
4   Q.    Three streets over?  Okay.  So your father's residence where
5         you and Harry were sitting n the car, was that very far from
6         where Milo Conklin had last been seen on Mabel Street?
7   A.    One street over.
8   Q.    One street over?  So you and Harry are sitting in your dad's
9         driveway in the Yukon or the white car?
10  A.    Yes.
11  Q.    Okay.  Did you hear anything after you got there?
12  A.    Ah, gunshots.
13  Q.    Okay.  How many gunshots did you hear?
14  A.    Five or six.
15  Q.    Could you tell where they were coming from?
16  A.    Yes.
17  Q.    Where did you think they were coming from from what you
18        heard?
19  A.    Next street over.
20  Q.    Okay, what would be the next street over?
21  A.    Mabel.
22  Q.    Mabel?
23  A.    Yeah.
24  Q.    Had you been sitting in your father's house in the driveway -
25        - or sitting in the driveway at your father's house for very

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

27

1      long before you heard those gunshots?

2  A.   No.

3  Q.   No?

4  A.   No.

5  Q.   After you heard the gunshots, what did you and Harry do?

6  A.   We went and picked Sam up.

7  Q.   Okay.  So you drove away from your father's residence?

8  A.   Right.

9  Q.   All right.  Where was it that you picked Sam up?

10  A.   Florence and Woodbury.

11  Q.   Florence and Woodbury?

12  A.   Right.

13  Q.   What did you see when you first saw Sam, what was he doing?

14  A.   Coming through the shortcut.

15  Q.   Coming through a shortcut?

16  A.   Yeah.

17  Q.   Now this shortcut, where did it -- what direction did it come

18      from?

19  A.   From Mabel.

20  Q.   From Mabel Street?

21  A.   Uhum.

22  Q.   Would it have been coming from the direction of Mabel Street

23      where you had seen Milo Conklin located at that residence?

24  A.   Yes.

25  Q.   Okay.  Was Sam walking when you saw him?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1  A.    Yes.

2  Q.    Okay.  When you saw him what did you and Harry do?

3  A.    We picked him up.

4  Q.    Okay.  And he got in the vehicle?

5  A.    Yes.

6  Q.    Where did he get into the vehicle?

7  A.    In the back.

8  Q.    Okay.  When he got into the vehicle, did he still have the

9        gun?

10  A.    Yes.

11  Q.    Did he say anything to you and to Harry when he got back into

12        the vehicle with the gun?

13  A.    Yes, said he didn't -- we didn't -- we didn't think he would

14        do it.

15  Q.    I'm sorry, could you say that again?

16  A.    He just said you all didn't believe that I would do, did you?

17  Q.    You all didn't believe that I would do it, did you?

18  A.    Yes, something like that.

19  Q.    What did you think at that time, what was going through your

20        mind?

21  A.    I don't know, I was just stuck.

22  Q.    You were just what?

23  A.    I don't know.

24  Q.    Well, how were you feeling emotionally?

25  A.    I was surprised, that's all.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    Q.    Okay.  What did you think had just happened?

2    A.    Somebody got shot.

3    Q.    Did you think that Sam Steel was going to go shoot Milo

4          Conklin when you dropped him off?

5    A.    No.

6    Q.    What did you think he was going to do?

7    A.    Probably scare him.

8    Q.    Scare Milo?

9    A.    Yeah.

10   Q.    Did Sam Steel say anything to you and Harry again after that,

11         at that point did he say anything else that you can recall?

12   A.    No, that I can recall.

13   Q.    Okay.  Where did you guys go at that point?

14   A.    We went to his house.

15   Q.    To Sam's house?

16   A.    Yeah.

17   Q.    Whose idea was that?

18   A.    His.

19   Q.    Sam's?

20   A.    Yeah.

21   Q.    Okay.  Once you got to Sam's house, did Harry park the car?

22   A.    Yeah.

23   Q.    All right.  Did Sam get out of the car?

24   A.    Yes.

25   Q.    Did you get out of the car?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    No.

2    Q.    No?

3    A.    No.

4    Q.    Where did Sam go, where did you see Sam go once he got out of

5          the car at his house?

6    A.    He went in his house.

7    Q.    All right.  Now is this his house on Douglas Street?

8    A.    Yes.

9    Q.    Okay.  He went inside the house?

10   A.    Yes.

11   Q.    Do you remember what Sam was wearing at the time when you

12         picked him up?

13   A.    Just black.

14   Q.    Black?

15   A.    Yeah.

16   Q.    Like what was the black thing he was wearing on top on his

17         chest area?

18   A.    Like a hood.

19   Q.    Like a hoodie?

20   A.    Yeah.

21   Q.    Sweatshirt kind of thing?

22   A.    Yeah.

23   Q.    What was he wearing on his legs?

24   A.    Sweatpants.

25   Q.    What color?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

31

1  A.   Black.

2  Q.   Okay.  Did his hoodie sweatshirt have a hood that went up

3       then, as that what you're saying?

4  A.   Yes.

5  Q.   Okay.  So he goes into the residence, his own residence,

6       correct?

7  A.   Yes.

8  Q.   Did he come back out?

9  A.   Yes.

10 Q.   How long do you think he was in is residence before he came

11      back out?

12 A.   Maybe five minutes.

13 Q.   All right.  When he came back out, was he wearing the same

14      stuff that he wore when he went in?

15 A.   No.

16 Q.   Okay.  Do you remember what he was wearing when he came out?

17 A.   No, I don't.

18 Q.   But it wasn't a black hoodie?

19 A.   No.

20 Q.   It wasn't the black sweatpants?

21 A.   No.

22 Q.   Did he have anything in his hands when he came out?

23 A.   A garbage bag.

24 Q.   A garbage bag?

25 A.   Yes.

1    Q.    Could you tell what was in the garbage bag?

2    A.    The clothes that he just took off.

3    Q.    Okay.  When Sam got -- came out of his house with this

4          garbage bag with his clothes, did he get back in the car?

5    A.    Yes.

6    Q.    Did he say anything to you when he got back in?

7    A.    Yes, that we was going to my house to burn up his stuff.

8    Q.    Okay, that you were going to go to your house and burn up the

9          clothes?

10   A.    Right.

11   Q.    So did you then go back to your house?

12   A.    Yes.

13   Q.    Is this the house on Williams Street?

14   A.    No, Stockbridge.

15   Q.    Stockbridge?

16   A.    Right.

17   Q.    So this is where you actually live, not your cousin's house,

18         correct?

19   A.    Right.

20   Q.    So you and Harry and Mr. Steel go back to your home on

21         Stockbridge, correct?

22   A.    Right.

23   Q.    When you got to your home on Stockbridge, what did you do?

24   A.    We all burned the clothes up.

25   Q.    Okay.  So you got out of the car?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

33

1    A.    Yes.

2    Q.    Sam got out of the car?

3    A.    Yes.

4    Q.    Did Harry get out of the car?

5    A.    Yes.

6    Q.    And where did you go?

7    A.    In the garage.

8    Q.    In your garage?

9    A.    Right.

10   Q.    All right.  And you burn the clothes up?

11   A.    Yes, sir.

12   Q.    Where did you burn them up in your garage?

13   A.    Just on the ground.

14   Q.    Okay.  What's the ground, what kind of ground do you have in

15         your garage?

16   A.    Just a dirt garage.

17   Q.    Just a dirt?

18   A.    Yeah.

19   Q.    No concrete?

20   A.    No.

21   Q.    Okay.  So how did the clothes get burned up?

22   A.    We burned them up.

23   Q.    Yeah, with what?

24   A.    Lighter fluid.

25   Q.    Lighter fluid?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

```
 1   A.   Yeah.

 2   Q.   Who did it?

 3   A.   I think I did.

 4   Q.   Okay.

 5   A.   Yeah.

 6   Q.   Sam asked you to?

 7   A.   Yeah.

 8   Q.   Is that a yes?

 9   A.   Yes.

10   Q.   After the clothes were burned, did it take very long to burn

11        them up?

12   A.   No.

13   Q.   Cause a lot of smoke?

14   A.   Yes.

15   Q.   It was dark outside at this time, right?

16   A.   Yes.

17   Q.   It was dark outside at the time that the gunshot went off?

18   A.   Yes.

19   Q.   Was that around nine o'clock when the gunshots went off?

20   A.   I'm not sure.

21   Q.   Okay.  After you burned the clothes up, what did you do?

22   A.   Nothing, stayed home.

23   Q.   Okay.  What did Sam do?

24   A.   They left.

25   Q.   Sam and Harry left?
```

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   A.   Yeah.

2   Q.   All right.  Did you see Sam again that night?

3   A.   No.

4   Q.   Did you see Sam again the next day?

5   A.   Yes.

6   Q.   All right.  Where was it that you saw Sam the next day?

7   A.   I can't recall but --

8   Q.   You can't remember where you saw him at?

9   A.   No, but I know I seen him, I don't know where, I don't

10       remember where.

11  Q.   Let me ask you this, did Sam before you went into the house

12       after burning the clothes and Sam and Harry left --

13  A.   Uhum.

14  Q.   -- did Sam say anything else to you that you can recall about

15       the shooting of Milo Conklin?

16  A.   No, not that I can recall.

17  Q.   All right.  But you saw Sam the next day, correct?

18  A.   Yes.

19  Q.   Did you talk to him?

20  A.   Yes.

21  Q.   Okay.  Did he say anything to you about what had happened to

22       the gun?

23  A.   That he broke it up and threw it by Jackson or somewhere,

24       sprinkled it around somewhere.

25  Q.   Okay.  Right, I think I missed that point that I wanted to

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    ask you about the gun.  So when you saw him the next day he

2    said he broke the gun up and sprinkled it or threw it?

3  A.  Yeah.

4  Q.  Between where?

5  A.  Here and Jackson.

6  Q.  Okay, that's what you think?

7  A.  Yeah.

8  Q.  All right.  Let me just back up a second and cover this, you

9    heard the gunshots, correct?

10 A.  Yes.

11 Q.  You picked Sam up, correct?

12 A.  Yes.

13 Q.  When Sam got back into the car with you and Harry after you

14   heard the gunshots, did he still have the gun with him?

15 A.  Yes.

16 Q.  Okay.  And then you said you drove to your house to burn up

17   the clothes -- or to Sam's house, right?

18 A.  He threw the gun out the window at the next block.

19 Q.  That's what I want to talk about.  So before -- when you were

20   in route to Sam's house --

21  A.   Right.

22 Q.  -- Sam threw the gun out the window?

23 A.  Yeah.

24 Q.  Okay, all right.  And you went back to his house, he changed

25   and then you went and burned the clothes?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    Right.

2    Q.    All right.  Now did Sam say anything about recovering that

3          gun from the location he had thrown it originally?

4    A.    He just said that he threw it between Jackson somewhere or

5          something.

6    Q.    Okay.  Well, when he originally threw it out the window, it

7          wasn't between Jackson somewhere, was it?

8    A.    No.

9    Q.    Okay.  So what was your understanding, that he went back and

10         got the gun?

11   A.    Yes.

12   Q.    And then dismantled it?

13   A.    Yes.

14   Q.    Broke it up into pieces?

15   A.    Yes.

16   Q.    And then threw it in certain locations?

17   A.    Right.

18   Q.    From here to Jackson?

19   A.    Right.

20   Q.    Okay.  Did you have any further conversations with Sam about

21         that?

22   A.    No.

23   Q.    Would you recognize Sam if you saw him again?

24   A.    Yes.

25   Q.    Could you just describe where he is in the courtroom with

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

38

| | | |
|---|---|---|
| 1 | | some specificity point him out for the Judge just for the |
| 2 | | record and for the Judge. |
| 3 | A. | He's sitting right there. |
| 4 | Q. | All right.  There's a lot of people sitting right here where |
| 5 | | you point your head, I want you to describe exactly what he's |
| 6 | | wearing and where he's sitting, just for the record and for |
| 7 | | this Judge right here so he can make sure he knows who you are |
| 8 | | talking about? |
| 9 | A. | He has on the green county clothes. |
| 10 | Q. | Green county clothes? |
| 11 | A. | Yeah. |
| 12 | | MR. ANDEREGG:  If the record could reflect the |
| 13 | | identification, Judge. |
| 14 | | THE COURT:  It will. |
| 15 | | MR. ANDEREGG:  Thank you, Judge, I have no further |
| 16 | | questions at this time. |
| 17 | | THE COURT:  All right, thank you. |
| 18 | | Mr. Reisterer, Do you have any questions of Mr. Johnson? |
| 19 | | MR. REISTERER:  Yes. |
| 20 | | I understand this is a preliminary investigation -- |
| 21 | | preliminary hearing, rather, how much leeway will the Court |
| 22 | | give me to get into the plea agreement and sentence that Mr. |
| 23 | | Johnson is currently serving, facing and the perimeters that - |
| 24 | | - |
| 25 | | THE COURT:  Why don't you just begin asking; if Mr. |

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1      Anderegg has a problem he can object to it.  If the witness

2      has a problem based on something regarding his lawyer then he

3      can announce it and I'll rule on it then so where you want to

4      go.

5                  MR. REISTERER:  Thank you.

6                        CROSS-EXAMINATION

7   BY MR. REISTERER:

8   Q.   Mr. Johnson, you were indicted in the Federal Court for the

9        State of Michigan, were you not?

10  A.   Yes.

11  Q.   And what were the charges that were contained in your

12       indictment, if you know?

13  A.   Delivery resulting in death.

14  Q.   And what else?

15  A.   Possession with intent.

16  Q.   And what else?

17  A.   Possession with intent.

18  Q.   Is it fair to say that you were indicted in a four count

19       indictment indicating in count one that on or about August

20       18th 2010 you distributed a quantity of heroin causing the

21       death of Jesse Payne, is that true?

22  A.   Yes.

23  Q.   And that same indictment on or about August 18th, 2010, you

24       intentionally and unlawfully distributed a quantity of a

25       mixture containing heroin to Jesse L. Payne who died as a

1    result of that heroin?  And count three, February 22, 2011,

2    you had a possession with intent to distribute heroin and a

3    count four of March 10, 2011, you had a possession with intent

4    to distribute heroin, is that all true?

5  A.   Yeah.

6  Q.   So at the time of the incident that you are currently

7    describing, that being in April of 2011, you had four counts,

8    four felony counts pending under indictment in the United

9    State of America in Michigan, is that true?

10  A.   Yeah.

11  Q.   Do you know whether or not there was a warrant for your

12    arrest issued prior to this April 11th case?

13  A.   No, I don't know.

14  Q.   So you were indicted and you were taken into custody in June

15    of 2011, is that true?

16  A.   Yes.

17  Q.   And you then entered into a plea agreement with the United

18    States of America that you signed in September of 2011 wherein

19    you would proffer and give up information regarding

20    essentially anything that you knew with respect to the drug

21    trade and anything else that happened in Kalamazoo County, is

22    that right?

23  A.   Yes.

24  Q.   And then you finally you met with Inspector -- or Detective

25    Beauchamp finally in November of 2011, is that right?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1  A.   Yes.

2  Q.   Was November of 2011 the very first time you told anybody

3       that you had information regarding this homicide of Milo?

4  A.   Yes.

5  Q.   Had you ever been interviewed by anybody prior to that?

6  A.   No.

7  Q.   So until you were in custody for your federal case where you

8       were offered a plea agreement you had never told anybody that

9       you had any information, is that true?

10 A.   True.

11 Q.   Let's go back to April.  You indicated that you hooked up

12      with Sam Steel that day, right?

13 A.   Yes.

14 Q.   What time of the day did you get together the first time?

15 A.   I have no idea.

16 Q.   Was it morning, was it afternoon, was it night?

17 A.   It could have been afternoon.

18 Q.   You don't recall?

19 A.   No.

20 Q.   When you first got together with Mr. Steel that day were you

21      -- was he with Harry Matthews?

22 A.   Yes.

23 Q.   So it was the three of you that got together at some unknown

24      time on that day, is that right?

25 A.   Yes.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    Q.    And what were you guys doing?

2    A.    Nothing in particular, just hanging out.

3    Q.    Hanging out, were you drinking?

4    A.    No, I don't drink.

5    Q.    Were you using drugs?

6    A.    No.

7    Q.    So what were you doing when you were hanging out?

8    A.    Riding around.

9    Q.    What were you doing when you were riding around?

10   A.    Nothing.

11   Q.    Just riding around doing nothing?

12   A.    Exactly.

13   Q.    So as you were riding around doing nothing, why did you guys

14         just start -- make a decision to start doing something?

15   A.    I don't know.

16   Q.    Well, did anyone else join you as you were riding around

17         doing nothing?

18   A.    Nope.

19   Q.    You started out at your cousin's house, is that right?

20   A.    Yep.

21   Q.    And then you moved on to where?

22   A.    Riding around.

23   Q.    Were you looking for somebody?

24   A.    No.

25   Q.    Were you looking for something to do?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

43

1    A.    No.

2    Q.    How long did this riding around last, was it hours, was it

3          minutes?

4    A.    Probably about a half hour, an hour, I don't know.

5    Q.    Well, if you met with him and you said in the afternoon --

6    A.    Right.

7    Q.    -- what did you do from the afternoon until nine o'clock?

8    A.    I don't know, probably rode around, I don't know.

9    Q.    So your mind is a blank?

10   A.    I mean as to what time -- whatever time you talking about,

11         yeah.

12   Q.    Well, you've been pretty specific when the prosecutor was

13         asking you questions about what happened that night --

14   A.    Uhum.

15   Q.    -- I'm trying to figure out what you did leading up to your

16         beginning of your memory?

17   A.    Rode around.

18   Q.    Okay.  Did you see anybody when you were riding around?

19   A.    Yeah.

20   Q.    Who did you see?

21   A.    Just people period.

22   Q.    People period?

23   A.    Yeah.

24   Q.    Who are these people period?

25   A.    I don't know.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

44

1    Q.    Did you talk to these people period?

2    A.    No.

3    Q.    At some point you said you were sitting on the porch and you

4          saw Milo, is that right?

5    A.    Oh, yeah.

6    Q.    Okay, you remember that part?

7    A.    Yeah.

8    Q.    And that was at Maple Street?

9    A.    That's not riding around.

10   Q.    Okay, well, you said you were just riding around?

11   A.    Oh, okay.

12   Q.    When did you get to Maple Street -- is it Maple of Mabel?

13   A.    Mabel.  I don't know, I didn't have a watch on, I don't know

14         what time I got there.

15   Q.    Well, was it light out or was it dark out?

16   A.    It was light still.

17   Q.    Okay.  This was in March or April?

18   A.    I don't know.

19   Q.    You don't know if it was March or April?

20   A.    No.

21   Q.    How about was it Easter?

22   A.    You tell me.

23   Q.    You're the witness?  Was it Easter, does that day ring a bell

24         to you?

25   A.    No.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

45

1    Q.    So you don't know if it was Easter but you know it was -- the

2          prosecutor said it was April, does that sound right, was it

3          April or was it March?

4    A.    I don't know; it was around that time.

5    Q.    It was around that time?

6    A.    Yep.

7    Q.    So if I told you it was March 5th, would I be wrong?

8    A.    Today, yeah.

9    Q.    Do you know what day it was?  Do you have any recollection

10         other than what the prosecutor has told you today?

11   A.    No, to exactly what day it was, no.

12   Q.    Okay, so you were riding around, at some point you got to

13         Mabel Street, is that right?

14   A.    Yep.

15   Q.    And you said there were quite a few people around on Mabel

16         Street, is that right?

17   A.    Yep.

18   Q.    Do you recall who those few people -- who quite those few

19         people were?

20   A.    No.

21   Q.    Do you have any names for me whatsoever?

22   A.    There's people out there every day; I was out there.

23   Q.    You were out there on Mabel Street or you were out there on

24         Mabel Street riding around, what were you doing on Mabel

25         Street?

1  A.    Both.

2  Q.    What was the address on Mabel Street, do you know?

3  A.    No.

4  Q.    Whose house was it on Mabel Street?

5  A.    Sam's house.

6  Q.    Is Sam's house across the street from Milo's house?

7  A.    I didn't know Milo had a house on Mabel.

8  Q.    I mean I thought you indicated that you saw Milo across the

9        street while you guys were hanging out on Mabel Street, is

10       that true or is that not true?

11 A.    That's true.

12 Q.    Okay.  When you saw Milo across the street, is that Milo

13       Conklin?

14 A.    Right.

15 Q.    Is Milo Conklin the person who is dead?

16 A.    Yes.

17 Q.    Was that Milo Conklin's house where you saw him across the

18       street or was he just across the street?

19 A.    I think he was just across the street.

20 Q.    So you don't think that was his house?

21 A.    No.

22 Q.    You said you could see him clearly, is that right?

23 A.    Yes.

24 Q.    Was he with other people?

25 A.    Yes.

1    Q.   Who was he with?

2    A.   I don't know them.

3    Q.   You don't know them or you don't know who they were or you

4         don't want to say?

5    A.   I don't know who they were.

6    Q.   Would you recognize them if you saw them again?

7    A.   No.

8    Q.   When you saw Milo across the street, what were you doing with

9         Sam and Harry?

10   A.   Just probably sitting down.

11   Q.   Do you recall what you were doing?

12   A.   No.

13   Q.   Do you recall if you were inside or outside?

14   A.   I was outside.

15   Q.   Were you in the front yard, were you on a porch, what were

16        you doing?

17   A.   In the front yard.

18   Q.   Okay.  Just standing around?

19   A.   Yep.

20   Q.   Just the three of you or were there others?

21   A.   There were other people.

22   Q.   Who were the other people?

23   A.   I don't know them.

24   Q.   There were other people with you and Sam and Harry or were

25        there other people with Milo?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

48

1  A.   Both.

2  Q.   So you were hanging out with other people but you don't know

3       who they are?

4  A.   Correct.

5  Q.   Were they younger or were they older than you?

6  A.   I assume younger.

7  Q.   Were they related to you or related to Mr. Steel or related

8       to Mr. Matthews?

9  A.   I don't know.

10 Q.   Do you know how many people there were approximate?

11 A.   No, I don't know.

12 Q.   At some point when you were hanging out with these unknown

13      people, you saw Milo leave with other unknown people, is that

14      right?

15 A.   Correct.

16 Q.   How did Milo leave with these other unknown people, was he

17      walking or was he driving?

18 A.   He was driving.

19 Q.   Do you know if he was the driver or if he was the passenger?

20 A.   He was the driver.

21 Q.   Do you know what kind of car it was?

22 A.   It was a white car, I don't know.

23 Q.   When you saw him leave, did you and your group of unknown

24      people do anything special that you remember?

25 A.   I remember we left.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

49

1    Q.    Did you follow him?

2    A.    No.

3    Q.    When you left, where did you go?

4    A.    Rode around.

5    Q.    So you just rode around again?

6    A.    No, this is the first time.

7    Q.    When you say the first time, please explain what you mean?

8    A.    Well, we came from my cousin's house to Mabel Street then we

9          got in the car and we left.

10   Q.    Okay, who is your cousin?

11   A.    Serena.

12   Q.    What is Serena's last name?

13   A.    Anderson.

14   Q.    Is she a real cousin or someone you just call cousin on the

15         street?

16   A.    She's my cousin.

17   Q.    Who is Kevin Board?

18   A.    My sister's boyfriend.

19   Q.    Did you ever recall seeing him that night?

20   A.    No.

21   Q.    Who is Kevin Johnson?

22   A.    I don't know.

23   Q.    So after you saw Milo leave with his -- do you know if he

24         left with more than one person, two people, three people, four

25         people?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

50

1    A.    I can't recall.

2    Q.    And you recall you left with Sam and Harry, is that right?

3    A.    Correct.

4    Q.    Did you go to the store at that point?

5    A.    Yes.

6    Q.    Was that Daysha's maybe?

7    A.    Yes.

8    Q.    What did you do at Daysha's?

9    A.    I think they got something to drink.

10   Q.    Do you have any idea what they got to drink?

11   A.    No.

12   Q.    Did you go in the store?

13   A.    No.

14   Q.    So after you left Daysha's, where did you go?

15   A.    We went -- ended up at my cousin's house.

16   Q.    Which -- is that also Serena Anderson?

17   A.    Yes.

18   Q.    You said you already had the gun with you?

19   A.    I think I did.

20   Q.    So what were you going to Anderson's for?

21   A.    Just to chill, I guess.

22   Q.    Okay.  So did you go and chill at Serena Anderson's house?

23   A.    No.

24   Q.    So you went there to chill and you didn't chill, what did you

25         do?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

51

1  A.    Sam asked to see my gun.

2  Q.    You said you already had it with you?

3  A.    I think I did.

4  Q.    So what was the point of going to Anderson's house?

5  A.    Just like I said, we went there to chill.

6  Q.    So did you chill there?

7  A.    No.

8  Q.    What does it mean to chill?

9  A.    Just sit and do nothing.

10 Q.    Okay.  Sounds like the story of the day, sit and do nothing

11        in a car, sit and do nothing at Mabel Street, sit and do

12        nothing at Anderson's house, is that right?

13 A.    Right.

14 Q.    Did you sit and do nothing anywhere else?

15 A.    Probably at home.

16 Q.    So you left Anderson's house at some point, is that right?

17 A.    Yep.

18 Q.    Did anything provoke you to leave Anderson's house?

19 A.    What do you mean?

20 Q.    Did somebody get a phone call, did you see somebody, did

21        anything trigger you guys leaving Anderson's house?

22 A.    He asked to see my gun so we -- I let him see it.  We didn't

23        go that, we u-turned, detoured.

24 Q.    So did you ever get to Anderson's house?

25 A.    We pulled in the front and then left again.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.   So you never got out of the car?

2   A.   No.

3   Q.   Do you always carry a gun?

4   A.   No.

5   Q.   Why did you carry a gun that night?

6   A.   I don't know.

7   Q.   It's not legal for you to carry a gun?

8   A.   Yeah, I know that.

9   Q.   You left Anderson's house and at some point Steel got out of

10       your car, is that -- got out of Harry's car, is that right?

11  A.   Yes.

12  Q.   Did he leave your sight?

13  A.   Yes.

14  Q.   Next thing -- then you heard what you identified as gunshots?

15  A.   Yes.

16  Q.   So at this point he was out of your sight, you did not see

17       what was going on?

18  A.   No.

19  Q.   It was just you and Matthews by yourselves?

20  A.   Right.

21  Q.   Anybody else?

22  A.   No.

23  Q.   You were sitting in someone's driveway, whose driveway were

24       you sitting at?

25  A.   My dad's.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

53

1  Q.   And what's your dad's address?

2  A.   I don't know.

3  Q.   What street does he live on?

4  A.   Woodbury.

5  Q.   What was across the street on Woodbury where your dad lives?

6  A.   What's across the street?

7  Q.   What's across the street?

8  A.   Florence.

9  Q.   Was your dad home, did you talk with him?

10 A.   No.

11 Q.   So you dropped off a man and you just sat and waited, is that

12      what your testimony is today?

13 A.   Yes.

14 Q.   And then you saw Mr. Steel come back and he got in the car?

15 A.   Right.

16 Q.   Okay. Your testimony is that you then went to your house, or

17      you went to Sam's house, is that right?

18 A.   Correct.

19 Q.   And then he came out of the house with a bag?

20 A.   Right.

21 Q.   What kind of bag was it?

22 A.   A garbage bag.

23 Q.   Plastic, paper?

24 A.   Plastic.

25 Q.   Clear, opaque, black, white?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

54

1    A.    Black.

2    Q.    So you couldn't see what was in it?

3    A.    No.

4    Q.    And then you went back to your house, is that right?

5    A.    Yeah.

6    Q.    And what was -- in your house there is a dirt floor garage,

7          is that right?

8    A.    Correct.

9    Q.    Who else was home at your house?

10   A.    My family.

11   Q.    Your family was home at your house?

12   A.    Yeah.

13   Q.    Who are the members of your family that were home that night?

14   A.    My girlfriend and my kids.

15   Q.    What's your girlfriend's name?

16   A.    Shayna.

17   Q.    Shayna?

18   A.    Yeah.

19   Q.    What's Shayna's last name?

20   A.    Morgan.

21   Q.    Morgan?

22   A.    Yeah.

23   Q.    How many kids do you have at home with her?

24   A.    Five.

25   Q.    How old are they?  Hold old are the oldest ones?

1   A.   Maybe nine.

2   Q.   And it's your testimony then that at that point you would've

3        burned that bag in your garage, is that right?

4   A.   Correct.

5   Q.   And you did that, you poured lighter fluid on this bag and

6        you lit it?

7   A.   Yeah, I think I did.

8   Q.   And you watched it burn down to the ground?

9   A.   Yes.

10  Q.   Until there was nothing left, is that right?

11  A.   Yes.

12  Q.   And then Steel and Matthews left, is that what your --

13  A.   Yes.

14  Q.   So you remember that part, that's what's going on?

15  A.   Yes.

16  Q.   Did you ever tell your girlfriend what happened?

17  A.   No.

18  Q.   Did you ever tell any of your family what happened?

19  A.   No.

20  Q.   You didn't tell anybody anything until you first met with

21       Beauchamp in November after you cut this deal with the United

22       States of America, is that right?

23  A.   Yes.

24  Q.   What have you been promised?

25  A.   Nothing.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    Q.   Well, you had three charges dismissed, is that right?

2    A.   Yes.

3    Q.   And you were facing 20 years to life and you received the

4         minimum, 20 years, is that right?

5    A.   Yes.

6    Q.   And you're expecting -- you know what a 5K is?

7    A.   Yes.

8    Q.   What is a 5K?

9    A.   That's -- it's time off.

10   Q.   So it's a reduction below the minimum mandatory, is that

11        right?

12   A.   Right.

13   Q.   And you're expecting your time to follow one of those when

14        you finish testifying here, is that right?

15   A.   No.

16   Q.   You don't expect that?

17   A.   No.

18   Q.   That's what it says in your plea agreement?

19   A.   That's got nothing to do with this.

20   Q.   Have you seen your plea agreement?

21   A.   What do you mean, before I got sentenced, yeah.

22   Q.   Okay.  And you realize that part of your plea agreement after

23        you testify you're eligible for a 5K reduction, is that right?

24   A.   No.

25   Q.   You're not eligible?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

57

1    A.   No.

2    Q.   Okay.  Have you been charged with anything in this case?

3    A.   No.

4    Q.   You haven't been charged with felon in possession of firearm?

5    A.   No.

6    Q.   You haven't been charged with accessory after the fact for

7         helping someone drive away and burn clothes?

8    A.   No.

9    Q.   You have any beef with  Milo?

10   A.   No.

11   Q.   Did you?

12   A.   No.

13   Q.   Isn't it true that he robbed you at some point?

14   A.   No.

15   Q.   He stole your money and your drugs?

16   A.   No.

17   Q.   Did you have a beef with J.R. Mahoney?

18   A.   No.

19   Q.   Do you share your gun with a lot of people?

20   A.   People have used it.

21   Q.   For what?

22   A.   I don't know; I didn't inquire.

23   Q.   So you have a gun that you share with others to commit

24        crimes, is that what you're saying?

25   A.   No, that's not what I'm saying.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1  Q.  What are you saying?

2  A.  I didn't say nothing about committing no crimes.

3  Q.  Well, you let other people use your gun, is that what you're

4      saying?

5  A.  People have, yeah.

6  Q.  What have they used it for, do you know?

7  A.  No, I didn't inquire.

8           MR. REISTERER:  One moment, please.

9        I have no more questions for this witness.

10          THE COURT:  All right.  May he be excused?

11          MR. ANDEREGG:  Yes, Judge.

12          THE COURT:  Or did you have any further questions?

13          MR. ANDEREGG:  I do not, Judge.

14          THE COURT:  Okay.  Deputies, you may take Mr.

15     Johnson.

16          (At 3:49 p.m., witness excused)

17          THE COURT:  Do you have another witness?

18          MR. ANDEREGG:  I do, Judge.  If it please the Court,

19     Judge, I'd call Harry Matthews.

20          THE COURT:  All right.

21          MR. ANDEREGG:  I apologize for the inconvenience,

22     Judge, I'm waiting for the witness to be brought down.

23          THE COURT:  Okay.

24        Come over here and have a seat in this chair to my right?

25     Please raise your right hand before sitting down?  Do you

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    swear or affirm that the testimony you will give is the truth,

2    the whole truth and nothing but the truth, so help you God?

3         MR. MATTHEWS: Yes.

4         THE COURT:  Please have a seat in that chair.  If

5    you would please state your name; spelling both your first and

6    you last name?

7         THE WITNESS:  Harry Matthews, H-a-r-r-y M-a-t-t-h-e-

8    w-s.

9         THE COURT:  All right.  Mr. Matthews, this gentleman

10   here in front of you with the gold tie, he's going to ask you

11   a couple of questions, probably more than a couple, but please

12   do your best to speak loud enough so that he can hear you.  If

13   you don't understand something just let him know, all right?

14        THE WITNESS:  Yep.

15        THE COURT:  This gentleman here to your right

16   wearing the pink tie, blue suit, he's going to ask you a

17   couple of questions I suspect as well.

18        THE WITNESS:  Okay.

19        THE COURT:  Please give him the same respect.  And

20   again, if you don't understand something let him know.

21        THE WITNESS:  Okay.

22        THE COURT:  Go ahead.

23                    HARRY MATTHEWS

24        (At 3:52 p.m., sworn as a witness, testified as

25        follows)

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

60

1                       DIRECT EXAMINATION

2    BY MR. ANDEREGG:

3    Q.    Mr. Matthews, I want to talk to you about the date of April

4          24th, 2011, okay?

5    A.    Yes.

6    Q.    Okay.  You have to answer me out loud --

7    A.    Okay.

8    Q.    -- no nodding of the head --

9    A.    Yes.

10   Q.    -- shaking of the head; I need you to answer audibly.  On

11         that date did you know a person by the name of Milo Conklin?

12   A.    I didn't know him; I don't know him.

13   Q.    Okay.  Had you heard of him?

14   A.    Yeah.

15   Q.    All right.  Were you aware that he was shot to death on April

16         24th, 2011?

17   A.    Yes.

18   Q.    You became aware of that?

19   A.    Yes.

20   Q.    All right.  You were actually charged in connection with that

21         case, isn't that correct?

22   A.    Yes.

23   Q.    As a matter of fact there's a pending charge against you, a

24         number of pending charges against you in connection to the

25         death of Milo Conklin, is that correct?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

61

1    A.    Yes.

2    Q.    You were charged with accessory after the fact?

3    A.    Yes.

4    Q.    Felony firearm?

5    A.    Yes.

6    Q.    Possession of a firearm by a felon?

7    A.    Yes.

8    Q.    And another count of felony firearm?

9    A.    Yes.

10   Q.    And carrying a concealed weapon?

11   A.    Yes.

12   Q.    Is that correct?

13   A.    Yes.

14   Q.    All right.  And this case is now pending in Circuit Court

15         before Judge Lightvoet, is that correct?

16   A.    Yes.

17   Q.    And you're represented by Attorney Alan Harbaugh, is that

18         true?

19   A.    Yes.

20   Q.    Now you were -- you've had consultations with Mr. Harbaugh

21         about cooperating in this case with the People of the State of

22         Michigan for the prosecution of the killer of Milo Conklin, is

23         that correct?

24   A.    Yes.

25   Q.    All right.  And you have entered into a plea agreement with

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

| | |
|---|---|
| 1 | the People of the State of Michigan to provide truthful |
| 2 | testimony in reference to the killing of Milo Conklin, haven't |
| 3 | you? |
| 4 | A. Yes. |
| 5 | Q. All right.  And your plea agreement with the People is that |
| 6 | you will plead guilty to accessory after the fact to murder |
| 7 | and the other counts will be dismissed and the People would |
| 8 | keep their right to make a recommendation at your sentencing |
| 9 | provided that you provide truthful testimony and assistance in |
| 10 | the trial and the investigation concerning the murder of Milo |
| 11 | Conklin, is that correct? |
| 12 | A. Yes. |
| 13 | Q. And that's why you are here today? |
| 14 | A. Yes. |
| 15 | Q. To provide truthful testimony? |
| 16 | A. Yes. |
| 17 | Q. I want to talk to you about April 24th, 2011, okay?  On that |
| 18 | date did you know a person by the name of Sam Steel? |
| 19 | A. Yes. |
| 20 | Q. What was your relationship to Sam Steel on April 24th of |
| 21 | 2011? |
| 22 | A. I've been knowing him for years. |
| 23 | Q. Okay.  How would you describe your relationship as of that |
| 24 | date? |
| 25 | A. Friends. |

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.   Friends?

2   A.   Yeah.

3   Q.   Did you know a person by the name of Walter Johnson?

4   A.   Yes.

5   Q.   What was your relationship with Walter Johnson on that date?

6   A.   I've been knowing him for years.

7   Q.   Okay.  How would you describe your relationship?

8   A.   Just acquaintance.

9   Q.   Okay.  Not as close as you were with Sam?

10  A.   No, no.

11  Q.   More of an acquaintance?

12  A.   Yeah.

13  Q.   Somebody you'd see around town?

14  A.   Yeah.

15  Q.   Socialize with sometimes?

16  A.   Yes.

17  Q.   Okay.  Were you aware of whether or not Sam Steel and Walter
18       Johnson had a relationship?

19  A.   Yes.

20  Q.   What was the relationship between those two as you understood
21       it?

22  A.   They were friends.

23  Q.   Okay, those two were friends?

24  A.   Yeah.

25  Q.   Did you come into contact with Sam Steel on April 24th, 2011?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    Yes.

2    Q.    Do you remember how it was you came into contact with him on

3          that day?

4    A.    Telephone; he called me.

5    Q.    Okay.  He called you?

6    A.    Yes.

7    Q.    All right.  And where were you when he called you?

8    A.    I was at home.

9    Q.    Okay.  And what did he want when he called you?

10   A.    Just wanted a ride.

11   Q.    Okay.  Did you -- did he tell you where he was at?

12   A.    Yes.

13   Q.    Okay.  Did you agree to give him a ride?

14   A.    Yes.

15   Q.    Did you go to his location?

16   A.    Yes.

17   Q.    Did you have a motor vehicle at that time?

18   A.    Yes.

19   Q.    Could you tell the Judge what your motor vehicle was?

20   A.    I have a white truck.

21   Q.    A white truck?

22   A.    Yeah.

23   Q.    Okay.  Was it like a pickup truck?

24   A.    No, it's a SUV.

25   Q.    An SUV?

1    A.    Yes.

2    Q.    Okay.  Where did you go to pick up Mr. Steel?

3    A.    On Mabel.

4    Q.    Mabel Street?

5    A.    Yes.

6    Q.    All right.  Do you know what the address was?

7    A.    No.

8    Q.    Okay.  Have you gone to this address on Mabel Street in the

9          past to see Sam Steel?

10   A.    Yes.

11   Q.    Okay.  Was this a home?

12   A.    Yes.

13   Q.    Do you know who resided at this home on Mabel Street?

14   A.    His mother.

15   Q.    His mother?

16   A.    Yes.

17   Q.    When you arrived at this location, was Mr. Steel there?

18   A.    Yes.

19   Q.    All right.  And did you pick him up?

20   A.    Yes.

21   Q.    Okay.  Did he ask to be taken someplace?

22   A.    Yes.

23   Q.    Where did he ask to be taken?

24   A.    Over to Walter's house.

25   Q.    Over to Walter Johnson's house?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   A.   Yes.

2   Q.   And where was this location, Walter Johnson's house, if you

3        recall?

4   A.   Stockbridge.

5   Q.   On Stockbridge?

6   A.   Yes.

7   Q.   All right.  When you got to Walter Johnson's house what

8        happened?

9   A.   Nothing.

10  Q.   Was Walter there?

11  A.   Yeah.

12  Q.   All right.  Did Walter get into the car with the two of you?

13  A.   Yes.

14  Q.   Okay.  Did you stay at Walter's very long?

15  A.   No.

16  Q.   All right.  He just came and got in the car?

17  A.   Yes.

18  Q.   Where did you go from there, do you remember?

19  A.   Went to Daysha's.

20  Q.   Okay.  What did you go to Daysha's for?

21  A.   Just to get some beer.

22  Q.   Okay.  Now at this point of your contact with Walter and Sam,

23       what was your understanding of what the three of you were

24       going to do?

25  A.   Just go back down on Mabel and just sit and have a few

```
 1        drinks.
 2   Q.   Okay, just kind of chill?
 3   A.   Yeah.
 4   Q.   Take it easy?
 5   A.   Yes.
 6   Q.   All right.  Did you end up going back to Mabel Street --
 7   A.   Yes.
 8   Q.   -- with Walter --
 9   A.   Yes.
10   Q.   -- and Sam Steel?
11   A.   Yes.
12   Q.   Were there other people at this address on Mabel Street where
13        Sam's mother lived?
14   A.   Yes.
15   Q.   Now there's other homes on Mabel Street, is that correct?
16   A.   Yes.
17   Q.   Okay.  Were there other people socializing at other homes --
18   A.   Yes.
19   Q.   -- in the area of Sam's mother's house?
20   A.   Yes.
21   Q.   How about across the street?
22   A.   Yes.
23   Q.   Did you see any people over there?
24   A.   Yes.
25   Q.   Okay.  About how many people?
```

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    I don't recall.

2    Q.    Pardon me?

3    A.    I don't recall how many.

4    Q.    All right, but more than two?

5    A.    Yes.

6    Q.    More than four?

7    A.    Yes.

8    Q.    All right.  Basically doing the same thing you were doing?

9    A.    Yes.

10   Q.    Just kind of chilling and socializing?

11   A.    Yes.

12   Q.    Were there many people at Sam's mother's house when you were

13         there?

14   A.    No.

15   Q.    All right.  Now at this point you didn't know of a person

16         named Milo Conklin?

17   A.    Knew of him but didn't know him.

18   Q.    Okay.  So if you were to see him on April 24th, 2011, if you

19         would have seen Mr. Conklin you wouldn't have known that that

20         was Milo Conklin?

21   A.    No.

22   Q.    No?

23   A.    No.

24   Q.    Had you as of April 24th, 2011 ever heard Sam Steel talk

25         about Milo Conklin?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

69

1    A.    Not really.

2    Q.    Not really?

3    A.    No.

4    Q.    Okay.  What do you mean by not really?

5    A.    He never said anything about him.

6    Q.    Okay, all right.  Did he ever say anything to you about his

7          home being broken into prior to April 24th, 2011?

8    A.    Yes.

9    Q.    Okay.  Did he seem upset about that?

10   A.    Yes.

11   Q.    Did he ever tell you who he suspected of doing that?

12   A.    No.

13   Q.    Okay.  Now you're over at Sam's mother's house socializing,

14         is that correct?

15   A.    Yes, yes.

16   Q.    Did there come a time when you left that residence?

17   A.    Yes.

18   Q.    Did Sam go with you?

19   A.    Yes.

20   Q.    And did Walter go with you?

21   A.    Yes.

22   Q.    Where did you go?

23   A.    Back to the liquor store.

24   Q.    Okay.  Did you get more alcohol?

25   A.    Yes.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.    Were you drinking?

2   A.    Yes.

3   Q.    Was Sam drinking?

4   A.    Yes.

5   Q.    Where did you go after the liquor store if you recall?

6   A.    I think that's Williams Street.

7   Q.    Over to Williams Street?

8   A.    Yes.

9   Q.    Do you remember why?

10   A.    No.

11   Q.    Now you were driving the motor vehicle, is this correct?

12   A.    Yes.

13   Q.    Do you remember why you went over to Williams Street?

14   A.    No.

15   Q.    Who told you to go to Williams Street?

16   A.    Walt and Sam.

17   Q.    Walt and Sam?

18   A.    Yeah.

19   Q.    They wanted to go to Williams Street?

20   A.    Yes.

21   Q.    Did you go to a residence there?

22   A.    Yes.

23   Q.    Did you know at that time whose residence it was?

24   A.    Yes.

25   Q.    Whose residence was it?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    His -- Walt's uncle house.

2    Q.    Okay.  Now is this the same residence you had picked Walter

3          up from?

4    A.    No.

5    Q.    No, you picked him up from Stockbridge, is that correct?

6    A.    Yes.

7    Q.    Okay.  Now you're on Williams Street, did you park the motor

8          vehicle when you got there?

9    A.    Yes.

10   Q.    Did Sam get out of the motor vehicle?

11   A.    Yes.

12   Q.    Did Walter?

13   A.    Yes.

14   Q.    Where did they go?

15   A.    Behind the house.

16   Q.    Behind the house?

17   A.    Yes.

18   Q.    What did you do?

19   A.    Sat in the car.

20   Q.    Okay.  Did they say why they were getting  out of the motor

21         vehicle?

22   A.    No.

23   Q.    Did they say what they were going to do when they got out of

24         the motor vehicle?

25   A.    No.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.   You saw them go around the corner of the house?

2   A.   Yes.

3   Q.   Towards the backyard?

4   A.   Yes.

5   Q.   How long were they gone before you saw them again?

6   A.   About three minutes.

7   Q.   Okay.  When you saw them again did they come back from the

8       same area that you saw --

9   A.   Yes.

10   Q.   -- them enter into, around the corner?

11   A.   Yes.

12   Q.   Okay.  And what did they do when you saw them again?

13   A.   Just got back in the car.

14   Q.   Okay.  Did they have anything in their possession that you

15       saw when they got back in the car?

16   A.   No.

17   Q.   Did they say anything to you when they got back into the car?

18   A.   No.

19   Q.   All right.  What did you do once they got back into the car?

20   A.   We took off driving towards Westnedge.

21   Q.   Okay.  Why did you take off and go that way?

22   A.   I was going back on Mabel Street.

23   Q.   Okay.  And back to where you've been before?

24   A.   Yes.

25   Q.   Sam's mom's house?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    Yes.

2    Q.    All right.  Did you make it back there?

3    A.    No.

4    Q.    What happened?

5    A.    He wanted to be dropped off on Elizabeth Street.

6    Q.    Okay.  Who wanted to be dropped off?

7    A.    Sam.

8    Q.    Sam did?

9    A.    Yes.

10   Q.    All right.  So did you take him to where he wanted to be

11         dropped off?

12   A.    Yes.

13   Q.    Was it on Elizabeth Street?

14   A.    Yes.

15   Q.    Did he get out of the car there?

16   A.    Yes.

17   Q.    All right.  Now this location where you dropped him off, was

18         this very close to Sam's mother's house?

19   A.    Yes.

20   Q.    About how close do you think it was?

21   A.    Probably a block away.

22   Q.    A block away or so?

23   A.    Yes.

24   Q.    Okay.  Did Sam -- did you see Sam walk away after you dropped

25         him off?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    Not really.

2    Q.    Okay.  You didn't see which direction he went?

3    A.    No.

4    Q.    All right.  Did Sam say anything to you before he got out of

5          the car about what to do?

6    A.    Not really, Walt did.

7    Q.    What did Walt tell you to do?

8    A.    Said go over to his dad's house on Woodbury.

9    Q.    Okay.  So is that what you did?

10   A.    Yes.

11   Q.    Went over to Woodbury?

12   A.    Yes.

13   Q.    What did you do when you got to Walter's dad's house?

14   A.    Sat there.

15   Q.    Okay.  All right.  Did you park there?

16   A.    Yes.

17   Q.    Were you there very long before you heard something?

18   A.    No.

19   Q.    Okay, you weren't there very long?

20   A.    No.

21   Q.    And you heard something?

22   A.    Yes.

23   Q.    Can you tell the Judge what you heard?

24   A.    About five or six shots.

25   Q.    Okay.  Now how far away from Sam's mother's house were you

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1      when you were on this driveway on Woodbury?

2  A.  Just probably half a block, a city block.

3  Q.  So not very far away?

4  A.  No.

5  Q.  Actually closer than where you dropped Sam off, is that

6      correct?

7  A.  Yes.

8  Q.  In a way?

9  A.  Yes.

10 Q.  Okay.  So could you tell where the shots seemed to be coming

11     from?

12 A.  No, not really.

13 Q.  Not really?

14 A.  No.

15 Q.  All right.  So five to six shots?

16 A.  Yeah.

17 Q.  And what did you do when you heard those shots?

18 A.  Nothing, you hear them all the time.

19 Q.  Okay.  So you just kept sitting there?

20 A.  Yeah.

21 Q.  Well, did you -- how long did you remain sitting in the

22     driveway before you left after hearing these shots?

23 A.  For about not even a minute.

24 Q.  Okay, then what did you do?

25 A.  I pulled out onto Florence.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

76

1    Q.    Okay, then where did you go?

2    A.    I pulled up right there on Florence and Woodbury.

3    Q.    Okay.  And then what happened?

4    A.    Sam got in the truck.

5    Q.    Okay.  So did you see Sam before he got into the truck?

6    A.    Not really.

7    Q.    Okay.  All of  a sudden he's just getting in?

8    A.    Yeah.

9    Q.    Why did you stop the truck?

10   A.    Walter asked me -- told me to stop the truck and Sam's right

11         there.

12   Q.    Okay.  So it appeared that Walt saw Sam before you did?

13   A.    Yeah.

14   Q.    And told you to stop?

15   A.    Yeah.

16   Q.    Did Sam get into the truck?

17   A.    Yeah.

18   Q.    Once Sam got into the truck did he say anything to you and

19         Walt?

20   A.    Told Walt he didn't think he'd do it.

21   Q.    He told Walt he didn't think he'd do it?

22   A.    Yeah.

23   Q.    That Walter didn't think he'd do it?

24   A.    Yeah.

25   Q.    Is that correct?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   A.    Yes.

2   Q.    Okay.  Do you remember what Sam was wearing at that time?

3   A.    A hoodie, sweats.

4   Q.    What color?

5   A.    Black and gray.

6   Q.    So after Sam gets back into the truck with you guys, did you

7         drive away?

8   A.    Yes.

9   Q.    All right.  Now up until this point when Sam gets back into

10        the truck, had you seen either Sam or Walter with a gun?

11  A.    Sam -- I seen Sam with a gun.

12  Q.    All right.  When did you see Sam with the gun?

13  A.    He threw it out the window.

14  Q.    Okay.  Is that the first time you had seen the gun?

15  A.    Yes.

16  Q.    Is when he threw it out the window?

17  A.    Yes.

18  Q.    Do you remember where abouts you were when he threw it out

19        the window?

20  A.    Probably two houses from the corner.

21  Q.    Two houses from the corner?

22  A.    Yeah.

23  Q.    On what street?

24  A.    Florence and Cobb.

25  Q.    Okay.  So it was pretty quick after you picked him up and

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1     took off?

2   A.   Yeah.

3   Q.   That he threw it out the window?

4   A.   Yeah.

5   Q.   Which window did he throw it out of?

6   A.   The back passenger window.

7   Q.   Okay.  Is that where he was sitting?

8   A.   Yes.

9   Q.   Did you get a look at the gun at all?

10  A.   Not really.

11  Q.   Okay.  Did he say anything before he threw it out the window?

12  A.   No.

13  Q.   All right.  Did he or Walter say anything to you about where

14       to go after you saw Sam throw the gun out the window?

15  A.   He told me to take him home.

16  Q.   Who told you to take him home?

17  A.   Sam.

18  Q.   Sam said take him home?

19  A.   Yes.

20  Q.   Okay.  So you took him back to his address on which street?

21  A.   Douglas.

22  Q.   On Douglas?

23  A.   Yeah.

24  Q.   When you got to his address on Douglas did you stop the car?

25  A.   Yes.

```
1   Q.   Okay.  Did you get out the car?

2   A.   No, he went in the house, I didn't get out.

3   Q.   All right.  Sam went in the house?

4   A.   Yes.

5   Q.   Okay.  Who else went in the house, anybody?

6   A.   Nobody.

7   Q.   Okay. Walter stayed with you?

8   A.   Yeah.

9   Q.   Okay.  Was Sam in the house very long?

10  A.   No.

11  Q.   Did he come back out?

12  A.   Yes.

13  Q.   When he came back out did he have anything in his hands?

14  A.   Just a bag.

15  Q.   A bag?

16  A.   Yes.

17  Q.   What kind of a bag?

18  A.   I really didn't pay that much attention to the bag.

19  Q.   Okay, that's fine.  Now when he came out of the house was he

20       wearing the same clothes?

21  A.   No.

22  Q.   He was wearing something else?

23  A.   Yes.

24  Q.   Do you remember what he was wearing?

25  A.   Not quite.
```

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.   Okay.  When he came out of the house with his bag did he get

2        back into your car?

3   A.   Yes.

4   Q.   Did he say anything to you when he got back in that you

5        remember?

6   A.   Wanted me to take him over to Walt's house.

7   Q.   Go over to Walt's house?

8   A.   Yeah.

9   Q.   Okay.  Is that what you did?

10  A.   Yes.

11  Q.   Did he say anything else to you that you remember?

12  A.   No.

13  Q.   When you got to Walter's house, is this Walter's house on

14       Stockbridge?

15  A.   Yes.

16  Q.   Where you first had picked him up?

17  A.   Yes.

18  Q.   When you got to Walter's house on Stockbridge, you parked the

19       car?

20  A.   Yes.

21  Q.   And then did you get out?

22  A.   No.

23  Q.   Did Sam get out?

24  A.   Yes.

25  Q.   Okay.  Did Walter get out?

```
 1   A.    Yes.

 2   Q.    Did you see where Sam and Walter went when they got out of

 3         your car?

 4   A.    It's like a fence so I couldn't -- a privacy fence --

 5   Q.    Okay.

 6   A.    -- so you really can't see over.

 7   Q.    So you couldn't see -- did they go behind the privacy fence?

 8   A.    Yes.

 9   Q.    Onto Walter's property?

10   A.    Yeah.

11   Q.    Okay.  Have you been into Walter's house before?

12   A.    Yes.

13   Q.    Does he have a garage?

14   A.    Yes.

15   Q.    All right.  Could you tell from where you were sitting in

16         your vehicle whether or not Walter and Sam went into the

17         garage?

18   A.    Not at first.

19   Q.    Not at first?

20   A.    No.

21   Q.    Okay.  Is there something that happened after they went

22         around the privacy fence that makes you think they went into

23         the garage?

24   A.    Smoke, fire.

25   Q.    Smoke and fire?
```

1   A.   Yeah.

2   Q.   What did you see smoke and fire coming from?

3   A.   Out of his garage.

4   Q.   Out of the garage?

5   A.   Yeah.

6   Q.   Did you stay in the car while this was happening?

7   A.   No, I got out and used the phone and things of that nature

8        but I pretty much stayed by the vehicle.

9   Q.   Okay.  So there was a time when you got out of the car --

10  A.   Yeah.

11  Q.   -- and went into the house?

12  A.   No, I didn't go in the house.

13  Q.   Okay, just stood around the car --

14  A.   Yeah.

15  Q.   -- basically and used your cell phone?

16  A.   Yeah.

17  Q.   All right.  So did you ever go into the garage to see what

18       those guys were doing?

19  A.   Yeah.

20  Q.   Pardon me?

21  A.   Yeah.

22  Q.   You did?

23  A.   Yes.

24  Q.   All right.

25  A.   They weren't doing nothing, there was just a fire there.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    Q.    All right, so you went into the garage?

2    A.    Yeah.

3    Q.    And you saw Sam in the garage?

4    A.    Yeah.

5    Q.    And you saw Walter in the garage?

6    A.    Yes.

7    Q.    And there was a fire?

8    A.    Yes.

9    Q.    Where was the fire located?

10   A.    It was on the ground.

11   Q.    On the ground?

12   A.    Yeah.

13   Q.    Is it a dirt ground garage?

14   A.    Yes.

15   Q.    Okay.  Could you tell what was being burned?

16   A.    No.

17   Q.    No?

18   A.    No.

19   Q.    Did Sam tell you what was being burned?

20   A.    No.

21   Q.    Did Walter?

22   A.    No.

23   Q.    Okay.  Were you guys there very long while this stuff was

24         burning?

25   A.    Not really, I can't really tell.

1   Q.   You can't really remember?

2   A.   No.

3   Q.   All right.  You ended up leaving --

4   A.   Yeah.

5   Q.   -- Walter's residence, is that correct?

6   A.   Yeah.

7   Q.   Okay.  When you left was the burning done?

8   A.   Yes.

9   Q.   All right.  Did you leave alone?

10  A.   No.

11  Q.   Who left with you?

12  A.   Sam.

13  Q.   Okay.  What about Walter, what happened to Walter?

14  A.   He stayed.

15  Q.   Okay.  So you and Sam got back into your car?

16  A.   Yes.

17  Q.   Where did you go from there?

18  A.   I took him home.

19  Q.   Okay.  Back to his house on Douglas?

20  A.   Yes, yes.

21  Q.   And then what did you do?

22  A.   I went home.

23  Q.   Okay.  Did you and Sam talk about anything that had happened

24       on the way back from Walter's house with Sam?

25  A.   No.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

85

1   Q.   Okay.  What was Sam's demeanor like, do you remember?

2   A.   No, it was just laid back.

3   Q.   How were you feeling?

4   A.   I don't know.

5   Q.   What?

6   A.   I don't know.

7   Q.   Were you confused?

8   A.   Yeah, well kind of, sort of.

9   Q.   What did you think had happened?

10   A.   Scared.

11   Q.   Scared?

12   A.   Yeah.

13   Q.   Did you expect anything about being involved in the shooting

14       at this point?

15   A.   Yeah.

16   Q.   When did you start to suspect there had been a shooting, when

17       you were going to be involved in a shooting?

18   A.   After I left Woodbury.

19   Q.   After you heard the shots?

20   A.   Yeah.

21   Q.   Okay.  You suspected that Sam might have done a shooting?

22   A.   Suspected.

23   Q.   Okay.  And then you picked him up and saw him throw the gun

24       out?

25   A.   Yes.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Q.   Kind of confirmed your suspicions?

2   A.   Yeah.

3   Q.   Start to feel a little shaken up at that point?

4   A.   Yeah.

5   Q.   Okay.  Eventually you end up back home and probably go to the

6        bed, right?

7   A.   Yeah.

8   Q.   All right.  Did you have contact with Sam the next day?

9   A.   Yeah.

10  Q.   How did that contact take place?

11  A.   He just called me --

12  Q.   Okay.

13  A.   -- asked for a ride.

14  Q.   Okay.  Did you go to his location?

15  A.   Yes.

16  Q.   Where was that location?

17  A.   Douglas.

18  Q.   On Douglas?

19  A.   Yeah.

20  Q.   All right.  When you got to Douglas what did you go see him

21       inside or did he come out to the car?

22  A.   He came out.

23  Q.   He came out?

24  A.   Yeah.

25  Q.   Did he get into your car?

1    A.    Yeah.

2    Q.    Did he say anything to you when he got in?

3    A.    Yeah, he did, he was like we were going to go to Grand

4          Rapids.

5    Q.    Tell the Judge what he told you.

6    A.    Told me we was going to go to Grand Rapids and he wanted to

7          get rid of the bag he had.

8    Q.    Okay.  Did he tell you what the bag -- what was in the bag?

9    A.    Yeah.

10   Q.    What did he tell you was in the bag?

11   A.    It was a gun.

12   Q.    A gun?

13   A.    Yeah.

14   Q.    Did he say what gun it was?

15   A.    No.

16   Q.    Now that gun -- the gun -- you saw him throw a gun out the

17         window after the shooting, correct?

18   A.    Yeah.

19   Q.    Did he say whether or not the gun that he had in the bag was

20         the same gun?

21   A.    Not at that time.

22   Q.    Well, did he say later?

23   A.    Yeah.

24   Q.    Okay.  When was it later that he told you that?

25   A.    Probably like a couple of days.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

88

1  Q.   What did he tell you?

2  A.   That he went back and got it and I said -- yeah.

3  Q.   Okay, so he told you a couple of days later --

4  A.   Yeah.

5  Q.   -- that he had gone back to where he had thrown the gun out

6        the window --

7  A.   Yeah.

8  Q.   -- and retrieved it?

9  A.   Yeah.

10  Q.   He took it home?

11  A.   Yeah.

12  Q.   All right.  Now let's back up to the point where he gets into

13        your car in the morning after --

14  A.   Yeah.

15  Q.   -- the shooting with the gun, okay?

16  A.   Uhum.

17  Q.   Did he say anything to you about your involvement?

18  A.   Yeah.

19  Q.   Tell the Judge what he told you?

20  A.   He told me I might as well have pulled the trigger seeing as

21        I was driving.

22  Q.   All right.  Why did he say that to you?

23             MR. REISTERER:  Objection, speculation.

24  BY MR. ANDEREGG:

25  Q.   Did he when he said that to you, did he say it in a context?

|    |    |    |
|----|----|----|
| 1  |    | In other words, to make you understand why it was being said |
| 2  |    | to you? |
| 3  | A. | Yeah. |
| 4  | Q. | What was the context that was said to you? |
| 5  | A. | To drive him down 131 so he could get rid of the gun. |
| 6  | Q. | Okay.  So he requested that you drive him up 131 -- |
| 7  | A. | Yeah. |
| 8  | Q. | -- to throw the gun out the window? |
| 9  | A. | Yeah. |
| 10 | Q. | To get rid of the gun? |
| 11 | A. | Yeah. |
| 12 | Q. | And is that then after that did he tell you you might as well |
| 13 |    | -- |
| 14 | A. | Yeah. |
| 15 | Q. | -- have pulled the trigger because you drove last night? |
| 16 | A. | Yeah. |
| 17 | Q. | Did he make you feel that you were as responsible as he was |
| 18 |    | for the shooting? |
| 19 | A. | Yeah. |
| 20 | Q. | Okay.  Is that how you were feeling? |
| 21 | A. | Yeah. |
| 22 | Q. | Were you scared? |
| 23 | A. | Yeah. |
| 24 | Q. | Were you worried about your involvement? |
| 25 | A. | Yeah. |

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

90

1   Q.   Did you end up driving him --

2   A.   Yeah.

3   Q.   -- up 131?

4   A.   Yes.

5   Q.   Okay.  Did he throw something that resembled pieces of a gun

6        out the window as you were driving up 131?

7   A.   Yes.

8   Q.   Okay.  What did you see him throwing out?

9   A.   Just pieces of -- like metal pieces, springs and shit like

10       that.

11  Q.   Did you see the gun handle?

12  A.   Yeah.

13  Q.   Okay.  Did he throw these pieces of the gun out as the

14       vehicle was moving?

15  A.   Yes.

16  Q.   Okay.  Do you have a firm recollection of where he threw out

17       a number of these pieces at this point?

18  A.   Yeah.

19  Q.   Okay, because you're kind of --

20  A.   Not exact locations.

21  Q.   All right.

22  A.   Just all the way towards D Avenue.

23  Q.   Okay.  So on 131 heading up towards D Avenue?

24  A.   Yeah.

25  Q.   Did you ever get off of 131 and travel down --

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1 A. Got off --

2 Q. -- D Avenue?

3 A. -- got off on D Avenue.

4 Q. Okay.  And was there an area around there where you got off

5   131 where you saw Sam deposit part of the gun?

6 A. Yes.

7 Q. Okay.  Do you remember where about that location was?

8 A. We took a right, took another right, the first right, and went

9   down and took a left.

10 Q. Okay.  And then what did you see him do?

11 A. Threw the gun out the window.

12 Q. Okay.  What part did you see him throw out at this point?

13 A. It was the handle.

14 Q. The handle of the gun?

15 A. Yeah.

16 Q. Now as part of your plea agreement, you were interviewed by

17   the police in the presence of your attorney, is that correct?

18 A. Yes.

19 Q. And you provided information to the detectives of the

20   Kalamazoo Department of Public Safety about this case, is that

21   correct?

22 A. Yes.

23 Q. And you also provided them with information about where they

24   might be able to find pieces of this handgun --

25 A. Yes.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    Q.    -- that were deposited by Sam Steel --

2    A.    Yes.

3    Q.    -- is that correct?

4    A.    Yes.

5    Q.    Okay, thank you sir.  I have -- well, one last question.

6          What I need you to do for me, sir, is with some specificity

7          describe for me if you can -- well, tell me if you can if Sam

8          Steel is located in the courtroom today and describe with

9          specificity if you see him in the courtroom where he is so the

10         Judge can see that you're able to identify him?

11   A.    Sitting at defendant table.

12   Q.    What's he wearing?

13   A.    Green, greens.

14   Q.    Okay, green jumpsuit?

15   A.    Yes.

16             MR. ANDEREGG:  If the record could reflect the

17         identification, Judge?

18             THE COURT:  All right, it will.

19             MR. ANDEREGG:  Thank you, sir, I have nothing

20         further.

21             THE COURT:  Mr. Reisterer?

22                     CROSS-EXAMINATION

23   BY MR. REISTERER:

24   Q.    Mr. Matthews, how long have you known Walter Johnson?

25   A.    About 30 years.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1  Q.  So you told the detectives that you met Mr. Johnson in prison

2      about 20 years ago in Jackson, is that right?

3  A.  Yes, yep.

4  Q.  So you've known him for quite some time?

5  A.  Yeah.

6  Q.  Yet you indicated he is not a friend, he's just an

7      acquaintance?

8  A.  Yes.

9  Q.  Back on April 24th, at least that's the day the prosecutor

10     has directed you to, you indicated that the three of you were

11     hanging out most of the day, is that right?

12 A.  Yeah.

13 Q.  And at least on two occasions you testified to that you went

14     to the store to buy alcohol, is that right?

15 A.  Yeah.

16 Q.  What were you drinking?

17 A.  Just beer.

18 Q.  All of you?

19 A.  Not Walt.

20 Q.  Okay, so just you and Mr. Steel were drinking?

21 A.  And a few other people that was outside.

22 Q.  Who was that?

23 A.  I don't recall.

24 Q.  You don't want to recall or you can't recall?

25 A.  I don't recall.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

94

1  Q.  Okay.  Did you buy beer for them too?

2  A.  Yeah.

3  Q.  Were they friends, were they family?

4  A.  Just people, just people in the neighborhood.

5  Q.  So you were supplying the people in the neighborhood with

6     something to drink?

7  A.  Basically.

8  Q.  Okay.  Do you recall the names of any of them?

9  A.  No.

10 Q.  How long were you hanging out with these people from the

11    neighborhood?

12 A.  Probably about an hour or two.

13 Q.  Okay.  So you spent a good hour or two hanging out with these

14    people yet as you stand -- sit here today you can't recall who

15    they were?

16 A.  No.

17 Q.  You indicated you knew -- what did you say about your

18    knowledge of who Milo Conklin is or was?  Did you know who he

19    was?

20 A.  I didn't.

21 Q.  You said you had no idea who he was.

22 A.  I didn't.

23 Q.  Okay.  So he was just -- it was just a name to you but you

24    couldn't put a face on him that day, is that right?

25 A.  Yeah.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

95

| | | |
|---|---|---|
| 1 | Q. | Did anyone point him out to you when you were hanging out |
| 2 | | drinking that day, saying that's Milo? |
| 3 | A. | No. |
| 4 | Q. | Nothing like that? |
| 5 | A. | No. |
| 6 | Q. | Do you know if there were people who were across the street |
| 7 | | on Mabel Street hanging out doing the same thing you and Mr. |
| 8 | | Steel and Mr. Johnson were doing? |
| 9 | A. | Yeah. |
| 10 | Q. | So there was a bunch of people hanging out? |
| 11 | A. | Yeah. |
| 12 | Q. | Anything special about April 24th that you know of? |
| 13 | A. | What do you mean? |
| 14 | Q. | Was it a special day, was it -- |
| 15 | A. | It was Easter Sunday. |
| 16 | Q. | Okay.  So one of you knows that. |
| 17 | A. | Yeah. |
| 18 | Q. | So you were hanging out with Mr. Steel on Easter, is that |
| 19 | | right? |
| 20 | A. | Yeah. |
| 21 | Q. | Do you have family here in town? |
| 22 | A. | No. |
| 23 | Q. | Did you have anyone else, anyone special to hang out with on |
| 24 | | Easter besides Mr. Steel? |
| 25 | A. | No. |

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

| | |
|---|---|
| 1 | Q. You indicated that you were hanging out at Mr. Steel's |
| 2 | mother's house? |
| 3 | A. Yeah. |
| 4 | Q. Was she home? |
| 5 | A. I don't know, I didn't go in. |
| 6 | Q. You were there for a period of time but you have no idea who |
| 7 | was in the house? |
| 8 | A. No. |
| 9 | Q. Is that true? |
| 10 | A. True. |
| 11 | Q. Okay.  So you picked up Mr. Steel and Mr. Johnson, you went |
| 12 | to Daysha's and got something to drink, went back to Mabel |
| 13 | Street, were drinking and sharing.  At some point you left, |
| 14 | went back to Daysha's to get more to drink, is that right? |
| 15 | A. Yeah. |
| 16 | Q. How much did you drink? |
| 17 | A. Probably about three -- probably about four beers. |
| 18 | Q. Not enough to affect your memory? |
| 19 | A. No. |
| 20 | Q. Not enough to affect you driving or your judgment? |
| 21 | A. No. |
| 22 | Q. Just from your testimony you kind of said that while you |
| 23 | picked Sam up that day and you went and picked up Walter, most |
| 24 | of this stuff that you were told to do was Walter said go to |
| 25 | Woodbury, Walter said there's Sam go pick him up, Walter was |

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1      kind of giving the directions, is that true?

2  A.   Not really.

3  Q.   Okay.  Well, you said that Walter said go to Woodbury?

4  A.   Yeah.

5  Q.   Walter said go park in his father's driveway?

6  A.   You said directions though, I wasn't given no directions.

7  Q.   Okay.  Well, Walter said go to Woodbury, you knew where

8       Woodbury was?

9  A.   Yeah.

10 Q.   Walter said go park in his father's driveway?

11 A.   Yeah.

12 Q.   Did you know where that was?

13 A.   No, not at that time until he told me.

14 Q.   Okay.  He told you to go there?

15 A.   Yeah.

16 Q.   And then you heard some shots and then Walter said go, time

17      to leave and then he saw Sam and said stop here and pick up

18      Sam, is that right?

19 A.   Yeah.

20 Q.   You got to Sam's house, you said Sam went in but you did not

21      go in the house, is that right?

22 A.   Yeah.

23 Q.   And then you went to Walter's house?

24 A.   Yeah.

25 Q.   And you didn't go in Walter's house, you kind of stayed in

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

| | | |
|---|---|---|
| 1 | | the peripheral, you didn't really involve yourself with what |
| 2 | | they were doing, is that true? |
| 3 | A. | I didn't care what they were doing. |
| 4 | Q. | Okay.  Who have you told except for Detective Beauchamp here |
| 5 | | what happened that night? |
| 6 | A. | I don't talk about it. |
| 7 | Q. | Okay.  So we're talking about an incident that happened April |
| 8 | | 24th of 2011, is that right? |
| 9 | A. | Yeah. |
| 10 | Q. | And you didn't tell any of your friends, you didn't tell any |
| 11 | | family what happened, is that right? |
| 12 | A. | Not that I recall. |
| 13 | Q. | That was either yes or no? |
| 14 | A. | Not that I recall. |
| 15 | Q. | You don't recall telling anybody? |
| 16 | A. | No. |
| 17 | Q. | Don't get hostile with me, I'm -- |
| 18 | A. | I'm not, I'm just saying, you know. |
| 19 | Q. | So you may have told somebody, you just don't recall? |
| 20 | A. | Not that I recall. |
| 21 | Q. | Okay.  And then when -- when you saw the pictures posted all |
| 22 | | around the town that Detective Beauchamp was looking for Mr. |
| 23 | | Steel, is that right? |
| 24 | A. | I wasn't here. |
| 25 | Q. | Where were you? |

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

99

1   A.   I moved away.

2   Q.   Okay, were you hiding?

3   A.   From what?

4   Q.   Did you do the shooting?

5   A.   No.

6   Q.   Okay.  And if you did, that would make your plea agreement

7        void, is that right?

8   A.   Yeah.

9   Q.   Because it says right in there this plea agreement is null

10       and void if in fact you're the one who shot Milo Conklin,

11       right?

12  A.   Yeah.

13  Q.   Okay.  So if you didn't shoot him the plea agreement is still

14       good but you moved out of Kalamazoo?

15  A.   Yeah.

16  Q.   Because you didn't want to have to talk?

17  A.   No, I just moved.

18  Q.   Where did you go?

19            MR. ANDEREGG:  Objection, Judge, relevance.  I don't

20       think it's --

21            THE COURT:  Overruled.

22         Where did you go?

23            THE WITNESS:  Went to Decatur.

24  BY MR. REISTERER:

25  Q.   Was it Decatur or was it Dowagiac?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

100

1  A.  Decatur.

2  Q.  Do you have family down there?

3  A.  No.

4  Q.  Do you have a job down there?

5  A.  No.

6  Q.  Friends down there?

7  A.  Yeah, I know people.

8  Q.  Okay, did you tell them why you were down there?

9  A.  No.

10  Q.  Okay.  So this happened in April, did you ever talk to the

11      police about the incident until you have this plea agreement

12      in place?

13  A.  No.

14  Q.  Okay.  So this incident happened in April, you said you don't

15      recall telling any friends or family about what happened --

16  A.  No.

17  Q.  -- is that true?

18  A.  No.

19  Q.  Did you ever talk to the police and tell them you didn't know

20      anything?

21  A.  I never talked to the police.

22  Q.  Well, until --

23  A.  Until.

24  Q.  -- this plea agreement was in place, is that right?

25  A.  Yeah.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1  Q.  And the prosecution began discussing what you're charged

2      with, it says you're charged with accessory after the fact of

3      murder, it's a five year; felony firearm, a two year; firearm

4      by a felon, a five year and felony firearm, a two year and a

5      carrying a concealed weapon, a five year, is that true?

6  A.  True.

7  Q.  Is that what you're charged with?

8  A.  Yeah.

9  Q.  And you're charged as a habitual offender fourth, which makes

10     those two five years you could face up to life in prison, you

11     knew that, right?

12 A.  True.

13 Q.  Okay.  And your habitual offender status is a result of

14     felonious assault with dangerous weapon in '97, robbery in '86

15     --

16         MR. ANDEREGG:  Objection, Judge, as far as relevance

17     on this.

18         THE COURT:  I'll let him explore the issue of your

19     witness as it relates to his veracity so it's overruled.

20 BY MR. REISTERER:

21 Q.  Escape in '89 and a carrying a concealed weapon in '89, is

22     that true?

23 A.  True.

24 Q.  Which one of those convictions resulted in you going to

25     prison such that you could meet Walter Johnson?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    A.    I never told you I met him there in prison.

2    Q.    You told the police you met him in prison?

3    A.    I never told you that.

4    Q.    Did you not meet him in prison?

5    A.    No.

6    Q.    So you told the police that you met Walter Johnson in Jackson

7          but that was not true?

8    A.    Never told you that.

9    Q.    I'm asking --

10                THE COURT:  Just answer the question.

11                THE WITNESS:  I'm answering it, I never told --

12                THE COURT:  The question to you is did you tell the

13         police you --

14                THE WITNESS:  I told them that at first.

15                THE COURT:  All right, go ahead.

16   BY MR. REISTERER:

17   Q.    You told the police at first that you met Walter Johnson in

18         prison, is that right?

19   A.    Yeah.

20   Q.    Was that true or was that not true?

21   A.    It was false.

22   Q.    Now you have a deal with the prosecution to dismiss all of

23         your habitual offender allegations is that right?  And plead

24         to one count of accessory after the fact without the habitual

25         offender status, is that right?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

103

1    A.    True, true.

2    Q.    You also need to take a polygraph test, is that right?

3    A.    Yeah, true.

4    Q.    Okay.  Have you taken one?

5    A.    No.

6                MR. ANDEREGG:  Objection, Judge, that's not

7         relevant.

8                MR. REISTERER:  As far as the plea agreement, your

9         Honor.

10               MR. ANDEREGG:  It's not relevant because the results

11        wouldn't be admissible even if he had so it has no relevance

12        whatsoever.

13               THE COURT:  I'm going to overrule the objection.

14            Go ahead.

15   BY MR. REISTERER:

16   Q.    As part of your plea agreement, it asks that you take a

17        polygraph exam?

18   A.    Yeah.

19   Q.    You agreed to take one.  Did you take one?

20   A.    No.

21   Q.    Do you know when you're scheduled for your plea and your

22        sentencing?

23   A.    No.

24   Q.    In fact it's been adjourned until after this matter is

25        concluded with today' hearing, is that true?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

104

1   A.    It was adjourned but it was not a reason given, I didn't get

2         a reason.

3   Q.    So you testified here today about your version of events and

4         you told Detective Beauchamp a version of events after you got

5         this signed plea agreement, have you told this story to

6         anybody else?

7   A.    No.

8   Q.    Have you discussed your testimony with anybody else?

9   A.    No.

10  Q.    Did you discuss your testimony with the prosecutor?

11  A.    No.

12  Q.    Prior to testifying here today you did not meet with him to

13        discuss your testimony?

14  A.    No.

15  Q.    How about the witness coordinator?

16  A.    No.

17  Q.    First time you spoke to him was today in court?

18  A.    Yes.

19              MR. REISTERER:  Thank you, I have no further

20        questions.

21              THE COURT:  All right, anything further, Mr.

22        Anderegg?

23              MR. ANDEREGG:  No, sir; thank you.

24              THE COURT:  Okay.  You may step down.

25          May he be excused?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1          MR. ANDEREGG:  No objection, Judge.

2          MR. REISTERER:  No objection.

3          THE COURT:  All right. Thank you, you can exit the

4     door you came through.

5              (At 4:29 p.m., witness excused)

6          THE COURT:  Do you have any other evidence, you'd

7     like to present?

8          MR. ANDEREGG:  We do have stipulations, Judge.  The

9     defense has agreed to stipulate to some things.  For purposes

10    of this hearing only, he's agreed to these following

11    stipulations to help round out the testimony.

12         THE COURT:  Go ahead.

13         MR. ANDEREGG:  Thank you, Judge.

14        A stipulation would involve that there was a shooting

15    reported to the Kalamazoo Department of Public Safety at

16    approximately 9 p.m. on April 24th, 2011, that the location of

17    the shooting was reported to be 626 Mabel Street in the City

18    and County of Kalamazoo.

19        The responding officers did go to that location and they

20    found an individual identified as Milo Conklin laying down on

21    the steps in the front of the home, he was laying on his face,

22    he had an apparent bullet wound to his back with a feint

23    pulse.  A stipulation involves that he was taken to the

24    hospital and eventually succumbed and died.

25        An autopsy was performed on Milo Conklin on April 25th,

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    2011.  He was a black male with a date of birth of 12/7/75 and

2    this was performed by Doctor John Bechinski, a pathologist

3    from Sparrow Forensic Pathology.  The finding of the pathology

4    report, Judge, was that the victim, Milo Conklin, had suffered

5    four gunshot wounds.  He had one gunshot wound in his upper

6    left chest approximately ten inches down from the top of the

7    head and approximately four inches left of the midline.  There

8    was actually a deformed jacket of a bullet removed from the

9    end of the bullet track in that wound.  He also had a bullet

10   wound in his back, approximately 24 inches down from the top

11   of head, just an inch on the right of the midline and a bullet

12   and a deformed jacket from a bullet was removed from that

13   wound also.  On his lower left abdomen thirty inches down from

14   the top of his head and about three and a half finches from

15   the right of the midline was another gunshot wound.  And that

16   gunshot wound also contained a deformed jacket of a bullet

17   that was recovered.  Finally, Mr. Conklin had a through and

18   through bullet wound in his left thigh.

19        The doctor's findings after performing the autopsy,

20   Judge, were that he died as a result of multiple gunshot

21   wounds and the cause of death in this case was homicide.

22             THE COURT:  Any objection to me receiving that as a

23   stipulation for this hearing, Mr. Reisterer?

24             MR. REISTERER:  No.

25             THE COURT:  I have just a bit more, Judge.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

107

1      THE COURT:  Oh, I'm sorry.

2      MR. ANDEREGG:  That's okay; I just want to round

3  this out.

4      Furthermore, Judge, after the shooting took place, the

5  Kalamazoo Department of Public Safety roped off the scene at

6  626 Mabel Street and conducted a scene analysis.  They found

7  five shell casings at the scene of the shooting in the front

8  yard near the sidewalk in front of the front door of 626

9  Mabel, five shell cases were recovered.  These shell cases

10 were analyzed with the Michigan State Police Laboratory and

11 they were all found to have been fired, in the expert's

12 analysis, to have been fired from the same handgun, which

13 would have been a .40 caliber handgun.

14     There's a stipulation also involves, Judge, a stipulation

15 that Detective Brian Beauchamp did interview the witness who

16 just testified, Harry Matthews, about where the gun was

17 deposited by Harry -- excuse me, by Sam Steel and that

18 Detective Beauchamp along with other members of the Kalamazoo

19 Department of Public Safety did a search of that area.  And

20 off of D Avenue in a location where Harry Matthews had said

21 the gun handle had been deposited, Detective Beauchamp and

22 members of the KDPS did find a handgrip, a handle to a handgun

23 that still contained the serial number to it.  This was found

24 to be consistent with being a .40 caliber handgun.

25     The serial number was actually run, Judge, the

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    stipulation would show to see if it was a registered handgun

2    and it did come back to a person out of Barry County, a Mike

3    Borik, who had actually reported a home invasion back on

4    January 15th of 2011 and report that handgun stolen.  He had

5    reported that handgun is actually an 18K .40 caliber semi-

6    automatic weapon.

7        Finally, Judge, a stipulation would show that Mr. Borik,

8    the lawful owner of that handgun had actually still in his

9    possession a spent casing from being fired from that handgun

10   and he provided it to the police.  And the police submitted

11   that spent casing to the Michigan State Police Ballistics Unit

12   for an expert in forensic examination to evaluate and it was

13   that expert's opinion that the same gun that fired the five

14   shell cases recovered from the scene of 626 Mabel fired that

15   spent shell casing provided by Mr. Michael Borik.

16       And the final stipulation, Judge, thank you for your

17   patience, is simply that the defendant at the time of April

18   24th, 2011 was a felon suffering a conviction of

19   delivery/manufacture, I believe of cocaine, on October 2006

20   out of our county, 9th Circuit Court, and he wasn't eligible

21   to be in possession of a handgun.

22       Those are all the stipulations, Judge, thank you.

23       THE COURT:  All right.  The sum total of those you

24   would agree for purposes of the preliminary examination I can

25   receive?

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    MR. REISTERER:  For purposes of this hearing, your

2    Honor, that conviction was for heroin not for cocaine.

3    MR. ANDEREGG:  Thank you very much, Mr. Reisterer.

4    I agree, Judge.

5    THE COURT:  All right.

6    MR. REISTERER:  I think he misspoke because the

7    information we had received said narcotics.

8    THE COURT:  Thank you.  Okay, the Court will receive

9    that stipulation.

10    Do you have any other evidence you'd like to present at

11    this hearing, Mr. Anderegg?

12    MR. ANDEREGG:  No, sir, thank you.

13    THE COURT:  Mr. Reisterer?

14    MR. REISTERER:  We have no evidence to present, your

15    Honor

16    THE COURT:  Do you have any motions, Mr. Anderegg,

17    on the four count amended criminal complaint?

18    MR. ANDEREGG:  Simply I would ask the Court to bind

19    over on all counts, Judge.

20    THE COURT:  Mr. Reisterer?

21    MR. REISTERER:  Your Honor, certainly counsel is

22    attempting to build a circumstantial case against my client

23    based upon two witnesses who have an awful lot at stake for

24    them to point the fingers at Mr. Steel.  It's our position

25    that their testimony is inherently incredible in light of the

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    enhancements and reduced sentences that they are testifying

2    under.  Ironically that we have no statements implicating Mr.

3    Steel until these people were in custody and represented by

4    attorneys and they're trying to throw an individual under the

5    bus.

6         Certainly it's equally plausible that either one of them,

7    or both of them in cahoots with each other, are the culprits

8    here and we'd ask the Court to consider that when making its

9    decision today.

10             THE COURT:  All right, thank you.

11         Anything else, Mr. Anderegg?

12             MR. ANDEREGG:  No, Judge, thank you.

13             THE COURT:  All right, thank you, counsel.

14         The Court has heard the testimony of two witnesses as

15    well as received some stipulated testimony regarding this

16    amended felony complaint that I'm asked to determine probable

17    cause.

18         Again, the Court is required to find for this hearing

19    whether or not the prosecutor has established probable cause

20    to believe the four counts found in the criminal complaint

21    have been satisfied through the live testimony and the

22    stipulations.

23         A recap of the testimony reflects that Walter Johnson

24    testified that on April 24th, 2011, and of course on cross-

25    examination he was less clear on the date, but he did testify

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    on direct examination that he was with the defendant, Mr.

2    Steel as well as Harry Matthews.  He talked about the

3    relationship; they were riding around, they were in Harry's

4    white truck.  They eventually went to Mabel Street where Mr.

5    Steel had relatives.

6        At that location Mr. Johnson indicated that he could tell

7    from across the street that Milo Conklin was there, that it

8    was also within the vantage point of Mr. Steel to see Milo

9    Conklin at that residence.  Mr. Steel didn't say anything

10   directly about Mr. Conklin, although Mr. Johnson indicated

11   that he used some profanity towards him, that Mr. Johnson was

12   aware that he was upset at -- that is Mr. Steel upset at Mr.

13   Conklin and formed a conclusion that he believed that Mr.

14   Conklin may have broken into Mr. Steel's house.  And in fact,

15   Mr. Johnson indicated that Mr. Steel spoke to him about

16   believing that Mr. Conklin had broken into Mr. Steel's house.

17       Ultimately the three of them left.  They went to a store;

18   they then headed in a direction of Mr. Johnson's cousin's

19   house on Williams Street.  At that point then apparently they

20   went to Mr. Johnson's home.  Mr. Johnson did testify that

21   after they went to his home -- or actually at his cousin's

22   house, excuse me, they were -- they pulled up to the house and

23   then I think I believe he testified later that he exited the

24   vehicle and at some point in time there was a transfer of a

25   gun from Mr. Johnson to Mr. Steel, that it was either after

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Mr. Johnson retrieved the gun from the home that they went to
2   or that it was on Mr. Johnson' person, he could not recall.
3   He believed it to be a .40 caliber gun.  He stated that Mr.
4   Johnson asked to have the gun and then ultimately Mr. Johnson
5   provided the gun to Mr. Steel.
6        At that point in time they -- the three of them again
7   left.  They went to an area at Elizabeth and Cobb.  Mr. Steel
8   asked to be let out.  He got out of the car; Mr. Matthews and
9   Mr. Johnson drove the car to Woodbury Street a couple of
10  blocks away, they sat and waited.  According to Mr. Johnson,
11  Mr. Steel had said to Mr. Johnson he was going to get Milo, go
12  around the corner and wait, those were the  words that Mr.
13  Johnson used.  So Mr. Johnson and Mr. Matthews then left after
14  leaving Mr. Steel to exit the vehicle.
15       Mr. Johnson said they went to his father's house, which
16  was a couple of streets over and then shortly thereafter that
17  he heard five or six gunshots and then he saw Mr. Steel
18  approach from an area from the direction of Mabel Street.  He
19  was walking; they picked him up at that Florence Woodbury
20  area.
21       Mr. Steel got in the back of the car, he still had the
22  gun that Mr. Steel (sic) had given to him and according to Mr.
23  Johnson, Mr. Steel said, quote, you all didn't believe I'd do
24  it, end quote.  He didn't say anything else, that is Mr. Steel
25  didn't say anything else.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1        Then they went to Mr. Steel's home.  Mr. Steel got out

2    but on the way to Mr. Steel's home apparently Mr. Steel then

3    threw the gun out of the window from inside the car.  Mr.

4    Steel who was wearing black hoodie and black sweatpants went

5    into his home on Douglas Street, he shortly thereafter came

6    out.  Mr. Johnson said he didn't go in the home with Mr. Steel

7    nor did Mr. Matthews; Mr. Steel went into his home by himself.

8        He came out, his clothes had changed, he was holding a

9    garbage bag.  According to Mr. Johnson it was full of clothes.

10   They got back in the car, went to Mr. Johnson's house on

11   Stockbridge, went into the garage area and he burned, that is

12   Mr. Johnson said he burned the bag that had the clothes on the

13   dirt floor in the garage.  Mr. Johnson did say that Mr. Steel

14   and Mr. Matthews and he all got out of the car.  He did this

15   with lighter fluid and he ultimately then burned it.  They

16   then left.

17       The next day he had a conversation with Mr. Steel and Mr.

18   Steel had indicated to him that he had broken up the gun and

19   sprinkled it up between here and Jackson.

20       He identified Mr. Steel here in court.

21       He then obviously on cross-examination went over some

22   particulars demonstrating a lack of specificity about who was

23   around, the number of people that were there, couldn't recall

24   specific dates, indicated that this didn't come up in terms of

25   him telling anyone until he was confronted by Officer

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    Beauchamp, obviously his agreement that he reached that would

2    include him testifying here demonstrates favorably as Mr.

3    Reisterer has indicated that there's certainly the opportunity

4    for Mr. Johnson to have a motivation to leave out things or

5    point the finger regarding this incident to somebody else.

6        Harry Matthews then testified and he testified quite

7    consistently with what Mr. Johnson had testified to in the

8    respects of the traveling from various places, who was in the

9    car and to some degree what statements were made.

10       Ultimately he then confirmed that they had gone over to

11    the Mabel Street area.  He didn't know Mr. Conklin, couldn't

12    pick him out of a crowd, didn't know that there was any

13    particular problem between Mr. Conklin and Mr. Steel.

14    However, it appeared that Mr. Steel was upset about a home

15    being broken into but he didn't go on to say that he believed

16    that it was Mr. Conklin who was involved, at least Mr.

17    Matthews didn't refer to that.

18       Ultimately as Mr. Johnson had indicated, they left the

19    Mabel Street area and went to a liquor store and then they

20    went and ultimately to another location where this transfer of

21    this gun apparently took place.  Mr. Matthews said he wasn't

22    privy to that, he didn't see it, didn't know what was going

23    on.

24       Then they went back in the direction of Mabel Street

25    where Mr. Steel wanted to be dropped off on Elizabeth Street

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    and he was told then to -- Mr. Johnson said, told him to go to

2    Woodbury and that's where they went and sat there consistent

3    with Mr. Johnson, said that he heard approximately five or six

4    shots, that it was a short distance away from the area of

5    Mabel Street.  And then Mr. Steel came back from the direction

6    of Mabel Street and was apparently quoted saying didn't think

7    he'd do it.

8        Then he saw Mr. Steel throw a gun outside the window

9    shortly after he was picked up as they headed over to Mr.

10   Steel's home.

11       Mr. Matthews confirmed the same as Mr. Johnson that Mr.

12   Steel changed his clothes and then he came out of the home

13   wearing different clothes and then they went over to Mr.

14   Johnson's house, this again consistent with what Mr. Johnson

15   testified to.  And ultimately Mr. Matthews found fire and

16   smoke from inside the garage and there was obviously something

17   burning.

18       Mr. Steel never said anything about a shooting to him at

19   that point in time, anything more than what he testified to in

20   terms of the comment, although Mr. Matthews did indicate based

21   on the shooting that he was concerned, that he felt suspicious

22   about it.

23       Mr. Steel then contacted Mr. Matthews the next day,

24   wanted another ride.  They headed up to Grand Rapids to quote,

25   to get rid of the bag, which apparently had the gun inside.

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1   Mr. Matthews said that Mr. Steel told him that he went back to

2   get the gun and took that home to get the gun that apparently

3   had been dropped off the night before.

4   And then a comment made by Mr. Steel to Mr. Matthews was

5   based on Mr. Matthews's involvement that he might as well have

6   pulled the trigger, that is directing it to Mr. Matthews.  Mr.

7   Matthews said he saw the defendant then throw some pieces of

8   gun out the window and then ultimately went off of D Avenue a

9   couple streets near D Avenue, exit off 131 and believed that

10  Mr. Steel threw a  handle of a gun out the window in that

11  direction.

12  The stipulations as Mr. Anderegg has presented here talk

13  about the individual Milo Conklin and that he died as a result

14  of multiple gunshot wounds, that he was -- that an autopsy was

15  done four days after the police arrived and found Mr. Conklin

16  at that address on Mabel Street.  There was also some shell

17  casings found that were supportive of .40 caliber handgun.

18  Officer Beauchamp would have testified regarding a search

19  area where a handle of a handgun to a .40 caliber handgun was

20  found in the general area that Mr. Matthews said that he went

21  with Mr. Steel.

22  That serial number then demonstrated as has been

23  stipulated on to reflect a previous owner, a victim of a home

24  invasion and the expert testimony that would have been had it

25  been presented here regarding the spent casing that the

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

117

1    previous owner had matched the casings of the gun that -- the

2    casings found at the scene of Mr. Conklin's death as well as

3    the stipulation regarding the defendant being illegal to

4    possess a firearm because of a previous controlled substance

5    conviction.

6         Certainly the prosecution has established based on these

7    two witnesses here Mr. Steel at least a probable cause

8    standard that he was involved in this particular incident and

9    that the charges that he's been cited for have been

10    established.

11         The Court is not in a position at this point to find the

12    two people's testimony inherently so incredible such that it

13    couldn't be believed and that a trier of fact could not

14    believe it despite obviously some testimony and some

15    exploration of motivation to testify this particular way.

16         And because it supports the claims that have been

17    presented to the Court even thought there is some bias

18    potentially and some veracity issues that need to be explored,

19    I'm not going to remove this from the trier of fact and I will

20    bind the four count amended complaint up to Circuit Court for

21    further proceedings.

22         Anything else with respect to this particular file, Mr.

23    Anderegg?

24         MR. ANDEREGG:  No, Judge, thank you.

25         THE COURT:  Mr. Reisterer?  Mr. Reisterer, do you

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1     have anything else on this particular case?

2                    MR. REISTERER:  Not on this case, your Honor.

3                    THE COURT:  All right, thank you.

4                    (At 4:49 p.m., proceedings concluded)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**8TH DISTRICT COURT – KALAMAZOO COUNTY**

1    STATE OF MICHIGAN        )

2    COUNTY OF KALAMAZOO      )

3

4        I certify that this transcript, consisting of 120 pages, is a

5        complete, true, and correct transcript to the best of my

6        ability of the proceedings held and testimony taken in this

7        case on Tuesday, September 11, 2012 before the Honorable Paul

8        J. Bridenstine, District Judge.

9

10   Dated: October 10, 2012        *Liliana M. Klomparens*

11                                  _____

12                                  Liliana M. Klomparens (CER 6953)
                                    8th District Court
13                                  227 W. Michigan Ave.
                                    Kalamazoo, MI 49007
14                                  (269) 384-8106

15

16

17

18

19

20

21

22

23

24

25

**8TH DISTRICT COURT – KALAMAZOO COUNTY**