**F I L E D**

**Dec 26, 2013**

**9TH JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN**

THE PEOPLE OF THE
STATE OF MICHIGAN

   v                                          File No. 2011-1983 FC

SAMUEL STEEL, III,

        Defendant.


Jury Trial - Volume II of VII
Before Honorable Pamela L. Lightvoet P47677, Circuit Judge
Kalamazoo, Michigan — Tuesday, August 27, 2013


APPEARANCES:

For the People:         Paul John Cusick P70895
                        Assistant Attorney General
                        Michigan Department of Attorney General
                        Criminal Division
                        3030 West Grand Boulevard, Suite 10-361
                        Detroit, Michigan 48202
                        (313) 456-0089

For the Defendant:     Robert A. Champion P52726
                        124 East Bridge Street, Suite C
                        Plainwell, Michigan 49080
                        (269) 685-9220

Recorded by:           Digitally recorded

Transcribed by:        Brenda K. Foley CER 4956
                        Foley Transcription Service
                        8165 Valleywood Lane
                        Portage, Michigan 49024
                        (269) 303-9680

                                * * * * *

                        TABLE OF CONTENTS

                                                              PAGE

Jury sworn  . . . . . . . . . . . . . . . . . . . . . 243

Procedural instructions   . . . . . . . . . . . . . . 245

Opening statement by Mr. Cusick . . . . . . . . . . . 261

WITNESSES: <u>People</u>

CAKRLOTTE WILLIAMS

        Direct examination by Mr. Cusick . . . . . . . . . . . 269

BRANDON NOBLE

        Direct examination by Mr. Cusick . . . . . . . . . . . 275
        Cross-examination by Mr. Champion . . . . . . . . . . 278

MATT HUBER

        Direct examination by Mr. Cusick . . . . . . . . . . . 283
        Cross-examination by Mr. Champion . . . . . . . . . . 286
        Redirect examination by Mr. Cusick . . . . . . . . . . 288

LASHONTAY KYLES

        Direct examination by Mr. Cusick . . . . . . . . . . . 299
        Cross-examination by Mr. Champion . . . . . . . . . . 311
        Redirect examination by Mr. Cusick . . . . . . . . . . 315
        Recross-examination by Mr. Champion . . . . . . . . . 318
        Reredirect examination by Mr. Cusick . . . . . . . . . 319
        Reredirect examination by Mr. Cusick . . . . . . . . . 323
        Rerecross-examination by Mr. Champion . . . . . . . . 324

ALESHA CAPER

        Direct examination by Mr. Cusick . . . . . . . . . . . 326
        Cross-examination by Mr. Champion . . . . . . . . . . 338

GERALD A. LUEDECKING

        Direct examination by Mr. Cusick . . . . . . . . . . . 344
        Voir dire examination by Mr. Champion . . . . . . . . 376
        Further direct examination by Mr. Cusick  . . . . . . . . 377
        Cross-examination by Mr. Champion . . . . . . . . . . 381

TABLE OF CONTENTS (cont.)

WITNESSES: <u>People</u>                                             PAGE

TRACY COCHRAN

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 384
    Voir dire examination by Mr. Champion . . . . . . . . . . 394
    Further direct examination by Mr. Cusick . . . . . . . . 395
    Cross-examination by Mr. Champion  . . . . . . . . . . . 403
    Redirect examination by Mr. Cusick . . . . . . . . . . . 415
    Recross-examination by Mr. Champion . . . . . . . . . . . 415
    Reredirect examination by Mr. Cusick . . . . . . . . . . 417
    Rerecross-examination by Mr. Champion . . . . . . . . . . 417

STEVEN BROWN

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 427
    Cross-examination by Mr. Champion  . . . . . . . . . . . 453
    Redirect examination by Mr. Cusick . . . . . . . . . . . 475
    Recross-examination by Mr. Champion . . . . . . . . . . . 478
    Reredirect examination by Mr. Cusick . . . . . . . . . . 482
    Rerecross-examination by Mr. Champion . . . . . . . . . . 486

WALTER JOHNSON

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 489

```
 1                      TABLE OF CONTENTS (cont.)

 2     EXHIBITS: People                               IDENTIFIED    RECEIVED

 3         1
           2      diagram                                348          349
 4         3      aerial map                             308          308
           4      photograph                             352          353
 5         5      photograph                             354          354
           6      photograph                             357          357
 6         7      photograph                             358          358
           8      photograph                             358          359
 7         9      photograph                             359          360
          10      photograph                             361          360
 8        11      photograph                             361          360
          12      photograph                             361          360
 9        13      photograph                             362          360
          14      photograph                             362          360
10        15      photograph                             362          360
          16      photograph                             362          360
11        17      photograph                             364          363
          18      photograph                             364          363
12        19      photograph                             365          363
          20      photograph                             365          363
13        21      photograph                             365          363
          22      photograph                             365          363
14        23      photograph                             366          363
          24      photograph                             366          363
15        25      photograph                             367          363
          26      photograph                             367          363
16        27      photograph                             367          363
          28      photograph                             368          363
17        29      photograph                             368          363
          30      photograph                             368          363
18        31      photograph                             369          369
          32      photograph                             369          369
19        33      photograph                             370          369
          34      photograph                             370          369
20        35      photograph                             370          369
          36      photograph                             370          369
21        37      photograph                             370          369
          38      .40-caliber shell casings              375          377
22        39      shell casings                          388          389
          40      spent bullets                          389          390
23        41      eyeglasses                             390          392
          42      blue fabric and mat                    392          392
24        43      wallet                                 393          393
          44      slacks                                 394          395
25        45      blue jeans                             395          395
```

1                    TABLE OF CONTENTS (cont.)

2   EXHIBITS: <u>People</u>                        IDENTIFIED      RECEIVED

3        46    tennis shoes                          396           397
         47    Heckler & Koch pistol frame           399           400
4        48    swab from pistol frame                401           401
         49    two buccal swabs                      402           402
5        50    evidence tag numbers                  423           424
         51    photograph                            274           275
6        52    photograph
        106    photograph                            364           363

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Kalamazoo, Michigan

2          Tuesday, August 27, 2013 - 9:34 a.m.

3          THE CLERK:   The court calls the matter of People of

4    the State of Michigan versus Samuel Steel, III, case number

5    C11-1983 FC.

6          Parties, please state appearances for the record.

7          MR. CUSICK:   Good morning, your Honor.

8          Paul Cusick on behalf of the People,

9    Assistant Attorney General.

10         MR. CHAMPION:   May it please the Court,

11   Robert Champion appearing on behalf of Samuel Steel.

12         THE COURT:   All right.  Good morning, Counsel.

13         We are here and ready to proceed with the trial.

14         The jury's upstairs.  We're bringing them down.

15         A couple things that we have to place on the record

16   before we begin.

17         First of all, we will swear the jury in when they

18   come down.

19         We selected 16 jurors a few weeks ago, and we did

20   receive a call last week that one of them was involved in an

21   automobile accident.  I won't go into greater detail than

22   that.

23         But, Counsel, I sent some information to you that we

24   had received with regards to the accident.  I indicated that I

25   was planning on releasing the juror, who was on some—sustained

1    some pretty serious injuries from what we understand and was

2    on some pretty heavy medication; and there were no objections

3    to the Court's dismissing that juror.

4              Is that correct, Counsel?

5              MR. CUSICK:    That's correct, your Honor.

6              MR. CHAMPION:    That is correct, your Honor.

7              THE COURT:    All right.    That was juror in seat

8    number 15.    So we are moving juror in 15—number 16 up to seat

9    number 15 for the rest of the trial, and we have removed that

10   extra seat.

11             So we do have eight seats in the front row and seven

12   in the back, and that's how we are—all the other numbers are

13   remaining the same with regards to the jurors that we

14   selected.

15             We just reviewed and finalized the elements that I'm

16   going to read to the jury after we read them the preliminary

17   instructions.

18             Mr. Champion, do you have a copy of all four of

19   those elements?    I had some extras in my office, and I—

20             MR. CHAMPION:    I do, your Honor.

21             THE COURT:    And you have one, two, three, and four;

22   is that correct?

23             MR. CHAMPION:    That is correct, your Honor.

24             THE COURT:    Okay.    So there's no objections to

25   those elements right now; is that correct, Counsel?

1            MR. CHAMPION:    That is correct, your Honor.

2            MR. CUSICK:    That's correct, your Honor.

3            THE COURT:    All right.  And I'll let the jury know,

4      obviously, that those can change, depending on how the trial

5      progresses, but, if they change, we'll let them know at the

6      end of the trial.

7            Those are now in the notebooks along with a map that

8      I understand is going to be marked as exhibit three; is that

9      correct?

10           MR. CUSICK:    That's correct, your Honor.

11           THE COURT:    And there's—My understanding is both

12     counsel are going to be using the map, so there's no objection

13     to that map.  It is in their notebooks already, and everyone

14     understands that, correct?

15           MR. CUSICK:    Correct, your Honor.

16           THE COURT:    The map, Mr. Champion, you have no

17     objections to that?  It's in the notebook.  It's going to be

18     introduced as exhibit three from what I understand, and I

19     understand you are going to use that map, too; is that

20     correct, sir?

21           MR. CHAMPION:    That is correct, your Honor.

22           THE COURT:    Okay.

23           MR. CHAMPION:    I'll be using one very similar to

24     that.

25           THE COURT:    I understand that a number of witnesses

might be appearing by way of teleconference, and I greatly
appreciate—I know that both sides have been cooperating with
regards to some of those witnesses.  And so, if there are no
objections placed on the record to a specific witness who's
appearing by way of teleconference, I'm assuming that
everyone's in agreement with that and that Mr. Steel has also
agreed to those witnesses that are appearing by way of
teleconference.

So, Mr. Champion, I'll need you to confirm that.

MR. CHAMPION:    Pardon, your Honor?

THE COURT:    There are a number of witnesses
appearing by way of teleconference—

MR. CHAMPION:    That's correct.

THE COURT:    —and I understand that Mr. Steel has
also confirmed that they don't need to appear in person.  So,
unless there's a specific objection to a particular witness
appearing by way of teleconference placed on the record later
on, I'm going to assume that you've—everyone's worked
everything out there with regards to those witnesses and that
there are no objections.

Is that—

MR. CHAMPION:    That's—

THE COURT:    —correct?

MR. CHAMPION:    That's correct, your Honor.

MR. CUSICK:    That's correct, your Honor.

1    THE COURT:  Okay.  Finally, I think there's one

2    witness that—Ricky Perry, I believe—that we need to address.

3    And, Counsel, I'll turn it over to you to address

4    Mr. Perry.

5    MR. CUSICK:  Your Honor, I—We have not been able to

6    make contact with a witness that was originally on our witness

7    list.  I contacted Mr. Champion last week indicating that we

8    have made numerous efforts to contact him.  We have not been

9    able to do so; and, therefore, we are moving to strike him

10   from our witness list.

11   MR. CHAMPION:  That's my understanding, your Honor.

12   I may add Mr. Perry to my witness list if we're able to locate

13   him, so I would just ask that he be added to my witness list.

14   THE COURT:  That's fine.  If no one has any

15   objections to that, then I'm assuming—adding him to

16   Mr. Champion's witness list if they want to call him, correct?

17   MR. CUSICK:  No objection, your Honor.

18   THE COURT:  All right.  With that, is there

19   anything else we need to place on the record before the jury

20   comes in?

21   Counsel?

22   MR. CUSICK:  No, your Honor.

23   THE COURT:  Mr. Champion, anything else we need to

24   place on the record?

25   MR. CHAMPION:  No, your Honor.

1          THE COURT:   All right.  So we're waiting for the

2   jury.  While we do that, we have a number of folks that are in

3   the courtroom.  And let me just tell you a few of the ground

4   rules here.

5          Whenever the jury comes in and out of the courtroom,

6   we stand out of respect for them.  So just make sure that

7   you're paying attention and doing that when we're all

8   standing.

9          You are not allowed to use any devices—any

10  electronic devices.  If cellphones go off or if we see you

11  using them, we'll take them.  The jury needs to pay attention

12  to the trial, not what's going on with regards to the

13  audience; and it just seems like a cellphone is always going

14  off during trial.  It's not fair to the parties, the

15  attorneys, or the jurors.  So that's why I have that rule.

16         Please make sure you pass that information along to

17  anyone else that you might know that might be coming in the

18  trial.  I certainly don't like to take cellphones; but, if

19  they go off, I will take them until the end of the trial,

20  which means when the jury comes back from their deliberations.

21  That could be two, three weeks from now.  I don't know.

22         So make sure those are turned off.  If the deputies

23  see you using them, texting anyone, that's not appropriate.

24  I've asked them to—to take those phones, and we'll address

25  those.

241

So please make sure you—all of those electronic devices are turned off and that you pass that along to others that you know that might be coming in and out of the court,

Also, folks, when we excuse the jury or take a break, just make sure you remain in the court here; and the deputies will let you know when you can leave then. I just don't want anyone commingling accidentally with the jurors. We like to keep them together as a group. So just please sit tight. And we're usually addressing one or two things on the record anyway when the jury leaves the court. So just please sit tight and give them a minute or so to clear the hallway. Okay?

MR. CHAMPION: Your Honor, I would just make a motion for the standard sequestration of witnesses in this matter.

MR. CUSICK: No objection.

THE COURT: Okay. So anyone who's in the court who is a potential witness, you need to leave at this time; and the attorneys will let you know, then, when it's okay for you to come back into the court.

MR. CHAMPION: I have someone outside making sure—make sure that they don't come in.

THE COURT: That's fine.

All right. All rise.

(At 9:41 a.m., jury enters courtroom)

1          You may be seated.

2          All right.  Good morning, ladies and gentlemen.

3          As you can see, we're down to 15 of you.  And that's

4     why we select alternates, obviously, because sometimes

5     situations arise; and so that's why we have some extras.  So

6     we did move the juror in seat number 16 to seat number 15 and

7     removed one chair, so you are officially juror number 15 now.

8          Before—Or when we saw you last, I gave you some

9     instructions.  We are now going to swear you in as a panel,

10    and then I'll give you some more instructions.

11         So, ladies and gentlemen, please stand and raise

12    your right hand.

13         THE CLERK:   Do each of you solemnly swear or affirm

14    that, in this case now before the court, you will justly

15    decide the questions submitted to you; that, unless you are

16    discharged by the Court from further deliberation, you will

17    render a true verdict and that you will render your verdict

18    only on the evidence introduced and in accordance with the

19    instructions of the Court, so help you God?

20         THE JURY (in unison):   I do.

21         THE CLERK:   Thank you.  You may be seated.

22         THE COURT:   Okay.  So each of you has a notebook on

23    your seats; and, in that notebook, there are some preliminary

24    instructions that I'm about ready to read to you.  And you can

25    read—you can follow along with me in those.

You should also have just a blank notepad for you to take notes on, if you choose, and a pen.

And, again, I'll just remind you that, at anytime during the trial, if you're running out of paper or pen, just raise your hand and we can stop and make sure that you—we get you some more paper or another pen, if necessary. So please remember that.

There is also, I believe, a map in there, too, that will be referenced and will be introduced as an exhibit as the trial progresses. So you can use that, too.

The preliminary instructions that I'm about ready to read to you, please do not write on those. We use those over and over again so we don't have to keep copying them every time we have a trial, just so that you know that.

You also have, under the other tab, some elements. There are four counts here, as you know. We went over those before, and I will read the elements after I'm done reading the preliminary instructions. You can write on those elements.

And those are the elements as they exist right now. And sometimes, as a trial progresses, the elements change; and we'll let you know at the end of the trial if that happens, and then we'll give you a corrected or updated copy at that point. But the elements, as they exist right now, are in your notebooks.

So just a reminder, ladies and gentlemen, too, please make sure you're paying attention to what's going on with the trial. People will be coming and going. That's normal in every trial. Just make sure you pay attention to what's going on with this trial and the evidence that's being presented to you.

With that, please follow along with me or listen carefully as I read the preliminary instructions.

A person accused of a crime is presumed to be innocent, and this means that you must start with the presumption that the defendant is innocent; and this presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.

Every crime is made up of parts called elements, and the prosecutor must prove each element of the crime beyond a reasonable doubt. The defendant is not required to prove his innocence or to do anything. If you find that the prosecutor has not proven every element beyond a reasonable doubt, then you must find the defendant not guilty.

A reasonable doubt is a fair, honest doubt growing out of the evidence or the lack of evidence. It is not merely an imaginary or a possible doubt but a doubt based on reason and common sense. A reasonable doubt is just that, a doubt that is reasonable after a careful and considered examination

of the facts and the circumstances of this case.

Now I will explain some of the legal principles you will need to know and the procedure that we will follow.

A trial follows this procedure:

First, the prosecutor will make an opening statement where he will give his theory about the case. The defendant's lawyer does not have to make an opening statement, but he may make an opening statement after the prosecuting attorney gives his or he may reserve and wait until later.

These opening statements are not evidence. They are only meant to help you understand how each side views the case.

The next—The jury instructions, then, go on to the elements. And I'm going to read those at the end, so I'm going to skip that next paragraph

Next, the prosecutor will present his evidence. He may call witnesses to testify and may show—introduce exhibits like documents or objects or photographs. The defendant's lawyer has the right to cross-examine the witnesses called by the prosecuting attorney.

After the prosecutor has presented all of his evidence, then the defendant's attorney may also offer evidence, but he does not have to. By law, the defendant does not have to prove his innocence or produce any evidence. If the defense does call any witnesses, then the prosecuting

attorney has the right to cross-examine those witnesses.

And, if that is the case, when the defense rests, then the prosecutor may call witnesses to contradict the testimony of defense witnesses, and this is called rebuttal.

After all the evidence has been presented, the prosecutor and the defendant's lawyer will make their closing arguments; and, like the opening statements, closing arguments are not evidence. They are only meant to help you understand the evidence and the way each side views the case. You must base your verdict only on the evidence.

You have been given a written copy of the instructions I'm reading to you. You may also refer to those during the trial.

Since no one can predict the course of a trial, these instructions may change at the end of the trial; and, at the close of the trial, I will provide you a written copy of my final instructions for your use during deliberations.

My responsibilities as the judge in this trial are to make sure that the trial is run fairly and efficiently, to make decisions about evidence, and to instruct you about the law that applies to this case. You must take the law as I give it to you.

Nothing I say is meant to reflect my own personal opinions about the facts of this case. As jurors, you are the ones who will decide this case.

1    Your responsibility as jurors is to decide what the

2    facts of the case are, and this is your job and no one else's.

3    You must think about all the evidence and all the testimony

4    and then decide what each piece of evidence means and how

5    important you think it is, and this includes how much you

6    believe about what each of the witnesses said.  What you

7    decide about any fact in this case is final.

8    When it is time for you to decide the case, you are

9    only allowed to consider evidence that was admitted in the

10   case.  Evidence includes only the sworn testimony of

11   witnesses, exhibits admitted into evidence, and anything else

12   I may tell you to consider as evidence.

13   It is your job to decide what the facts of the case

14   are.  You must decide which witnesses you believe and how

15   important you think their testimony is.  You do not have to

16   accept or reject everything a witness says.  You are free to

17   believe all or none or any part of any witness's testimony.

18   In deciding which testimony you believe, you should

19   rely on your own common sense and everyday experiences.

20   However, in deciding whether you believe a witness's

21   testimony, you must set aside any bias or prejudice you may

22   have based on the person's race or gender or national origin.

23   There are no fixed set of rules for judging whether

24   you believe a witness, but it may help you to think about

25   these questions:

Was the witness able to see or hear clearly?

How long was the witness watching or listening?

Was anything else going on that may have distracted the witness?

Does the witness seem to have a good memory?

How does the witness look and act while testifying? Does the witness seem to be making an honest effort to tell the truth, or does the witness seem to evade the questions or argue with the lawyers?

Does the witness's age or maturity affect how you judge his or her testimony?

Does the witness have any bias or prejudice or personal interest in how the case is decided?

Have there been any promises, threats, suggestions, or other influences that affect how the witness testified?

In general, does the witness have any special reason to tell the truth or any special reason to lie?

All in all, how reasonable does the witness's testimony seem when you think about all the other evidence in the case?

The questions the lawyers ask the witnesses are not evidence, only the answers are evidence. You should not think that something is true just because one of the lawyers asks a question that assumes or suggests that it is.

I may ask some of the witnesses questions myself,

1  and these questions are not meant to reflect my own opinions

2  about the evidence.  If I ask a question, my only reason would

3  be to ask about things that may not have been fully explored.

4      During the trial, you may think of an important

5  question that would help you understand the facts of this

6  case, and you are allowed to ask those questions.  You must

7  wait to ask the question until the witness has completely

8  finished testifying and both attorneys have completely

9  finished their questioning.  Then, if you have an important

10 question after this, do not ask it yourself.

11     I will ask if anyone has a question.  I'll give you

12 an opportunity to raise your hand.  Then I'll ask you to write

13 the question down on a clean piece of paper.

14     The attorneys will take turns gathering those

15 questions, and then we will review them—We have a book of

16 rules that we have to follow.—and, if the question is

17 appropriate, then I will ask the witness your question or

18 questions.

19     Do not show your question to the other jurors.

20     If your question is not asked, it is because I have

21 determined, under the law, that the question should not be

22 asked.  Do not speculate about why the question was not asked.

23 In other words, you should draw no conclusions or inferences

24 about facts—the facts of the case nor should you speculate

25 about what the answer may have been.

1       Also, in considering the evidence, you should not
2   give greater weight to testimony merely because it was given
3   answering a question that was submitted by one of the jurors.
4       If, at anytime, you cannot hear what a witness says
5   or what a lawyer says, again, please raise your hand
6   immediately so we can have the question or the answer
7   repeated.
8       And, again, if your question is not asked, don't
9   read anything into that.  Don't wonder why.  Just understand
10  we have rules that we have to follow.
11      During the trial, the lawyers may object to certain
12  questions or statements made by the other lawyers or by the
13  witnesses.  I will rule on these objections according to the
14  law.  My rulings for or against one side or the other are not
15  meant to reflect my own personal opinions about the facts of
16  this case.
17      Sometimes the lawyers and I will have discussions
18  outside of your hearing; and, also, while you are in the jury
19  room, I may have to take care of other matters that have
20  nothing to do with this case.  Please pay no attention to
21  these interruptions.
22      As I indicated before, you are not to discuss this
23  case with anyone, including your family or friends; and you
24  must not even discuss the case with the other jurors until the
25  time comes for you to decide the case.

When it is time for you to decide the case, I will send you to the jury deliberation room for that purpose; and then you should discuss the case among yourselves but only in the jury deliberation room and only when all of the jurors are present. When the trial is over, you may discuss the case with anyone, if you wish.

If I call for a recess during the trial, I will either send you back to the jury room or allow you to go—to leave the courtroom on your own and go about your business.

Again, you must not discuss the case with anyone or let anyone discuss it with you or in your presence. If someone tries to do that, tell him or her to stop and explain that, as a juror, you are not allowed to discuss the case. If he or she continues, leave the area immediately and report the incident to us as soon as you return to court.

And you would do that by letting Ms. Wint know what happened. She'll pass along—the information along to the attorneys and myself and we'll address or handle it from there.

You must not talk to the defendant or the lawyers or the witnesses or anyone that you may recognize as having been in and watched the proceedings about anything at all, even if it has nothing to do with this case. Be very careful 'cause sometimes you might be passing each other in the hallways. And just completely ignore them, please. They should ignore

1    you, too, just so that it does not appear as though there's
2    any appearance of impropriety.  That's why we do that.  It is
3    very important that you only get information about the case in
4    this courtroom when you are acting as the jury and when the
5    defendant and the lawyers and I are all present.

6          During the trial, do not read or listen to or watch
7    any news reports of this case.

8          I'm not sure you have a copy of this instruction in
9    your book.

10         During the trial, do not read, listen to, or watch
11   any news reports about this case.  Under the law, the evidence
12   you must—you consider to decide the case must meet certain
13   standards.

14         For example, witnesses must be sworn in—They must
15   swear to tell the truth.—and the lawyers must be able to
16   cross-examine them.  Because news reports do not have to meet
17   these standards, they could give you incorrect or misleading
18   information that may unfairly favor one side or the other.
19   So, to be fair to both sides, please make sure you follow this
20   instruction.  The only information that you will receive about
21   this case will come to you in this courtroom.  And you do have
22   this instruction in your books.

23         You must not consider any information that comes
24   from anywhere else.  Again, you must not read any newspaper
25   headlines or articles related to the trial.  You must not

watch or listen to any television or radio comments or
accounts of the trial while it is in progress.

Until your jury service is concluded, you are not to
discuss this case with others, including the other jurors.  It
says, except as otherwise authorized; and I don't authorize
you to discuss this case with anyone.

You are not to read or listen to any news reports
about the case.

Do not use a computer or cellphone or other
electronic device with communication capabilities while you
are in attendance during the trial or during your
deliberations, and do not use these devices at anytime during
breaks or recesses to obtain or disclose any information about
a party or a witness or an attorney or a court officer or to
look up or read any news accounts of the case or to obtain any
information collected through any juror research on any topics
raised or testimony offered by any witness or by an exhibit.

You must not do any investigations on your own or
conduct any experiments of any kind on your own.

And, again, this includes using the Internet for any
purpose related to this case; and that also includes using the
Internet to contact other jurors.  Don't contact each other at
all over the Internet, by e-mail, on any Facebook or social
media sites either, please, during the trial.

If you discover that a juror has violated any of

these instructions, please make sure that you pass that information along to us as soon as possible.

You may take notes during the trial, if you wish, but you do not have to. If you do take notes, you should be careful that it does not distract you from paying attention to all the evidence. When you go to the jury room to decide on your verdict, you may then use your notes to help you remember what happened in the courtroom. If you do take notes, do not let anyone, except the other jurors, see those notes.

And what happens during the breaks—during the recesses and over the evening hours, Ms. Wint will—We'll just have you keep your notebooks on your chairs whenever you leave the courtroom. She will gather those. She'll place those in the vault so that they are safe over the lunch hour or over the evening hours.

We don't want you taking those with you because, if you accidentally leave them somewhere, then someone can pick them up and read and figure out what your thinking is or what's important to you, maybe. So that's why we do that.

And then you will finally be able to bring your notebooks out of the courtroom for your deliberations; but, otherwise, we keep them here safe.

Your notes are not examined by anyone. No one reads your notes or looks at them; and, when your jury service is concluded, then those are placed through the shredder and,

1     again, no one reads your notes at anytime.

2            You can see we have chosen a jury of 15 individuals;

3     and, after you have heard all of the evidence and my final

4     jury instructions, we randomly select three seats so that only

5     12 of you will deliberate; and it is, again, a random

6     selection.

7            Possible penalty should not influence your decision.

8     It is the duty of the judge to fix the penalty within the

9     limits provided by the law if there is a guilty verdict.

10           I may give you more instructions during the trial;

11    and, at the end of the trial, I will give you detailed

12    instructions about the law in this case.  You should consider

13    all of my instructions as a connected series.  Taken

14    altogether, they are the law that you must follow.

15           After all the evidence has been presented and the

16    lawyers have given you their closing arguments, I will then

17    give you detailed final instructions about the rules of law

18    that apply to this case.  Then you will go to the jury room to

19    decide on your verdict.

20           A verdict must be unanimous.  That means that every

21    single juror must agree on it, and it must reflect the

22    individual decision of each and every juror.

23           It is important for you to keep an open mind and not

24    make any decision about anything in the case until you go to

25    the jury room to decide the case.

1    Now, before I move on to the elements, does anyone

2    have any questions about the instructions that I have just

3    read?  If so, just raise your hand.

4    And no hands are raised.

5    All right.  So I'm going to review the elements with

6    you as they exist right now.  You have a copy of these, I

7    think, under the other section of your notebooks.  And, again,

8    I'll caution you that sometimes the elements do change and we

9    will let you know if that happens.

10    I will also indicate that sometimes the titles on

11    the jury instructions don't match up with the counts.  They

12    are identified for you.

13    Count one, the title, as I indicated before, is open

14    murder.  There are two options, as you can see, for count one.

15    I'm going to read those to you.

16    The defendant is charged with the crime of

17    first-degree premeditated murder under count one.  To prove

18    this charge, the prosecutor must prove each of the following

19    elements beyond a reasonable doubt:

20    First, that the defendant caused the death of

21    Milo Conklin; that is, that Milo Conklin died as a result of

22    the shooting.

23    Second, the defendant intended to kill Milo Conklin.

24    Third, that this intent to kill was premeditated,

25    that is, thought out beforehand.

1          Fourth, that the killing was deliberate, which means
2     that the defendant considered the pros and cons of the killing
3     and thought about and chose his actions before he did it.
4     There must have been real and substantial reflection for long
5     enough to give a reasonable person a chance to think twice
6     about the intent to kill.
7          The law does not say how much time is needed.  That
8     is for you to decide if enough time has passed under the
9     circumstances of this case.  The killing cannot be the result
10    of a sudden impulse without thought or reflection.
11         You may also consider the less—lesser charge of
12    second-degree murder under count one.  To prove this charge,
13    the prosecutor must prove each of the following elements
14    beyond a reasonable doubt:
15         First, that the defendant caused the death of
16    Milo Conklin; that is, that Milo Conklin died as a result of
17    the shooting.
18         Second, that the defendant had one of these three
19    states of mind:
20         He intended to kill; or
21         He intended to do great bodily harm to Milo Conklin;
22    or
23         He knowingly created a very high risk of death or
24    great bodily harm knowing that death or such harm would be the
25    likely result of his actions.

1    Count two, the title, as I read to you on the

2    information, is weapons felony firearm.  The title on the jury

3    instructions is possession of firearm at the time of

4    commission or attempted commission of felony firearm.

5        It reads as follows:

6        The defendant is also charged with a separate crime

7    of possessing a firearm at the time he committed the crime of

8    first-degree premeditated murder or second-degree murder.  To

9    prove this charge, the prosecutor must prove each of the

10   following elements beyond a reasonable doubt:

11       First, that the defendant committed the crime of

12   first-degree premeditated murder or second-degree murder,

13   which has been defined for you.  It is not necessary, however,

14   that the defendant be convicted of that charge—or of that

15   crime.

16       Second, that at the time the defendant committed

17   that crime, he knowingly carried or possessed a firearm.

18       Count three, the title in the information is weapons

19   firearms possession by felon.  The title on the jury

20   instructions is felon possessing a firearm.

21       In count three, the defendant is also charged with

22   the crime of possessing a firearm in this state after having

23   been convicted of a specified felon [*sic*]—felony.  To prove

24   this charge, the prosecutor must prove each of the following

25   elements beyond a reasonable doubt:

First, that the defendant possessed a firearm in this state.

Second, that the defendant was convicted of a specified felony.

Count four, the title on the information is weapons felony firearm. On the jury instructions, it's titled possession of firearm at the time of commission or attempted commission of felony firearm.

The defendant is also charged with a separate crime of possessing a firearm at the time he committed the crime of felon possessing a firearm. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the defendant committed the crime of felon possessing a firearm, which has been defined for you. It is not necessary, however, that the defendant be convicted of that crime.

Second, that, at the time the defendant committed that crime, he knowingly carried or possessed a firearm.

All right. Those are the elements as they exist right now.

And I will turn it over to Counsel for an opening statement.

MR. CUSICK: Thank you, your Honor.

Gm.

UNIDENTIFIED JURORS:   Good morning.

2      MR. CUSICK:    We're here today for one reason: that

3 is because the defendant Samuel Steel murdered Milo Conklin.

4 He murdered him on April 24th of 2011 at around 9:00 p.m.

5 Easter Sunday.  He murdered him at the house of

6 626 Mabel Street in the city of Kalamazoo.  He murdered him

7 because he felt or believed that Milo Conklin had taken money

8 from him and stolen from him.

9      Testimony in this case will show that, and the

10 witnesses will indicate, that an African-American male dressed

11 in a black hoodie and black pants came from Elizabeth Street,

12 which is just north of Mabel Street, on that day at that time,

13 went toward 626 Mabel Street directly toward Milo Conklin,

14 shot Milo Conklin five or six times, killed Milo Conklin, then

15 ran across the street south to Florence Street.

16      Many of the witnesses can give a description of the

17 shooter.  After 24th of 2011, there was a thorough

18 investigation that was done.  Detective Brian Beauchamp, the

19 officer in charge of the case, headed the investigation.  And

20 many people were talked to, many people were interviewed.

21 And, based on that, information came about as to who, in fact,

22 shot and murdered Milo Conklin.

23      People began to come forward.  Took them a long time

24 to come forward, but they came forward.  And many people came

25 forward on their own volition to indicate what happened on

261

1    that night at that place.

2          One of the individuals that you'll hear from is a

3    man by the name of Steven Brown.  Steven Brown says he knows

4    the defendant and he knew the victim Milo Conklin; that he saw

5    the defendant go up to Milo Conklin and shoot him a couple of

6    times—He saw the last two shots.—then run right past him

7    toward Florence Street, and he went into a white van driven by

8    a man by the name of A. J. Mathews, a white Denali.  And

9    you'll hear him testify to that.

10         Now Steven Brown came up with a story

11   initially—concocted a story, and you'll indicate—and he'll

12   indicate why he came up with a story that was different from

13   that.  And you'll hear his testimony and his explanation as to

14   why early on he came up with a different story.  But he came

15   forward in November of 2011 in a very emotional way and told

16   Detective Beauchamp what happened.

17         Around the same time, just a little bit before that,

18   another individual came forward on his own volition, on his

19   own accord.  That individual is named Walter Johnson.

20   Walter Johnson will testify, and he's a federal prisoner who

21   promised to give truthful testimony as to any criminal

22   activity that he was aware of.  Came forward November—October,

23   November of 2011 and told Detective Beauchamp exactly what

24   happened.

25         Walter Johnson will testify to the fact that at

                                262

1  about—in the afternoon of April 24th of 2011 the defendant and
2  A. J. Mathews, the individual I just mentioned who was driving
3  the white Denali, came by his house and picked him up.  They
4  started riding around the area in Kalamazoo, around
5  Mabel Street and around the city.

6        They stopped at Mabel Street and hung out for a
7  while.  This was Easter Sunday.  A lot of people were outside.
8  They went to a liquor store, bought some liquor.
9  A. J. Mathews, the defendant, had some beers and went to his
10 mother's house, which is 623.  When I say his mother's house,
11 I'm referring to the defendant's mother's house, which is
12 623 Mabel Street.

13       Now at that time the defendant was making statements
14 about now much he was upset with Milo Conklin, and you will
15 hear throughout the trial statements—people testifying to
16 statements the defendant made as to how Milo Conklin had to
17 get—be getten [sic] rid of because the defendant believed that
18 it was Milo Conklin who had robbed him.  Whether or not that's
19 the case is not—not the main issue, but that's what the
20 defendant believed.

21       So the defendant asked Walter Johnson for his gun.
22 They drove to a house on William Street.  Walter Johnson gave
23 him a gun.  He didn't know what was going to exactly happen.
24 He felt that the defendant was just going to intimidate
25 Milo Conklin.

263

They drive from William Street to the area of
Elizabeth—When I say they drive, A. J. Mathews was driving,
Walter Johnson was in the passenger seat, the defendant was in
the back seat.

A. J. Mathews drives to Elizabeth and
Cobb Street—the intersection of Elizabeth and Cobb, which is
just north of Mabel Street where the shooting occurred.

The defendant got out of his—out of the car, walked
toward Mabel Street.  Walter Johnson and Harry Mathews heard
five or six shots.  At that time, they were parked on the
driveway of Walter Johnson's father's house.

Harry Mathews then drives around Florence—to
Florence and Woodbury, and the defendant gets in the car and
they drive away.  Shortly thereafter, right around that area,
the defendant gets rid of the gun.  It was a .40-caliber
handgun.

They go to Douglas Street where the defendant lives.
The defendant changes clothes.  He was in a black hoodie and
black pants.  They then go to Stockbridge, which is where
Walter Johnson lives, and the defendant goes into the garage,
sets his clothes on fire.  That was about the extent to what
Walter Johnson had to do with the case.

The investigation continued.  Based on the
investigation, a warrant was issued, charged the defendant
with the crime of open murder and charged A. J. Mathews with

accessory after the fact for driving away.

Immediately that day—This was in December, December 22nd of 2011, I believe.—A. J. Mathews turns—turns himself in, walks directly to the precinct the day he was charged—minutes after he was charged—and comes forward. He admits to everything that Walter Johnson told Detective Beauchamp. He admits to driving away. He admits to driving there. He admits that the next day, after the defendant shot Milo Conklin, they went back to get the gun because the defendant was afraid the gun was too close to the murder scene.

So the next day A. J. Mathews indicates he went back in his white Denali. He picked the defendant up and drove along 131 North. At about eight miles from here, the gun was disposed of. During that time, the defendant was taking the gun apart and throwing pieces outside the window. The handle of the gun was found about eight miles from here in a wooded area.

When A. J. Mathews turned himself in on December 22nd, the defendant fled. He fled the state. He went to Georgia. First, he went to Chicago and then he went to Georgia, and he came up with a completely different identity.

For a time he lived with a lady by the name of Kristine Wilkerson, and he came up with a name of Glen Norris. Didn't tell her what his true reason was for coming to

1    Georgia—came up with a completely different story—and lived

2    there for almost eight months.

3            August 6th of 2012—And you'll hear testimony as to

4    how he was apprehended.  It was basically because of phone

5    calls.—he was arrested.  They were able to track the

6    defendant.  He was arrested eight months later and brought

7    back to Michigan.

8            Walter Johnson, A. J. Mathews, Steven Brown's

9    testimony is corroborated by other aspects of the case.

10   Through the investigation, Detective Beauchamp went to the

11   wooded area I just mentioned about eight miles from here and

12   was able to get—find the handgun that was used.

13           Tests were done.  Walter Johnson indicated that he

14   was able to receive that handgun from a theft that occurred in

15   another county.  Tests were done on that handgun based on

16   information received from the owner of that handgun that the

17   gun was stolen by—who the gun was stolen from, and it did

18   indicate that that was the correct handgun—the right handgun

19   that was used in the shooting based on casing tests.

20           Michael Bombich from the Michigan State Police will

21   testify that he went to—Actually, I believe he's from the

22   Kalamazoo police department.—will testify to the fact that

23   they went to the house on Stockbridge where the clothes were

24   burned.  He found burnt clothes.  He found a burnt area in the

25   garage.

266

1    There's phone records and cell towers indicating
2    that, yes, A. J. Mathews and Samuel Steel and Walter Johnson
3    were in the area that they—that Walter Johnson and
4    A. J. Mathews said they were in during this time.
5         There were phone calls between A. J. Mathews and
6    Samuel Steel and Samuel Steel and A. J. Mathews and some
7    between Walter Johnson and A. J. Mathews.
8         And there were other witnesses that had the courage
9    to come forward and indicate what they know about the case.
10   One of them is a friend of the defendant, a man by the name of
11   Devon Smith, somebody who grew up with the defendant, who knew
12   him very well.  And he will testify that, in November of 2011,
13   the defendant admitted to him that he did, in fact, shoot and
14   kill Milo Conklin.
15        And then the investigation continued.  And, even up
16   until July of this year when the defendant was in a cell, his
17   cellmate, a man by the name of David Lee, will testify that
18   the defendant told him about what he did.  Took an oozy, is
19   what the defendant said, and he was grandstanding and said
20   that he shot the victim 20 or 25 times getting out of a white
21   car, going to Georgia, then being apprehended.
22        Now David Lee doesn't know who
23   David Smith—Devon Smith is.  Devon Smith, Walter Johnson,
24   Steven Brown, A. J. Mathews never talked about this case with
25   one another.  Some of them don't even know who each other are.

Well, nobody knows who David Lee is.

This is what the evidence will show: that it was the defendant who committed this crime, he thought it out, and he intended to kill Milo Conklin.

At the end of all the testimony, I will come back and I will ask for a verdict of guilty of first-degree premeditated murder.

Thank you.

THE COURT:   Thank you.

Mr. Champion—

MR. CHAMPION:   I reserve—

THE COURT:   —are you planning on—

MR. CHAMPION:   —my right—

THE COURT:   I'm sorry?

MR. CHAMPION:   —to make an opening.

I reserve my right to make an opening statement.

THE COURT:   And, as you recall, ladies and gentlemen, Mr. Champion can either reserve or give an opening statement at this time, and he's reserved it.

I appreciate that, Counsel.

We'll move forward to the first witness.

Go ahead, Mr. Cusick.

MR. CUSICK:   Your Honor, at this time the People will call Charlotte Ross.

THE COURT:   Right over here, ma'am.

```
 1              Before you have a seat, please raise your right
 2      hand.  Do you solemnly swear or affirm that the testimony
 3      you're about to give will be the truth, the whole truth, and
 4      nothing but the truth, so help you God?
 5              MS. ROSS:   Yes.
 6              THE COURT:   Please have a seat.
 7              That chair falls back sometimes, so just be careful
 8      about that.
 9              MS. ROSS:   Okay.
10              THE COURT:   It's a little wobbly there.
11              Make sure you speak right in the end of that
12      microphone.  If you pull back too far or move to either side,
13      it will not pick up what you're saying.  And it is hard to
14      hear in this court, so just so that you know that.
15              I need you to speak up, and I need you to state and
16      spell your first and last name for the record, please.
17              THE WITNESS:   Cakrlotte Williams.
18      C-a-k-r-l-o-t-t-e—Williams—W-i-l-l-i-a-m-s.
19              MR. CUSICK:   May I proceed, your Honor?
20                      CAKRLOTTE WILLIAMS,
21      called at 10:22 a.m., and sworn by the Court, testified:
22                      DIRECT EXAMINATION
23 BY MR. CUSICK:
24 Q    Good morning.
25 A    Good morning.
```

| | | |
|---|---|---|
| 1 | Q | Ms. Williams, I want to direct your attention to the date of |
| 2 | | April 24th of 2011.  Do you remember that day? |
| 3 | A | Yes, I do. |
| 4 | Q | Do you know a Milo Conklin? |
| 5 | A | Yes, I— |
| 6 | Q | Did you know a Milo Conklin? |
| 7 | A | Yes, I do. |
| 8 | Q | And who is he to you? |
| 9 | A | He's my stepson. |
| 10 | Q | Do you remember seeing him that day on April— |
| 11 | A | Yes. |
| 12 | Q | —24th? |
| 13 | | Where did you see him that day? |
| 14 | A | He was over to my daughter's house, Ebonie Bly.  We had Easter |
| 15 | | dinner. |
| 16 | Q | Approximately what time was that? |
| 17 | A | Probably about 4:00 o'clock. |
| 18 | Q | Okay.  What time did he leave?  Did Milo Conklin eventually |
| 19 | | leave? |
| 20 | A | He was there for a couple hours.  Probably about 7:00, 7:30 or |
| 21 | | so. |
| 22 | Q | Okay.  Did you see Milo Conklin after that? |
| 23 | A | No. |
| 24 | Q | Did you receive information later that evening about something |
| 25 | | that happened to Milo Conklin? |

270

```
 1  A   Yes.

 2  Q   And what did you hear?

 3  A   I had just got home from his aunt's house, and my daughter—his

 4      sister Markesha Bly—called me and said, Mom, Milo done just

 5      got shot over on Mabel Street, hurry up over there.

 6          And I went there, and he was gone already to the

 7      hospital.

 8  Q   Okay.  Did you go to the hospital?

 9  A   Yes, I did.

10  Q   And what hospital—hospital was that?

11  A   Bronson.

12  Q   Did you see Milo Conklin in the hospital?

13  A   No, they wouldn't let us see him.  They said there was too

14      much blood, they had to get him cleaned up and we couldn't see

15      him until he got to the funeral home.

16  Q   Do you eventually see him at the funeral home?

17  A   Yes.

18  Q   Was that the first time that you saw him after he was—he was

19      shot?

20  A   Yes.

21          MR. CUSICK:   Your Honor, may I approach?

22          THE COURT:   Yes.

23          THE WITNESS:   I don't want to see it.

24          THE COURT:   Counsel, will you approach a second.

25          (At 10:24 a.m., bench conference as follows:
```

271

1          THE COURT:   You don't have to ask me to

2     approach.  You have free range, just so that you

3     know—

4          MR. CUSICK:   For future—

5          THE COURT:   —in my court.  And, also,

6     when—after I swear a witness in, go ahead and

7     proceed when you're ready.

8          MR. CUSICK:   Okay.

9          THE COURT:   You don't have to ask me.

10     I'm losing you at the end.  And I know

11     sometimes you want to keep your voice low, but make

12     sure you speak up because I just—

13          MR. CHAMPION:   . . . (inaudible)

14          THE COURT:   —don't want to remind you over and

15     over again.

16          MR. CUSICK:   Okay.

17          MR. CHAMPION:   It's hard to hear

18     . . . (inaudible)

19          THE COURT:   It's very hard to hear, and I'm

20     losing you at the end so speak up.

21          MR. CUSICK:   Okay.  Thank you.)

22          THE COURT:   Go ahead.

23   BY MR. CUSICK:

24   Q    I'm handing you People's proposed exhibit number 51.  Can you

25        tell the Court what that is.

```
 1    A      Yes.

 2    Q      What is that?

 3    A      Milo's picture.

 4    Q      When was that picture taken?

 5    A      I don't know.  I think this was on his obituary.

 6                    THE COURT:   I can't hear you.  You got to speak—

 7                    THE WITNESS:   Well, I think this was on his

 8           obituary.

 9                    MR. CUSICK:   Okay.

10                    THE WITNESS:   On his—Yeah.

11                    MR. CUSICK:   Your Honor, at this time, I'd ask that

12           People's proposed exhibit number 51 be admitted into evidence.

13                    MR. CHAMPION:   No—

14                    THE COURT:   Mr. Champion?

15                    MR. CHAMPION:   No objection, your Honor.

16                    THE COURT:   Okay.  Fifty-one is received.

17                    And, ladies and gentlemen, just so that you know,

18           every time a—an exhibit is received—Sometimes you'll see it,

19           sometimes you might not if it's a document or whatnot,

20           depending on how the jur—or the attorneys are proceeding.  But

21           all of the exhibits will be provided to you in the jury

22           deliberation room, so you'll certainly have an opportunity to

23           review all of them, just so that you know that.

24                    Go ahead.

25                    MR. CUSICK:   Your Honor, I have no—nothing further.
```

273

```
1                    Thank you.

2                    THE COURT:  Mr. Champion, any questions?

3                    MR. CHAMPION:  I have no questions, your Honor.

4                    THE COURT:  Okay.  Thank you, ma'am.  You may step

5          down.

6                    MR. CUSICK:  Your Honor, Ms. Williams will be

7          released from testifying.  And I would just ask that she

8          remain—be able to remain in the courtroom.

9                    THE COURT:  Any objections to that?

10                   MR. CHAMPION:  No, your Honor.

11                   THE COURT:  All right.  That's fine.

12                   MR. CUSICK:  Your Honor, do you want me to publish

13         this . . . (inaudible)

14                   THE COURT:  I think they just saw it—

15                   MR. CUSICK:  . . . (inaudible)

16                   THE COURT:  —so I think if you just set it there,

17         that's fine.

18                   MR. CUSICK:  Your Honor, at this time the People

19         would call Brandon Noble.

20                   THE COURT:  Before you have a seat, please raise

21         your right hand.  Do you solemnly swear or affirm that the

22         testimony you're about to give will be the truth, the whole

23         truth, and nothing but the truth, so help you God?

24                   MR. NOBLE:  I do.

25                   THE COURT:  Please have a seat, sir.
```

274

1           With that microphone, you really need to speak right

2       in the end.  Please make sure you don't pull too far back or

3       move to either side.

4           I need you to state and spell your first and last

5       name for the record, please.

6           THE WITNESS:   First name's Brandon—B-r-a-n-d-o-n;

7       last name's Noble—N-o-b-l-e.

8                        BRANDON NOBLE,

9       called at 10:27 a.m., and sworn by the Court, testified:

10                    DIRECT EXAMINATION

11  BY MR. CUSICK:

12  Q   How are you employed?

13  A   I'm a public safety officer in the city of Kalamazoo.

14  Q   Okay.  And how long have you been employed as a public safety

15      officer in the city of Kalamazoo?

16  A   Four and a half years.

17  Q   I want to direct your attention to the date of April 24th,

18      2011.  Do you recall that day?

19  A   I do.

20  Q   And did you arrive at the location of 626 Mabel Street in the

21      city of Kalamazoo that day?

22  A   Yes.

23  Q   And what brought you to that location?

24  A   There was a report of shots fired.

25  Q   When you arrived at the location, what did you observe?

| | | |
|---|---|---|
| 1 | A | The scene was pretty hectic.  There's several people calling |
| 2 | | for my assistance.  And, upon further investigation, I came |
| 3 | | upon a male—a black male subject that was laying face down on |
| 4 | | the sidewalk. |
| 5 | Q | What did you do in response to what you saw? |
| 6 | A | I asked several individuals to move away so I could provide |
| 7 | | assistance, and I began rendering aid to the victim. |
| 8 | Q | And how did you go about doing that? |
| 9 | A | I began—actually began CPR.  He was breathing very |
| 10 | | shallowly—shallow, and the bag valve was used to assist in |
| 11 | | breathing. |
| 12 | Q | Were there any other people who were around that area when you |
| 13 | | were attempting to help the person on the ground? |
| 14 | A | Yes, a subject later identified as Keyth Whitfield. |
| 15 | Q | What was Keyth Whitfield doing? |
| 16 | A | He kept attempting to go in the pockets of the victim.  And |
| 17 | | he—As I was rendering aid, he kept getting in the way, |
| 18 | | interfering.  I told him to back away several times, and he |
| 19 | | kept refusing to do so. |
| 20 | Q | Were you able to identify the person that was on the ground? |
| 21 | A | I was. |
| 22 | Q | Okay.  And who was that individual? |
| 23 | A | Milo Conklin. |
| 24 | Q | How were you able to identify him? |
| 25 | A | There was several people at the scene informing me of the |

276

| | | |
|---|---|---|
| 1 | | subject's identity. |
| 2 | Q | Regarding Keyth Whitfield, what happened after—what happened |
| 3 | | as a result of what he was doing? |
| 4 | A | Mr. Whitfield was arrested for interfering.  He is a nuisance |
| 5 | | to the scene and told several times to back away, and he was |
| 6 | | eventually taken into custody. |
| 7 | Q | How many people were around Milo Conklin's body? |
| 8 | A | Specific number's hard, but there was probably about—I'd |
| 9 | | estimate between ten and 15. |
| 10 | Q | Were you able to take statements from anybody that was around |
| 11 | | the area? |
| 12 | A | There were some people, as I was rendering aid, I was |
| 13 | | attempting just to get kind of—get information for assisting |
| 14 | | officers as they're arriving on scene.  They gave me a |
| 15 | | description of the subject that reportedly did the shooting. |
| 16 | Q | And what was that description? |
| 17 | A | Description was a black male approximately in his 20s wearing |
| 18 | | a black hoodie, and he was last seen running northbound |
| 19 | | towards Elizabeth Street. |
| 20 | Q | How many people did you talk to? |
| 21 | A | At the time there's—I remember specifically one black |
| 22 | | female—But I did not recall her name.—as I was rendering aid. |
| 23 | Q | So there was one person that you spoke with? |
| 24 | A | Confirm. |
| 25 | Q | Okay.  And you don't recall her name? |

277

```
1    A    Correct.
2                    MR. CUSICK:   I have nothing further.
3                    Thank you.
4                    THE COURT:   Mr. Champion?
5                    MR. CHAMPION:   Thank you.
6                              CROSS-EXAMINATION
7    BY MR. CHAMPION:
8    Q    Did you stay on the scene?
9    A    I'm sorry?
10   Q    When you arrived, were you the first officer?
11   A    That is correct.
12   Q    Did you stay on the scene—
13   A    Yeah—
14   Q    —after that?
15   A    —I was on scene.  The victim was loaded into the ambulance.
16        And then I was directed to take Mr. Whitfield into custody,
17        and I went for the booking process.
18   Q    So you—you arrested the individual that was going through
19        Mr. Conklin's pants—Is that correct?
20   A    Correct.
21   Q    —and he was taking things out.
22             What type of things was he taking out?
23   A    I didn't see him get anything.  I saw some—it looked like
24        miscellaneous papers at the time.  And then I told him to
25        quit, and I didn't allow him to go in the pockets any further.
```

```
 1   Q   How did you approach the scene?

 2   A   I was actually on routine patrol.  I was traveling down

 3       southbound on Cobb when the initial reports of shots fired

 4       came out.

 5               I made a left-hand turn onto Mabel and encountered a

 6       large group.

 7   Q   From the time you received the call to the time that you

 8       arrived at the scene, how much time had passed?

 9   A   Approximately, I'd say, 30 seconds.  I was right in the

10       vicinity.

11   Q   Did you see any vehicles leaving the area?

12   A   I did not.

13   Q   And you said there was ten to 15 people gathered around at

14       that time?

15   A   That is correct.

16   Q   And Mr. Conklin was on the sidewalk—

17   A   That is correct—

18   Q   —is that correct?

19   A   —yeah.

20   Q   To the north or south of the roadway?

21   A   It was right in front of 626 Mabel, which is on the north side

22       of Mabel.

23   Q   And Mabel runs east and west; is that correct?

24   A   That is correct.

25   Q   Were you able to identify any of these ten or 15 people that
```

279

| | | |
|---|---|---|
| 1 | | were initially on the— |
| 2 | A | No, I—I was not. I just knew Mr. Whitfield from previous |
| 3 | | contacts. |
| 4 | Q | Now somebody said it was a black male in his 20s—Is that |
| 5 | | correct? |
| 6 | A | That is correct. |
| 7 | Q | —wearing a black hoodie? |
| 8 | A | Correct. |
| 9 | Q | Any other description? |
| 10 | A | At the time they said, I believe, they added that was |
| 11 | | slender—slender build. |
| 12 | Q | Nothing about hair of facial hair, anything of that nature? |
| 13 | A | No, they said that he was wearing a hoodie and could not make |
| 14 | | that out. |
| 15 | Q | Pants, anything of that nature? |
| 16 | A | They could not provide that. |
| 17 | Q | Did anyone identify who the person was? |
| 18 | A | No, they did not. |
| 19 | Q | Did anyone tell you how recent the shooting had occurred? |
| 20 | A | No, they did not, not on scene. |
| 21 | Q | I believe the weather was about 60 degrees; is that correct? |
| 22 | A | Sixty degrees and cloudy, yes, sir. |
| 23 | Q | And you were on routine patrol in the area? |
| 24 | A | That is correct. |
| 25 | Q | And you were within a couple blocks of the shooting at the |

1    time the call came in?

2  A  That is correct.

3  Q  Did you hear any shots?

4  A  I did not.

5  Q  This was a little after 9:00 p.m.; is that correct?

6  A  That is correct.

7  Q  Was it dark out at that time?

8  A  No, it was starting to get dark.  It was not completely dark,

9     still daylight.

10 Q  It wasn't raining out or anything of that nature; is that

11    correct?

12 A  It was not raining.  We had received previous rain.  There was

13    a puddle by the victim.

14 Q  But that was in the sidewalk—Is that right?

15 A  Correct.

16 Q  —correct?

17            And you didn't search the scene at all; is that

18    correct?

19 A  No.

20 Q  You took this other individual into custody and then you left

21    the scene?

22 A  That is correct.

23            MR. CHAMPION:   Thank you.

24            I have no other questions.

25            THE COURT:   Mr. Cusick, any follow-up?

1          MR. CUSICK:   I have nothing further, your Honor.

2          THE COURT:   Ladies and gentlemen, do any of you

3     have any questions for this witness?  If so, just raise your

4     hand.

5          No hands are raised.

6          Thank you, sir.  You may step down.

7          Is he excused from his subpoena, Counsel?

8          MR. CUSICK:   Yes, your Honor.

9          THE COURT:   Any objections to that, Mr. Champion?

10         MR. CHAMPION:   No objection, your Honor.

11         THE COURT:   Thank you, sir.

12         THE WITNESS:   Yeah.

13         THE COURT:   Counsel, will you approach a moment.

14         (At 10:36 a.m., bench conference as follows:

15              THE COURT:   Okay.  So I did not give them an

16              opportunity to ask any questions on the last

17              witness.  I don't know—She's sitting here.  Do you

18              want me to ask them, or do you want to just move on

19              and not worry about it?

20              MR. CUSICK:   I think we can move—I think we

21              can move on.

22              MR. CHAMPION:   Yeah.

23              THE COURT:   I don't think she gave much

24              information other than identify—

25              MR. CUSICK:   She doesn't have any specific

1           information.

2                   THE COURT:   All right.  So—Okay.  Thank you.

3           Sorry about that.)

4           THE COURT:   Go ahead.

5           MR. CUSICK:   Thank you, your Honor.

6                   At this time we would call—People would call

7      Matthew Huber.

8           THE COURT:   Before you have a seat, sir, please

9      raise your right hand.  Do you solemnly swear or affirm that

10     the testimony you're about to give will be the truth, the

11     whole truth, and nothing but the truth, so help you God?

12                  MR. HUBER:   I do.

13                  THE COURT:   Thank you, sir.

14                  Have a seat.

15                  With that microphone, you really need to speak right

16     in the end of the microphone.  Please don't pull back too far

17     or move to either side.

18                  I need you to state and spell your first and last

19     name for the record, please.

20                  THE WITNESS:   Matt Huber—M-a-t-t H-u-b-e-r.

21                            MATT HUBER,

22     called at 10:37 a.m., and sworn by the Court, testified:

23                        DIRECT EXAMINATION

24  BY MR. CUSICK:

25  Q   Officer Huber, I want to direct your attention to—Well, first

| | | |
|---|---|---|
| 1 | | of all, where are you an officer? |
| 2 | A | City of Kalamazoo. |
| 3 | Q | How long have you been an officer? |
| 4 | A | Fifteen years. |
| 5 | Q | I want to direct your attention, sir, to the date of April 24th |
| 6 | | of 2011.  Do you recall that day? |
| 7 | A | Yes, I do. |
| 8 | Q | And do you arrive at the location of 626 Mabel Street in the |
| 9 | | city of Kalamazoo? |
| 10 | A | Yes, I do. |
| 11 | Q | What brought you to that location? |
| 12 | A | I responded that evening to a report of two subjects had been |
| 13 | | shot. |
| 14 | Q | When you arrived at that location, what did you observe? |
| 15 | A | I observed officers tending to victims on the ground in front |
| 16 | | of the residence. |
| 17 | Q | In front of the residence of 626 Mabel Street? |
| 18 | A | Yes, sir. |
| 19 | Q | What do you do in response to that? |
| 20 | A | As the officer's rendering aid, I began securing the crime |
| 21 | | scene.  I placed crime scene around—crime scene tape around |
| 22 | | the residence and where the incident occurred. |
| 23 | Q | Did you have occasion to speak with a Keyth Whitfield? |
| 24 | A | Yes, I did. |
| 25 | Q | And can you describe the context of that conversation or what |

284

| | | |
|---|---|---|
| 1 | | Mr. Whitfield was doing. |
| 2 | A | As I was securing the crime scene, Mr. Whitfield provided me |
| 3 | | with a description of the suspect saying that he was there |
| 4 | | during the shooting. |
| 5 | Q | What was that description? |
| 6 | A | He provided me a brief description of a black male wearing a |
| 7 | | black hoodie. |
| 8 | Q | Did he indicate—give you any more information—Mr. Whitfield? |
| 9 | A | He would not. |
| 10 | Q | Did you ask him for any more information? |
| 11 | A | I'm sure I did, but he would not provide any more information. |
| 12 | Q | Did you speak with anybody else around that area at that time |
| 13 | | that may have been a witness to the shooting? |
| 14 | A | No, sir, not that I remember. |
| 15 | Q | What happened after you spoke with Mr. Whitfield? |
| 16 | A | After I spoke to Mr. Whitfield, I assisted with the sheriff's |
| 17 | | department—Sergeant Sandlin with his canine—and tracked the |
| 18 | | suspect. |
| 19 | Q | Okay.  Can you describe to the jury that process. |
| 20 | A | Canine tracked the suspect.  The tracking dog will be sent, |
| 21 | | attempt to pick up a scent of a possible occasion of the |
| 22 | | suspect. |
| 23 | Q | And were you able to get any information regarding the suspect |
| 24 | | at that time? |
| 25 | A | No, sir. |

```
1   Q    And when did you arrive at the scene?

2   A    I was dispatched at 9:12 p.m., and I left from our

3        department's headquarters at Crosstown and Burdick.  So I

4        would have to say approximately two minutes from the beginning

5        of the call.

6   Q    How long were you at the scene?

7   A    Approximately 30 minutes to an hour.

8   Q    Did you do anything else at the scene itself than what you

9        just testified to?

10  A    No, sir.

11                  MR. CUSICK:   I have nothing further.

12                  Thank you.

13                  THE COURT:   Mr. Champion?

14                  MR. CHAMPION:   Thank you, your Honor.

15                          CROSS-EXAMINATION

16  BY MR. CHAMPION:

17  Q    Officer, you said that there was an attempt to use a canine

18       for a track?

19  A    That's correct.

20  Q    Were you able to pick up any track whatsoever?

21  A    No, sir.

22  Q    Now you secured the scene with tape—

23  A    That's correct.

24  Q    —according to your police report.  What size of area did you

25       secure at that point?
```

```
1   A   I don't recall the exact size.

2   Q   Was it a lot, or was it the block?

3   A   Be no more than two lots.

4   Q   Two blocks?

5   A   Two lots.

6   Q   Two lots?

7   A   Yes.

8   Q   When you arrived, how many individuals, other than law

9       enforcement or emergency personnel, were there?

10  A   There was a crowd, but I can't give you an exact number.

11  Q   More than—

12  A   There's—

13  Q   —five?

14  A   More than five.  There was enough where I had to push the

15      people back, but I can't give you an exact size.

16  Q   And you spoke to one individual, and all he'd tell you—tell

17      you that it was a black male wearing a black hoodie—

18  A   That's correct.

19  Q   —is that correct?

20  A   He would not provide me with any more.

21  Q   Did anyone else give you any information?

22  A   No, sir.

23  Q   Now, when a canine officer shows up, they check the area for a

24      line of scene; is that correct?

25  A   That's correct.
```

```
1   Q   Did you have information about a path or a travel area that

2       the suspect in this shooting had traveled or proceeded down?

3   A   I don't recall receiving any information for that.  The canine

4       officer may have had that information, but I don't remember

5       having that.

6   Q   You didn't have that information—

7   A   No, sir.

8   Q   —that you recall?

9               When Brandon—Was Brandon Noble on the scene when you

10      arrived?

11  A   Yes.

12  Q   And he ultimately arrested this Mr. Whitfield, I believe is

13      his name; is that correct?

14  A   That's correct.

15              MR. CHAMPION:    Thank you.

16              I have no other questions.

17              MR. CUSICK:    Briefly, your Honor?

18                        REDIRECT EXAMINATION

19  BY MR. CUSICK:

20  Q   Do you remember writing—making a report on—would have been

21      April 24th of 2011?

22  A   Yes, sir.

23  Q   Do you remember indicating what exactly Mr. Whitfield said to

24      you?

25  A   Yes, I do.
```

```
 1   Q    After you sought more information, did he say anything else to

 2        you?

 3   A    Yes, he did.

 4   Q    What did he say?

 5              MR. CHAMPION:   Your Honor, I'm going to object.

 6        Calls for a hearsay response.

 7              MR. CUSICK:   Well, I can lay a foundation,

 8        your Honor, possibly.

 9              THE COURT:   All right.

10   BY MR. CUSICK:

11   Q    What was Mr. Whitfield's demeanor at the time?

12              THE COURT:   At what time?

13              MR. CUSICK:   At the—I'm sorry.

14   BY MR. CUSICK:

15   Q    At the time that you had contact with him.

16              THE COURT:   On April 24th?

17   BY MR. CUSICK:

18   Q    On April 24th of 2011.

19   A    His demeanor, short-tempered, not very forthcoming.

20   Q    You indicated that—Well, he was arrested, correct?

21   A    That's correct.

22   Q    Can you describe his emotional state a little bit more for the

23        Court.

24   A    I can't say about the fact where he got arrested.  I can say

25        when I—my contact with him, he was just very short, kind of I
```

1   was there, this is who you're looking for, but I don't want to

2   talk to you.

3  Q   Did he—Okay.  He indicated he didn't want to talk to you

4   anymore?

5  A   Correct.

6           MR. CUSICK:   I have nothing further.

7           THE COURT:   Any follow-up questions, Mr. Champion?

8   No?

9           MR. CHAMPION:   I have no other questions,

10  your Honor.

11          THE COURT:   Ladies and gentlemen, any questions for

12  this witness at this time?  Raise your hand if you have any

13  questions.

14          No hands are raised.

15          Thank you, sir.  You may step down.

16          Is he excused from his subpoena, Counsel?

17          MR. CUSICK:   Yes, your Honor.

18          MR. CHAMPION:   No objection, your Honor.

19          MR. CUSICK:   Your Honor, at this time the People

20  would call Timothy Knight.

21          THE COURT:   If you want to stand and stretch a

22  moment before the next witness comes in, you're welcome to.

23  We're still on the record, so please make sure you're quiet.

24          Before you have a seat, sir, please raise your right

25  hand.  Do you solemnly swear or affirm that the testimony

290

```
 1    you're about to give will be the truth, the whole truth, and
 2    nothing but the truth, so help you God?
 3              MR. KNIGHT:   I do.
 4              THE COURT:   Please have a seat, sir.
 5              With that microphone—
 6              And the chair does go back a little bit fur—
 7              THE WITNESS:   Uhm-hmm.
 8              THE COURT:   —far.
 9              Make sure you speak right in the end of that
10    microphone, please.  If you pull back too far or move to
11    either side, it might not pick up what you're saying.
12              THE WITNESS:   Okay.
13              THE COURT:   Please state and spell your first and
14    last name for the record.
15              THE WITNESS:   Timothy Knight—T-i-m-o-t-h-y
16    K-n-i-g-h-t.
17                        TIMOTHY KNIGHT,
18    called at 10:45 a.m., and sworn by the Court, testified:
19                      DIRECT EXAMINATION
20 BY MR. CUSICK:
21 Q    Officer Knight, how are you employed?
22 A    By the City of Kalamazoo.
23 Q    How long have you been employed?
24 A    Just over six years.
25 Q    As an officer?
```

291

1   A   Yes.

2   Q   I want to direct your attention to April 24th of 2011.  Were

3       you in the area of 626 Mabel Street in the city of Kalamazoo?

4   A   I was not.

5   Q   Okay.  Do you have contact, or did you deal in some way with

6       the investigation—

7   A   Yes, I did.

8   Q   Okay.—of the death of Milo Conklin?

9   A   Yes.

10  Q   And what involvement did you have in that investigation?

11  A   I was at Bronson Hospital where Milo Conklin was brought to.

12  Q   Okay.  And can you describe for the jury the circumstances

13      when Milo Conklin was brought to the hospital.

14  A   I arrived at Bronson Hospital before Mr. Conklin had arrived.

15      When the ambulance pulled up, I followed the paramedics and

16      the hospital staff to a trauma room where they attempted to

17      save Mr. Conklin's life.

18  Q   Was he, at the time—Do you know if he was breathing when he

19      arrived at the hospital?

20  A   I know he was not responsive.  He was not making any

21      statements.

22  Q   Okay.  Was anybody with Milo Conklin at the hospital when he

23      arrived?

24  A   Another officer came in the ambulance as well as Life

25      paramedics.

```
 1   Q   Who was that officer?

 2   A   Officer Hampton.

 3   Q   And do you have occasion to stay in the hospital with

 4       Milo Conklin?

 5   A   I stayed the entire time.

 6   Q   Okay.  Can you describe to the jury that circumstance, what

 7       happened.

 8   A   During that time I watched as hospital staff attempted to save

 9       his life.  I was also provided a bullet which was removed from

10       the body while they were cutting off his clothes.  And then,

11       at 2205 hours, the doctor had pronounced him dead.

12   Q   Okay.  When did he arrive at the hospital?

13   A   Approximately 2140 hours.

14   Q   So 9:40?

15   A   Correct.

16   Q   What happened after he was pronounced dead?

17   A   Medical examiner came to examine the body, and then

18       Kalamazoo Removal came and removed the body.

19   Q   Do you know who that medical examiner was?

20   A   I believe it was Ken Roark.

21   Q   Do you have any other involvement with this case?

22   A   I do not.

23              THE COURT:   Any questions, Mr. Champion?

24              MR. CHAMPION:   None, your Honor.

25              THE COURT:   Ladies and gentlemen, do any of you
```

293

1　　have any questions for this witness?  If so, just raise your

2　　hand.

3　　　　　　　No hands are raised.

4　　　　　　　Thank you, sir.  You may step down.

5　　　　　　　THE WITNESS:　Thank you.

6　　　　　　　THE COURT:　Is he excused from his subpoena,

7　　Counsel?

8　　　　　　　MR. CUSICK:　Yes, your Honor.  Thank you.

9　　　　　　　THE COURT:　Any objections to that, Mr. Champion?

10　　　　　　　MR. CHAMPION:　No, your Honor.

11　　　　　　　MR. CUSICK:　Your Honor, at this time, the People

12　　would call Gerald Luedecking.

13　　　　　　　THE COURT:　Why don't you approach a moment.

14　　　　　　　(At 10:49 a.m., bench conference as follows:

15　　　　　　　　　THE COURT:　How long is he going to be, a

16　　　　　　　while?

17　　　　　　　　　MR. CUSICK:　What?

18　　　　　　　　　THE COURT:　Is he going to be a while?

19　　　　　　　　　MR. CUSICK:　This is going to be a while.

20　　　　　　　　　THE COURT:　Yeah.  Should I give them a break

21　　　　　　　before you call him?

22　　　　　　　　　MR. CUSICK:　Yeah, or I could—

23　　　　　　　　　THE COURT:　They've been in—

24　　　　　　　　　MR. CUSICK:　—do one—

25

294

```
1              THE COURT:    —about an hour.

2              MR. CUSICK:    —quick witness.

3              THE COURT:    Why don't we do another quick

4         witness—

5              MR. CUSICK:    One quick witness.

6              THE COURT:    —if you've got another one out

7         there, and then we'll take a break before we do him.

8              MR. CUSICK:    Okay.    Thanks.)

9         MR. CUSICK:    Your Honor—

10        THE COURT:    Take a break now?

11        MR. CUSICK:    —Mr. Luedecking is in another

12   courtroom.   .  .  . (inaudible)

13        THE COURT:    Okay.   We'll take our morning break

14   now.   So we'll take about a 15-minute break or so.   We'll

15   bring you back down.

16        Please remember all of my prior instructions, and

17   make sure that you're not even talking among yourselves.

18        Also, be careful if you go outside to get some fresh

19   air.   I don't know if it's raining or not.   But just be

20   careful when you come back in the building.   And, if you think

21   someone might be talking about the case, make sure you leave

22   the area immediately.   And, certainly folks are, you know,

23   welcome to talk.   So I just don't want you overhearing

24   anything that you're not supposed to be hearing, so—

25        Leave your notebooks on your chairs, and we will
```

1    watch those during the break or place them in the vault.

2              And Ms. Wint will bring you upstairs.

3              All rise.

4              (At 10:50 a.m., jury exits courtroom)

5              You may be seated.

6              And, Mr. Cusick, I can't see when the door is shut;

7    so you have the responsibility of letting me know when it's

8    shut.

9              MR. CUSICK:   That door?

10             MR. CHAMPION:   It is shut, your Honor.

11             MR. CUSICK:   It is shut.

12             THE COURT:   Okay.  So the jury has left the

13   courtroom.

14             Is there anything else that we need to place on the

15   record, then, at this time?

16             MR. CUSICK:   No, your Honor.  It's my understanding

17   Gerald Luedecking is in another courtroom testifying.  He's

18   almost done.  He should be back very shortly, so—

19             THE COURT:   I assumed he might be a little lengthy,

20   so—

21             MR. CUSICK:   Yeah.

22             THE COURT:   —I thought it would be a good time to

23   break.

24             I will indicate—my mistake—our first witness

25   Ms. Williams, I did not give the jury an opportunity to ask

                              296

1     her any questions, and I apologize, Counsel.  That was my

2     fault.  We did have a discussion at the bench, and I realize

3     that she, basically, just identified who Milo Conklin was.  So

4     I think everyone was in agreement—She was seated in the

5     courtroom, and I said we could certainly put her back on the

6     stand and see if they had any questions; and I think everyone

7     was—was in agreement just to continue forward.

8               Is that correct, Counsel?

9               MR. CUSICK:    That's correct, your Honor.

10              MR. CHAMPION:    It is, your Honor.

11              THE COURT:    And I'm sorry.  That—That was my fault.

12              Okay.  Is there anything else, then, that we need to

13    address?

14              MR. CUSICK:    No, your Honor.

15              THE COURT:    No.

16              I will just indicate—We, again, have had a number of

17    folks coming in and out.  I would ask—I think the jury is

18    doing their best to pay attention to what's going on with the

19    trial.  It is quite disruptive, though, when lots of people

20    are coming and going.  So, if you could just pass that along;

21    and, if you're here, just try your best to stay.

22              And I certainly realize that trials are open to the

23    public, but just make sure you're aware of that and maybe pass

24    that along to folks.  If you're here, I would appreciate if

25    you just hang with us for a while here.

1        And, again, just a reminder, if anyone's here, make

2   sure that your cellphones and other electronic devices are

3   turned off.  And please pass that along to other friends and

4   family members who might be coming and going, because I

5   certainly don't want to take cellphones and electronic devices

6   if we don't have to.  But just please pass that information

7   along.

8        And I appreciate your cooperation in just sitting

9   tight until the jury clears the hallway, so—

10        Court's in recess.

11        (At 10:53 a.m., court recessed)

12        (At 11:08 a.m., proceedings reconvened)

13        THE CLERK:   The court recalls the case of People of

14   the State of Michigan versus Samuel Steel, III, case number

15   C11-1983 FC.

16        Parties, please restate appearances for the record.

17        MR. CUSICK:   Paul Cusick on behalf of the People,

18   your Honor, Assistant Attorney General.

19        MR. CHAMPION:   May it please the Court,

20   Robert Champion appearing on behalf of Sam Steel, who's

21   present, also.

22        THE COURT:   We're ready to proceed.  The jury's on

23   their way down.

24        All rise.

25        (At 11:08 a.m., jury returns to courtroom)

1          You may be seated.

2          Welcome back, ladies and gentlemen.

3          Next witness, Mr. Cusick?

4          MR. CUSICK:   Your Honor, the People at this time

5     would call Lashontay Kyles.

6          THE COURT:   Before you have a seat, please raise

7     your right hand.  Do you solemnly swear or affirm that the

8     testimony you're about to give will be the truth, the whole

9     truth, and nothing but the truth, so help you God?

10          MS. KYLES:   Yes.

11          THE COURT:   Please have a seat.

12          With that microphone, you really need to speak right

13     in the end of it, so you're going to have to move up a little

14     bit closer and maybe pull it down so it's right in line with

15     your mouth, if you would.

16          I need you to state and spell your first and last

17     name for the record, please.

18          THE WITNESS:   Lashontay Kyles—L-a-s-h-o-n-t-a-y

19     K-y-l-e-s.

20                         LASHONTAY KYLES,

21     called at 11:10 a.m., and sworn by the Court, testified:

22                       DIRECT EXAMINATION

23 BY MR. CUSICK:

24 Q    Good afternoon—or good morning.

25          Can you state your name—

299

```
 1                    I want to direct your attention, Ms. Kyles, to the

 2        date of April 24th of 2011.  Do you remember that day?

 3   A    Yes.

 4   Q    And do you know—did you know a Milo Conklin?

 5   A    Yes.

 6   Q    And who was he to you?

 7   A    It was my cousin and best friend.

 8   Q    Okay.  And did you see him that day?

 9   A    Yes.

10   Q    Okay.  And where did you first see him that day, if you

11        recall?

12   A    Who, Milo?

13   Q    Yes.

14   A    We was on Mabel.  I got dropped off on Mabel.

15   Q    Okay.  And approximately what time did you get dropped off at

16        Mabel?

17   A    I think it was like around—around 4:00 or 5:00.  I'm not sure.

18        I don't remember.

19   Q    And who were you with when he got dropped off?

20   A    I was with my cousin B. J.

21   Q    So what happened—Where did you go when he got dropped off at

22        Mabel around that time?

23   A    We was at Chuck People house . . . (unintelligible)

24   Q    I'm sorry?

25   A    We was at Chuck People house.
```

| | | |
|---|---|---|
| 1 | Q | Chuck People's house? |
| 2 | A | Yeah, I think— |
| 3 | Q | Okay. |
| 4 | A | —it's his house or whatever. |
| 5 | Q | Is that 626 Mabel? |
| 6 | A | Yes. |
| 7 | Q | Okay. And, when you say we, who's we? |
| 8 | A | It was me, Chuck, and the older man and his girl, Pedro, |
| 9 | | Shawna, and that's it. |
| 10 | Q | Okay. Do you know a Samuel Steel? |
| 11 | A | No, I don't know him like that, but I heard of him. |
| 12 | Q | Okay. Have you ever met him before? |
| 13 | A | No. |
| 14 | Q | Was he there that day? |
| 15 | A | No. |
| 16 | Q | Okay. And this is approximately what time again when all |
| 17 | | these people are there? |
| 18 | A | It was—I think it was like around like 4:00 or 5:00. |
| 19 | Q | Okay. And did you eventu—Did you stay there all night, or did |
| 20 | | you eventually leave? |
| 21 | A | No, I stayed there waiting on my cousin. We was waiting on my |
| 22 | | cousin to come back, so I stayed there kickin' it. |
| 23 | Q | Your cousin Milo Conklin? |
| 24 | A | No, B. J. |
| 25 | Q | Okay. And did you go to the store or anything before that? |

```
 1   A   No, we didn't go to the store yet.

 2   Q   Okay.  So you arrive at that house, and Milo Conklin's there—

 3   A   Yes.

 4   Q   —along with the other people that you testified to, right?

 5   A   Yes.

 6   Q   And did an incident in court—Did an incident occur that day

 7       that brings you to court today?  Did an incident you ever—Did

 8       you see something happen that day to Milo Conklin?

 9   A   Yeah, did I see something happen to him?

10   Q   Yeah.

11   A   Yes.

12   Q   Okay.  And did that happen at that time that you're referring

13       to, or was it later in the night?

14   A   It was later on that day—

15   Q   Okay.

16   A   —like night—like around night.

17   Q   Okay.  At night?

18   A   Yeah, you talking about when he got shot, ain't you?

19   Q   Okay.

20   A   Yes.

21   Q   When did that happen?

22   A   I think it was like around—I don't know the time.  I know it

23       was going to be dark.  The sun—Wasn't no sun.

24   Q   Okay.  Now, from the time that you were there, did you stay

25       there the entire time until Milo got shot, or did you leave?
```

```
 1  A    I stayed there the whole time.

 2  Q    Okay.  And what were you doing there when—

 3  A    We was—

 4  Q    —you were there?

 5  A    —drinking beer, chillin', talking.

 6  Q    Okay.  Was—And Milo was there?

 7  A    Yes.

 8  Q    Had you consumed a lot of beer that day?

 9  A    Yeah, we was drinking.  We went back to the store.

10  Q    Okay.

11              THE COURT:   I missed it.  You went back to the

12         store; is that what you said?

13              THE WITNESS:   Yes.

14              THE COURT:   Okay.

15  BY MR. CUSICK:

16  Q    Okay.  So you went back to the store—So you left Mabel Street—

17  A    Yes.

18  Q    —and you went to the store?

19  A    Yes.

20  Q    Okay.  What store did you go to?

21  A    We went to Daysha's.  And, before we went to Daysha's, we rode

22         around.  We went—We went through Interfaith, and then we went

23         to Daysha's.

24  Q    Okay.  And what's Interfaith?

25  A    Interfaith apartment complex.
```

1 Q Okay. And, when you say we, who's we?

2 A Me, Pedro, Shawna, and Milo.

3 Q And Milo? Okay.

4 A Yes.

5 Q So there's four of you that go to Daysha's?

6 A Yes.

7 Q Okay. And what do you do at Daysha's?

8 A We parked in the parking lot, got a phone call from Chuck. He

9 asking us where we at.

10 Milo told him, like, we be around there, we at the

11 store.

12 Q Okay. Now this is Chuck Thomas?

13 A Yeah, I don't know his last name—

14 Q Okay.

15 A —or nothing like that.

16 Q Is it the individual that lives at 626 Mabel?

17 A Yes.

18 Q And what happened then?

19 A Milo went in the store. We was sitting in the car. He

20 grabbed the beers. We went back to Mabel.

21 Q When did you arrive back at Mabel, if you—if you recall?

22 A It was getting ready to be dark when we went back to Mabel.

23 He parked. We all got out the car. He handed us 40s. Then I

24 was on the phone out in his car talking.

25 Q Okay. Now, when you were in the car, did—Who was driving the

304

```
 1      car?

 2  A   Milo.

 3  Q   So he parked the car?

 4  A   Yes.

 5  Q   Did everybody get out of the car?

 6  A   Yes.

 7  Q   Okay.  What happened then?

 8  A   Then we all talking and stuff.  I hopped up on my phone.  He

 9      handed me a beer.

10  Q   When you say he, who's he?

11  A   Milo.

12  Q   Okay.  What happened then?

13  A   He—Milo handed me a beer.  I was on the phone talking, leaning

14      towards his car.

15  Q   Leaning towards whose car?

16  A   Milo.

17  Q   Okay.

18  A   Like towards the back of the house.

19  Q   Okay.  And this is 626 Mabel?

20  A   Yes.

21  Q   And what happened then?

22  A   They all in the front.  Somebody come through the cut from

23      Lizzy.

24              MR. CUSICK:   Okay.  I want to hold off on that for

25      one second.
```

1          Your Honor, at this time I believe we have a

2     stipulation to admit People's proposed exhibit three.

3               THE COURT:   Mr. Champion?

4               MR. CHAMPION:   I believe that's a photograph—an

5     aerial photograph; is that correct?

6               MR. CUSICK:   Yes.

7               MR. CHAMPION:   I have no objection to that.

8               THE COURT:   Okay.  So exhibit three is received.

9               And, ladies and gentlemen, you all have a copy of

10    this exhibit in your notebooks.  This is exhibit three.

11              And my guess is it will be appearing on the monitor

12    here in a second.

13   BY MR. CUSICK:

14   Q    Okay.  Now you indicated you saw somebody come through the

15        brush?

16   A    Yeah, the—

17   Q    Okay.  Now—

18              THE COURT:   All right.  Hold on a second.

19              I have to let you know, when you respond—You're away

20    from the microphone, and then we cannot hear.  That microphone

21    doesn't pick up the whole area, so you really need to come

22    back whenever you're going to say anything and speak right in

23    the end of that microphone.

24              THE WITNESS:   All right.

25              THE COURT:   Go ahead.

```
1              MR. CUSICK:    Thank you, your Honor.

2              Now I just want to—I don't want to block anybody

3        here.

4  BY MR. CUSICK:

5  Q    But this street right here, do you know what that street is?

6        This William Street.  Would that be a fair description?

7  A    Yes.

8  Q    Okay.

9              THE COURT:    And I'm going to stop you and just

10        indicate the street here—We're referring to exhibit three for

11        the record.—and it's the very top white line shown across the

12        top of that photograph, correct?

13              MR. CUSICK:    Correct, your Honor.

14              THE COURT:    All right.  Go ahead.

15  BY MR. CUSICK:

16  Q    And the second street right here.  You said Lizzy Street.  Is

17        that Elizabeth Street?

18  A    Yes.

19  Q    The street south of that—the third line down—Mabel Street; is

20        that correct?

21  A    Yes.

22  Q    The fourth line down further south is Florence Street; is that

23        correct?

24  A    Yes.

25  Q    Okay.  Now that's a fair and accurate depiction of the area
```

```
 1        overhead that you're aware of?

 2   A    Yes.

 3   Q    Okay.  Now you said that you—you saw somebody coming through

 4        the brush; is that correct?

 5   A    I saw, like when they came like a little closer to me, I

 6        wasn't even thinking of it.  It was just a cut there.

 7   Q    Okay.  You were at a house you indicated by 626 Mabel Street?

 8   A    Yes.

 9   Q    Okay.  And what direction were they coming from?

10   A    . . . (inaudible)

11   Q    Just let me know if you know what street—what street were they

12        coming from.

13   A    Oh, Lizzy.

14   Q    Lizzy?  Is that Elizabeth Street?

15   A    Yes.

16   Q    Okay.  And you were on the side of the house you testified to,

17        correct?

18   A    Yeah, I was on the side.

19   Q    Of 626 Mabel, correct?

20   A    Yes.

21   Q    And you saw that individual—What did you see that

22        individual—Where did you see him—him or her go?

23   A    I seen him.

24   Q    Is it a he?

25   A    It went to the—
```

```
1   Q   Was it a he?

2   A   I don't know.  They was in all black.

3   Q   Okay.  Can you describe to the jury—You said all black.

4   A   Like—

5   Q   Do you know what type of shirt that person was wearing?

6   A   It was—It was like a black hoodie—

7   Q   Okay.

8   A   —and probably some sweat pants.

9   Q   What—What color sweatpants, if you recall?

10  A   It was—It was black.

11  Q   Okay.  All black.

12  A   Yes.

13  Q   Do you get a chance to see the person's face?

14  A   No, I just took one glance . . . (unintelligible) and got back

15      talking on my phone.

16  Q   So you didn't get a chance to see the person's face?

17  A   No.

18  Q   Okay.  What did you see the person do at that time?

19  A   Well, I really ain't see nobody do nothing.  I was on the

20      phone.  And then I heard close-up gunshots, so I ran to the

21      back of the house to the porch and ran back up, and Milo was

22      on the ground.

23  Q   Okay.  Did you see where that individual that was dressed in

24      all black—where that individual went after that?

25  A   No.
```

309

1  Q   Okay. So you saw an individual in black come from

2       Elizabeth Street, correct?

3  A   Through the cut to Mabel.

4  Q   Okay. Through the cut to Mabel.

5  A   Yeah.

6  Q   And did you hear any gunshots?

7  A   Yes.

8  Q   How many gunshots did you hear?

9  A   . . . (unintelligible) probably like four or five or five or

10      six.

11  Q   Okay. So you never got a good glance at the shooter?

12  A   No.

13  Q   But the person—Do you believe the shooter to be the person

14      that came through Elizabeth Street?

15  A   Yes.

16  Q   And you didn't see the person—the shooter—after that, after

17      you—

18  A   No, when I went back up—back up to the front and seen

19      everybody, they was just standing there. I'm like, why don't

20      you all call 9-1-1.

21  Q   Did somebody call 9-1-1?

22  A   Yes.

23  Q   Okay. Now where was Milo's body?

24  A   It was by the porch.

25  Q   Is this in front of 626 Mabel or behind?

```
 1   A    Yes.

 2   Q    What happened then?

 3   A    They call 9-1-1, and then—Chuck—Chuck had his phone.  And I

 4        was just telling Chuck, like, you calling his baby mama or his

 5        people or his sister . . . (unintelligible)

 6                   Chuck was like, yeah, ooh.

 7                   And I think Chuck took his—took his wallet.  And,

 8        after that, nothing else.

 9                   MR. CUSICK:   I have nothing further, your Honor.

10                   Thank you.

11                   THE COURT:   Mr. Champion?

12                   MR. CHAMPION:   Thank you, your Honor.

13                        CROSS-EXAMINATION

14   BY MR. CHAMPION:

15   Q    Ms. Kyles—Is that the correct way to say your last name?

16   A    Yes.

17   Q    Ms. Kyles, you said you picked up Milo at some point in time—

18   A    I—

19   Q    —on this date?

20   A    I didn't say I picked up Milo.

21   Q    You didn't pick him up?

22   A    No.

23   Q    How did you get to his house on Mabel Street?

24   A    My cousin.

25   Q    Your cousin.
```

311

```
 1              Did you take Milo there, or was he already at that

 2         . . . (inaudible)

 3    A    Milo take—No, he was already there.

 4    Q    He was already there?

 5    A    Yes.

 6    Q    And you arrived there about 5:00, 6:00 o'clock; is that

 7         correct?

 8    A    Yes.

 9    Q    Now the person that you described was a black male, thin,

10         about five-six, five-seven; is that correct?

11    A    You said thin?

12    Q    Thin.  That's correct.

13    A    No.

14    Q    The police report indicates that he was very skinny is what

15         the police report indicate.

16    A    No, I didn't say that.

17    Q    So, if you told Officer Juday he was a very thin person—

18    A    Juday.

19    Q    —that would be mistaken?

20    A    Yeah, that must have been mistaken.

21    Q    Did you say that you saw his face?

22    A    I said I took a glance of his—a glance.  I was on the phone.

23         I was drunk.

24    Q    How much had you had to consume that day?

25    A    A lot.
```

```
 1   Q    Would you guess how much beer?

 2   A    Probably—I don't even remember.

 3   Q    Do you recall?

 4   A    No.

 5   Q    Did you speak to more than one officer?

 6   A    More than one officer.  More than one officer?  I think I only

 7        spoke to one.

 8   Q    How would you—If you told the officer—Or did you tell the

 9        officer that you got a good look at this person?

10   A    I did not tell him I had a good look.

11   Q    You didn't look into his eyes?

12   A    I looked and got back on the phone.  There's a cut there.

13        That always be there.  People always come through it.

14   Q    Do you recall describing this individual with a mustache?

15   A    No.

16   Q    Do you recall describing this person with an Afro haircut?

17   A    An Afro?  No.

18   Q    You don't dispute that, you just don't recall that; is that

19        correct?

20   A    I don't—

21   Q    Pardon?

22   A    —dispute it or whatever.

23   Q    You don't dispute it, you just don't remember?

24   A    I don't remember—

25   Q    You don't remember.
```

313

| 1 | A | —saying nothing like that, with a Afro. |
| 2 | Q | Do you recall—You know who Sam Steel is, don't you? |
| 3 | A | Yeah, now. |
| 4 | Q | Do you recall saying that Sam, at the time, when you were |
| 5 | | interviewed by the police, was—had a bald head? |
| 6 | A | No. |
| 7 | Q | You don't dispute you may have said that, also; is that |
| 8 | | correct? |
| 9 | A | No. |
| 10 | Q | Do you know if Sam came over and gave Milo a beer? |
| 11 | A | He didn't—No.  Chuck came from over that way and brought |
| 12 | | Milo a beer. |
| 13 | Q | Chuck brought one.  You don't know or you never saw Milo and |
| 14 | | Sam Steel speaking? |
| 15 | A | No. |
| 16 | Q | But you were in back of the house part of the time; is that |
| 17 | | correct? |
| 18 | A | No, on the side of the house— |
| 19 | Q | On the side of the house. |
| 20 | A | —that night. |
| 21 | Q | So—I just want to be clear.  So, if you described this person |
| 22 | | as five-six, five-seven, with a mustache, short hair in an |
| 23 | | Afro style, you don't—you may have said that, but you just |
| 24 | | don't recall? |
| 25 | A | I didn't say that.  I said all black, hoodie—he had a hoodie |

314

```
 1        on, I took just one glance, I'm on the phone.

 2   Q    So you never said that?

 3   A    No, I don't remember saying that.

 4   Q    Did you ever—

 5   A    They switching up something.

 6   Q    Before you came in today, did you review any police reports or

 7        anything, statements that you made?

 8   A    No.

 9   Q    Did you speak to anyone before coming in today—

10   A    Yes.

11   Q    —like the prosecutor?

12   A    Yes.

13              MR. CHAMPION:   Thank you.

14              I have no other questions.

15              MR. CUSICK:   I have a couple questions, your Honor.

16                   REDIRECT EXAMINATION

17   BY MR. CUSICK:

18   Q    Do you remember talking with Detective Kris—Kristin Cole?

19   A    I don't know who that is.

20   Q    Okay.  Do you remember speaking with an individual on

21        April 24th of 2011?

22   A    A individual?

23   Q    Yeah, a detective, officer.

24   A    Yes.

25   Q    Okay.  Do you remember telling that individual that there was
```

| | | |
|---|---|---|
| 1 | | a—the shooter had a black hooded sweatshirt— |
| 2 | A | Yes. |
| 3 | Q | —and a hood that was— |
| 4 | A | On the head. |
| 5 | Q | —covering his face—most of his face? |
| 6 | A | Yes. |
| 7 | Q | And do you remember saying there were no distinguishing |
| 8 | | characteristics that you could recall? |
| 9 | A | What you mean by that, like— |
| 10 | Q | Do you remember—Do you remember telling the officer that there |
| 11 | | were no distinguishing characteristics that you could recall, |
| 12 | | that there was nothing that you could specifically recall |
| 13 | | about the shooter? |
| 14 | A | No. |
| 15 | Q | Okay.  Let me rephrase that. |
| 16 | | Your testimony—Did you get a good look at the |
| 17 | | shooter? |
| 18 | A | No. |
| 19 | Q | Had you been drinking that night? |
| 20 | A | Yes. |
| 21 | Q | So you did not get a good look at the face of the shooter? |
| 22 | A | No. |
| 23 | Q | That's correct?  You did not? |
| 24 | A | No. |
| 25 | Q | Okay.  Did you get a good look at the face of the shooter? |

316

```
 1   A   The shooter?

 2   Q   Let me just ask the question one more time.  Did you get a

 3       good look at the face of the shooter?

 4   A   No, I just glanced.

 5   Q   Do you know a Quazae Jackson?

 6   A   Yes.

 7   Q   Was he there at the time, do you recall?

 8   A   Yes.

 9   Q   Was he with you in the car?

10   A   Yes.

11   Q   Okay.  So he went with you and Milo to get liquor at the

12       store?

13   A   Yes.

14   Q   And he came back with you?

15   A   Yes.

16   Q   And he was there at the shooting as well?

17   A   Yes.

18                   THE COURT:   What?  I missed it.

19                   MR. CUSICK:   He was there at the shooting as well.

20                   Sorry, Judge.

21                   THE WITNESS:   Yes.

22                   MR. CUSICK:   I have nothing further.

23                   MR. CHAMPION:   Just a follow-up.

24

25
```

RECROSS-EXAMINATION

BY MR. CHAMPION:

Q    Ma'am, you just testified that you recall being interviewed by
     Detective Cole; is that correct?

A    I don't know the name.  I been interviewed that night by
     Beauchamp.

Q    Were you also interviewed by a Officer David Juday?

A    Yes, when I was there at the scene.

Q    At the scene.

          And did the officer ask you to describe the person
     that you saw?

A    I do not remember.  He probably did, but I didn't say no
     five-six then.

Q    So, if he wrote that in his report, he would have been
     mistaken?

A    Yes.

Q    And, when you spoke to Detective Cole, you described the
     person as a dark-skinned black male about five-six, average
     build.  Do you recall—

A    Who is—

Q    —that?

A    Who is Cole?  Who is that?

Q    Detective Kristine [*sic*] Cole.

A    I don't know who that is.

Q    Well, you just told the prosecutor—

                                 318

```
 1   A      I said I spoke—That night I spoke with Beauchamp.

 2   Q      You spoke to Beauchamp.  What did you tell—

 3   A      Yes.

 4   Q      —Detective Beauchamp?

 5   A      I told him I was on the phone, somebody came through the cut—

 6   Q      Did you give a—

 7   A      —in all black.

 8   Q      Did you give a description of the person to

 9          Detective Beauchamp?

10   A      I told him I glanced.

11   Q      So you don't recall speaking to Detective Kristine [*sic*] Cole;

12          is that correct?

13   A      No, I don't remember.

14   Q      And you don't remember speaking to Patrol Officer David Juday;

15          is that correct?

16   A      Probably if I see his face.  I don't know who—I don't know the

17          names.

18                    MR. CHAMPION:    Thank you.

19                    THE COURT:    Any follow-up questions?

20                    MR. CUSICK:    One more.

21                         REREDIRECT EXAMINATION

22   BY MR. CUSICK:

23   Q      Did you speak with Detective Brian Beauchamp about the

24          shooting?

25   A      Yes.
```

```
 1              THE COURT:   Are we talking about on April 24?   Is
 2       that—
 3              MR. CUSICK:   Yes, on—
 4              THE WITNESS:   Yeah.
 5              THE COURT:   Okay.
 6              MR. CUSICK:   —April 24th.
 7              THE WITNESS:   Yes.
 8  BY MR. CUSICK:
 9  Q    And did you give him a description?
10  A    Yes, I told him I was leant up on the car, somebody came
11       through in all—all black, I took a glance.   And I was drunk.
12       I just took the drink and jumped.
13              MR. CUSICK:   I have nothing further.
14              Thank you.
15              THE COURT:   Do you ever recall speaking with any
16       other officer other than Detective Beauchamp, as you
17       referenced that night?
18              THE WITNESS:   That night, I just spoke with him.
19              THE COURT:   You don't recall speaking with anyone
20       else; is that what you're—
21              THE WITNESS:   Nope.   And one police officer.   I
22       don't know the name or none of that.
23              THE COURT:   You have talked about a hoodie and
24       there was also a question about a sweatshirt with a hood.
25              THE WITNESS:   Yes.
```

| | |
|---|---|
| 1 | THE COURT:   Is a sweatshirt with a hood a hoodie? |
| 2 | THE WITNESS:   Yes, it's a hoodie. |
| 3 | THE COURT:   Can you put the exhibit three back up. |
| 4 | Ma'am, if you look at this map, can you tell us |
| 5 | where you were on Mabel Street or where— |
| 6 | It's 626 Mabel Street; is that correct, Counsel? |
| 7 | MR. CUSICK:   Yes. |
| 8 | MR. CHAMPION:   Yes. |
| 9 | THE COURT:   Can you point— |
| 10 | Is there a pointer? |
| 11 | I don't know if you know or not. |
| 12 | If you know where the house is, can you identify it |
| 13 | on that exhibit, ma'am. |
| 14 | THE WITNESS:   It is—It's the house right here. |
| 15 | THE COURT:   All right.  You're talking, and we |
| 16 | can't hear—Did you say maybe this is the house? |
| 17 | THE WITNESS:   I said, yes, that's the house. |
| 18 | THE COURT:   Okay.  Can you point to that again. |
| 19 | You can sit down. |
| 20 | Just for the record, when we look at exhibit three, |
| 21 | there is a word that identifies Mabel Street on that exhibit, |
| 22 | and you pointed to a house almost directly above, when you |
| 23 | look at that exhibit, where Mabel Street is indicated on the |
| 24 | exhibit; is that correct, ma'am? |
| 25 | First of all, do you understand my question? |

1          THE WITNESS:   Yeah, I—

2          THE COURT:   Did you understand what I just said?

3          THE WITNESS:   Yeah, where the house at, yeah.

4          THE COURT:   Pull that microphone down a little bit

5     more.

6          THE WITNESS:   Yes.

7          THE COURT:   The house that you just pointed to, is

8     it directly above where Mabel Street—

9          THE WITNESS:   Yes.

10         THE COURT:   —the word Mabel Street is indicated?

11         THE WITNESS:   Yes.

12         THE COURT:   Thank you.

13         I'm sorry, Counsel.

14         Any follow-up questions based on the Court's

15    questions, first of all?

16         MR. CUSICK:   No, your Honor.

17         THE COURT:   Mr. Champion, any follow-up questions?

18         MR. CHAMPION:   No, your Honor.

19         THE COURT:   All right.   Ladies and gentlemen, do

20    any of you have any questions for this witness?   If so, just

21    raise your hand.

22         It looks like—

23         I'm sorry.   Do you have a question?

24         MR. CUSICK:   I have one question.

25         THE COURT:   All right.   I'll give you a moment in a

```
 1    second.  Hold on.

 2                    Go ahead, Mr. Cusick.

 3                    FURTHER REREDIRECT EXAMINATION

 4    BY MR. CUSICK:

 5    Q    This—This is the house, correct?

 6    A    Yes.

 7    Q    Where were you standing?

 8    A    Like over—

 9                    THE COURT:   You got to talk into the microphone.

10                    MR. CUSICK:   Why don't you take—Why don't you take

11         it and tell me where you were standing when you saw the

12         shooter.

13                    THE WITNESS:   I was standing—The car was right

14         here.

15    BY MR. CUSICK:

16    Q    And where was—

17                    THE COURT:   Okay.  Wait.  Hold on a second.

18                    You said the car was right here?

19                    THE WITNESS:   Yeah, Milo car.

20                    THE COURT:   All right.  And you—So you pointed to

21         the—if you're looking at the photograph—to the right side of

22         that house; is that correct?  Is that where you're pointing

23         to?

24                    THE WITNESS:   Yes.

25                    THE COURT:   Thank you.
```

```
 1                    Go ahead.
 2  BY MR. CUSICK:
 3  Q    Were you between the car and the house?
 4  A    His car was right here.  I was on the front leaning
 5       towards—His car was facing this way—
 6  Q    Okay.
 7  A    —Mabel Street.
 8  Q    Okay.  So you—The car was parked by the side of the house,
 9       correct?
10  A    Yes.
11  Q    And you were in front of his car?
12  A    Yes.
13  Q    And where did you see the shooter come from?
14  A    Come between the house and the car.  The car's right here
15       . . . (inaudible)—
16                    THE COURT:   I don't know if they can hear you.
17                    THE WITNESS:   Between the house and the car.
18                    MR. CUSICK:   Okay.  Thank you.
19                    I have nothing further.
20                    THE COURT:   Any follow-up questions, then,
21       Mr. Champion?
22                          RERECROSS-EXAMINATION
23  BY MR. CHAMPION:
24  Q    Where was Milo?
25  A    Milo was in the front.
```

324

```
1   Q    He was on the porch; is that correct?

2   A    Yes, on the porch standing.

3   Q    Did you see Milo?

4   A    After he gave me the beer, yeah, I seen him.  They was—was

5        listening to them.  They all was in the front.

6   Q    But you were next to the car next to the house; is that

7        correct?

8   A    Yes.

9   Q    And Milo was on the front porch; is that correct?

10  A    Yes.  I wasn't that far from the porch.

11              MR. CHAMPION:   Thank you.

12              I have no other questions.

13              MR. CUSICK:   I have nothing further.

14              THE COURT:   All right.  Ladies and gentlemen, if

15       you have any questions, raise your hand.

16              So you're all set?  You don't have a question?

17       Okay.

18              Thank you, ma'am.  You may step down.

19              Is she excused from her subpoena, Counsel?

20              MR. CUSICK:   Yes, your Honor.

21              MR. CHAMPION:   No objection, your Honor.

22              THE COURT:   All right.

23              MR. CUSICK:   Your Honor, at this time, People would

24       call Alesha Capers [sic].

25              MR. CHAMPION:   What was the name?
```

1          MR. CUSICK:   Alesha Capers [*sic*].

2          THE COURT:   Right over here, ma'am.  Come right up

3     front.

4          Before you have a seat, please raise your right

5     hand.  Do you solemnly swear or affirm that the testimony

6     you're about to give will be the truth, the whole truth, and

7     nothing but the truth, so help you God?

8          MS. CAPER:   Yes.

9          THE COURT:   Please have a seat, ma'am.

10         With that microphone, you really need to speak right

11    in the end of the microphone.  Please don't pull back too far

12    or move to either side.

13         I need you to state and spell your first and last

14    name and please speak up.

15         THE WITNESS:   Alesha Caper—A-l-e-s-h-a; last name

16    C-a-p-e-r.

17         MR. CUSICK:   Thank you.

18                        ALESHA CAPER,

19    called at 11:38 a.m., and sworn by the Court, testified:

20                     DIRECT EXAMINATION

21    BY MR. CUSICK:

22    Q    Good morning.

23    A    Good morning.

24    Q    Ms. Caper—

25         Is it Caper or Capers?

326

```
 1  A   Caper, with an R.

 2  Q   Ms. Caper, I want to direct your attention to the date of

 3      April 24ᵗʰ of 2011.  Do you recall that day?

 4  A   Yes.

 5  Q   And do you recall an individual by the name of Milo Conklin?

 6  A   Yes.

 7  Q   And who was he to you?

 8  A   I was kind of somewhat dating him a little bit, so—

 9  Q   Okay.  You were dating him at the time?

10  A   Yes.

11  Q   Were you with him that day?  Did you see—

12  A   Yes.

13  Q   —him that day?

14             When did you first see him that day?

15  A   I seen him that morning.  He was on Park Street.  He had got

16      his hair cut at an aunt's house.  I stopped by and I seen him

17      then.  And he and I talked briefly.  We rode over to Mabel,

18      and then I brought him back over to Park Street.

19  Q   Okay.  What time were you at his aunt's house?

20  A   This is like around 10:00 or 11:00 a.m., 'cause he had gotten

21      a haircut.

22  Q   Now at the time that he—As of April 24ᵗʰ, 2011, how long had

23      you been dating Milo?

24  A   Since September of 2010.

25  Q   How long had you known Milo?
```

| 1 | A | I want to say like I met him like sometime in the end of 2009. |
| 2 | Q | Now you indicated that on April 24th of 2011 you went to |
| 3 | | Mabel Street; is that— |
| 4 | A | Yes. |
| 5 | Q | —correct? |
| 6 | | And what happened when you were there? |
| 7 | A | The first time it was fine.  But, when we went back the second |
| 8 | | time that afternoon, I had went over there, me and him were |
| 9 | | talking, and he was standing out with some of his other |
| 10 | | friends that were out there. |
| 11 | Q | Okay.  I want to—The first time you were there—Approximately |
| 12 | | what time were you there the first time? |
| 13 | A | That was at around 10:00 or 11:00 a.m. when we left from |
| 14 | | Park Street. |
| 15 | Q | Okay.  And then the—And then what did—Did you and Milo leave |
| 16 | | together from there? |
| 17 | A | Yeah, we went back to Park Street— |
| 18 | Q | Okay. |
| 19 | A | —and I didn't see him.  I guess he had Easter dinner with his |
| 20 | | family.  And then I had went off and had dinner with one of my |
| 21 | | friends' families. |
| 22 | Q | Okay.  Then— |
| 23 | A | And then— |
| 24 | Q | Then— |
| 25 | A | —me and him had linked back up that afternoon on Mabel. |

```
 1   Q    What time?

 2   A    This was, I want to say, like around 4:00.  It was still kind

 3        of early.

 4   Q    Okay.  And, when you were there, did you see an individual by

 5        the name of Samuel Steel?

 6   A    Yes.

 7   Q    Do you see Samuel Steel in court today?

 8   A    Yes.

 9   Q    Can you point to him and describe what he's wearing.

10   A    He's in the white shirt and the gray-striped tie.

11             MR. CUSICK:   Your Honor, let the record reflect the

12        witness has identified the defendant Mr. Steel.

13             THE COURT:   That's noted for the record.

14   BY MR. CUSICK:

15   Q    Where did you see Mr. Steel on that day?

16   A    He was across the street with—Several of his family members,

17        they were across the street from where we were at on Mabel.

18   Q    Okay.  So were you—So he was across the street—the defendant

19        was.  Now this is at the time you came back in the afternoon—

20   A    Yes.

21   Q    —correct?

22   A    Yes.

23   Q    And did you see the defendant do anything at the time?

24   A    Yes, he was mean-mugging.

25   Q    Mean-mugging?
```

1  A   Yes.

2  Q   Describe to the jury what that means to you.

3  A   Me and Milo were sitting in the car talking.  Milo got out.

4      He seen Sam.  He waved at him.  And Sam just kind of had his

5      arms like this and was just kind of like—had his mouth tight

6      like—like that.  And I noticed it because I know that

7      Milo said he knew Sam before and was kind of fond of him.  So

8      I kind of found it odd that he would be looking at him like

9      that.

10 Q   Okay.  Did you say—Did the defendant say anything to Milo that

11     day?

12 A   No, he didn't even wave back.  But—

13 Q   Okay.

14 A   —there are previous times where I would be over there, if

15     Milo waved, he would always speak back.  It was never like

16     that.

17 Q   Okay.  So his demeanor—The defendant's demeanor on previous

18     occasions was different on this occasion?

19 A   Yes.

20 Q   What did you say to Milo after you saw this?

21 A   I said, why is he mean-mugging you.

22          And Milo went on to say, like, oh, no, I been

23     knowing him blah blah blah.

24          But he didn't indicate like there was a issue with

25     Sam, so I was just kind of lost; and I asked him, what was

330

```
 1        that about.  He—You know—

 2   Q    Okay.

 3   A    —he hasn't been—

 4   Q    You don't—

 5   A    —doing that.

 6   Q    You don't have to say exactly what Milo said.  I just

 7        want—just said did you say anything to Milo about—

 8   A    Yeah, why is he mean-mugging you.

 9   Q    Okay.  And how did you feel when you saw the defendant

10        mean-mugging him?

11   A    That he shouldn't be speaking, like, if—There's obviously some

12        tension there, you know.  Regardless of whether it was or not,

13        there was something there that was different than any other

14        time that I had seen them interact with each other.

15   Q    Okay.  Was there any type of interaction between Samuel Steel

16        and Milo Conklin that you saw that day?

17   A    No, just a lot of just glaring back.  And Milo was trying to,

18        like once we got out the car, he kind of was trying to avoid

19        eye contact; and it was just not—like I said, it was very

20        different from any other time that I had seen them around each

21        other.

22   Q    Okay.  Now this was Easter Sunday—Right?

23   A    Yes.

24   Q    —April 24th?

25                  Can you describe the street, how many people—in the

                                     331
```

```
 1        afternoon—were on Mabel Street that day.
 2   A    A lot.  Like it was to the point—I was like parked on the edge
 3        of the driveway.  Like there was like several cars in the
 4        driveway already, and my car was at the edge.  Milo car was in
 5        front of mine.
 6                And then across the street, where Mr. Steel was,
 7        there were like several people like lined up over there, some
 8        that I knew, some that I didn't know.
 9                And so there was kind of dysfunction everywhere
10        throughout the street or whatever.
11   Q    Okay.  What happened after that?  What happened after you saw
12        the defendant mean-mugging Milo?
13   A    I wind up leaving, and Milo had stayed.  Me and him had had a
14        conversation, but—I know it's hearsay now.—he winded up
15        staying.  And, after me and him had talked, I went back my way
16        and then I met back up with him in Interfaith—Patwood.  I met
17        back up with him then and I had a friend with me, and me and
18        him talked and—
19   Q    Okay.  You were at Interfaith?
20   A    Yes.
21   Q    How far away is that from Mabel Street where you were before?
22   A    Probably like—Oh.  Where—You mean like where I left from or
23        from Mabel?
24   Q    You indicated that you and Milo met back up?
25   A    Yes.
```

332

| | | |
|---|---|---|
| 1 | Q | Okay. How far—And that was at Interfaith, correct? |
| 2 | A | Yes. |
| 3 | Q | How far away is that from the location that you were at on |
| 4 | | Mabel? |
| 5 | A | Hmm, not even—It's something like a couple of blocks away, |
| 6 | | like it's not far at all. |
| 7 | Q | Okay. When you met back up with Milo, do you recall what time |
| 8 | | that was? |
| 9 | A | It was—I know it's evening time 'cause the sky was already |
| 10 | | getting like that dark look to it but it wasn't like |
| 11 | | completely black. And I had met with him—Me and him had |
| 12 | | talked outside for a little while.—and he said that he was |
| 13 | | going to go back over there, 'cause he had gotten a call while |
| 14 | | he and I were talking. |
| 15 | Q | Okay. Now was he with anybody at that time? |
| 16 | A | Yes. |
| 17 | Q | Who was he with? |
| 18 | A | He was with B. J., a taller guy with braids. He was with a |
| 19 | | girl Tay. I don't know her real name, but she has |
| 20 | | . . . (unintelligible). He was with her. There was, I want |
| 21 | | to say—I don't know the guy's real name.—I think Dontario is |
| 22 | | his name. |
| 23 | Q | So you— |
| 24 | A | He was— |
| 25 | Q | —do know— |

| | | |
|---|---|---|
| 1 | A | —out there. |
| 2 | Q | —the real—Do you know the real names of the people that he was |
| 3 | | with? |
| 4 | A | Oh, no, those are—I just don't know Tay's or— |
| 5 | Q | Okay. |
| 6 | A | I don't know B. J.'s real name either. |
| 7 | Q | Is that Lashontay Kyles? |
| 8 | A | Yes. |
| 9 | Q | Do you know a Quazae Jackson? |
| 10 | A | No. |
| 11 | Q | Okay. What happened then? |
| 12 | A | He and I had talked. He got a call from someone that was on |
| 13 | | Mabel, somebody that was already kind of sketchy to me. So, |
| 14 | | when he said he was going to go over there just because of all |
| 15 | | the kind of little glares and stuff that was going on and real |
| 16 | | uneasy, I told him not to go over there. |
| 17 | | He's like, oh, I'm not going to go, I'm just going |
| 18 | | to go grab some beer. So I gave him some money to go get |
| 19 | | beers from the store. |
| 20 | | And from my understanding, he was going to go to |
| 21 | | Daysha's and go right back and then I would meet back up with |
| 22 | | him once I dropped my friend back off at home 'cause she rode |
| 23 | | with me. |
| 24 | Q | Okay. So you were planning on getting back together with |
| 25 | | Milo? |

334

```
 1   A   Once I dropped my friend off.

 2   Q   What happened then?

 3   A   When I had left from over there, he had already told me he

 4       wasn't going there.  And, when I left from Patwood, I didn't

 5       even make it to like where the Shell's and BP is downtown; and

 6       he had called me and was like, well, such and such—I don't

 7       know if I can say that first name.  But he said Chuck had

 8       called him and asked him—

 9                   MR. CHAMPION:   Your Honor—

10                   THE WITNESS:   —you know, to come back over there—

11                   MR. CHAMPION:   Your Honor, I'm going—

12                   THE COURT:   Hold on.  Hold on.

13                   MR. CHAMPION:   —to object.

14                   THE COURT:   Hold on.

15                   MR. CHAMPION:   This is all hearsay.

16                   MR. CUSICK:   Well—

17                   THE WITNESS:   My phone records were looked at—

18                   THE COURT:   Hold on.

19                   THE WITNESS:   —before.

20                   THE COURT:   Hold on a second, ma'am.

21                   MR. CUSICK:   I agree.  I can lay a foundation if—

22   BY MR. CUSICK:

23   Q   Ms. Caper, I don't want you to tell me what other people say.

24       You can just tell me—

25   A   Okay.
```

335

1  Q   —what you said.  Okay?

2  A   So—

3              THE COURT:   Okay.

4              THE WITNESS:   —he got—

5              THE COURT:   Hold on.  I have to rule on this.

6      Okay?

7              So I'm going to sustain the objection.

8              So the jury is to disregard anything she said that

9      Chuck said or any information she received about the phone

10     call.

11             I'll let you start from there.

12             Go ahead.

13             THE WITNESS:   Okay.  So Milo—

14             MR. CUSICK:   Okay.

15             THE COURT:   Hold on a second.  He's going to ask

16     you a question now.

17             THE WITNESS:   Uh-huh.

18  BY MR. CUSICK:

19  Q   So, without telling me exactly what the discussion was,

20     Milo received a phone call?

21  A   Yes.

22  Q   What was Milo's demeanor at the time?  Do you—

23  A   He was okay.

24  Q   Okay.  And, after the phone call, what happened then?

25  A   I pulled up to where I was at at my friend's house.  I

                              336

```
 1        stopped—

 2    Q   Okay.

 3    A   —in—

 4    Q   Okay.  So you left Interfaith?

 5    A   Yeah.  I got the phone call when I got down to the Shell and

 6        BP after he and I had already discussed that he wasn't going

 7        over there.

 8    Q   Okay.

 9    A   He stated he had a call and that's why he went.

10    Q   And so it was your understanding that Milo was not going

11        there?

12    A   Right.

13    Q   And you left—you left Interfaith.  Did you ever see

14        Milo Conklin or speak with Milo Conklin again after that?

15    A   No, I spoke with him; and, not even five minutes later,

16        someone called me and said that he was dead.  That was the

17        call I got.

18    Q   What did you do then?

19    A   Passed out, and my friends took me to the hospital where I was

20        met by some of his family members.

21                    MR. CUSICK:   May I have one moment?

22                    (At 11:49 a.m., off record discussion between

23                    Mr. Cusick and Detective Beauchamp)

24                    I have nothing further.

25                    Thank you.
```

337

```
 1              THE COURT:   Mr. Champion?

 2                      CROSS-EXAMINATION

 3  BY MR. CHAMPION:

 4  Q    As I understand, Ms. Caper, Sam Steel was across the street

 5       with a group of friends; is that correct?

 6  A    Yeah, friends and family.

 7  Q    Friends and family.  Milo and you and a group were on the

 8       other side; is—

 9  A    Yes.

10  Q    —that correct?

11              Did you ever see Sam Steel walk up and give Milo two

12       beers?

13  A    No.

14  Q    Did you ever see Sam Steel and Milo, in fact, sharing food—

15  A    No.

16  Q    —that evening?

17              Milo and Sam were friends; is that correct?

18  A    I thought.

19  Q    And Milo spoke highly of Sam; is that correct?

20  A    He did.

21  Q    And Sam was looked at as a big brother almost to—

22  A    I wouldn't go that far.

23  Q    Did Milo look at him as a big brother?

24  A    He never went that far, no.

25  Q    Did Sam talk to Milo about issues?
```

338

| | |
|---|---|
| 1 | A   When he first started coming around Mabel, a couple of times; |
| 2 | but not really. |
| 3 | Q   And there was other individuals upset with Milo; is that |
| 4 | correct? |
| 5 | A   Not to my— |
| 6 | MR. CUSICK:   Your Honor— |
| 7 | THE WITNESS:   —knowledge, at— |
| 8 | MR. CUSICK:   —this is— |
| 9 | THE WITNESS:   —that point, no. |
| 10 | MR. CUSICK:   —the same—this is the same objection |
| 11 | defense counsel made.   It's hearsay as to what was said about |
| 12 | Milo. |
| 13 | THE COURT:   Mr. Champion? |
| 14 | MR. CHAMPION:   I didn't ask what was said. |
| 15 | BY MR. CHAMPION: |
| 16 | Q   Were you aware if anybody was upset with Milo? |
| 17 | A   No. |
| 18 | THE COURT:   Hold on a second.   Hold on a second. |
| 19 | I'll overrule that—or sustain that objection. |
| 20 | He changed the question.   I'll let that answer in. |
| 21 | BY MR. CHAMPION: |
| 22 | Q   Not that you were aware of; is that correct? |
| 23 | A   Right. |
| 24 | Q   And you weren't—You weren't aware that Sam was upset with |
| 25 | Milo; is that correct? |

1   A   No.

2   Q   There was just a group of individuals; and, when you drove by,

3       you said Sam did what exactly?  I forget—

4   A   I didn't drive by.  I was in the driveway—

5   Q   You were in the driveway.

6   A   —outside of the car.  And Milo had, you know, spoke to him as

7       he normally did when they seen each other.  And it wasn't the

8       same type of interaction that they would previously have that

9       I've witnessed.

10  Q   And that's what I'm trying to clarify.  Sam was on the other

11      side of the street with his group of individuals?

12  A   Right.

13  Q   And Milo was on the opposite side of the street with another

14      group of individuals; is that correct?

15  A   Right.

16  Q   And they just sort of waved and Sam didn't wave back; is that

17      correct?

18  A   It was more than not waving back like; so I would say, no,

19      that's incorrect.  Because how he was, like it was more so

20      crossing of the arms like—like something you see in movies

21      when someone doesn't like another person and you can tell

22      there's something going on there.  But I had no previous

23      knowledge that there was an issue there, so—

24  Q   So you had no knowledge.

25              Was there other individuals both around Sam at that

340

1      moment?

2  A   Yeah.  Well, the individuals that I speak of were his

3      daughters.  Like I didn't see him really surrounded by guys.

4      Two of his daughters I know from high school.  So those were

5      the individuals that I speak of.  I seen other people, but

6      they weren't like around him like that.

7  Q   And were there other individuals around Milo at that point in

8      time?

9  A   Yeah, like the older guy who was there at the house who also

10     was injured—He was out there.—and me and then the one that

11     owned the house, and then there were a few people on the

12     porch.

13 Q   So there was—there was a number of individuals around.

14 A   Uhm-hmm.

15 Q   Okay.  So Sam didn't say anything, he just didn't wave back

16     and sort of crossed his arms and stared; is that right?

17 A   Yeah.

18               MR. CHAMPION:    Thank you.

19               MR. CUSICK:    I have nothing further, your Honor.

20               THE COURT:    Ladies and gentlemen, do any of you

21     have any questions for this witness?  If so, raise your hand.

22               No questions.

23               Thank you, ma'am.

24               THE WITNESS:    Thank you.

25               THE COURT:    You may step down.

                                341

1          Is she excused from her subpoena, Counsel?

2          MR. CUSICK:   Yes, your Honor.

3          THE COURT:   Mr. Champion, any objections to her

4    being excused?

5          MR. CHAMPION:   No, your Honor.

6          THE COURT:   All right.  Thank you.  You can go

7    right out that door right there.

8          MR. CUSICK:   Your Honor, at this time we're going

9    to call Gerald Luedecking.  I don't—I know it's coming—

10         THE COURT:   Okay.

11         MR. CUSICK:   —up to lunch, and he'll be available

12   this afternoon, too.  I'll just—

13         THE COURT:   All right.

14         MR. CUSICK:   —leave it to the Court's discretion.

15         THE COURT:   Will you approach a minute, please.

16         (At 11:53 a.m., bench conference as follows:

17              THE COURT:   How long do you think your

18              examination of him is going to be?

19              MR. CUSICK:   I'm sorry?

20              THE COURT:   How long do you think your

21              examination of him is going to be?

22              MR. CUSICK:   It could be a while.  It's going

23              to be one of the longer witnesses because he's the

24              one that—he collected all the—

25              THE COURT:   Right.

1          MR. CUSICK:   But he's—

2          THE COURT:   Take more than a half an hour?

3      Can we—Yeah.

4          MR. CUSICK:   I think it'll be more than a half

5      an hour.  Certainly more than half an hour.  It'll

6      be about half an hour at least, probably, for my

7      direct and then—I don't know—

8          THE COURT:   I'd like to get started and go

9      maybe half hour or so—

10         MR. CUSICK:   Okay.  That's fine.

11         THE COURT:   —and then take a break.

12     Let me make sure that the jury is okay with

13     that.  And then, if we stop about 12:30 or so.

14         MR. CUSICK:   Okay.)

15     THE COURT:   Folks, when we talk up here at the

16 bench, you can't talk.  We're still on the record and we can

17 pick up what you're saying.  So please just bear with us here

18 and be quiet.  I can hear some talking going on in the

19 background—in the background there.

20     All right.  What I'd like to do is go another half

21 hour or so, but let me just ask the jurors.

22     Are you okay with that, or does anyone need a break?

23 We're getting very close to the noon hour.  Raise your hand if

24 you need a break.

25     No one does.  All right.

```
 1                     We'll start with the next witness then.
 2                     MR. CUSICK:   Your Honor, at this time, the People
 3          call Gerald Luedecking.
 4                     THE COURT:   Right up here, sir.
 5                     Please raise your right hand.  Do you solemnly swear
 6          or affirm that the testimony you're about to give will be the
 7          truth, the whole truth, and nothing but the truth, so help you
 8          God?
 9                     MR. LUEDECKING:   I do.
10                     THE COURT:   Please have a seat, sir.
11                     With that microphone, you need to speak right in the
12          end of the microphone.  Please don't pull too far back.
13                     I need you to state and spell your first and last
14          name for the record, if you would.
15                     THE WITNESS:   My name is Gerald A. Luedecking.
16          It's G-e-r-a-l-d L-u-e-d-e-c-k-i-n-g.
17                          GERALD A. LUEDECKING,
18          called at 11:54 a.m., and sworn by the Court, testified:
19                          DIRECT EXAMINATION
20     BY MR. CUSICK:
21     Q    Good morning.
22     A    Good morning.
23     Q    Mr. Luedecking, how are you employed?
24     A    Right now I am employed part time with the sheriff's
25          department.
```

344

1  Q  Okay.  And, on April 24th of 2011, how were you employed then?

2  A  I was a full-time laboratory specialist with the

3     Kalamazoo Department of Public Safety.

4  Q  And did you have any—You're a laboratory specialist, correct?

5  A  Yes.

6  Q  How long at that time were you a laboratory specialist?

7  A  In 2011, about five years.

8  Q  Okay.

9  A  I'd been in the crime lab about 19 years.

10 Q  Can you describe to the jury what a laboratory specialist is.

11 A  Sure.  The crime lab has two different positions: a laboratory

12    technician and a laboratory specialist.

13        The technician is a uniformed police officer that

14    works 24 hours a day.  We have several that work different

15    shifts.  And they go to crime scenes, they take photographs,

16    process them for fingerprints, collect evidence.

17        The specialists work Monday through Friday in the

18    laboratory.  Very seldom do we go out to crime scenes except

19    major crime scenes.  We run the day-to-day operations of the

20    laboratory.

21        My speciality was—I examined narcotics.  I did that

22    for the majority of my time as a specialist.  But I had been a

23    laboratory technician, had extensive training, and I respond

24    to major crime scenes.

25 Q  You had been—You indicated for five years you had been a

345

```
 1       laboratory specialist—
 2   A   Approximately.
 3   Q   —as of—Okay.
 4           So how many crime scenes have you attended to those
 5       five years?
 6   A   In those five years, I'd probably been to—Boy!—a hundred
 7       different crime scenes, 35 homicides.  In my career as a
 8       police officer, I've been to thousands.
 9   Q   Okay.  And you had been—How long were you a police officer?
10   A   Since 1972.
11   Q   And you were with the crime lab for 19 years, you said?
12   A   Yes, sir.
13   Q   Can you describe to the jury what you did at the crime lab.
14   A   Well, as a laboratory technician, I responded to—Like I said a
15       moment ago, I responded to all the crime scenes that I was
16       called to.  I took photographs, processed for fingerprints,
17       collected evidence, looked for trace evidence, preserved
18       evidence, collected evidence.
19           And then, when we weren't responding to crime
20       scenes, we were in the laboratory processing evidence for
21       trace evidence, fingerprints, doing all the laboratory stuff
22       that the regular patrolman don't have an opportunity to do.
23   Q   And you had—And you already testified to this.—you had
24       specific training as a laboratory specialist?
25   A   Yes.
```

346

```
 1            MR. CUSICK:   Your Honor, at this time, I would just
 2       ask that Mr. Luedecking be qualified as an expert laboratory
 3       specialist.
 4            THE COURT:   Mr. Champion?
 5            MR. CUSICK:   He was on our witness list as proposed
 6       expert testimony.
 7            MR. CHAMPION:   No objection, your Honor.
 8            THE COURT:   He is so qualified under 702.
 9            MR. CUSICK:   Thank you.
10  BY MR. CUSICK:
11  Q   Mr. Luedecking, I want to direct your attention to April 24th
12      of 2011.
13  A   Yes, sir.
14  Q   You're aware of that date?
15  A   Yes, sir.
16  Q   Okay.  And do you arrive at the location of 626 Mabel Street
17      in the city of Kalamazoo?
18  A   Yes.
19  Q   What brought you to that location?
20  A   I got a call from my boss—Captain Parsons—at home stating that
21      public safety was on the scene of a shooting; that the
22      injuries appeared serious, and I was requested to come to the
23      scene and process it.
24  Q   When you arrived at the scene, can you briefly describe to the
25      jury what you saw at the scene.
```

347

```
 1   A   This was on a residential street, and the street had been
 2       blocked off by a patrol car at each end.  The area had been
 3       further isolated with the yellow crime scene tape.  There were
 4       a number of police officers present.  There were a number of
 5       people that were standing in their yards and watching what we
 6       were doing.
 7   Q   Okay.  And approximately what time were you there?  I'm sorry
 8       if you—
 9   A   I got there about 10:15 p.m.
10   Q   What do you—Did you talk to any of the individuals at the
11       scene when you were there, or was that something that would
12       have been outside of your capacity as a laboratory specialist?
13   A   Well, yes, I talked to some people.  I talked to police
14       officers.  But the concept that you see on TV is for
15       entertainment.
16           The crime lab processes and collects evidence.  We
17       try to preserve it.
18           The notion that we go out and talk to witnesses and
19       knock on doors is entertainment.  It's not reality.  That's
20       not what we do.
21           If there are people that are present that make
22       themselves known to us, we'll certainly talk to them; but, in
23       this case, the only people I spoke with were police officers.
24   Q   I'd like to show you People's proposed exhibit number two.
25       Describe what that is.
```

```
1  A    This is a diagram that I prepared of 626 Mabel Street, the
2       crime scene that we're talking about.
3  Q    Okay.  Is that a fair and accurate depiction of the crime
4       scene as of April 24th of 2011?
5  A    Yes, this is as close to scale as I could possibly make it.
6            MR. CUSICK:   Your Honor, at this time I'd ask that
7       People's proposed exhibit number two be admitted into
8       evidence.
9            MR. CHAMPION:   No objection.
10           THE COURT:   Two is received.
11 BY MR. CUSICK:
12 Q    Can you describe for the jury the layout of your exhibit—of
13      exhibit number two.
14           MR. CUSICK:   And I have—I have—
15           THE WITNESS:   Do you have a pointer I can—
16           MR. CUSICK:   Yeah, I have a pointer right here.
17           THE COURT:   And just a reminder that you do need to
18      speak right in the end of the microphone if you are going to
19      speak, so be careful if you're moving away from the
20      microphone.
21           THE WITNESS:   Okay.  This is the diagram that you
22      just spoke of.  It's a diagram I prepared of 626 Mabel.  The
23      area that says 626 Mabel towards the top of the diagram—that
24      big square object, the object that I just pointed at—is, in
25      fact, the house.
```

The item coming down and across, those two items are the sidewalk that runs in front of 626 Mabel.

The linear thing at the bottom is Mabel Street.

That rectangular thing towards the right side of the diagram that has a little triangle, that depicts a vehicle that's setting in the driveway. The triangle depicts the fact that the vehicle is backed in the driveway and facing out.

You can see a bunch of little dots and numbers on the diagram. Those are the locations of specific pieces of evidence we picked up.

And then, down below, it says legend.

And you can see the very first item is one, two, five, 15, 16. And what those are are shell casings. So I'm going to point to one, two, five, 15, and 16.

Three and four are bullet or jacket fragments.

Item six is a pair of glasses.

Item seven is a blue bag.

Eight through 12 and number 17 are footwear impressions that we observed at the scene.

And I think that it's important that you understand the terminology between fragments, bullets, casings, and all of that.

The item that you put into a weapon to fire it is called a cartridge. That's the whole bullet. That's the whole cartridge. It includes the casing, the primer, the

1    power, and the bullet that get fired out of the gun.

2            Typically, with a pistol—semi-automatic pistol—after

3    you fire the weapon, something is ejected out of the side of

4    the weapon, and that's called a casing.  That is what the

5    bullet had originally been in, and it's expended from the

6    weapon.

7            The thing that comes out of the barrel is the

8    bullet.  And the reason it's important that you know that

9    terminology is because people misuse it.  They call them

10   bullets, casings, cartridges, and it's not correct.  The whole

11   thing is the cartridge.  The thing that is ejected out of the

12   weapon is called a casing, and the thing that fires out of the

13   end of the barrel is the bullet.

14           MR. CUSICK:   Okay.

15           THE WITNESS:   Now, in this particular case, it says

16   on the diagram bullet and jacket.  The—The bullet in this case

17   has a copper jacket around a piece of lead.  And what we found

18   here is we found a bullet that still had the copper jacket,

19   and we also found just the copper jacket where the lead had

20   separated out of that.

21   BY MR. CUSICK:

22   Q    Now did you place all of these items onto evidence, or would

23        somebody else have done that, these items—

24   A    Did—

25   Q    —that you marked?

```
 1   A   Did I place them in evidence?

 2   Q   Right.

 3   A   No.

 4   Q   Okay.  Regarding the bullet jacket, is that when the gun

 5       ejects and the casing jumps out of the gun?  How is—Just so—I

 6       think just to clarify what was—What's the bullet jacket

 7       exactly again?

 8   A   The casing is ejected out of the gun on a semi-automatic

 9       pistol.  The bullet comes out the end of the barrel.  And some

10       of the bullets are lead, but they have a copper jacket that

11       goes around them to keep them intact until they have an

12       opportunity to expand.

13              In this case, we found a bullet that had still the

14       copper jacket attached to it, but we also found a copper

15       jacket; and that's why it says bullet and jacket.

16   Q   Okay.

17   A   They're two different items.

18   Q   Okay.  Thank you for that clarification.

19              I'll be showing you some photographs,

20       Mr. Luedecking.

21              Would you like to be referred to as

22       Detective Luedecking, Officer Luedecking, Mr. Luedecking?

23   A   Whatever you're comfortable with, I'm good with.

24   Q   Showing you People's proposed exhibit number four.

25              MR. CHAMPION:   No objection.
```

352

BY MR. CUSICK:

Q    Can you describe what that is.

A    People's exhibit number four is a picture of the front of this
     Mabel Street address.  It shows the front of the house, the
     porch, a portion of the sidewalk leading up to the house, and
     in a portion of this is a blue item and some blood.

Q    Okay.  Is that a fair and accurate depiction of how the scene
     looked at the time on April 24th—

A    Yes.

Q    —2011?

          MR. CUSICK:   I'd ask that proposed exhibit number
     four be admitted into evidence, your Honor.

          THE COURT:   And you had no objections, correct?

          MR. CHAMPION:   That's correct, your Honor.

          THE COURT:   Okay.  Exhibit four is received.

BY MR. CUSICK:

Q    I'd like to hand you People's—

          (At 12:09 p.m., off record discussion between
          Mr. Cusick and Mr. Champion)

          MR. CUSICK:   I'd ask for it to be—

          MS. HYBEL:   . . . (inaudible)

          MR. CUSICK:   He already described it.

BY MR. CUSICK:

Q    You briefly—You already made the description.  Is there any
     other thing—the exhibit on the screen—

1   A   No.

2   Q   —that you'd like to point out to the jury?

3   A   The upper left-hand portion just above the light on the front

4       of this home is the address.  Stairs leading down to the

5       sidewalk.  The dark stain to the left lower portion of this

6       photograph that I'm pointing at is a bloodstain, and then the

7       blue item with the little evidence marker from the patrol

8       officers.

9   Q   That is 626 Mabel?

10  A   Say it again?

11  Q   That is 626 Mabel?

12  A   Yes.

13  Q   I'd like to show you People's proposed exhibit number five.

14      Very briefly describe . . . (inaudible) Is that a photograph

15      from the scene?

16  A   Yes, it is.

17  Q   Is that a fair and accurate depiction of how it looked at the

18      time on April 24th of 2011?

19  A   It's how I found it, yes.

20          MR. CUSICK:   Your Honor, I'd ask that People's

21      proposed exhibit number five be admitted into evidence.

22          MR. CHAMPION:   No.

23          THE COURT:   Five is received.

24  BY MR. CUSICK:

25  Q   Can you describe to the jury what that scene is.

                            354

```
 1  A    Yes, this is looking east down the sidewalk in front of

 2       626 Mabel.  You can see the blue tarp in the approximate

 3       center of the photograph, blood just below that.  A lot of the

 4       items to the left side of the photograph are items of medical

 5       debris.  They're from the life-saving efforts.  And then you

 6       can see that there's a little bit on the sidewalk, and then

 7       there's just debris and items in the front yard.

 8                    MR. CHAMPION:   Your Honor, may we approach?

 9                    THE COURT:   Yes.

10                    (At 12:11 p.m., bench conference as follows:

11                         MR. CHAMPION:   One of my witnesses just showed

12                    up in court.

13                         THE COURT:   Which one?

14                         MR. CHAMPION:   Edward—

15                         THE COURT:   Which one?

16                         MR. CHAMPION:   . . . (inaudible)

17                         THE COURT:   Which one?

18                         MR. CHAMPION:   Edward Jackson.

19                         THE COURT:   No, but which—

20                         MR. CUSICK:   . . . (inaudible) defendant's

21                    sister?

22                         MR. CHAMPION:   Yeah, . . . (inaudible) going

23                    to call her.

24                         MR. CUSICK:   You're not going to call her?

25                         MR. CHAMPION:   . . . (inaudible)
```

```
 1              MR. CUSICK:   She's on your witness list, but
 2         . . . (inaudible)
 3              MR. CHAMPION:   . . . (inaudible)
 4              THE COURT:   What is she—Do you want to just
 5         take a minute and go talk to her and excuse her, or
 6         do you want me to have Yasmine do that?
 7              MR. CHAMPION:   It doesn't matter.
 8              THE COURT:   I'll let you go talk to her a
 9         second and just tell her that she needs to be—leave.
10              MR. CHAMPION:   Okay.
11              THE COURT:   Hold on a second.
12              Did he take these photographs, or—
13              MR. CUSICK:   No.
14              THE COURT:   —somebody else did?
15              Okay.  He's just identifying them?
16              MR. CUSICK:   Yeah.
17              THE COURT:   Okay.)
18              THE COURT:   Just give us one second, ladies and
19    gentlemen.
20              (At 12:12 p.m., Mr. Champion exits courtroom and
21              returns momentarily)
22              Go ahead.
23              MR. CUSICK:   Thank you, your Honor.
24 BY MR. CUSICK:
25 Q    That's—I believe you described People's exhibit number five,
```

```
 1         correct, Mr. Luedecking?
 2   A     I believe I did, yes.
 3   Q     Okay.  I'd like to show you People's proposed exhibit number
 4         six.
 5                   Actually, before I do that, . . . (inaudible) number
 6         five.
 7                   See the car right next to the house?
 8   A     Yes.
 9   Q     Now, in front, that street is Mabel, correct?
10   A     Yes, to the right-hand side of this photograph where you can
11         see the police vehicle parked is Mabel.
12   Q     Now, right behind the house, is that Elizabeth Street?
13   A     Yes.
14   Q     I'd like to show you People's proposed exhibit number six.  Is
15         that a fair and accurate depiction of the scene on April 24th
16         of 2011?
17   A     Yes.
18                   MR. CUSICK:   Your Honor, I'd ask that People's
19         proposed exhibit number six be admitted into evidence.
20                   MR. CHAMPION:   No objection, your Honor.
21                   THE COURT:   Six is received.
22   BY MR. CUSICK:
23   Q     What is that?
24   A     This is a close-up of the bottom of the steps of 626 Mabel.
25         You can see the blue item that I talked about earlier and a
```

1       pool of blood.

2    Q   Okay.  I'd like to show you People's proposed exhibit number

3        seven.  Is that a photo of the crime scene?

4    A   Yes, this is a photo of the east side of the home.

5    Q   Okay.  Is that a fair and accurate depiction of how it looked

6        at the time—

7    A   Yeah.

8    Q   —of April 24th of 2011?

9    A   Yes.

10                  MR. CUSICK:  I'd ask that People's proposed exhibit

11       number seven, your Honor, be admitted into evidence.

12                  MR. CHAMPION:  No objection.

13                  THE COURT:  Seven is received.

14   BY MR. CUSICK:

15   Q   Can you describe to the jury what that is.

16   A   Again, this is to the east of 626 Mabel.  This building to the

17       left of the photograph—the two-story building—is 626 Mabel.

18       You can see that there's a vehicle backed in next to the

19       house, there's another one right behind it, and a vehicle

20       further to the east of that that's backed in.

21   Q   I'd like to show you People's proposed exhibit number eight.

22       Is that a—Is this a photograph of the crime scene?

23   A   Yes.

24   Q   Is it a fair and accurate depiction as of April 24th of 2011 of

25       the crime scene?

                                    358

1   A   Yes, sir.

2               MR. CUSICK:   I'd ask that People's—People's

3       proposed exhibit number eight be admitted into evidence,

4       your Honor.

5               MR. CHAMPION:   No objection, your Honor.

6               THE COURT:   Eight is received.

7   BY MR. CUSICK:

8   Q   Can you describe to the jury what that is.

9   A   This is just the street in front of the home.  You can see

10      that the yellow police tape has been placed up.  Some of it

11      has been taken down and moved.  The typical street scene.

12      Nothing significant that I can think of comes to mind, just an

13      overall of the street.

14  Q   Okay.  So is 626 Mabel, would that be on—Are we—Is this facing

15      south?  I mean, is this facing east?

16  A   East.

17  Q   Okay.

18  A   So 626 Mabel in this photograph would be to the left-hand

19      side.

20  Q   I'd like to show you People's proposed exhibit number nine.

21      Is that a photo of the crime scene?

22  A   Yes.

23  Q   And is it a fair and accurate depiction of how it looked on

24      April 24th of 2011?

25  A   Yes, sir.

1    MR. CUSICK:   I'd ask that People's proposed exhibit

2    number nine be admitted into evidence, your Honor.

3    MR. CHAMPION:   No objection, your Honor.

4    THE COURT:   Nine is received.

5  BY MR. CUSICK:

6  Q    What is that?

7  A    This is 626 Mabel.  We've talked about it quite a bit.

8    There's a trash can in the yard.  And now you can start seeing

9    little yellow items displayed in the photograph, and those

10    item—yellow items are evidence markers.  As we went through

11    the scene, we'd find a piece of evidence, we'd place a marker

12    by it and leave it in place until we were sure that we had as

13    much of the evidence as we could find.

14  Q    I'd like to show you—And I'm trying to move things along here.

15    I'd like to show you People's exhibits—proposed exhibits

16    number ten to 16.  Can you look at those, and are those fair

17    and accurate depictions of the crime scene as of April 24th

18    . . . (inaudible)

19  A    Yes, sir, they are.

20    THE COURT:   Okay.  Your Honor, I'd ask that

21    People's proposed exhibits number ten, 11, 12, 13, 14, 15, and

22    16 be admitted into evidence.

23    MR. CHAMPION:   No objection, your Honor.

24    THE COURT:   Items ten through 16 are received.

25

360

BY MR. CUSICK:

Q    Regarding People's exhibit number ten, can you describe what
     that is.  It's on the—That's on the video.

A    The—Again, this is 626 Mabel.  You can see two vehicles to the
     right of the photograph, one in the neighbor's driveway to the
     left, trash can in the front yard.

Q    Okay.  Regarding People's exhibit number 11.

A    Just a better photograph, a little further away.  You can now
     see some of the street, the curb.  Nothing significant that I
     can think of except the yellow placards have been placed down
     in front of the home.

Q    The yellow placards are?

A    Evidence markers.

Q    People's exhibit number 12.

A    This is behind 626 Mabel.  626 Mabel would be to the left of
     this photograph.  In fact, you can see just a small portion of
     the rear porch.

              The item that I'm going to point at in the center
     right of the photograph, that was referred by neighbors as a
     cut-through.  And it's a area that is used by many of the
     local residents to transverse from Mabel Street to
     Elizabeth Street.

Q    Okay.

A    In fact, in some of these photos, you can see a police car in
     the back yard; and that was to discourage people from coming

                              361

1      through the crime scene.

2   Q  Okay.

3   A  So it's used quite—quite heavily.

4   Q  People's exhibit number 13.

5   A  That's just more of the rear yard.  In the previous

6      photograph, you could see a portion of this shed.  The photo's

7      been taken to the right of the shed just to show that that

8      fence is intact and there is some yellow barrier tape up.

9   Q  People's exhibit number 14.

10  A  Now that tape has been extended beyond the shed and through

11     that cut-through, again, to discourage people from coming

12     through.  You can see where, at one point, there was a cement

13     portion of the yard that had the appearance of maybe being a

14     garage at one time.

15  Q  On that cement there?

16  A  Yes.  It looked like it had, at some point in life, been a

17     garage.

18  Q  Okay.  People's exhibit number 15.

19  A  That's just a close-up of that cut-through.  And I guess the

20     significance of this photograph is you can see how much the

21     yard has worn from people walking through the area.

22  Q  People's exhibit number 16.

23  A  This is the rear of 626 Mabel.  We're looking to the south.

24     The vehicles that we spoke to earlier parked in the driveway

25     can be seen to the left side of this photograph.  And you can

362

```
 1        just see the rear yard of 626.  I spoke about a porch in a
 2        photograph a moment ago.  You can see that porch to the left
 3        side of this photograph.
 4   Q    And I am going to show you People's proposed exhibits number
 5        17 through 30 and proposed exhibit—Sorry for this being out of
 6        order.—106.
 7                  Will you look through those.  And are those pictures
 8        of the crime scene?  Are they a fair and accurate depiction of
 9        the crime scene as of April 24th of 2011?
10   A    Yes, sir, these are fair and accurate depictions.
11                  MR. CUSICK:   Your Honor, I would just ask that
12        People's proposed exhibits number 106 and 17 to 30 be admitted
13        into evidence.
14                  MR. CHAMPION:   No objection, your Honor.
15                  THE COURT:   Exhibit one—
16   BY MR. CUSICK:
17   Q    Start with People's—
18                  THE COURT:   I'm sorry.
19                  MR. CUSICK:   I'm sorry.
20                  THE COURT:   Exhibit 106 is received—
21                  MR. CUSICK:   I apologize, your Honor.  I—
22                  THE COURT:   —and exhibits 17 through 30 are also
23        received.
24                  Go ahead.
25
```

BY MR. CUSICK:

1  
2  Q   Start with People's exhibit number 106. Can you describe what  
3      that is.  
4  A   Yes, sir. Again, this is the rear of 626 Mabel. The area  
5      right in the front bottom of the photograph is this driveway I  
6      said looked like it could have contained a garage at some  
7      point.  
8          You can see to the center of the photograph two of  
9      the three cars parked in the driveway, the rear porch, and the  
10     yellow crime scene or barrier tape that we put up.  
11 Q   Okay. People's proposed exhibit number 17.  
12 A   Seventeen is the area or the space between, I believe, a  
13     Ford Taurus that was driven into the driveway and 626 Mabel.  
14     And you can see the relative distance between the car and the  
15     house.  
16 Q   Was that car at the location when you arrived?  
17 A   Yes.  
18 Q   Okay. Is there—That's the east side of 626 Mabel?  
19 A   Yes. Mabel Street, in this photograph, would be towards the  
20     top of the photograph and that's to the south.  
21 Q   There's a white car in front of it—or behind it?  
22 A   Yes, that is the one that's in the diagram; and that was  
23     backed into the driveway. This is driven into the driveway.  
24 Q   Okay. People's proposed exhibit number 18—I'm sorry.—People's  
25     exhibit number 18. It looks like another picture of the

```
 1       house?

 2   A   This is a picture of 626 Mabel, but you can see a lot more of

 3       the yellow evidence markers.  They have been placed down as we

 4       find pieces of evidence.

 5   Q   Okay.  Exhibit number 19.

 6   A   Nineteen is a close-up of evidence markers three, five, seven,

 7       two, one, 16, and 15.

 8   Q   Okay.

 9   A   And I think that we'll see some close-ups of those in a

10       moment.

11   Q   Okay.  Exhibit number 20.

12   A   Exhibit number 20 is a close-up of evidence marker number one,

13       and it's a shell casing that was recovered on the sidewalk in

14       front of 626 Elizabeth [sic].

15   Q   Okay.  Twenty-one.

16   A   Twenty-one shows evidence marker two at the bottom, 16 in the

17       grass, and number one on the sidewalk.

18   Q   Okay.  Evidence marker number two, do you know what that is?

19   A   Yes, sir, it's a shell casing.

20   Q   And 16?

21   A   I'd have to refer to my notes on 16.  I don't specifically

22       recall, but I believe it's a shell casing.

23   Q   And number one, do you specifically recall?

24   A   Number one is the shell casing that we just spoke of.

25   Q   Okay.  Twenty-two.
```

365

| | | |
|---|---|---|
| 1 | A | Photograph or People's exhibit 22 is, again, a shell casing |
| 2 | | with evidence marker number two; and it's on the sidewalk in |
| 3 | | front of 626 Elizabeth [*sic*]. |
| 4 | Q | Twenty-three. |
| 5 | A | Twenty-three is the blue tarp that we spoke of. You can see |
| 6 | | an evidence marker's been placed on it. I think it's a shower |
| 7 | | curtain. |
| 8 | | And then you can see another—I'm sorry.—another |
| 9 | | evidence marker has been placed to the west of that curtain, |
| 10 | | and that's evidence marker number three. |
| 11 | Q | Okay. Is anything—And the steps there are 626 Mabel, correct? |
| 12 | A | Yes. |
| 13 | Q | Now you previously said in the last exhibit, number—I believe |
| 14 | | the last exhibit was number 22.—you said that it was on |
| 15 | | Elizabeth. Did you mean Elizabeth, or is that Mabel? |
| 16 | A | I'm sorry. |
| 17 | Q | Okay. I just wanted— |
| 18 | A | I meant Mabel, 626 Mabel. If I said Elizabeth, I— |
| 19 | Q | Okay. |
| 20 | A | —I am sorry. I misspoke. |
| 21 | Q | Okay. Number 24. |
| 22 | A | Twenty-four is a close-up of evidence marker number three. |
| 23 | | And I spoke earlier of jackets and lead bullets, and this |
| 24 | | happens to be a lead and jacketed bullet that's been fired |
| 25 | | from a gun. The jacket is still intact. The lead, you can |

| 1 | | see. And what this jacket allows, it allows the bullet to |
| 2 | | expand; and it stays intact with the bullet until the lead |
| 3 | | fully expands. And you can see the results of that, the lead |
| 4 | | and the copper jacket. |
| 5 | Q | Okay. Twenty-five. |
| 6 | A | Twenty-five is a close-up of evidence item number three and |
| 7 | | number four. |
| 8 | Q | Twenty-six. |
| 9 | A | Twenty-six is just a copper jacket. It's evidence marker |
| 10 | | number four that you saw on the sidewalk in the previous |
| 11 | | photograph. And, if you look, you can see the round shape on |
| 12 | | that jacket where the lead core would have been; but the lead |
| 13 | | has separated from it, and the only thing we find here is the |
| 14 | | copper jacket that had originally surrounded that bullet. |
| 15 | Q | That thing up to the—the left—I'm sorry.—that white |
| 16 | | thing—Yeah.—do you know—do you know what that is, or is it— |
| 17 | A | I do. |
| 18 | Q | Okay. |
| 19 | A | It's a tip of a cigar, like a Tiparillo or some kind of |
| 20 | | cigar—like—along those lines. |
| 21 | Q | Okay. Twenty-seven. |
| 22 | A | Twenty-seven is a photograph of item one, five, 12, and the |
| 23 | | one we spoke of in the lawn, which I think is evidence number |
| 24 | | six—No, I'm mistaken. Bear with me a moment.—one, two, 16, |
| 25 | | and five. |

| | | |
|---|---|---|
| 1 | Q | So is it facing west? |
| 2 | A | This photograph is facing east with the steps to 626 to my |
| 3 | | left. |
| 4 | Q | Okay. Twenty-eight. |
| 5 | A | Twenty-eight is a close-up of a shell casing—evidence number |
| 6 | | five—that was found on the sidewalk. |
| 7 | Q | Twenty-nine. |
| 8 | A | Twenty-nine is a photograph—again, looking to the east—and you |
| 9 | | can see the steps from 626 Mabel. You can see some of the |
| 10 | | evidence that we spoke of, and you can see a new evidence |
| 11 | | placard in the lawn, number six. |
| 12 | Q | Now I just have—I'm sorry. That's 29, correct? |
| 13 | | Thirty. |
| 14 | A | And 30 is a close-up of evidence placard number six. And I'm |
| 15 | | going to point. There's a pair of eyeglasses in this |
| 16 | | photograph. |
| 17 | Q | Were—Okay. |
| 18 | | And— |
| 19 | A | Those eyeglasses are located to the top of evidence placard |
| 20 | | number six. This is on the west edge of the house between the |
| 21 | | house and the sidewalk. |
| 22 | Q | So the other side of the steps? |
| 23 | A | Say it again? |
| 24 | Q | The other side of the steps. |
| 25 | A | I don't know what you mean by the other side. |

368

```
1   Q    If you're facing the steps, to the left?

2   A    Yes.

3              MR. CUSICK:   Okay.  I'm almost done here,

4        your Honor.  I just have a couple more photographs—or a few.

5        I shouldn't say couple, since a couple is two.

6   BY MR. CUSICK:

7   Q    Sir, I'm showing you People's proposed exhibits number 31 to

8        37.  Are these fair and accurate—Are these of the crime scene?

9   A    Yes, sir, items 31 through 37.

10  Q    They're fair and accurate depictions as of—as the crime scene

11       appeared on April 12ᵗʰ [sic]—I'm sorry.—April 24ᵗʰ of 2011?

12  A    Yes, sir.

13             MR. CUSICK:   Okay.  Your Honor, I'd ask that

14       People's proposed exhibits number 31 to 37 be admitted into

15       evidence.

16             MR. CHAMPION:   No objection.

17             THE COURT:   Exhibits 31 through 37 are received.

18  BY MR. CUSICK:

19  Q    Regarding exhibit number 31, describe to the jury what that

20       is.

21  A    This is a close-up of the glasses we spoke of.  Essentially,

22       30, 31, and 32 are the same photo, just from a different

23       lighting perspective to try to get those glasses to show up.

24  Q    Okay.  Thirty-two is the same?

25  A    Essentially, yes.
```

1   Q   Thirty-three.

2   A   Thirty-three is to the right of the steps—or to the east—and

3       it shows evidence placard number one on the sidewalk, which

4       was a shell casing; and it shows evidence placard number 15,

5       which is going to be described here in a moment.

6   Q   Number 34.

7   A   Thirty-four is evidence placard 15.  It's kind of hard to see,

8       and I'm going to point to it in a moment.  It's a shell casing

9       that was in the lawn.

10  Q   I'm sorry.  A shell casing, sir—

11  A   In the lawn.

12  Q   Okay.  Number thirty—Is that—That's number 34, I believe,

13      right?

14  A   Yes, sir.

15  Q   Number 35.

16  A   Thirty-five is looking to the south.  It's to the right or the

17      east side of the house.  It's the driveway.  I'm sorry.  It's

18      looking to the north.  It's the driveway.  And you can see

19      evidence placard, I believe, ten, 11, 12, 17.  And those were

20      footwear impressions in the soft dirt.

21  Q   Thirty-six.

22  A   Thirty-six is a close-up of item 17, and 37 is a close-up with

23      a forensic scale in it so that we can photograph this item.

24              MR. CUSICK:    Okay.

25              THE COURT:    Is that it for the photographs?

                            370

1          MR. CUSICK:    That's done with the photographs.  We

2     just have—

3          THE COURT:    I think it's a good time to break for

4     lunch.

5          You can step down, sir.

6          THE WITNESS:    Thank you, ma'am.

7          THE COURT:    All right.  So, ladies and gentlemen,

8     we'll break for an hour for lunch.  So I will ask that you

9     return upstairs as close to 1:30 as possible.  You're just

10    under an hour here.  I appreciate your patience with us.

11    We're pushing this along.

12         Please remember all my prior instructions.

13         Make sure you don't talk to anyone about this case,

14    including among yourselves.

15         Don't do any investigations on your own.  We have

16    Wi-Fi here.  Don't look up anyone, anything, any term related

17    to the case, anything about the case.

18         Keep your notebooks on your chairs when you leave.

19         Make sure you do not come directly to this

20    courtroom.  Just check in back upstairs on the fourth floor.

21         Don't come to the second floor either, please.

22         And just be careful when you're coming in and out of

23    the court building in case there's somebody that's interested

24    that might be talking about the case.  We want to make sure

25    you're not overhearing anything about the case.

```
1              So have a good lunch.  We'll see you in about an

2    hour.

3              All rise.  Please stand, folks, for the jury.

4              (At 12:39 p.m., jury exits courtroom)

5              You may be seated.

6              Counsel, the jury has left the courtroom.  Is there

7    anything we need to address, then, here while the jury's out?

8              MR. CUSICK:   No, your Honor.

9              THE COURT:   No.  Okay.

10             I appreciate everyone's cooperation in remaining

11   quiet and bearing with us here.  And there was a lot less

12   traffic, so I appreciate that.

13             MR. CUSICK:   I forgot that was my job.  I'm sorry.

14             THE COURT:   Yes, that's your job.  We're going to

15   fire you.  We're moving to Mr. Champion here.  He's now in

16   charge of that.

17             Okay.  So we'll see everyone in an hour.

18             And I thank you for bringing a lunch in, too.

19             Court's in recess.

20             MR. CUSICK:   Thank you.

21             (At 12:40 p.m., court recessed)

22             (At 1:42 p.m., proceedings reconvened)

23             THE CLERK:   The court recalls the case of People of

24   the State of Michigan versus Samuel Steel, III, case number

25   C11-1983 FC.
```

```
 1                    Parties, please restate appearances for the record.

 2                    MR. CUSICK:   Paul Cusick on behalf of the People,

 3       Assistant Attorney General.

 4                    MR. CHAMPION:   May it please the Court,

 5       Robert Champion appearing on behalf of Mr. Steel.

 6                    THE COURT:   All right.  Counsel, I believe the jury

 7       should be on their way down.  Anything we need to address

 8       before they come in?

 9                    MR. CUSICK:   No, your Honor.

10                    MR. CHAMPION:   Your Honor, there was one witness

11       listed, a Florence Wilbon, which is my client's sister.  I

12       will not be calling her . . . (inaudible)

13                    THE COURT:   I appreciate that.

14                    MR. CUSICK:   No objec—

15                    THE COURT:   We're going to continue with

16       Gerald Luedecking; is that correct?

17                    MR. CUSICK:   Yes.

18                    THE COURT:   You want to come up here, sir.

19                    MR. LUEDECKING:   . . . (inaudible), your Honor.

20                    THE COURT:   And you are still under oath.  You

21       understand that?

22                    MR. LUEDECKING:   Yes, ma'am, I do.

23                    THE COURT:   I'll just have you state your name for

24       the record again after you have a seat.  I won't swear you in

25       again because you understand that.
```

```
 1              MR. LUEDECKING:   I do understand I'm under oath.

 2              Gerald A. Luedecking.

 3              THE COURT:   So we should be out of here by 9:00,

 4       right?

 5              MR. CUSICK:   I'm sorry, Judge?

 6              MS. HYBEL:   Tonight?

 7              THE COURT:   I'm entertaining myself.  I'm sorry.  I

 8       shouldn't be doing that.  I said we should be out of here by

 9       9:00, correct?

10              MR. CUSICK:   I was thinking more like 10:00.

11              THE COURT:   Ten.  We'll go till 10:00.

12              We'll let you go till 10:00.  We'll be out of here

13       earlier than that.

14              MR. CUSICK:   Talking to myself.

15              THE COURT:   All rise.

16              (At 1:46 p.m., jury returns to courtroom)

17              You may be seated.

18              When we broke before lunch, Gerald Luedecking was on

19       the stand.  He is back on the stand.  He's still under oath.

20       And I will turn it over to Mr. Cusick.

21              MR. CUSICK:   Thank you, your Honor.

22  BY MR. CUSICK:

23  Q    Good afternoon.

24  A    Good afternoon.

25  Q    Mr. Luedecking, did—I think we went through all the
```

```
 1        photographs.

 2               Just in general do you remember—And I apologize.  I

 3        don't remember you testifying to this.  But do you remember

 4        what the weather was like that night when you were at the

 5        scene?

 6   A    Yes, it was relatively cool, about—in the mid 50s, 55 or so,

 7        clear.  It had rained about 18 hours before I was called to

 8        the scene, but it hadn't rained while I was on the scene or

 9        the day of that shooting scene.

10   Q    Now I want to direct your attention to the date of November 4$^{th}$

11        of 2011.  Do you recall that day?

12   A    Yes, sir.

13   Q    Okay.  And did you arrive in the area of 11215 Cressey Road

14        that day?  And that's in Plainwell, Michigan.

15   A    Yes, sir.

16               MR. CUSICK:   May I approach, your Honor?

17               THE COURT:   Yes.

18   BY MR. CUSICK:

19   Q    I'm handing you People's proposed exhibit number 38.  Can you

20        describe what that is.

21   A    Yes, I can.

22   Q    Okay.  And what is it?

23   A    People's proposed exhibit 38 are six nine-millimeter shell

24        casings—I'm sorry.—.40-caliber shell casings that I collected

25        from the home at 11215 Cressey Road in Barry County.
```

1   Q     And, without going into too much detail—

2                MR. CUSICK:    Your Honor, at this time I'd ask that

3         People's proposed exhibit number 38 be admitted as People's

4         exhibit number 38.

5                MR. CHAMPION:    May I voir dire, your Honor?

6                THE COURT:    Yes.

7                        VOIR DIRE EXAMINATION

8   BY MR. CHAMPION:

9   Q     Sir, as I understand it, these five [sic] casings were

10        recovered from whom?

11  A     Yes, but there's six there, I believe, sir.

12  Q     Oh, excuse—Six.    There's five in one container and one in

13        another; is that correct?

14  A     Yes, sir.

15  Q     Where—Where were they recovered from?

16  A     This particular home had a detached workshop; and, in that

17        workshop, were—was some reloading equipment—the equipment to

18        reload bullet casings—and they were recovered from a can of

19        shell casings.

20  Q     Do you know if they were reloaded or not?

21  A     I believe I do.

22  Q     Okay.   Were they?

23  A     No.

24  Q     Why do you believe that?

25  A     Well, I inspected them very carefully and picked those six out

                              376

```
1    of a can.  I'm not sure how much you want me to get in to, but
2    the—
3 Q  Based upon the information, it didn't appear they'd been
4    reloaded; is that—
5 A  Right.  I had examined them, and I didn't see the scratches
6    and marks that are normally associated with reloading.
7 Q  And these were sent on to the Michigan state crime lab?
8 A  Yes.
9            MR. CHAMPION:    Thank you.
10           I have no other questions.
11           I have no objection.
12           THE COURT:    Okay.  With no objection, then
13   exhibit 38 is received.
14                 FURTHER DIRECT EXAMINATION
15 BY MR. CUSICK:
16 Q  I think you alluded to this a little bit, Mr. Luedecking, but
17   you didn't place anything other than—exhibit number 38—you
18   didn't place anything that you saw at the crime scene or that
19   was—Exhibit number 38 was found at another location.  But, as
20   far as the crime scene is concerned, did you place anything
21   onto evidence?
22           THE COURT:    I'm sorry.  Place anything?
23           MR. CUSICK:    From the crime scene onto evidence.
24           THE WITNESS:    No, I—Number one, did not collect any
25   evidence from the crime scene, another officer did.
```

```
 1              And, number two, if I understand what you're trying

 2         to say, is People's exhibit number 38 contains six shell

 3         casings, and all six of those shell casings came from a home

 4         on Cressey Road in Barry County.

 5    BY MR. CUSICK:

 6    Q    Okay.  Is there a reason why you, through your capacity as a

 7         laboratory specialist, didn't place anything into evidence

 8         from the crime scene?

 9    A    Yes.

10    Q    Okay.  And why is that?

11    A    Well, it's hard to follow but not complicated.  There's six

12         laboratory personnel from Kalamazoo Department of

13         Public Safety.  If we all collect a piece of evidence, that

14         piece of evidence becomes like number one.  So all of the

15         laboratory personnel have taken a 100 number.  One person is

16         100, another person is 200.  My number happened to be 500.

17              So the very first piece of evidence that I would

18         collect would be five-o-one; so that, later on, if anybody

19         looks at this from the lab, they can tell who collected it.

20         If you have ten different officers collecting evidence and

21         they all number it number one, it becomes very confusing.

22              Number two, since I've been a specialist, we

23         implemented a policy that we will have one person collect,

24         package, and tag all of the evidence found at a major crime

25         scene to keep it as simple as we can so there's no confusion
```

378

1   in the future as to who collected this, who collected that.

2   It's one person collect it. I may find it. I may document

3   it. I may put an evidence tag by it, but I don't collect it.

4 Q  Okay. Have you had training with regards to fingerprint

5   analysis?

6 A  Yes.

7 Q  Can you describe for the jury what that training entailed.

8 A  I am not a fingerprint expert. I can't tell you that a

9   fingerprint was made by an individual. But I do know the

10   difference between a whorl and a loop and a tented arch. Over

11   the course of 40 years, I've taken many classes on fingerprint

12   collection, identification of a fingerprint, and preserving

13   it.

14       One of the major classes I took was a 72-hour class

15   on the use of chemicals and a laser and different chemical

16   reagents to highlight, photograph, and collect fingerprints.

17   So I've had extensive training on locating fingerprints,

18   different techniques for collecting the fingerprints, and how

19   to preserve those fingerprints.

20 Q  Okay. Through your experience, is it often the case that

21   fingerprints don't show up on certain items?

22 A  Yes, there's several items that are very, very bad for getting

23   fingerprints off of.

24 Q  Okay. And what are those items?

25 A  Well, telephone—telephones used quite a bit by different

379

```
 1        people—They get the oils and greases off of your hand on

 2        them.—credit cards, paper money, and fired shell casings.

 3   Q    So were these tested for fingerprints, to your knowledge, if

 4        you know?

 5   A    I—

 6                    THE COURT:   . . . (inaudible)

 7                    THE WITNESS:   —don't know—

 8                    THE COURT:   Can I jump in.

 9                    These—Are you referring—

10                    MR. CUSICK:   I'm sorry.

11                    THE COURT:   —to the shell casings in exhibit six?

12                    MR. CUSICK:   Yes.

13                    THE COURT:   Okay.  Go ahead.

14                    MR. CUSICK:   Yeah, the shell casings in exhibit 38,

15        yeah.

16                    THE COURT:   I'm sorry, exhibit 38—

17                    MR. CUSICK:   Yeah.

18                    THE COURT:   —six shell casings.

19                    THE WITNESS:   Thirty-eight, I'm not aware that they

20        were tested for fingerprints.  They were sent for a ballistic

21        analysis.

22   BY MR. CUSICK:

23   Q    But it's your experience that there would not be fingerprints

24        on shell casings?

25   A    Yes.  In fact, there are a number of major police agencies in
```

```
 1        the United States that will not fingerprint shell casings

 2        because of the lack of results.

 3   Q    What about firearms?  Is it often, through your

 4        experience—40 years in the police department—that fingerprints

 5        don't show up on a firearm?

 6   A    Well, we get fingerprints more randomly on firearms than we

 7        ever do on shell casings; but, by the very nature of a

 8        firearm, they're designed not to obtain the fingerprints.

 9        Hunters and sportsmen don't like fingerprints on their items

10        because then they turn to rust and they rust the firearm.  So

11        the parkerize, the bluing, the stainless steel are made

12        fingerprint resistant.  We'll still fingerprint them, but

13        they're designed not to retain a fingerprint.

14              MR. CUSICK:   Your Honor, at this time I have

15        nothing—nothing further.

16              Thank you.

17              THE COURT:   Mr. Champion?

18                       CROSS-EXAMINATION

19   BY MR. CHAMPION:

20   Q    However, you do obtain fingerprints from firearms from time to

21        time; is that correct?

22   A    Yes, sir, it is.

23   Q    Depends on where they grab the weapon or touch it.  Would that

24        be a fair statement?

25   A    Yeah, and environmental conditions, yes.  That's true.
```

| 1 | Q | How well it's been cared for, for example, would play into it, |
| 2 | | if it had been oiled or cleaned or things of that nature? |
| 3 | A | Yes, that's true. |
| 4 | Q | Now the photographs that you—were admitted into evidence—I |
| 5 | | believe starting at two going all the way up to 37—were they |
| 6 | | taken at the time that evening? |
| 7 | A | Yes. |
| 8 | Q | You didn't go back at anytime and take any additional |
| 9 | | photographs; is that correct? |
| 10 | A | No, sir.  That's correct. |
| 11 | Q | During the time you were processing the scenes, the vehicles |
| 12 | | to the—I believe would be to the east of the address—were any |
| 13 | | of those vehicles ever moved, or were they always—did they |
| 14 | | always stay at the same location? |
| 15 | A | They were not moved when the police department was there. |
| 16 | | They were inside an area that was protected with barrier tape |
| 17 | | and police officers. |
| 18 | Q | So, if a photograph was taken and you really can't see the |
| 19 | | car, it's just the angle the photograph was taken? |
| 20 | A | I'm sorry.  You couldn't see the cars that what? |
| 21 | Q | If, looking like into the back yard in one of the photographs, |
| 22 | | it appears there was no vehicles in the driveway, it's just |
| 23 | | the angle that photograph was taken? |
| 24 | A | Yes. |
| 25 | Q | Could you see Florence Street from the back yard, if you |

382

1   recall?

2  A   I suppose you could see cars driving on it, but you couldn't,

3      per se, see the street.

4              MR. CHAMPION:   Thank you.

5              MR. CUSICK:   I have nothing further, your Honor.

6              THE COURT:   Ladies and gentlemen, do any of you

7      have any questions for this witness?  If so, just raise your

8      hand.

9              No hands are raised.

10             Thank you, sir.  You may step down.

11             Is he excused from his subpoena, or is he—

12             MR. CUSICK:   Yes, your Honor.

13             THE COURT:   Mr. Champion?

14             MR. CHAMPION:   No objection, your Honor.

15             THE COURT:   All right.  Thank you, sir.

16             THE WITNESS:   Thank you, your Honor.

17             MR. CUSICK:   At this time, your Honor, the People

18     will call Tracy Cochran.

19             THE COURT:   Before you have a seat, please raise

20     your right hand.  Do you solemnly swear or affirm that the

21     testimony you're about to give will be the truth, the whole

22     truth, and nothing but the truth, so help you God?

23             MR. COCHRAN:   I do.

24             THE COURT:   Please have a seat, sir.

25             Please make sure you speak right in the end of that

```
 1        microphone.
 2                   I need you to state and spell your first and last
 3        name for the record.
 4                   THE WITNESS:   Tracy Cochrane—T-r-a-c-y; last name
 5        of C-o-c-h-r-a-n.
 6                            TRACY COCHRAN,
 7        called at 2:00 p.m., and sworn by the Court, testified:
 8                         DIRECT EXAMINATION
 9   BY MR. CUSICK:
10   Q    Good afternoon.
11   A    Good afternoon.
12   Q    How are you employed?
13   A    Kalamazoo Department of Public Safety.
14   Q    Okay.  And how long have you been employed with the department
15        of public safety?
16   A    I'm in my 24th year.
17   Q    Okay.  And what position do you hold currently with the
18        department?
19   A    I currently hold a position of crime lab technician.
20   Q    How long have you served as a crime lab technician?
21   A    I'm in my 17th year.
22   Q    Can you describe for the jury what a crime lab technician is.
23   A    We have a multitude of disciplines that we do.  We work inside
24        the crime lab anywhere from processing evidence for latent
25        fingerprints—And that would be objects that are brought into
```

```
 1    our lab from our patrol officers that might seize anything
 2    from weapons to documents, all ranges of articles.  We process
 3    those for latent fingerprints.
 4              Also, trace evidence, hairs, fibers, bloodstain
 5    pattern analysis we also do.
 6              And do a lot of computer work, videography work.
 7    Surveillance recordings that come in, we'll examine those.
 8              Photographs, like this court case, we will go
 9    through the photographs and get those ready.
10              PR work.
11              And then, when a crime goes out on the street,
12    whether it's a B and E—breaking and entering—suicide,
13    homicide, fatal traffic accident, serious PI accidents, then
14    we get called to the scene and we process the scene from start
15    to finish documenting the scene with photographs, sketches,
16    diagrams, collection and preservation of evidence.
17              And then, once we've cleared the scene, bring that
18    evidence back.  If there's any further processing that needs
19    to be done, whether it's latent fingerprints, trace, whatever,
20    then we do—we continue and do that.
21  Q  When you—I want to direct your attention to the date of
22    April 24th of 2011, approximately 11:35 p.m., did you receive
23    information regarding an incident that happened at 626 Mabel?
24  A  Yes, I did.
25  Q  And, in response to that, what did you do?
```

1   A   I'm sorry?

2   Q   In response to that information, what did you do?

3   A   We—Originally, I arrived at headquarters.  I got called into

4       work.  I arrived at headquarters and briefly spoke over the

5       phone with Specialist Luedecking, who was already en route to

6       the scene at 626 Mabel.

7           He—We gathered our equipment—Specialist Latham and

8       myself.  We then went to Bronson Hospital where the victim was

9       at.  And, at that location, I noticed the victim laying in—on

10      the gurney at the hospital; and he had what appeared to be a

11      bullet wound up in the left chest area, one in the right

12      abdomen, and there was a injury just above his left knee.

13          And he wasn't wearing any pants or tennis shoes.

14      That was seized.  I seized that as evidence, as well as

15      PSO Knight was a security officer there.  He turned over to me

16      a—what's—what we call a spent bullet.

17          And when I refer to spent bullet or spent casing,

18      it's basically the cartridge of a—of a weapon.  A cartridge is

19      basically made up of your spent casing and the bullet and the

20      power inside—primer.

21          A spent bullet in this case—It was a—the lead

22      portion of a bullet.  We would later find at the scene that

23      there was also what we call a jacket that goes over that lead

24      bullet.  And then, when that gets fired or it hits something,

25      sometimes it can stay together, sometimes it can separate.

386

```
1    And, in this case, he gave me a piece of spent bullet that was

2    just lead.

3  Q  Okay.  How long were you at Bronson Hospital?

4  A  Probably 40 minutes to an hour, something like that.

5  Q  Okay.  And after you were at Bronson Hospital, what happened

6     then?

7  A  After we left Bronson Hospital, we re—we responded to—

8  Q  I'm sorry.  When you say we, sir—When you say we, who are you

9     referring to?

10 A  Specialist Latham, who also works in lab, and myself.

11 Q  Okay.  I'm sorry.  What did you and Specialist Latham do?

12 A  We—We responded to Mabel Street.

13 Q  Okay.  And, when you arrived at Mabel Street, do you know

14    approximately what time you arrived?

15 A  A little bit—Probably about five minutes before midnight,

16    somewhere in there.

17 Q  Okay.  And what did you observe when you were at Mabel?

18 A  We briefly spoke Specialist Luedecking.  He kind of walked us

19    through the scene showing us what he had located already.  And

20    he located a lot of evidence.  He already had our evidence

21    markers out, which are just yellow markers that distinguish,

22    you know where the evidence is located.  Walked us through the

23    scene.  And there were several spent casings and spent bullets

24    that were located right in front of 626 Mabel.

25 Q  Okay.  And have you worked with Mr. Luedecking—Mr. Luedecking
```

1    before?

2  A  Yes, sir.

3  Q  Okay.  And what was your responsibility at the crime scene?

4  A  My responsibilities were to document the scene with

5     photographs, which I did; to—And that includes doing, you

6     know, pictures of the overall scenes, close-ups of the

7     evidence, and collecting the evidence at that point and then

8     bringing it back to headquarters.

9  Q  Okay.

10 A  I also did—also searched the area around 626—north of that

11    area and south of that area—on the houses that were on the

12    south side of the road.

13 Q  How many people were outside that you recall in front of

14    Mabel Street—in front of 626 Mabel Street when you were there?

15 A  I just recall Specialist Luedecking being there.  There might

16    have been one other officer that was scene security, if you

17    will.  I didn't notice anybody standing around the front of

18    the residence.

19 Q  I'm handing you People's proposed exhibit number 39.  Can you

20    describe for the jury what that is.

21 A  Yes, I can.  This is a nine-by-twelve envelope.  As you see

22    here, there are six different smaller envelopes with the spent

23    casings.  That is also sealed in plastic.  It has my initials

24    where I sealed it in the envelope.  And then these—all six of

25    these were sealed separately and then secured in this

                              388

```
 1    nine-by-twelve envelope with case number—this case number
 2    11-6260, my name, package 201, and my initials signed across
 3    the back.
 4            MR. CUSICK:   Your Honor, at this time, I'd ask that
 5    People's proposed exhibit number 39 be admitted into evidence
 6    as People's exhibit number 39.
 7            MR. CHAMPION:   No objection.
 8            THE COURT:   Thirty-nine is received.
 9  BY MR. CUSICK:
10  Q   And do you know who you gave that to afterwards—after the
11      scene—after you left the scene?
12  A   I took possession of these shell casings, and I took those
13      back to the lab where they were secured.  And they were in my
14      possession until I packaged them, and then they go into our
15      evidence lockup or evidence lockers.
16  Q   Okay.  And was that the case for all of the evidence that you
17      collected at 626 Mabel?
18  A   Yes, sir.
19  Q   I'm handing you People's proposed exhibit number 40.  Can you
20      tell the jury what that is.
21  A   Yes, once again, you can see this nine-by-twelve here.  It's
22      got a evidence sticker, my package 202, and it's got case
23      number 6260, my initials; and, below that, you'll have the
24      three individual envelopes.  And these were the—the spent
25      bullets, if you will.  The one is just a spent lead.  There's
```
389

1  another one that's the spent jacket where the lead has been
2  removed from the jacket.  And the third one is the entire
3  spent bullet where the lead is still attached with the jacket
4  of the bullet.  And these three were packaged separately and
5  placed into this large envelope.

6        MR. CUSICK:   Your Honor, I would ask that People's
7  proposed exhibit number 40 be admitted into evidence.

8        MR. CHAMPION:   No objection.

9        THE COURT:   Forty is received.

10 BY MR. CUSICK:

11 Q    I'm handing you People's proposed exhibit—I'm sorry.

12       I'm handing you People's proposed exhibit number 41.
13 Can you tell the jury what that is.

14 A    This, once again, is a—It's a pair of eyeglasses that were
15 found in front of 626 Mabel Street.  It's got my packaging
16 here, once again, with my name, the case number, and package
17 203 with my initials signed across the back of the envelope.

18       And you will notice that the—the eyeglasses are—kind
19 of have a powder over them, which is due to a latent print—or
20 latent fingerprint processing trying to find fingerprints on
21 it.

22 Q    Can you repeat that one more time about the . . . (inaudible)

23 A    If you'll see, the eyeglasses got kind of a—a little whitish
24 powder to them.  That is part of the process to locate latent
25 fingerprints that I did inside the lab.

390

```
 1   Q    Okay.  And that was done in this case?

 2   A    Correct.  Yes.

 3   Q    That's what that was.  Okay.

 4              And did you do the test?

 5   A    I did.

 6   Q    Okay.  And what was the result of that?

 7   A    I did not find any fingerprints on the eyeglasses.

 8   Q    Is that normal in your line—in your line of work to not have

 9        fingerprints recovered from a certain item like that?

10   A    Yes, it's not uncommon to not locate fingerprints.  There

11        could be a person does not secrete.  There's usually 98 to

12        98½ percent of sweat, if you will, perspiration that goes with

13        the fingerprint that goes away because it's perspiration.

14              The other one and a half to two percent—amino acids,

15        bodily fluids—that come up that you secrete will stay on the

16        object.  If you're not a secretor—Okay.—that might not—you

17        might not have anything on there.

18              Like with spent casings, kind of the same way.

19        That's why they call it a latent fingerprint.  It's a chance

20        impression.  There's a chance you're going to find it, there's

21        a chance you won't.

22              Sometimes I've even did my own tests where, you

23        know, I've gotten the grease off of my neck here and put that

24        down.  And sometimes I'll get it on certain items, sometimes I

25        won't get the nice fingerprint like you see on CSI or
```

1     whatever.

2               MR. CUSICK:   And, your Honor, I don't believe I've

3     moved to admit that—People's proposed exhibit number 41—into

4     evidence.  I move that it be admitted.

5               MR. CHAMPION:   No objection.

6               THE COURT:   Forty-one is received.

7     BY MR. CUSICK:

8  Q   I'm handing you People's proposed exhibit number 42.  Can you

9     describe for the jury what that is.

10 A   Yes, sir.  This was a—In front of the residence, right by the

11    step area and the sidewalk, we located—or I should say

12    Specialist Luedecking located to begin with—this—like a very

13    thin, blue material like a curtain type texture and a like a

14    bath mat that you'd find in the bathroom to step on.  That was

15    in front of the residence.

16              MR. CUSICK:   Your Honor, I would ask that People's

17    proposed exhibit number 42 be admitted into evidence.

18              THE COURT:   Mr. Champion, any objection to that?

19              MR. CHAMPION:   No objection.

20              THE COURT:   I'm sorry?  You said no objection?

21              MR. CHAMPION:   No objection.

22              THE COURT:   Forty-two's received.

23    BY MR. CUSICK:

24 Q   Were there any—Was there any other testing that was done on

25    that?

1   A    I did not.  Not that I know of.

2   Q    I'm handing you People's proposed exhibit number 43.  Can you

3        describe for the jury what that is.

4   A    This is the wallet that I also took possession of when I was

5        at Bronson Hospital with the—It had some misdemeanor

6        documents—social security card and the—the Michigan

7        identi—Michigan identification card belonging to Milo Conklin.

8        And the evidence package is item 216 with the case number

9        11-6260 with my initials signed over the back of the evidence

10       tape.

11            MR. CUSICK:   And, your Honor, I'd ask that People's

12       proposed exhibit number 43 be admitted into evidence.

13            MR. CHAMPION:   No objection.

14            THE COURT:   Forty-three is received.

15  BY MR. CUSICK:

16  Q    So that's a license of Milo Conklin?

17  A    It's a photo identification card, not a driver's license—a

18       Michigan ID, if you will.

19  Q    Social security card in his wallet?

20  A    Correct.

21  Q    Okay.  Now would there be any reason to do testing on that or

22       the mat in front of 626 Mabel, through your experience?

23  A    This was seized at the hospital; so, no, I didn't—I didn't do

24       any further investigation or processing of the wallet—

25  Q    Okay.

                              393

1  A  —'cause it was in possession of Mr. Conklin.

2  Q  Okay.  I'm handing you People's proposed exhibit number 44.

3     Can you describe to the jury what that is.

4  A  Yes, this is a pair of black dress slacks.  I took possession

5     of that from Specialist Luedecking on—in this case.  And I

6     seized that and took it back into the crime lab.

7  Q  Where did you seize that from Mr.—from Specialist Luedecking?

8  A  I don't recall exactly where—where when I took possession of

9     it from him.  I've just got it here seized black—black pants

10    from Gerry 4/25 of '11.

11 Q  Do you know what those are—whose they belonged to?

12 A  Looking at all the photographs that were taken in this case,

13    it appears to belong to another subject that I had no contact

14    with, and I don't even know his name.

15       MR. CUSICK:   Your Honor, I'd ask that People's

16    proposed exhibit number 44 be admitted.

17       THE COURT:   Forty-four?

18       MR. CHAMPION:   Forty-four.  Let me voir dire just a

19    moment, your Honor.

20                     VOIR DIRE EXAMINATION

21 BY MR. CHAMPION:

22 Q  These pants you seized, is that correct, Officer?

23 A  Correct.

24 Q  But they were not brought on Milo Conklin; is that correct?

25 A  It's my understanding they were from another victim at the

                              394

```
1    scene.

2  Q    But you don't know the name of that person?

3  A    I don't right offhand, no.

4  Q    How did you come into possession of these?

5  A    Specialist Luedecking turned them over to me.

6              MR. CHAMPION:   Thank you.

7              I have no objection.

8              THE COURT:   Forty-four is then received.

9                    FURTHER DIRECT EXAMINATION

10 BY MR. CUSICK:

11 Q    . . . (inaudible) People's proposed exhibit number 45.  Can

12      you tell the jury what that is.

13 A    This is a pair of blue jeans that I also seized from

14      Bronson Hospital that were—that belonged to Milo Conklin.  I

15      put those in—sealed them up in this paper bag, which has my

16      name, date, and the case number on it.  And this was package

17      218.

18              MR. CUSICK:   Your Honor, I'd ask that People's

19      proposed exhibit number 45 be admitted into evidence.

20              MR. CHAMPION:   No objection.

21              THE COURT:   Forty-five is received.

22 BY MR. CUSICK:

23 Q    Just going back to People's exhibit number 43—

24              THE COURT:   The wallet?

25              MR. CUSICK:   The wallet.
```

BY MR. CUSICK:

2  Q  —you seized that from the hospital, correct?

3  A  Correct.

4  Q  Was—Did you seize it from Milo Conklin's person?

5  A  I believe it was turned over to me by PSO Knight.

6  Q  I'm sorry?

7  A  PSO Knight.

8  Q  And the glasses, which are People's exhibit number 41, you

9     seized them from where?

10 A  Those were seized at the scene directly—in the front yard just

11    to the west or left of—if you were looking at the house, just

12    to the left of the front steps, somewhere in that area, in the

13    grass.

14 Q  And I just want you to answer this if you have personal

15    knowledge of this.  Do you know if those were Milo Conklin's

16    glasses?

17 A  I don't know, no.

18 Q  Okay.  I'm handing you People's proposed exhibit number 46.

19    Can you tell the jury what that is.

20 A  This is a pair of white tennis shoes that I also seized from

21    Bronson Hospital that were on Milo Conklin.  It is, once

22    again, the paper bag that I've put my name on and initials

23    with the date and case number and my package 219.

24         And I—And I should say they weren't on him when I

25    took them, as I stated before.  His blue jeans and his tennis

1    shoes were off of him.  They were in a Bronson Hospital bag to

2    begin with when I got there.

3                MR. CUSICK:   Your Honor, I move People's proposed

4    exhibit number 46 be admitted into evidence.

5                MR. CHAMPION:   No objection.

6                THE COURT:   Forty-six is received.

7                MR. CUSICK:   May I have one moment, your Honor?

8                (At 2:24 p.m., off record discussion between

9                Mr. Cusick and Detective Beauchamp)

10   BY MR. CUSICK:

11   Q   Was there anything that you—else that you did at the crime

12       scene at 626 Mabel on the late night of April 24th/early

13       morning hours of April 25th?

14   A   Yes, I—Like I said, I searched the area to the north of 626,

15       as well as there was a large, kind of a vacant lot to the east

16       of that area.  I looked around—There's a fence that goes on

17       the north side of that property.  It's kind of a cut-through.

18       So we searched that area for any possible evidence.

19                I walked the street, sidewalk.  I know

20       Specialist Luedecking did, Latham, just double-checking

21       everything, and, also, with the houses to the south of that

22       area.

23                I found other items like a knife and a Carmex®—like

24       a little lip balm stuff you would use.  That was to the north

25       of 626 along the west side fence area, but it didn't appear to

                                397

1  be involved with this. However, I still took it just in case.

2  And, after that, we were—Like I said, I processed

3  evidence after that in the lab. And then we were called, you

4  know, several months later to do—to do other things.

5  Q  Okay. How long were you at the location of 626 Mabel Street?

6  Starting the late night of April 24th, how long were you there?

7  A  We were probably there, I want to estimate, you know, six

8  hours or so—six or seven. I can't be for certain, but

9  somewhere in that neighborhood.

10 Q  And you being you—yourself and Gary Latham?

11 A  Specialist Latham had to leave a little bit earlier than I

12  did.

13 Q  Okay. Now you indicated that you continued being a part of

14  this investigation, correct?

15 A  Correct.

16 Q  I want to direct your attention to the date of February 8th of

17  2012. Do you recall that day?

18 A  Yes, sir.

19 Q  Okay. Were you in the area of E Avenue and 12th Street?

20 A  Yes.

21 Q  Where is that?

22 A  That's north—north from here quite a ways. And

23  Detective Beauchamp had—had contacted CID command, who then

24  contacted me to go to that location.

25 Q  Okay. And so, when you arrived at that location,

398

```
1       approximately what time was it, if you recall?

2   A   I don't recall.  It was—It was during the day.  It was—It was

3       up in the day, you know, noon or something like that.  I

4       couldn't tell you the exact time.

5   Q   When you arrived at the location, who was there?

6   A   Detective Beauchamp.

7   Q   Anybody else—

8   A   No, not—

9   Q   —that you recall?

10  A   —that I recall.

11  Q   Okay.  And why were you at that location?

12  A   He had found part of a pistol at that location.

13  Q   I'm handing you People's proposed exhibit number 47.  Can you

14      describe what that is.

15  A   Yes, this is a pistol frame inside our evidence gun box which

16      we use.  Once again, it's got my red evidence sticker with my

17      name and initials on here—or my name and employee number with

18      the correct case number and package 222.  And it is a

19      Heckler & Koch, just the frame itself.  It's missing the slide

20      and the barrel that would normally go with the gun.

21  Q   And were you there—

22                  THE COURT:   Your Honor—

23                  Well, I'll ask a couple were questions.

24  BY MR. CUSICK:

25  Q   Were you there when Detective Beauchamp found the gun?
```

```
 1  A    I was not there when he found the gun.

 2  Q    Okay.  But he gave the gun to you—or the frame?

 3  A    I took—I took possession of the gun, yes.

 4  Q    Yeah.  Okay.  And did you place it on evidence?

 5  A    I did.

 6              MR. CUSICK:   Your Honor, I'd ask that People's

 7       proposed exhibit number 47 be admitted into evidence.

 8              MR. CHAMPION:   No objection.

 9              THE COURT:   Forty-seven is received.

10  BY MR. CUSICK:

11  Q    Now the area—How far away is E Avenue and 12th Street, if you

12       recall?

13  A    That's—It's probably a good 20, 30-minute drive up there.  I

14       mean our—The county line starts at A Avenue and goes, you

15       know, A, B, C, D; and as you go south, TU—I mean, that's the

16       span.—so at E Avenue, it's quite—it's quite a ways up there,

17       as well as 12th Street.

18  Q    Did you test that for latent prints?

19  A    I did.

20  Q    Okay.  What was the result?

21  A    Once again, like I mentioned before with the eyeglasses,

22       there's also surface area to be concerned with.  Normally,

23       everybody handles their eyeglasses like this, so we're not

24       going to find fingerprints on the glass.

25              With this, the pistol frame itself, it's a black
```

1  polymer; and it had, obvious—obviously been out in the weather

2  conditions for quite some time.  The metal portions of it were

3  rusted.  The bottom side of it was full of dirt and—and

4  gravel.  So it was not really conducive to finding

5  fingerprints.

6           However, prior to—I do my same routine that I do of

7  any guns.  I normally swab the grip areas; the trigger; and,

8  depending on the slide or if it's a hammer, revolver, I'll

9  swab that for possible DNA at future reference, which is the

10  same as I did in this case.  However, the chances of that

11  are—are very slim due to being out in the weather conditions

12  for quite some time.

13  Q   I'm handing you People's proposed exhibit number 48.  Can you

14      tell the Court what that is—or tell the jury and the Court

15      what that is.

16  A   Yes, this is my evidence package with my name, employee

17      number, package 223 with this case number.  And there is a

18      small, other manila envelope that con—originally contained the

19      swab that I just explained coming from the H & K weapon and

20      with my initials sealed across the tape; and then it would

21      have been placed inside of this nine-by-twelve.

22           MR. CUSICK:   Your Honor, I ask that People's

23  proposed exhibit number 48 be admitted into evidence.

24           MR. CHAMPION:   No objection, your Honor.

25           THE COURT:   Forty-eight is received.

401

BY MR. CUSICK:

Q   That was—All this evidence was taken to the crime lab—to the
    evidence room?

A   Correct.

Q   Then, finally—I believe I just have one more item.—I'm handing
    you People's proposed exhibit number 49.  Can you tell the
    jury what that is.

A   Yes, sir.  This is a—Three different envelopes here.  The two
    envelopes on your right—to the jury's right are six-by-nines,
    and that are two buccal swabs that were seized from Sam Steel
    on 9/17 of '12, and they were placed in this larger
    nine-by-twelve envelope that has the case number 11-6260, my
    name and initials; and that was sealed on the back with my
    name.

            MR. CUSICK:   Your Honor, I would ask that People's
    proposed exhibit number 49 be admitted.

            MR. CHAMPION:   No objection.

            THE COURT:   Forty-nine is received.

            MR. CUSICK:   May I just have one moment,
    your Honor?

            (At 2:34 p.m., off record discussion between
            Mr. Cusick and Detective Beauchamp)

            MR. CUSICK:   I have nothing further at this time.
            Thank you, your Honor.
            Actually, one more question.  I always do that.

BY MR. CUSICK:

Q   Did you do anything else with regards to this investigation
    after Feb—after February of 2011 [*sic*]?

A   I don't recall, no.

            MR. CUSICK:   Thank you, your Honor.

            THE COURT:   Mr. Champion?

            MR. CHAMPION:   Thank you.

                    CROSS-EXAMINATION

BY MR. CHAMPION:

Q   Good afternoon.

A   Good afternoon.

Q   You did go back on April 26—Is that correct?—and seized
    another piece of evidence; is that right?

A   No, sir.

Q   You didn't go back and get another shell casing?

A   A shell casing was brought to me.

Q   Brought to you.

A   Correct.

Q   You did not go there, somebody brought it to you?

A   That's correct.

Q   Who was that?

A   That was Detective Captain Julie Parsons.

Q   And do you know where that was found?

A   It was my understanding that it was found after a wash-up of
    the area.  It was found underneath the—the porch of

                            403

1    626 Mabel Street.

2  Q   Front?  Back?  Do you know?

3  A   I assumed it was the front porch.

4  Q   There was two porches by the photographs; is—

5  A   That's correct.

6  Q   —that right?

7  A   The back area was huge.

8  Q   Now did you take the photographs, or did someone else?

9  A   I took—

10 Q   When I say—

11     The photographs on 6/24 [*sic*]—I mean, 4/24—April 24.

12 A   Yes, I took most of the photographs at that scene.  I believe

13     Specialist Luedecking might have taken a half a dozen before I

14     got there.

15 Q   Now going through the evidence, what's been marked as People's

16     exhibit 39—That's the shell casings—three shell casings.—those

17     were found at the scene; is that correct?

18 A   Five of them would have been found at the scene.  The sixth

19     one would have been the one that was brought to me.

20 Q   What locations were these found at, if you know?

21 A   The shell casings—the spent casings were located—You have the

22     front of the house, then you have a very short—I don't know, a

23     couple foot of grass, a sidewalk, and then a curb lawn.

24     Most of those shell casings were already marked with

25     evidence markers by Specialist Luedecking when I got there,

1      but they were—As you're facing the house—looking at the house,

2      and then you have a large—that empty lot here—And there was

3      two cars parked in the driveway.—those shell casings were on

4      the ground just to the right and just in front of the house, a

5      couple of them on the grass. I think maybe one was on the

6      sidewalk. I'd have to look at a diagram to—to be specific,

7      but they were right there in the front to the right side of

8      the house—the front of the house.

9             MR. CHAMPION:   Could we bring up exhibit two.

10  BY MR. CHAMPION:

11  Q    Officer, I'm showing you what's been marked as

12       People's exhibit two. Do you recognize that diagram?

13  A    Yes, that appears to be a diagram that was made by

14       Technician Luedecking.

15  Q    If you know, where were the—Based upon that diagram, where

16       were the shell casings found, if you can tell. Could you show

17       the jury where those were found.

18  A    Right here's the—the front of the house, small—about a two or

19       three-step porch. I believe 15 was a shell casing.

20             One, this is the little grass area, the sidewalk.

21             I believe number two was a shell casing, number five

22       and number 16; but, without looking specifically at my report,

23       they were—I believe these were all of them right here.

24  Q    And I'm just looking at the legend. That's consistent with

25       the legend that you have up there for that diagram?

405

```
 1  A    I'm sorry.  I didn't hear you.

 2  Q    The legend that you have up there underneath the diagram,

 3       that's consistent; is that correct?

 4  A    Yeah, it's—it's consistent with the driveway, sidewalk, the

 5       house, the large lot across here.  Yes, it's not—This is not

 6       to scale, however.  It says not to scale.  And this is north.

 7  Q    Thank you.  You can have a seat, Officer.

 8              Now the shell casings found at the scene, was there

 9       any type of processing done to those?  And I'm just talking

10       about the casings.

11  A    Yes, sir.

12  Q    What type of processing did you do for the shell casings?

13  A    Once again, those were processed for latent fingerprints.

14  Q    They were processed for any DNA, things of that nature?

15  A    No, sir.

16  Q    The—The spent bullets, were they processed in any way?

17  A    I did not, no.

18  Q    You don't know if they were sent for DNA testing or anything

19       of that nature?

20  A    That would probably be better answered by the lead detective,

21       probably.

22  Q    You processed the eyeglasses.

23              Now the blue sheet and mat that I believe is

24       signified by number seven on the—the diagram, what was the

25       significance of that, if you know?
```

1   A   It was my understanding—related to me that those items were

2       brought out after the incident occurred.  Now whether that was

3       to help with stopping the blood or what, I don't know.

4   Q   You just seized it, it was in the crime scene; is that

5       correct?

6   A   Correct.

7   Q   And you don't know if they were tested or processed in any

8       way; is that correct?

9   A   Correct, sir.

10  Q   Now, as to the pants, one belonged to Milo; the other one you

11      don't know who it belonged it.  You were just given those

12      items; is that correct?

13  A   Yes, sir.

14  Q   How long does it take for you to typically process these—these

15      items once you seize it from the scene or from wherever you

16      collect the items to placing it in the evidence locker?

17  A   That kind of depends on everything that's going on.  I try to

18      get to it as soon as I can.  If I get called out on other

19      scenes—other major stuff—I've got to respond it and take care

20      of that, collect that evidence.  I go on days off—three days,

21      four days—come back.  I'll process that.

22              In this case, I think that was—I looked at that on

23      5—5/13 or 5/12, something like that.  So within a week or so,

24      a couple weeks.

25  Q   Where were these items stored in between?

1    A    They're stored in the—in adjoining lockers.

2    Q    So they were seized approximately April 24th and then processed

3         about May 13th; is that correct?

4    A    Correct.

5    Q    You stated you searched the area to the north and to the east;

6         is that correct?

7    A    Yes, sir.

8    Q    How large of an area did you search?

9    A    There's—Directly east of 626 Mabel, there's a large vacant

10        lot.  It's probably at least a—about—maybe a lot or lot and a

11        half, as far as—maybe three-quarters of an acre, something

12        like that, a half an acre.  I searched that area.

13             I also—We searched the two vehicles that were there

14        in the driveway and the third one that was parked out in the

15        middle of this vacant lot, not knowing, you know, could that

16        be involved or not.

17             I also searched behind the house and, like I said,

18        there was a—It's all kind of fenced in except for the north of

19        this area.  There's a cut-through in the fence that's open.  I

20        searched around that area, a little bit north of that, as well

21        as to the south of 626 Mabel about four or five houses in each

22        direction.

23             MR. CHAMPION:   Can I see exhibit number three.

24   BY MR. CHAMPION:

25   Q    Do you recognize 626 Mabel up there on that particular

                              408

1    photograph?

2                THE COURT:    If you're going to say something—

3                Thank you.

4                THE WITNESS:    Like—It all depends on when this

5        overhead satellite picture was taken.    I did not say—Okay.—how

6        many houses in from it is it; but, depending on when it was

7        taken, this vacant lot right here appears to be the house

8        we're looking at with the white—I believe it was a Cadillac

9        parked in the middle.

10               And there's behind the house, and there's like a

11       little building that was behind here that was on the other

12       side of the property where this fence line runs right—right

13       through here.

14   BY MR. CHAMPION:

15   Q    What areas, if you can show the jury, did you search on this

16       particular evening?

17   A    I assisted in searching, once again, the main areas through

18       here and the house—in front of the house, down the street a

19       little ways, through these—through the back yard

20       here—this—this vacant area—around the—the car, the back porch

21       area, and along the fence row through this area going back to

22       the next street to the north; as well as I kind of canvassed

23       the houses across the street to the south of 626 Mabel walking

24       down the curb lawn, in the road as well, the front of the

25       houses looking for, once again, any—any bullet holes or

1    something—stray bullets that might have hit the houses or

2    maybe a gun that was dropped on the way from approach or

3    exiting, anything that looked out of—out of place.

4  Q  If you know, did you receive any information at the time that

5    the possible shooter had fled to the north towards Elizabeth?

6  A  I had—Seems like there was information that he might have—the

7    shooter might have went north and, at one point—

8         MR. CUSICK:   Object, your Honor.  I'm going to

9    object just based on—The event's hearsay, what he heard other

10   people say.  It's being offered for the truth of the matter

11   asserted.  I don't think there's any other purpose.

12        MR. CHAMPION:   It's being offered to see what this

13   officer did and why he did certain things.  We've heard why he

14   searched a particular area and the type of search.  I'm not

15   going for the truth of the matter asserted but what actions

16   did he take based upon the information he had at the time of

17   the scene.

18        THE COURT:   I am assuming that later on we might be

19   getting into this a little bit—

20        MR. CUSICK:   Okay.

21        THE COURT:   —so I'll allow it—

22        MR. CHAMPION:   Thank you.

23        THE COURT:   —to some extent.

24        You can answer that question.

25

                           410

BY MR. CHAMPION:

Q    You said you searched an area around a cut-through; is that
     correct?

A    That's correct.

Q    Why did you search that area?

A    Well, 'cause that would be the most logical place if somebody
     was running from the scene or coming to the scene to approach
     from.  I suppose they could always go over the fence or
     whatever, but I would—you know, the path of least resistance
     seems to be the best.

          As I stated before, I also—We get conflicting
     stories of witnesses, you know, uttering things.  It appears
     that somebody else mentioned that he might have ran south; so
     that's, once again, why I was searching north and I was also
     searching south to see if there was anything there.

Q    Did you search around the block?  When I say around the block,
     Mabel to the streets to the east and the west.

          THE COURT:   You're asking him personally?

          MR. CHAMPION:   Pardon?  Yes.

          THE COURT:   Him—Okay.

          Go ahead.

          THE WITNESS:   I did not search Elizabeth or
     Florence Streets, no, I did not.

BY MR. CHAMPION:

Q    Just the immediate area around Mabel Street?

411

| | | |
|---|---|---|
| 1 | A | Yep, that's correct. |
| 2 | Q | Thank you. |
| 3 | | Now it appears, based upon your testimony, you |
| 4 | | arrived there a little before midnight? |
| 5 | A | Yes, sir. |
| 6 | Q | And you were there six to seven hours? Hard to say? |
| 7 | A | Hard to say. Somewhere in there. It's—Usually, it's quite a |
| 8 | | while till we're—we're pretty good at where we're at. |
| 9 | Q | I know it's been a couple of years. Do you recall if it was |
| 10 | | getting light when you left or was it still dark? |
| 11 | A | I—I want to say it was getting light, but I can't recall. |
| 12 | Q | Now the pistol frame, you processed that for both fingerprints |
| 13 | | and DNA; is that correct? |
| 14 | A | Yes, sir. |
| 15 | Q | And that would be exhibit 47; is that correct? |
| 16 | A | That's correct. |
| 17 | Q | Now, when you process a—the frame for those items, do you |
| 18 | | first process them for DNA? How does the process work? |
| 19 | A | Yes. Before I do a latent print exam, I will process it for |
| 20 | | DNA. |
| 21 | Q | What does that entail? |
| 22 | A | Which, basically, is a sterile—sterile cotton swab and wet—You |
| 23 | | put a drop of distilled water, and then you basically swab, in |
| 24 | | this case, the grip, the trigger—the inside trigger and the |
| 25 | | trigger guard that goes around the trigger. |

412

1   Q   During that process, is it possible to destroy any

2        fingerprints as a result of that?

3   A   You could, yes.

4   Q   So, after you process it for DNA, you then process it for

5        fingerprints?

6   A   Yes.  And, as far as the DNA goes, I always try to hit those

7        areas that are not conducive to the fingerprints, whether that

8        be a small area—Like the grip is very porous.  Like you, you

9        know, you feel your refrigerator.  It looks smooth, but,

10       unless it's the stainless steel ones, the porous areas are not

11       conducive to fingerprints very well; or objects that are very

12       narrow like—like your eyeglass rim here and so forth, I would

13       try to grab the DNA off of that stuff so, the main flat

14       portions, I still have a chance for fingerprints.

15   Q   How about the hammer, did you process that for DNA?

16   A   I did not, no.

17   Q   Now I notice there's a white powdery substance on the—the

18       frame.  What is that?

19   A   That is fingerprint powder.

20   Q   And I also noticed there's a red dye of some sort.

21   A   That's a dye stain.

22   Q   And what's the purpose of that?

23   A   The purpose of that—First off, you look at an object visually

24       to see if there's any fingerprints.  No fingerprints are

25       there, you go to the next step of cyanoacrylate fuming.

413

1      Basically, it's superglue fuming.  The object gets put in a—a

2      container.  Superglue is heated.  It forms a—a vapor, and it

3      adheres to any fingerprints that are left behind.

4   Q  Adhere's to what, the amino acids?

5   A  Correct, that's left behind.

6           And then, after that, once again, we look at it for

7      fingerprints.  Nothing there, the next step is to dye stain;

8      and that is with the alternate light source where, also, if

9      you can't see it visually with the glue, that could maybe help

10     bring out that fingerprint so you can see it.

11  Q  And that's—

12  A  And that—

13  Q  —what the red stain—

14  A  That's what the red stain is.

15  Q  In this particular case, you did not find any DNA nor did you

16     find any fingerprints; is that correct?

17  A  I don't do the DNA analysis stuff.  I did not find any

18     fingerprints.

19          MR. CHAMPION:   May I have just one moment,

20     your Honor?

21          THE COURT:   Yes.

22          (At 2:52 p.m., off record discussion between

23          Mr. Champion and defendant)

24          MR. CHAMPION:   I have no other questions,

25     your Honor.

414

```
 1                    MR. CUSICK:    Very briefly, your Honor.

 2                         REDIRECT EXAMINATION

 3  BY MR. CUSICK:

 4  Q    You indicated that—Okay.  So these items were collected on

 5       April 24th and April 25th—Correct?—of 2011?

 6  A    Correct.

 7  Q    And they were processed when?

 8  A    On 5/13.

 9  Q    Okay.  Now is that delay normal or—or not?

10  A    Yes, that's a normal length of time.

11  Q    Okay.  Through your experience and through other

12       investigations that you've been—that you've dealt with?

13  A    Correct.  Sometimes it's even—it's even been longer, depending

14       on, like I said, the circumstances, the caseload that we have

15       and as far as—Yeah.

16                    MR. CUSICK:    Okay.  Nothing further.

17                        RECROSS-EXAMINATION

18  BY MR. CHAMPION:

19  Q    Officer, if you know, looking at the exhibit—the frame—what

20       was—how long did it take to process that particular item?

21                    THE COURT:    Forty-seven.

22                    MR. CHAMPION:    Forty-seven.  That's correct.

23                    THE WITNESS:    From start to finish,

24       probably—probably around three, three and a half hours,

25       something like that.
```

415

BY MR. CHAMPION:

Q    When did you process that after locating or seizing the item?

A    I believe I processed this one pretty—pretty close to right
     after I seized it because of the workload.

           THE COURT:    I missed it.  Because of what?

           THE WITNESS:    Because the workload I had, and I
     think I processed that fairly—fairly quickly.

Q    Now this was found outside; is that correct?

A    Yes, it was.

Q    And it was in February, if I recall correctly?

A    Correct.

Q    Was it snowy out, wet?

A    No, if—if you guys recall, last year was kind of a mild
     winter.  The ground was dry.  It had been raining, obviously,
     at some point; but, no, it was not—there was no snow, it was
     not wet.  However, the gun was very—the metal portions was
     very rusted and dirt was stuck to the bottom side, so it had
     been there for a little bit to get the dirt stuck on there.

Q    I'm looking at the—the weapon as marked in People's
     exhibit 47.  I'm not sure I see where the rust is.  Was that
     changed by the processing?

A    Correct.  Some of these little eyelets down here and stuff,
     after I process it with the fuming chamber as well as the RAM
     and the powder, on this—this side is kind of dissipated, if
     you will, or you can't see it very well.

416

```
 1                    MR. CHAMPION:   Thank you.

 2                    I have no other questions.

 3                    THE COURT:   Any follow-up?

 4                         REREDIRECT EXAMINATION

 5   BY MR. CUSICK:

 6   Q    Regarding the gun, it was found in February of 2012, correct?

 7   A    If it had been in that area for about ten months, would that

 8        have any effect on being able to retrieve fingerprints—

 9   Q    Yes, substantially.

10                    MR. CUSICK:   I have nothing further.

11                    Thank you.

12   BY MR. CUSICK:

13   Q    —or DNA?

14   A    Correct.

15                         RERECROSS-EXAMINATION

16   BY MR. CHAMPION:

17   Q    Briefly, is it still possible to find DNA after that period of

18        time?

19   A    I would say if—if that weapon was inside under a controlled

20        environment, you probably could; but, being out in the

21        exterior and the—and the weather and so forth, highly

22        unlikely.  But, once again, I'm not the DNA expert, but—

23   Q    So it's possible, but you don't know; is that correct?  Is

24        that a fair statement?

25   A    That's correct.
```

```
 1              MR. CHAMPION:   Thank you.

 2              THE COURT:   Any further questions?

 3              MR. CUSICK:   No, your Honor.

 4              THE COURT:   Ladies and gentlemen, any questions for

 5    this witness?  If so, just raise your hand.

 6              No hands are raised.

 7              Thank you, sir.  You may step down.

 8              Counsel, approach a moment.

 9              Is he excused from his subpoena?

10              MR. CUSICK:   Yes, your Honor.

11              THE COURT:   Any objections to that?

12              MR. CHAMPION:   No objection.

13              (At 2:56 p.m., bench conference as follows:

14                  THE COURT:   Who do you have next?  I just

15              don't know if we should take—

16                  MR. CUSICK:   Well, I was going to ask.  I have

17              Barb Compton, who took the evidence over.  Will you

18              stipulate it was taken to . . . (inaudible)

19                  MR. CHAMPION:   Yeah.

20                  MR. CUSICK:   Okay.  And then we have Ken

21              Roark, and then we'll have . . . (inaudible).  I

22              anticipate Steven Brown will be . . . (inaudible)

23                  THE COURT:   I'm sorry.  You have one—

24                  MR. CUSICK:   We have—We have—

25                  THE COURT:   —that's not so long?
```

```
 1            MR. CUSICK:   —one that's very short.  We have
 2       a stipulation for chain.
 3            THE COURT:   What's the one that's really
 4       short?
 5            MR. CUSICK:   Ken Roark.
 6            THE COURT:   And what's he going to say?
 7            MR. CUSICK:   Transported the body.
 8            THE COURT:   So maybe we can do him and the
 9       stipulation.
10            MR. CUSICK:   We can—
11            THE COURT:   . . . (inaudible)
12            MR. CUSICK:   —probably have a stipulation for
13       that, too.
14            MR. CHAMPION:   If he just transported the
15       body—
16            MR. CUSICK:   Yeah.
17            MR. CHAMPION:   — . . . (inaudible)
18            MR. CUSICK:   And then we have evidence tags
19       . . . (inaudible)
20            THE COURT:   Well, let's do the stipulation
21       . . . (inaudible) and then we'll take a break here.
22       I'll see how they're doing first.
23            MR. CUSICK:   Then we'll just—Okay.
24            THE COURT:   Okay.)
25       THE COURT:   So my understanding is we have a
```

1    witness who should be short.  That's always an estimate.  So

2    I'd like to do one more witness, and then I understand the

3    attorneys might have something to place on the record with

4    regards to a possible stipulation.

5              Are we okay, or do you need a break?  Raise your

6    hand if you need a break right now.

7              UNIDENTIFIED JUROR:   Can I stand?

8              THE COURT:   I'm sorry?

9              UNIDENTIFIED JUROR:   Can I stand?

10             THE COURT:   Yes, certainly, stand and stretch.

11             You want to change seats with somebody so that—

12             UNIDENTIFIED JUROR:   . . . (inaudible)

13             THE COURT:   —you can stand and sit as—

14             UNIDENTIFIED JUROR:   . . . (inaudible)

15             THE COURT:   So you can certainly stand and

16   stretch—We're still on the record.—until another witness comes

17   in, so—

18             All right.  So we'll proceed with another witness

19   then.

20             MR. CUSICK:   Your Honor, I believe we have a

21   stipulation . . . (inaudible)

22             THE COURT:   You want to do that first?

23             MR. CUSICK:   Yeah.  And I don't think we need the

24   next witness.  If we can—

25             THE COURT:   Okay.

1        MR. CUSICK:   Do you want to approach?  Can we

2    approach?

3               THE COURT:   Sure.

4               (At 2:58 p.m., bench conference as follows:

5                    MR. CUSICK:   We have two stipulations.

6                    THE COURT:   Okay.  So you'll transfer to the

7                    stipulation of the—or the transfer of the body—

8                    MR. CHAMPION:   Yeah, the body—

9                    THE COURT:   —too?

10                   MR. CHAMPION:   —and the chain.

11                   MR. CUSICK:   . . . (inaudible) my witness.

12                   THE COURT:   And then so we'll just do the two

13                   stipulations and then we'll take a break.

14                   MR. CUSICK:   Okay.

15                   MR. CHAMPION:   Yeah.

16                   THE COURT:   Perfect.)

17              THE COURT:   Okay.  Go ahead, Counsel.

18              MR. CUSICK:   Your Honor, with regards to—I believe

19   there is one stip—there's two stipulations that we have, and

20   that is exhibit 38, exhibit 39, exhibit 40, exhibit 48, and

21   exhibit 49 were placed into evidence, and the testimony was it

22   was placed into evidence by Tracy Cochrane; and those items

23   were sent to the Michigan State Police lab for further

24   testing.

25              MR. CHAMPION:   That's a correct statement,

1   your Honor.  I would stipulate to the chain in this matter.

2           THE COURT:   Just so that the jury is clear, then,

3   you're referencing the shell casings, the spent casings, the

4   eyeglasses, and the blue bath—bath mat—Is that correct?—that

5   were sent from the evidence room?

6           MR. CUSICK:   No, your Honor.

7           THE COURT:   Why don't you repeat that.  I'm sorry.

8           Go ahead.

9           MR. CUSICK:   Okay.  It's 38, and these are the six

10  shell casings—

11          THE COURT:   All right.

12          MR. CUSICK:   —39, spent casings—

13          THE COURT:   Okay.

14          MR. CUSICK:   —40, three spent bullet and spent

15  jackets—

16          THE COURT:   All right.

17          MR. CUSICK:   —48, a DNA swab; and 49, two buccal

18  swabs from the defendant.

19          THE COURT:   And the stipulation is that those were

20  sent to the Michigan State Police lab for testing; is that

21  correct?

22          MR. CUSICK:   Yes.

23          MR. CHAMPION:   That's a correct—

24          THE COURT:   And you agree—

25          MR. CHAMPION:   —statement, your Honor.

422

1      THE COURT:   —to that?  Okay.

2      I appreciate that.  So that is noted for the record.

3      MR. CUSICK:   . . . (inaudible)

4      THE COURT:   That's fine.

5      MR. CUSICK:   And, your Honor, I believe we have

6  another stipulation, and that is that Ken Roark transported

7  the body of Milo Conklin from 626 Mabel to Bronson—from

8  Bronson Hos—I'm sorry.—Bronson Hospital to Sparrow Hospital.

9  And I would admit—move to admit the evidence tag numbers as

10  People's exhibit number 50.

11      MR. CHAMPION:   That's a correct statement,

12  your Honor.

13      THE COURT:   So the stipulation is that the body of

14  Milo Conklin was transported from Bronson Hospital to

15  Sparrow Hospital in Grand Rapids; is that correct, Counsel?

16      MR. CUSICK:   That's correct.

17      MR. CHAMPION:   That's my understanding, your Honor.

18      THE COURT:   All right.  And—

19      MR. CUSICK:   I believe Sparrow Hospital's in

20  Lansing.

21      THE COURT:   I'm sorry.

22      MR. CHAMPION:   . . . (inaudible)

23      THE COURT:   Lansing.

24      MR. CHAMPION:   That's correct.

25      THE COURT:   And then there's a request to admit

423

exhibit 50. Any objections to that, Mr. Champion?

MR. CHAMPION: No, your Honor.

THE COURT: All right. Then 50 is received.

And, with that, I—All right. I think that takes care of those two witnesses then.

So, ladies and gentlemen, we're not going to call a witness based on those stipulations. We'll just take a break. So we'll take about a 15-minute break. Ms. Wint should be here in a moment.

Please remember all of my prior instructions.

Please just keep your notebooks on your seats, if you would, and you can follow her upstairs as soon as she arrives.

And I will also indicate, if it's easier for you to walk around the front of the jury box, you're certainly welcome to do that. Just be careful of the cords.

All rise.

(At 3:03 p.m., jury exits courtroom)

You may be seated.

MR. CHAMPION: The door is closed, your Honor.

THE COURT: Thank you.

You hear that?

MR. CUSICK: I was going to . . . (inaudible)

MS. HYBEL: He does the job well.

MR. CUSICK: I was going to say he

1        . . . (inaudible)

2                    THE COURT:    I appreciate that.

3                    Counsel, the jury has then left the courtroom.   Is

4        there anything that we need to address before we take a break?

5                    MR. CUSICK:    No, your Honor.

6                    MR. CHAMPION:   No, your Honor.

7                    THE COURT:    No.   Okay.   Court's in recess.

8                    (At 3:04 p.m., court recessed)

9                    (At 3:21 p.m., proceedings reconvened)

10                   THE CLERK:    The court recalls the case of People of

11       the State of Michigan versus Samuel Steel, III, case number

12       C11-1983 FC.

13                   Parties, please restate appearances for the record.

14                   MR. CUSICK:    Paul Cusick on behalf of the People.

15                   MR. CHAMPION:   Robert Champion appearing on behalf

16       of Sam Steel.

17                   THE COURT:    All right.   Counsel, the jury should be

18       on their way down.   Is there anything we need to address

19       before they come in?

20                   MR. CUSICK:    No, your Honor.

21                   MR. CHAMPION:   I don't believe so, your Honor.

22                   THE COURT:    Counsel, while we have a moment, I can

23       indicate that I have received, according to my notes, exhibits

24       two through 49 and then exhibit 51 and 106—

25                   MR. CUSICK:    . . . (inaudible)

                                   425

1              All rise.

2              THE COURT:   Pardon?

3              MR. CUSICK:   Fifty is what we just

4      . . . (inaudible)

5              THE COURT:   Yes.  Thank you.

6              —and 50.

7              (At 3:24 p.m., jury returns to courtroom)

8              You may be seated.

9              Next witness?

10             MR. CUSICK:   Your Honor, People would call

11     Steven Brown.

12             THE COURT:   Before you have a seat, sir, please

13     raise your right hand.  Do you solemnly swear or affirm that

14     the testimony you are about to give will be the truth, the

15     whole truth, and nothing but the truth, so help you God?

16             MR. BROWN:   Yes, ma'am.

17             THE COURT:   Please have a seat, sir.

18             Pull that microphone down so it's right in line with

19     your mouth, if you would.

20             THE WITNESS:   Yeah.

21             THE COURT:   You really have to speak right in the

22     end of it.  You might want to move the top part of that

23     microphone so it's right in line with your mouth, sir, if you

24     would.

25             I need you to state and spell your first and last

```
 1        name for the record.

 2                    THE WITNESS:    Steven Brown—S-t-e-v-e-n B-r-o-w-n.

 3                              STEVEN BROWN,

 4        called at 3:26 p.m. and sworn by the Court, testified:

 5                          DIRECT EXAMINATION

 6   BY MR. CUSICK:

 7   Q    Good afternoon, Mr. Brown.

 8                    Mr. Brown, I want to—

 9   A    Yeah.

10   Q    —direct your attention to the day of April 24th of 2011.  Do

11        you remember that day?

12   A    Yeah.

13   Q    And did you know a Milo Conklin?

14   A    Yeah.

15   Q    And who was he to you?

16   A    He was a friend of mine.

17   Q    And did you know a Samuel Steel?

18   A    Yeah.

19   Q    And do you see him in court today?

20   A    Yeah.

21   Q    Can you point to him and describe what he's wearing—

22   A    Describe what he's wearing?

23   Q    Yeah.

24   A    Oh.

25                    THE COURT:    Describe what he's wearing.
```

```
 1              MR. CUSICK:    —in court today.

 2              THE WITNESS:   A white shirt and tie.

 3              MR. CUSICK:    Your Honor, let the record reflect the

 4        witness has identified the defendant—

 5              THE COURT:    That's noted.

 6              MR. CUSICK:    —Samuel Steel.

 7   BY MR. STEEL:

 8   Q    How long had you known Milo Conklin as of April 24th of 2011?

 9   A    I've known Milo since I was about 12—11, 12 years old.

10   Q    What do you—

11              THE COURT:    I'm sorry.  I think we're having a hard

12        time hearing you.

13              THE WITNESS:   Eleven—11 or 12 years old.

14              THE COURT:    Thank you.

15   BY MR. CUSICK:

16   Q    How long had you known Samuel Steel as of April 24th of 2011?

17   A    Probably since I was about 14.

18   Q    How did you know—How close were you with Milo Conklin?

19   A    His mother and my mother are like family, so we grew up

20        together.

21   Q    Were you very close with Samuel Steel as well?

22   A    Yeah.

23   Q    Do you remember the first time you saw Milo Conklin on

24        April 24th of 2011—the first—

25   A    Yeah.  Yeah
```

```
1    Q    And when was that?

2    A    It was like, maybe, about 12:00 or 1:00 in the afternoon on

3         Easter.  It was Easter Sunday, I know that.

4    Q    And where did you see Milo Conklin?

5    A    At Chuck house on Mabel Street.

6    Q    Is that—Is that Chuck Thomas?

7    A    I don't know his last name.

8    Q    Is that 626 Mabel?

9    A    Yeah.

10   Q    Were you at that house?

11   A    Yeah, I was there, yeah.

12   Q    Who else was at that location?

13   A    At the time it was—I don't know everybody's name that was

14        there—

15   Q    Okay.

16   A    —but at the time it was just me and a couple friends.

17   Q    Was the defendant there at that time?

18   A    He wasn't there.  He was probably across the street.

19   Q    Okay.  Why do you say he was across the street?

20   A    'Cause we was all out there.  When I say all, I mean, like me,

21        Rattler was out there—

22            THE COURT:   I'm sorry.  I missed the name.

23            THE WITNESS:   Lamont, he was out there, a couple

24        other guys.  And I know—Oh, what's his name?

25            MR. CUSICK:   If you know—If you know their name—
```

| | | |
|---|---|---|
| 1 | | THE WITNESS:   Uhm-hmm. |
| 2 | | MR. CUSICK:   —just let us know who they are. |
| 3 | | THE WITNESS:   I don't know a lot of their names, |
| 4 | | but I know faces. |
| 5 | | MR. CUSICK:   Okay. |
| 6 | BY MR. CUSICK: | |
| 7 | Q | Across the street—Did the defendant live across the street; or |
| 8 | | do you know somebody close to the defendant, if they lived |
| 9 | | across the street? |
| 10 | A | A family member. |
| 11 | Q | A family member. |
| 12 | A | Yeah. |
| 13 | Q | On Mabel? |
| 14 | A | Yeah. |
| 15 | Q | Okay.  One o'clock.  How long were you with Milo when you saw |
| 16 | | him— |
| 17 | A | I was with Milo for a while. |
| 18 | Q | Okay. |
| 19 | A | Me and Milo was—It was like—Me and Milo was out there from—for |
| 20 | | a few hours.  It was a few hours me and Milo was out there. |
| 21 | Q | Okay.  And did you eventually see Milo leave? |
| 22 | A | I didn't—Yeah, I seen Milo leave.  He went to go get a plate |
| 23 | | off my car.  I had—It was a Monte Carlo—It was my |
| 24 | | stepdaughter's car.—and he asked me could he get the license |
| 25 | | plate.  I told him, yeah. |

430

| | | |
|---|---|---|
| 1 | Q | Okay. So he left—He left the house on Mabel Street? |
| 2 | A | Yeah. |
| 3 | Q | Okay. And what happened after that? |
| 4 | A | I had left for a little while; and, at that time, it was |
| 5 | | getting kind of dark. You know, it wasn't dark dark, but it |
| 6 | | was, like, you know, it was about to get dark, probably about |
| 7 | | 7:00, somewhere close to that. |
| 8 | | And we had been out there for a while anyway. But I |
| 9 | | had walked towards Ada—Ada Street. Had got into a |
| 10 | | confrontation with a guy over there. It was through, you |
| 11 | | know, so I started walking back, you know, not thinking |
| 12 | | nothing. And, actually, I heard the shots— |
| 13 | Q | Okay. |
| 14 | A | —and, you know, seen— |
| 15 | Q | I want to—So you were hanging out with Milo— |
| 16 | A | Yeah. |
| 17 | Q | —during the day? |
| 18 | A | Yeah. |
| 19 | Q | Did you see Sam Steel at all during that day? |
| 20 | A | Yeah. |
| 21 | Q | Okay. Well, you said you did. I'm sorry. |
| 22 | A | Yeah. |
| 23 | Q | And it got dark out? |
| 24 | A | Not all the way dark. It wasn't—It was—It was getting dark. |
| 25 | Q | Okay. And you said that there were—you heard shots? |

1   A     When I was—Not—Not when we were all sitting out there. This

2          was after I had left and when Milo had came back.

3   Q     And this—Do you know exactly where Milo came—went?

4   A     Exactly where he—He went to go get a license plate from off my

5          car 'cause—

6   Q     Did he—

7   A     —when he came back, he had the license plate on the car.

8   Q     Okay. Do you know if he went anywhere else?

9   A     Probably go get a beer, you know.

10   Q     So, when he came back, you indicated that you heard shots?

11   A     Yeah.

12   Q     Where were you standing?

13              MR. CUSICK: Can we have exhibit three.

14              Thank you.

15 BY MR. CUSICK:

16   Q     Where were you standing just—when you heard the shots?

17   A     Like first few shots I was coming off of Ada going back

18          to—through Florence Street where the shortcut at and like

19          right by the fence back there. It was like right over the

20          fence.

21   Q     Okay. I'd like you to turn and look at exhibit number three.

22          And you can use—You can get—And I believe the Court allows you

23          to use the microphone. Stand up, if you need to point.

24   A     You want to see where I was at?

25   Q     Yes.

1          THE COURT:   If you're going to speak, sir, you
2     either have to speak in the microphone—
3          THE WITNESS:   Okay.
4          THE COURT:   —in front of you—
5          THE WITNESS:   Is it on?
6          THE COURT:   —or use the handheld because,
7     otherwise, we can't hear you.
8          It should be on, I think.  Just say your name—
9          THE WITNESS:   Yeah.
10         THE COURT:   —in the microphone.
11         THE WITNESS:   It's on.
12         THE COURT:   Okay.
13         I'm sorry.  What's the question?
14         MR. CUSICK:   Just where—where was he.
15         THE COURT:   Okay.
16         MR. CUSICK:   I was going to have—have him point it
17    out.
18         Maybe if you can zoom in.
19         THE COURT:   Okay.  So this is exhibit three we're
20    looking at.
21         MR. CUSICK:   Right.
22         I'm going to hand you a pointer, if you need it,
23    Mr. Brown.  And can you just point—
24         THE WITNESS:   I was . . . (inaudible)
25         MR. CUSICK:   —to where you were standing when you

                              433

```
 1      heard the shots.
 2                  THE COURT:    Let's go back a second.  Do you
 3      recognize this photograph?  Can you—
 4                  THE WITNESS:   Yeah—
 5                  THE COURT:    —tell what this is?
 6                  THE WITNESS:   —I recognize it, but I just—It's so
 7      small.
 8  BY MR. CUSICK:
 9  Q     Do you see Mabel Street?
10  A     Yeah, I see Mabel right here.
11  Q     Now do you see where 626 may be?  You're pointing to about the
12        middle of the—
13  A     Yeah.
14  Q     —the map—
15  A     Yeah.
16  Q     —with a white car on the side?
17  A     Yeah.
18  Q     Is—
19                  THE COURT:    We can't hear—
20                  THE WITNESS:   Right—
21                  THE COURT:    —your answer.
22                  THE WITNESS:   Yeah.  Yeah.
23                  THE COURT:    Thank you.
24                  Go ahead.
25                  MR. CUSICK:    Okay.
```

BY MR. CUSICK:

Q    Is that 626 Mabel to the best of your knowledge?

A    Uhm-hmm.

                THE COURT:   Yes?

                THE WITNESS:   Yes.  Yes.

BY MR. CUSICK:

Q    Okay.  And where were you standing in relation to that—

A    I was like—

Q    —when you first heard—

A    —in this area right here.  He had to be—

Q    Okay.  So you're pointing—Just for the record, you're pointing
     to a house—between two houses across the street from 626—

A    Yeah.

Q    —Mabel Street, correct?

A    Yeah.  Yes.

Q    Is that correct?

A    Yes.  Yes.

Q    Do you know what address that might be?

A    I don't know the address, but I know the house.

Q    And you indicated you heard shots.  Tell me what happened
     next.

A    Well, I heard shots, seen a guy coming across the street on
     the side of the little tan house and I was like—

Q    Okay.  I want to—I don't mean to interrupt.  I just don't
     want—

435

```
1   A      Yeah.

2   Q      —don't want to get lost here.

3                  Where did you see the—Did you see the shooter?

4   A      Yeah.  Yeah.

5   Q      Okay.  And where did you see the shooter coming from?

6   A      From across the street on Mabel.

7   Q      Can you point where the shooter was coming from.

8   A      . . . (inaudible)

9   Q      So, just for the record—

10  A      . . . (inaudible)

11  Q      —you pointed directly to 626 Mabel?

12  A      Uhm-hmm.

13  Q      That's where he was coming from?

14  A      Yeah.

15  Q      There's a cut-through right—

16                 THE COURT:   Was that—I didn't hear the answer.

17                 THE WITNESS:   Yes.  Yes.

18  BY MR. CUSICK:

19  Q      So was he coming from the north?

20  A      From—Yeah.  Yes.  Yeah.

21  Q      And then you started pointing downward.  Was that—

22  A      Like coming across.

23  Q      Okay.  So tell me exactly—Show the jury exactly where you saw

24         the shooter come from and where you saw the shooter go.

25                 Okay.  So you're pointing to just by 626 Mabel—
```

```
 1   A    Yes, sir.

 2   Q    —the side of 626 Mabel—

 3   A    Yes.

 4   Q    —correct?

 5   A    Yes.

 6   Q    You saw the shooter go across the street?

 7   A    Yeah.  Yeah.

 8   Q    And—

 9   A    And I was—You know, I didn't really know what was going on at

10        the time, you know, so I'm like kind of shook up and was

11        hesitant to move.

12   Q    Okay.  Now where were you standing again, just so we're clear?

13   A    Like right on the side between—

14   Q    Can you point directly to it.

15   A    Yes.  Right in here.

16   Q    Okay.

17                  THE COURT:   I think he said right in here—

18                  THE WITNESS:   Yeah.

19                  THE COURT:   —is that correct?

20                  THE WITNESS:   Yes, right in—right in there.

21   BY MR. CUSICK:

22   Q    So near the back of the house that's right across the street?

23   A    Yes.  Yes.

24   Q    And, if I—if I may, you—you indicated just now—

25   A    Uhm-hmm.
```

```
 1   Q   —that the shooter came directly to the side of this house?

 2   A   It was like, you know, side of the house, yeah.

 3               THE COURT:   I can't hear him.

 4               THE WITNESS:   Yes.

 5               MR. CUSICK:   Make sure you speak up and make sure

 6       you speak into the mike.  Okay?

 7               THE WITNESS:   Yeah.  Yes.

 8   BY MR. CUSICK:

 9   Q   Okay.  So you were standing right here is what you testified

10       to—Correct?

11   A   Yeah.

12   Q   —at the back to the more western—eastern side of the house—

13   A   Yes.

14   Q   —across the street from 626 Mabel—

15   A   Uhm-hmm.

16   Q   —is that correct?

17   A   Yes.

18   Q   And you indicated that you saw the shooter come directly back

19       more toward the western side of the house?

20   A   Yes, I didn't actually know where he was going at first.

21   Q   Okay.  So did you see any of the shots at all or no?

22   A   I seen—I seen when he was falling.  You know, I seen that.

23   Q   Okay.  So were you running away from the house 626 Mabel when

24       you heard the shots?

25   A   Actually, I wasn't—I wasn't running.  I was like going
```

| 1 | | towards. |
|---|---|---|
| 2 | Q | Okay. |
| 3 | A | Yeah. |
| 4 | Q | Explain to the jury what you mean by going towards. |
| 5 | A | Going towards I mean like going back to where I just had came |
| 6 | | from.  I had came from that area, so I was going right back |
| 7 | | over there. |
| 8 | Q | Okay.  So you had come from which area? |
| 9 | A | I had came—Well, I had came from the Ada area going back over |
| 10 | | there. |
| 11 | Q | Okay.  And where is— |
| 12 | A | I had left—I had left—When I say going back over there, I mean |
| 13 | | going back to Mabel Street. |
| 14 | Q | Okay.  And where is the Ada area?  It might not be on the map, |
| 15 | | but what direction? |
| 16 | A | It's like up here.  Right there. |
| 17 | Q | Okay.  So you walked north across Florence Street? |
| 18 | A | Yeah.  Yeah. |
| 19 | Q | And that's where you saw it? |
| 20 | A | Yeah.  I was walking back through Burrell—I was walking back |
| 21 | | through Burrell Street going back to Mabel. |
| 22 | Q | You were behind the house across the street from 626 Mabel? |
| 23 | A | That's where I was walking from, yeah. |
| 24 | Q | Okay.  And you were able to see Milo Conklin? |
| 25 | A | Yeah, you could see everything. |

439

1    Q    Okay.

2    A    You could see—You could see the houses, the streets, all that.

3    Q    And did you get a chance to see the shooter?

4    A    Yes.

5    Q    Who was the shooter?

6    A    (Witness points)

7              MR. CUSICK:    For the record, the witness has

8         pointed to Samuel Steel.

9              THE COURT:    Hold on a second.  He—

10             MR. CHAMPION:    Your Honor—

11             THE COURT:    That is noted for the record.

12             I didn't get a response.

13             MR. CUSICK:    I'm sorry.  I'm sorry, your Honor.

14   BY MR. CUSICK:

15   Q    Who is the name of the person—

16   A    Sam Steel.

17   Q    —that—

18             Okay.  Did you see Sam Steel shoot Milo Conklin?

19   A    I seen—

20   Q    I mean, did—

21   A    He was—He the one coming through the shortcut—

22   Q    Okay.

23   A    —yeah.

24   Q    What was he dressed—How was he dressed?

25   A    Black hoodie, sweatpants.

| | | |
|---|---|---|
| 1 | Q | What color—Do you remember what color the sweatpants were or |
| 2 | | no? |
| 3 | A | Black. |
| 4 | Q | Okay. |
| 5 | A | Black or blue, something like that.  It was dark.  It was a |
| 6 | | dark color, I mean. |
| 7 | Q | Did you get a look at his face? |
| 8 | A | Yeah. |
| 9 | Q | Do you have any doubt it was Samuel Steel? |
| 10 | A | No doubt in my mind. |
| 11 | Q | Had you ever spoken with the defendant before April 24th of |
| 12 | | 2011 regarding Milo Conklin? |
| 13 | A | Yeah. |
| 14 | Q | What did the defendant say regarding Milo Conklin? |
| 15 | A | He said he want to do something to him, you know; we was |
| 16 | | talking one day. |
| 17 | Q | Did he indicate why he was going to do something to him? |
| 18 | A | Yeah. |
| 19 | Q | And what did he say he was going to do? |
| 20 | A | He said he was—he want to get that nigger. |
| 21 | Q | And—I'm sorry.—what—why did he say he wanted to do it? |
| 22 | A | I guess he had—had broke into his house. |
| 23 | Q | Because Milo had broken into— |
| 24 | A | Yeah. |
| 25 | Q | —his house? |

1          Where did you see Sam Steel go to after you saw him?

2  A   When I looked back, he was getting into a truck.

3  Q   Okay.  Where was the truck?

4  A   It was on Florence Street.

5  Q   Okay.  What kind of truck was it?

6  A   It was a white, like Suburban kind of truck.

7  Q   Okay.  Did you see who was in that truck?

8  A   I seen two people.

9  Q   Okay.  And who were those—those people?

10 A   One of them was A. J., and the other person got in the back

11     seat.

12 Q   I'm sorry?

13 A   The other person got in the back seat.  I didn't see the

14     person that was in the passenger side, though.

15 Q   Okay.  So where did the defendant—What seat did the defendant

16     go into?

17 A   The back seat.

18 Q   Okay.  And you only saw two people?

19 A   Yeah.  Yeah.

20 Q   Was it—It was—Was it—Is it fair to say it was dark out?

21 A   It was getting, just about, yeah.

22 Q   Okay.  You didn't see anybody in the front passenger side?  I

23     mean, look—

24 A   I didn't see—I didn't see—I didn't see the face, no.

25 Q   Can you tell if anybody was seated in the front passenger side

442

| | | |
|---|---|---|
| 1 | | one way or the other? |
| 2 | A | Yeah, of course. |
| 3 | Q | Okay.  So did you see somebody in the front passenger side? |
| 4 | A | Yeah. |
| 5 | Q | Okay. |
| 6 | A | Yeah. |
| 7 | Q | What happened then? |
| 8 | A | They pulled off.  They pulled off from there. |
| 9 | Q | Did you see Samuel Steel later that—that day? |
| 10 | A | Well, yeah, yeah. |
| 11 | Q | Okay. |
| 12 | A | Yes, I did. |
| 13 | Q | And where did you see Sam Steel? |
| 14 | A | Coming back on Mabel Street. |
| 15 | Q | And what did the defendant say when you saw him? |
| 16 | A | Yeah, what the fuck is you all doing on camera. |
| 17 | Q | Okay.  Can you say that a little louder.  I'm sorry. |
| 18 | A | What the fuck is you all doing on camera. |
| 19 | Q | Okay.  And so there were cameras around? |
| 20 | A | A news team. |
| 21 | Q | Okay.  And who did he—Who did the defendant say that to? |
| 22 | A | It was me and Tommy Morgan.  We was standing right—It was more |
| 23 | | than that on the fence, but it was me and Tommy Morgan.  We |
| 24 | | was there. |
| 25 | Q | Okay.  Did you have any other conversation with the defendant |

443

| | | |
|---|---|---|
| 1 | | that day, April 24th— |

1  that day, April 24th—

2 A  No.

3 Q  —regarding the shooting?

4 A  No.  I can't recall, no.

5 Q  Is it fair to say on April 24th, 2011, you were friends with

6    both Milo Conklin and Sam Steel?

7 A  Yeah, it is.

8 Q  Did you ever have conversations after that day with

9    Samuel Steel as to what happened?

10 A  It wasn't like in no brief detail—no, like no details or

11    nothing; but I been around a person long enough to know—

12 Q  I'm sorry—

13 A  —what's going on.

14 Q  —Mr. Brown.

15 A  I said it wasn't like no conversation like what happened on

16    that day or—

17 Q  Right.

18 A  He was—You know, when I got locked up a couple times, he asked

19    me what questions they was asking me, you know.

20 Q  Okay.  Did he talk about him doing the shooting at all after—

21 A  No.

22 Q  —after that?

23 A  No.

24 Q  So you never talked specifically about the shooting—

25 A  No.

```
 1   Q   —after that?

 2   A   No.

 3   Q   Did you ever ask him about the shooting?

 4   A   No.

 5   Q   How did you feel toward Samuel Steel at that—at that time

 6       after the shooting?

 7   A   I was—I was kind of fucked up, you know.  Like I was in

 8       between like two individuals I had considered to be friends at

 9       first, you know; and, after that happened, I didn't know what

10       to do.  I was like stuck in—I was between a rock and a hard

11       place, to be honest.

12   Q   Were you scared?

13   A   Yeah, truth be told.

14   Q   Now there came a time that you had conver—

15               So you saw Milo Conklin fall at 626 Mabel, correct?

16   A   Yeah.

17   Q   What was your first thought when that happened?

18   A   I—I thought he was just hurt, you know.

19   Q   Do you—

20   A   I didn't—

21   Q   —have any—

22   A   Yeah.

23   Q   —indication of who did it at that time, who did the shooting?

24   A   No, no, no—

25   Q   Okay.
```

```
 1   A     —not at that time, no.

 2   Q     Not until you saw the defendant?

 3   A     Yeah.  Yeah.

 4   Q     Now there came a point where you were interviewed by

 5         Detective Beauchamp, correct?

 6   A     Yeah.

 7   Q     Just one more question.  When you came back to the scene—Not

 8         when you came back.  When you saw the defendant later on come

 9         back that night at 626 Mabel—

10   A     Uhm-hmm.

11   Q     —was he wearing the same clothes as you saw him earlier or

12         different clothes?

13   A     He was wearing different clothes.

14   Q     Okay.  Do you recall what clothes he was wearing?

15   A     It was like a zip-up jacket, you know, something like a

16         Shy John, something like that, you know, velour jacket and

17         some pants—dark color pants.

18   Q     Do you know that for sure or—

19   A     Yeah.

20   Q     Okay.

21   A     I remember that.

22   Q     He was not—He was not wearing the same clothes?

23   A     No.

24   Q     Now there came a point when you discussed and had an interview

25         with Detective Brian Beauchamp, correct?
```

1   A   Correct.

2   Q   And I want to bring your attention to that day—

3   A   Uhm.

4   Q   I believe it was May—May—I'm sorry.—May 10th of 2011.  Do you

5       remember that first interview that you had—

6   A   Yeah, I do.

7   Q   —with Detective Beauchamp?

8   A   Yes, I do.

9   Q   And did you tell Detective Beauchamp who shot Milo Conklin?

10  A   I told him—I made up a story, you know, and—I had a situation

11      going on with a friend of mine's, and I had made up a story,

12      you know.  And it was weighing on me so hard that I wanted to

13      tell the truth.

14  Q   Okay.  Who is—Who is the friend of yours?

15  A   His name is Melvin Johnson.

16  Q   Melvin Johnson?

17  A   Yeah.

18  Q   So you made up a story?

19  A   Uhm-hmm.

20  Q   And what did you tell Detective Beauchamp?

21  A   I told him that—that it was him who did it, yeah.

22  Q   Melvin Johnson?

23  A   Yeah.

24  Q   That was about May 10th of 2011?

25  A   Yeah.

1   Q   Why did you do that?

2   A   I was—Melvin had—I had a girlfriend named Juanita, and he end

3       up getting out the joint and getting her and having kids by

4       her.  We was beefing about it for a minute, you know; and

5       that's—I was mad.

6   Q   Okay.  Now, shortly thereafter, you reached out to

7       Detective Beauchamp again; is that correct?

8   A   Yes, I did.

9   Q   Why did you reach out to him?

10   A   Because—It was my mother.  My mother told me, she said, if

11       there's anything I know, you know, with him being my friend,

12       don't let it weigh heavy on your heart; let it be known, or

13       you're going to deal with it for the rest of your life.

14   Q   So you met up with Brian Beauchamp in June—Is that correct?

15   A   Yeah.

16   Q   —of 2011?

17   A   Yeah.

18   Q   Now did you—In June of 2011, do you—did you tell him who the

19       real shooter was at that time or no; or was that later on?

20   A   No, it was—No.

21   Q   Okay.  But where did you meet up with Detective Beauchamp?

22   A   I met up with him on—at Versluis, I believe, at the park.

23   Q   I'm sorry?

24   A   I think it was the park—at Versluis park at that time.

25           THE COURT:   Versluis, is that what you're saying?

| | |
|---|---|
| 1 | THE WITNESS: Yeah, it was. Yeah. |
| 2 | BY MR. CUSICK: |
| 3 | Q And what did you tell him then? |
| 4 | A Really, we didn't really talk that much then, not that day. |
| 5 | Q Is it fair—Do you know what the—Is it fair to say you got cold |
| 6 | feet? |
| 7 | A Yeah. Yeah. Yeah. Super cold feet. |
| 8 | Q You didn't tell—Did you tell him that you made up the story? |
| 9 | A Not then. |
| 10 | Q Were you initially planning on telling him that? |
| 11 | A Yeah. Yeah. |
| 12 | Q Did you continue to try to contact Detective Beauchamp after |
| 13 | that? |
| 14 | A Yeah. |
| 15 | Q What was your demeanor still at that time toward Sam Steel? |
| 16 | A I was scared. You know, I didn't know—know if I did say |
| 17 | something was something going to happen to me. You know, |
| 18 | that's how I felt. |
| 19 | Q And you eventually came forward on November 8th of 2011, |
| 20 | correct? |
| 21 | A Yeah. Yes, I did. |
| 22 | Q And what did you tell Detective Beauchamp on November 8th, |
| 23 | 2011? |
| 24 | A You know, I—At the time he was, you know, asking me the |
| 25 | questions, and I still was trying to like dodge his |

| | | |
|---|---|---|
| 1 | | questions—questions a little bit. |
| 2 | Q | Okay. I want to stop you there. Why did you want to dodge |
| 3 | | those questions? |
| 4 | A | Because I really didn't want to deal with it. I was like, you |
| 5 | | know, I didn't want to have the situation keep going on. |
| 6 | | That's why. |
| 7 | Q | Did you tell him—Had you told him that Melvin Johnson was not |
| 8 | | the shooter? |
| 9 | A | Yeah. Yes, I did. |
| 10 | Q | And then did you tell him who the shooter was? |
| 11 | A | Yes. |
| 12 | Q | And who did you tell Detective Beauchamp who the shooter was? |
| 13 | A | I told him it was Sam Steel. |
| 14 | Q | Okay. Now I want you to be completely straightforward with |
| 15 | | the jury here. What was your demeanor, at the time, on |
| 16 | | November 8th of 2011, when you were in the interview with |
| 17 | | Detective Beauchamp? |
| 18 | A | I was scared. I was—I didn't—I didn't want to—I cried, you |
| 19 | | know, thinking about what would happen to me or thinking about |
| 20 | | what happened to Milo, thinking about how I was in the middle |
| 21 | | of, you know, friends I used to have, you know, that I don't |
| 22 | | have anymore. And, you know, having this on me, it weighed me |
| 23 | | down a whole lot to the point where I broke down and told the |
| 24 | | truth. |
| 25 | Q | Do you know Walter Johnson? |

450

```
 1   A      Yeah.

 2   Q      Did Walter Johnson—Did you know him to have firearms?  Did he

 3          possess firearms?

 4   A      Yeah.

 5   Q      Do you know if he ever shared—Walter Johnson—did he always

 6          keep the firearms to himself, or did he share them sometimes?

 7   A      He shared them.

 8   Q      Did he ever share them with Sam Steel?

 9                    MR. CHAMPION:   I'm going—

10                    THE WITNESS:   You know—

11                    MR. CHAMPION:   —to object.  Calls for speculation.

12                    MR. CUSICK:   If he had personal knowledge.  I can

13          make—

14                    THE COURT:   I'll let—

15                    MR. CUSICK:   —a foundation.

16                    THE COURT:   —him answer that based on the

17          additional question.

18   BY MR. CUSICK:

19   Q      Do you—Do you know—

20                    THE COURT:   You might rephrase it.

21                    MR. CUSICK:   Okay.

22   BY MR. CUSICK:

23   Q      Do you know whether—Okay.  Do you know—

24   A      I never seen—

25   Q      —what—
```

451

```
 1   A    —him give—

 2   Q    Let me just ask the question.

 3              Have you ever seen—Have you ever seen Walter Johnson

 4        give any firearms to Samuel Steel?

 5   A    No.  No.

 6   Q    Have you talked with the defendant about whether or not he

 7        received any firearms from Walter Johnson?

 8   A    No.

 9   Q    Had you borrowed firearms from Walter Johnson?

10   A    No.

11   Q    Do you know an A. J. Matthew or a Harry Mathews?

12   A    Yeah.

13   Q    Do you know an individual by the name of Devon Smith?

14   A    Yeah.

15   Q    Did you ever talk with A. J. Mathews about this case?

16   A    I never spoke to him about the case, no.

17   Q    Have you ever talked with Walter Johnson about the case?

18   A    No.

19   Q    Have you ever talked with Devon Smith about what happened to

20        Milo Conklin or the case?

21   A    No.

22   Q    Okay.  Are you telling the whole truth today?

23   A    Yes, I am.

24              MR. CHAMPION:   Objection, your Honor.  Self-serving

25        question.
```

452

```
 1                    THE COURT:   Response?

 2                    MR. CUSICK:   Your Honor, I can ask him if he's

 3        telling the truth.  I don't know how that's self-serving.  I

 4        mean, I guess if he's telling the truth—

 5                    THE COURT:   Overruled.

 6                    MR. CUSICK:   — . . . (inaudible) the testimony.

 7                    THE COURT:   I'll allow it.

 8                    MR. CUSICK:   I have nothing further at this time,

 9        your Honor.

10                    THE COURT:   Mr. Champion?

11                    MR. CHAMPION:   Thank you.

12                    May I have that exhibit of the overhead.

13                            CROSS-EXAMINATION

14   BY MR. CHAMPION:

15   Q    So, as I understand it, you were at Milo's house on April 24th;

16        is that correct?

17   A    Milo didn't live—

18   Q    Pardon?

19   A    I wasn't at Milo's house, no.

20   Q    You were at a friend's of Milo's or a cousin; is that right?

21   A    Not a—It was a friend, yeah.

22   Q    626 Mabel—

23   A    Yeah, it was—

24   Q    —is that right?

25   A    Mabel.
```

| 1 | Q | And you were there about 1:00 o'clock; is that right? |
| 2 | A | During—Yeah, I was there the whole day. |
| 3 | Q | And Milo was there from 1:00 o'clock until he went to go get a |
| 4 |  | license plate; is that correct? |
| 5 | A | He left a couple times before that. |
| 6 | Q | I think your testimony was he was there and he left to go get |
| 7 |  | a license plate— |
| 8 | A | Yeah. |
| 9 | Q | —and possibly some— |
| 10 | A | Yeah. |
| 11 | Q | —beer. |
| 12 | A | Yeah. |
| 13 | Q | How long a period was he gone during that time? |
| 14 | A | Probably about an hour. |
| 15 | Q | Maximum? |
| 16 | A | Hour, hour and a half, something like that. |
| 17 | Q | And that was to get the license plate and to get beer; is that |
| 18 |  | right? |
| 19 | A | Yeah. |
| 20 | Q | Now you left at some point in time and went to Ada Street; is |
| 21 |  | that correct? |
| 22 | A | That wasn't at—It wasn't at no 2:30 or 3:00 o'clock. |
| 23 | Q | Well, it was later in the evening— |
| 24 | A | Yeah. |
| 25 | Q | —is that right? |

454

```
 1   A      Yeah.

 2   Q      And you left, as I understand, and went to Ada Street, which

 3          is right down here.

 4   A      Uhm-hmm.

 5   Q      Where at—

 6                      THE COURT:   Hold on.

 7                      Is that a yes?

 8                      THE WITNESS:   Yes.  Yes.

 9   BY MR. CHAMPION:

10   Q      Where on Ada did you go?

11   A      Right there at the corner.

12   Q      Could you point that out to the jury.

13                      That's actually not on Ada.  That's on

14          . . . (inaudible)

15   A      Burrell.  At the corner of Burrell and Ada.

16   Q      What is right there?

17                      THE COURT:   I didn't hear.  It's on the corner of?

18                      MR. CHAMPION:   Burrell and Ada.

19                      THE COURT:   Thank you.

20   BY MR. CHAMPION:

21   Q      What is on the corner of Burrell and Ada?

22   A      It's a house.  . . . (inaudible)

23   Q      That little house right there?

24   A      Yeah.

25   Q      So you went there—
```

```
 1   A      Uhm-hmm.

 2   Q      —is that correct?

 3                   THE COURT:    Hold on a second.

 4                   THE WITNESS:    Uhm-hmm.

 5                   THE COURT:    Hold on a second.

 6                   You've got to speak into—

 7                   THE WITNESS:    Yes.

 8                   THE COURT:    —the microphone.

 9                   THE WITNESS:    Yeah.

10                   THE COURT:    Thank you.

11   BY MR. CHAMPION:

12   Q      So you went to Ada and Burrell—

13   A      Uhm-hmm.

14   Q      —which is, it looks like, about three blocks away?

15   A      Yeah.  Yeah.

16   Q      I believe your testimony earlier was that you heard the shots

17          when you were at Ada and Burrell.

18   A      No.

19                   THE COURT:    Hold on a second.

20                   Folks, if you make noise, you're going to have to

21          leave.  So you have to just remember that.  Okay?

22                   I'm sorry, Mr. Champion.  Go ahead.

23                   MR. CHAMPION:    Thank you.

24   BY MR. CHAMPION:

25   Q      So you were walking back from Ada and Burrell—
```

```
 1   A    Yeah.

 2   Q    —is that correct?

 3   A    Yeah, correct.

 4   Q    And it's getting dark out; is that correct?

 5   A    Uhm-hmm.

 6               THE COURT:   Wait.

 7               THE WITNESS:   Yes.

 8               THE COURT:   Is that a yes?

 9   BY MR. CHAMPION:

10   Q    And you're walking back—Did you walk down Burrell?

11   A    Yes.

12   Q    And you cut through where, if you could show the jury.

13   A    . . . (inaudible) a shortcut.

14               THE COURT:   And I think you said shortcut.

15               THE WITNESS:   Right there.   It's a shortcut, yeah.

16   BY MR. CHAMPION:

17   Q    You went through a shortcut right in between these two houses—

18   A    Yeah.

19   Q    —is that correct?

20   A    Exactly.

21   Q    I believe that your testimony is you went between—I believe in

22        one of your statements—that you went between Sam Steel's house

23        and another house; is that correct?

24   A    Yeah.

25   Q    Or that's the area you were heading—
```

1  A    Right.

2  Q    —is that correct?

3  A    Yeah.

4  Q    Where on this map is Sam Steel's house, if you could show me.

5              THE COURT:   If you're going to say something, speak

6        up, please.

7              THE WITNESS:   That's—That's his mom's house.

8  BY MR. CHAMPION:

9  Q    So, as I understand it—

10             THE COURT:   I didn't hear the answer, Mr. Champion.

11        Hold on a second.

12             MR. CHAMPION:   I'm sorry.

13             THE COURT:   No.  He needs to repeat it.

14             THE WITNESS:   I said that's his mother's.

15             THE COURT:   That's his mother's house.

16             Go ahead.

17  BY MR. CHAMPION:

18  Q    To your knowledge, Sam Steel owns that property; is that

19        correct?

20  A    To my knowledge, yeah.

21  Q    So, as I understand it, looking at the map, you're walking in

22        between or behind these houses—

23  A    In between, yeah.

24  Q    —on the south side of Mabel Street—

25  A    Uhm-hmm.

```
 1   Q     —is that correct?

 2                    And 626—

 3                    THE COURT:    I—

 4   BY MR. CHAMPION:

 5   Q     —Mabel—

 6                    THE COURT:    Hold on.

 7                    I'm not getting—

 8                    THE WITNESS:    Yes.  Yes, ma'am.

 9                    THE COURT:    Thank you.

10                    THE WITNESS:    Yes, ma'am.

11   BY MR. CHAMPION:

12   Q     And 626 Mabel is on the north side of the roadway right in

13         this area?

14   A     Yes.  Yes.

15   Q     In fact, it's right where I'm pointing at this time; is that

16         correct?

17   A     Exactly.

18   Q     Where were you when you heard the shots?

19   A     I was coming through the shortcut right there.  I wasn't on

20         Ada Street.  I was coming right exactly where you was

21         pointing.

22   Q     Right there?

23   A     Yeah.

24   Q     Now isn't it true that you contacted a detective on April 24th—

25   A     Yes.
```

459

| | | |
|---|---|---|
| 1 | Q | —and said you'd meet the detective and tell him what happened— |
| 2 | A | Yes. |
| 3 | Q | —is that correct? |
| 4 | A | Yes. |
| 5 | Q | But you didn't meet him; is that right? |
| 6 | A | (No audible response) |
| 7 | Q | Is that correct? |
| 8 | A | Correct. |
| 9 | Q | In fact, you fled the state; is that correct? |
| 10 | A | No, I didn't flee the state.  I was still here. |
| 11 | Q | Well, on April—Excuse me.—May 10th— |
| 12 | A | Uhm-hmm. |
| 13 | Q | —where did you have contact with Detective Beauchamp? |
| 14 | A | Out of state. |
| 15 | Q | Pardon? |
| 16 | A | On the phone.  I talked to him on the phone. |
| 17 | Q | On April—Excuse me.  On May 10th— |
| 18 | A | Yes. |
| 19 | Q | —you spoke to him on the phone? |
| 20 | A | Well, yes— |
| 21 | Q | Are you sure about that? |
| 22 | A | —I believe it's that day, yeah. |
| 23 | Q | Weren't you, in fact, in Joliet, Illinois? |
| 24 | A | Yes. |
| 25 | Q | Isn't it true that Detective Beauchamp and another detective |

460

```
 1        came to you—

 2   A    Yeah—

 3   Q    —and—

 4   A    —but I talked—

 5   Q    —picked you up—

 6   A    —to him on the phone—

 7   Q    —in Joliet—

 8   A    —first.

 9   Q    —Illinois?

10   A    Yeah, I talked to him on the phone first.

11                 THE COURT:   Hold on.

12                 THE WITNESS:   Yes.

13                 THE COURT:   You've got to wait until he's done with

14        his question.

15                 THE WITNESS:   Hmm.

16                 THE COURT:   Otherwise, we have two people speaking.

17                 THE WITNESS:   Right.

18                 THE COURT:   So just wait till his question and then

19        you can answer.

20   BY MR. CHAMPION:

21   Q    So, approximately, within two weeks you're having a

22        conversation with Detective Beauchamp—

23   A    Yeah.

24   Q    —is that correct?

25   A    Exactly.
```

461

| | | |
|---|---|---|
| 1 | Q | He's bringing you back from Joliet, Illinois— |
| 2 | A | Uhm-hmm. |
| 3 | Q | —is that correct? |
| 4 | A | Exactly. |
| 5 | Q | You're out of state— |
| 6 | A | Yeah. |
| 7 | Q | —right? |
| 8 | A | Yeah. |
| 9 | Q | And, during that time, that's when you told |
| 10 | | Detective Beauchamp that Melvin Johnson shot— |
| 11 | A | I said it earlier. |
| 12 | Q | Pardon? |
| 13 | A | I said it earlier. |
| 14 | Q | Pardon? |
| 15 | A | I said that earlier. |
| 16 | Q | That was on May 10th; is that correct? |
| 17 | A | Yeah. |
| 18 | Q | Why are you coming back from Joliet, Illinois? |
| 19 | A | Why I'm coming back? |
| 20 | | MR. CUSICK:   Objection, your Honor.  That's |
| 21 | | irrelevant. |
| 22 | | MR. CHAMPION:   It's certainly relevant, your Honor. |
| 23 | | He's testified that he was scared of individuals, that he was |
| 24 | | mad at individuals.  Here's—Here's an individual that's— |
| 25 | | THE COURT:   Hold on. |

1    MR. CHAMPION:   —out of state.

2    THE COURT:   Counsel, will you please approach.

3    (At 4:00 p.m., bench conference as follows:

4         THE COURT:   Hold on.  I don't know why—why is

5    he coming back from Joliet, Illinois.  All I know is

6    Detective Beauchamp went to go get him.  What's—What

7    are you getting at?

8         MR. CHAMPION:   . . . (inaudible) that he

9    wasn't scared of anyone.  He was out of state.  He

10   was away from everyone at that point in time.

11        THE COURT:   But the question is why are you

12   coming back from Illinois.  What's he going to say?

13   I don't know why he's coming back from Illinois.

14        MR. CHAMPION:   Detective Beauchamp was

15   bringing him back.

16        THE COURT:   Went to bring him back.

17        MR. CUSICK:   Well—Okay.  I just don't

18   understand why—

19        THE COURT:   . . . (inaudible)

20        MR. CUSICK:   I don't understand

21   . . . (inaudible) Okay.  Go ahead.

22        THE COURT:   The question is why are you coming

23   back.  Did they go get him to pick him up and bring

24   him back?  Okay.  So what's the problem

25   . . . (inaudible) relevancy there?

```
 1            MR. CUSICK:   Well, I just have a problem with
 2       the fact where he lived and where he moved to—
 3            THE COURT:   I don't know—
 4            MR. CUSICK:   —comes out.
 5            THE COURT:   —any of this.  Where was he
 6       living?  . . . (inaudible)
 7            MR. CUSICK:   As far as Detective Beauchamp
 8       came to pick him up, . . . (inaudible) fine—
 9            THE COURT:   Okay.
10            MR. CUSICK:   —so—)
11       THE COURT:   Overruled.
12       Go ahead, Mr. Champion.
13  BY MR. CHAMPION:
14  Q    So, on May 10th, after Detective Beauchamp picked you up in
15       Joliet, Illinois—
16  A    Yeah.
17  Q    —you told him that you saw Melvin Johnson walking through the
18       cut—
19  A    Yeah.
20  Q    —is that correct?
21  A    Yeah.
22  Q    In fact, you even said you said hi to Melvin Johnson—
23  A    Yeah—
24  Q    —is that correct?
25  A    —I said I said hi.
```

| 1 | Q | Pardon? |
| 2 | A | I didn't say who I said hi to, but I said—yeah, well— |
| 3 | Q | And that you saw Melvin Johnson get into a dark-colored SUV— |
| 4 | A | Yeah. |
| 5 | Q | —is that correct? |
| 6 | A | Yeah. |
| 7 | Q | And, in fact, you told Detective Beauchamp the same story that |
| 8 |   | you told about Sam Steel? |
| 9 | A | Yeah.  No, it— |
| 10 | Q | In fact— |
| 11 | A | —wasn't— |
| 12 | Q | —what you— |
| 13 | A | —the same story. |
| 14 | Q | You said that Melvin Johnson was mad at Milo— |
| 15 | A | Uhm-hmm. |
| 16 | Q | —because Milo had ripped him off; is that right? |
| 17 | A | No, I did say because Milo had ripped him off. |
| 18 | Q | Pardon? |
| 19 | A | I didn't say that, no. |
| 20 | Q | So, in the police report, if it says that, that's a mistake— |
| 21 | A | Yeah. |
| 22 | Q | —you didn't say that? |
| 23 | A | Yeah, I didn't say that. |
| 24 | Q | Didn't you also say that Los Pratt was involved in the |
| 25 |   | shooting? |

```
 1   A   Yeah.

 2   Q   So now you've identified Melvin Johnson being involved in the

 3       shooting, Los Pratt being involved in the shooting, and,

 4       basically, the same story is that they were all mad at

 5       Milo for robbing them or breaking into their house; is that

 6       correct?

 7   A   No.  No.

 8   Q   No, it's not.

 9   A   Unh-unh.

10   Q   So that's a mistake?

11   A   Yeah.

12   Q   Now, looking at the police report, you said that there was a

13       second time in June that you talked to Detective Beauchamp?

14   A   Yes.

15   Q   According to the police report, the next time you were

16       interviewed—the second interview—you went in and met with

17       Detective Beauchamp on November 8ᵗʰ—

18   A   Yeah, I—

19   Q   —2011?

20   A   —speak to him on the phone a lot.

21   Q   Pardon?

22   A   I have to speak to him over the phone.

23   Q   So between May 10ᵗʰ—

24   A   Uhm-hmm.

25   Q   —and November 8ᵗʰ—
```

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | —you never gave any other statements; is that correct? |
| 3 | A | From May 10th to—Not in person, but over the phone I spoke to |
| 4 | | him a couple times. |
| 5 | Q | Did you ever tell Detective Beauchamp that Sam Steel, during |
| 6 | | that period of time— |
| 7 | A | Well— |
| 8 | Q | —did the shooting? |
| 9 | A | —in November, yeah. |
| 10 | Q | But, in the meantime, you had already identified |
| 11 | | Melvin Johnson— |
| 12 | A | Yeah. |
| 13 | Q | —and given a reason—gave— |
| 14 | A | Yeah. |
| 15 | Q | —a description of why Melvin did it— |
| 16 | A | Yeah. |
| 17 | Q | —but now you're saying you were just mad at Melvin so you set |
| 18 | | him up for a murder because you were mad at him? |
| 19 | A | Well, yeah, you might as well say that. |
| 20 | Q | And then you also set up Los Pratt for being involved in the |
| 21 | | murder, also; is that correct? |
| 22 | A | No, I mentioned his name— |
| 23 | Q | Right. |
| 24 | A | —but I didn't— |
| 25 | Q | So now you've just set up another individual; is that correct? |

467

```
 1   A     No.

 2   Q     You implicated him in a—in a shooting?

 3   A     Right.  Right.

 4   Q     In November, now you're saying that it was Sam Steel—

 5   A     Uhm-hmm.

 6   Q     —who ran south from where Mr. Conklin was shot—

 7   A     From the area, yeah.

 8   Q     —by his mother's house or by a house that he'd been at—

 9   A     Hmm.

10   Q     —earlier that evening—

11   A     Yeah.

12   Q     —is that correct?

13                    And that's where it gets a little—

14                    THE COURT:   Wait.  I—

15  BY MR. CHAMPION:

16   Q     —confusing.

17                    THE COURT:   —didn't hear the answer.

18                    Is that a yes?

19                    THE WITNESS:   Yes, ma'am.

20  BY MR. CHAMPION:

21   Q     That's where it gets a little confusing because, in your taped

22         statement, you stated that Sam wasn't around that evening

23         until after the shooting—

24   A     Right.

25   Q     —when, in fact, Sam had been there all evening across the
```

| | | |
|---|---|---|
| 1 | | street. |
| 2 | A | No, he wasn't. |
| 3 | Q | He'd been there? |
| 4 | A | No. |
| 5 | Q | Never. |
| 6 | A | He had been there for a while. |
| 7 | Q | He'd been there for a while. |
| 8 | A | Yeah. |
| 9 | Q | What time? |
| 10 | A | He was there at 1:00.  We was all drinking outside.  And, |
| 11 | | during that day, he had left a little bit, probably about |
| 12 | | 5:00, 6:00. |
| 13 | Q | He left about 5:00? |
| 14 | A | Yeah. |
| 15 | Q | Did he ever bring any beer across the street— |
| 16 | A | Yeah. |
| 17 | Q | —to— |
| 18 | A | Yeah. |
| 19 | Q | And did he give it to Milo? |
| 20 | A | Yeah. |
| 21 | Q | Did he give Milo any food? |
| 22 | A | I don't recall that, no. |
| 23 | Q | Who was with Milo, let's say, at 5:00 o'clock? |
| 24 | A | I was there, Chuck, his—the people that stayed across the |
| 25 | | street where Milo was. |

469

1  Q    Pardon?

2  A    The people that was across the street—that lived across the

3       street where Milo stayed—was at.

4  Q    Who was with Sam Steel across the street at his mother's

5       house?

6  A    Family members—Family members and a couple associates.

7              THE COURT:    A couple of?

8              THE WITNESS:    Associates.

9  BY MR. CHAMPION:

10 Q    Now you stated that Sam didn't come until after—come to the

11      scene till after the shooting.

12 A    Right.

13 Q    And you'd seen him earlier run through this cut that you're

14      describing or a shortcut—

15 A    Yeah.

16 Q    —and that he was wearing all dark clothing?

17 A    Yeah.

18 Q    What was he wearing when he showed up later?

19 A    He was wearing different color clothes—different clothes.

20 Q    What clothes?

21 A    A light shirt and dark pants.

22 Q    Now, when you spoke to Detective Beauchamp on May 10th, 2011,

23      you described that Melvin Johnson was wearing a dark-colored

24      hooded sweatshirt and dark pants; is that correct?

25 A    Yeah.  Basically, you just going over the same thing you just

                              470

```
 1        said to me.  You ain't going to catch me up.

 2   Q    And you said that you observed Melvin Johnson—

 3   A    Right.

 4   Q    —place the gun in his pants as he was running back; is that

 5        correct?

 6   A    Yeah.

 7   Q    What I'm trying to understand, then, is Sam Steel ran past you

 8        towards Florence.

 9   A    There wasn't nobody running.  I didn't say nothing about

10        running, man—

11   Q    He just—

12   A    —no.

13   Q    —walked by you?

14   A    Yeah, it was like a casual walk, that's all.  You probably

15        could walk that slow.

16   Q    He just slowly walked over to Florence Street; is that

17        correct?

18   A    Went towards right on the corner, man, right off the curb.

19   Q    Where was this white vehicle?

20   A    If you can blow the screen up a little bit more, I could see a

21        little bit better—

22             MR. CHAMPION:   Could you enlarge that a little bit,

23        please.

24             THE WITNESS:   —or let me use your spectacles.

25             THE COURT:   Okay.  Now hold on.  If you're going to
```

```
 1    say something—
 2                    THE WITNESS:   Yes, ma'am.
 3                    THE COURT:    Where did the microphone go?
 4                    THE WITNESS:   Yeah.  Yeah.
 5                    MR. CHAMPION:   It's right in front of you.
 6                    THE WITNESS:   Right here.
 7                    THE COURT:    Okay.  Use the microphone, sir.
 8                    THE WITNESS:   Right here in this area.
 9                    THE COURT:    You got to move it by your mouth.   I
10    think you said—
11                    THE WITNESS:   Right here.
12                    THE COURT:    —right here—
13                    THE WITNESS:   Yeah.
14                    THE COURT:    —in this area.
15                    THE WITNESS:   Yeah, right there, in this area right
16    here.
17  BY MR. CHAMPION:
18  Q    Which way was the vehicle traveling?
19  A    That way.
20  Q    Going towards the west?
21  A    Going towards Cobb Street.
22  Q    And who was in the vehicle?
23  A    I only seen two people.
24  Q    You saw two people—
25  A    Yeah.
```

```
1   Q   —in the vehicle?

2   A   I seen the driver and the person that jumped in the back seat.

3   Q   And somebody jump in the back seat?

4   A   Yeah.

5   Q   Was that Sam Steel got in the back seat?

6   A   Yes, sir.

7   Q   So it was just the driver and somebody in the back seat?

8   A   There was somebody else on the passenger side.  I didn't see

9       who they was, though.

10  Q   So you turned around, you watched Sam casually walk to

11      Florence Street; is that correct?

12  A   I'm still—I was walking like this.  I was—I was walking

13      like—like that.

14  Q   This is after you've seen Milo fall to the ground—

15  A   You could see—When you're going—Excuse me.  When you're

16      walking, you can—you could see everything in front of you, you

17      could—from that—from that little driveway, or you could turn

18      around and see everything behind you.

19  Q   You could see everything behind you and everything in front of

20      you?

21  A   Yeah.

22  Q   You didn't run to Milo's aid?

23  A   No, I didn't run nowhere.

24  Q   Did you identify yourself to any of the police officers at the

25      time?
```

```
1   A    A lot of officers was asking who was there; and I said my
2        name, yeah.
3   Q    You said your name?
4   A    Yes.
5   Q    In fact, you told them that you would speak to them on
6        April 24th but never showed up—
7   A    Right.
8   Q    —is that correct?
9   A    Yeah.
10              MR. CHAMPION:   Can I have just a moment,
11       your Honor?
12              THE COURT:   Yes.
13              (At 4:10 p.m., off record discussion between
14              Mr. Champion and defendant)
15  BY MR. CHAMPION:
16  Q    Could you see who the driver of the vehicle was?
17  A    Yeah.
18  Q    Who was it?
19  A    I could—I could tell by the glasses it was A. J.
20  Q    But you couldn't tell who the passenger was—
21  A    Yeah.
22  Q    —is that correct?
23  A    Right.
24              MR. CHAMPION:   Thank you.
25              THE COURT:   Go ahead.
```

474

BY MR. CUSICK:

Q    Just picking up on the last question—

A    Uhm-hmm.

Q    —that Mr. Champion asked—

A    Yes.

Q    —you indicated you could tell by the glasses.

A    Yeah.

Q    Did A. J. Mathews have distinct glasses on that you recall?

A    Yeah, he always got the same kind of glasses on.

Q    Okay.  And that's why—how you recognized A. J. Mathews?

A    Yeah.

Q    You indicated—

A    And the truck.  And his white truck, yeah.

Q    And it was his white truck?

A    Yeah.

Q    Had you seen that truck before?

A    Many times.

Q    Okay.  You just couldn't see—get a glimpse of—

A    Right.

Q    You didn't recognize who the individual in the passenger seat was?

A    Exactly.

Q    Now you—I don't want—I'm not going to go into exactly where you went, but you did leave the state, correct?

```
 1   A    Yeah.

 2   Q    And you left the state—

 3   A    Yes.

 4   Q    —more than once since—

 5   A    Yes.

 6   Q    —April of 2011, correct?

 7   A    Yes.

 8   Q    And you're not living in the Kalamazoo area right now, are

 9        you?

10   A    No.

11   Q    Why did you leave the—the state?

12   A    I had too many threats on my life, you know, and it was—It got

13        to the point where I wasn't going to get stressed out and

14        continue to be out here and wondering if somebody was going to

15        do something to me, you know.  And I had reliable sources

16        that—People was coming to tell me that somebody was looking

17        for me because of this situation right here.  So I wasn't

18        going to sit here and let something happen to me.

19   Q    Okay.  So you left because you were scared?

20   A    Yeah.

21   Q    So you did concoct a story—

22   A    Yes, I did.

23   Q    —regarding Melvin Johnson—

24   A    Right.

25   Q    —and you told Detective Beauchamp what you said was just not
```

| | | |
|---|---|---|
| 1 | | true and you lied? |
| 2 | A | Yes, I did. |
| 3 | Q | And you indicated you had a discussion—You don't have to tell |
| 4 | | me what your mom said, but you had a discussion with your |
| 5 | | mother? |
| 6 | A | Yes, I did. |
| 7 | Q | As a result of that, what effect did that have on you? |
| 8 | A | It made me think twice about what the hell I was doing, you |
| 9 | | know, made me come forward and tell the truth. |
| 10 | Q | And did you pass the defendant when he was—after the shooting? |
| 11 | A | Yeah, he was—He was probably like from where I'm at to maybe a |
| 12 | | couple feet behind the guy right here. |
| 13 | Q | So approximately— |
| 14 | A | Probably about 30 feet away from me, something like that. |
| 15 | Q | Was there any other—And where did you—Where did you see him |
| 16 | | specifically?  Where were you standing when—when you saw him? |
| 17 | A | I was exactly—I was getting ready—I was right—This is a little |
| 18 | | fence back there.  I was right there. |
| 19 | Q | Okay.  On the side of the house across— |
| 20 | A | Yeah. |
| 21 | Q | —the street? |
| 22 | A | Yeah. |
| 23 | Q | And was he behind you? |
| 24 | A | Not like behind me.  It was like—like in passing. |
| 25 | Q | Okay.  And you could also see across the street from there— |

477

| | |
|---|---|
| 1 | A     Yeah.  Yeah.  Yeah, you can— |
| 2 | Q     —at 626— |
| 3 | A     —stand on— |
| 4 | Q     —Mabel? |
| 5 | A     You can stand on Florence and see across the street, yeah. |
| 6 | Q     You can see through—through—past those houses? |
| 7 | A     Yes. |
| 8 | Q     Were there any other distinguishing characteristics about the |
| 9 | defendant that made you know that it was the defendant? |
| 10 | A     Way a person walk, you know.  If you been around somebody long |
| 11 | enough, you'll know it, so— |
| 12 | Q     And he wasn't running, he was walking? |
| 13 | A     Yeah. |
| 14 | MR. CUSICK:  I have nothing further. |
| 15 | Thank you, your Honor. |
| 16 | THE COURT:  Mr. Champion? |
| 17 | MR. CHAMPION:  Yes, your Honor, I have a few more |
| 18 | questions. |
| 19 | RECROSS-EXAMINATION |
| 20 | BY MR. CHAMPION: |
| 21 | Q     So, as I understand it, you left the state because you were |
| 22 | afraid because of threats; is that correct? |
| 23 | A     Yeah. |
| 24 | Q     Was that before May 10th, 2011? |
| 25 | A     No. |

| | | |
|---|---|---|
| 1 | Q | So, on May 10th, 2011— |
| 2 | | Do you know a person by the name of Johnny P? |
| 3 | A | Yeah, I know him. |
| 4 | Q | You told Detective Beauchamp that Johnny P had been committing |
| 5 | | a series of robberies and burglaries; is that right? |
| 6 | A | Yeah— |
| 7 | Q | You also— |
| 8 | A | —or something like— |
| 9 | Q | —implicated Tank Bloodworth or Tim Bloodworth— |
| 10 | A | Uhm-hmm. |
| 11 | Q | —in a series of burglaries— |
| 12 | A | Right. |
| 13 | Q | —is that correct? |
| 14 | A | Right. |
| 15 | Q | You said Milo Conklin was involved in a series; is that |
| 16 | | correct? |
| 17 | A | I said—I didn't say that.  I didn't say that. |
| 18 | | MR. CUSICK:  Your Honor, I'd just have to ask what |
| 19 | | the relevance of this is— |
| 20 | | THE WITNESS:  No, I— |
| 21 | | MR. CUSICK:  —what he said— |
| 22 | | THE COURT:  Wait.  Hold on a second. |
| 23 | | THE WITNESS:  Yes, ma'am. |
| 24 | | MR. CUSICK:  What he may have told |
| 25 | | Detective Beauchamp about other crimes that may have occurred |

479

```
 1        is not really relevant as to this crime—

 2                    THE COURT:   Overruled.

 3                    MR. CUSICK:   —or this case.

 4                    THE COURT:   Go ahead, Mr. Champion.

 5   BY MR. CHAMPION:

 6   Q    Additionally, you said Carlos Pratt or Los Pratt, as he's

 7        known—

 8   A    Uhm-hmm.

 9   Q    —was also involved in these robberies; is that correct?

10   A    No, you making up something in your head right now.  I didn't

11        say that.

12   Q    You didn't say that at all?

13   A    I didn't say—I said Carlos had got robbed.  I didn't say he

14        was involved in it.

15                    THE COURT:   I missed it.  You said Carlos was

16        hanging out with who?

17                    THE WITNESS:   No, he had got robbed.

18                    THE COURT:   Oh, he got robbed.

19                    THE WITNESS:   Somebody went in his house while he

20        was there.

21   BY MR. CHAMPION:

22   Q    Who was there?

23   A    While Carlos was there.

24   Q    Who was there when you say—

25   A    I said somebody had came into Carlos's house while he was

                              480
```

```
 1        there and they tried to hurt him—
 2   Q    And they tried—
 3   A    —and rob him.
 4   Q    —to hurt him.
 5   A    Hurt him and rob him, yeah.
 6   Q    In fact, you gave names of who the individuals were?
 7   A    No, I didn't give names.  I just said—Yeah, I did.  I said
 8        Johnny P and Tank.
 9   Q    In fact, you said Melvin Johnson was extremely angry about
10        Los Pratt about—
11   A    Yeah.
12   Q    —getting robbed; is that correct?
13   A    Yeah, he was, yeah.
14   Q    And that's when you told Detective Beauchamp that
15        Melvin Johnson told you—
16   A    Hmm.
17   Q    —that he was going to get Milo; is that correct?
18   A    It was—It was more than just him that said they was going to
19        try to get him because of what they assumed.
20   Q    So you—you identify a lot of people committing some very
21        serious crimes—
22   A    And most of them are locked up right now for it.
23   Q    You identify some very serious individuals, but you never
24        identified Sam Steel; is that right?
25   A    Not—No, not then, no.
```

```
1              MR. CHAMPION:   Thank you.

2                        REREDIRECT EXAMINATION

3  BY MR. CUSICK:

4  Q    Why didn't you identify Sam Steel?

5  A    I was scared.

6              MR. CUSICK:   Nothing further.

7              THE COURT:   Anything else, Mr. Champion?

8              MR. CHAMPION:   I have no other questions,

9     your Honor.

10             THE COURT:   Ladies and gentlemen, do any of you

11    have any questions for this witness?

12             It looks like we do have some questions.

13             So, Mr. Cusick, if you would take the questions

14    first.

15             Just make sure they're written out on a clean piece

16    of paper.

17             I'll have you gather those first and Mr. Champion

18    can gather them the next time.

19             Mr. Champion.

20             (At 4:18 p.m., bench conference as follows:

21                THE COURT:   It says, if Mr. Brown was behind

22                the house across the street, . . . (inaudible) so—

23                MR. CHAMPION:   If you look at the house, it's

24                . . . (inaudible), they're saying how could you see

25                with the house in the way.

                              482
```

1    MR. CUSICK:   Yeah, how could—how could he see

2    the shooting.

3         THE COURT:   That's okay?  . . . (inaudible)

4         MR. CUSICK:   This is fine.  No objection to

5    this.

6         MR. CHAMPION:   I have no objection to that

7    either.

8         THE COURT:   Okay.  The next witness, my

9    understanding is . . . (inaudible) from

10   Van Buren County?

11        MR. CUSICK:   Yeah.

12        THE COURT:   Okay.  So he's going to come in in

13   cuffs.  That's what they're telling me

14   . . . (inaudible)

15        MR. CUSICK:   Okay.  He's going to be a while.

16   Do you want to just—He'll probably be here—It might

17   go into tomorrow morning as well.  He's one—He's one

18   of the main witnesses, Walter Johnson.

19        MR. CHAMPION:   I'd rather do him tomorrow

20   . . . (inaudible)

21        THE COURT:   Okay.  So do you want me to tell

22   them to bring Mr. Johnson back—

23        MR. CUSICK:   If that's—

24        THE COURT:   — . . . (inaudible)

25        MR. CUSICK:   —okay with you if we can adjourn

1    after Mr. Brown.  I just—If that's okay with you,
2    your Honor.
3         THE COURT:   How many other witnesses do we
4    have then?
5         MR. CUSICK:   Today?
6         THE COURT:   Yeah.
7         MR. CUSICK:   We were going to have
8    Mr. Johnson, but none—none today.  Like I said, we
9    could have Walter Johnson, but—
10        THE COURT:   Are we going to—
11        MR. CUSICK:   —his testimony's going to be
12   quite long because he's . . . (inaudible) witnesses.
13        THE COURT:   Can we get started with him today?
14        MR. CUSICK:   Yes, if that's okay with you,
15   your Honor.
16        THE COURT:   . . . (inaudible)
17        MR. CHAMPION:   I'd rather just do it all at
18   one, personally.
19        THE COURT:   I'd rather—We've got half an hour,
20   at least, that we could go with him.  I'm assuming
21   . . . (inaudible)
22        MR. CHAMPION:   It's up to you.
23        MR. CUSICK:   That's fine.
24        THE COURT:   You don't have any other short
25   ones out there?

484

```
 1                    MR. CUSICK:    Yeah.

 2                    THE COURT:    I'll see where we're at.

 3                    MR. CUSICK:    Okay.

 4                    MR. CHAMPION:    Okay.)

 5               THE COURT:    Okay.  Question is did you hang out

 6      with Sam Steel after Milo was shot?

 7                    THE WITNESS:    Yeah.

 8                    THE COURT:    Next question—

 9               And we might need exhibit three back up, but let me

10      ask you the question.

11               If you were behind the house and across Mabel Street

12      so about an odd—how did you see the shooting or see Milo fall?

13                    THE WITNESS:    Actually, if you—Like I was saying

14      earlier, you could stand on Florence Street and basically you

15      can see everything, you know, if you was standing on

16      Florence Street; and I was a little closer than that.

17                    THE COURT:    Okay.  So any follow-up questions based

18      on those questions, first of all, Mr. Cusick?

19                    MR. CUSICK:    No, your Honor.

20                    THE COURT:    Mr. Champion?

21                    MR. CHAMPION:    Not based on those.  I do have

22      another question, if I may.

23                    THE COURT:    I'll allow it.  Go ahead.

24

25
```

RERECROSS-EXAMINATION

BY MR. CHAMPION:

Q    Mr. Brown, for your testimony today, have you been promised

     anything by the prosecution or—

A    No.

Q    —Detective Beauchamp?

A    No, not at all.

Q    Threatened in any way?

A    No.

Q    How many times have you talked to Detective Beauchamp over the

     last two years?

A    Probably like three or four times.

Q    Just three or four times total?

A    Yeah.  Yeah.

             MR. CHAMPION:   Thank you.

             MR. CUSICK:   I have nothing further.

             THE COURT:   Okay.  Any other questions for this

     witness, then, ladies and gentlemen?

             No other questions.

             All right.  Thank you, sir.  You may step down.

             Is he excused from his subpoena, then, Counsel?

             MR. CUSICK:   Yes, your Honor.

             MR. CHAMPION:   Yes, your Honor.

             THE COURT:   You can step down, sir.

             All right.  Counsel, will you approach.

(At 4:22 p.m., bench conference as follows:

              THE COURT:  Okay.  Yeah, we've got 40 minutes
     here.  I don't want to waste it given where we're
     at, so why don't we just go until about ten to?

              MR. CUSICK:  I'll probably be able to finish
     my direct.

              THE COURT:  I'm sorry?

              MR. CUSICK:  I'll probably be able to finish
     my direct.

              THE COURT:  Okay.  So we'll go from there.

              MR. CHAMPION:  . . . (inaudible)

              Then I would ask for a break.

              THE COURT:  Oh, yeah, I'm not going to go
     after 5:00, so that's fine, obviously.

              MR. CHAMPION:  If he rests, I'm going to ask
     for whatever time—

              MR. CUSICK:  It will be finished then—

              MR. CHAMPION:  Okay.

              MR. CUSICK:  —for the day, right?

              THE COURT:  Wait a minute.  Hold on a second.

              You're going to be done with your case, then,
     after that?

              MR. CUSICK:  No.

              THE COURT:  Oh, okay.

              MR. CUSICK:  I think he meant rest as in—

1                    THE COURT:   Yeah.

2                    MR. CUSICK:   —rest for the day.

3                    THE COURT:   No, we'll just—We'll go until

4        about ten to, quarter to, ten to—

5                    MR. CUSICK:   Okay.

6                    THE COURT:   —and then we'll take a break.

7                    MR. CUSICK:   Okay.

8                    THE COURT:   If he's done, fine; if he's not,

9        we'll bring him back, obviously, tomorrow.  Okay.)

10               THE COURT:   All right.  Next witness?

11               MR. CUSICK:   Yes, your Honor.  The People would

12  call Walter Johnson.

13               THE COURT:   Ladies and gentlemen, while we're

14  waiting, if you want to stand and stretch.  We're still on the

15  record, so you need to be quiet.

16        I will indicate that—My understanding is this

17  witness will likely go over into tomorrow, but we'll break at

18  about quarter to or ten to.

19        Before you have a seat, sir, please raise your right

20  hand as best you can.  Do you solemnly swear or affirm that

21  the testimony you're about to give will be the truth, the

22  whole truth, and nothing but the truth, so help you God?

23               MR. JOHNSON:   Yes, I do.

24               THE COURT:   Okay.  Please have a seat.  Go ahead

25  and have a seat.

```
 1              We're going to need some help here.  I think he just
 2       knocked off the microphone here.  The top part of the
 3       microphone just was knocked off.
 4              Now—
 5              I think it fell down there.
 6              And just stay there . . . (inaudible) make sure that
 7       is lined up right with his—right in line with his mouth.
 8              Sir, you're going to need to speak—Scoot up a little
 9       bit.  You're going to need to speak right in the end of that
10       microphone.  It's really hard to hear here, so you're going to
11       have to get up close.  Don't pull back too far or we won't be
12       able to hear you.
13              I need you to state and spell your first and last
14       name for the record, please.
15              THE WITNESS:   Walter Johnson—W-a-l-t-e-r
16       J-o-h-n-s-o-n.
17              THE COURT:   All right.  Go ahead.
18              MR. CUSICK:   Thank you, your Honor.
19                         WALTER JOHNSON,
20       called at 4:24 p.m., and sworn by the Court, testified:
21                      DIRECT EXAMINATION
22  BY MR. CUSICK:
23  Q    Good afternoon.
24  A    How you doing?
25  Q    Mr. Johnson, do you know a Samuel Steel?
```

```
 1   A     Yes.

 2   Q     Do you see him in court today?

 3   A     Yes.

 4   Q     Can you point to him and describe what he's wearing.

 5   A     White shirt.

 6                 MR. CUSICK:   Let the record reflect, your Honor,

 7         the witness has identified the defendant Samuel Steel.

 8                 THE COURT:   That's noted.

 9   BY MR. CUSICK:

10   Q     How long have you known Samuel Steel?

11   A     About 30, 40 years.

12   Q     So you grew up with him?

13   A     Yeah.

14   Q     Do you know a individual by the name of Steven Brown?

15   A     No, not that I can recall.

16   Q     Do you know an individual by the name of A. J. Mathews?

17   A     Yes.

18                 THE COURT:   You're going to have to get a little

19         bit closer and speak up a little bit more, sir.

20                 Thank you.

21   BY MR. CUSICK:

22   Q     Do you know an individual by the name of Devon Smith?

23   A     Yes.

24   Q     I want to direct your attention to the date of April 24th of

25         2011.  Do you remember that day, sir?
```

```
 1   A      Yes.

 2   Q      Okay.  And do you know an individual by the name of Khaki?

 3   A      Yes.

 4   Q      Okay.  Do you know the real name of that individual by the

 5          name of Khaki?

 6   A      No.

 7   Q      Okay.

 8                   THE COURT:   I'm sorry.  Are you saying Khaki?

 9                   MR. CUSICK:   Khaki.

10                   THE COURT:   Go ahead.

11   BY MR. CUSICK:

12   Q      Did you have occasion to be in contact with the defendant

13          Samuel Steel on April 24th of 2011?

14   A      Yes.

15   Q      Okay.  And where did you first have contact with the

16          defendant?

17   A      I think my cousin's house.

18   Q      Okay.  And where is that?

19   A      On William Street.

20   Q      Is that in the city of Kalamazoo?

21   A      Yes.

22   Q      And who were you with at the time you first saw the defendant?

23          Was anybody with you at the time, or was it just you and the

24          defendant or somebody else there?

25   A      Harry.
```

491

```
 1   Q   Harry?

 2   A   Yeah.

 3   Q   Is that Harry Mathews?

 4   A   Yeah.

 5   Q   Okay.  And what time did you have contact with them on that

 6       day?

 7   A   I don't know.  I can't recall that.

 8   Q   Was it in the morning, afternoon, night?

 9   A   Afternoon.

10   Q   Okay.  What happened after they came to William Street?  Did

11       they both come to William Street, Harry Mathews and Sam Steel?

12   A   Yes.

13   Q   Together?

14   A   Yes.

15   Q   What happened then?

16   A   Went to the store.

17   Q   I'm sorry, sir.  Can you say that—

18   A   Went around—We got—We rode around.

19   Q   Okay.

20   A   Yeah.

21   Q   When you say rode around, you just drove around?

22   A   Yeah.

23   Q   Who was driving?

24   A   Harry.

25   Q   Okay.  Where were you?
```

492

```
 1  A    Passenger.

 2  Q    Okay.  Where was the defendant?

 3  A    He was a passenger, also.

 4  Q    Okay.  Were you—But in—What kind of car were you riding in?

 5  A    We was in a truck.

 6  Q    Okay.  And were you sitting in the front seat or the back seat

 7       of the truck, or do you—

 8  A    I don't recall.

 9  Q    You don't recall?

10  A    Yeah.

11  Q    Okay.  A. J. Mathews was for sure driving?  Is—

12  A    Yes.

13  Q    —A. J. Mathews also known as Harry Mathews?

14  A    Yes.

15  Q    Okay.  And he was driving the whole time?

16  A    Yes.

17  Q    Okay.  Where—You were riding around.  How long were you, the

18       defendant, and Harry Mathews riding around?

19  A    I'm not sure.  We—We probably went around the corner.

20  Q    Okay.  For more than an hour, less than an hour?

21  A    Less than an hour.

22  Q    Okay.  Where did you stop the first time?

23  A    I think we went to a store.

24  Q    Okay.  Do you remember what store that was?

25  A    Probably Daysha's.
```

```
 1   Q   Okay.  And what is Daysha's?

 2   A   A store.

 3   Q   Okay.  What kind of a store?

 4   A   I guess a liquor store, whatever.

 5   Q   Okay.  And how long were you at the store?

 6   A   Five, ten minutes, I don't know.

 7   Q   What happened after that?

 8   A   We probably went to Mabel Street.

 9   Q   And when you were at Mabel Street, what happened?

10   A   Nothing, just sat around.

11   Q   Okay.  Where were you on Mabel Street?

12   A   I mean, I don't know the address.

13   Q   Okay.  But do you know if you were in somebody's house or were

14       you outside or—

15   A   Yeah, we was in front of one of Sam's house.

16   Q   It was Sam's house?

17   A   Yeah.

18   Q   Okay.  And, when you say we, was Harry Mathews still there?

19   A   Yes.

20   Q   Okay.  Who else was there that you recognized the names of the

21       people?

22   A   It was people I don't know their names.

23   Q   Okay.  Were there a lot of people outside that day?

24   A   Yeah.

25               THE COURT:   I missed it.
```

494

```
 1                  Yes or no?

 2                  THE WITNESS:   No.  As far as what?

 3                  THE COURT:   Did you say yes or no?  Were there a

 4         lot of people outside that day?

 5                  THE WITNESS:   Yes.

 6                  THE COURT:   Thank you.

 7                  I just didn't hear your answer.

 8                  Go ahead.

 9    BY MR. CUSICK:

10    Q    And, sir, how long were you, Harry Mathews, and the defendant

11         at—on Mabel Street when you were there the first time?

12    A    I'm not sure.  I didn't keep track of time.

13    Q    Okay.  I understand.  It was a long time ago.  But just—

14    A    Yeah.

15    Q    If you can't remember, that's—that's fine.

16    A    Yeah, I don't exactly know how long it was.

17    Q    Okay.  Was it more than an hour possibly?

18    A    Around that time, probably.

19    Q    Okay.  After you went to Mabel Street, where did you go after

20         that?

21    A    We may have went back to the store—

22    Q    Okay.

23    A    —maybe.

24    Q    Did you—Did the defendant say anything to you at that time?

25    A    As far as?  I mean—After the store?
```

| 1 | Q | Yeah. |
| 2 | A | Oh, yeah, we was headed back towards my cousin's house. |
| 3 | Q | Okay.  And where does your cousin live? |
| 4 | A | On William Street. |
| 5 | Q | Okay.  Did the defendant say anything to you about—Well, do |
| 6 |   | you know Milo Conklin— |
| 7 | A | Yes. |
| 8 | Q | —or did you know Milo Conklin? |
| 9 | A | Yes. |
| 10 | Q | How long had you known Milo Conklin? |
| 11 | A | Not really that long. |
| 12 | Q | Okay.  Did the defendant say anything regarding Milo Conklin? |
| 13 | A | That he suspected he broke in his house, yeah. |
| 14 | Q | Okay.  Did the defendant earlier that day, on April 24th, 2011— |
| 15 |   | Was Milo Conklin outside, if you recall? |
| 16 | A | Yes. |
| 17 | Q | Did the defendant say anything to Milo Conklin at that time? |
| 18 | A | Indirectly. |
| 19 | Q | Okay.  What did he—Well, can you tell the jury what that—that |
| 20 |   | means. |
| 21 |   | Did he say—Did he say anything to you about |
| 22 |   | Milo Conklin? |
| 23 | A | Previously, yes. |
| 24 | Q | Okay.  And what did he say previously about Milo Conklin? |
| 25 | A | That he suspected he broke in his house. |

496

1  Q  Anything else that you recall?

2  A  No.

3  Q  Okay.  When you say indirectly that he—When I asked you, did

4     he say something to Milo Conklin, what do you mean by

5     indirectly?

6  A  He used a little profanity, but it wasn't—It was towards him,

7     but he didn't respond to it, so—

8  Q  Milo Conklin didn't respond?

9  A  Right.

10 Q  Do you recall exactly what Sam Steel said?

11 A  Not exactly.

12 Q  Okay.  What happened when you guys—You indicated that you went

13    to William Street after you were on Mabel Street back to

14    William Street.

15 A  After the store, yeah.

16 Q  You were—And that's where your cousin lives?

17 A  Yes.

18 Q  Why did you go back to William Street?

19 A  No particular reason.

20 Q  Okay.  Did the defendant ask you for something at that time?

21 A  Yes, he asked to see my gun.

22 Q  Okay.  What kind of gun was it?

23 A  A .40 caliber.

24 Q  Okay.  Had you previously given him guns before—let him borrow

25    guns before of yours?

497

```
 1   A   No.

 2   Q   Okay.  Now did you give him the gun?

 3   A   Yes.

 4   Q   Okay.  Where was the gun?

 5   A   It was behind my cousin's house.

 6   Q   Okay.  And where behind your cousin's house.

 7   A   I had it hid in some grass.

 8   Q   And was that a normal place that you hid the gun?

 9   A   Yes.

10   Q   And what happened after you gave the gun to Samuel Steel?

11   A   We dropped him off on Elizabeth and Cobb around the corner.

12   Q   Okay.  When you say we, this is you and Harry Mathews?

13   A   Correct.

14   Q   Who was driving?

15   A   Harry.

16   Q   Harry Mathews, I think you said, was driving the whole

17       time—Right?

18   A   Correct.

19   Q   —just so we're clear?  Okay.

20             Do you remember where you were at that time, whether

21       or not you were in the front seat or back seat?

22   A   I think I was in the front passenger.

23   Q   Okay.  What happened when you dropped the defendant off at

24       Elizabeth and Cobb?

25   A   We then went to—Me and Harry went to Woodbury and sat in the
```

498

```
 1         driveway.
 2    Q    Okay.  What's at Woodbury?
 3    A    My father's residence.
 4    Q    Okay.  And did you know what the defendant had planned to do
 5         at that point?
 6    A    Yes.
 7    Q    What—What did you believe the defendant wanted to do?
 8    A    I believe he wanted to scare Milo.
 9    Q    And why did you think that he wanted to scare Milo?
10    A    Probably for breaking in his house.
11    Q    Did he—What happened when you were sitting—
12              And it was on Woodbury, your father's address,
13         correct?
14    A    Correct.
15    Q    And you were parked on Woodbury?
16    A    (No audible response)
17    Q    What happened then?
18              THE COURT:   I missed it.  Was that a yes?
19              THE WITNESS:   Yes.
20              THE COURT:   Okay.  Go ahead.
21    BY MR. CUSICK:
22    Q    When you were parked on Woodbury, what happened then?
23    A    I heard gunshots.
24    Q    How many gunshots did you hear?
25    A    Five or six.
```

499

```
 1   Q    What happened then?

 2   A    We picked Sam up.

 3   Q    Okay.  You and Harry picked Sam up?

 4   A    Correct.

 5   Q    And where did you pick him up?

 6   A    Right on Woodbury and Florence.

 7   Q    Okay.  And what happened then?

 8   A    He threw the gun out the window.

 9   Q    Okay.  The defendant threw the gun out the window?

10   A    Correct.

11   Q    Where did the defendant throw the gun out the window?

12   A    I think it was Simpson—the next street over—Simpson and

13        Florence.

14               MR. CUSICK:   Can we have exhibit number three.

15   BY MR. CUSICK:

16   Q    Mr. Johnson, can you see—can you see that map?  Can you read

17        that map at all?  I don't know if we can magnify it at all.

18   A    Yes, I can see it.

19   Q    You can see it?

20               THE COURT:   I didn't hear what he just said.

21               MR. CUSICK:   Yes.

22               THE WITNESS:   Yes.

23               THE COURT:   Okay.

24

25
```

BY MR. CUSICK:

Q    You indicated that you dropped him off on Elizabeth and Cobb?

A    Yes.

        MR. CUSICK:    Okay.    Can we have that portion.

BY MR. CUSICK:

Q    Where—Where would Cobb be?

A    Right there.

Q    Is it the street on the left—

A    Yes, the left.

Q    —going north and south?

A    Correct.

Q    Okay.    And where would Woodbury Street be?

A    At the bottom.

Q    Okay.    And you indicated that you drove—Did you drive up
     Woodbury after you heard the shots?

A    Yes, back to the corner of Florence and Woodbury.

Q    Okay.    And then where did you drive after that?

A    After that?

Q    Yeah.

A    Back to Douglas.

Q    Okay.    So did you go west on—or—or—

A    Yeah, west.

Q    What did the defendant say to you when he got back in the car?

A    He just said that—did we hear that and that we didn't think
     he'd do it.

| | | |
|---|---|---|
| 1 | Q | What do you say to him? |
| 2 | A | I didn't say anything. |
| 3 | Q | What was your feelings at that time? |
| 4 | A | I was shocked. |
| 5 | Q | You didn't think that he would—he would do that? |
| 6 | A | No. |
| 7 | Q | What happened when he got back to Douglas? |
| 8 | A | He went in his house and changed clothes. |
| 9 | Q | Okay. And—I'm sorry.—you said that he threw the gun out |
| 10 | | someplace? |
| 11 | A | Yes. |
| 12 | Q | And, once again, I apologize if you already—Where did he throw |
| 13 | | the gun out? |
| 14 | A | On Simpson and Florence, the next street over. |
| 15 | Q | Okay. The next street over? |
| 16 | A | Yeah. |
| 17 | Q | Is it very close to the scene? |
| 18 | A | Right. |
| 19 | Q | After Douglas—How far away is Douglas? How far away was the |
| 20 | | drive from, say, Florence and Simpson or Florence and Cobb |
| 21 | | there to Douglas—his house? |
| 22 | A | Maybe five minutes. |
| 23 | Q | Okay. How long was he in the house? |
| 24 | | Did you go in the house with him— |
| 25 | A | No. |

1   Q   —if you recall?

2   A   No.

3   Q   Did A. J. Mathews go in the house with him?

4   A   No.

5   Q   When he came back out, what happened?  Or did he come back

6       out, I should say.

7   A   Yes, he came back out.

8   Q   What happened then?

9   A   He put his clothes in a bag and passed it back, and we went to

10      my house.

11   Q   Do you recall what he was wearing at the time after he changed

12      clothes?

13   A   No.

14   Q   You went to your house after that?

15   A   Correct.

16   Q   Where was your house?

17   A   On Stockbridge.

18   Q   How far away from Douglas where the—where you—the defendant

19      was—changed his clothes to Stockbridge, how far away is the

20      drive?

21   A   To my house?

22   Q   Yeah.

23   A   Maybe ten minutes.

24   Q   Okay.  And what happened when you were at Stockbridge?

25   A   We burnt the clothes up in my garage.

```
 1  Q   Do you have a attached garage or a detached garage?

 2  A   Detached.

 3  Q   What happened after—How long were you at your house at

 4      Stockbridge?

 5  A   Maybe a half hour.

 6  Q   Did the defendant say anything, do you recall, there?

 7  A   Not that I can recall.

 8  Q   Did the defendant say anything from the time that he got—other

 9      than what you already testified to—when he first got in the

10      car?

11  A   . . . (unintelligible)

12  Q   Did he say anything from the time that he got in the car from

13      the Florence and Woodbury area to the time that he was at your

14      house at Stockbridge?  Did he say anything else that you

15      recall?

16  A   No, not that I recall.

17  Q   Did you say anything to him?

18  A   No, I don't think so.

19  Q   Okay.  Did you say anything to Harry Mathews that you recall

20      between that time?

21  A   No.

22  Q   Whose idea was it to go to Stockbridge?

23  A   Sam's.

24  Q   Okay.  Were you scared at the time?

25  A   Just shocked, yeah.
```

504

```
 1  Q   When he got into the car on Woodbury and Florence—

 2  A   Correct.

 3  Q   —where did he get in?  Did he get into the back—

 4  A   In the back.

 5  Q   Okay.  He got in the back?

 6  A   Right.

 7  Q   You indicated it was a .40-caliber gun that you—

 8  A   Correct.

 9  Q   —gave Sam Steel, correct?

10  A   Correct, yeah.

11  Q   Where did you get that gun?

12  A   From some customers of mine.

13  Q   Okay.  And who are they?

14  A   Mark and Paige.

15  Q   And do you know approximately when you got that gun?

16  A   Not exactly.

17  Q   Have you been promised anything for your testimony by the

18      prosecution in this case?

19  A   No.

20  Q   You've been charged in federal prison [*sic*], correct?

21  A   Yes.

22  Q   And you agreed to give testimony—to give information on any

23      criminal activity; is that correct?

24  A   Yes.

25  Q   And when did you, if you recall, come forward with the
```

```
 1        information that you had about this case?
 2    A   I'm not sure exactly.
 3    Q   Do you remember having an interview with Brian Beauchamp on
 4        November—I'm sorry.—November 2nd of 2011?
 5    A   Yes.
 6    Q   Did you ask—Did you tell anybody that you had information
 7        about a homicide?
 8    A   No.
 9    Q   I'm sorry.  When you came for—Did you try to con—How did you
10        come forward and tell inves—
11    A   My lawyer.
12    Q   Okay.  You told your lawyer?
13    A   Yeah.
14    Q   Okay.  Was that approximately sometime in 2011 then?
15    A   Yes.
16    Q   And then, through your lawyer, you had contact with
17        Detective Brian Beauchamp?
18    A   Correct.
19    Q   Do you recall having an interview with Detective Beauchamp on
20        November 2nd, 2011?
21    A   Approximately that time.
22    Q   Okay.  And had you told anybody previous to—other than your
23        lawyer—previous to Detective Beauchamp what happened on—
24    A   No.
25    Q   —April 24th of 2011?
```

```
1   A   No.

2   Q   And why didn't you tell anybody?

3   A   I was just being quiet about it.

4   Q   Do you have an agreement with the federal

5       government—government to tell the truth?

6   A   Yes.

7   Q   How about any knowledge that you might have about any criminal

8       activity that you might be aware of?

9   A   Yes.

10  Q   Okay.  And you pled guilty to distribution of heroin, correct?

11  A   Correct.

12  Q   Distribution of heroin resulting in death, correct?

13  A   Correct.

14  Q   And how long are you serving for that at this point?

15  A   How long?

16  Q   Yeah.

17  A   Two and a half.

18  Q   And with regards to this case—this homicide case—and with

19      regards to the attorney general's office, has the

20      attorney general's office promised you anything in relation to

21      your testimony?

22  A   No.

23  Q   Did the Kalamazoo prosecutor's office ever promise you

24      anything—

25  A   No.
```

507

| | | |
|---|---|---|
| 1 | Q | —regarding your testimony? |
| 2 | A | No. |
| 3 | Q | Have you ever promised—gotten anything promised—Have you ever |
| 4 | | been promised anything for your truthful testimony in this |
| 5 | | case— |
| 6 | A | No. |
| 7 | Q | —specifically? |
| 8 | A | No. |
| 9 | | MR. CUSICK:   May I have a second, your Honor? |
| 10 | | (At 4:47 p.m., off record discussion between |
| 11 | | Mr. Cusick and Detective Beauchamp) |
| 12 | BY MR. CUSICK: | |
| 13 | Q | I asked—You indicated two and a half years? |
| 14 | A | Correct. |
| 15 | Q | Is that how long you've been locked up— |
| 16 | A | Yes. |
| 17 | Q | —in prison? |
| 18 | A | Yes. |
| 19 | Q | How long are you going to serve—How long is the sentence, |
| 20 | | though, from when—the time you pled guilty, how—Is it—Is it |
| 21 | | true that it would be not less than 20 years is what you |
| 22 | | agreed to? |
| 23 | A | Correct. |
| 24 | Q | So the minimum will be not less than 20 years? |
| 25 | A | Right.   Right. |

508

```
 1   Q    After you were at Stockbridge—

 2              You said the defendant burned the clothes?

 3   A    Correct.

 4   Q    Where did he burn them in your garage?  Was there smoke coming

 5        out of your garage?

 6   A    Yes.

 7   Q    And did you stay at Stockbridge, or did you leave?

 8   A    I stayed.

 9   Q    Did the defendant stay at Stockbridge?

10   A    No.

11   Q    Did A. J. Mathews stay at Stockbridge?

12   A    No.

13   Q    So did they leave together?

14   A    Yes.

15   Q    Was anybody else at Stockbridge when you were there?

16   A    Excuse me?

17   Q    Was anybody else at Stockbridge at your house when you were

18        there?

19   A    Just—Just me and my family.

20   Q    Did you see your family that day?

21   A    Yeah.

22   Q    Okay.  When you came back to Stockbridge?

23   A    Yeah.

24   Q    But were they there when you were burning the clothes?

25   A    No, they—they wasn't looking out no windows or nothing.
```

```
 1  Q    Okay.  The next day—

 2            Did you have a phone at the time—

 3  A    Yes.

 4  Q    —of this incident?

 5            Did you call—make phone calls to Samuel Steel during

 6       this day and the next day, April 24th and April 25th?

 7  A    I don't recall that.

 8            THE COURT:   I didn't hear the answer.

 9            THE WITNESS:   I said, I don't recall.

10  BY MR. CUSICK:

11  Q    Does that mean that you don't remember one way or the other?

12  A    Exactly.

13  Q    Okay.  Did you have any contact with the defendant on

14       April 25th of 2011?

15  A    Yes.

16  Q    Okay.  Can you describe to the Court that contact.

17  A    You said contact?

18  Q    Yeah, like did you talk to him or—

19  A    Yeah—

20  Q    —did you see him?

21  A    —I talked to him.  I seent [*sic*] him.

22  Q    Okay.  Where did you see him?

23  A    I don't—I can't remember specifically.

24  Q    Did you talk to him about what happened on April 24th of 2011?

25  A    Not really, just that—he just told me that the gun was—wasn't
```

```
 1      where we threw it at.

 2    Q   Okay.  And so he—What does—What did that mean?  What did that

 3        mean to you?

 4    A   He just said he went and got it and threw it on I-94.

 5    Q   Around I-94?

 6    A   Right.

 7    Q   And were you with him when he threw it—when he went back and

 8        got it?

 9    A   No.

10    Q   Did you ever discuss this case with Samuel Steel after that

11        day?

12    A   No.

13    Q   Okay.  Did you have contact at all in May of 2011 or June of

14        2011 with Samuel Steel that you recall?  When I say contact,

15        like did you see him or did you talk to him over the phone at

16        all that you recall?

17    A   Yes.

18    Q   Okay.  Did you talk about the crime that happened0—

19    A   No.

20    Q   —on April 24ᵗʰ?

21    A   No.

22    Q   So, after that day, you never talked with Samuel Steel about

23        the—the shooting?

24    A   Correct.

25    Q   Did you ever talk with A. J. Mathews about the shooting that
```

1      you recall?

2    A    No.

3    Q    Do you know—this Khaki that we referred to—did you ever talk

4         with him about the shooting?

5    A    No.

6    Q    Devon Smith, have you ever talked to him about the shooting?

7    A    No.

8                   MR. CUSICK:   May I have one moment, your Honor?

9                   (At 4:52 p.m., off record discussion between

10                  Mr. Cusick and Detective Beauchamp)

11                  MR. CUSICK:   I have nothing further, your Honor.

12                  THE COURT:   All right.  We'll excuse the jur—the

13        jury in a second.

14                  Sir, you can step down.  Be very careful of that

15        step.

16                  And we'll continue with Mr. Johnson's testimony

17        tomorrow then.

18                  Before I excuse you, ladies and gentlemen, just

19        please remember all of my prior instructions.

20                  We will excuse you—When I excuse you today, you can

21        just leave the building.  You don't have to go upstairs to

22        report.

23                  But please make sure you're careful if you're

24        looking at the news or looking online.

25                  Make sure you don't do any investigations on your

                                512

own.

Don't look up anyone, anything, any names related to the case, any terms or subject matter of this case at all.

Make sure you're not speaking with each other either, and make sure you don't talk to anyone else about the case.  So please remember that.

I will have you report tomorrow at 9:00 o'clock upstairs on the fourth floor.  Soon as we're ready for you, we will bring you back downstairs, and we'll begin the trial.

Make sure you leave your notepads—or notebooks on your—binders on your chairs.  Slide any notes that you have inside those, please.

And, with that, we will see you tomorrow.  You're excused from this door.

All rise.

(At 4:55 p.m., jury exits courtroom)

You may be seated.

MR. CUSICK:    . . . (inaudible)

THE COURT:    Thanks.

All right.  So the jury has left the courtroom.

Counsel, is there anything that we need to address at this time before we break?

MR. CUSICK:   No, your Honor.  Thank you.

MR. CHAMPION:   Not that I'm aware of.

THE COURT:   No.  Okay.

513

1    There are a number of folks in the courtroom, and I

2    appreciate the fact that it looks like all of you have kept

3    your electronic devices turned off, so I appreciate that.

4    And, again, just pass that along to anyone that might be

5    coming tomorrow that might not have received that instruction.

6        I will caution all of you, please, you cannot make

7    any sounds, any sighs, any facial expressions at any witness

8    or during any witness's testimony.  There have been a few

9    comments made; and, from this point forward, if someone makes

10   a comment, I'm going to excuse you from the rest of the trial

11   and I will not let you back in.  So please pass that

12   information along, too.  That is just simply inappropriate, so

13   just please remember that.

14       But I do appreciate all of your patience thus far

15   with the trial and with waiting patiently until we excuse you.

16       So I think they will bring out Mr. Steel and then—

17       MR. CUSICK:   Your Honor, there is one more thing.

18   I did talk with—

19       THE COURT:   I'm sorry.  Go ahead.

20       MR. CUSICK:   There is one more thing.  We

21   subpoenaed a witness.  His name was Quazae Jackson.  He was

22   personally served the subpoena.  He has not appeared.  I'd ask

23   for a bench warrant for his arrest.

24       THE COURT:   Okay.  That's fine.  I'll need the

25   paperwork for that, and I will—

514

1          He was supposed to be here when?

2          MR. CUSICK:   Today.

3          THE COURT:   Just today and he hasn't checked in at

4     all; is that correct?   Okay.   So that's fine.

5          Is there anything else, then, that we need to

6     address on the record?

7          MR. CUSICK:   No, your Honor.

8          THE COURT:   No.   Okay.   And we'll bring—Make sure

9     Mr. Johnson's here, then, tomorrow morning.

10          And, when the deputies excuse you, then you are

11     released for the day, also.

12          Court's in recess.

13          (At 4:57 p.m., proceedings adjourned)