**F I L E D**

**Dec 26, 2013**

9TH JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

STATE OF MICHIGAN

9TH CIRCUIT COURT—TRIAL DIVISION

THE PEOPLE OF THE
STATE OF MICHIGAN

   v                                  File No. 2011-1983 FC

SAMUEL STEEL, III,

        Defendant.

Jury Trial - Volume IV of VII
Before Honorable Pamela L. Lightvoet P47677, Circuit Judge
Kalamazoo, Michigan — Thursday, August 29, 2013

APPEARANCES:

| | |
|---|---|
| For the People: | Paul John Cusick P70895<br>Assistant Attorney General<br>Michigan Department of Attorney General<br>Criminal Division<br>3030 West Grand Boulevard, Suite 10-361<br>Detroit, Michigan 48202<br>(313) 456-0089 |
| For the Defendant: | Robert A. Champion P52726<br>124 East Bridge Street, Suite C<br>Plainwell, Michigan 49080<br>(269) 685-9220 |
| Recorded by: | Digitally recorded |
| Transcribed by: | Brenda K. Foley CER 4956<br>Foley Transcription Service<br>8165 Valleywood Lane<br>Portage, Michigan 49024<br>(269) 303-9680 |

               * * * * *

TABLE OF CONTENTS

WITNESSES: <u>People</u>                                          PAGE

KRISTINE WILKERSON

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 798
    Cross-examination by Mr. Champion . . . . . . . . . . . . 807

RONALD CAMPBELL

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 809
    Voir dire examination by Mr. Champion . . . . . . . . . 818
    Further direct examination by Mr. Cusick . . . . . . . . 818
    Cross-examination by Mr. Champion . . . . . . . . . . . . 831

PAUL SZABO

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 835
    Cross-examination by Mr. Champion . . . . . . . . . . . . 849

PATRICK JOHNSON

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 856

DEVON SMITH

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 863
    Cross-examination by Mr. Champion . . . . . . . . . . . . 874
    Redirect examination by Mr. Cusick . . . . . . . . . . . . 880
    Recross-examination by Mr. Champion . . . . . . . . . . . 881
    Reredirect examination by Mr. Cusick . . . . . . . . . . . 883

WENDELL MONTGOMERY

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 885

DAVID LEE

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 892
    Cross-examination by Mr. Champion . . . . . . . . . . . . 900
    Redirect examination by Mr. Cusick . . . . . . . . . . . . 906
    Recross-examination by Mr. Champion . . . . . . . . . . . 910

KRISTIN COLE

    Direct examination by Mr. Cusick . . . . . . . . . . . . . 919

1                    TABLE OF CONTENTS (cont.)

2   WITNESSES: <u>People</u>                                    PAGE

3   DAVID RAYMOND JUDAY

4       Direct examination by Mr. Cusick . . . . . . . . . . . . . 922
        Cross-examination by Mr. Champion . . . . . . . . . . . . 924
5       Redirect examination by Mr. Cusick . . . . . . . . . . . 924
        Recross-examination by Mr. Champion . . . . . . . . . . 924

6   BRIAN BEAUCHAMP

7
        Direct examination by Mr. Cusick . . . . . . . . . . . . . 926
8       Voir dire examination by Mr. Champion . . . . . . . . . 952

9   Separate record . . . . . . . . . . . . . . . . . . . . . 969-971

10      Further direct examination by Mr. Cusick . . . . . . . . 975
        Voir dire examination by Mr. Champion . . . . . . . . . 998
11      Further direct examination by Mr. Cusick . . . . . . . . 999
        Cross-examination by Mr. Champion . . . . . . . . . . . 1025
12      Redirect examination by Mr. Cusick . . . . . . . . . . . 1051
        Recross-examination by Mr. Champion . . . . . . . . . . 1055
13      Reredirect examination by Mr. Cusick . . . . . . . . . . 1056

14

15

16

17

18

19

20

21

22

23

24

25

                            792a

1                    TABLE OF CONTENTS (cont.)

2  EXHIBITS: People                          IDENTIFIED      RECEIVED

3      66   photograph                          999            999
       67   photograph                         1000            999
4      68   photograph                         1001            999
       69   photograph                         1002            999
5      70   photograph                         1002            999
       71   photograph                         1002            999
6      72   photograph                         1002            999
       73   photograph                         1002            999
7      74   photograph                         1002            999
       75   photograph                         1003            999
8      76   photograph                         1003            999
       77   photograph                         1003            999
9      78   photograph                         1004            999
       79   photograph                         1004            999
10     80   photograph                         1004            999
       81   photograph                         1004            999
11     82   photograph                         1005            999
       83   photograph                          982            982
12     84   photograph                          982            982
       85   photograph                          982            982
13     86   photograph                          983            982
       87   photograph                          983            982
14     88   photograph                          983            982
       89   photograph                          984            984
15     90   photograph                          984            984
       91   photograph                          984            984
16     92   photograph                          984            984
       99   list of names and phone numbers     951            978
17    101   cellphone and keys                  990            990
      102   sketch                              991            991
18    109   FBI wanted poster                   821            822

19

20

21

22

23

24

25

                              792b

1          Kalamazoo, Michigan

2          Thursday, August 29, 2013 - 9:09 a.m.

3          THE CLERK:   The court calls the matter of People of

4     the State of Michigan versus Samuel Steel, III, case number

5     C11-1983 FC.

6          Parties, please state appearances for the record.

7          MR. CUSICK:   Good morning, your Honor.

8          Paul Cusick on behalf of the People.

9          MR. CHAMPION:   May it please the Court,

10    Robert Champion appearing on behalf of Samuel Steel.

11         THE COURT:   All right.  Counsel, the jury's on

12    their way down.

13         We did discuss one thing in chambers, and that was

14    with regards to some phone records.

15         Mr. Champion, I'll let you address that very

16    quickly.

17         MR. CHAMPION:   Yes, your Honor.  My expert has

18    looked at the data that I've provided him that the prosecution

19    has provided.  He believes, based upon his expertise, he's

20    missing certain information.  The way it was provided to the

21    prosecutor's office makes it difficult for him to fully

22    analyze and proffer an opinion, so he's asking that both

23    Sprint® and MetroPCS discovery be e-mailed directly from those

24    two companies to him so that he can analyze that.

25         I would ask that it be done within four days.  I've

                                  793

1    left that portion open.—and that it be e-mailed directly to

2    our expert Michael Kellum.

3         MR. CUSICK:   Your Honor, I think we discussed in

4    chambers that everything we have we'll have an obligation to

5    give.  And that's been done in this case.  And we have no

6    objection to that.  Maybe I misunderstood what we talked about

7    in chambers; but, as far as us getting additional discovery, I

8    mean, we have given him everything that we have.

9         THE COURT:   My understanding is the prosecuting

10   attorney's—the People have provided everything to the defense

11   in the same format that they provided it.  And my

12   understanding from Mr. Champion, based on what his expert's

13   indicating, is there might just be an issue with the way that

14   he's able to view that; and he seems to think it's

15   provided—has been provided differently—in a different manner

16   or in a different format from the phone companies in the past

17   in past cases he may have worked at—worked on.

18        I indicated I would sign an order allowing

19   Mr. Champion to receive everything that was initially provided

20   directly from—

21        Sprint®, correct?

22        MR. CHAMPION:   And MetroPCS.

23        THE COURT:   Okay.  And MetroPC [*sic*].  That's fine.

24   The exact same items are . . . (inaudible) provided directly

25   from them.  I don't know if you're going to get them in a

```
1    different format or not; but, whatever they provided, they can
2    provide you.  That's what I indicate.
3              MR. CHAMPION:   Whatever I receive, I will also
4    provide . . . (inaudible)
5              THE COURT:   Yes.
6              MR. CUSICK:   And so—
7              THE COURT:   To the People.  So I—
8              MR. CUSICK:   So—
9              THE COURT:   —appreciate that.
10             So I will sign—
11             MR. CUSICK:   —it's going to come directly from
12   MetroPCS and Sprint® then?
13             THE COURT:   Yes.
14             MR. CUSICK:   Okay.
15             THE COURT:   Not from you.  It'll come directly from
16   them.
17             My understanding is that you've turned over
18   everything quite some time ago, so that's fine.
19             Anything else, then, we need to address?
20             The jury's out in the hall.
21             MR. CUSICK:   No, your Honor.  Thank you.
22             THE COURT:   Mr. Champion?
23             MR. CHAMPION:   No, your Honor.
24             THE COURT:   And you have that order right there?
25   Is that—
```

1            MR. CHAMPION:  Yes, your Honor.

2            THE COURT:  Okay.

3            MR. CHAMPION:  I removed by the prosecution.  I

4  just said by Sprint® and by MetroPCS.

5            THE COURT:  Okay.  All rise.

6            (At 9:12 a.m., jury enters courtroom)

7            You may be seated.

8            Welcome back, ladies and gentlemen.

9            I will turn it over to Mr. Cusick for his next

10  witness.

11            MR. CUSICK:  Thank you, your Honor.

12            Good morning, Ms. Wilkerson.  Can you hear me?

13            MS. WILKERSON:  Good morning.

14            Yes, sir.

15            MR. CUSICK:  Can you please—

16            THE COURT:  First of all, why don't you just

17  identify your next witness, if you would.

18            MR. CUSICK:  Okay.  The next witness for the People

19  is Kristine Wilkerson.

20            THE COURT:  Okay.  So, ladies and gentlemen, just

21  so that you know, Ms. Wilkerson is—

22            Wilkerson, is that correct, ma'am?

23            MS. WILKERSON:  Yes, ma'am.

24            THE COURT:  All right.  She's, obviously, appearing

25  by way of teleconference here.  So we have real-time here.

```
1              If there's an issue, Ms. Wilkerson, let us know.
2              But she's able to see us, I believe—
3              Is that correct, ma'am?
4              MS. WILKERSON:   Yes, ma'am.
5              THE COURT:   —and then we are, obviously, able to
6      see her, too.
7              So let me just indicate to the witness, if there's
8      anytime that you cannot hear what is being said, just let us
9      know, please, so that we can have the question or whatever is
10     said repeated; and we will let you know if there is an issue,
11     also.
12             Ma'am, are you able to see me on the screen?
13             MS. WILKERSON:   No, I see the—I don't know what—
14             THE COURT:   You see what—
15             MS. WILKERSON:   Paul Cusick?
16             MR. CUSICK:   Yes.
17             THE COURT:   Okay.  So you see the attorney—
18             MS. WILKERSON:   I see the corner of your desk.  I
19     can see the corner of your desk, and I can see the attorney
20     standing at the podium.
21             THE COURT:   Okay.  I'm going to ask you to raise
22     your right hand, ma'am, and we'll swear you in.  You can hear
23     me, though, obviously, correct?
24             MS. WILKERSON:   Yes, ma'am.
25             THE COURT:   All right.  Do you solemnly swear or
```

1     affirm that the testimony you're about to give will be the

2     truth, the whole truth, and nothing but the truth, so help you

3     God?

4              MS. WILKERSON:   Yes, ma'am.

5              THE COURT:   All right.  You can put your hand down,

6     ma'am.

7              I need you to state and spell your first and last

8     name for the record.

9              THE WITNESS:   Kristine Wilkerson—K-r-i-s-t-i-n-e;

10    last name is W-i-l-k-e-r-s-o-n.

11             THE COURT:   Thank you, ma'am.

12             I'll turn it over to the attorneys.

13             MR. CUSICK:   Thank you, your Honor.

14                      KRISTINE WILKERSON,

15    called at 9:16 a.m., and sworn by the Court, testified:

16                      DIRECT EXAMINATION

17 BY MR. CUSICK:

18 Q    Good morning, Ms. Wilkerson.

19             I want to direct your attention to the year 2012.

20    Did you come into contact with an individual that you—that you

21    now know as Sam Steel?

22 A    Yes, sir.

23 Q    And how did you meet Sam Steel?

24 A    I met him at a bar.

25 Q    Where?

```
 1  A    Off of Roswell Road and 285.

 2  Q    Okay.  And where are you testifying from today, Ms. Wilkerson?

 3  A    Atlanta, Georgia.

 4  Q    Okay.  And is that bar that you described, what state and city

 5       is that in?

 6  A    Atlanta, Georgia.  Sandy Springs, I believe.

 7  Q    Okay.  And how did Sam Steel introduce himself to you?

 8  A    I was drinking that night, so I'm not a hundred percent sure.

 9       But there was a group of people, and we were all playing pool.

10  Q    Okay.  Do you recall what month that was in 20—Was this in

11       2012?

12  A    That is correct.  I want to say it was like the end of

13       April/early May because it was like a few weeks after

14       Whitney Houston had died.  That's all I can remember.

15  Q    Okay.  And what name—Did Sam Steel use the name Sam Steel when

16       he introduced you—

17  A    No, he said—

18  Q    —himself?

19  A    —Sammy, Sam.

20  Q    Did he have the last name Steel, or did he have a different

21       last name?

22  A    I believe he used Sammy Gunn—

23  Q    Okay.

24  A    —with two Ns.

25  Q    And what did—What did Sam Steel tell you his job was?
```

1  A  He was into real estate, buying and selling houses.

2  Q  Did he tell you where he was originally from?

3  A  Chicago.

4  Q  Did he mention anything about being in Michigan or from

5     Michigan?

6  A  Not to my knowledge.  Not to my knowledge.  If he did, I just

7     don't remember.

8  Q  Okay.  Did he indicate why he was in Georgia?

9  A  No, not really.  I know he had said he just moved down here.

10 Q  Okay.  And what was your relationship with Samuel Gunn?

11 A  He was my—He ended up being my boyfriend.

12 Q  How long—

13 A  He lived with me.

14 Q  And you indicated he lived with you?

15 A  Uhm-hmm.  Shortly after we started dating, we agreed—you know,

16    he was going to come help me out and—help me and my daughter

17    out, and he started living with us.

18 Q  Okay.  Was he working at the time that you're aware of?

19 A  To my knowledge, he was buying and selling houses.

20 Q  Okay.  Did you see him in his professional capacity at all

21    during that time?

22 A  Yes, we road around and we looked at houses.  Every once in a

23    blue, I'd get in the car and we'd ride around and look at

24    houses.

25 Q  Okay.  And what did the defendant say, usually, when you were

                          800

| | | |
|---|---|---|
| 1 | | riding around and looking at houses?  Did he say anything in |
| 2 | | particular about— |
| 3 | A | He would— |
| 4 | Q | Go ahead.  Did he say anything in partic— |
| 5 | A | He would talk about return on investment. |
| 6 | Q | Okay.  So how long did you date Mr. Sammy Gunn, a.k.a. |
| 7 | | Samuel Steel? |
| 8 | A | About four to five months max. |
| 9 | Q | Okay.  Was he living with you the entire time that— |
| 10 | A | No, he probably lived about four months with me. |
| 11 | Q | Okay.  Did you ever leave the state of Georgia with him or go |
| 12 | | on trips with him during that time period? |
| 13 | A | No, sir. |
| 14 | Q | Did you ever meet his family during that time period? |
| 15 | A | He had a—There was a family reunion here in Georgia that he |
| 16 | | went to, and a couple of his family members did come by my |
| 17 | | house. |
| 18 | Q | Do you know who those family members were? |
| 19 | A | Not exactly.  I don't remember everybody, no, sir. |
| 20 | Q | Okay.  Did—Do you remember anybody regarding—anybody that may |
| 21 | | have been his family? |
| 22 | A | He had a cousin that lived in Atlanta. |
| 23 | Q | Okay.  And did you meet— |
| 24 | A | And— |
| 25 | Q | Do you know that person's name? |

```
 1  A   I just know he's a big, fat—a big—his body habit is obese.

 2  Q   Okay.  Now did there come a time when you spoke with the

 3      Federal Bureau of Investigation—the FBI?

 4  A   Yes, sir.

 5  Q   Okay.  And do you know a Ron Campbell?  Does that name sound

 6      familiar to you?

 7  A   It didn't until last night when you reminded me.

 8  Q   Okay.  Did you ever—

 9  A   It's the FBI agent that was at my—one of the FBI agents at my

10      house.

11  Q   Do you know an individual, I think—Was it Ron?—from the FBI?

12      Does that—Does that ring—

13  A   Yes, sir.

14  Q   Okay.  Is that correct?  Is that how you remember it—his name?

15  A   Yes, sir.

16  Q   Okay.

17  A   I believe so, yes, sir.

18  Q   And can you—Do you remember when you first talked with Ron

19      from the FBI approximately?

20  A   Yes, sir.

21  Q   When was that?

22  A   Yes, sir.  It was a Friday morning.  It was a Friday morning.

23      They pulled me over as I was on my way to work, and he was the

24      first person that came to my—my car window.

25  Q   Okay.  And did he show you anything at the time?
```

| 1 | A | Yes, sir. He showed me a wanted poster with my—at that time |
| 2 |   | my boyfriend on it. |
| 3 | Q | What were your feelings when you saw that poster? |
| 4 | A | I didn't believe who these people were. I thought I was about |
| 5 |   | to get robbed. |
| 6 | Q | Okay. Was the—Did you indicate that that—the poster—the |
| 7 |   | person on the poster was a particular individual? |
| 8 | A | Yes, sir. |
| 9 | Q | Do you remember what you said who that individual was? |
| 10 | A | I made up a name— |
| 11 | Q | And what was the name— |
| 12 | A | —'cause I was freaking out. |
| 13 | Q | And what was the name that you made up— |
| 14 | A | Sam— |
| 15 | Q | —if you recall? |
| 16 | A | Glen Norris. Glen. |
| 17 | Q | Okay. |
| 18 | A | I called him Glen. |
| 19 | Q | Did you ever call him Glen? |
| 20 | A | No, I always referred to him as Sammy— |
| 21 | Q | Okay. |
| 22 | A | —Sam. |
| 23 | Q | And did you tell the FBI that day anything more? |
| 24 | A | They told me more information about myself and my family than |
| 25 |   | I was able to give them. |

1   Q   Okay.  And were you aware that at the time Samuel Steel had

2       been being investigated by the FBI?

3   A   No, sir, not until the FBI came and got me.

4   Q   Okay.  And how did that make you feel when you found that out?

5                   MR. CHAMPION:   Your Honor, I'm going to object to

6       the relevance.

7                   THE WITNESS:   Well, I wigged out.  I lost—

8                   THE COURT:   Hold—

9                   THE WITNESS:   —my mind.

10                  THE COURT:   Hold on.  Hold on.  There's an

11      objection.  Give me one second.

12                  Go ahead.

13                  MR. CHAMPION:   The relevance of how she felt.

14                  MR. CUSICK:   Your Honor, I think it is relevant.

15      Flight is obviously an issue in this case.  And coming up with

16      a new identity to another individual, I think, is relevant as

17      to flight, as to consciousness.

18                  THE COURT:   Anything else?

19                  MR. CHAMPION:   How she felt when the FBI was

20      interviewing her, I believe, has no relevance to this

21      particular—

22                  THE COURT:   Overruled.

23                  Go ahead.

24                  You can answer the question, ma'am.  I will have the

25      question repeated.

Go ahead, Mr. Cusick.

BY MR. CUSICK:

Q    When you found out the FBI was investigating Samuel Steel when
     they approached you, how did that make you feel?

A    I lost my mind.  I wigged out.  I was scared to death.

Q    Okay.  Did you have any contact with Samuel Steel that day?

A    That day?  No, sir.  Well, they made me call him.  The FBI
     stood in my living room and made me call him.

Q    Did you call him?

A    Yes, sir, I did.

Q    And did the defendant answer?

A    I believe so, yes.

Q    Okay.  Do you remember if the defendant—

A    I was surrounded by about—I had about 50 FBI agents in my
     living room standing there, so, yes, I believe he did answer.

Q    Okay.  And did you have a conversation with him at the time
     that you recall as to what he may have said to you—the
     defendant, I'm speaking of?

A    No, I was being force-fed information by the FBI to act as an
     angry girlfriend because Sam did not come home the night
     before.

Q    Have you ever had any contact with Samuel—

A    So I was basically fussing at him.

Q    Have you ever had any contact with—

                        Were you angry at the time with Sam Steel or not?

                                   805

1    A    I was angry at the whole—It was just so much chaos.  I was
2         angry at that whole situation.  I didn't believe them.  All
3         this negative stuff they said, I didn't believe.
4    Q    Okay.  Have you had contact with Samuel Steel since that day?
5    A    Yes, sir.  We've exchanged letters.
6    Q    Okay.  Have you talked with him on the phone at all?
7    A    I—Once or twice, he had like 30-second phone calls.  My
8         cellphone doesn't take collect calls.  So I got some
9         1-800 number I answered, and it was him for 30 seconds telling
10        me he loved me, and I told him the same thing back and I wish
11        him the best.
12   Q    Okay.  Did he ever talk to you about what happened in—anything
13        that may have happened in Kalamazoo, Michigan?
14   A    No, sir.
15   Q    And did he tell you anything other than what you've testified
16        to as to why he was in Georgia?
17   A    No, sir.
18   Q    And how were you feelings toward Sam Steel in August of
19        2011 [*sic*]—I'm sorry.—August of 2012?
20   A    After the FBI took him, I was confused, I was angry, I had a
21        little breakdown, I was a little shocked.
22   Q    Okay.
23   A    It was a lot of information to take in.  I had him living in
24        my house with my kid.  It was a lot of information for me to
25        take in.  I sort of had a nervous breakdown.

```
 1   Q    Okay.  At the time, were you—were you in love with

 2        Samuel Steel?

 3   A    Yes, sir.

 4                  MR. CHAMPION:   Again, your Honor, what's the

 5        relevance . . . (inaudible) question.

 6                  MR. CUSICK:   How she feels—

 7                  THE COURT:   Overruled.

 8                  Go ahead.

 9   BY MR. CUSICK:

10   Q    You can answer that question.

11   A    Yes, sir.

12   Q    What are your feelings toward him now?

13   A    I really—I'm not sure what to do.  I have no clue what's—I

14        mean, I've moved on with my life, if that's what you're

15        asking.

16                  MR. CUSICK:   Okay.  I have nothing further.

17                  Thank you.

18                  THE WITNESS:   You made me miss a day of work for

19        this?

20                  THE COURT:   Hold on a second, ma'am.  You're not

21        quite done.

22                  THE WITNESS:   Okay.

23                         CROSS-EXAMINATION

24   BY MR. CHAMPION:

25   Q    Good morning, ma'am.
```

807

```
 1              My name's Bob Champion.  I represent—
 2   A   Good morning.
 3   Q   I represent Mr. Steel.
 4              Now are you afraid of Sam Steel?
 5   A   No, sir.
 6              MR. CHAMPION:   Thank you.
 7              THE COURT:   Any other questions, Mr. Cusick?
 8              MR. CUSICK:   No, your Honor.
 9              THE COURT:   Hold on one moment, ma'am.  I'm going
10   to ask the jury if they have any questions for you.
11              Ladies and gentlemen, do any of you have any
12   questions for this witness?  If so, just raise your hand.
13              No hands are raised.
14              All right.  May she be excused from her subpoena,
15   Counsel?
16              MR. CUSICK:   Yes, your Honor.
17              THE COURT:   Mr. Champion?
18              MR. CHAMPION:   Yes, your Honor.
19              THE COURT:   All right.  Thank you, ma'am.
20              We will turn off the teleconference.
21              Thank you.
22              Next witness, please?
23              MR. CUSICK:   Your Honor, the People would call
24   Ron Campbell.
25              THE COURT:   Before you have a seat, sir, please
```

```
1    raise your right hand.  Do you solemnly swear or affirm that
2    the testimony you're about to give will be the truth, the
3    whole truth, and nothing but the truth, so help you God?
4                  MR. CAMPBELL:   I do.
5                  THE COURT:   Please have a seat, sir.
6                  With that microphone, you really need to stay close
7    to it and speak right in the end of the microphone.
8                  I need you to state and spell your first and last
9    name for the record, please.
10                 THE WITNESS:   My name's Ronald Campbell—R-o-n-a-l-
11   d—Campbell—C-a-m-p-b-e-l-l.
12                           RONALD CAMPBELL,
13   called at 9:30 a.m., and sworn by the Court, testified:
14                        DIRECT EXAMINATION
15   BY MR. CUSICK:
16   Q   Good morning, Mr. Campbell.
17   A   Good morning.
18   Q   How are you employed, sir?
19   A   I'm a special agent with the Federal Bureau of Investigation.
20   Q   Okay.  And where is your office located?
21   A   I'm located in the Atlanta office.
22   Q   How long have you been with the FBI?
23   A   Be 25 years next week.
24   Q   Okay.  And what's your specific role regarding the FBI?
25   A   I work violent crimes.
```

| | |
|---|---|
| 1 | Q    Okay.  Now did you have occasion to come into contact with |
| 2 |      a—or deal with an investigation regarding a Samuel Steel? |
| 3 | A    Yes, I did. |
| 4 | Q    Have you seen Mr. Steel before? |
| 5 | A    Yes. |
| 6 | Q    Do you see— |
| 7 | A    Not prior to the investigation, but, yes. |
| 8 | Q    Do you see him in court today? |
| 9 | A    Yeah, he's sitting over there with the tie on. |
| 10 |               THE COURT:   Your Honor, let the record reflect the |
| 11 |      witness has identified the defendant. |
| 12 | BY MR. CUSICK: |
| 13 | Q    When did you— |
| 14 |               THE COURT:   That is noted. |
| 15 |               Go ahead. |
| 16 |               MR. CUSICK:   Thank you, your Honor. |
| 17 | BY MR. CUSICK: |
| 18 | Q    When did you first become a part of the investigation? |
| 19 | A    It was back in early to mid 2012. |
| 20 | Q    And can you describe your initial involvement with the |
| 21 |      investigation. |
| 22 | A    Yes, our office here in Kalamazoo contacted the Atlanta office |
| 23 |      and said that they had a fugitive warrant—an unlawful flight |
| 24 |      to avoid prosecution warrant for Sam Steel and they believed |
| 25 |      Sam Steel was in the Atlanta area. |

810

1    Q    Okay.  And were you able to ascertain how they were able to

2         find out the defendant was in the Atlanta area?

3    A    Yes.  Initially, they had a phone number that they believed

4         was associated with the fugitive and that they've attained

5         phone records for that fugitive and the phone was being used

6         on cell towers in the Atlanta area.

7    Q    Okay.  Now approximately when was this?  This is early part

8         of—to mid part of 2012?

9    A    Yes.

10   Q    Okay.  And, in response to that, what—what happened?

11   A    I conducted an investigation, went to a specific location.  It

12        was a hotel.  I determined that—After an investigation there,

13        determined that somebody from the Kalamazoo area was staying

14        in a certain room.

15             We contacted those people.  They said they, in fact,

16        knew the defendant was a fugitive but he was not with them at

17        that time.

18   Q    Was there a time that—After you found out the defendant was

19        not with them, what happened then?

20   A    Well, during—during that portion of the investigation, I made

21        contact directly with the Kalamazoo police department.

22        Instead of having them relay information to the—to the

23        Kalamazoo office and then relay it to me in Atlanta, I made

24        direct contact with the officers working the case here.

25             A couple months later in the very early part of

                                   811

```
 1        August, they came up with another phone number that they

 2        believed the defendant himself was actually using.  Again, the

 3        cellphone records indicated that he was using towers in the

 4        Atlanta area, and they contacted me.

 5   Q    Okay.  Now up until early August of 2012, had you done

 6        anything more with the investigation?

 7   A    No.  Between those two periods, I had not done anything.

 8   Q    Okay.  I want to direct your attention to August 2nd of 2012.

 9        Do you remember that day?

10   A    Yes, I do.

11   Q    And do you know what day of the week that was?

12   A    I believe that was a Thursday.

13   Q    Okay.  Anything happen with regards to this investigation that

14        day?

15   A    Yes.  We had—As I said, we had a cellphone number for—that the

16        Kalamazoo police department believed Sam Steel was using.

17        That cellphone was being utilized on towers in Marietta.

18        Marietta is a suburb of Atlanta.  And I was out that morning

19        with a couple other agents trying to locate the fugitive.

20   Q    And who were the other agents you were with, if you—

21   A    Initially, there was Matt Carman (phonetic), myself,

22        Waldvogel.  And there may have been another one, but I don't

23        specifically remember.

24   Q    Okay.  Did you have any type of identification for

25        Samuel Steel?
```

1   A   I had a wanted poster—

2   Q   Okay.

3   A   —of him and physical descriptions, which is common.

4   Q   What happened—Were you able to see Samuel Steel that day?

5   A   Yes, using—Using the cell tower information, we came up with a

6       specific area within that area—that cell tower area.  I was

7       conducting surveillance in that area; and, within a few hours,

8       I saw Sam Steel walk out of a house.

9   Q   What did you do in response to that?

10  A   I attempted to pull up with the other agent in the car with

11      me.  I attempted to pull up next to him, and we—The plan was

12      we were going to pull up.  When we got close enough, we were

13      going to get out of the vehicle and apprehend him.

14          He had walked down a driveway and had turned.  And I

15      was just turning onto the street and then—I don't know what

16      happened, but it appeared to me that he forgot something and

17      he turned to go back in the house and he saw my vehicle.

18          He walked up the driveway before I could get to him,

19      so I just drove by trying to pretend like I was just driving

20      down the street.  Apparently, I didn't fool him.  He went into

21      the house, and a short period later cellphone tower records

22      indicated that he was about three miles away on a different

23      tower.

24  Q   You said that he went into a house.  Where was this house

25      located?

813

| 1 | A | It was on Wakita Drive in Marietta. |
| 2 | Q | Do you recall or were you able to find out whose house that |
| 3 | | was? |
| 4 | A | Yes.  Well, I found out who was residing there. |
| 5 | Q | And who was residing in it? |
| 6 | A | Kristine Wilkerson. |
| 7 | Q | Okay.  Did you know at the time whether or not—or where the |
| 8 | | defendant resided at that time, August 2nd of 2012? |
| 9 | A | Well, I had seen him in the driveway of |
| 10 | | Kristina [sic] Wilkerson's house.  I saw him go back into that |
| 11 | | residence; and then, a short time later, the cellphone that he |
| 12 | | was using was a few miles away.  So I know that he was there, |
| 13 | | but he wasn't there any longer. |
| 14 | Q | And you saw him enter the house.  Where did he exit? |
| 15 | A | I couldn't see him exit the house, but I saw him walking down |
| 16 | | the driveway of the house; so I assume he came out of the |
| 17 | | house.  I started to drive up and, as I said, he turned and |
| 18 | | walked back up before I could get there; and I watched him go |
| 19 | | into the house. |
| 20 | Q | What was his reaction to you?  What was his expression, if he |
| 21 | | had any? |
| 22 | A | Well, like I said, he turned and he saw my car.  And I was |
| 23 | | just trying to pretend like I was just driving down the street |
| 24 | | 'cause I wasn't going to be able to get out of the vehicle |
| 25 | | fast enough to catch him.  So he just kept on walking into the |

| | |
|---|---|
| 1 | house.  He also, apparently, recognized me as law enforcement |
| 2 | and tried to pretend like he didn't—that nothing was going on. |
| 3 | Q | And what happened—what happened after that? |
| 4 | A | So, as I said, the cellphone that he was using that brought us |
| 5 | to that location where I had seen him was now several miles |
| 6 | away—a few miles away, and then later on it was several miles |
| 7 | away. |
| 8 | I came up with a game plan figuring we'll leave that |
| 9 | house alone, get out of there, see if he'll come back. |
| 10 | The cellphone had gone from Marietta, which is in |
| 11 | Cobb County on the northwest side of Atlanta, over to |
| 12 | Gwinnett County, which is on the northeast side of Atlanta, |
| 13 | probably 30 minutes without traffic—And there's always traffic |
| 14 | in Atlanta.—away.  And it was bouncing between two—two |
| 15 | cell towers. |
| 16 | Q | Okay.  Now were you by yourself at this time, or are you still |
| 17 | with a crew? |
| 18 | A | I had called for reinforcements to come back up there.  There |
| 19 | was a number of us.  Matt Carman (phonetic) was in the vehicle |
| 20 | with me.  We decided to go back to the office to work on the |
| 21 | cell towers to see what we could find out. |
| 22 | The next day—Friday morning—we again set up on that |
| 23 | house.  We saw—Eventually, we identified her as |
| 24 | Kristine Wilkerson leave.  We waited for her to get around the |
| 25 | corner.  We pulled her over with our blue lights. |

```
 1  Q   What was her—Okay.

 2              So, when you saw Kristine Wilkerson, was she with

 3      anybody or was she by herself . . . (inaudible)

 4  A   She was by herself in the car.

 5  Q   What—What happened when you approached her?

 6  A   She was very upset.

 7  Q   Did she seem to be upset with you?

 8  A   She seemed to be upset at being pulled over.

 9  Q   What happened then?

10  A   I approached her, identified myself.  I told her what I was

11      looking for, that I was looking for Sam Steel.  I showed her a

12      wanted poster of Sam Steel.

13              She initially denied knowing him, said that her

14      boyfriend lived at the house, that his name was Glen Norris.

15  Q   Okay.  So, when you showed him [sic] the—showed her the photo,

16      she indicated that that was not him?

17  A   She initially indicated that was not him.  I explained that I

18      had done my investigation, I had seen him the day before at

19      her house; and then she admitted that that, in fact, was her

20      boyfriend that she knew as Glen Norris.

21  Q   Now were you able to get a good look at the defendant at that

22      time—at the time when he went—

23  A   The day before?

24  Q   —the day before?

25  A   Yes.
```

```
 1  Q    Okay.  And did it look similar to the picture that you were

 2       given?

 3  A    Yes.

 4  Q    Okay.  What happened then?

 5  A    So that morning we took in Kristine.  She got very upset that

 6       her boyfriend that she knew—She told us his name was

 7       Glen Norris.  She knew him—He had two nicknames.  He had a

 8       nickname of Block and a nickname of Bean.

 9            That—I told her that he was wanted for murder in

10       Kalamazoo.

11            She became very distraught at that.  She said she

12       had a very young child.

13            MR. CHAMPION:   Your Honor, I'm going to object.

14       This is hearsay.

15            MR. CUSICK:   Well, I can lay a foundation.

16            THE COURT:   Pardon?

17            MR. CUSICK:   I can maybe lay a foundation.

18            THE COURT:   Go ahead.

19            I'll sustain the objection right now.

20  BY MR. CUSICK:

21  Q    What was her demeanor at the time—Ms. Wilkerson's?

22  A    She was very upset.

23  Q    Can you go even a little bit more into detail as to what you

24       observed regarding her emotional state.

25  A    She started to cry when we were talking—when I was talking to
```

1     her.

2                    MR. CUSICK:   Your Honor, I think that, based on

3          that testimony, the testimony can come in as to an excited

4          utterance.

5                    MR. CHAMPION:   Your Honor, may I voir dire briefly?

6                    THE COURT:   Yes.

7                         VOIR DIRE EXAMINATION

8     BY MR. CHAMPION:

9     Q    Was her statements as a result of questioning by the officers,

10         including yourself?

11    A    I'm sorry?

12    Q    Were her statements—Kristine's statements—a result of

13         questioning that you were doing of her at the time?

14    A    Yes.

15                    MR. CHAMPION:   Thank you.

16                    I would renew my objection.

17                    THE COURT:   I will sustain the objection.

18                    Next question?

19                       FURTHER DIRECT EXAMINATION

20    BY MR. CUSICK:

21    Q    You don't have to tell me exactly what she said, but did you

22         continue to ask her questions?

23    A    Yes.

24    Q    And, based on that, what happened?

25    A    We wanted to search the house to see if he was in there,

                                    818

considering she had initially denied knowing him and then came
around saying she knew him.  So she brought us back to the
house.  She said we could go in there and search.

Q   Did you do so?

A   Yes, we did.

Q   What happened then?

A   There was no other person there.  There was men's clothing
there.

She then—She wasn't under arrest or anything.  She
was free to go.  She said she had to get to work.  So we left,
and she went to work.  She called me a short time later,
again, very upset.  She wanted to go home, but she was afraid
to go home fearing that Sam would be there.

So I met her at her house—

MR. CHAMPION:  Your Honor, again, I'm going to
renew my objection . . . (inaudible)

MR. CUSICK:  I'll just ask you to testify to what
you observed, sir.

THE WITNESS:  Okay.

THE COURT:  The objection's sustained.  The jury is
to disregard the last statement or comment about what
Kristine Wilkerson told him.

Go ahead.

THE WITNESS:  Okay.  I went back to the house.  I
searched the house again.  Kristine came in.  She gathered

819

1    some clothes, and she went over to her sister's house, I
2    believe she said she was going to.
3  BY MR. CUSICK:
4  Q    And how many people were with you at the time when you—
5  A    The second—
6  Q    —searched—
7  A    —time it was just two.
8  Q    Just two.
9         The first time?
10 A    There was a lot, six or eight.
11 Q    Six or eight?  Okay.
12        What—So the second time you were there, what
13    happened then?
14 A    She left—I left her house.  She called me later on saying that
15    she had left her sis—
16        MR. CHAMPION:   Your Honor, again, I'm going to
17    object.
18        MR. CUSICK:   Well, your Honor, this is not hearsay.
19    This is as to why the officer did the investigation and why he
20    acted in the way he acted.  This is not being offered for the
21    truth of the matter asserted.
22        THE COURT:   Overruled.  I'll allow it.
23        Go ahead.
24        THE WITNESS:   She told me she was back at her
25    residence and a black Mercedes had just showed up in her

                              820

1  driveway.  A man came out, knocked on the door and asked for

2  Sam—I'm assuming under the name of Glen Norris.

3         At the—Earlier, when we were talking to her, she

4  told us Sam's habits.  So we did a neighborhood—basic

5  neighborhood investigation.  She said that he would hang out

6  at a gas station around the corner, drank beer with the guys

7  there.

8         So I had gone over to that gas station, showed the

9  photo around.  A number of witnesses there said they

10  recognized him as a guy that hangs out there.

11         I left my business card and the wanted posters with

12  several of those people.

13         Short—

14         MR. CUSICK:   One second, sir.

15         May I have one moment, your Honor?

16         THE COURT:   Yes.

17  BY MR. CUSICK:

18  Q   I'm showing you People's proposed exhibit number 109.  What is

19      that?

20  A   It's a copy of the wanted flyer for Sam Steel.

21  Q   Is that the same photo that you used during the investigation?

22  A   It's a copy of the same, yeah.  Yes.

23         MR. CUSICK:   Your Honor, at this time I would ask

24      that People's proposed exhibit number 109 be admitted into

25      evidence.

821

1          MR. CHAMPION:    No objection.

2          MR. CUSICK:    Can you—

3          THE COURT:    One-o-nine is received.

4          MR. CUSICK:    Can you just publish it to the jury,

5     just show that.  Okay.

6   BY MR. CUSICK:

7   Q    Now you said that you went to a gas station.  What—

8   A    Yes.

9   Q    What happened at that gas station?

10  A    There was a number of people—customers, employees—there.  We—I

11       started showing this photo to those people, and they

12       recognized him as somebody that would hang out in that gas

13       station area.

14  Q    Okay.

15  A    I left copies of the poster and copies of my business card

16       with my phone number on there.

17  Q    Approximately how many people did you—did you talk with at the

18       gas station?

19  A    Six or seven, eight maybe.

20  Q    How far away is Kristine—

21  A    It's the next street over.

22  Q    From Kristine Wilkerson's—

23  A    Yes.

24  Q    —house to the gas station?

25  A    Yes.

                                822

1   Q   What happened then?

2   A   I went back to my office.  As I said, I got—I received a phone

3       call from Kristine telling me that a black Mercedes was in her

4       driveway.

5               After I hung up with her, I received a call from one

6       of the people at the gas station saying that they had just

7       observed Sam get out of a black Mercedes.  The black Mercedes

8       left.  They called 9-1-1 to have the police come get him.

9       Before the police could get there, the black Mercedes came

10      back, picked up Sam and departed the area.

11              They also—

12  Q   Did you observe that at the time?

13  A   No.

14  Q   Okay.  This is still August 3rd, correct?

15  A   Yes.

16  Q   What time of day is this?

17  A   This is after lunch by the time I got the phone call.

18  Q   What happened then?

19  A   The witness had saw the black Mercedes drop Sam off and then

20      subsequently come back and picked him up, provided me the

21      license plate number of the Mercedes.

22  Q   Okay.  In response to that information, what did you do?

23  A   I ran the license plate through NCIC, which is the repository

24      for the information, and that address was between those two

25      towers over in Gwinnett County that Sam's phone was pinging

                                823

1   off of, if you—

2   Q   Okay.  And what happened then?

3   A   I took a couple of other agents.  We went out to that area,

4       started driving around and, in fact, found the Mercedes.  It

5       was parked across the street—in a driveway across the street

6       from the registered address.

7   Q   Okay.  And, based on that information, the registered address

8       of where the license plate was—

9   A   Yes.

10  Q   —was . . . (inaudible)

11          And where is that?

12  A   It's 4060 Citron Court, Norcross, Georgia.

13  Q   How far away is that from Wakita Drive, Kristine Wilkerson's

14      house?

15  A   Roughly a 30-minute drive—30, 40-minute drive.

16  Q   Okay.  Can you see anybody in the car or anything?

17  A   No.

18  Q   What type of windows did the car have?

19  A   I believe it had tinted windows, but I'm not a hundred percent

20      sure.

21  Q   What happened then?

22  A   I set up a surveillance location down the street attempting to

23      see if I could see Sam walking around.  I didn't observe

24      anything.  We stayed there for several hours.  The decision

25      was made to leave the area.  I didn't want to go approach the

```
 1        registered address with the car being across the street, not
 2        having seen Sam, knowing that there was a couple-hour gap
 3        between.  I didn't know if he was dropped off somewhere else.
 4        Like I said, it's a 30 or 40-minute ride from the gas station
 5        to Citron Court.
 6    Q   And at this time—And I apologize if you said so, but I don't
 7        think so.  How many people were you with at this time when you
 8        were at Citron Court?
 9    A   At this time I probably had four people with me.
10    Q   What happened then, sir?
11    A   This was probably seven-thirtyish on a Friday night.
12    Q   Now I want to stop you there.  So from—When—When did you first
13        have contact with Kristine Wilkerson that day?
14    A   We stopped her when she was leaving for work roughly
15        7:00 o'clock, 7:30, somewhere around there—
16    Q   Okay.  . . . (inaudible)
17    A   —in the morning.
18    Q   —7:30 p.m. [sic].  The entire day were you spending and
19        focused on this entire—this investigation?
20    A   Yes.
21    Q   Okay.  What happened then?
22    A   At 7:30 we decided to back off and let things settle down.  We
23        believed that Sam thought we were police officers but he
24        didn't know for sure.  So, we got out of the area, we let him
25        calm down over the weekend, and then we—we initiate on Monday.
```
825

| | | |
|---|---|---|
| 1 | Q | That was a decision that you made through—Is that based on |
| 2 | | your experience through investigations? |
| 3 | A | Yes. |
| 4 | Q | So, on August 4th, 2012, that would have been a Saturday.  And |
| 5 | | how do you—Is there any way that you remember August 3rd [*sic*] |
| 6 | | of 2012 or— |
| 7 | A | It happens to be my birthday. |
| 8 | Q | Okay.  So you have a—do you have a pretty clear memory of that |
| 9 | | day? |
| 10 | A | Yes. |
| 11 | Q | August 4th, 2012, that's a Saturday? |
| 12 | A | Yes. |
| 13 | Q | You do anything that day with regards to this investigation? |
| 14 | A | No. |
| 15 | Q | August 5th of 2012 is a Sunday.  You do anything that day? |
| 16 | A | I contacted several agents and asked them to meet me early in |
| 17 | | the morning in the vicinity of Citron Court— |
| 18 | Q | Okay. |
| 19 | A | —to initiate a surveillance. |
| 20 | Q | Okay.  What happened? |
| 21 | A | The 6th—Monday morning—I was down the street from the |
| 22 | | residence— |
| 23 | Q | Of Citron Court? |
| 24 | A | Citron Court.—noticed a couple people coming in and out of the |
| 25 | | house.  The tag came back, I believe, to a Mark Waller. |

826

| | | |
|---|---|---|
| 1 | Q | Do you know who Mark Waller was? |
| 2 | A | At the time, no. |
| 3 | Q | Okay. |
| 4 | A | I may have relayed that information to Kalamazoo.  At some |
| 5 | | point, I learned he was from Kalamazoo here. |
| 6 | | I observed Mark Waller come out, get in the vehicle |
| 7 | | and depart the area. |
| 8 | Q | Okay. |
| 9 | A | A short time later—ten, 20 minutes later—I see him come back |
| 10 | | with a second person in his car.  They drove down the street, |
| 11 | | drove down by my car, pulled up next to me. |
| 12 | Q | Okay.  Now were—Did they have tinted windows or not in that |
| 13 | | car? |
| 14 | A | That car, I don't believe, had tinted windows. |
| 15 | Q | You don't believe so? |
| 16 | A | My car did. |
| 17 | Q | Right. |
| 18 | A | I don't believe their car did. |
| 19 | Q | Okay.  You said the car drove past your car.  What happened |
| 20 | | when the car was driving past your car? |
| 21 | A | Well, when it came back around, it stopped right next to me |
| 22 | | trying to look in to see who was in there. |
| 23 | Q | Okay.  And did you see anybody you see in court today that—at |
| 24 | | that time?  Did you see the defendant at that time or— |
| 25 | A | No, the defendant, I believe, was in the vehicle, but he was |

1    hiding his face behind the post of the door.

2  Q  Okay.  What happened then?

3  A  The vehicle pulled into the driveway or the grass next to the

4     driveway of the house.  The passenger got out and, with the

5     vehicle—This wasn't the Mercedes, this was an SUV.—with the

6     vehicle blocking the view, he went into the house.

7          I was on the radio and I was on a cellphone trying

8     to relay to the other agents in the area what I had observed.

9  Q  Okay.  So you saw the defendant go into the house?

10 A  I saw somebody go into the house.

11 Q  You don't know if it was the defendant—

12 A  At that point—

13 Q  — . . . (inaudible)

14 A  —I did not know.

15 Q  You see one person go into the house?

16 A  I think they both eventually went in, and then several people

17    came out on the front yard.  Several, I say—It was probably

18    two or three.

19 Q  Okay.  In response to that, what did you do?

20 A  As I said, I was on the radio trying to tell the other agents

21    what was going on and I was on the cellphone trying to call

22    for the sheriff's—the local sheriff's department.  I was

23    talking to a officer there.

24         Then, as I was doing all that, one of the other

25    agents that was positioned on the street behind

828

```
 1        Singleton [sic] Road—

 2   Q    What road was that?  I'm sorry.  You said—

 3   A    Singleton [sic].

 4   Q    Okay.

 5   A    It's either road or avenue or something.

 6   Q    So was it parallel to Citron?

 7   A    Yes, it's directly behind Citron Court, the side of the house

 8        that the Wallers' residence was on.

 9             He calls out that he sees him—he sees Sam Steel

10        coming between the two houses.

11   Q    Okay.  Do you recall that agent?

12   A    Paul Szabo.

13   Q    What happened then?

14   A    We had another vehicle with two agents in it located at the

15        front entrance of the subdivision; and, as I said, I was on

16        Citron Court past the house.  I started to drive up to that

17        location as the other vehicle started to come to Agent Szabo's

18        location.

19   Q    Okay.  Now the two individuals, or one or two individuals that

20        you saw go into that house on Citron—I just want to back up a

21        little bit.—were they walking or running into the house?

22   A    No, they were walking.

23   Q    What happened then, sir?

24   A    As I turned the corner to get onto Singleton [sic], I had seen

25        Agent Szabo standing outside his vehicle.  The other two
```

```
 1       agents were ahead of me in their vehicle, and they were coming
 2       to a stop, and Agent Szabo had the defendant on the ground.
 3  Q    Okay.  Did you have an occasion to be able to speak with the
 4       defendant at that time?
 5  A    Yes, I did.
 6  Q    Did the defendant say anything to you that you recall?
 7  A    I asked him—I showed him a copy of the photo and said, are you
 8       Sam Steel.
 9  Q    What did he say?
10  A    I don't recall his exact words, but it was something to the
11       effect that he knew what time it is.
12  Q    What did you take that to mean?
13  A    That he knew I knew he was Sam Steel.
14  Q    What happened then?
15  A    He was handcuffed, placed in the back of a vehicle, and two of
16       us transported him to the Gwinnett County Jail.
17  Q    When you say the two of you—
18  A    Two agents, myself and another agent.
19  Q    And did you continue on with the—Do you—Were you able to take
20       anything from the defendant's person?
21  A    He—I believe he had a cellphone, keys, and he may have had
22       some cash on him.  The cash—If he did, in fact, have cash, it
23       was put on his books, as it's called, at the
24       Gwinnett County Jail.
25  Q    Okay.  Did you—
```

1   A    But I'm not a hundred percent sure about that.

2   Q    Did you give that to anybody—give those—the—

3   A    The items—

4   Q    —items—

5   A    —I kept in my possession for approximately a week until the

6       Kalamazoo police department came to Atlanta to pick up

7       Sam Steel.  I met with the detectives, and I gave the property

8       to Detective Beauchamp.

9   Q    At the Gwinnett County Jail, did you have any more contact

10      with the defendant?

11  A    During the ride, we were talking to him, and he didn't—he

12      indicated he didn't really want to tell us anything, you know,

13      about the murder.  I didn't know too much about the murder, so

14      we didn't really question him about that.

15  Q    Did he say anything at all that you recall?

16  A    I mean, he might have said something about the weather but

17      just, you know, innocuous stuff.

18  Q    Nothing that you recall specific?

19  A    Yeah, nothing.

20          MR. CUSICK:   I have nothing further at this time.

21          Thank you.

22                   CROSS-EXAMINATION

23 BY MR. CHAMPION:

24  Q    Agent, as I understand, you were contacted by the FBI office

25      here in either Kalamazoo or Grand Rapids; is that correct?

| | | |
|---|---|---|
| 1 | A | Kalamazoo, yes. |
| 2 | Q | And that was reference, also, a felony warrant from the |
| 3 | | U.S. Attorney General's office for a drug possession or a |
| 4 | | delivery; is that correct? |
| 5 | A | No. |
| 6 | Q | You weren't aware of that at all? |
| 7 | A | No. |
| 8 | Q | You weren't ever aware that there was a—a federal warrant for |
| 9 | | Sam Steel? |
| 10 | A | There was a federal warrant for Sam Steel, but it was an |
| 11 | | unlawful flight to avoid prosecution warrant for murder. |
| 12 | Q | And that was from where? |
| 13 | A | From Kalamazoo. |
| 14 | Q | But were you aware of the federal warrant? |
| 15 | A | I knew that he was involved or, I believe, suspected to be |
| 16 | | involved with drugs; but I don't recall specifically that |
| 17 | | there was a—I don't—I didn't know that there was a federal |
| 18 | | warrant, but I don't know if there was a local warrant. |
| 19 | Q | Were you aware of the—That's what I'm trying to understand. |
| 20 | A | A federal drug warrant? |
| 21 | Q | Yes. |
| 22 | A | No, I said I was not aware of that. |
| 23 | Q | You didn't run—You said you ran the car through NCIC.  Didn't |
| 24 | | you run— |
| 25 | A | I— |

832

| | | |
|---|---|---|
| 1 | Q | —Sam Steel? |
| 2 | A | I believe I did run him through, but I don't recall seeing any |
| 3 | | federal drug warrant. |
| 4 | Q | There was a—You weren't aware a drug warrant was issued in |
| 5 | | November of 2011? |
| 6 | A | I don't believe I was aware of that. |
| 7 | Q | Sam didn't have any guns on him? |
| 8 | A | No. |
| 9 | Q | He was cooperative with you? |
| 10 | A | Yes.  The second time, yes. |
| 11 | Q | Well, the first time when you saw, he was walking down a |
| 12 | | driveway; is that correct? |
| 13 | A | Yes. |
| 14 | Q | The long and short of that is he was walking down the |
| 15 | | driveway, looked like he forgot something, turned back and |
| 16 | | walked into the house? |
| 17 | A | Yes. |
| 18 | Q | You drove around the block, you don't know where he went, he |
| 19 | | was sometime later 30 minutes away? |
| 20 | A | Yes. |
| 21 | Q | And a few days later you arrested him— |
| 22 | A | Yes. |
| 23 | Q | —correct? |
| 24 | | MR. CHAMPION:   Thank you. |
| 25 | | MR. CUSICK:   I have nothing further, your Honor. |

1          Thank you.

2          THE COURT:   Ladies and gentlemen, do any of you

3    have any questions for this witness?  If so, raise your hand.

4          No hands are raised.

5          Thank you, sir.  You may step down.

6          Is he excused from his subpoena, Counsel?

7          MR. CUSICK:   Yes, your Honor.  Thank you.

8          THE WITNESS:   Thank you.

9          MR. CHAMPION:   No objection, your Honor.

10         THE COURT:   Thank you.

11         Next witness?

12         MR. CUSICK:   Your Honor, at this time the People

13   would call Paul Szabo.

14         THE COURT:   Before you have a seat, sir, please

15   raise your right hand.   Do you solemnly swear or affirm that

16   the testimony you're about to give will be the truth, the

17   whole truth, and nothing but the truth, so help you God?

18         MR. SZABO:   Yes, I do.

19         THE COURT:   Please have a seat, sir.

20         With that microphone, you really need to stay close

21   to it and speak right in the end of it.

22         I need you to state and spell your first and last

23   name for the record.

24         THE WITNESS:   My name is Paul Szabo—P-a-u-l; last

25   name spelled S-z-a-b-o.

834

```
 1                    THE COURT:   Give me one moment, Counsel.

 2              Go ahead.

 3                    MR. CUSICK:   Thank you, your Honor.

 4                              PAUL SZABO,

 5        called at 10:01 a.m., and sworn by the Court, testified:

 6                          DIRECT EXAMINATION

 7   BY MR. CUSICK:

 8   Q    Good morning.

 9   A    Good morning.

10   Q    Sir, how are you employed?

11   A    I'm a special agent with the Federal Bureau of Investigation.

12        I've been employed with the FBI for approximately seven years.

13        I was a sworn law enforcement officer for approximately

14        11 years before that as well.  I'm currently assigned to the

15        Atlanta field office in Atlanta, Georgia.

16   Q    Where were you a police officer before?

17   A    In the state of Ohio.

18   Q    Okay.  And what is your role with the FBI currently?  What do

19        you do on your daily job at the FBI.

20   A    I'm currently assigned to a squad that investigates violent

21        crime and gang matters.

22   Q    Okay.  Did you have occasion to come into contact with or to

23        investigate Samuel Steel?

24   A    Yes, sir.

25   Q    You see him in court today?
```

1   A    Yes, I do.

2   Q    Can you point to him and describe what he's wearing.

3   A    Yes, he's seated to my right wearing a blue shirt and a tie.

4                MR. CUSICK:   Your Honor, let the record reflect the

5        witness has identified the defendant.

6                THE COURT:   It's noted.

7   BY MR. CUSICK:

8   Q    When do you first get involved with this investigation?

9   A    We were notified by the Kalamazoo police department that

10       Samuel Steel was wanted for murder in Kalamazoo, Michigan, and

11       we had information that he had fled to the Atlanta, Georgia,

12       area.

13  Q    And when was this?  When did you first receive this

14       information?

15  A    We first had information in early spring of 2012.  We had a

16       lead that he may be there with some friends or relatives;

17       however, that was not the case.  We did not find him with

18       them.

19               And then we received additional information.

20       Actually, Special Agent Ron Campbell was in contact with the

21       Kalamazoo police department.  We received information in

22       August of 2012 that Mr. Steel was believed to be, again, in

23       the Atlanta, Georgia, area—in particular, the Marietta,

24       Georgia area.

25  Q    Marietta, Georgia?

                              836

1    A    Correct.

2    Q    Now how far away is Marietta from Atlanta?

3    A    It's a neighboring suburb, ten miles maybe.

4    Q    Okay.  When you first became involved in the investigation,

5         were you able to find where Sam Steel was located

6         initially—specifically where he was?

7    A    Yes.  Again, Ron Campbell was handling the investigation.  I

8         was one of the agents who was assisting him as far as the

9         fugitive case in Atlanta went.

10             Special Agent Campbell had located an address in

11        Marietta where we believed Mr. Steel had been staying.  In

12        fact, Agent Campbell had, in fact, seen Mr. Steel on one

13        occasion; and before we—the rest of the agents—could get there

14        to attempt to apprehend him, apparently, Mr. Steel had gone

15        out the back door or cut through the back yard of that—

16             MR. CHAMPION:   Your Honor, I'm going to object.

17        This calls for speculation.

18             MR. CUSICK:   Your Honor, he's investigating—Based

19        on his investigation, as to what he did with information, I

20        think it is relevant; and it is not hearsay because it's not

21        being offered for the truth of the matter asserted.

22             THE COURT:   Overruled.  I'll allow it.  We had some

23        of this information come in through this way, also, so—

24             Go ahead.

25             THE WITNESS:   I was advised that

                              837

| | |
|---|---|
| 1 | Special Agent Campbell had seen Mr. Steel in front of—And I |
| 2 | don't remember the address, but in front of a residence.—and |
| 3 | was walking away from the residence, turned around, and then |
| 4 | walked back into the residence. And— |
| 5 | BY MR. CUSICK: |
| 6 | Q Do you recall when that was? |
| 7 | A When that was? |
| 8 | Q Yeah. |
| 9 | A August 2nd of 2012. |
| 10 | Q Okay. |
| 11 | A It turned out that Mr. Steel was not there. It |
| 12 | was—Special Agent Campbell was able to keep an eye on the |
| 13 | front of the residence; and, at that time, we did not have |
| 14 | agents on the rear of the residence or anywhere around the |
| 15 | residence. So it was our belief that Mr. Steel had gone out |
| 16 | the rear of the residence because he was not in the area. He |
| 17 | escaped that time. |
| 18 | Q Okay. Initially, you were able to identify Sam Steel in the |
| 19 | Georgia area. What was the main basis of your identification |
| 20 | of him going to Georgia? |
| 21 | A Through cell towers. He had a cellphone that was utilizing |
| 22 | cell towers in Georgia. |
| 23 | Q What happened—You mentioned August 2nd. What happened after |
| 24 | that? |
| 25 | A The—One thing that we noticed was that the cellphone that was |

1    being utilized by Mr. Steel hit two towers in the Norcross,

2    Georgia, area, which is on the northeast side of Atlanta, as

3    opposed to Marietta, which is on the northwest side, probably

4    a half hour or more away.  So we knew that he had gone to that

5    general area, although we did not know where he was.

6            So, on August 3rd, believing that Mr. Steel was

7    staying at the residence in Marietta, we went to that

8    residence early in the morning; and Special Agent Campbell

9    actually stopped a female who was leaving the residence that

10   morning and spoke with that female.

11           She advised Special Agent Campbell that Sam Steel

12   had, in fact, been—or she recognized his photograph, I should

13   say, as a boyfriend and that he had, in fact, been at her

14   house but was not at her home that day.

15 Q  Based on that information, what did you do?

16 A  With her permission, we went back to the residence to ensure

17   that he was not inside the residence.  She gave us permission

18   to look inside the residence, and myself and other agents did

19   go through the residence and confirm that Mr. Steel was not

20   there.

21 Q  Did you receive any information from Kristine Wilkerson

22   regarding the investigation?

23 A  I did not speak directly with Ms. Wilkerson.

24 Q  What happened then?

25 A  Special Agent Campbell had received some information later

839

| 1 | | that day through—through both Ms. Wilkerson that she—an |
|---|---|---|
| 2 | | individual driving a black Mercedes had been at her residence |
| 3 | | and also received some information—I'm sorry. |
| 4 | | Special Agent Campbell also received information |
| 5 | | then from an individual at a gas station located near |
| 6 | | Ms. Wilkerson's residence.  Apparently, Mr. Steel was known to |
| 7 | | hang out at that gas station; and an individual from that |
| 8 | | station called to say that they had, in fact, seen Mr. Steel |
| 9 | | and that he had left in a black Mercedes. |
| 10 | Q | Okay. |
| 11 | A | They— |
| 12 | Q | And what date was this again? |
| 13 | A | This would have been August 3rd, 2012. |
| 14 | Q | What happened then? |
| 15 | A | The—The individual who called provided a—a license plate. |
| 16 | | Special Agent Campbell was able to come up off of that license |
| 17 | | plate with an address in Norcross.  The license plate was |
| 18 | | registered to an individual named Mark Waller at |
| 19 | | 4060 Citron Court in Norcross, Georgia. |
| 20 | | What was important about that particular address was |
| 21 | | it did correspondence with the cell towers where the phone |
| 22 | | had—the cell towers the phone had been utilizing after it left |
| 23 | | the Marietta area. |
| 24 | Q | Okay.  Based on that information, what happened? |
| 25 | A | It was our belief that he was most likely staying at that |

1    residence.  We did—Myself and several other agents, including
2    Agent Campbell, went to that residence.

3         We did notice—I did observe the black Mercedes was
4    parked in a driveway across the street from 4060.  We did not
5    see the vehicle arrive—It was parked unoccupied at the
6    time.—so we didn't know whether the individuals from that
7    vehicle were still there, which house they had gone to.

8         We did set up surveillance for several hours but
9    saw—we did not see Mr. Steel or any activity at the time.

10   Q    Okay.  Based on that information—What kind of a car was it?

11   A    It was a black Mercedes.

12   Q    Okay.  What happened after that?

13   A    We ended up coming back in the early morning hours of
14   August 6th, 2012.

15   Q    Okay.  Did you do anything regarding the investigation on
16   August 4th, which, I believe, is a Saturday, or August 5th,
17   which is a Sunday?

18   A    No, I did not.

19   Q    Regarding August 6th, what happened?

20   A    We went out early in the morning—And I believe there were four
21   agents.—and we set up around the residence.  Agent Campbell
22   sat in a vehicle on the street on Citron Court, and he was
23   able to view the front of the residence.

24        After what had occurred in Marietta, it was our
25   belief that he may try to flee through—by exiting a rear door.

1    And, fearing that that might happen again or believing that

2    might happen again, I set up a position on the street

3    immediately behind Citron Court, which was Singletree—I don't

4    remember if it's road or street, but on Singletree.

5  Q  Is Singletree parallel to—Singletree parallel to—

6  A  Yes, sir.

7  Q  —Citron?

8  A  Yes.  They're parallel.  I was able to locate where

9    4060 Citron would be in relation to the homes on Singletree,

10   and I set up in a position so that I could keep an eye

11   specifically on that area for somebody coming out the back of

12   the home.

13 Q  Okay.  And did you do so?

14 A  I did.

15 Q  Okay.  What happened then?

16 A  It is reported sometime later by Ron Campbell that he observes

17   a male leave the residence in a vehicle, and that vehicle then

18   returned to the residence a short time later—I don't remember

19   but not a very long time returns later.—and it's now occupied

20   by two individuals.

21        Agent Campbell advised over the radio that that

22   vehicle, in fact, drove past 406—4060 Citron and drove down

23   the street.  Citron is a court.  It's a dead-end court.

24   Agent Campbell was in a vehicle towards the end of that court,

25   and he advised that the vehicle from the Citron residence with

```
 1        the two occupants drove down, stopped next to his vehicle, and

 2        was looking into his vehicle.

 3   Q    Okay.  Now where was Agent Campbell at the time again?  He was

 4        specifically on Citron?

 5   A    He was parked on Citron Court.

 6   Q    And you are at Singleton [sic] then?  Or is it

 7        Single—Singletary [sic]?

 8   A    Singletree.

 9   Q    Singletree.

10   A    Yes.

11   Q    Okay.  And what happened then?

12   A    Agent Campbell reported that the vehicle then went back to the

13        home, and he did see two individuals go into the residence.

14        He also saw some activity outside of the home shortly

15        thereafter.

16             It is within a very short period of time when I

17        observed Sam Steel come running out from the back yard out

18        onto Singletree.  He comes out onto the road, and he is

19        running down Singletree directly towards me.  I'm actually

20        able to use binoculars, and I can see for certain that it is,

21        in fact, Sam Steel based on the photographs that I had of him.

22             I radioed the other—

23   Q    Okay.  I just want to hold off on that.

24             You see right in front of you—

25   A    Yes, sir.
```

843

1   Q   Right in front of you is People's exhibit number 109.  Is that
2       the photo that you were shown?
3   A   That is what I had, yes.
4   Q   Okay.  What happened then, sir?
5   A   He was running directly towards me.  At that point, I'm
6       assuming he did not know I was in the vehicle.  I radioed the
7       other agents to respond the area, that it was, in fact, him
8       and that he was running.
9   Q   Okay.  What exactly was the time of this?  Do you recall
10      exactly what time it was or—
11   A   I don't recall an exact time.  It was in the early morning
12      hours, 7:00 a.m., 8:00 a.m., somewhere around that time.
13   Q   What happened then?
14   A   As he came down the street towards me, he—he was running at
15      first, and then he slowed and started to walk.  He was looking
16      over his shoulder as he came.  He actually came and walked
17      right past my car.
18            At this point, other agents were responding to the
19      area.  I didn't want to get out to confront Mr. Steel until
20      other agents were nearby because I anticipated it would be a
21      foot pursuit.
22            As other agents were coming down, I backed my car up
23      next to Mr. Steel; and, as I was getting out of the car, he
24      had, in fact, seen the other vehicles coming down the street
25      and he had stopped, put his hands in the air, and was actually

844

1    getting down on the ground.  I advised him to get on the

2    ground, but he was already in the act of doing that and—

3 Q  Okay.  How long did the, I guess, the chase—How long do you

4    see him run for—

5 A  I—

6 Q  —and walk?  The time that he was looking over his shoulder,

7    walking, and the time that he was running, how long did that

8    last?

9 A  It was less than a minute.

10 Q  Okay.

11 A  I would say it was maybe a minute at most.

12 Q  What happened then?

13 A  He—Again, he complied instantaneously.  Even before I was

14    getting out of the car, he was going down to the ground.  I

15    was able to handcuff him.  He was compliant and was taken into

16    custody without—without incident.

17          By that—At that point, all the other agents are on

18    scene—This is happening simultaneously.—including

19    Agent Campbell.

20 Q  So, when you first arrest him, was it just you that was

21    around, or were other people . . . (inaudible)

22 A  No, there were others.

23 Q  Okay.

24 A  I just—I was the closest person, and I handcuffed him.

25 Q  How many agents were around him at the time?

1   A    There were four of us total.

2   Q    Were you running after him, all the agents—you and the other

3        agents chasing him?

4   A    I didn't chase him on foot.  As I was getting out of the car,

5        he complied.

6   Q    Okay.  You were in your car at the time that he was

7        . . . (inaudible)

8   A    Correct.  As soon as Mr. Steel saw that we were there, he,

9        obviously, made the assumption we were law enforcement and

10       he—he put his hands up instantly.

11  Q    What did he say, if anything?

12            MR. CHAMPION:   Objection, your Honor.

13  BY MR. CUSICK:

14  Q    What did he say?

15            MR. CHAMPION:   Can we approach?

16            THE COURT:   Yes.

17            (At 10:16 a.m., bench conference as follows:

18                MR. CHAMPION:   He's in custody.  I've heard no

19                mention of *Miranda*.

20                MR. CUSICK:   Well, I guess if he didn't ask a

21                question, he said something . . . (inaudible) There

22                wouldn't have to be a *Miranda* if there's no

23                interrogation.

24                THE COURT:   Are you expecting—

25                MR. CUSICK:   Did he say anything—

                            846

1          THE COURT:    Are you expecting that he said

2     something?

3          MR. CUSICK:    No.  But, I mean, if

4     somebody—somebody's under arrest and there's no

5     questions and they make a statement—

6          THE COURT:    He's voluntarily saying—I just

7     don't know if the police report—

8          MR. CUSICK:    Right.

9          THE COURT:    —indicates what he—

10          MR. CUSICK:    . . . (inaudible)

11          MR. CHAMPION:    . . . (inaudible) police report

12     . . . (inaudible)

13          MR. CUSICK:    I can clarify that.  I can make

14     sure that, you know, that it wasn't in response to

15     any question.

16          THE COURT:    I'm going to overrule the

17     objection and allow him to answer.  It doesn't sound

18     like there is—I guess you can clarify and say did

19     you ask him a question, but I don't think—

20          MR. CHAMPION:    The way the—

21          THE COURT:    —that it would be an—

22          MR. CHAMPION:    —question is—

23          THE COURT:    —involuntary statement.

24          MR. CHAMPION:    —what he said, I think is

25     inappropriate, did he make any statements.

                           847

1          MR. CUSICK:   Okay.  Fair enough.

2          THE COURT:   Okay.)

3          THE COURT:   Go ahead and rephrase your question,

4     then, Mr. Cusick.

5  BY MR. CUSICK:

6  Q    The defendant—What did the defendant say—

7          MR. CHAMPION:   Again, your Honor, I'm going to

8     object.  I don't believe there's a proper foundation.

9          THE COURT:   Overruled.

10          Go ahead.

11  BY MR. CUSICK:

12  Q    What did the defendant say?

13  A    I don't remember his specific comment, but it was essentially

14     you know what time it is, you know what it is, a reference to

15     he knew—we knew who he was.

16  Q    Did you transport him, or did somebody else?

17  A    I did not.  Again, Special Agent Campbell was there when I

18     handcuffed him.  I turned him over to Agent Campbell then and

19     there.

20  Q    Did you—Were you able to retrieve anything from the

21     defendant's person at the time or no?

22  A    I would have searched him for weapons, and I would have

23     emptied his pockets and handed everything to Agent Campbell,

24     as he was taking custody of him.

25  Q    Did you have any more involvement with this investigation?

848

```
 1  A    No.
 2                  MR. CUSICK:   I have nothing further.
 3            Thank you.
 4                        CROSS-EXAMINATION
 5  BY MR. CHAMPION:
 6  Q    Good morning, Agent.  How are you?
 7  A    Good morning.  I'm doing well.
 8  Q    Now the first encounter that Special Agent Campbell had with
 9       Sam Steel, you weren't present; is that correct?
10  A    That's correct.
11  Q    Your assumption that he snuck out the back door is just that;
12       is that correct?
13  A    It's based on what Agent Campbell told me he observed and then
14       the fact that Mr. Steel was not there.
15  Q    Were you aware—According to Agent Campbell, who testified
16       earlier today, he said he saw Sam Steel walk down the
17       driveway, looked like he forgot something, walked back into
18       the house and Special Agent Campbell drove by the residence,
19       didn't stop in front.  Were you aware of that?
20  A    That's accurate.
21  Q    And that—Were you aware that Special Agent Campbell's
22       testimony today was that he drove around the block and he had
23       no idea where or when Sam Steel left the residence?
24  A    I'm not aware that's what he testified to, but—
25  Q    You weren't aware of that on the—on the day in question?  You
```

1        weren't present; is that correct?

2  A    I was not present, no.

3  Q    Thank you.

4            Now, when you began your investigation in—What,

5    April, March of 2012—

6  A    Somewhere around there, yes.

7  Q    —May—You're not sure.

8  A    Uhm-hmm.

9  Q    —that time frame—were you aware that there was a federal

10    indictment for Sam Steel for drugs?

11  A    I'm not aware of that.

12  Q    Do you commonly run people through NCIC—or

13    NCI—Yeah.—National Crime Information Network to see if there

14    are outstanding warrants or indictments?

15  A    Yes, oftentime we do.  I did not run Sam Steel.

16  Q    So you weren't aware that a federal indictment had been issued

17    as early as November of 2011 for the arrest of Sam Steel?

18  A    I was not, no.

19           MR. CHAMPION:   Thank you.

20           MR. CUSICK:   May we approach, your Honor?

21           THE COURT:   Yes.

22           (At 10:21 a.m., bench conference as follows:

23              MR. CUSICK:   When I asked the question

24           regarding the federal—any federal case that you were

25           aware yesterday, defense counsel objected.  He

1    brings it up.  I just wanted—I want to be clear if I
2    ask a question regarding that—I mean, I don't
3    know—He obviously feels it's relevant.  He asked the
4    question.
5        THE COURT:  He's opened the door at this
6    point.
7        MR. CHAMPION:  Well, the difference is—Okay.—I
8    have no federal reports.  I don't have
9    . . . (inaudible) She talked to the federal police.
10   I don't have those reports.  I have none of that
11   information, none of that discovery.
12       The indictment's public documents.  I can talk
13   about the indictment.  They're making a big deal of
14   him fleeing.  The federal indictment was before.
15       THE COURT:  I mean, depending on the question,
16   it may or may not be in.  There is—The door was
17   opened.  That's all I can say.  I don't know what
18   the question—I don't know what was going on there.
19   I don't know if—I don't know what you—what you have
20   at this point, so—But you've opened the door to the
21   federal indictment.  So, again, depending on what
22   the question is, he may or may not be able to get
23   into that.  I don't know what he's planning on
24   doing.  I don't know what's out there.
25       MR. CHAMPION:  Well, the issue is a flight,

851

and there was a federal indictment prior to.  It's
just a matter of record . . . (inaudible)

 Yesterday's question, what I objected to, is
what had that witness told the FBI as part of the
federal investigation.

 THE COURT:  Yesterday's question, I think, was
did you talk to a federal agent about—

 MR. CUSICK:  Yeah, and I just—The only reason
I'm bringing this up is because, you know, going
forward, if I have a question like that—I mean,
obviously, defense counsel can object whenever he
wants, but—

 THE COURT:  Wait.  It may—

 MR. CUSICK:  —I just want—

 THE COURT:  —or may not—

 MR. CUSICK:  —I want to be—

 THE COURT:  —come in.

 MR. CUSICK:  I want to be clear that—

 MR. CHAMPION:  Right.

 MR. CUSICK:  —that's what—

 THE COURT:  Right.  I mean, obviously—

 MR. CUSICK:  My view is it—

 THE COURT:  —this issue—

 MR. CUSICK:  —would be relevant.

 THE COURT:  —is now in the trial.  So he's

```
1                   opened the door—

2                        MR. CHAMPION:   Right.

3                        THE COURT:   —so we'll see what happens.

4                        MR. CUSICK:   Thank you.

5                        MR. CHAMPION:   Thank you.)

6              THE COURT:   Any further questions?

7              MR. CUSICK:   I have nothing further, your Honor.

8              Thank you.

9              MR. CHAMPION:   Thank you, your Honor.

10             THE COURT:   Ladies and gentlemen, do any of you

11       have any questions for this witness?

12             It looks like we do have a question.  Go ahead,

13       Mr. Cusick.

14                   (At 10:23 a.m., bench conference as follows:

15                        THE COURT:   Well, there you go.

16                        MR. CUSICK:   I think it was brought up.

17                        MR. CHAMPION:   Yeah.)

18             THE COURT:   What is the difference between a

19       federal warrant for arrest and a local warrant from Kalamazoo,

20       Michigan?

21             THE WITNESS:   It would be the jurisdiction that

22       issues the warrant.  A federal warrant—Excuse me.—federal

23       charges would be brought by the United States Attorney's

24       office for a violation of federal crime.  A warrant brought

25       by, for example, Kalamazoo, Michigan, would be for a violation
```

| | |
|---|---|
| 1 | of state—a state crime that occurs within their jurisdiction. |
| 2 | THE COURT:   Counsel, will you approach. |
| 3 | (At 10:24 a.m., bench conference as follows: |
| 4 | THE COURT:   That next part of this question |
| 5 | is, and does it make a difference.  I'm not going to |
| 6 | ask him that question.  He's answered his portion of |
| 7 | it— |
| 8 | MR. CUSICK:   Okay. |
| 9 | THE COURT:   —so—Okay.) |
| 10 | THE COURT:   Mr. Cusick, any further questions based |
| 11 | on that question? |
| 12 | MR. CUSICK:   No, your Honor.  Thank you. |
| 13 | THE COURT:   Mr. Champion? |
| 14 | MR. CHAMPION:   No, your Honor. |
| 15 | THE COURT:   Thank you, sir.  You may step down. |
| 16 | THE WITNESS:   Thank you. |
| 17 | THE COURT:   I'm sorry.  Counsel, will you approach |
| 18 | again. |
| 19 | (At 10:25 a.m., bench conference as follows: |
| 20 | THE COURT:   Who do you have next? |
| 21 | MR. CUSICK:   We have one very quick witness |
| 22 | Pat Johnson.  He was on the initial investigation. |
| 23 | He's from Chicago. |
| 24 | THE COURT:   Perfect. |
| 25 | MR. CUSICK:   He will not take long at all. |

854

1          It'll take less time than these guys.

2               THE COURT:   Yeah.

3               MR. CUSICK:   And then maybe we can take a

4          break as we have—

5               THE COURT:   Yeah, because we've been here not

6          quite a half—an hour and a half, so that's good.

7          We'll do one more.

8               MR. CUSICK:   Okay.

9               MR. CHAMPION:   Yeah.

10              THE COURT:   Okay.)

11          THE COURT:   Next witness, Mr. Cusick?

12          MR. CUSICK:   Pat Johnson, your Honor.

13          THE COURT:   Everyone's okay if we take one more

14     witness?  Anyone need a break right now?

15          Before you have a seat, sir, please raise your right

16     hand.  Do you solemnly swear or affirm that the testimony

17     you're about to give will be the truth, the whole truth, and

18     nothing but the truth, so help you God?

19          MR. JOHNSON:   Yes, ma'am.

20          THE COURT:   Please have a seat, sir.

21          With that particular microphone, you really need to

22     stay close to the end and speak right in the end of it.

23          I need you to state and spell your first and last

24     name for the record, sir.

25          THE WITNESS:   Patrick Johnson—J-o-h-n-s-o-n.

1          THE COURT:   Patrick—P-a-t-r-i-c-k?

2          THE WITNESS:   Yes, ma'am.

3          THE COURT:   All right.  Go ahead.

4          MR. CUSICK:   Thank you.

5                      PATRICK JOHNSON,

6      called at 10:26 a.m., and sworn by the Court, testified:

7                      DIRECT EXAMINATION

8   BY MR. CUSICK:

9   Q    Mr. Johnson, good morning.

10  A    Good morning.

11  Q    How are you employed, sir?

12  A    I'm a detective with the Chicago police department.

13  Q    Okay.  And how long have you been with the Chicago police

14       department?

15  A    A little more than 17 years.

16  Q    And did you—Were you part of an investigation regarding a

17       Samuel Steel?

18  A    Yes, I was.

19  Q    Did you have any contact directly with Samuel Steel?

20  A    No, I did not.

21  Q    Okay.  When did you get involved in the investigation?

22  A    I first became involved in the investigation in late December

23       of 2011.

24  Q    Okay.  2011?

25  A    Yes.

                              856

```
 1   Q    And how did you become involved in the investigation?

 2   A    I received word from Kalamazoo detectives that Samuel Steel

 3        might be headed to Chicago.

 4   Q    Okay.  And, based on that information, what did you do?

 5   A    Excuse—I'm sorry?

 6   Q    Based on that information, sir—Officer—what did you do?

 7   A    I—I remember one of the first things we did was went to

 8        Wendell Montgomery's, I believe, apartment—

 9   Q    Okay.  And why did you go—

10   A    —in Chicago.

11   Q    Why did you go to Wendell Montgomery's apartment?

12   A    I believe that the information we had from Kalamazoo is that

13        he might be going to Wendell Montgomery's apartment or that

14        there was a phone that had been used that came back to

15        Wendell Montgomery they thought Sam Steel was using.

16   Q    Okay.  And did you go to Wendell Montgomery's apartment?

17   A    Yes.

18   Q    Do you recall what day you went?

19   A    I don't recall the exact day.  If I looked at my reports, it

20        might refresh my memory.  But I believe it was—it was after

21        Christmas—

22   Q    Would your report—

23   A    —sometime in the week after Christmas.

24   Q    Would your report refresh your memory?

25   A    Yes.  Okay.
```

```
1  Q   Is your memory refreshed?

2  A   Yes, it is.

3  Q   What day did you—

4  A   I—

5  Q   —go to Wendell Montgomery's apartment?

6  A   Actually, it says here two different occasions between

7      January 3$^{rd}$ and January 5$^{th}$ of 2012.

8  Q   Did you speak with Mr.—Mr. Montgomery?

9  A   I'm sorry.  I didn't hear you.

10 Q   I'm sorry.  Did you speak with Mr. Montgomery?

11 A   Yes.

12 Q   And were you able to receive information from him regarding

13     where Sam Steel is—or was?

14 A   He was not able to give us information where Sam Steel was at

15     that moment.  He said that Sam Steel had been in Chicago at

16     Wendell Montgomery's apartment for about a week—a little less

17     than a week, six days.

18 Q   Do you recall which days those were?

19 A   I believe the 23$^{rd}$ to the 29$^{th}$ of December.

20 Q   Okay.  What—What was your involvement with the investigation

21     after that?

22 A   Minimal at that point.  I—Like I said, I had two—two

23     interviews with Wendell Montgomery in early 2012.

24             Later in the year, there was information that he

25     might—Sam Steel might be back in Chicago—I think that was in
```

| | | |
|---|---|---|
| 1 | | July.—and we followed up on that, and it didn't— |
| 2 | Q | July of 2012? |
| 3 | A | Yes. |
| 4 | Q | Did you conduct any type of investigation regarding that |
| 5 | | information in July of 2012? |
| 6 | A | Yes, we conducted a surveillance of a picnic in a public park |
| 7 | | in Chicago that summer— |
| 8 | Q | Okay. |
| 9 | A | —we thought he might arrive, but he never did. |
| 10 | Q | And how did you figure out—or how do you receive the |
| 11 | | information that he might arrive? |
| 12 | A | I—There was a cooperator—cooperating source that was giving |
| 13 | | information to the Kalamazoo police department. |
| 14 | | MR. CUSICK: I have nothing further. |
| 15 | | MR. CHAMPION: No questions, your Honor. |
| 16 | | THE COURT: Ladies and gentlemen, do any of you |
| 17 | | have any questions for this witness? |
| 18 | | No hands are raised. |
| 19 | | Thank you, sir. You may step down. |
| 20 | | Is he excused from his subpoena, Counsel? |
| 21 | | MR. CUSICK: Yes, your Honor. |
| 22 | | MR. CHAMPION: Yes, your Honor. |
| 23 | | THE COURT: Thank you, sir. |
| 24 | | All right. We'll take a morning break at this time |
| 25 | | for about 15 minutes or so. |

```
1            Please remember all of my prior instructions.

2            Ms. Wint should be here in a moment.

3            Just leave your notebooks on your chairs.

4            All rise.

5            (At 10:31 a.m., jury exits courtroom)

6            You may be seated.

7            MR. CUSICK:   Door's closed, your Honor.

8            THE COURT:   All right.  Counsel—The door is

9     closed.—is there anything we need to address?

10           The jury has left the courtroom.

11           MR. CHAMPION:   No, your Honor.

12           MR. CUSICK:   No, your Honor.

13           THE COURT:   I have been working on your order.

14    I've made just a few changes.  So I just want you both to look

15    at it very quickly before I sign it in final form.

16           Court's in recess for about 15, 20 minutes.

17           (At 10:32 a.m., court recessed)

18           (At 10:53 a.m., proceedings reconvened)

19           THE CLERK:   The court recalls the case People

20    versus Samuel Steel, III, case number C11-1983 FC.

21           Parties, please restate appearances for the record.

22           MR. CUSICK:   Good morning, your Honor.

23           Paul Cusick on behalf—

24           MR. CHAMPION:   May it please the Court,

25    Robert Champion appearing on behalf of Samuel Steel.
```

1          THE COURT:   All right.  Just a couple things.  I
2     did sign the order, so that's being processed, Mr. Champion,
3     for the phone records.
4          And we also did have a discussion about the
5     information we received from Mr.—the People received from
6     Mr. Clatterbuck.  I did indicate that he does need—My
7     understanding is it's just, basically, one sentence
8     information about any witness contact he had had; and I did
9     indicate to Counsel that Mr. Clatterbuck needs a little bit
10    more detailed information to be provided with regards to any
11    witnesses that he's interviewed.  That needs to be turned
12    over—I believe I said Tuesday or Wednesday.  I don't recall
13    exactly which day I said.
14         MR. CHAMPION:   I believe you said the 4th, if I'm
15    not mistaken.
16         THE COURT:   The 4th.
17         MR. CUSICK:   You said on Tuesday by
18    5:00—5:00 o'clock.  I mean, I would actually—
19         THE COURT:   He's back from vacation on—
20         MR. CHAMPION:   I'm not sure.  I just know our
21    office attempted to contact him yesterday and was advised—
22         THE COURT:   Let's say—
23         MR. CHAMPION:   —he was—
24         THE COURT:   —Wednesday at—
25         MR. CHAMPION:   —on vacation.

| | |
|---|---|
| 1 | THE COURT: —noon then. How's that? |
| 2 | MR. CUSICK: If defense counsel won't start their |
| 3 | case by then. |
| 4 | THE COURT: Hmm. I don't know. |
| 5 | MR. CUSICK: I mean, it just creates— |
| 6 | THE COURT: It looks like— |
| 7 | MR. CUSICK: —a situ— |
| 8 | THE COURT: —we're going to be done? |
| 9 | MR. CUSICK: Yeah. |
| 10 | THE COURT: I'm going to say Tuesday by 5:00. It |
| 11 | looks like he might be—we might be turning it over to you |
| 12 | Wednesday early morning. |
| 13 | MR. CHAMPION: Thank you. |
| 14 | THE COURT: So—Yeah, Tuesday by 5:00. |
| 15 | All rise. |
| 16 | (At 10:56 a.m., jury returns to courtroom) |
| 17 | You may be seated. |
| 18 | All right. Welcome back, ladies and gentlemen. |
| 19 | Your next witness, Mr. Cusick. |
| 20 | MR. CUSICK: Your Honor, at this time, the People |
| 21 | would call Devon Smith. |
| 22 | THE COURT: Before you have a seat, sir, can you |
| 23 | raise your right hand as best you can. Do you solemnly swear |
| 24 | or affirm that the testimony you're about to give will be the |
| 25 | truth, the whole truth, and nothing but the truth, so help you |

1      God?

2                  MR. SMITH:   Yes, ma'am.

3                  THE COURT:   Please be careful as you step up.  Have

4      a seat.

5                  All right.  With that microphone, sir, you need to

6      speak right in the end of the microphone.

7                  Can you move it down a little bit.  I don't know if

8      you . . . (inaudible) Don't pull too far back or we won't be

9      able to hear what you're saying.

10                 I need you to state and spell your first and last

11     name for the record, sir.

12                 THE WITNESS:   Devon Smith—D-e-v-o-n S-m-i-t-h.

13                            DEVON SMITH,

14     called at 10:58 a.m., and sworn by the Court, testified:

15                        DIRECT EXAMINATION

16 BY MR. CUSICK:

17 Q    Good morning, Mr. Smith.

18 A    Good morning.

19 Q    Mr. Smith, I want to direct your attention to sometime of

20     November 2011.  Were you in the area of 629 Mabel Street?

21 A    I don't remember the address, but I know I was on

22     Mabel Street.

23 Q    Okay.  And why were you at that lo—Did something happen that

24     day that brings you into court today?

25 A    Yeah, it was a conversation I had with—with a guy over there.

```
1   Q   Okay.  And do you know a Sam Steel?

2   A   Yes.

3   Q   And how long have you known Sam Steel?

4   A   Ever since I was about 11 or 12 years old, something like

5       that.

6   Q   And who lives at that location, Mr. Smith, at 629 Mabel Street

7       that you were aware of at the time of November of 2011?

8   A   His mother.

9   Q   And who else, Mr. Smith, was there at the time, do you recall?

10  A   I know I had my son with me at the time.  My son was with me.

11  Q   Anybody else that you recall?

12  A   There was so many people there, like coming and leaving, I

13      can't recall.

14  Q   So, from what you can recall, you had your son there,

15      Sam Steel was there—

16  A   Yes.

17  Q   —and—and you were there, correct?

18  A   Excuse me?

19  Q   And you were there?

20  A   Yes.

21  Q   Okay.  Sir, do you know an A. J. Mathews?

22  A   Yeah.  Yeah, I know A. J.

23  Q   How long have you known him?

24  A   I knew A. J.—It wasn't like we had a relationship.—just like

25      through passing, but I never knew him, never sit around him
```

864

1     and had a conversation with him or nothing like that.

2   Q   What about Walter Johnson?  Do you know Walter Johnson?

3   A   Yes, I know Walt.

4   Q   How long have you known him?

5   A   I knew Walt ever since I was 18.

6   Q   Do you know a Steven Brown as Khaki?

7   A   Yeah, I know Khaki.

8   Q   How long have you known him?

9   A   I knew Khaki ever since I was about maybe 19 or 20, something

10      like that.

11  Q   November of 2011 at this location, do you have a conversation

12      with the defendant?

13  A   Yes.

14  Q   Can you tell the jury what that conversation was about.

15  A   We had a conversation on the side.  He had pulled me to the

16      side of his mother's house.  And he was telling me the police

17      was like on to him, like start messing with him about the

18      murder of Milo—

19  Q   Okay.  And—

20          THE DEFENDANT:  He's telling a lie.  He's lying.

21          THE COURT:  Sir—

22          Okay.  Hold on a second.

23          I'm going to have the jury go out in the hallway for

24      a minute.

25          Ms. Wint should be here in a moment.

865

1          THE DEFENDANT:   You know he's lying.

2          THE COURT:   All rise.

3          (At 11:01 a.m., jury exits courtroom)

4          You may be seated.

5          Please let me know when the door is shut.

6          MR. CUSICK:   It's shut, your Honor.

7          THE COURT:   Mr. Steel, this is the second time that

8    you have spoken up.  I will not stand—

9          THE DEFENDANT:   Well, he's lying on me.

10         THE COURT:   Mr. Steel—

11         THE DEFENDANT:   He's lying.  I can't—

12         THE COURT:   —listen to me.  I will not stand for

13   that.  If you do it another time, you'll be downstairs

14   watching this by way of video conference.  Do you understand

15   that?

16         You are not allowed to speak when witnesses are

17   talking.  You're certainly entitled to be in here but not when

18   you behave like that.  This is—

19         THE DEFENDANT:   This man—

20         THE COURT:   No—

21         THE DEFENDANT:   —know that man is lying.

22         THE COURT:   —it's not your turn to talk.

23         You've said that twice.  You will not disrupt this

24   trial nor will anyone else.  If I hear any other comments—

25         You're not allowed to shake your head, folks.

1    You're not allowed to react to any witness.

2            I will start taking people out of the court and not

3    letting you come back in.  Trials are certainly—are certainly

4    open to the public, but you have got to respect the process.

5            THE DEFENDANT:  I apologize, your Honor.

6            THE COURT:  Do not let it happen again—

7            THE DEFENDANT:  It won't.

8            THE COURT:  —or you will not be sitting here.  Do

9    you—

10           THE DEFENDANT:  It won't.

11           THE COURT:  —understand that?

12           THE DEFENDANT:  Yes, I do.

13           THE COURT:  Okay.

14           THE DEFENDANT:  I'm sorry.

15           THE COURT:  She should be coming in in a second.

16           And I'll make one other comment, Mr. Steel.  It

17    certainly, I do not believe, helps when the jury is watching

18    you act like this.  It does nothing for your case—

19           THE DEFENDANT:  I understand, your Honor—

20           THE COURT:  —so—

21           THE DEFENDANT:  —but the man is not telling the

22    truth.  He's trying to get time off.

23           THE COURT:  Mr. Steel, it is not—you're not

24    testifying, you are not allowed to comment.  You can make that

25    choice later.  Okay?

```
 1                    THE DEFENDANT:  Okay.

 2                    THE COURT:   You can talk to your attorney.

 3                    THE DEFENDANT:  Yes.

 4                    THE COURT:   But I'm telling you it certainly does

 5           not help your situation.

 6                    THE DEFENDANT:  Right.

 7                    THE COURT:   I'm sure the appearance does not look

 8           so well, and your conduct don't look so well.  So please don't

 9           make me take you out of the courtroom.  Okay?

10                    THE DEFENDANT:  Okay.

11                    THE COURT:   I thought I buzzed.  I'll buzz again.

12                    All rise.

13                    (At 11:04 a.m., jury returns to courtroom)

14                    You may be seated.

15                    You may continue, Mr. Cusick.

16                    MR. CUSICK:   Thank you, your Honor.

17   BY MR. CUSICK:

18   Q    Mr. Smith, you were talking about a conversation that you had

19        with Mr. Steel—

20   A    Yeah.

21   Q    —in November of 2011 at 629 Mabel Street.  Can you tell the

22        jury what the defendant said.

23   A    Start back over?

24   Q    Yeah, if you can, sir.

25   A    Yeah, we went to the side of his mother house; and he said,
```

1    man, I think the police going to start fucking me about—about

2    Milo murder.

3              And I said, I thought you said you ain't do it, man.

4              And he stated, I had to, that motherfucker broke in

5    my house.

6  Q  Okay.

7  A  So—

8  Q  Up until that point, Mr. Smith, had you ever had any

9    conversations with the defendant about the murder?

10 A  Excuse me?

11 Q  Up until that point in November 2011, had you ever had any

12   conversations with the defendant about the murder?

13 A  Well, he used to call me on the phone and we used to talk and

14   he be saying that people were saying he killed Milo and he

15   didn't do it, you know, things like that; and that was about

16   it.

17 Q  Okay.  And then on—In this time I November of 2011, when he

18   said this to you, what did you say to him?

19 A  I said, I thought you didn't do it.

20 Q  Okay.

21 A  And that's when he stated, you know, that motherfucker broke

22   in my house, I had to.

23 Q  Okay.  Now did he say—the defendant say anything about

24   A. J. Mathews or Walter Johnson and what their involvement

25   was?

```
 1  A    No, he—I basically asked him—like I said, who was you with,
 2       was you by yourself, you know, like—
 3                 He was like, he was with A. J. and Walt.
 4  Q    Okay.  And did he indicate if he was dropped off anywhere?
 5  A    Yeah, I asked him, I said, who you was with.
 6                 He say, A. J. and Walt.
 7                 Then I say, they ain't see you do it, did they.
 8                 He said, no, they dropped me off on Elizabeth.
 9  Q    Okay.  And what did he say after that?
10  A    He said—He said, they dropped me off on Elizabeth.
11                 And I asked him, I said, ain't nobody see you do it.
12                 He said, no, I went through the shortcut on
13       Elizabeth and I popped that motherfucker and kept running
14       through there.  He was just pointing to the ground—like we was
15       on the side of his mother house—like through the shortcut on
16       Mabel and jumped back in the truck with them on Florence.
17  Q    Okay.  With them, are you—who are you referring to?
18  A    Excuse me?
19  Q    You said jumped back in the truck with them.  Who are you—
20  A    He had to be talking about A. J. and Walt.
21  Q    Okay.  Did he say where the truck was parked?
22  A    No, he didn't say where it was parked.
23  Q    Okay.  Did he say anything about clothes that he was wearing?
24  A    Only thing he told me about the clothes, he just say he burnt
25       some clothes—they burnt the clothes or something like that,
```
870

```
 1    man, like—
 2            'Cause I asked him, I said, what you do with the
 3    gun.
 4            He said, I burnt everything.
 5  Q  He tell you where he burned it or—
 6  A  No, he didn't tell me where he burnt it.
 7  Q  And did you have occasion to speak with a
 8    Detective Brian Beauchamp?
 9  A  Yes.
10  Q  And I want to direct your attention to March 14th of 2013.
11  A  Yes.
12  Q  You came forward and told Detective Beauchamp what happened?
13  A  Yes.
14  Q  Why did you do that?
15  A  'Cause it's the right thing to do.  It'll help Milo's mother
16    get her closure she needs.
17  Q  Did you know Milo Conklin?
18  A  Yes.
19  Q  Were you friends with him?
20  A  Yes, real good friends.
21  Q  You were friends with the defendant?  Were you friends with
22    the defendant?
23  A  Yes.
24  Q  Were you at Mabel Street on April 24th of 2011?  Did you
25    witness anything yourself?
```

871

```
 1  A    No, I was—No, I wasn't there.
 2                  MR. CUSICK:   Okay.  Just have one moment?
 3                  (At 11:09 a.m., off record discussion between
 4                  Mr. Cusick and Detective Beauchamp)
 5                  May I have one moment, your Honor?  I apologize.
 6                  THE COURT:   Yes.
 7  BY MR. CUSICK:
 8  Q    Sir, you're in federal custody, correct?
 9  A    Yes.
10  Q    Okay.  And did you plea to a certain charge?  You pled—Did you
11       plead guilty to a certain charge?
12  A    Yes.
13  Q    Okay.  And can you just tell the jury what that charge was.
14  A    Conspiracy to delivery a hundred or more grams of heroin and
15       cocaine base.
16  Q    Okay.  And are you serving time for that right now?
17  A    Yes.
18  Q    How long are you serving for that?
19  A    Fifteen years.
20  Q    Is that a minimum of 15 years?
21  A    A hundred and eighty-eight months, that's what my term was,
22       yeah.
23  Q    And that's—Is it a—Do you know if it's—Is it a life offense,
24       meaning that the maximum is life and the minimum is 15?  If
25       you know.  If you don't know, I don't want you to
```

872

```
 1          . . . (inaudible)

 2    A     I don't recall.

 3    Q     Okay.  Did you promise to the federal government to tell the

 4          truth as part of your plea agreement?

 5    A     Yes.

 6    Q     Okay.  And do you tell them to—that you would give truthful

 7          information regarding criminal activity that you are aware of?

 8    A     Yes.

 9    Q     And have you done so?

10    A     Yes, sir.

11    Q     Have you talked with Walter Johnson at all about this case?

12    A     Never.

13    Q     Have you talked with A. J. Mathews at all about this case?

14    A     Never.

15    Q     Have you talked with Khaki—Steven Brown—about this case?

16    A     Never.

17                    MR. CUSICK:   I have nothing further.

18                    Thank you, your Honor.

19                    THE COURT:   Counsel, will you approach, please.

20                    (At 11:12 a.m., bench conference as follows:

21                        THE COURT:   Is there a problem?

22                        MR. CHAMPION:   . . . (inaudible)

23                        THE COURT:   I know.  But is there a problem

24                    with Mr. Steel.  He's talking about—Is there

25                    somebody in the—
```

```
 1                    MR. CHAMPION:   There's a—

 2                    THE COURT:   —court—

 3                    MR. CHAMPION:   —witness here.

 4                    MR. CUSICK:   Witness for us?

 5                    MR. CHAMPION:   . . . (inaudible)

 6                    THE COURT:   Is it—Who is it?

 7                    MR. CHAMPION:   Mr. Whitfield.

 8                    THE COURT:   Oh, is he—

 9                    MR. CUSICK:   How long has he . . . (inaudible)

10                    THE COURT:   Is it going to be—Is he in the

11              courtroom or not?  Is he in the courtroom?

12                    MR. CHAMPION:   Yes, . . . (inaudible)

13                         CROSS-EXAMINATION

14   BY MR. CHAMPION:

15   Q    Now I understand you came forward on March 14, 2013, and spoke

16        to Detective Beauchamp; is that correct?

17   A    Yes.

18   Q    Between April of 2011 and March of 2013, isn't it true that

19        you and Walter Johnson shared the same cell?

20   A    I can't recall.

21   Q    You don't recall being in the cell during that period of time

22        with Walter Johnson?

23   A    No.

24   Q    If records indicate otherwise, you wouldn't dispute that; is

25        that correct?
```

```
 1   A   I mean, I can't recall.
 2   Q   And as part of your federal case, your cooperation in this
 3       case, you got a reduction in your sentence; is that correct?
 4   A   Say that again.
 5   Q   As part of your cooperation in this case, you got a reduction
 6       in your federal case as to your sentence?
 7   A   No.
 8   Q   You didn't?
 9   A   No.
10   Q   So, if the proffered letter and the plea agreement and the
11       agreement to file a memorandum after you testify to reduce
12       your sentence, that wouldn't be applicable in this case?
13   A   I have no idea.  I never heard of that.
14   Q   You never heard of that.
15   A   . . . (unintelligible)
16   Q   You weren't aware of your plea agreement which said you were
17       going to get a reduction for your cooperation?
18   A   No, sir.
19   Q   You didn't sign that agreement?
20   A   No, sir.
21   Q   Do you recognize that document?
22   A   Yeah, that's my conspiracy case, yes.
23   Q   Do you recognize that signature?
24   A   Yes.
25   Q   So your cooperation did affect your ability or your sentence
```

| | | |
|---|---|---|
| 1 | | and case; is that correct? |
| 2 | A | I got 188 months, no. |
| 3 | Q | Pardon? |
| 4 | A | I got 188—I got 15 years.  I ain't got nothing. |
| 5 | Q | You got nothing. |
| 6 | A | No. |
| 7 | Q | Your original guidelines were not higher? |
| 8 | A | Yeah, they was higher; but the judge didn't give it to me. |
| 9 | Q | Pardon? |
| 10 | A | A hundred eighty-eight months. |
| 11 | Q | And they reduced those because of your cooperation; is that |
| 12 | | . . . (inaudible) |
| 13 | A | How would they reduce and I still got 15 years?  How |
| 14 | | would—With the good time? |
| 15 | Q | Sir, was your original guidelines over 240 months? |
| 16 | A | Three hundred and sixty to life. |
| 17 | Q | Okay.  And you received what? |
| 18 | A | A hundred and eighty-eight months. |
| 19 | Q | A hundred and eighty-eight months. |
| 20 | A | Yes. |
| 21 | Q | So a substantial reduction; is that correct? |
| 22 | A | Yes, but that wasn't because of— |
| 23 | Q | Well, you said it was a conspiracy case— |
| 24 | A | Yes. |
| 25 | Q | —is that correct? |

```
 1   A   Yes.

 2   Q   Was that involving Walter Johnson?  Was he—

 3   A   No.

 4   Q   —part of the—

 5   A   No, Walter—

 6   Q   — . . . (inaudible)

 7   A   —wasn't, no.

 8   Q   When did you get charged with this case?

 9   A   I got charged with this case August 26th of 2011.

10   Q   And eleven.

11   A   Yeah.

12   Q   And Walter Johnson also was charged; is that correct?

13   A   I'm not sure what Walter was charged with.

14   Q   You know who Walter is?

15   A   Yes.

16   Q   Okay.  You're friends with him; is that correct?

17   A   Yes.

18   Q   When did Sam Steel give you this information?

19   A   Late November of 2011, maybe December.  I can't remember the

20       exact date.

21   Q   And where were you at?

22   A   On Mabel Street at his mom's house.

23   Q   Okay.  Where were you living at the time?

24   A   Battle Creek, Michigan.

25   Q   And you were on tether; is that correct?
```

1   A   GPS, yes.

2   Q   Were you to go to Kalamazoo?

3   A   Yes, I had permission from my pretrial agent Nick Bobo, and I

4       had permission to go on weekend passes to Kalamazoo to visit

5       friends or family.

6   Q   Do you know if they ever was able to confirm that, in fact,

7       you were at that address?

8   A   I'm not sure.  They should be able to with the GPS.  I mean—

9   Q   Let me ask you this question.  Isn't it a violation of your

10      bond to be associated with anyone with a felony conviction at

11      the time?

12  A   I wasn't sure of that.

13  Q   You weren't given a paper that outlined all your conditions of

14      bond that you had to sign as a pretrial release?

15  A   I can't recall.

16  Q   And your—Agent Bobo didn't go through specifically each and

17      every term with you prior to your pretrial release?

18  A   I can't recall.

19  Q   You can't recall that.

20  A   No.

21  Q   That affected you personally, correct?

22  A   Excuse me?

23  Q   Those issues would have affected you personally during that

24      period of time, correct?

25  A   I ain't hearing what you're saying.

                            878

1   Q   What I'm saying is that a condition of being released, you

2       have to follow these rules, correct?

3   A   Yes.

4   Q   If you don't follow those rules, you'd have been locked up,

5       correct?

6   A   I don't know.

7   Q   And you made no statements to the police until March of 2013,

8       correct?

9   A   I made it with my attorney.

10   Q   Pardon?

11   A   I made it with my attorney.

12   Q   Well, you met there with Detective Beauchamp, correct?

13   A   Yes.

14   Q   You did with the U—Assistant U.S. Attorney General—

15   A   Yes.

16   Q   Is that correct?

17   A   Yes.

18   Q   —after you entered a plea in this case in your federal case;

19       is that right?

20   A   Yes.

21   Q   And you had—may have been in the same cell between April of

22       2011 and March of 2013 with Walter Johnson; is that correct?

23   A   No, I can't recall.

24   Q   You may have, you don't know; is that correct?

25   A   I can't recall.  I don't think I was.

MR. CHAMPION:   I have no other questions.

2          THE WITNESS:   Yeah.

3                     REDIRECT EXAMINATION

4  BY MR. CUSICK:

5  Q    Sir, I just want to be clear.  On November—In November of

6       2011—December—the time that you had the conversation, you had

7       been charged but you were out on bond, correct?

8  A    Yes.

9  Q    Okay.  You're serving 15 years in prison at a minimum,

10      correct?

11 A    Yeah.

12 Q    And since your plea—You don't have to be specific—Okay.—but

13      you have cooperated with federal authorities regarding

14      criminal activity, correct?

15 A    Yes.

16 Q    And have you—In March of this year 2013, did you have

17      information regarding Samuel Steel and criminal activity?

18 A    Can you word that differently?

19 Q    Okay.  Did you—You were proffering is what the term is.  You

20      spoke with the federal government and gave truthful

21      statements—

22 A    Yes.

23 Q    —about criminal activity that you were aware of, correct?

24 A    Yes.

25 Q    Some of that criminal activity, did it deal with Samuel Steel?

                               880

```
 1   A      Yes.

 2   Q      And you gave truthful statements regarding criminal activity

 3          that Samuel Steel may have—may have been involved with,

 4          correct?

 5   A      Yes.

 6   Q      And that's when this came forward when you—when you made the

 7          statement, correct?

 8   A      Yes.

 9                   MR. CUSICK:   I have nothing further.

10                   Thank you, your Honor.

11                   THE COURT:   Mr. Champion, any further questions?

12                        RECROSS-EXAMINATION

13   BY MR. CHAMPION:

14   Q      Well, if I understand correctly, you pled in January of 2013

15          to this offense—Is that right?—or was that before?

16   A      Excuse me?

17   Q      When did you plead to your federal case?

18   A      January 2012.

19   Q      2012.

20   A      Yes.

21   Q      And you've already been sentenced on that; is that correct?

22   A      I got sentenced April 30th, 2012.

23   Q      2012.

24   A      Yes.

25   Q      Then you came forward in March of 2013, correct?
```

1    A    Yes.

2    Q    Just a few months ago?

3    A    Yes.

4    Q    And were you promised anything for that testimony or that

5         cooperation?

6    A    No, sir.

7    Q    No—No—No motions would be filed to reduce your sentence?

8         Absolutely nothing?

9    A    No, sir.

10   Q    So, if your plea agreement says that the U.S. Attorney General

11        office could file a motion to reduce your sentence, you

12        weren't aware of that in your plea sentence; is that correct?

13   A    No, sir.

14   Q    You weren't aware of that.

15             Isn't it true you were just in Paw Paw, the—the jail

16        there?

17   A    I'm still there.

18   Q    You're still there.

19   A    Yeah.

20   Q    And Walter Johnson was in that same facility—

21   A    Yes.

22   Q    —just recently, correct?

23   A    Yes.

24             MR. CHAMPION:    Thank you.

25             MR. CUSICK:    Can I have one moment, your Honor?

```
 1              (At 11:25 a.m., off record discussion between

 2              Mr. Cusick and Detective Beauchamp)

 3                     REREDIRECT EXAMINATION

 4    BY MR. CUSICK:

 5    Q    You gave, Mr. Smith, information to the federal government

 6         when you were writted out of federal prison—Is that—Is that

 7         correct?—when you were brought back to—

 8    A    Yes.

 9    Q    — . . . (inaudible)

10              And you were not in—Were you in Michigan before

11         that?

12    A    No, I was—

13    Q    You don't have to tell me exactly where, but were you at a

14         federal correctional facility?

15    A    Yes.

16    Q    Okay.  And was that out of state?

17    A    Excuse me?

18    Q    Was that out of state?

19    A    Yes, sir.

20              MR. CUSICK:   Okay.  And I apologize, your Honor, I

21         didn't do this initially.

22    BY MR. CUSICK:

23    Q    Do you see Sam Steel in court today?

24    A    Yes.

25    Q    Can you point to him and describe what he's wearing.
```

```
 1   A   He wearing a—look like a white shirt with a tie—

 2                   MR. CUSICK:   Your Honor, let the record—

 3                   THE WITNESS:   —striped tie.

 4                   MR. CUSICK:   Let the record reflect the witness has

 5       identified . . . (inaudible)

 6                   I have nothing further.

 7                   THE COURT:   That's noted.

 8                   Mr. Champion, any further questions?

 9                   MR. CHAMPION:   I have nothing further, your Honor.

10                   THE COURT:   Ladies and gentlemen, do any of you

11       have any questions for this witness?  If so, just raise your

12       hand.

13                   No hands are raised.

14                   Thank you, sir.  You may step down.  Be careful of

15       that step.

16                   Next witness?

17                   MR. CUSICK:   Wendell Montgomery.

18                   THE COURT:   Before you have a seat, sir, please

19       raise your right hand.  Do you solemnly swear or affirm that

20       the testimony you're about to give will be the truth, the

21       whole truth, and nothing but the truth, so help you God?

22                   MR. MONTGOMERY:   Yes.

23                   THE COURT:   Please have a seat, sir.

24                   Be careful of the chair.  Sorry about that.

25                   With this particular microphone, sir, you really
```

1    need to stay close to the end and speak right in the end of
2    the microphone.
3                 Please state and spell your first and last name for
4    the record.
5                 THE WITNESS:   Wendell Montgomery.
6                 THE COURT:   You know what?  You're going to have to
7    move that microphone up a little bit, I think, so it's right
8    in line with your mouth.
9                 Can you repeat that.
10                THE WITNESS:   Wendell Montgomery.
11                THE COURT:   Now I need you to spell your first and
12   last name, also, sir.
13                THE WITNESS:   Wendell—W-e-n-d-e-l-l—Montgomery—M-o-
14   n-t-g-o-m-e-r-y.
15                         WENDELL MONTGOMERY,
16   called at 11:28 a.m., and sworn by the Court, testified:
17                        DIRECT EXAMINATION
18   BY MR. CUSICK:
19   Q    Good morning, Mr. Montgomery.
20   A    Good morning.
21   Q    I want to direct your attention to December 23rd of 2011.  Did
22        you have occasion to be with a Samuel Steel?
23   A    Yes.
24   Q    Okay.  And where was that?
25   A    In Chicago.

1    Q    Chicago?

2    A    Yes.

3    Q    You have to speak up, sir.  I'm sorry.

4    A    Chicago.

5    Q    And who—who—Can you tell me what—who the defendant came with

6         or who he was with, if anybody?

7    A    He came with Howard and Erica.

8                   THE COURT:    I can't hear you.

9                   MR. CUSICK:    I can't hear you.

10                  THE COURT:    You have to speak—

11                  THE WITNESS:    Howard.

12                  THE COURT:    Howard?

13                  THE WITNESS:    His brother Howard, Howard Hughes.

14   BY MR. CUSICK:

15   Q    Howard Hughes?

16   A    Yeah.

17   Q    Okay.  And who else?

18   A    Erica.

19                  THE COURT:    Erica?

20                  THE WITNESS:    Yes.

21                  MR. CUSICK:    Okay.  Thank you, sir

22   BY MR. CUSICK:

23   Q    And how long was the defendant at your house, if you recall?

24   A    I think about three days.

25   Q    Three days or so?

| | |
|---|---|
| 1 | A    Yeah, about three days. |
| 2 | Q    Do you know exactly for sure how long? |
| 3 | A    It was about three days. |
| 4 | Q    And did the defendant say anything to you about why he was |
| 5 |      there? |
| 6 | A    Yeah, he said he got—they got him looking bad here or |
| 7 |      something. |
| 8 |           THE COURT:   I can't hear you, sir. |
| 9 |           He said he was what? |
| 10 |           THE WITNESS:   He said they got him looking bad. |
| 11 |      They got him looking bad here or something. |
| 12 |           MR. CUSICK:   I'm sorry, sir.   Can you speak up |
| 13 |      as—as high as you can—I'm sorry.—as loud as you can. |
| 14 |           THE WITNESS:   He said that they have him looking |
| 15 |      bad here in Kalamazoo, Michigan. |
| 16 | BY MR. CUSICK: |
| 17 | Q    Okay.   It's getting bad in Kalamazoo, did you say?   I don't |
| 18 |      want to put words in your mouth.   I just—Is that— |
| 19 | A    They said he—He said they had got him looking bad here in |
| 20 |      Kalamazoo, Michigan. |
| 21 | Q    Okay. |
| 22 |           THE COURT:   I still didn't hear it. |
| 23 |           MR. CUSICK:   I believe—And I don't want to—I'll |
| 24 |      just—I got him looking bad here—they've got him looking bad |
| 25 |      here in Kalamazoo, Michigan. |

```
 1  BY MR. CUSICK:

 2  Q    Is that correct?  Is that what you said, sir?

 3  A    Yes.

 4  Q    Did he say anything else that you recall?

 5  A    No.

 6  Q    After that, have you had any kind—When he left your house, do

 7       you know where he went?

 8  A    No.

 9  Q    Do you know why he—Let me rephrase that.

10            Were you—How—How did you—What did you think when he

11       first came to your house?

12            THE COURT:   What did he think?

13  BY MR. CUSICK:

14  Q    Yeah, what did you think when you first saw Samuel Steel?  Did

15       you see him often?

16  A    I was glad to see him.

17            THE COURT:   Let me just stop.  There's two

18       questions now.

19            MR. CUSICK:   Okay.

20            THE COURT:   What did he think, I don't think is an

21       appropriate question.  It sounds like you have withdrawn that

22       question—

23            MR. CUSICK:   Yeah, I withdrew—

24            THE COURT:   —and you're—

25            MR. CUSICK:   —that.
```

```
 1                    THE COURT:    —asking—

 2                    MR. CUSICK:    I'm sorry.

 3                    THE COURT:    —how often you saw him.

 4                    MR. CUSICK:    Yeah, how—

 5                    MR. CUSICK:    Okay.  You're going to have to speak

 6          up, sir.  It's really hard to hear you.

 7                    So the question is how often did you see Sam Steel

 8          back in 2011 before he came to your home.

 9                    THE WITNESS:    I didn't see him till—It had been

10          like maybe a year or so.

11                    MR. CUSICK:    Okay.  I have nothing further.

12                    Well—

13     BY MR. CUSICK:

14     Q    Did he let—Did the defendant ever give you his phone, or did

15          you ever give the defendant your phone?

16     A    I gave him my phone.  I left my phone at home.

17                    THE COURT:    I'm sorry.  Did you say I left my phone

18          at home?

19                    THE WITNESS:    Yeah, when I went to work.

20     BY MR. CUSICK:

21     Q    For who?

22     A    Sam.

23     Q    Okay.  And do you—You see Sam Steel in court today?

24     A    Yes.

25     Q    Point to him.
```

1   A    Right here.

2                MR. CUSICK:   Your Honor, let the record reflect the

3        witness has identified the defendant.

4                THE COURT:   That's noted.

5                MR. CUSICK:   I have nothing further.

6                THE COURT:   Mr. Champion, any questions?

7                MR. CHAMPION:   I have no questions, your Honor.

8                THE COURT:   Ladies and gentlemen, do any of you

9        have any questions for this witness?  If so, just raise your

10       hand.

11               No hands are raised.

12               All right.  Thank you, sir.  You may step down.

13               THE WITNESS:   All right.

14               THE COURT:   I'm assum—Is he excused from his

15       subpoena, Counsel?  Any objections to that?

16               MR. CUSICK:   Yes.

17               MR. CHAMPION:   No objection, your Honor.

18               MR. CUSICK:   Can we approach, your Honor?

19               THE COURT:   Yes.

20               (At 11:33 a.m., bench conference as follows:

21                MR. CUSICK:   We have one witness David Lee.

22               He might be half hour.  Should we go with him—I just

23               want to let you know.  Either way's fine.  He's

24               prepared.—or he can go after lunch.

25                       THE COURT:   Who else do you have this

890

1    afternoon?

2         MR. CUSICK:   We have Officer Juday, Officer

3    Cole, and Detective Beauchamp.

4         THE COURT:   Let's get started on him.  I will

5    indicate I might have to break before cross because

6    I have a noon judges meeting, so—

7         MR. CHAMPION:   What time does your meeting get

8    over?

9         THE COURT:   At noon.

10         MR. CHAMPION:   I mean over.

11         THE COURT:   It'll probably be an hour to an

12    hour and 15 minutes.

13         MR. CHAMPION:   Oh, so it would—

14         MR. CUSICK:   Okay.

15         THE COURT:   So let's get started.

16         MR. CUSICK:   Okay.)

17         THE COURT:   Next witness?

18         MR. CUSICK:   David Lee, your Honor.

19         THE COURT:   Be careful when you have a seat here,

20    sir.

21         Before you have a seat, can you raise your right

22    hand as best you can.  Do you solemnly swear or affirm that

23    the testimony you're about to give will be the truth, the

24    whole truth, and nothing but the truth, so help you God?

25         MR. LEE:   Yes, ma'am.

```
 1              THE COURT:  Please have a seat.  Be careful as you

 2     step up.  Watch that seat.  It pulls—It falls back.

 3              I'm going to need you to move closer to the

 4     microphone.  You really need to stay really close to the end

 5     of that microphone when you talk.

 6              THE WITNESS:  Okay.

 7              THE COURT:  I need you to state and spell your

 8     first and last name for the record, sir.

 9              THE WITNESS:  David Lee—D-a-v-i-d L-e-e.

10              THE COURT:  You're going to have to move up a

11     little bit closer.  Thank you.

12                            DAVID LEE,

13     called at 11:34 a.m., and sworn by the Court, testified:

14                         DIRECT EXAMINATION

15     BY MR. CUSICK:

16     Q    Good morning, Mr. Lee.

17     A    How you doing?

18     Q    Good.

19              I just want to—Do you know a Samuel Steel?

20     A    I know him.

21     Q    Okay.  Do you see him in court today?

22     A    Yes.

23     Q    Can you point to him and describe what he's wearing.

24     A    He right there.

25              MR. CUSICK:  Your Honor, let the record—
```

1   BY MR. CUSICK:

2   Q   Can you describe what he's wearing in court.

3   A   A blue shirt with a black-striped tie.

4            MR. CUSICK:   Your Honor, let the record reflect the

5      witness has identified the defendant.

6            THE COURT:   That's noted for the record.

7   BY MR. CUSICK:

8   Q   How do you know the defendant?

9   A   We was incarcerated together for a couple weeks.

10   Q   I'm sorry. I apologize. Would you—

11   A   We was incarcerated together for a couple weeks.

12   Q   Okay. Where was that?

13   A   Newaygo County Jail.

14   Q   Okay. And who were you—Was there anybody else that were—was

15      with you that you were incarcerated with other than the

16      defendant?

17   A   It was other inmates that was in the cell with us.

18   Q   Okay. About how many?

19   A   Six other.

20   Q   Okay. And where are you from originally, sir?

21   A   Flint.

22   Q   Do you know a Walter Johnson?

23   A   No.

24   Q   Do you know a Harry—Harry Matthews or A. J. Mathews?

25   A   No, never heard of them.

| | |
|---|---|
| 1 | Q | Do you know a Devon Smith? |
| 2 | A | No. |
| 3 | Q | Do you know a guy by the name of Khaki, |
| 4 | | otherwise—Steven Brown, otherwise known as Khaki? |
| 5 | A | No, I don't. |
| 6 | Q | Okay.  Did you have a conversation with the defendant in July |
| 7 | | of this year? |
| 8 | A | Yes. |
| 9 | Q | And, that conversation, does that bring you to court today? |
| 10 | A | Yeah, I didn't expect to be coming up here, but, yeah, I |
| 11 | | guess. |
| 12 | Q | What was that conversation in reference to? |
| 13 | A | Well, it was referencing to me and him.  We was talking about |
| 14 | | our cases and what was going on in our life.  I think it was |
| 15 | | at rec—You know, they let us go outside for rec.—and we was |
| 16 | | basically discussing the fundamental—our cases and stuff, what |
| 17 | | we was facing and he basically was talking about, I guess, |
| 18 | | this case right here. |
| 19 | Q | Okay.  Did he tell you whether—what he did at all? |
| 20 | A | No, what he told me was—He told me what kind of case he was |
| 21 | | fighting down here and what kind of federal case he was |
| 22 | | fighting, too, and he basically was just telling me what |
| 23 | | happened during the case and stuff like that. |
| 24 | Q | Okay.  Did he tell you exactly what happened with regards to |
| 25 | | the case that he—in Kalamazoo County? |

894

1  A   Well, we was talking and, you know, he was discussing about
2      how he had to go to trial; and he basically was telling me
3      that, you know, when it happened, the guy he got into—supposed
4      to have been killed and whatnot was the guy supposed to have
5      something to do with kidnapping his child and hold him for
6      ransom.
7          So I asked him—I was like, you going to trial.
8          He was like, yeah, I'm taking it to trial.
9  Q   Okay.  I want to stop you there.  What did he say that he
10     did—Did he say he did anything to the individual that died?
11 A   No, what he said was—When he said he was taking it to trial,
12     he said some guy had seen him, or whatever, jump out the car
13     and shoot the dude up and whatnot like 20-some times with a
14     Uzi-looking type gun or something.
15 Q   Okay.  And—
16 A   And I—
17 Q   —what did he say he did after that?
18 A   He said—I said, after you did that, I was like, you can still
19     take it to trial.
20         He was like, yeah, I'm taking it to trial.  He said
21     he just—
22 Q   Okay.  And I don't want you to get into any discussions as to,
23     you know—
24 A   Right.
25 Q   —what you think legally he should have done or whatever.

1      Okay?

2    A   Okay.

3    Q   Did he discuss the incident anymore?

4    A   Well, outside—You know what I'm saying?—just saying—I asked

5        him did the guy see him.

6            He was like, yeah, basically.  You know, he said—he

7        described what kind—the guy said it was a Uzi-looking type gun

8        and he was supposed to have shot the guy like 20-some times or

9        something like that.

10   Q   Okay.  And did he say where he went or what he did after the

11       shooting?

12   A   No, he didn't say where he went.  He just said he basically

13       ran and he went to Georgia—

14   Q   Okay.

15   A   —outside Atlanta or something like that.  He was down there

16       for a while.

17   Q   Now did you discuss the incident any more than what you've

18       already testified to that you recall—if you recall?

19   A   Yeah, basically, he was just—You know, he was kind of upset.

20            I told him, you know, I wouldn't go all the way—

21   Q   Okay.

22   A   —stuff like that.

23            And he was like, you know, he got mad.  He was like,

24       it's all good 'cause the witness he had against him was

25       some—some guy, I guess, was some kin to one of his kids or his

                              896

| | |
|---|---|
| 1 | kid's mother or something like that.  He couldn't believe that |
| 2 | the guy was going to testify on him 'cause he had took care of |
| 3 | him one night and said he was just basically going to get |
| 4 | him—get him or his people. |
| 5 | Q He said he was going to get him and his people? |
| 6 | A Yeah, that was basically what he told me. |
| 7 | And I just said he was tripping.  But I understand, |
| 8 | though. |
| 9 | Q Did he say anything about other witnesses in the case? |
| 10 | A Yeah, he was basically talking about the witness on the state |
| 11 | case and the federal case when he said— |
| 12 | Q What did he say—What did he say about other witnesses in the |
| 13 | case? |
| 14 | A I mean, he just said, you know, he was mad at most of the |
| 15 | people 'cause he knew the people and—You know what I'm |
| 16 | saying?—and they was testifying against him.  He was just mad, |
| 17 | said he was just going to have to get in contact with his |
| 18 | people that was locked up and . . . (unintelligible) whatever, |
| 19 | I guess get rid of them, I guess. |
| 20 | Q Did he indicate whether or not he wanted them to tell the |
| 21 | truth or not? |
| 22 | A No, he never said that.  He said— |
| 23 | Q One way—One way or the other, he didn't say anything? |
| 24 | A No, he just said he had a bunch of witnesses coming to testify |
| 25 | in his behalf. |

897

```
 1   Q    What did you say in response to that?

 2   A    I asked him, you know—I asked him, you know, was they kin.

 3        He was like, some of them, some of them are just

 4        friends.

 5        And I was like, man, you going to use them up there.

 6        I say—I basically told him they was going to end up being

 7        perjured, they get up there lying for you—

 8   Q    Okay.

 9   A    —'cause he basically already told me what happened.

10   Q    You came forward—You wrote a letter to the U.S. Marshals; is

11        that correct?

12   A    Yes.

13   Q    Now have you pled yet?  Have you pled guilty to anything?

14   A    No, I'm still fighting mine.

15   Q    Okay.  I don't want you to discuss your case at all.  Okay?

16   A    Okay.

17   Q    And, obviously, you don't have any agreement with any—

18   A    No.

19   Q    —government organization; is that correct?

20   A    No, sir, I don't.

21   Q    Don't have any agreement with our office—

22   A    No, nobody.

23   Q    —or the feds?

24        You wrote a letter to the U.S. Marshals; is that

25        correct?
```

1   A     Yes, I did.

2   Q     And do you recall when that was?

3   A     July, like the second—I think the beginning of the second week

4       in July.

5   Q     Beginning of the second week in July.

6              And what did you tell them in that letter?

7   A     I basically told them the guy—you know, Sam—really he was

8       basically threatening some of the witnesses' family.  He told

9       me—You know what I'm saying?—he was going to have people

10     basically hurt the people's family.

11            So I contacted them to let the people know—just to

12     let the people know—You know what I'm saying?—to watch who the

13     witness' family was, stuff like that, you know—to be aware of

14     that.

15   Q     Okay.

16   A     I didn't expect to have to come up here, you know.

17       That's—That was all the letter was for.  That was it.

18   Q     Okay.  And why—why did you come forward?

19   A     I came forward because if anything, you know, pertaining to

20     him and whoever he got into—I really didn't have no issue

21     with—My issue was basically the people's family—You know what

22     I'm saying?—kids and stuff like that get involved with it, you

23     know, 'cause I got kids and family and I wouldn't want nothing

24     to happen to them based on the fence, you know.  What

25     everybody else had going on really ain't had nothing to do

899

```
1    with it.  . . . (unintelligible) I ain't—I ain't want it on my
2    conscience.
3              MR. CUSICK:   Nothing further.
4              Thank you.
5              THE COURT:   Mr. Champion, whenever you're ready.
6              MR. CHAMPION:   Yes.
7                        CROSS-EXAMINATION
8    BY MR. CHAMPION:
9    Q    Sir, as I understand it, you told Detective Beauchamp that,
10        first, Samuel Steel was going to have people come in and
11        testify that he was at home at the time of the killing; is
12        that correct?
13   A    I don't remember if I said that correctly or not.  I know he
14        said he was going to have people coming up—
15   Q    Is that correct or not, yes or no?
16   A    No.
17             MR. CUSICK:   I'd ask—I'd ask if he asks a question
18        the witness would be allowed to answer the question.
19             THE COURT:   I think he answered it, so I think—
20             That's fine.  I don't know if it was necessarily a—
21   BY MR. CHAMPION:
22   Q    You don't know—
23             THE COURT:   —yes or no—
24   BY MR. CHAMPION:
25   Q    —if you said that?
```

900

1          THE COURT:   —question.

2          THE WITNESS:   I don't remember—recall saying that.

3   BY MR. CHAMPION:

4   Q    You also told—Isn't it true?—Detective Beauchamp that

5        Samuel Steel got out of a—got out of a 19—Excuse me.—a 2007

6        white Corvette—

7   A    Corvette with a—

8   Q    —with a—

9   A    —cream top—

10  Q    —cream top—

11  A    —yeah.

12  Q    —is that correct?

13         He got out of—

14  A    No, I said—

15  Q    He got out—

16         THE COURT:   Hold on a second.  Hold on a second.

17         Let him answer the question.

18         What was your answer?

19         THE WITNESS:   He got it wrong.  I said he said

20       that, not me.  I repeated what he said.

21  BY MR. CHAMPION:

22  Q    Well, you told Detective Beauchamp—

23  A    Yes, I did—

24  Q    —that—

25  A    —say that.

                          901

1    Q    —is that correct?

2    A    Yes, I did.

3    Q    You told Detective Beauchamp that Sam Steel told you he got

4         out—

5    A    Yes.

6    Q    —of a 2007 white Corvette—

7    A    That's what he said.

8    Q    —with a cream top; is that correct?

9    A    Yes.

10   Q    And he got out of a vehicle with either a Uzi or a machine gun

11        or a MAC-11—

12   A    Type gun—

13   Q    —is that—

14   A    Yes.

15   Q    —correct?

16             And he shot—

17             THE COURT:   Hold on a second.

18             All right.  You got to be careful just not to talk

19        over each other.

20             THE WITNESS:   Okay.

21             THE COURT:   So the answer to that is?

22             THE WITNESS:   Yes, type gun.

23   BY MR. CHAMPION:

24   Q    You also told him that witnesses saw him—him being

25        Sam Steel—shoot this individual anywhere from 20 to 25 times

                              902

```
 1        with this submachine gun type gun—
 2    A   No—
 3    Q   —or weapon?
 4    A   —I said that's what he told me that a witness—the witness that
 5        was testifying against him said.  I didn't say anything.  I
 6        was just repeating what he said.
 7    Q   And that he told you—Again, this is what you're telling
 8        Detective Beauchamp, correct?
 9    A   Right, that he said.
10    Q   Sam Steel wasn't there; is that correct?
11    A   You said what?
12    Q   Sam Steel wasn't there when you were telling
13        Detective Beauchamp this—
14    A   No.
15    Q   —information.  This is coming through you—
16    A   Right.
17    Q   —is that correct?
18            And you're saying, this is what Sam Steel allegedly
19        told you; is that—
20    A   No, that's—
21    Q   —right?
22    A   —what he did tell me.
23    Q   You said that the reason the shooting took place or Sam Steel
24        allegedly told you that the shooting took place is because
25        somebody had kidnapped his son and held him for ransom?
```

903

| | | |
|---|---|---|
| 1 | A | No.  He told me that the guy that was supposed to got killed |
| 2 | | was the guy that supposedly held his son for ransom. |
| 3 | Q | Right.  That's what I just asked you. |
| 4 | A | That is not what you said though. |
| 5 | Q | Isn't it true you told him the reason for the |
| 6 | | shooting—Correct? |
| 7 | A | No. |
| 8 | Q | — . . . (inaudible) |
| 9 | A | Not the reason for the shooting, what he told me. |
| 10 | Q | I understand that.  Okay. |
| 11 | A | Well, you got to word it right then. |
| 12 | Q | According to your statement that was taped, you said— |
| 13 | A | Uhm-hmm. |
| 14 | Q | —the reason the murder happened was because the victim had |
| 15 | | kidnapped Sam Steel's son and held him for ransom; is that |
| 16 | | correct? |
| 17 | A | You still got it incorrect again.  I said he told me that the |
| 18 | | reason that the guy—you know, they end up having to kill the |
| 19 | | guy is because he was the guy supposedly kidnapped his son. |
| 20 | Q | I understand that.  But this is what you told the police |
| 21 | | officer— |
| 22 | A | Oh, okay. |
| 23 | Q | —correct? |
| 24 | A | Right.  Correct. |
| 25 | Q | So you don't know if any of that story is true; is that right? |

904

```
1   A    That's true.

2   Q    Do you know Walter Johnson?

3   A    No.

4   Q    He wasn't in the same facility with you for a period of time

5        up to Newaygo?

6   A    I haven't the slightest idea.

7   Q    You never met Sam Steel before?

8   A    No.

9   Q    Know any of his relatives?

10  A    No, I stayed 200-some miles away from here.  I never met the

11       guy a day before in my life.

12            MR. CHAMPION:   Thank you.

13            I have no other questions.

14            MR. CUSICK:   I have nothing further, your Honor.

15            Thank you.

16            THE COURT:   Ladies and gentlemen, do any of you

17       have any questions for this witness?

18            It looks like we do have a question.

19            Mr. Champion, I believe it's your turn to collect.

20            (At 11:47 a.m., bench conference as follows:

21                 THE COURT:   These are fine.

22                 MR. CUSICK:   Yeah.)

23            THE COURT:   All right.  This is a yes or no

24       question, sir.

25            THE WITNESS:   Yeah.
```

```
 1              THE COURT:   Did Sam Steel tell you that he shot
 2    Milo, yes or no?
 3              THE WITNESS:   No.
 4              THE COURT:   Did Sam Steel threaten to kill other
 5    people?
 6              THE WITNESS:   Yes, he—Oh, yes.  Yes.
 7              THE COURT:   Did he indicate why?
 8              THE WITNESS:   Yes.
 9              THE COURT:   All right.  Any follow-up questions?
10              MR. CUSICK:   Yes.
11                       REDIRECT EXAMINATION
12    BY MR. CUSICK:
13    Q    Why did he indicate?
14    A    Basically, they was testifying against him.
15    Q    And, when he said—The question was did Sam Steel tell you that
16         he shot this individual.  Were those—Those weren't his exact
17         words, correct?
18    A    No, they wasn't.
19    Q    Okay.  What did he—What did Sam Steel tell you exactly
20         regarding the shooting?
21    A    He told me that—I asked him whether somebody see.
22              He said, yeah, the guy that supposed to have been
23         the—the witness said—he said that he seen him.  That's what he
24         told me.  He didn't say—I didn't say he said the dude—You know
25         what I'm saying?—shot him or whatever.  I said he told me the
```

906

| | |
|---|---|
| 1 | guy that's supposed to be testifying seed [*sic*] him—Mr. Steel. |
| 2 | That's what he told me. |
| 3 | Q | Okay. And did he indicate to you why the shooting took place? |
| 4 | A | Yeah, it was supposed to have been some guy—the guy that, I |
| 5 | | guess, that got killed or whatever was the guy that was |
| 6 | | supposed to held one of his kids for ransom. |
| 7 | Q | Defendant Sam Steel? |
| 8 | A | Yes. |
| 9 | Q | Okay. So what did you take from that conversation— |
| 10 | A | I mean— |
| 11 | Q | —that you— |
| 12 | | THE COURT: Hold on a second. |
| 13 | | MR. CUSICK: I'm—Well, it's—I'm sorry, your Honor. |
| 14 | | I can approach if— |
| 15 | | THE COURT: Thank you, yes. |
| 16 | | (At 11:49 a.m., bench conference as follows: |
| 17 | | MR. CUSICK: I can ask what he took from that |
| 18 | | conversation, I mean, just what his— |
| 19 | | MR. CHAMPION: . . . (inaudible) |
| 20 | | THE COURT: Well, you're taking— |
| 21 | | MR. CUSICK: I think there's— |
| 22 | | THE COURT: —it out— |
| 23 | | MR. CUSICK: —a little confusing— |
| 24 | | THE COURT: —of the jury's hands, then, at |
| 25 | | this point. |

1          MR. CUSICK:   Right.  But the question was did

2          Sam Steel shoot—Did he say that Sam Steel said he

3          shot.  And I'm just clarifying what the statement

4          was.  I really am just—I mean, I think there's a

5          little bit of confusion here.

6          MR. CUSICK:   I'm not sure what the question

7          was.  That's—

8          THE COURT:   Right.  But you're asking him to

9          draw conclusions based on what Mr. Steel told him.

10          MR. CHAMPION:   Right.

11          THE COURT:   If you want to clarify, you can

12          clarify.  But I'm not going to let him ask what did

13          you take—what's your—

14          MR. CUSICK:   Okay.

15          THE COURT:   —conclusion based on that

16          question.

17          MR. CUSICK:   Okay.)

18          THE COURT:   Next question.

19  BY MR. CUSICK:

20  Q    So just with regard—So the victim of the shooting, it's your

21       understanding, the reason he died was because he—did he have a

22       beef with Sam Steel?

23  A    Yes.

24          MR. CHAMPION:   Your Honor, that's a misstatement of

25       what the witness has testified to.

1          THE COURT:   I—I'm going to sustain that.  I'm going
2     to strike the answer.
3               Counsel, will you approach.
4               (At 11:50 a.m., bench conference as follows:
5                    THE COURT:   Look, I think the confusion here
6               is—There was a little confusion based on what he
7               said.  He's testified that Sam Steel never told him
8               personally that he shot this person.  What Sam Steel
9               told him was that somebody else is going to testify
10              that he shot the person.
11                   MR. CUSICK:   Uhm-hmm.  Okay.
12                   THE COURT:   Isn't—Isn't that what he said?
13                   MR. CHAMPION:   Uhm-hmm.
14                   THE COURT:   Do you both agree with that?
15                   MR. CUSICK:   Okay.
16                   MR. CHAMPION:   I do.
17                   THE COURT:   But, look, he can't draw any
18              conclusions based on that.  It's the jury's
19              responsibility.
20                   MR. CUSICK:   Okay.  Fair enough.)
21    BY MR. CUSICK:
22    Q    Sam Steel—Did Sam—Sam Steel—You indicated he mentioned a
23         witness, correct?
24    A    Yes.
25    Q    Okay.  And did the witness—According to what Sam Steel said,

                                    909

```
 1        did the witness see him do anything?

 2   A    Yeah, that's what I asked him; and he said, yeah.

 3                   MR. CUSICK:   Okay.  Nothing further.

 4                        RECROSS-EXAMINATION

 5   BY MR. CHAMPION:

 6   Q    As I understand it, the witness, according to Sam Steel and

 7        what he told you, the witness that was going to testify

 8        against him saw Sam Steel shoot the victim 20 to 25 times; is

 9        that correct?

10   A    That's what he told me.

11   Q    And, when you said that Sam threatened people—You said that,

12        correct?

13   A    Yes.

14   Q    —who did he threaten?

15   A    There was no name in particular, it was just he was talking

16        about witnesses supposed to be testifying against him.  That's

17        it.

18   Q    He didn't say anything—

19   A    No names in—

20   Q    —of that nature?

21   A    —particular, no.

22   Q    And he was incarcerated at the time; is that correct?

23   A    Yes.

24                   MR. CHAMPION:   Thank you.

25                   MR. CUSICK:   Nothing further.
```

```
 1              THE COURT:   Ladies and gentlemen, do any of you
 2    have any questions for this witness?  If so, raise your hand.
 3              No hands are raised.
 4              Okay.  We will break for the lunch hour then.  I'm
 5    going to ask that you report upstairs at 1:30, so you're going
 6    to have a little bit over an hour and a half for lunch.
 7              Please remember all of my prior instructions.
 8              Please be careful when you enter and exit the
 9    building, also.  Make sure you don't—
10              Folks, hold on.  We are still on the record.  You
11    have got to be quiet.
12              Please make sure that you don't speak with anyone
13    about the case, even among yourselves.  Remember that.
14              Please don't do any investigations on your own
15    either during the lunch hour or at anytime.
16              You can follow Ms. Wint out.
17              Leave your notebooks on your seats.
18              All rise.
19              (At 11:53 a.m., jury exits courtroom)
20              You may be seated.
21              Is he excused from his subpoena?  Any objections—
22              MR. CUSICK:   Yes, your Honor.
23              THE COURT:   —to that?
24              MR. CHAMPION:   Yes.
25              THE COURT:   All right.  Thank you, sir.  Be very
```

```
 1    careful when you step down.

 2              MR. CHAMPION:   They're departed.

 3              THE COURT:   Is it shut?

 4              MR. CHAMPION:   The officer waited till they had

 5    left.

 6              THE COURT:   The jury cleared the hallway is what

 7    I'm assuming, so—

 8              MR. CHAMPION:   Yes.

 9              THE COURT:   Is the door shut?

10              MR. CHAMPION:   Yes.

11              THE COURT:   Okay.  So the jury's left the

12    courtroom, and the door is shut.

13              Is there anything else we need to address, then,

14    since the jury's out of the courtroom?

15              MR. CUSICK:   No, your Honor.

16              MR. CHAMPION:   Not that I'm aware of, your Honor.

17              THE COURT:   Okay.  So we'll return at 1:30.

18              Court's in recess.

19              MR. CHAMPION:   Thank you.

20              (At 11:55 a.m., court recessed)

21              (At 1:32 p.m., proceedings reconvened)

22              THE CLERK:   The court recalls the case of People of

23    the State of Michigan versus Samuel Steel, III, case number

24    C11-1983 FC.

25              Parties, please restate appearances for the record.
```

1          MR. CUSICK:   Good afternoon, your Honor.

2          Paul Cusick on behalf of the People,

3  Assistant Attorney General.

4          MR. CHAMPION:   May it please the Court,

5  Robert Champion appearing on behalf of Samuel Steel.

6          THE COURT:   All right.  Counsel, the jury should be

7  on their way down.

8          Anything we need to address before they come in?

9          MR. CUSICK:   There's a couple of things,

10  your Honor.

11          Regarding—There's a witness.  His name's

12  Nicholas Bobo.  He was originally on my witness list back in

13  May, and I just received—I took him off the witness list—And I

14  spoke with Mr. Champion about this.—because he—he wasn't

15  approved by the federal government, and I have to—He's a

16  probation agent for the federal government; and I had to get

17  approval, and I was not able to get approval.

18          I resent a letter and got an approval yesterday.

19  Spoke with Mr. Champion.  I believe he doesn't have any

20  objection to me adding him to my witness list.

21          MR. CHAMPION:   That's a correct statement,

22  your Honor.  I actually want the person to testify.

23          THE COURT:   All right.  His name just came up,

24  also, so—

25          MR. CUSICK:   Yeah.

                           913

```
 1              THE COURT:   —that's fine.  So I don't have any
 2    problems.
 3              Anything else?
 4              MR. CUSICK:   Just with scheduling.  I don't know if
 5    you want to approach or go on the record with scheduling.
 6              THE COURT:   Why don't you approach.
 7              (At 1:33 p.m., bench conference as follows:
 8              MR. CUSICK:   We anticipate having—I spoke with
 9              Bob . . . (inaudible) I think we're pretty much
10              eye-to-eye on this.  We have two more witnesses—two
11              police officer witnesses that will be relatively—
12              THE COURT:   Today?
13              MR. CUSICK:   —quick—
14              THE COURT:   . . . (inaudible)
15              MR. CUSICK:   —or Brian Beauchamp, who'll be
16              long, but I think we can get him done today if we
17              kind of go through today.
18              Nicholas Bobo's not available until Wednesday
19              of next week.  So I was going to ask the
20              Court—Because Mr. Champion would want to start his
21              case on Wednesday, I would just ask for two more
22              witnesses to be called Wednesday and
23              . . . (inaudible) It would be no doubt in the
24              morning.
25              THE COURT:   Okay.  It looks like we'll be—we
```

should be able to finish up today with the witnesses
and then we'll have two more on Wednesday morning
and then we'll turn it over to you and you're
thinking you're probably going to be done by
Wednesday, also, right?

MR. CHAMPION: Wednesday, Thursday at the
latest.

THE COURT: Wednesday, Thursday. So we're on
track, looks like, probably to finish up—

MR. CUSICK: Okay.

THE COURT: —next week. So I'll let them know
that. . . . (inaudible) that's going to be exactly
where we're at.

MR. CUSICK: Okay.

THE COURT: Just say that's kind of what we're
thinking about now so that, when they take a break,
they can make adjustments—

MR. CUSICK: I don't know.

THE COURT: —to—

MR. CUSICK: Do we have to end at 5:00 or
. . . (inaudible) 5:15 just to get Brian done today,
and then we'll have to come back tomorrow or—I was
just wondering—

THE COURT: You mean if we go a little—

MR. CUSICK: —like if we—

```
 1              THE COURT:   —bit over today?

 2              MR. CUSICK:   —were at like 5:00 o'clock and

 3         he—Mr. Champion had a few more questions or I did,

 4         would we have to end at 5:00?  I know some courts go

 5         a little bit longer just to get it done.

 6              THE COURT:   If we're not too far—

 7              MR. CUSICK:   Okay.  Just curious.

 8              THE COURT:   I'll just let them know we might

 9         finish up today, we might go a little bit later—

10              MR. CUSICK:   Okay.

11              THE COURT:   —or we might need to come back

12         tomorrow morning, then, just for a short—

13              MR. CUSICK:   Okay.

14              THE COURT:   —period of time.

15              MR. CUSICK:   Okay.  That's fine either way.)

16         THE COURT:   All right.  I believe the jury's out in

17    the hallway.

18              And, just a reminder, folks, make sure your

19    cellphones are turned off.  Don't use any electronic devices

20    while you're in the court.

21              Okay.  All rise.

22              (At 1:35 p.m., jury returns to courtroom)

23              You may be seated.

24              All rise.  Just so you're aware of where we're at,

25    we believe we're moving along a little quicker than we
```

thought. So, depending on what happens today—We have one

witness that might be a little bit lengthier, I will say that.

And I'm telling you this so that, when we take an afternoon

break, if you have to make any phone calls, you can.

We're going to do our best to end by 5:00 o'clock

today. If we have a witness on the stand and it looks like we

can finish that witness within 15, 20 minutes or so, I'd like

to keep going. Depending on what the attorneys indicate as

far as how long their questions are going to be, we might

bring the witness, then, back tomorrow morning and finish up

tomorrow morning and then we'll be done for the day tomorrow.

So there's a possibility we won't have you report

tomorrow, and we would have you check in next Wednesday.

There's also a possibility that we might bring you back for a

short time tomorrow morning to finish a witness. And there's

also a possibility that we might go after 5:00 o'clock today.

So, when you take a break, if you're not able to

stay past 5:00, please let Ms. Wint know and then she can pass

that information along to us. And, if you can or if you need

to make a phone call just in case we're running a little bit

late today, please do so during the break so that you can let

us know if there is an issue.

So we expect that things will wrap up next week,

likely on Thursday. And so what that means is we think we'll

be able to have all the testimony and all the evidence,

917

1 closing arguments, and final jury instructions by Thursday in

2 the afternoon.  Then you begin your deliberations.  And we

3 never know how long that's going to be.  But we are certainly

4 moving along a little bit quicker right now than what we

5 planned, so that's good news.  Now things can change, so

6 that's all I can tell you right now.

7    Okay.  With that, I will turn it back over to

8 Mr. Cusick.

9    MR. CUSICK:   Thank you, your Honor.

10    At this time, the People would call Kristin Cole.

11    THE COURT:   Before you have a seat, please raise

12 your right hand.  Do you solemnly swear or affirm that the

13 testimony you're about to give will be the truth, the whole

14 truth, and nothing but the truth, so help you God?

15    MS. COLE:   I do.

16    THE COURT:   Please have a seat, ma'am.

17    Make sure that you speak right in the end of that

18 microphone, if you would.  You pull back too far—

19    THE WITNESS:   Yeah.

20    THE COURT:   —our recording system won't pick up

21 what you're saying.

22    THE WITNESS:   Okay.

23    THE COURT:   I need you to state and spell your

24 first and last name for the record, please.

25    THE WITNESS:   Kristin—K-r-i-s-t-i-n—Cole—C-o-l-e.

called at 1:39 p.m., and sworn by the Court, testified:

DIRECT EXAMINATION

BY MR. CUSICK:

Q   Good afternoon.

A   Good afternoon.

Q   How are you employed?

A   I'm a detective with Kalamazoo Department of Public Safety.

Q   How long have you been so employed?

A   I've been employed with the department for about 16 years.

Q   And did you have occasion to go to the area of April 20—of 626 Mabel Street on April 24th of 2011?

A   Yes, I did.

Q   Approximately what time were you there?

A   I don't know the exact time.  It was prior to midnight.  I was called in by my lieutenant.

Q   Did you speak to any possible witnesses to a homicide?

A   Not at the scene but, later on in the evening, I did speak to one of the witnesses.

Q   Who was that witness?

A   Lashontay Kyles.

Q   She give a description of the shooter?

A   Yes.

Q   Who else was there during that interview?

A   I'm sorry?  Who else was at the house where the shooting

919

|    |   |                                                                  |
|----|---|------------------------------------------------------------------|
| 1  |   | occurred or—                                                     |
| 2  | Q | Who else was there at the time that you interviewed her?         |
| 3  | A | Sorry.  It's hard to hear in here.                               |
| 4  | Q | I'm sorry.  And I'll speak up.                                   |
| 5  | A | Okay.                                                            |
| 6  | Q | I apologize.                                                     |
| 7  | A | Detective Beauchamp was with me.                                |
| 8  | Q | Okay.  Did you make a report, or did you write a report         |
| 9  |   | regarding this?                                                 |
| 10 | A | I did, yes.                                                      |
| 11 | Q | Okay.  And what description did she give regarding the          |
| 12 |   | shooter?                                                        |
| 13 | A | She stated that he was a dark-skinned black male, a little bit  |
| 14 |   | taller than five-foot-six, average build.                       |
| 15 | Q | Did she say if he had any other distinguishing                  |
| 16 |   | characteristics?                                                |
| 17 | A | Not that she noticed.  He did walk right past her.  However,    |
| 18 |   | it was dark outside and she was on the phone at the time.       |
| 19 | Q | What was her state at the time?  Do you know if she had been    |
| 20 |   | drinking or not?                                                |
| 21 | A | They—She said that they had made a beer run just prior to this  |
| 22 |   | and that she was on the phone talking to her girlfriend when    |
| 23 |   | the shooter walked past her.                                    |
| 24 | Q | Did she say whether or not she got a good look at the shooter   |
| 25 |   | or not?                                                         |

```
 1  A    She said that they did make eye contact, yes.

 2              MR. CUSICK:   Okay.  I have nothing further.

 3         Thank you.

 4              THE COURT:   Mr. Champion?

 5              MR. CHAMPION:   I have no questions, your Honor.

 6              THE COURT:   Ladies and gentlemen, do any of you

 7         have any questions for this witness?  If so, just raise your

 8         hand.

 9              No hands are raised.

10              Thank you, ma'am.  You may step down.

11              Is she released from her—

12              MR. CUSICK:   Yes.

13              MR. CHAMPION:   Yes, your Honor.

14              MR. CUSICK:   David Juday.

15              THE COURT:   Thank you.

16              Before you have a seat, sir, please raise your right

17         hand.  Do you solemnly swear or affirm that the testimony

18         you're about to give will be the truth, the whole truth, and

19         nothing but the truth, so help you God?

20              MR. JUDAY:   Yes, ma'am.

21              THE COURT:   Please have a seat, sir.

22              THE WITNESS:   Thank you.

23              THE COURT:   I need you to—

24              I'll wait for you to have a seat.

25              Make sure you speak right in the end of that
```

921

```
1       microphone.

2              I do need you to state and spell your first and last

3       name for the record, please, sir.

4                      THE WITNESS:   Yes, ma'am.

5                      David Raymond Juday—D-a-v-i-d—Juday—J-u-d-a-y.

6                          DAVID RAYMOND JUDAY,

7       called at 1:43 p.m., and sworn by the Court, testified:

8                          DIRECT EXAMINATION

9   BY MR. CUSICK:

10  Q    Good afternoon.

11  A    Good afternoon, sir.

12  Q    How are you employed, sir?

13  A    I'm employed as a public safety officer for the City of

14       Kalamazoo.

15  Q    Okay.  And I want to direct your attention to the date of

16       April 24th of 2011.  Do you recall that day?

17  A    Yes, sir.

18  Q    Were you in the area of 626 Mabel Street in the city of

19       Kalamazoo?

20  A    Yes, sir, I was.

21  Q    Okay.  And did you have occasion to speak with

22       Lashontay Kyles?

23  A    Yes, sir, I did.

24  Q    Did you receive a description as to a shooter?

25  A    Yes, sir.
```

1  Q    And what description was that from Ms. Kyles?

2  A    Ms. Kyles stated that the suspect was a black male dressed in

3       a all black hooded sweatshirt.  She stated that he was

4       approximately five-seven.  He had a thin face, smaller eyes,

5       with a thin mustache.  He was in his late 20s is what she

6       predicted and that he was dark-skinned.

7  Q    Did she say anything else that you recall?

8  A    She told me that, when she was with the victim Milo and when

9       they backed the vehicle into 626 Mabel, that she was on the

10      phone alongside the house in between the house and the vehicle

11      and that is when she noticed the suspect come through the cut

12      area from the north of the house and that she had eye contact

13      with that individual.

14 Q    Did she indicate whether or not he had long hair or short

15      hair?

16 A    She stated that he had very short hair and that when—after he

17      made eye contact with her, he put his hood up.

18 Q    How did she appear to you at the time?  Had she been drinking?

19 A    She didn't appear to be drinking, no.  She was very upset,

20      crying, as expected to anybody that had just witnessed

21      something of this scale of tragedy.

22              MR. CUSICK:   I have nothing further.

23              Thank you.

24              THE COURT:   Mr. Champion, any questions?

25              MR. CHAMPION:   Yes, your Honor.

923

```
 1                      CROSS-EXAMINATION

 2   BY MR. CHAMPION:

 3   Q    If I—In reviewing your police report, is it true she told you

 4        that he was between five-six and five-seven and very skinny

 5        and very dark-complected?

 6   A    That would be an accurate statement.

 7   Q    And did she also tell you that he had—had Afro style—He had

 8        very short hair but in an Afro style?

 9   A    She did.

10                 MR. CHAMPION:   Thank you.

11                      REDIRECT EXAMINATION

12   BY MR. CUSICK:

13   Q    And when did you speak with her?  I didn't get that.

14   A    I spoke with Ms. Kyles approximately 20 minutes after my

15        arrival.  I noticed that she was standing approximately

16        40 yards from where the scene took place; and, during

17        my—during trying to locate witnesses, I'd come across her.

18        She was standing by the sidewalk.

19                 MR. CUSICK:   Okay.  Thank you.

20                 I have nothing further.

21                 MR. CHAMPION:   Just one follow-up.

22                      RECROSS-EXAMINATION

23   BY MR. CHAMPION:

24   Q    What does a Afro style mean to you?

25                 MR. CUSICK:   Your Honor, he just objected to my
```

```
 1        question about what something—asking a question what that
 2        means to the witness.  I think it's for the jury to decide.
 3        It's the exact same type of question.
 4                    MR. CHAMPION:   I'll rephrase it.
 5   BY MR. CHAMPION:
 6   Q    What is—
 7                    THE COURT:   Thank you.
 8   BY MR. CHAMPION:
 9   Q    —an Afro style haircut that you placed in your report?
10   A    As I placed in my report?
11   Q    Right.
12   A    What I put in my report was a description of what Ms. Kyles
13        stated to me, which was a very short haircut in an Afro style.
14   Q    You didn't follow up on that?
15   A    An Afro style haircut to me would be a short haircut that has
16        small curls in it.
17                    MR. CHAMPION:   Thank you.
18                    MR. CUSICK:   Nothing further, your Honor.
19                    THE COURT:   Ladies and gentlemen, any questions for
20        this witness?  If so, just raise your hand.
21                    No hands are raised.
22                    Thank you, sir.  You may step down.
23                    THE WITNESS:   Thank you.
24                    MR. CUSICK:   Your Honor, at this time the People
25        would call Detective Brian Beauchamp.
```

1          THE COURT:   Before you have a seat, sir, please
2     raise your right hand.  Do you solemnly swear or affirm that
3     the testimony you're about to give will be the truth, the
4     whole truth, and nothing but the truth, so help you God?
5          MR. BEAUCHAMP:   I do.
6          THE COURT:   Please have a seat, sir.
7          As you've heard, make sure you speak right in the
8     end of that microphone.
9          I need you to state and spell your first and last
10    name for the record, please.
11         THE WITNESS:   Brian Beauchamp—B-r-i-a-n
12    B-e-a-u-c-h-a-m-p.
13                    BRIAN BEAUCHAMP,
14    called at 1:48 p.m., and sworn by the Court, testified:
15                  DIRECT EXAMINATION
16 BY MR. CUSICK:
17 Q    Good afternoon.
18 A    Good afternoon.
19 Q    Detective, how are you employed?
20 A    I'm a detective with the Kalamazoo Department of
21    Public Safety.
22 Q    How long have you been so employed?
23 A    I've been with the department for almost 21½ years.
24 Q    Okay.  And what role do you have in the Samuel Steel homicide
25    case?

                              926

1  A   Currently, I'm assigned to the major crimes unit inside the

2      detective division.  I've been in that capacity for—I've been

3      a detective for ten years—almost ten years, nine and a

4      half—been in major crimes for eight and a half years.

5  Q   Okay.  And I want to direct your attention, sir, to April 24th

6      of 2011.  Do you recall that day?

7  A   Yes, I do.

8  Q   Did you go to the area of 626 Mabel Street in the city of

9      Kalamazoo?

10 A   Yes, I did.

11 Q   And what brought you to that location?

12 A   I was—It was a Sunday evening.  I was called at home by one of

13     my supervisors and requested to come into work in regards to a

14     homicide that had occurred at that location.

15 Q   Okay.  And, when you arrived at that location—What time—What

16     time did you arrive at that location?

17 A   I got called at probably around 9:30.  I had to get ready for

18     work, so I probably arrived at the location—

19           Typically—Typically, when you get called in, we'll

20     go to the division first, get a briefing on what we know at

21     that point, and then assignments are made; and I was assigned

22     to go out to the scene with Detective Cole.  I'm estimating we

23     arrived around 11:00 p.m. roughly.

24 Q   Okay.  And, when you arrived at the scene, can you just

25     describe for the jury what you observed.

927

```
 1   A    I saw the police line tape that you've seen on some of the

 2        pictures so far, a lot of police cruisers, and the—on the

 3        street—on Mabel Street on both sides of the police tape.

 4                    The crime lab was out there.  I saw

 5        Lab Specialist Luedecking.  He pointed out some items of

 6        evidence that he had observed already.

 7                    And, from there, I was notified to speak to a

 8        witness that Officer Juday had spoken to with Detective Cole.

 9   Q    And who is that witness?  Who was that witness?

10   A    Lashontay Kyles.

11   Q    Okay.  Were you able to speak with any other

12        witnesses—potential witnesses at the scene that night?

13   A    Not at the scene.  There was other witnesses that we'd

14        obtained names from some of the patrol officers, and we began

15        to start to go back out and locate these people during the

16        overnight hours.

17   Q    Okay.  Did you receive a description of a perpetrator?

18   A    There was several different descriptions from various people.

19   Q    Okay.  Some of them were—They were different?

20   A    There was different heights, different builds, different

21        hairstyles that were provided.

22   Q    You said that the investiga—the early parts of the

23        investigation went into the early morning hours of April 25th?

24   A    Yeah, we were there—We worked all night long into the morning.

25        The morning of the 25th, Detective Ghiringhelli,
```

928

```
 1        Detective Hecht, and I did a canvass on Florence Street,

 2        starting at Westnedge, going to Cobb; and then we came back

 3        down Mabel Street going all—every house on Mabel from Cobb

 4        back to Westnedge.

 5               And we left probably 10:00—10:00 o'clock to noon

 6        that day to go home and get some sleep and regroup.  We'd—

 7    Q   Okay.

 8    A   We'd had another incident happen a week earlier that we were

 9        preparing for the next day.

10    Q   Very briefly, what was that incident?

11    A   One of our officers was murdered on April 19ᵗʰ—April 18ᵗʰ—I'm

12        sorry.—2011, and his funeral was April 26ᵗʰ.

13    Q   So do you have a pretty good memory of April 24ᵗʰ and

14        April 25ᵗʰ?

15    A   Yes.

16    Q   You indicated that you canvassed the area from Westnedge—And

17        what street did you indicate?

18               And I have our exhibit number three up.

19    A   From—From Westnedge to Cobb on Florence—both sides of the

20        street—Detective Hecht and Detective Ghiringhelli and I went

21        to every house.  Then we went up Cobb to Mabel and then back

22        down Mabel to Westnedge.

23    Q   Okay.  And did you do that in response to information you

24        received?

25    A   Some of the information we had received was that the shooter
```

```
 1        had went—fled southbound through the shortcut from Mabel to

 2        Florence.  That was the reason for doing the canvass on

 3        Florence.

 4  Q     Okay.  Was there any more investigation that you did on

 5        April 24th, 2011, and April 25th before you went to—went to bed

 6        in the early morning hours?

 7  A     No, not that I can recall.

 8  Q     Okay.  Now did you continue the investigation afterwards?

 9  A     Yeah, it wasn't till the 28th that I was able to get—to start

10        back on the investigation for the other reasons—for the

11        funeral and the—we had to do things the next day after the

12        funeral for Officer Zapata.

13  Q     Okay.

14  A     So, on the 28th, we held a briefing in the detective bureau and

15        everybody talked about what they had learned up to that point.

16  Q     Okay.  And did more informa—had more information come in since

17        April 25th to April 28th?

18  A     Yes.  I mean, not come in.  We just—Everybody wanted to get

19        together and talk about what they had learned up to that

20        point.

21  Q     So the investigation, it's fair to say, was continuing after

22        April 25th up until the rest of the year up until recently; is

23        that fair to say?

24  A     Correct.

25                   THE COURT:   I'm sorry.  Can you repeat that

                                   930
```

```
 1        question.  I got the answer, but can you repeat the question.

 2                    MR. CUSICK:    The investigation continued after

 3        April 25th up until recently.

 4   BY MR. CUSICK:

 5   Q    Now you had some descriptions of a potential shooter, correct?

 6   A    Correct.

 7   Q    And did you receive information regarding names?

 8   A    Yes.

 9   Q    Okay.  And, based on that information, can you tell the jury

10        what you did.

11   A    We received information Sunday night, Monday morning that an

12        individual named Steve Brown had made himself known to some

13        officers on scene and wanted to meet in another location.

14                    Attempts were made by other detectives to try to

15        locate him, and they were unsuccessful.  Those attempts

16        continued for a couple weeks until Steve Brown contacted

17        Detective Ghiringhelli on May 9th.  During that contact with

18        Detective Ghiringhelli, it was learned that he was out of

19        state in Illinois, and we made arrangements with him to come

20        to his location, pick him up, and drive him back to Kalamazoo

21        to be interviewed.

22   Q    Okay.  Now, at this point, when you had a conver—Had you

23        received any other names from any other individual at that—And

24        I don't want you to—I'm not going to ask you for hearsay or

25        even who those names are.  But did you receive other
```

931

```
 1        information or anything specifically indicating anybody that

 2        they saw who did the shooting?

 3   A    No, not at that point.  There was other names of people we

 4        were attempting to locate to interview in regards to things

 5        that came up from other detectives and officers' interviews

 6        that initial evening.

 7   Q    Once again, I'm not asking specifically what other people may

 8        have told you; but did Sam Steel's—though the investigation,

 9        did Sam Steel's name come up?

10   A    His name came up peripherally in the beginning as having been

11        a possible witness to the homicide as being out on

12        Mabel Street when it occurred.

13   Q    Okay.  And then were you able to speak with Samuel Steel—

14   A    I—

15   Q    —initially?  Did you try to make contact with him?

16   A    I attempted to make contact with him in early June.  Had a—We

17        played phone tag a couple times, and then he was supposed to

18        come down the first week of June.  There was—He didn't show

19        up.

20             I got assigned to work a patrol shift to back

21        patrol because of vacations the weekend of June 9$^{th}$ and 10$^{th}$,

22        and I had occasion to have contact with Sam on Mabel Street

23        when I was working in uniform that weekend.

24   Q    Okay.  Can you describe those contacts.

25   A    Detective Porn and I drove down—We were assigned to work the
```

1    north side that evening, and we drove down Mabel Street to see
2    if we could see anybody we knew that we might want to talk to
3    still on the investigation.  And I observed Sam in front of
4    his house with a couple other individuals.  They were drinking
5    alcohol on their own property.  And I got out of the cruiser
6    and attempted to make contact with Mr. Steel.

7  Q  Okay.  And did you make contact with him?

8  A  I did.

9  Q  And what was the discussion about, and what did the defendant
10    say?

11  A  I asked him why—I asked if I could speak to him.  He didn't
12    appreciate that in front of his friends.

13         I then asked him why he didn't come down to speak to
14    me earlier in the week.

15         There was—I don't recall his response to that.  He
16    asked me to get off his property.

17         I wasn't on his property, I was on the sidewalk; so
18    I stayed on the sidewalk for about ten, 15 minutes.  Then we
19    got sent on a call, and we left.

20  Q  Okay.  Now there's a lot going on, and I'm going to try to
21    make this as clear as possible—my question—so—

22         Did you make—This was in June that you first had
23    contact with Sam Steel?

24  A  Yeah, around June 9th or 10th.

25  Q  Okay.  Now did you eventually—Were you able to take a

933

1      statement from Steven Brown?

2   A  Yes.

3   Q  And it was approximately May 10th?

4   A  Yes, it was on May 10th.

5   Q  And who else was there when you took that statement?

6   A  I believe Detective Ghiringhelli was in the room with me when

7      it was taken.

8   Q  And did Steven Brown give you a name of an individual?

9   A  Yes.

10  Q  Who—Who—What name did he give you?

11  A  He told me that an individual named Melvin Johnson was the

12     shooter.  He referred to him as Peanut.  That's his

13     nickname—Melvin's nickname.

14            THE COURT:   I'm sorry?  He referred to him as what?

15            THE WITNESS:   Steve Brown referred to

16     Melvin Johnson as Peanut.

17  BY MR. CUSICK:

18  Q  Up until that point, is the only name that came out as to

19     being a possible shooter was Melvin Johnson—Correct?

20  A  Correct.

21  Q  —as being—Okay.

22  A  Correct.

23  Q  Now this is—This is—Is this any relation to Walter Johnson

24     that you know of or no?

25  A  No, no relation.

                        934

1   Q   At this point, had you formed an opinion as to what happened

2        on May 10th of 2011 as to who the shooter may have been or did

3        you not have enough information at that time?

4   A   I didn't have enough information at that point.

5   Q   Okay.  In response to what Steve Brown told you, did you do

6        anything in response to that?

7   A   During this whole process, there was several search warrants

8        for cellphones that were obtain—drafted and obtained.  That

9        assignment was given to another detective.  If we had a phone

10       number that we wanted to look at the records, we simply asked

11       that detective to—We provided her with the information, and

12       she went forward and obtained the search warrants for various

13       phone numbers.  So that was going on during the same time.

14   Q   Okay.  And did you look into Melvin Johnson's phone records?

15   A   Yes.

16   Q   Okay.  And what did you find out regarding those phone

17       records?

18   A   Well, I looked into his phone records after first interviewing

19       him.

20   Q   Okay.  Did he—

21   A   I didn't have his phone number until I had spoke to him.

22   Q   Did he voluntarily come in and make a statement?

23   A   No, I had to go to his mom's house to speak to him.

24   Q   Okay.  Did he give a full statement to you?

25   A   Yes.

935

1    Q    Based on that information, what did you do?

2    A    It caused me more follow-up with individuals he said that he

3         had been with on April 24th, 2011.

4    Q    And, based on—What happened after that, based on that

5         information?

6    A    Well, we eventually got Melvin's phone records back.  I had

7         also, a day or two before, spoke to his girlfriend

8         Kario Pritchett, and we obtained her phone records, also; and

9         we started going through the records to see if they

10        indicated—or verified what they—where they said they may have

11        been during that time.

12   Q    Okay.  And these are, just for the record, exhibit number 96

13        that's already been admitted and exhibit number 97 for the

14        phone records; is that correct?

15   A    Correct.

16   Q    How did you identify whether—where Kario Pritchett and

17        Melvin Johnson were?  How were you able to identify that?

18   A    From looking at their—the calls they made during the time

19        before and after the homicide, it provided you with

20        coordinates for cell towers; and that is how we were able to

21        determine where their phones were at at that time.

22   Q    And have cell towers been effective for you in the past,

23        through your experience?

24   A    Yes.

25   Q    And what did the cell towers indicate regarding

936

| | | |
|---|---|---|
| 1 | | Kario Pritchett and Melvin Johnson? |
| 2 | A | They indicated that they were not near the scene of the |
| 3 | | homicide. |
| 4 | Q | How—Do you know—Can you tell how far away they were or—or not? |
| 5 | | If you can't answer that— |
| 6 | A | The tower their—their phones were activating off right before |
| 7 | | and right after was on the east side of Kalamazoo.  The |
| 8 | | tower—The specific tower they activated off of was in the |
| 9 | | 700 block of Nazareth. |
| 10 | Q | Okay.  How far away is that from Mabel Street? |
| 11 | A | Driving, probably five to six minutes. |
| 12 | Q | I guess that doesn't—It was a—It was a cellphone tower on the |
| 13 | | east side, though, correct? |
| 14 | A | Correct. |
| 15 | Q | And, based on your experience, did that indicate anything to |
| 16 | | you? |
| 17 | A | Well, it helped corroborate they said where they had told me |
| 18 | | they were—Well, I can't say they told me that.  It helped |
| 19 | | corroborate where they said they were at. |
| 20 | Q | Okay.  And, regarding Steven Brown, did you have any views as |
| 21 | | to the statement that he had given you? |
| 22 | A | Yeah, it was very difficult to understand how he could say it |
| 23 | | was Melvin Johnson when I spoke to Melvin and his girlfriend |
| 24 | | and their cell records indicate something different. |
| 25 | Q | Up until April 24th of 2011, have you—had you ever met |

937

1   Samuel Steel?

2  A   No.

3  Q   Now bringing you to—Did you have any contact—any other contact

4      with Steven Brown after that?

5  A   In early June of 2011, he had contacted me and asked me if he

6      could meet me to share some information.  We met up at

7      Versluis Park, and there was no information shared.  He—Well,

8      he shared information on some—some fears he was having,

9      basically, about the case.

10 Q   Okay.  And based on—Did he give a statement as to what he saw

11     or indicate—or make any amended statement from what he

12     originally gave you?

13 A   Not on that date, no.

14 Q   Had you discussed or interviewed any other witnesses between,

15     I guess, May 10th and through the month of June?  Well, you

16     interviewed a lot of witnesses.  Did you receive any more

17     information regarding the homicide?

18 A   No.

19 Q   What about July of 2011?

20 A   In the summer months, obviously, people take vacations; so

21     there was some vacation time there—in there for me.

22             I had spoke to other people in June, which caused us

23     to go obtain more cellphone records.  Those records came back

24     periodically in the month—late June into July.  So those take

25     time to go through and analyze.  That's pretty much what was

                              938

| | |
|---|---|
| 1 | going on, amongst my other caseload. This wasn't the only |
| 2 | case I was investigating, you know, through these times. |
| 3 | Q | Did you receive any relevant information that you deemed |
| 4 | relevant throughout, I'll say, July, August of 2011? |
| 5 | A | No. |
| 6 | Q | Okay. There were no more descriptions as to who the shooter |
| 7 | might be or who the shooter was, et cetera? |
| 8 | A | No, there was not. |
| 9 | Q | What about September, if you recall, of 2011? |
| 10 | A | No new information was—was coming in at all at that time |
| 11 | either. |
| 12 | Q | Fair to say you were still investigating the case, correct? |
| 13 | A | Right. |
| 14 | Q | When you— |
| 15 | A | Amongst—Amongst my other caseload, yes. |
| 16 | Q | And, when you did receive information, you—did you—did—Let me |
| 17 | ask you this. Did there come a time when you received |
| 18 | information that you felt was important to this case? |
| 19 | A | In late October, I was notified by DEA—a KVET officer, |
| 20 | Ted Westra, who is assigned to the DEA task force for KVET. |
| 21 | And he notified me that a Walter Johnson had wanted to share |
| 22 | information in regards to the Milo Conklin homicide. |
| 23 | It took probably a week to get the various parties |
| 24 | involved to sign the paperwork to allow us to go interview |
| 25 | him. |

| 1 | Q | Okay. This is about October of 2011, correct? |
| 2 | A | It was late October of 2011, and then the interview eventually |
| 3 | | took place on November 2nd, 2011. |
| 4 | Q | Okay. And did you take a statement on November 2nd from |
| 5 | | Walter Johnson? |
| 6 | A | Yes, I did. |
| 7 | Q | Now, based on that statement, what did you do? |
| 8 | A | After taking the statement, myself and Officer Westra went up |
| 9 | | to the Mecosta County Jail where Walter was being lodged at |
| 10 | | that time. We interviewed him with Walter's attorney present. |
| 11 | | And, after the interview, I came back to the office, |
| 12 | | explained to my bosses and other detectives that were |
| 13 | | assisting on the case what Walter had shared with us and asked |
| 14 | | for assistance to go out and attempt to corroborate what he |
| 15 | | had told us. |
| 16 | Q | Okay. And what—And what was that? |
| 17 | A | Well, the first thing that needed to be done was look at—try |
| 18 | | to find Mark Sprague and Paige Bowers. He didn't know their |
| 19 | | last names. |
| 20 | | So I began searching in our records computer for the |
| 21 | | first name Paige, 'cause, in my opinion, it was a less common |
| 22 | | name than Mark. And I came across—And he gave me a |
| 23 | | description of what they looked like—white female, white male, |
| 24 | | physical build. So I can—You can search in our records |
| 25 | | computer for names in that fashion. |

1          So I did a search, went through the results.  I
2     don't remember how many results there were, but narrowed it
3     down to Paige Bowers 'cause one of her associates was a guy
4     named Mark Sprague.

5          I then checked on Mark Sprague's status by running a
6     warrant check on him and Paige.  Mark, I learned, was
7     currently incarcerated in the Kalamazoo County Jail at that
8     time.

9  Q  Did you take statements from them?

10 A  I did.  But, to back up a second—

11 Q  Okay.

12 A  —the other corroboration that needed further assistance was
13    the information about the—the clothes that had been burned.
14    And Detective Hecht and Sergeant Kozal went out to
15    Walter Johnson's former residence and made contact with—or
16    attempted to make contact with the residents where they
17    learned that the bank—that the bank had taken over the
18    property; and that, subsequently, led them to get permission
19    from the bank to search the garage.  And then they made
20    contact with a neighbor across the street, Mike Wilson.

21 Q  Okay.  And Matthew Bombich was the individual who went and
22    recovered evidence from Stockbridge, correct?

23 A  That's correct.

24 Q  And when did that occur, if you recall?  Was that the next
25    day?

| | | |
|---|---|---|
| 1 | A | That was on November 3rd, 2011. |
| 2 | Q | Now Paige Bowers and Mark Sprague, did you take statements |
| 3 | | from them? |
| 4 | A | Yes, I did. |
| 5 | Q | And, based on that information, did you know where the firearm |
| 6 | | was at that point? |
| 7 | A | No. |
| 8 | Q | Did Walter Johnson ever indicate where—to you that he knew |
| 9 | | specifically where the firearm was? |
| 10 | A | No.  He passed on information that he said he learned from |
| 11 | | what Sam had told him. |
| 12 | Q | Now, at this point, did you contact Steven Brown or did |
| 13 | | Steven Brown contact you? |
| 14 | A | We located Steven Brown—It might have taken a week or so.—and |
| 15 | | had him—We went and picked him up and drove him down to our |
| 16 | | offices for an interview. |
| 17 | Q | Okay.  Now had you been discussing—talking with Steven Brown |
| 18 | | on the phone from May until November of 2011? |
| 19 | A | I could have talked to him a couple times on the phone, but |
| 20 | | there was no other information that was coming in in regards |
| 21 | | to the homicide. |
| 22 | Q | Okay.  And, initially—I'll rephrase. |
| 23 | | Did Steve Brown give you—give a statement to you? |
| 24 | A | In November, he gave me a second statement, yes. |
| 25 | Q | Was that November 8th of 2011? |

942

1   A     Yes.

2   Q     And what was Steven Brown's—If you can be as specific as

3          possible, what was Steven Brown's demeanor at that time,

4          emotional state?

5   A     Emotional state was he appeared scared.  When he was

6          confronted with the fact that we had other information about

7          somebody else being the shooter, he became visibly upset and

8          began to cry.

9   Q     Did he come forward with another name other than

10         Melvin Johnson?

11  A     At that point, he did.

12  Q     And what name did he come forward with?

13  A     He initially said the name was Beano, and then I—

14  Q     Did that mean anything to you?

15  A     I know that to be a nickname for Sam Steel.

16  Q     Okay.  What happened then?

17  A     With Steve?

18  Q     Yes.

19  A     I asked him why he initially lied to us about who the shooter

20         was.

21               He told us that he had a problem with the other

22         individual Melvin and that's why he said the name.

23  Q     Did he indicate how he felt toward the defendant?

24  A     That he was scared of the defendant.

25  Q     Now, based on that information that you've already testified

| | | |
|---|---|---|
| 1 | | to, what did you do to continue the investigation? |
| 2 | A | Well, back up a second. When we were bringing Steve downtown |
| 3 | | to the detective bureau, we were driving on Rose Street—me |
| 4 | | and—I can't remember if it was Detective Moorian or |
| 5 | | Ghiringhelli. But Steve was in our back seat, and we—Steve |
| 6 | | saw Sam Steel's vehicle on Dutton Street coming up to Rose and |
| 7 | | literally dove down in the back seat so he wouldn't be seen in |
| 8 | | my car. |
| 9 | Q | Okay. Did you see Sam Steel that day? |
| 10 | A | I couldn't tell who was driving. And I knew Sam Steel at that |
| 11 | | point owned an SUV, a Hummer. And I quickly glanced to my |
| 12 | | right, but I was, you know, driving and going straight ahead, |
| 13 | | so I couldn't tell you who was driving or not. |
| 14 | Q | Okay. What did you do to continue the investigation? |
| 15 | A | After that point, I went and obtained phone records for |
| 16 | | Walter. |
| 17 | | I attempted to locate Harry Mathews, obtained |
| 18 | | Harry Mathews' phone records and interview other various |
| 19 | | people in November of 2011. |
| 20 | Q | Did you—Had you at this point obtained Samuel Steel's phone |
| 21 | | records or not? |
| 22 | A | Yes, we did have his records already on file. |
| 23 | Q | And when was that? When did you obtain those? |
| 24 | A | I believe we obtained them in early June of 2011. |
| 25 | Q | Had Walter Johnson's name come up with regards to this |

944

```
 1    homicide investigation up until he came forward?
 2  A  No, not at all.
 3  Q  What about A. J. Mathews—Harry Mathews?
 4  A  There had been information about a—information on several
 5     different vehicles that were potentially the get-away vehicle.
 6     One of them was a vehicle that was Harry Mathews's vehicle.
 7     So that information had been out there, but there was one or
 8     two other vehicles that had also been allegedly a get-away
 9     vehicle, also.
10  Q  Did you take a statement from Harry Mathews at that point?
11  A  One day I was leaving this courthouse and drove out Academy to
12     Park, and I saw Harry's vehicle drive past me.  So I followed
13     him up to the strip mall at Ada and Westnedge and got out of
14     my vehicle and made contact with him.  Just simply told him I
15     wanted to talk to him in a more private location, preferably
16     my office; but he didn't want to do that.
17            He recontacted me, and we made arrangements to
18     meet—I think it was November 28th we met at Panera Bread on
19     Gull Road.
20  Q  And, based on that information—or based on that conversation
21     did you receive any more information specific to the homicide?
22  A  From Harry?
23  Q  Yeah.
24  A  No.
25  Q  What happened then?  What happened with the investigation?
```

945

```
 1        What continued?

 2   A    In—That led to mid to late—mid to late December, taking the

 3        investigation at that point to the prosecutor's office and

 4        requesting a warrant for Sam Steel and Harry Mathews.

 5   Q    Was there a warrant issued by the prosecutor's office at that

 6        point?

 7   A    The warrant was issued on December 22nd, 2011.

 8   Q    And did you look at the—go over the phone records of

 9        Harry Mathews and of Walter Johnson and of Sam Steel?

10   A    Yes.

11   Q    And, based on your experience, did that—did those phone

12        records indicate anything to you?

13   A    Yeah, it indicated that they, you know, at the various times

14        close to the time of the murder, they were—all their phones

15        were activating off of a tower in the 500 block of Willard,

16        which is only a few blocks away from the crime scene.

17   Q    Now did Harry Mathews—Are you aware of what Harry Mathews did

18        on December 22nd of 2013 [sic]—2011?

19   A    Attempts were made to locate Mr. Steel during the afternoon

20        that day.  They were unsuccessful.  The decision was made by

21        our—my command officers to put a news release out with

22        Harry Mathews' picture and Sam Steel's picture and put it on

23        the news—the 6:00 o'clock news.

24             Within—Before 6:30—Before the news was done, we had

25        a phone call from station four-five, which is at Park and
```

1    North—It's a fire station/police station.—from the officers
2    coming on duty on the night shift—They start at 7:00.  One of
3    the sergeants called and said, are you guys looking for
4    Harry Mathews; he said he was on the news.  They had no idea
5    that there was anything going on.  And so somebody went up
6    there and took custody of Mr. Mathews and processed the
7    arrest.
8  Q  So the very day Mr. Mathews turned himself in?
9  A  Correct.
10 Q  Are you aware of where—At that time on December 22nd of 2011,
11    were you aware of where Samuel Steel went?
12 A  We had information through a confidential informant of what
13    Sam Steel's phone number was on that date, and we had
14    requested an exigent request with Sprint® to do live pinging
15    of his cellphone to try to pinpoint where he was located on
16    that day.
17           We—We learned during the—during the first hour after
18    it aired that there was no more pings coming in on his phone,
19    which told us that the phone was turned off at that point.
20 Q  Okay.  Did you ever have any more pings from that phone after
21    that that you recall?
22 A  Not after six-tenish, six-fifteenish on December 22nd—
23 Q  Okay.
24 A  —2011.
25 Q  So what—Without—I'll just ask you this.  What did that tell

947

1    you at the time?

2  A  Initially, we just—we weren't sure if he was—if he just turned

3     his phone off or if he was fleeing.

4  Q  Okay.  Later on in the investigation, did you form an opinion

5     as to that?

6  A  About five days later.  It was the holiday time, so everybody

7     was off during—for three, four days during the holidays.  We

8     came back to work on December 27th.  It was 27th or 28th that a

9     person came to the detective bureau and told us that they

10    believed that their—

11              MR. CHAMPION:  Your Honor, I'm going to object as

12    hearsay.

13              MR. CUSICK:  Your Honor, this is, once again, the

14    investigation, why Detective Beauchamp did what he did.  It's

15    not coming in for the truth of the matter asserted.  And he

16    can testify as to receiving information, what that information

17    was, as to why he acted in the way he did.

18              MR. CHAMPION:  A person, that's where the issue

19    . . . (inaudible)

20              THE COURT:  Approach, please.

21              (At 2:22 p.m., bench conference as follows:

22                  MR. CUSICK:  Okay.  I—

23                  THE COURT:  What are you asking him to

24              say—What do you expect him to say, that a—

25                  MR. CUSICK:  I mean—

                                948

1          THE COURT:   —person came in and said what?

2          MR. CUSICK:   —just, you know, if he received

3     information from somebody as to who gave him the

4     phone, something like that, if he received that

5     information.  It's not being offered for the truth

6     of the matter asserted.  I can—I can try to kind of

7     specify my questions a little bit more and—

8          But I think most of what he—he learned through

9     the investigation he can testify to.

10         THE COURT:   But what are you expecting him to

11    say as far as what this person told him and then he

12    responds and does what?  That's what I'm—What are

13    you expecting him to say?

14         MR. CUSICK:   Well, that he continued the

15    investigation.  He did—He got those phone records

16    and was on the track—

17         THE COURT:   Your question right now is that

18    somebody contacted him and said what.

19         MR. CUSICK:   Right.  I think that it was

20    the—Somebody contacted him and said they gave his

21    phone to—to Sam Steel.

22         THE COURT:   Okay.  I'll—

23         MR. CUSICK:   Like I said—

24         THE COURT:   I'm going to allow—

25         MR. CUSICK:   —I can get around—

```
 1                    THE COURT:   —that.

 2                    MR. CUSICK:   —this.  I don't—

 3                    THE COURT:   If you can go a different route,

 4          that would be great.

 5                    MR. CHAMPION:   Well, I'm just looking for a

 6          name, not just say person.

 7                    THE COURT:   Well—

 8                    MR. CUSICK:   Okay.  Now I understand.  I

 9          understand.  I do.

10                    THE COURT:   Okay.  So it sounds like—

11                    MR. CUSICK:   I'm not laughing at what you

12          said; I agree with you.

13                    THE COURT:   Okay.

14                    MR. CUSICK:   I had no idea.

15                    THE COURT:   Go ahead.

16                    MR. CUSICK:   Okay.)

17               MR. CUSICK:   I'll just—

18   BY MR. CUSICK:

19   Q    So the phone was shut off on December 22nd, correct?

20                    THE COURT:   You have to speak up a little bit.

21                    MR. CUSICK:   I'm sorry, your Honor.

22   BY MR. CUSICK:

23   Q    The phone was shut off on December 22nd, correct?

24   A    Correct.

25   Q    Okay.  Did you receive a new phone number for the defendant?
```

1   A      Yes.

2   Q      And I'm going to hand you People's proposed exhibit—

3                    (At 2:24 p.m., off record discussion between

4                    Mr. Cusick and Ms. Hybel)

5                    MR. CUSICK:   I'm sorry.  It's 99.  Ninety-eight's

6          already been admitted.

7   BY MR. CUSICK:

8   Q      I'm handing you People's proposed exhibit 99.  Can you tell me

9          what that is.

10  A      It's a list of names and various phone numbers for individuals

11         that had been interviewed—our information was received on

12         during this investigation.

13  Q      Okay.  And are these based on the phone records that have

14         already been admitted?

15  A      Correct.

16  Q      Okay.

17  A      Well, for—except for two people that were not admitted.

18                   MR. CUSICK:   Your Honor, I would ask—

19  BY MR. CUSICK:

20  Q      And who are those people?

21  A      Wendell Montgomery and Entenia (phonetic) Hadley.

22  Q      And they just have the phone numbers on there?

23  A      Correct.

24                   MR. CUSICK:   Your Honor, I would ask to admit—admit

25         it into evidence.

951

```
 1              MR. CHAMPION:   May I voir dire briefly on that,

 2       your Honor?

 3              THE COURT:   Yes.

 4              I missed the second name.

 5              THE WITNESS:   Wendell Montgomery and

 6       Entenia (phonetic) Hadley.

 7              THE COURT:   Thank you.

 8              Go ahead, Mr. Champion.

 9                      VOIR DIRE EXAMINATION

10   BY MR. CHAMPION:

11   Q    Detective, you've got a number of Sam Steel, a.k.a.

12        Timm Jones, different numbers.  How did you determine that

13        Tim Johnson was also Sam Steel?

14   A    Can I see the exhibit?

15              Tim Johnson was Sam Steel's second phone he had in

16        Georgia from August 3rd to August 6th.  It was in his custody.

17   Q    Well, my question is how did you determine that?

18   A    It was on his person when he was arrested, and I—

19   Q    . . . (inaudible)

20   A    —did a search warrant for the record—for the actual—to

21        download the information from the phone.

22   Q    So all the numbers 206-1922, how did you determine that?

23   A    That came through a—an interview that the FBI did with

24        Tim . . . (unintelligible) in January of 2012.

25              MR. CHAMPION:   May we approach, your Honor?
```

952

1      THE COURT:   Yes.

2      (At 2:27 p.m., bench conference as follows:

3           THE COURT:   Can I see that exhibit a second.

4           MR. CHAMPION:   Pardon?

5           THE COURT:   Can I see the exhibit, please.

6           MR. CUSICK:   Okay.   These are phone numbers

7      that the defendant used . . . (inaudible) MetroPCS

8      phone records.

9           MR. CHAMPION:   Well, I'm talking about how

10     they determined these phone numbers belonged to

11     Sam Steel.

12          MR. CUSICK:   I don't believe there's a report

13     as to what that number was—how they received that

14     number.   I believe in the report—I believe it was

15     Brian who just said that he received information as

16     to what the number was.

17          MR. CHAMPION:   . . . (inaudible)

18          MR. CUSICK:   I mean—

19          MR. CHAMPION:   — . . . (inaudible) That's the

20     issue that I have . . . (inaudible)

21          MR. CUSICK:   I guess most of these records

22     will be—are—This was just to make it easier, but

23     most of these records are—are certified copies; and

24     these are phone numbers that they had.   Now—

25          THE COURT:   . . . (inaudible)

953

1       MR. CUSICK:   Right.

2       THE COURT:   So he's got that one and then he's

3   got the . . . (inaudible)

4       MR. CUSICK:   . . . (inaudible)

5       MR. CHAMPION:   The ones that he is able to

6   confirm . . . (inaudible)

7       MR. CUSICK:   And the one that was on his

8   person—

9       MR. CHAMPION:   . . . (inaudible)

10      MR. CUSICK:   Right.  And all those—

11      MR. CHAMPION:   This is the one I was

12  questioning.

13      MR. CUSICK:   And all those—the records, the

14  reports, the MetroPCS—we gave those to you.

15      MR. CHAMPION:   . . . (inaudible)

16      MR. CUSICK:   Okay.  Okay.

17      MR. CHAMPION:   My question was how did they

18  determine—

19      MR. CUSICK:   Right.

20      MR. CHAMPION:   — . . . (inaudible)

21      THE COURT:   That he was using those.

22      MR. CUSICK:   Because he received information

23  from the FBI that that is the name went to the

24  phone.  This is when he went to pick it up from

25  Chicago, I believe, when the guy . . . (inaudible)

954

Chicago during the dogfight case.  But we're not
going to . . . (inaudible) now.

I believe that that one is when
. . . (inaudible) his name was Tim Jones
. . . (inaudible)—

MR. CHAMPION:   . . . (inaudible)

MR. CUSICK:   —'cause he was identified by
. . . (inaudible)

MR. CHAMPION:   . . . (inaudible)

MR. CUSICK:   I don't have any.  I don't have
any.

MR. CHAMPION:   . . . (inaudible)

MR. CUSICK:   Not that I know of.

THE COURT:   So these are going to come through
the dogfighting case that—

MR. CHAMPION:   Pardon?

THE COURT:   . . . (inaudible) through the
investigation . . . (inaudible)

MR. CUSICK:   Yeah, that's why—

THE COURT:   — . . . (inaudible)

MR. CUSICK:   Yeah, I don't want to bring that
up.

THE COURT:   . . . (inaudible) just going to
say that you investigated another case involving him
and that's how they came in?

1    MR. CHAMPION:   I think they came through the

2    FBI.

3    MR. CUSICK:   Based on information that they

4    received.  One of them was through the—

5    MR. CHAMPION:   . . . (inaudible)

6    MR. CUSICK:   Go ahead.

7    MR. CHAMPION:   . . . (inaudible) question for

8    the detective does he have any of these reports.

9    MR. CUSICK:   Okay.  Okay.

10    MR. CHAMPION:   . . . (inaudible)

11    MR. CUSICK:   Do you want to do that outside of

12    the presence of the jury?

13    MR. CHAMPION:   . . . (inaudible)

14    MR. CUSICK:   Okay.

15    THE COURT:   . . . (inaudible) take a afternoon

16    break right now . . . (inaudible)

17    MR. CHAMPION:   It's 2:30 now.  Then we'll just

18    finish up with this witness . . . (inaudible)

19    THE COURT:   How much . . . (inaudible) are you

20    going to have him?

21    MR. CUSICK:   I'll be probably 15, 20—15

22    minutes to a half hour.

23    MR. CHAMPION:   . . . (inaudible)

24    THE COURT:   Why don't we just take a break

25    right now.

956

```
 1                    MR. CUSICK:    Okay.

 2                    THE COURT:    . . . (inaudible)

 3                    MR. CUSICK:    Okay.)

 4             THE COURT:    We're going to take an afternoon break

 5      a little early here.  So we'll give you about 15 minutes or

 6      so, and we'll—It's probably going to be about 20 to 25 minutes

 7      actually.  That's my guess at this point.

 8             Make sure you remember all of my prior instructions,

 9      and make sure you leave your notebooks on your chairs.

10             All rise.

11             (At 2:31 p.m., jury exits courtroom)

12             You may be seated.

13             Folks, you still have to stop talking when I'm

14      excusing the jury.  I can hear you talking in the background.

15      So just please be quiet unless we go off the record, if you

16      would.

17             Okay.  We are addressing proposed exhibit 99.

18             Do you have copies of that exhibit—I don't—or no?

19             MR. CUSICK:    I—No, I don't.  I did—

20             THE COURT:    Okay.

21             MR. CUSICK:    —give—

22             THE COURT:    Just—It might just be easier as we go

23      along, so I'm going to just have a couple copies made a

24      second.

25             And then looks like you want some—
```

957

1          MR. CHAMPION:   Clarification on two of the numbers

2      . . . (inaudible)

3          THE COURT:   All right.  I'm going to hand the

4      proposed exhibit 99 to the witness—

5          You want a copy?

6          —so that we can work off these—

7          Give me one second.

8          (At 2:33 p.m., off record discussion between Court

9          and clerk)

10          All right.  So just so the record's clear, the

11      jury's out of the courtroom and we just have some questions on

12      proposed exhibit 99 that we're going to be addressing outside

13      of the jury's presence.

14          Mr. Champion, I'll turn it over to you.

15          MR. CHAMPION:   Thank you.

16  BY MR. CHAMPION:

17  Q   Detective, I'm focusing in—actually, on three issues.  On the

18      first one, you have Sam Steel, a.k.a Nick Jake.  Where did

19      that Nick Jake come from?

20  A   That was the name on the subscriber page from the phone—that

21      was provided by the phone company.

22  Q   Was that a pay-as-you-go phone?

23  A   Pardon?

24  Q   Was that a pay-as-you-go type of phone?

25  A   That, I don't know.

                                958

```
 1                    THE COURT:   I'm sorry.  You said—
 2                    THE WITNESS:   I do not—
 3                    THE COURT:   —that you don't know?
 4                    THE WITNESS:   I don't know.  I never saw the phone.
 5    BY MR. CHAMPION:
 6    Q    Now the phone number (269) 206-1922 says a Timm Jones from
 7         September 2011 to December of 2011.  How did you establish
 8         that Sam Steel was in possession of that phone?
 9    A    Well, from looking at the records and comparing common numbers
10         that were called, I was able to determine that that was
11         Sam Steel's phone.
12    Q    Just because of common numbers?
13    A    I observed numbers of family members that called from this
14         number compared back to the 377-8330 number.
15    Q    Could other people have been using those numbers, family
16         members, friends?  Did you have any other information other
17         than comparing numbers?
18    A    No, I did not.
19    Q    As to from December 9th through December 22nd . . . (inaudible)
20         207-7256?
21    A    That was the phone that Sam had the day that the warrant was
22         issued.  I can tell from looking at those records.  Numerous
23         calls that were made specifically on December 22nd were made to
24         his attorney's cellphone and his attorney's office and his
25         wife.
```

959

```
1              THE COURT:   I can't hear you.

2              His attorney's office; is that what you said?

3              THE WITNESS:   An attorney that he had at that time

4       for a pending case.

5              THE COURT:   Okay.

6  BY MR. CHAMPION:

7  Q    Did he still have 377-8330?

8  A    No, based on what the records provided from the phone company,

9       that phone had been changed.

10 Q    When?

11 A    I'd have to see the records.  I don't recall off the top of my

12      head.

13 Q    Which phone got turned off that you said stopping pinging?

14 A    The 207-7256.

15 Q    Did you ever speak to Sam Steel on that phone?

16 A    No, I did not.

17 Q    Did you have any other information that that phone belonged to

18      Sam Steel?

19 A    Information that was provided by a confidential informant.

20              THE COURT:   I'm going to jump in and go back a

21      second.

22              Where did you get the number 377-8330 from?

23              THE WITNESS:   From a confidential informant that

24      was provided to KVET.

25              THE COURT:   Thank you.
```

1  BY MR. CHAMPION:

2  Q   Did you ever list that in any of your reports that you

3      received that information from a confidential informant?

4  A   I don't know if it was in my report or another officer's

5      reports.  It was passed on to me, and I passed it on to

6      Detective Rivard, who drafted the search warrants.

7  Q   Did you receive any direct information that 206-1922 or

8      207-7256 belonged to Sam Steel?

9  A   207-7256, I did, through a confidential informant.

10             206-1922 was given to me by Special Agent Waldvogel

11     from an interview he had conducted.

12  Q  Did you have a report on either one of these, either from the

13     confidential informant information or from the FBI?

14  A  A report?

15  Q  Yes.

16  A  No, I did not.

17             THE COURT:   . . . (inaudible)

18             THE WITNESS:   It would have been—It would have been

19     in the—

20             THE COURT:   Go ahead.  Go ahead and finish.

21             THE WITNESS:   It would have been in the application

22     for the search warrant.

23             MR. CHAMPION:   Thank you.

24             I have no other questions.

25             THE COURT:   I have a question.  With regards to

                            961

1   206-1922, you indicated that you received that number from one

2   of the special agents—one of the FBI agents; is that correct?

3            THE WITNESS:   A special agent that works in

4   Kalamazoo.

5            THE COURT:   I see.  With regards to an interview

6   that he conducted, so he received that information from a

7   confidential informant, also?  Is that how he got the number,

8   if you know?

9            THE WITNESS:   That person was not a confidential

10  informant.  They were named.

11           THE COURT:   Okay.

12           THE WITNESS:   That's how I learned it.

13           THE COURT:   And so that person was named and they

14  provided him with the information that Sam Steel was using

15  that phone number?

16           THE WITNESS:   Correct.

17           THE COURT:   Now you indicated that you—previously

18  that that phone number you had checked with other relatives

19  and other family members of Mr. Steel and other records and

20  confirmed that they were calling that number?

21           THE WITNESS:   I observed incoming/outgoing calls

22  from the 206-1922 to some of Sam Steel's family members who we

23  knew what their numbers were.

24           THE COURT:   All right.  The four-o-four numbers,

25  the one, you've already addressed from Tim Johnson.  That's

```
 1    the number that he—or the cellphone Mr. Steel had on his

 2    person when they addressed [sic] him down in Atlanta; is that

 3    correct, sir?

 4                   THE WITNESS:   Yes.

 5                   THE COURT:   What about the other four-o-four

 6    number?

 7                   THE WITNESS:   That was a number provided by the vet

 8    in Chicago to the FBI.

 9                   THE COURT:   I'm sorry.  By the what?

10                   THE WITNESS:   The veterinarian in Chicago.

11                   THE COURT:   I see.

12                   And we've already addressed that in a motion—

13                   MR. CUSICK:   Right.

14                   THE COURT:   —as far as why that was contacted.

15    That deals with the other case.

16                   Okay.  Any further questions, Mr. Champion?

17                   MR. CHAMPION:   No, your Honor.

18                   THE COURT:   Any further questions—

19                   MR. CUSICK:   No, your Honor.  Just move for its

20    admittance.

21                   MR. CHAMPION:   I would wait till the jury—I still

22    have a couple issues I'd like to address before I—

23                   MR. CUSICK:   Okay.  With voir dire in front of the

24    jury, or do you want to—It doesn't matter.

25                   MR. CHAMPION:   Pardon?
```

1        MR. CUSICK:   Do you want—

2        MR. CHAMPION:   Well—

3        MR. CUSICK:   —to voir—

4        MR. CHAMPION:   —I would like just a few minutes

5   before the jury comes . . . (inaudible)

6        MR. CUSICK:   Oh.  I see.

7        THE COURT:   Okay.  So you want to bring him back on

8   the stand and ask some questions after you've had a few

9   minutes?

10        MR. CHAMPION:   I may.

11        THE COURT:   All right.

12        MR. CHAMPION:   Thank you.

13        THE COURT:   So right now there's a motion to admit

14   exhibit 99, and we will—I'll wait and give a ruling then after

15   Mr. Champion has an opportunity to ask any further questions,

16   if he needs to.

17        So we'll take about a 15-minute break.

18        Court's in recess.

19        MR. CHAMPION:   Thank you.

20        MR. CUSICK:   Thank you, your Honor.

21        THE COURT:   I'm sorry.  Counsel, is there anything

22   else we need to address at this time?

23        MR. CUSICK:   I don't think so.

24        THE COURT:   You can step down.

25        MR. CHAMPION:   No, your Honor.

964

1          THE COURT:   All right.  Court's in recess.

2          (At 2:40 p.m., court recessed)

3          (At 2:59 p.m., proceedings reconvened)

4          THE CLERK:   The court recalls the case of People of

5   the State of Michigan versus Samuel Steel, III, case number

6   C11-1983 FC.

7          Parties, please restate appearances for the record.

8          MR. CUSICK:   Paul Cusick on behalf of the People,

9   your Honor.

10          MR. CHAMPION:   May it please the Court,

11   Robert Champion appearing on behalf of Samuel Steel.

12          MR. CUSICK:   Your Honor, I do—I did speak with

13   Mr. Champion just after we had our—

14          THE COURT:   Yeah.

15          MR. CUSICK:   —session.  I mean, I believe

16   Mr. Champion will stipulate Sam Steel—we can admit the exhibit

17   if it's not a.k.a. Nick Jake, a.k.a. Timm Jones.  So the first

18   four, we would not have also known as; we'll put Sam Steel.

19          MR. CHAMPION:   My understanding is that these names

20   Nick Jake, Timm Jones, Tim Jones, Tim Jones, and Tim Johnson,

21   the actual phones were registered to those individuals,

22   correct?

23          MR. CUSICK:   Right.

24          MR. CHAMPION:   It's not that Sam Steel was going by

25   that name but he was using a phone that was registered under

965

1    those names, correct?

2              MR. CUSICK:   It's my understanding.

3              THE COURT:   Why don't we put Mr. Beauchamp back on

4    the stand and just confirm that—I mean, unless it's a—Is that

5    a stipulation that's—That's our understanding that's what

6    you're going to testify to.

7              Is that right, Mr. Beauchamp—Okay.—Detective

8    Beauchamp.

9              Okay.  So—So there's no objection to the exhibit

10   as—as long as they correct that and—

11             MR. CHAMPION:   Subject—

12             THE COURT:   —take out the a.k.a?

13             MR. CHAMPION:   Subject to cross-examination.  And,

14   basically, it's going to be a demonstrative evidence as I

15   understand.

16             MR. CUSICK:   Right.  And I would ask—So—

17   . . . (inaudible) type this up.  I don't . . . (inaudible) we

18   just black—black that portion out on the exhibit or—

19             THE COURT:   I've written on mine—

20             Give us one second.

21             I've written on—Well, it can be your copy there,

22   Mr. Champion.

23                  (At 3:01 p.m., off record discussion between Court

24                  and clerk)

25             Counsel, you want to look at that.

```
1                    (At 3:02 p.m., bench conference as follows:

2                         MR. CUSICK:   I would . . . (inaudible)

3                         MR. CHAMPION:   Well, the question's going to

4                    be it's registered to these individuals

5                    . . . (inaudible)

6                         THE COURT:   All right.  You just

7                    . . . (inaudible)

8                         MR. CUSICK:   Okay.  That's fine.

9                         THE COURT:   My understanding is—

10                        MR. CUSICK:   That's fine.

11                        THE COURT:   —he's going to say—

12                        MR. CUSICK:   Yeah.

13                        MR. CHAMPION:   Right.

14                        THE COURT:   And you'll have to lay more of a

15                   foundation—

16                        MR. CUSICK:   No, that's fine.

17                        THE COURT:   —for why those names are there—

18                        MR. CUSICK:   That's fine.

19                        THE COURT:   —because that has not been

20                   indicated.  But my understanding is that's the names

21                   that the phone was under.

22                        MR. CUSICK:   Right.  Okay.  That's fine.

23                        THE COURT:   But he'll have to—He'll have to

24                   testify—

25                        THE COURT:   Yeah . . . (inaudible)
```

```
 1              MR. CHAMPION:    . . . (inaudible)

 2              THE COURT:    Okay.  Okay.  We're going to make

 3         a copy of that.)

 4         THE COURT:    All right.  So we can address this

 5    exhibit in a moment, too.

 6              But, while we're waiting, we did receive information

 7    during the break that the juror in seat number one, she

 8    believes that Melvin Johnson was her student in seventh grade.

 9    So we're just going to bring her in and see if that affects

10    her ability to remain on this case as a juror and influences

11    her one way or the other.  And then we'll see what happens

12    from there.

13              So she's out in the hallway.  We're just going to

14    bring her in.

15              Counsel—

16              All right.

17              All rise.

18              We'll bring her in.

19              (At 3:03 p.m., Juror Hill enters courtroom)

20                              — — —

21

22

23

24

25
```

1    (At 3:03 p.m., beginning of separate record)

2    THE COURT:   You may be seated.

3    You may be seated.

4    So we have the juror in seat number one in the

5    courtroom, for the record, and she is the only juror that is

6    here at this time.

7    And, ma'am, my understanding is that you passed on

8    information to Ms. Wint indicating that you realized based on

9    the testimony that Melvin Johnson may have been your student

10   when he was in the seventh grade; is that correct?

11   JUROR HILL:   Yes.

12   THE COURT:   Okay.  So approximately how long ago

13   would that have been?

14   JUROR HILL:   Well, I had him when he was about

15   12 years old.  I don't know . . . (inaudible)

16   THE COURT:   Okay.  So over—

17   JUROR HILL:   . . . (inaudible)

18   THE COURT:   —ten, 15 years ago?

19   JUROR HILL:   Yes.  Yes.

20   THE COURT:   Okay.  So, with that information, let

21   me ask you this then, ma'am.  Do you believe that you can

22   remain on this jury and be a fair and impartial—

23   JUROR HILL:   . . . (inaudible)

24   THE COURT:   —juror?

25   Absolutely?  I think that's what you said.

969

SEPARATE RECORD

1  JUROR HILL:  Yes.

2  THE COURT:  Okay.  So you're just passing this

3  information along because that's what we asked you to do,

4  correct?

5  JUROR HILL:  Right.

6  THE COURT:  All right.  So you just realized that

7  you may know one of the witnesses?

8  JUROR HILL:  It's possible.  Because they said his

9  mother lived on Nazareth Road, and that is the Comstock school

10  area part of it.  So I thought maybe it is—

11  THE COURT:  Okay.

12  JUROR HILL:  —my Melvin.

13  THE COURT:  Let me ask you, do you know for sure

14  one way or the other whether that was him?

15  JUROR HILL:  No, I do not know.

16  THE COURT:  Okay.  You don't know one way or the

17  other.

18  JUROR HILL:  No.

19  THE COURT:  So you're just passing that information

20  along to us?

21  JUROR HILL:  Right.

22  THE COURT:  Okay.  I appreciate that.

23  And, again, just so the record's clear, that's not

24  going to affect your decision one way or the other?

25  JUROR HILL:  No.

1    THE COURT:   It's not going to affect—Or is it going

2    to affect your ability to determine the credibility of the

3    witnesses that have come—

4    JUROR HILL:   No.

5    THE COURT:   —and given testimony?

6    No.  All right.

7    Let me see if the attorneys have any questions a

8    moment.

9    JUROR HILL:   Okay.

10   MR. CUSICK:   I don't have any questions at this

11   point, your Honor.

12   THE COURT:   Okay.  Mr. Champion, do you have any

13   questions at this point?

14   MR. CHAMPION:   No, your Honor.

15   THE COURT:   All right.  So I appreciate that,

16   ma'am.

17   I'm going to have you step out in the hallway—

18   JUROR HILL:   Okay.

19   THE COURT:   —again, and then we'll bring you back

20   with the rest of the jurors in a moment.  Okay?

21   JUROR HILL:   All right.

22   (At 3:06 p.m., end of separate record)

23                    — — —

24

25

```
 1                 THE COURT:   Please let me know when the door is

 2       shut.

 3                 Is she going to make a cleaner copy?

 4                 MR. CUSICK:   Yes.

 5                 THE COURT:   Okay.  That's fine.

 6                 MR. CUSICK:   Thank you.

 7                 THE COURT:   All right.  Is the door shut,

 8       Mr. Cusick?

 9                 MR. CUSICK:   Yes, your Honor.

10                 THE COURT:   All right.  So, just so that the

11       record's clear, then, the juror in seat number one has left.

12                 Any position with regards to her remaining on the

13       jury or any request to have her excused based on what was just

14       indicated on the record?

15                 Mr. Cusick?

16                 MR. CUSICK:   Your Honor, she said that she could be

17       a fair and impartial juror.  I don't think there's any

18       indication that she can't be at this point.

19                 THE COURT:   Mr. Champion, any position—

20                 MR. CHAMPION:   I have no objection, your Honor.

21       She indicated she could be fair.

22                 THE COURT:   —to have her remaining on the—

23                 MR. CHAMPION:   Yes.

24                 THE COURT:   —jury?  Everyone's in agreement that

25       she can remain, correct?
```

972

1          MR. CUSICK:   Yes, your Honor.

2          MR. CHAMPION:   That's correct, your Honor.

3          THE COURT:   All right.  And I agree, also, based on

4     that.

5          My understanding, also, Counsel, is we have been

6     making some changes to proposed exhibit 99.  It has not been

7     admitted.  And I understand that—I believe everyone's in

8     agreement that we need a little bit more information before

9     the exhibit is admitted, and I understand that there might be

10    some additional testimony from Detective Beauchamp.

11         And I think that you're also changing the exhibit.

12    So the copy that I—the Court tried to make some changes to it,

13    it's not the cleanest changes 'cause I used some Wite-Out™.

14    And my understanding is you're working on that and will

15    propose a different exhibit 99 once those changes have been

16    made.

17         With that, is there anything else we need to address

18    before the jury comes in, Counsel?

19         MR. CUSICK:   No, your Honor.  Thank you.

20         THE COURT:   Mr. Champion, anything we need to

21    address?

22         MR. CHAMPION:   No, your Honor.

23         THE COURT:   All right.  Jury's here.

24         Just a reminder, make sure your cellphones are

25    turned off and other electronic devices.  Don't use those

                              973

1   during the trial at all.

2              And the jury's here.  All rise.

3              (At 3:08 p.m., jury returns to courtroom)

4              You may be seated.

5              So we switched the chairs out.  It looks to be a

6   little bit lower than the last one.  Okay.  I think it was

7   leaning back a little bit too far, so—

8              All right.  Before—Or when we excused you the last

9   time, Brian Beauchamp was on the stand.

10             You're still under oath, sir.  You understand that?

11             THE WITNESS:   Yes, I do.

12             THE COURT:   And I am going to ask you to speak up.

13             THE WITNESS:   Yes, I do.

14             THE COURT:   Okay.  We were looking for a stand for

15  that hand-held mike.  I don't know if it would be easier if

16  you used that or not.  I'll leave that to your discretion, but

17  we might be able to hear you a little bit better.  I will note

18  that.

19             Just state your full name for the record, and then

20  I'll turn it back over to Mr. Cusick.

21             THE WITNESS:   Brian Beauchamp.

22             THE COURT:   Go ahead.

23             MR. CUSICK:   Thank you, your Honor.

24

25

FURTHER DIRECT EXAMINATION

BY MR. CUSICK:

Q    Detective, we were speaking about phone numbers before the
     jury was excused, and I just want to kind of go back to that.
     You were—Were you able to track Sam Steel's phone—phone
     numbers during the course of the investigation?

A    Yes, I was.

Q    And did he have a number that you understood to be
     (269) 377-8330?

A    Yes, he did.

Q    And how were you able to determine that that was Sam Steel's
     phone number?

A    Based on what was provided to us from a confidential informant
     back in May of 2011.  They advised that that was Mr. Steel's
     phone number at that time.

          From then reviewing those phone records, I observed
     numerous calls between various witnesses and relatives to
     Sam Steel—witnesses on this case and relatives of Sam.

Q    And was that under the name Sam Steel, that phone number?

A    Was the phone under that name?

Q    Yes.

A    It was under a different name.

Q    And what was the name that it was under?

A    Nick Jake.

Q    Okay.  And is that the phone that he had in April of 2011?

1   A   Yes, it was.

2   Q   Now there was another number—that number being (269) 206-1922.

3       Do you recognize that number?

4   A   Yes, I do.

5   Q   And whose phone did you believe that to be?

6   A   Sam Steel's.

7   Q   When did he have that phone?

8   A   From September of 2011 through December of 2011 based on what

9       we return—what was returned to us from the phone

10      company—Sprint®.

11  Q   What name was that under?

12  A   Timm Jones, and Timm had two Ms. on it.

13  Q   Were you able to verify—Did you receive information that

14      caused you to believe that that belonged to Samuel Steel?

15  A   Yes, it was passed on to me by Special Agent Waldvogel from

16      the Kalamazoo FBI office from an interview he had conducted.

17      Once the records were obtained and the connection—or the

18      records were reviewed, comparing it to phone numbers of family

19      members of Mr. Steel, that's why we believe that was

20      Mr. Steel's phone during that time frame.

21  Q   There was another phone number, and that number is

22      (269) 207-7256.  Now were you able to ascertain whose phone

23      that was?

24  A   Again, the same way the phone we believed to be Sam Steel's,

25      it was using the name Tim Jones with one M.  That phone was

1    activated December 9th, 2011, and was not used again after

2    December 22nd, 2011.

3  Q  How did you ascertain that it was Samuel Steel's?

4  A  That came to me from a confidential informant on December 22nd,

5    2011.

6  Q  I want to draw your attention to the number of (404) 914-2834.

7    Were you able to ascertain whose phone number that was?

8  A  Again, Sam Steel.  The name on the subscriber page was

9    Tim Jones.  This was a phone that was a MetroPCS phone.  It

10    was activated in May of 2012, and was not used after

11    August 3rd, 2012.  And we obtained that number—The local agent

12    Mark Waldvogel obtained that phone number through a source in

13    July of 2012—July 30th.

14 Q  So that information—I don't want to put words in your mouth.

15    Was there any other information that made you believe it to be

16    Sam Steel?

17 A  There was—There was phone calls between that phone and people

18    we later learned to be associates of Sam's down in Georgia—a

19    cousin Lenzell Steel, a friend named Jerri Barry, and, I

20    believe, another relative named Claude Shepard.

21 Q  Now I want to direct your attention to a phone number of

22    (404) 707-4694.  Were you able to ascertain whose phone that

23    was?

24 A  Yes.  And I don't think I noted on that last phone—the

25    (404) 914-2834—that phone had the subscriber name of Tim Jones

977

1     as well.

2  Q   Okay.  Thank you.

3  A   On the one you just asked me—the (404) 707-4694—that was a

4      phone that was found in—on Mr. Steel's possession when he was

5      arrested August 6th, 2012.  And that—When the records were

6      obtained from MetroPCS for that phone, the subscriber was

7      Tim Johnson; and it was activated August 3rd, 2012 and not used

8      after August 6th, 2012.

9           MR. CUSICK:   Your Honor, I would move to admit

10     People's proposed exhibit number 99, as amended.

11          MR. CHAMPION:   No objection subject to

12     cross-examining.

13          THE COURT:   I'm sorry?  Subject—

14          MR. CHAMPION:   No objection.  No objection,

15     your Honor.

16          THE COURT:   Okay.  So exhibit 99 is received.

17 BY MR. CUSICK:

18 Q   Okay.  Now I don't want to rehash all the testimony; but, on

19     December 22nd, was that the date the warrant was issued?

20 A   Yes, it was.

21 Q   Okay.  Number (26) [*sic*] 207-7256, was that—was that used at

22     all after December 22nd, 2011?

23 A   No, it was not.

24 Q   Okay.  Is it fair to say that, at the time during the

25     investigation from December 22nd of 2011 to May of 2012, did

                              978

1    you know exactly where—Well, it's obvious; but did you know
2    where Samuel Steel was—or had you had information about where
3    Samuel Steel may be?
4  A  Well, we—we learned that he had gone to Chicago.
5  Q  And how did you do that?  How did you learn that?
6  A  We learned that from an individual that came to the police
7    department to tell us that their daughter was allowing
8    Sam Steel's wife to use her phone—her daughter's phone to
9    contact Sam in Chicago.
10           We obtained those records and identified a Chicago
11   phone number and then obtained the records and a Chicago
12   number and learned it was in the name of Wendell Montgomery.
13 Q  Okay.  And is Wendell Montgomery indicated on there?
14 A  Yes.  (312) 576-6323.  We learned that through
15   Entenia (phonetic) Hadley, (269) 447-4535—
16 Q  En—
17 A  —through her records.
18 Q  Entenia (phonetic) Hadley, did you receive information as to
19   whether or not she used that phone or anybody else used that
20   phone?
21 A  That was the phone that the person that came in to tell us
22   about her daughter Entenia (phonetic) that—She had learned
23   through her daughter that Sam's wife was contacting him.
24 Q  Okay.  Now regarding Harry Mathews, did you have any other
25   conversations with Harry Mathews after he was charged?

                                979

```
 1  A    Yes, February 8th, 2012.

 2  Q    After—And was that after he pled guilty?

 3  A    I believe so.

 4  Q    And did you receive a statement from him?

 5  A    Yes, I did.

 6  Q    Did you promise him anything at the time of the statement?

 7  A    I did not, no.

 8  Q    Did you promise anything to any of the witnesses during the

 9       entire time—

10  A    No.

11  Q    —that you talked to them?

12  A    No.

13  Q    And, based on the information you received from Harry Mathews,

14       were you able to—Did you do anything regarding the

15       investigation based on that information you received?

16  A    After speaking to Mr. Mathews, he had indicated to me where I

17       could locate—attempt to locate the weapon that was used to

18       kill Milo Conklin.

19             I took the directions he provided me, left from his

20       attorney's office, and drove north on 131.  I was leaving from

21       Portage, drove north on 131, exited D Avenue, took a right

22       onto D Avenue off the highway, went to the first stop

23       sign—which was 12th Street—took a right on 12th.

24             He indicated in my interview that I needed to take

25       the first left.  The first left led into a subdivision.  He
```

980

1    had described it to be a wooded area down a road.  Well, this
2    was not that, so I drove one more street to the south—which
3    was E Avenue—and I parked my car at the corner of E and 12th
4    and walked the ditch line looking for the firearm.
5  Q  And were you able to find the firearm?
6  A  I did.  Harry had indicated it was probably a hundred yards in
7    from the corner of 12th and E east of E—east of 12th Street.
8    The lab marked it off with their measuring device; and, from
9    the corner to where I located it, it was 153 yards.
10 Q  Okay.  And that's exhibit number 47 that has been introduced
11   already?
12 A  That's correct.
13 Q  When you received—or found that item, what did you do?
14 A  I contacted my supervisor and asked her to send the crime lab
15   out there to take custody of the firearm.
16 Q  Did you—
17             MR. CUSICK:   Sorry, your Honor.  May I have a
18   moment?
19             THE COURT:   You're fine.
20 BY MR. CUSICK:
21 Q  I'm handing you People's proposed exhibits number 83 to 88.
22   Can you take a look at them and tell the jury what those are
23   pictures of.
24 A  Okay.
25 Q  Are those fair and accurate depictions—Well, what—Well, let me

                                    981

1    ask you this.  What are they?

2  A    These are pictures from where the firearm was seized on

3       E Avenue.

4  Q    Is that a fair and accurate depiction of how the scene looked

5       at the time you were there?  Is this February 8th of 2012?

6  A    That's correct.

7            MR. CUSICK:   Your Honor, at this time, I would move

8       that People's proposed exhibits number 83 to 88 be admitted

9       into evidence.

10           MR. CHAMPION:   No objection.

11           THE COURT:   Eighty-three through 88 are received.

12 BY MR. CUSICK:

13 Q    Can you briefly describe to the jury what this is.

14 A    This is exhibit 83, and this is a photograph looking from—To

15      the left would be off camera is where the firearm was

16      recovered in the ditch, and you're looking back to the west

17      towards 12th Street.

18           MR. CUSICK:   Can we have 84.

19 BY MR. CUSICK:

20 Q    Briefly describe what that is, sir.

21 A    Eighty-four is looking to the—in a southwesterly direction

22      towards where the firearm is located from the side of the

23      road.

24 Q    Eighty-five.  What is this?

25 A    Eighty-five is looking from the road towards the trees in a

                              982

| | |
|---|---|
| 1 | southeasterly direction towards where the firearm's at. |
| 2 | Q Okay. Eighty-six. |
| 3 | A Eighty-six is looking—my estimate—due south from the road |
| 4 | towards where the firearm's at. |
| 5 | Q Eighty-seven. |
| 6 | A Eighty-seven is a closer-up shot of where the firearm was |
| 7 | located at. |
| 8 | Q And 88. |
| 9 | A Just a different lighting of the same thing. |
| 10 | Q Okay. Thank you, sir. |
| 11 | A I'll note that the lab marked with the orange paint. The |
| 12 | first orange paint spot is where the gun was located. The lab |
| 13 | had taken it in their possession before taking the pictures, |
| 14 | but they marked it when they picked it up. |
| 15 | Q And did you take—Did somebody take a picture of the gun, if |
| 16 | you recall, at the time that it was—or immediately after it |
| 17 | was found? |
| 18 | A Yes. |
| 19 | Q I'm showing you People's proposed exhibits number 89 through |
| 20 | 92. Can you tell the jury what that is—tell the Court what |
| 21 | that is. |
| 22 | A These are photographs of the firearm taken inside of the |
| 23 | Kalamazoo public safety crime lab. |
| 24 | Q Was that the day that it was taken— |
| 25 | A Yes, on— |

```
 1   Q    —and recovered?

 2   A    —February 8ᵗʰ—

 3              MR. CUSICK:   Your Honor—

 4              THE WITNESS:   —2012.

 5              MR. CUSICK:   —I would just ask that People's

 6   proposed exhibits number 83 to 92 be admitted into evidence.

 7              THE COURT:   Eighty-three through 88 are in.  Are

 8   you talking about 89—

 9              MR. CUSICK:   Eighty-nine to 93—90—89 to 92.

10              MR. CHAMPION:   No objection.

11              THE COURT:   Eighty-nine, 90, 91, and 92 are

12   received.

13              MR. CUSICK:   And if we could just publish them very

14   briefly.  I don't need—

15              This has already been admitted into evidence,

16   correct?

17              THE WITNESS:   This is eighty—exhibit 89 is a

18   picture of the firearm exhibit 47, I believe.

19              MR. CUSICK:   Exhibit number 90.

20              THE WITNESS:   A picture of the other side of the

21   firearm showing some dirt on it.

22              MR. CUSICK:   Ninety-one.

23              THE WITNESS:   Picture of the firearm with the dirt

24   and my scale.

25              MR. CUSICK:   Ninety-two.
```

984

```
 1                  THE WITNESS:    Picture of the serial number for the
 2          firearm showing the make and model.
 3                  MR. CUSICK:    Thank you, sir.
 4   BY MR. CUSICK:
 5   Q    Based on information you received from Harry Mathews, did you
 6        do anything else regarding the investigation?
 7   A    I guess you'll have to be more specific.
 8   Q    Okay.  Did you do anything else other—You found the gun.  Did
 9        you search anywhere else on February 8th of 2011, if you
10        recall?
11   A    No, I did not.
12   Q    Okay.  Now from February of 2012 until August of 2012 you
13        continued the investigation?
14   A    Back up a second.  From the time the warrant was issued, there
15        was some time off for the holidays.  Then I took vacation the
16        first week of January, and nothing occurred on that case to
17        try to find Sam during that time frame.
18                  When I came back from vacation, another homicide had
19        happened the day—the day after I got back.  I worked on that
20        case with another detective for six weeks until late—late
21        February.  February 8th was the only day I did not work on that
22        other homicide when I had the information to go to the
23        interview with Mr. Mathews.
24   Q    Okay.
25   A    So, from, basically, the time of the warrant till late
```

985

1   February, nothing happened to try to locate Mr. Steel.

2   Q   What actions did you take to try to locate Mr. Steel?

3   A   In March and April, there was, I believe, more search warrants

4       done on some records.  We had—There really wasn't much more—We

5       weren't getting any—many leads on where he could be at that

6       time.  The Chicago lead had fallen off.

7               It wasn't until sometime in May 2012 that

8       Sergeant Kozal—I was off for a medical—I had surgery for my

9       neck, and I was off for about three weeks.  And Sergeant Kozal

10      took over following up on things that he was developing during

11      that time frame as far as people associated with Mr. Steel.

12      They came up with a possible lead of Sam being in Atlanta

13      through some—a relative that they had noted that was making a

14      trip to Atlanta.  That's when he contacted

15      Mr.—Special Agent Campbell for the first time.

16  Q   Special Agent Campbell?

17  A   Campbell, yes.

18  Q   Okay.  And, when you contacted Special Agent Campbell, what

19      happened?

20  A   Based on that lead, Special Agent Campbell works—It was a

21      weekend.  It was early June of '12.  He ended up actually

22      making contact with some relatives of Sam's that were down

23      there visiting other relatives looking—but there was no—Sam

24      was not around these—these individuals during that time frame.

25  Q   Okay.  Did you receive any information after that as to where

1          Samuel Steel was?

2    A    Yes, I received information from—from an informant in July

3         that Sam was in Chicago, and I—That's when I contacted

4         Special Agent Johnson, and he and his partner organized a

5         surveillance detail.  I drove to Chicago in late July 2012 on

6         a Friday and did surveillance with them and the FBI task force

7         on a—on a residence that we subsequently went and searched and

8         made contact with the occupants there.

9    Q    Did you find Mr. Steel there?

10   A    No, we did not.

11   Q    What do you do after that?

12   A    After that, I went on vacation again.  And Sergeant Kozal was

13        in contact with Special Agent Waldvogel.  They followed up on

14        a—on a previous lead regarding information on Sam that led

15        them to be notified of the (404) 914-2834 number.  And, when

16        they obtained the records for that phone, they did a search

17        warrant to request an active ping which would tell you very

18        closely where an individual would be with their cellphone.

19        They learned that that phone was activating off of cell towers

20        in the Atlanta, Georgia, area; and that was on July 30th, 2012.

21   Q    Okay.  In response to that, what did you do?

22   A    The investigation continued.  Again, like I said, I wasn't

23        there that week.  When I got back to work on August 6th, I had

24        learned all this information.

25                 And I came to work at 6:00 a.m. that day.  I started

987

1    looking at the phone records from that number that was now not
2    active just to see if we could develop any more leads, phone
3    numbers, identify something.
4              And we got a phone call from Special Agent Campbell.
5    We knew he was out doing surveillance on a lead that he had
6    developed from the black Mercedes that he testified about, and
7    he called and said that Mr. Steel was in custody.
8  Q  Did you go to Georgia?
9  A  We went to Georgia approximately ten or 11 days later, me,
10    Sergeant Kozal, and Detective Ghiringhelli and
11    Detective Pittelkow.
12 Q  And what happened when you were in Georgia?
13 A  Between the 6th and the 16th is when I think we arrived down
14    there of August 2012.  We looked at the phone records for
15    Mr. Steel from—from the first phone and identified people that
16    he had been talking to, ran the phone numbers through a
17    database we have access to to identify—Sometimes it'll give
18    you a possible subscriber; sometimes it doesn't.  And we made
19    a list of people we wanted to attempt to interview prior to
20    bringing Mr. Steel back to Michigan, and we—
21 Q  Did you—Did you do so?
22 A  We did that.  We interviewed probably five or six people while
23    we were down there.
24 Q  Who are the people you interviewed?
25 A  I interviewed Kristine Wilkerson, Lenzell Steel, Jerri Barry—

988

| | | |
|---|---|---|
| 1 | Q | Who's Len—Who is Lenzell Steel? |
| 2 | A | He's a cousin that is from Illinois originally but now lives |
| 3 | | in metro Atlanta. |
| 4 | Q | And I'm sorry to interrupt, sir. Who were the other people? |
| 5 | A | Claude Shepard, who's a relative. |
| 6 | | Jerri Barry, who's an acquaintance of Mr. Steel's. |
| 7 | | She actually used to live here in Kalamazoo and now resides |
| 8 | | down in Georgia—Atlanta. |
| 9 | | We also—I did not speak to this person, but I know |
| 10 | | Sergeant Kozal did. Him and Special Agent Campbell went and |
| 11 | | talked to Cynthia Waller and another—I think her son. They |
| 12 | | attempted contact with Mark Waller, but he was not around |
| 13 | | during the two day we were down there. |
| 14 | Q | Okay. And how long were you down there, did you say? |
| 15 | A | I think two nights. |
| 16 | Q | Do you recall what day you came back? |
| 17 | A | We came back on a Friday. We left on a Friday morning and |
| 18 | | arrived back in Michigan Friday evening. |
| 19 | Q | And, when you say we, who are you including? |
| 20 | A | The other detectives and Sam Steel. |
| 21 | Q | Just for the record, I want to get an—I just want to see—Do |
| 22 | | you see Samuel Steel in court today? |
| 23 | A | I do. |
| 24 | Q | Can you point to him and describe what he's wearing. |
| 25 | A | He's sitting next to defense counsel wearing a blue shirt and |

```
 1          a striped tie.
 2                    MR. CUSICK:   Your Honor, let the record reflect the
 3          witness has identified the defendant.
 4                    THE COURT:   It's noted.
 5  BY MR. CUSICK:
 6  Q    Now, Detective Beauchamp, did you receive anything from
 7       Mr. Steel's person?
 8  A    Yes, I did.
 9  Q    Were you the one that searched him?
10  A    No.
11  Q    Okay.  Where did you receive these items?
12  A    A cellphone and a set of keys were turned over to me by
13       Special Agent Campbell in the FBI office in Atlanta, Georgia.
14  Q    Okay.  I'd like to show you People's proposed exhibit
15       number 101.  Tell the jury what that is.
16  A    That's—This is the cellphone that was taken from Sam Steel's
17       person, turned over to me by Special Agent Campbell, and a set
18       of keys that was also on his person.
19                    MR. CUSICK:   Your Honor, I would ask that People's
20       proposed exhibit number 101 be admitted into evidence.
21                    MR. CHAMPION:   No objection.
22                    THE COURT:   One-o-one is received.
23  BY MR. CUSICK:
24  Q    What—The cellphone that he had, which one is that?
25  A    It's the (404) 707-4694 cellphone.
                              990
```

```
 1   Q   How long had he had that, according to the records?

 2   A   Three days.

 3   Q   You re—Did you recover anything else from Mr. Steel?

 4   A   On the drive back when we arrived in—at the jail where he was

 5       being lodged at, I did an inventory search of his property.

 6   Q   Okay.  And—And did you recover something?

 7   A   Yes, I did.

 8   Q   I'm handing you People's proposed exhibit number 102.  Can you

 9       tell the Court what that is.

10   A   It's a white piece of paper with lines with a sketch of the

11       streets involved in this investigation—Elizabeth, Mabel,

12       Florence, Woodbury—showing a rough draft of a house—two houses

13       and then an area labeled shortcut.

14           MR. CUSICK:   Your Honor, I would ask that People's

15       proposed exhibit number 102 be admitted into evidence.

16           MR. CHAMPION:   No objection.

17           THE COURT:   One-o-one—One-o-two, did you say?

18           MR. CUSICK:   Did I admit—Did I admit—

19           THE COURT:   It's 102.

20           MR. CUSICK:   —101?

21           THE COURT:   I believe.

22           MR. CUSICK:   One-o-two.

23           THE COURT:   One-o-one [sic] is in.

24           MR. CUSICK:   And I'd ask for that to be published

25       to the jury.
```

991

```
 1                    THE COURT:    That's fine.
 2   BY MR. CUSICK:
 3   Q    Detective Beauchamp, are you familiar with the area of
 4        Mabel Street, Elizabeth, Florence, that area—that
 5        neighborhood?
 6   A    Yes, I am.
 7   Q    Okay.  Briefly describe what you observe on the sketch.
 8   A    At the top is Elizabeth Street.  It's not spelled correctly,
 9        but it's Elizabeth.
10             And then right below Elizabeth is what I believe to
11        be 626 Mabel where Milo Conklin was murdered.  Mabel Street's
12        labeled.
13             And, across the street offset, is another residence.
14             And then the shortcut.
15             And then, below the shortcut, showing
16        Florence Street.
17             And then the street running off of Florence, which
18        would be to the south.  It's initialed WB for Woodbury.
19   Q    Now, during the drive back, do you have occasion to speak with
20        Mr. Steel?
21   A    Yes.
22   Q    And did you—Did the defendant make any statements to you—
23             MR. CHAMPION:    Your Honor, may we approach?
24             (At 3:41 p.m., bench conference as follows:
25                  MR. CUSICK:    I can—I know I have to lay a
                                  992
```

1     foundation.

2            MR. CHAMPION:   No, you can't.  You can't when

3     he didn't say anything.  He exercised his right to

4     remain silent . . . (inaudible)

5            MR. CUSICK:   Well, I mean, I . . . (inaudible)

6     ask about it.  I won't—I won't—I mean, he—I don't

7     think it was in response to questioning, but I don't

8     want there to be an issue, so—

9            MR. CHAMPION:   . . . (inaudible)

10           MR. CUSICK:   okay.

11           THE COURT:   Hold on a second.  Wait,

12    Mr. Champion.

13           I don't know what you just said, so I don't

14    know what's going on up here.  So, he obviously—

15           MR. CHAMPION:   Well, he—

16           THE COURT:   —didn't say—

17           MR. CHAMPION:   — . . . (inaudible)

18           THE COURT:   —anything about the case, right?

19           MR. CHAMPION:   Right.

20           MR. CUSICK:   Right.

21           THE COURT:   So—

22           MR. CUSICK:   Okay.  So I'll just stop.  That's

23    fair enough.

24           MR. CHAMPION:   He exercised his right to

25    remain silent.

                          993

| 1 | MR. CUSICK:   Yeah, it's fair enough. |
|---|---|
| 2 | THE COURT:   Okay. |
| 3 | MR. CUSICK:   I'll stop.) |
| 4 | THE COURT:   Next question, Mr.— |
| 5 | MR. CUSICK:   I'll withdraw the last question. |
| 6 | THE COURT:   Okay.  Go ahead, Mr. Cusick. |

7  BY MR. CUSICK:

8  Q   When you got back to Kalamazoo, did you continue the

9      investigation after that?

10 A   Yes.

11 Q   Can you tell the jury some of the steps that you took to

12     continue the investigation.

13 A   I drafted a search warrant to obtain his incoming/outgoing

14     mail from the jail he was being lodged at at that time, which

15     was—we had him lodged in the Van Buren County Jail.

16         I obtained—drafted and obtained a search warrant to

17     collect his DNA to have that analyzed.

18         Listened to phone calls from the jail during that

19     time.

20 Q   Now have you—You ask a Megan Erickson to do anything with

21     regards to this case?

22 A   Yes, I did.

23 Q   And what did you ask her to do?

24 A   I contacted the Mecosta County Jail and got in contact with

25     the person in charge of the jail operations, which was

994

```
1    Lieutenant Erickson; and I asked her, for the time frame that

2    Walter Johnson was incarcerated at the Mecosta County Jail, if

3    she could check two phone numbers to see if Walter had made

4    any outgoing calls to these two—two numbers for Harry Mathews.

5  Q  And did she do so?

6  A  Yes, she did.

7  Q  Now do you recall the dates that Walter Johnson was at the

8    Mecosta County Jail?

9  A  He was in Mecosta County Jail from October 7th, 2011, to

10   February 3rd, 2012.  He was then—Before that, when he was taken

11   into federal custody—It was June 1st, if I remember correctly,

12   of 2011.—and he was lodged for two weeks at the

13   Kalamazoo County Jail, we have access to those jail—those jail

14   records for inmates' phone calls.  And I did a search for

15   those two numbers at the Kalamazoo County Jail during the time

16   frame he was incarcerated there.

17 Q  And when was he incarcerated there?

18 A  If my memory's right, it was June 1st to June 15th, roughly,

19   2011.

20 Q  Okay.

21 A  And there was no phone calls between his—between the jail,

22   Harry Mathews.  I should note that the inmates have a

23   PIN number they have to put in when they make phone calls, so

24   I was able to search by the numbers dialed to see if anybody

25   called those numbers for Harry Mathews and by the inmate
```

1      itself.

2            And then I did the same thing for where

3      Walter Johnson was incarcerated next, which was the

4      Newaygo County Jail.  He got transferred from Kalamazoo to

5      Newaygo roughly June 15th, 2011, and he was held in Newaygo up

6      until October 7th or 6th—7th of 2011.  Did the same search

7      there, 'cause they use the same system that the

8      Kalamazoo County Jail uses, which we have access to, at the

9      public safety department in Kalamazoo.

10            And then, from the time he was—He left Mecosta on

11     February 3rd, 2012.  He went back to Newaygo.  I don't remember

12     the exact date he left Newaygo.  It was March, I believe—maybe

13     April—of 2012.  And I checked again Newaygo for that time

14     frame for those two numbers for Harry Mathews, and there was

15     no phone calls.

16  Q  Why did you ask Megan Erickson to do what she did, and why did

17     you do what you did?

18  A  So we could see if Walter Johnson and Harry Mathews talked to

19     each other after the homicide and when Walter was

20     incarcerated.

21  Q  Through your investigation, what did you conclude?

22            THE COURT:   I didn't hear the question.

23 BY MR. CUSICK:

24  Q  Through your investigation, what did you conclude?

25  A  Through the phone records, that they had not talked to each

                              996

| | |
|---|---|
| 1 | other during those time frames, which was 37 days—Walter got |
| 2 | incarcerated 37 days after the homicide. |
| 3 Q | I'm handing you People's proposed exhibit—exhibits number |
| 4 | 82—66 to 82. Now did you take those photos? |
| 5 A | I did not. |
| 6 Q | Can you look at them. |
| 7 A | Okay. |
| 8 Q | Do you know who took those photos? |
| 9 A | It was either Lab Specialist Latham or Bombich. |
| 10 Q | Okay. And do you know when those photos were taken? |
| 11 A | In the early May of this year. |
| 12 Q | Okay. And why did you—Why were those photos taken? |
| 13 A | We asked them to do this because it was the time of |
| 14 | year—around the time that the homicide had occurred two years |
| 15 | earlier, and we wanted to show the—the escape route that |
| 16 | Sam Steel used from that perspective. |
| 17 Q | Were you aware of how the area looked at the time in April—on |
| 18 | April 24th of 2011? |
| 19 A | Yes. |
| 20 Q | And you're familiar with the neighborhood? |
| 21 A | Yes. |
| 22 Q | Had you—Have you been to that location anytime since April 24th |
| 23 | of 2011? |
| 24 A | Yes, I've driven by and been there, yes. |
| 25 Q | And are those fair and accurate depictions of how the area |

1     looked at the time that those pictures were taken in May of

2     this year?

3  A  Yes.

4  Q  And are those fair and accurate depictions of how the area

5     looked on April 24th of 2011?

6  A  Yes.

7            MR. CUSICK:   Your Honor, I would ask that People's

8     proposed exhibits number 66 to 82 be admitted into evidence.

9            MR. CHAMPION:   May I voir dire briefly?

10           THE COURT:   Yes.

11                    VOIR DIRE EXAMINATION

12 BY MR. CHAMPION:

13 Q  Officer, those photographs were taken over two years later; is

14    that correct?

15 A  Correct, sir.

16 Q  What changes in the area between April 24th, 2011, and May of

17    2013 occurred?

18 A  What changes occurred?

19 Q  Right.

20 A  The wheelchair ramp at the house at 623, I believe, was added

21    between the time of the homicide and June of 2011.

22 Q  How about landscaping, fences—

23 A  After—

24 Q  —growth?

25 A  After the homicide, there was a stockade fence put up at

                              998

```
1        623 Mabel that has since been taken down again.
2   Q    How about growth, trees, bushes, things of that nature?
3   A    That, I can't answer, sir.
4                MR. CHAMPION:   Thank you.
5                I have no other questions.
6                THE COURT:   Any objections?
7                MR. CHAMPION:   No objection, your Honor.
8                THE COURT:   Exhibits 66 through 82 are received.
9                MR. CUSICK:   May I have 66.
10                  FURTHER DIRECT EXAMINATION
11  BY MR. CUSICK:
12  Q    Detective Beauchamp, can you describe what exhibit 66 is.
13  A    This is looking south in front of 623 Mabel, looking from the
14       edge of the street to the south.  And 626 would be behind you
15       off your right shoulder.
16                MR. CUSICK:   Can we have—I'm sorry.
17  BY MR. CUSICK:
18  Q    So that's—626, that's behind 626?
19  A    It'd be behind you if you're looking at this picture.
20  Q    Okay.  So do you know—
21  A    To the camera—
22  Q    —what address—
23  A    To the—to the—
24  Q    —this is?
25  A    —photographer.
                          999
```

| | |
|---|---|
| 1 | Q   Do you know what address this is? |
| 2 | A   This is 623 Mabel. |
| 3 | Q   Okay.  Do you know who lived at that address on— |
| 4 | A   That was Sam Steel's mother at the time of the homicide. |
| 5 | Q   You indicated that that ramp had been put there since |
| 6 | April 24th, 2011? |
| 7 | A   Yes, to the best of my recollection.  I know it was there in |
| 8 | June of 2011.  I don't remember it being there in April of |
| 9 | 2011. |
| 10 | Q   You don't remember it being there or you— |
| 11 | A   I don't recall if it was there in April 2011 or not, but I |
| 12 | know it was there in June of '11. |
| 13 | MR. CUSICK:   Okay.  Can I have 67. |
| 14 | THE WITNESS:   A closer view of 623 looking to the |
| 15 | south. |
| 16 | BY MR. CUSICK: |
| 17 | Q   Okay.  Now is there a fence on this side?  I'm pointing to the |
| 18 | right side of the picture.  Is that a fence there? |
| 19 | A   Yes. |
| 20 | Q   Okay.  And what's this?  I'm pointing to the—Is this a garage |
| 21 | right next to it? |
| 22 | A   Behind it, yes. |
| 23 | Q   Okay. |
| 24 | A   The white object—white building. |
| 25 | Q   Is there a—Is there a—In this picture, is there a shortcut or |

1    no from—on the right-hand side of this picture?

2  A    You can't see the shortcut from this picture.

3              MR. CUSICK:   Okay.  . . . (inaudible) 67?

4              MS. HYBEL:   Sixty-eight.

5              MR. CUSICK:   I'm sorry.  Sixty-eight.

6              THE WITNESS:   This is to the east slightly looking

7    down the driveway of 623 Mabel to the south.  In the distance,

8    behind the white vehicle to the right—to the right behind the

9    white vehicle is a house that would be on Woodbury Street.

10 BY MR. CUSICK:

11 Q    Okay.  So the house on the right is . . . (inaudible)

12             THE COURT:   You can take the handheld microphone

13   there and talk into it, if you need to.

14             THE WITNESS:   This house right here would be on

15   Woodbury Street.

16 BY MR. CUSICK:

17 Q    Okay.  And the house in front of that, what house—Is that the—

18 A    This?

19 Q    Yes.

20 A    That is 623 Mabel.

21 Q    Okay.  Can you see a shortcut through that picture?

22 A    The shortcut would be right behind this second vehicle.

23   There's a cut in the fence.

24 Q    Okay.  And did you canvass the area on April 24th of 2011?

25 A    Yes, and 25th.

                              1001

1    Q    And did you see a shortcut at that time?

2    A    Yes.

3                 MR. CUSICK:   Sixty-nine, please.

4                 THE WITNESS:   Looking from down the driveway now to

5         the south, behind this vehicle is where the shortcut is at.

6         Street sign indicating Florence, and then this is Woodbury

7         Street going to the south.

8                 MR. CUSICK:   Seventy, please.

9                 THE WITNESS:   A closer shot.  If you look closely,

10        you can see Florence, a stop sign here, stop sign on Woodbury

11        up at Ada Street.

12                MR. CUSICK:   Seventy-one, please.

13                THE WITNESS:   Going farther down the driveway, this

14        is the shortcut in here looking to the south.

15                MR. CUSICK:   Seventy-two.

16                THE WITNESS:   Again, looking to the south.  Here is

17        a better view of the shortcut where the fence is cut down—or

18        pushed down.  This is Florence Street running east and west

19        and then Woodbury going north and south.

20                MR. CUSICK:   Seventy-three, please.

21                THE WITNESS:   Kind of looking to the southwest, a

22        view from in front of the second vehicle in the driveway at

23        623 Mabel.  The shortcut is to the middle left of the screen,

24        showing parts of the back yard at 623 Mabel.

25                MR. CUSICK:   Seventy-four, please.

                              1002

1    THE WITNESS:  To the side of that second vehicle,

2    looking south again, there's the fence pushed down that has

3    been discussed.

4    MR. CUSICK:  Seventy-five.

5    THE WITNESS:  A view to the right of the shortcut,

6    see Florence Street.  You can barely see Woodbury.  This is a

7    better shot of Woodbury Street.  It's one block long, runs

8    between Florence and Ada.  Ada Street would be—That green

9    house would have an address on Ada Street.

10   BY MR. CUSICK:

11   Q    So is that the corner of Florence and Woodbury?

12   A    This is the corner of Florence and Woodbury.  This would be

13   the driveway that Harry Mathews and Walter Johnson indicated

14   they were backed into.

15   MR. CUSICK:  Seventy-five [*sic*], please.

16   MS. HYBEL:  This is . . . (inaudible)

17   MR. CUSICK:  Seventy-six, please.

18   THE WITNESS:  This is on Woodbury, as indicated—at

19   the corner of Woodbury and Florence—looking due north.  The

20   shortcut is here.  And this is 623 Mabel.

21   MR. CUSICK:  Seventy-seven, please.

22   THE WITNESS:  A closer shot.  You can see 626 Mabel

23   right here, 623 Mabel, and the shortcut.

24   BY MR. CUSICK:

25   Q    So, when you're standing here, you can see kind of across

1003

```
 1        Mabel; is that a fair statement?

 2    A   Correct.

 3              MR. CUSICK:   Seventy-eight, please.

 4              THE WITNESS:   Standing a little farther back,

 5        looking to the north again, 623 Mabel, the shortcut, and

 6        portions of 626 Mabel.

 7              MR. CUSICK:   Seventy-nine, please.

 8              THE WITNESS:   On the—Probably closer to the

 9        northeast side of Woodbury and Florence—I'm sorry.—southeast

10        side of Woodbury and Florence, 626 Mabel, 623 Mabel, the

11        driveway for 623, and the shortcut.

12    BY MR. CUSICK:

13    Q   I'm sorry.  That is Mabel Street, correct?

14    A   Mabel Street is up here.  This is—

15    Q   . . . (inaudible)

16    A   This is Florence.

17    Q   I'm sorry.  What we're looking at through the shortcut is

18        Mabel Street, correct?

19    A   That's correct.

20              MR. CUSICK:   Eighty, please.

21              THE WITNESS:   On the—it would be the east—sidewalk

22        on Woodbury looking due north towards 626 Mabel and 623 Mabel

23        with the shortcut again.

24              MR. CUSICK:   Eighty-one, please.

25              THE WITNESS:   This is looking in a northwesterly

                              1004
```

direction from Woodbury and Florence, kind of to give an angle

of when they pulled out—when Walter and Harry pulled out of

the driveway, which would be off screen to your left.  They

would make a left turn onto Florence.

        MR. CUSICK:  Eight-one, please.

        MS. HYBEL:  This is 81.

        MR. CUSICK:  This is—This is 81?

        I'll have 82.

        THE WITNESS:  Standing on the north—I'm

sorry.—southwest corner of Woodbury and Florence, a closer

shot of Florence Street to the west of Woodbury.  And that is

636 Florence, which would be the first residence to the west

of the open field where the shortcut is accessed through.

        MR. CUSICK:  Thank you, Detective.  I have no other

questions regarding those photos.

BY MR. CUSICK:

Q    I'd like to direct your attention to exhibit—exhibit 100.  Can

     you just refresh the jury's memory as to what this is.

A    Can you refresh my memory which exhibit that is.

Q    It's Sam Steel's phone—phone records.

A    Okay.

Q    This one.

        So this exhibit—Can you describe what this exhibit

     is.

A    This is a condensed version of phone records for Sam Steel's

|    |   |                                                                                      |
|----|---|--------------------------------------------------------------------------------------|
| 1  |   | phone on the day of the homicide—(269) 377-8330—indicating                            |
| 2  |   | time of call—date, time of call, who's making the call, who's                         |
| 3  |   | receiving the call, and which tower the phone was activating                          |
| 4  |   | off of.                                                                               |
| 5  | Q | And it's fair to say that Samuel Steel, Walter Johnson, and                           |
| 6  |   | Harry Mathews were calling—or at least Samuel Steel was                               |
| 7  |   | calling either Walter Johnson or Harry Mathews and vice versa,                        |
| 8  |   | correct?                                                                              |
| 9  | A | That's correct.  Now this is, obviously, like I said,                                 |
| 10 |   | condensed.  There were other phone calls that day to other                            |
| 11 |   | numbers but—                                                                          |
| 12 | Q | And those records have been entered into evidence, correct?                           |
| 13 | A | Correct.                                                                              |
| 14 | Q | And then the next day the phone calls were primarily early on                         |
| 15 |   | between Harry Mathews and Samuel Steel?                                               |
| 16 | A | Yes, 8:16, 8:35, 8:52, 9:03.  That was it on the 25th for Harry                       |
| 17 |   | and Sam.                                                                              |
| 18 | Q | And did you look at the records after April 25th at all?                              |
| 19 | A | Yes, just to continue showing any further contacts.                                   |
| 20 | Q | So were there any further contacts that you found between                             |
| 21 |   | April 25th and May 4th?                                                               |
| 22 | A | Nega—No, there was not.  And it stops shortly after May 5th.                          |
| 23 |   | From my recollection, around May 9th, that phone stopped being                        |
| 24 |   | used and another number was obtained, which we did—we did not                         |
| 25 |   | know what it was.                                                                     |

| | | |
|---|---|---|
| 1 | Q | And that exhibit also has Harry Mathews' phone records. It's |
| 2 | | kind of cumulative in some—in some ways—Correct?—but— |
| 3 | A | Correct. |
| 4 | Q | And Walter Johnson's? |
| 5 | A | Correct. |
| 6 | Q | Now the phone records that you received that have been |
| 7 | | admitted into evidence, they have cellphone towers that they |
| 8 | | are assigned to; is that a fair assessment? |
| 9 | A | Correct. |
| 10 | Q | And have you had a lot of experience with cellphone towers |
| 11 | | through your investigations? |
| 12 | A | Yes. And, probably in the last six years, it's become a lot |
| 13 | | bigger investigative tool for us on major crimes. |
| 14 | Q | I'd like to show you People's exhibit number 98. Now this |
| 15 | | might be, initially, just looking at that, very confusing. |
| 16 | | Can you describe what those—what that is a map of. |
| 17 | A | That's a map of cell towers that were activated by |
| 18 | | Harry Mathews, Sam Steel, Walter Johnson, Kario Pritchett, and |
| 19 | | Melvin Johnson during the time frames involved before and |
| 20 | | after the homicide and the day after the homicide— |
| 21 | Q | Regarding— |
| 22 | A | —different towers that were activated at various times. |
| 23 | Q | Okay. Regarding Kario Pritchett and Melvin Johnson, can you |
| 24 | | point to the area where the cellphone towers pinged. |
| 25 | | THE COURT: You might want—Oh, you have it. |

```
 1                    THE WITNESS:   Right here is Nazareth Road, and the

 2          point was—the dot was plotted there.  That's the 700 block of

 3          Nazareth.

 4   BY MR. CUSICK:

 5   Q    Okay.  Where is Mabel Street?

 6   A    Mabel Street is roughly—That is going to be—That's West Main,

 7          Park, Patterson—Mabel's going to be right in here on this map.

 8   Q    Okay.  Now Kario Pritchett and Melvin Johnson's phones were

 9          pinging at that location at the time of the homicide?

10   A    Yes, before and after the homicide.

11   Q    Okay.

12   A    Within a half an hour of the homicide and within a half an

13          hour after.

14   Q    Okay.  Is that—Can you just briefly explain that, how—how that

15          works, half an hour.  Did they ping any—

16                    MR. CHAMPION:   Your Honor, I'm going to object.

17                    May we approach?

18                    THE COURT:   Yes.

19                    (At 4:06 p.m., bench conference as follows:

20                        MR. CHAMPION:   We're getting into scientific

21                    testimony that he is not qualified to testify to.

22                        MR. CUSICK:   This isn't scientific testimony.

23                        MR. CHAMPION:   It is.

24                        MR. CUSICK:   Detectives always can

25                    testify—always have the experience—
```

1    MR. CHAMPION:   . . . (inaudible)

2    THE COURT:   My understanding is the only thing

3    that he has done is taking the cellphone towers off

4    of the phone records, and he's outlined where the

5    tower is based on—I'm trying to recall if he

6    testified based on his knowledge of the area and

7    knowledge—I can't remember who introduced this

8    exhibit.

9    MR. CUSICK:   We received it yesterday.

10   THE COURT:   And all they're doing is

11   indicating which tower those records are identifying

12   the phones as being on.

13   MR. CHAMPION:   You can't say they were in the

14   area because there's a number of factors that—

15   THE COURT:   All he can do—

16   MR. CHAMPION:   — . . . (inaudible)

17   THE COURT:   —is say the phones are in the

18   area.

19   MR. CHAMPION:   We know that the tower was

20   activated.  In fact, my expert will testify that the

21   phone doesn't even have to necessarily be in that

22   area because they bounce from one cell to another

23   cell.  So there's a number of factors that come into

24   play.  That's the issue when we have—That's why it

25   is scientific.  That's why it has been challenged in

```
 1        the state of Michigan.  That's why we have said it's

 2        scientific.

 3               MR. CUSICK:   This testimony—

 4               THE COURT:   The question—The question to him

 5        at this point was where are—which tower are those

 6        Pritchett and—What's his name?—the two people, their

 7        phones were activated off of which tower; is that

 8        correct?

 9               MR. CHAMPION:   That's correct.

10               MR. CUSICK:   Uhm-hmm.  And he—he can testify

11        to that.  These are from the phone records—

12               THE COURT:   All that's based—

13               MR. CUSICK:   —that he was—

14               THE COURT:   —on is the—

15               MR. CHAMPION:   Pardon?

16               THE COURT:   —particular—

17               All they're saying is the phones—those

18        phones—They're not saying the people's in the

19        area—or are in the area; he's just saying the phones

20        are based on those records—per the cellphone

21        records.

22               Right?

23               MR. CHAMPION:   That—That tower was activated.

24        That's all they can say.

25               THE COURT:   That's all he can say.
```

                                    1010

1    MR. CUSICK:   Right.  That's—

2    THE COURT:   So why don't you clarify, then,

3    that—

4    MR. CHAMPION:   'Cause he can't say where they

5    were at, just that it was activated.  He can't say

6    there's no way they can be over in that area because

7    other factors come into play.

8    In fact, if any of you have GPSs on your

9    phones, attempt to use as an example—This is what my

10   expert will testify.—the Google, sometimes they'll

11   have you miles away from where you're actually at—

12   MR. CUSICK:   . . . (inaudible)

13   MR. CHAMPION:   —because it's pinging off the

14   wrong tower because they will transfer

15   . . . (inaudible) towers.  That's what he's going to

16   testify.

17   THE COURT:   All he can say is, per the phone

18   records, that's where that phone is, right?

19   MR. CHAMPION:   No, that tower was activated.

20   THE COURT:   I'm sorry.  That's where that—

21   MR. CUSICK:   . . . (inaudible)

22   THE COURT:   —tower is—

23   MR. CUSICK:   That tower was activated—

24   THE COURT:   —per the—

25   MR. CUSICK:   —based on—

1011

```
 1                    THE COURT:   —phone records.

 2                    MR. CHAMPION:   . . . (inaudible)

 3                    THE COURT:   So—

 4                    MR. CUSICK:   And these are the same—

 5                    THE COURT:   —you need—

 6                    MR. CUSICK:   These are the same policy—

 7                    THE COURT:   —to clarify in your—Right.  So you

 8              just need to clarify your question, then, that,

 9              according to the phone records—

10                    MR. CUSICK:   Okay.

11                    THE COURT:   —that's the tower that the phones

12              are activating.

13                    Right?

14                    MR. CHAMPION:   Just—Right.  Just like the FBI

15              testified to, the towers were pinging within a two

16              or three-mile—

17                    THE COURT:   Radius.

18                    MR. CHAMPION:   —radius.

19                    THE COURT:   So just—

20                    MR. CUSICK:   It was a pretty—

21                    THE COURT:   You may—

22                    MR. CUSICK:   —pretty pinging location, by the

23              way.

24                    THE COURT:   It's a pretty what?

25                    Just ask the question—
```

                                     1012

```
 1                    MR. CUSICK:   Okay.

 2                    THE COURT:   —properly.)

 3               THE COURT:   Next question?

 4  BY MR. CUSICK:

 5  Q    I just want to clarify the phone records that have been

 6       admitted, they have latitude and

 7       longitudinal—longitudinal—longitude lines.  I was going to say

 8       longitudinal.  Did they have latitude and longitude lines?

 9  A    Yeah, for every cell tower they give you a latitude and

10       longitude.

11  Q    And is that based on where the cellphone's being pinged off?

12  A    Can you repeat the question.

13  Q    Is that based on where the—the cellphone is being pinged off.

14                    And I'm going to lay—

15               MR. CHAMPION:   Your Honor, I believe that's a

16       misstatement.  That's not what it indicates.  It indicates

17       that that cell tower was activated, nothing about the

18       cellphone.

19                    MR. CUSICK:   Well, was—

20               THE COURT:   What is your objection, Mr. Champion?

21               MR. CHAMPION:   Objection is it's a misstatement of

22       what he's attempting to say.  He's attempt—

23               THE COURT:   Maybe a foun—

24               MR. CHAMPION:   —and he's giving testimony.

25               THE COURT:   Is it foundation, then, as far as—
```

                                    1013

BY MR. CUSICK:

Q    What is the cellphone tower—

              THE COURT:   Hold on a second.

              MR. CUSICK:   I'm sorry.

              THE COURT:   I have an objection.

              MR. CUSICK:   I'm sorry.

              THE COURT:   Are you responding to it, or are you
        withdrawing your question?

              MR. CUSICK:   I'll withdraw my question and ask—

              THE COURT:   Okay.  You're going to—

              All right.  Good.  Go ahead—

              MR. CUSICK:   —ask Mr.—

              THE COURT:   —with the next question.

              MR. CUSICK:   —Champion's question.

BY MR. CUSICK:

Q    Just as Mr. Champion stated, these, based on—The cellphone
        towers, how do you base—how do you base them being placed on
        that map?

A    Based on the time of the phone call, the coordinates given for
        that phone call for the latitude and longitude, plot it on the
        map from Google Earth, and that's where the point gets put at.

Q    Cellphone tower was activated?

A    The cellphone tower gets activated by the phone when the phone
        receives a call or makes a call.

Q    So, based on Kario Pritchett and Melvin Johnson's phone

1014

1   records, where did the tower get activated?

2   A   700 block of Nazareth.

3   Q   And, based on Melvin Johnson—I'm sorry. Based on

4       Walter Johnson, Sam Steel, and Harry Mathews' records, did

5       they activate any cellphone towers at the time of the

6       homicide?

7   A   500 block of Willard.

8   Q   And where is Mabel Street?

9   A   Just north of Willard about five, six blocks.

10  Q   Regarding the—Down to the right, the south—I guess it would be

11      southwest of that that you're pointing to.

12  A   This one.

13  Q   —what is that—

14  A   That's the—

15  Q   —tower, and when was that activated?

16  A   This is the 1000 block of Fulford. This is within two blocks

17      of Walter Johnson's residence, and this is where Walter's

18      phone and Harry's phone activated within 20 to 30 minutes

19      after the homicide.

20  Q   Okay. To the left and, I guess, it would be to the west that

21      you're pointing to, what cellphone tower is that?

22  A   That is the 5600 block of Beech. That was a tower that was

23      activated off of Harry's phone sometime between 8:00—7:30 and

24      8:30, I believe, at one point during—on the 24th.

25  Q   November 24th?

1   A   On April 24th.

2   Q   On April 24th?

3   A   Correct.

4   Q   Okay.  When—Do you recall exactly when it was activated?

5   A   I'd have to look at the—the exhibit over here.

6   Q   That'll refresh your memory?

7   A   Yes, it would.

8           Okay.  Let me correct that.  This is actually the

9   5000 block of West Michigan or this location right here.

10          And on April 25th, at 8:14 and 8:17, Harry Mathews'

11  phone activated off of that tower.  At that time, Harry had

12  a—a friend that he sometime—a girlfriend that he sometimes

13  visited off—

14          MR. CHAMPION:   Your Honor, I'm going to object.

15  This is testimony that's not into evidence—

16          MR. CUSICK:   Right.  I just would ask—

17          MR. CHAMPION:   — . . . (inaudible) unresponsive to

18  the question.

19          MR. CUSICK:   I would just ask that you can testify

20  to the phone number and the activation of the cellphone tower

21  and when—when it occurred.

22          THE WITNESS:   I'm sorry.  Repeat that, please.

23          MR. CUSICK:   If you can just tell—testify to the

24  phone number and the cellphone tower that it activated and

25  when that occurred.

```
 1              THE COURT:   So let me sustain the objection and

 2      just let the jury know that they're to disregard any testimony

 3      just given with regards to the girlfriend's residence.

 4              Go ahead.

 5              I think he answered the question indicating that it

 6      was Harry Mathews' phone per the cellphone records associated

 7      with that tower.

 8              Is that correct?

 9              THE WITNESS:   Correct.

10              THE COURT:   All right.  So next question.

11              MR. CUSICK:   Okay.

12  BY MR. CUSICK:

13  Q    And just where—where is that in the—in Kalamazoo County?

14  A    It's on the west side of the city limits.

15  Q    And what time was that?

16  A    There was a phone call on the 25th at 8:14 and 8:17 in the

17      morning.

18  Q    Where is Douglas?

19  A    Pardon?

20  Q    Where is Douglas Street?

21  A    Douglas is right here.

22  Q    And just approach, do you know this cellphone tower right

23      here?  Was that—Was that pinged at a specific time?

24              THE COURT:   Is that what?

25              MR. CUSICK:   Was that—Was that activated at a
```

```
 1        certain time?

 2                  THE WITNESS:   This is a tower that has coordinates

 3        on Ravine Road.  I can't recall off the top of my head which

 4        phone activated off that tower at what time right now without

 5        looking at the records.

 6   BY MR. CUSICK:

 7   Q    Will it refresh your memory to look—

 8   A    Yes—

 9   Q    —at the records?

10   A    —it would.

11                  This—That tower there was activated at some point

12        during the phone records we obtained for Sam Steel but not on

13        the day of the homicide or the day after the homicide.  It was

14        incorrectly put on that map by Officer Bombich, who—

15   Q    Okay.

16   A    —did this map.

17   Q    And then just regarding the lower ones, there's one that says

18        right by the wording Kalamazoo Charter Township?

19   A    Correct.

20   Q    Okay.  Can you indicate when that tower was activated and by

21        what cellphone.

22   A    That was activated by Sam Steel's cellphone on April 25th.

23        It's Pitcher and Mosel is the closest intersection to where

24        that tower is located.  And that would have been the only

25        person's phone that activated off that tower at a certain time
```

1    on the 25th, which it was at—

2            I think I've mixed up the order of these numbers

3    here.

4            Yeah, it would have been at 10:04 a.m. an inbound

5    call that Sam Steel received on April 25th, 2011.

6  Q  Okay.  We've got two more here.

7            West D Avenue, up there on the left.

8  A  Correct.

9  Q  When was that activated?

10 A  That was activated at 9:52, 9:55, and 9:57 on April 25th.

11 Q  The phone numbers?

12 A  They were Sam Steel making a call and then receiving two

13    inbound calls.

14 Q  And where is that area with regards to an area that you

15    testified to earlier?

16 A  This is 12th Street right here.  This would be E Avenue right

17    here running east and west one mile south of D, and 153 yards

18    is where the firearm was located.

19 Q  And, finally, the last one up at the—

20            And what time was that activated?

21 A  9:52, 9:55, and 9:57.

22 Q  Then further—the furthest area up north.

23 A  This is a cell tower at B and 24th that was activated at

24    10:00 a.m. and 58 seconds by an inbound call to Sam Steel's

25    phone.

```
 1  Q    At what time?

 2  A    Ten—Ten o'clock and 58 seconds on April 25th.

 3  Q    April 25th.  Okay.

 4  A    Correct.

 5              MR. CUSICK:   May I have one moment, your Honor?

 6              May I have one moment, your Honor?

 7              Your Honor—May we approach, your Honor?

 8              THE COURT:   Yes.

 9              If you want to stand and stretch a moment while

10         we're having a bench conference, you're welcome to do so.

11              Please remember we're on the record.  Please don't

12         talk.

13              (At 4:22 p.m., bench conference as follows:

14                   THE COURT:   I don't believe I have any more

15                   questions.

16                   I don't know if you want to go right into your

17                   cross-examination or—

18                   THE COURT:   You have what?

19                   MR. CUSICK:   I don't believe I have any more

20                   questions.

21                   THE COURT:   Okay.

22                   MR. CUSICK:   Do you want to go right into your

23                   cross-examination?  I assume—I don't know.

24                   THE COURT:   Yes.  We're—

25                   MR. CUSICK:   It's up to you.
```

```
 1                    THE COURT:   —going to continue.

 2                    MR. CHAMPION:   Okay.

 3                    THE COURT:   So how—Any idea . . . (inaudible)

 4                    MR. CHAMPION:   Not with this one.

 5                    THE COURT:   . . . (inaudible) we have any

 6              issues with regards to anyone staying

 7              . . . (inaudible) staying late or not.  I don't want

 8              to go too long.

 9                    MR. CUSICK:   I'd rather—I'd rather—

10                    MR. CHAMPION:   Okay.

11                    MR. CUSICK:   If we can get done today—

12                    THE COURT:   . . . (inaudible)

13                    MR. CUSICK:   — . . . (inaudible))

14               THE COURT:   Mr. Cusick, any further questions?

15               MR. CUSICK:   I just have one more.

16   BY MR. CUSICK:

17   Q    Was there anything else during the investigation that you—that

18        you dealt with other than what you've testified to—

19   A    No.

20   Q    —here today?

21              Is there anything that's come up in the last year

22        that drew your attention to certain witnesses?

23   A    You mean in regards to—Well, can you say the specific witness

24        or—

25   Q    Devon Smith, did—did you interview Devon Smith?
```

```
1   A   I was contacted by the Assistant U.S. Attorney and the
2       DEA task force officer, and they wanted me to go to Newaygo
3       with them to interview Devon Smith.
4   Q   And did you take a statement from him?
5   A   I did.
6   Q   Did you take a statement from David Lee?
7   A   David Lee wrote a letter to the U.S. Marshals, which was
8       turned over to the Assistant U.S. Attorney, who contacted me
9       'cause he was aware I was part of investigating the homicide
10      case.  And I went up to the Newaygo County Jail and
11      interviewed Mr. Lee.
12  Q   Do those cellphone towers, when they're activated, do they
13      correspond with statements—the investigation that you
14      conducted in this case?
15  A   Yes, they correspond with Walter Johnson's statement to me and
16      Harry Mathews' statement to me.
17          MR. CUSICK:   I apologize to Mr. Champion and the
18      judge.  I know that I said I was going to be almost done, but—
19  BY MR. CUSICK:
20  Q   On April 24th, early morning—Late April 24th going into the
21      early morning hours of April 25th, there was a period of six
22      hours and 42 minutes for Sam Steel's phone records; is that
23      correct?
24  A   Can you repeat the question.
25  Q   There was a period of six hours and 42 minutes where there
```

1022

```
 1        were no calls made under Sam—or received under Sam Steel's

 2        phone records; is that correct?

 3   A    That's correct.  There was a inbound call to Sam from Walter

 4        twice—9:08 and 9:09—where Sam's phone activated off the

 5        500 block of Willard—the tower there.  The call came into

 6        dispatch for a shooting at 9:12 p.m. on April 24th—

 7                  MR. CHAMPION:   I couldn't hear—

 8                  THE WITNESS:   —2012—

 9                  MR. CHAMPION:   —that, your Honor.  He's—

10                  THE WITNESS:   The 9-1-1 call came in at 9:12 p.m.

11        to dispatch for the homicide.

12                  And, immediately after that phone call from

13        Walter Johnson, there were no incoming or outgoing calls made

14        or received from Sam Steel's phone until 3:51 a.m., which is

15        indicative of a person turning—

16                  MR. CHAMPION:   Objection—

17                  THE WITNESS:   —their—

18                  MR. CHAMPION:   —your Honor.  Calls for speculation.

19                  THE COURT:   Any response?

20   BY MR. CUSICK:

21   Q    Based on your experience as an officer, does that indicate

22        anything to you?

23   A    Yes, from—

24                  THE COURT:   Hold on a second.  Hold on a second.

25        Hold on a second.
```

```
1              The objection is sustained.

2              I think he was done with the answer anyway for the

3       prior question.

4              So the next question is?

5              MR. CUSICK:   Well, I'll finish up here.

6  BY MR. CUSICK:

7  Q    Melvin Johnson and Kario Pritchett, did you look at their

8       phone records as well?

9  A    Yes, I did.

10 Q    And I believe it's on this exhibit; is that correct?

11 A    It is later in the exhibit.

12 Q    Did they make any—Did Melvin Johnson make any calls that you

13      were able to verify between Walter Johnson, Harry Mathews, or

14      Sam Steel?

15 A    No.

16             MR. CUSICK:   I have nothing further, your Honor.

17             THE COURT:   Okay.  Before I turn it over to

18      Mr. Champion for his questions, how are we doing?  Okay?   I'd

19      like to continue on.  I haven't received any information from

20      Ms. Wint that there's an issue if we go a little bit past

21      5:00.  Raise your hand if you do need to stop before 5:00.

22             That's not my plan, but we'll see where we're at,

23      so—

24             Okay.  Mr. Champion?

25             Actually, why don't you stand and stretch again—if
```

```
 1        you want, before I turn it over to him and if anyone wants

 2        to—a moment while he's approaching.

 3                             CROSS-EXAMINATION

 4   BY MR. CHAMPION:

 5   Q    So at 9:09 p.m. on April 24th, 2011, Sam Steel was on the

 6        phone; is that correct?

 7   A    Sam's phone—Sam Steel's phone was activated, yes.

 8   Q    It was activated for over 30 seconds; is that correct?

 9   A    I would have to see the specific record.

10   Q    Those are the reports that are important; would you agree?

11                   THE COURT:   I think we have two questions now.

12        Which one is he supposed to—

13                   MR. CHAMPION:   We'll go—

14                   THE COURT:   —respond to?

15                   MR. CHAMPION:   —back to the—

16   BY MR. CHAMPION:

17   Q    It was activated for over 30 seconds—

18                   THE COURT:   Okay.

19   BY MR. CHAMPION:

20   Q    —correct?

21   A    The 9:09 phone call was activated for 31 seconds.

22   Q    How soon after the shooting did someone contact the police?

23   A    The police were contacted at 9:12 p.m.

24   Q    I understand that.  But I'm sure you worked a lot of crime

25        scenes.  How long was the delay between the shooting and the
```

```
1        time the police were called?

2                   MR. CUSICK:   Judge, how can he testify to the

3        exact, specific time of the shooting?

4                   MR. CHAMPION:   He should—He was doing an

5        investigation and was on the scene.  He interviewed witnesses.

6                   MR. CUSICK:   Well—

7                   THE COURT:   Sustained.

8   BY MR. CHAMPION:

9   Q    You talked to Charles Thomas, right?

10  A    I was there when Charles Thomas was interviewed, yes.

11  Q    Well, you spoke to him, also, according to your police report.

12  A    In November of '11.

13  Q    On the 24th you did not interview Charles Thomas?

14  A    I was present when he was being interviewed, yes.

15  Q    You were present while he was being interviewed, correct?

16  A    Correct.

17  Q    And that's where the shooting took place, correct?

18  A    Correct.

19  Q    Did he call the police?

20  A    I don't know.

21  Q    He told you which way the shooter went, correct?

22  A    To the south, yes.

23  Q    He told you the path, correct?

24  A    Yes.

25  Q    Did you take any photographs of that area that day, because
```

```
 1       you had that information?
 2    A  No, there was no photographs taken that day.  It was
 3       nighttime.
 4    Q  You had information the shooter also went to the north; is
 5       that correct?
 6    A  Again, Mr. Champion, I'm not—
 7    Q  My question is did you have—
 8    A  I'm trying—
 9    Q  —information—
10    A  —to answer—I'm trying to answer your question, sir.
11                I don't know every piece of information right off
12       the bat in the investigation.
13    Q  My question is did you have information that the shooter went
14       to the north.
15    A  Other detectives and officers were given that information,
16       yes.
17    Q  And, at some point in time, you had that same information,
18       correct?
19    A  Later on the 25th, yes.
20    Q  Well, you canvassed the area—
21    A  Correct.
22    Q  —right?  You canvassed it that night and the next morning—
23    A  Correct.
24    Q  —is that correct?
25                In fact, I believe Mabel Street was actually shut
```
                                    1027

```
 1        down from Westnedge to Cobb; is that correct?

 2    A   Correct.

 3    Q   Did you—

 4    A   Actually, no, it's not correct.

 5    Q   Pardon?

 6    A   It wasn't—The whole street was not shut down from Westnedge to

 7        Cobb.

 8    Q   It wasn't?

 9    A   No.

10    Q   Did they have to push the ambulance gurney from Westnedge to

11        that location of 626 Mabel?

12    A   Push the gurney?  I wasn't there when that occurred.  There

13        was a lot of police cruisers that pulled up—

14    Q   So when you—

15    A   —from Westnedge—

16    Q   When you—

17    A   —to—

18    Q   —arrived—

19    A   —down Mabel Street towards the scene and the ambulance had to

20        go through those police cruisers, yes.

21    Q   You don't know if they had to push the gurney or not because

22        you weren't there—

23    A   That's correct.

24    Q   —is that correct?

25               Now you canvassed the area, you canvassed
```

|     |   |                                                                      |
|-----|---|----------------------------------------------------------------------|
| 1   |   | Florence Street; is that correct?                                    |
| 2   | A | Correct.                                                             |
| 3   | Q | Did you find the gun?                                                 |
| 4   | A | No.                                                                  |
| 5   | Q | See Sam Steel out there?                                              |
| 6   | A | I did not.                                                           |
| 7   | Q | See Walter Johnson out there?                                         |
| 8   | A | I did not.                                                           |
| 9   | Q | In fact, you were looking, based upon the information you were       |
| 10  |   | receiving—Well, let's take that step back.                           |
| 11  |   | Actually, on the 24th or the 25th, did Sam Steel                     |
| 12  |   | contact you?                                                         |
| 13  | A | No, he did not.                                                      |
| 14  | Q | On the 25th, he didn't?                                               |
| 15  | A | I don't recall him contacting me.                                    |
| 16  | Q | I'm showing you the police report.  It's page 20 of 445.             |
| 17  |   | Could you read the top paragraph, please, and the second            |
| 18  |   | paragraph and the third.                                             |
| 19  | A | Yes.                                                                |
| 20  | Q | Did Sam—                                                            |
| 21  | A | He called—He called my phone.                                       |
| 22  | Q | Did Sam Steel contact you several times between April 25th and       |
| 23  |   | 27th?                                                               |
| 24  | A | He called my phone and never—We did not speak to each other.        |
| 25  |   | We played phone tag.                                                 |

1029

| 1 | Q | As a matter of fact, you did speak. |
| 2 | A | Okay, if you say so. |
| 3 | Q | I'm reviewing your report.  Isn't it true you spoke? |
| 4 | A | Yeah, we did speak. |
| 5 | Q | In fact, you told him to call you back on the 27th and he |
| 6 | | called you back? |
| 7 | A | Correct.  And he left a hostile message. |
| 8 | Q | He left a hostile message.  He was doing what you told him to |
| 9 | | do and he contacted you several times—Right? |
| 10 | A | Correct. |
| 11 | Q | —between the 24th and the 27th? |
| 12 | | Now, in the prosecutor's opening statement—And |
| 13 | | there's been testimony that the reason Sam was upset with |
| 14 | | Milo is because of a break-in; is that correct? |
| 15 | A | Yes. |
| 16 | Q | In fact, you were looking at Milo for a number of different |
| 17 | | robberies and break-ins; is that correct? |
| 18 | A | As part of this investigation— |
| 19 | Q | As— |
| 20 | A | Can I— |
| 21 | Q | As a matter— |
| 22 | A | —answer your— |
| 23 | Q | —of fact— |
| 24 | A | —question, please? |
| 25 | | THE COURT:   Hold on a second.  Hold on a second. |

1030

```
 1        You've got to let him answer the question.

 2                    Go ahead.

 3                    MR. CHAMPION:   Isn't that correct?

 4                    THE WITNESS:   I was investigating the homicide of

 5        Milo Conklin.  As part of that investigation, lots of

 6        information came in about Milo Conklin's activities.

 7   BY MR. CHAMPION:

 8   Q    About committing armed robberies and other acts; is that

 9        correct?

10   A    Correct.

11   Q    As a matter of fact—

12                    MR. CHAMPION:   If I could have just a moment.

13   BY MR. CHAMPION:

14   Q    The gun that was stolen that was sold to Walter Johnson that

15        the—it's believed the shell casings that came from the owner

16        of this gun and the shell casings that were found at the scene

17        of the homicide, shell casings matching those were found at

18        one of those other crime scenes prior to Milo's death; is that

19        right?

20   A    That is correct.

21   Q    And that was involving another armed robbery and shooting; is

22        that right?

23   A    Correct.

24   Q    Now you were given the description and followed up on that

25        involving Melvin Johnson—Is that right?
```

1031

```
 1   A   Yes.

 2   Q   —that he had fled to the south—Is that correct?

 3   A   That—

 4   Q   —and got into—

 5   A   From—

 6   Q   —a different colored vehicle; is that right?

 7   A   Well, you're mixing up the two different people that said this

 8       information.

 9   Q   Well, Melvin Johnson was a suspect; is that right?

10   A   From my interview with Steve Brown, Melvin Johnson was a

11       suspect for the first six months of this investigation.

12   Q   Pardon?

13   A   From my interview with Steve Brown on May 10th, Melvin Johnson

14       was the suspect in this case for the first six months.

15   Q   That's correct.

16               And much of the information that Steve Brown gave

17       you, Charles Thompson also provided you—Is that correct?—or

18       one of your colleagues?

19   A   What Mr. Thomas provided, to my recollection, was a vague

20       description of the shooter, from the direction he came to the

21       direction he fled to.  Mr. Thomas never said who the shooter

22       was.

23   Q   He didn't say.

24   A   Correct.

25   Q   That's correct.  But he was present.  He saw—He said he went
```

1    to the south.

2  A   Came from the north, went to the south.

3  Q   Correct.

4          Now, when you spoke to Steve Brown on February 8th of

5      this year, you didn't make a promise of what would occur to

6      him as far as the prosecution; is that right?

7  A   Steve Brown?

8  Q   Excuse me.  Mr. Mathews—Excuse me.—A. J. Mathews.

9  A   No, that's not my job.

10 Q   But the prosecutor did; is that correct?

11 A   The prosecutor and his attorney came to an agreement, yes.

12 Q   And you were part of that agreement; is that right?

13 A   I was not part of that agreement.

14 Q   You were not a part of it?

15 A   No.

16 Q   Were you aware of it?

17 A   Prosecutor Anderegg—

18 Q   Pardon?

19 A   —contacted—

20         John Anderegg with the prosecutor's office contacted

21     me and advised that they were making a plea agreement with

22     Harry Mathews.

23 Q   And that's common—

24 A   Yes.

25 Q   —is that right?

1033

```
 1              They typically check with the investigating officer

 2      before they make such an agreement?

 3    A  Well, if my recollection's correct, they made the agreement

 4      and then told me to go interview him.

 5    Q  Now A. J. Mathews was charged based upon a police report; is

 6      that correct?

 7    A  Based upon the police investigation.

 8    Q  Investigation, a police report which you provided to the

 9      prosecutor's office; is that right?

10    A  Yes.

11    Q  And, in that police report, did it contain Walter Johnson's

12      statement about what had occurred that day?

13    A  Yes.

14    Q  And that investigation and the warrant that was submitted had

15      that information; is that correct?

16    A  Correct.

17    Q  And A. J. Mathews or Harry Mathews did not give you a

18      statement anywhere close to that until after he was charged

19      with a crime; is that right?

20    A  Correct.

21    Q  Now you said that Walter Johnson and A. J. or Harry Mathews

22      had no direct contact via the two phone numbers you had; is

23      that right?

24    A  That's correct.

25    Q  How about Walter Johnson's girlfriend?  Did Walter Johnson
```

1    have contact with his girlfriend during that period of time?

2  A   Did Walter contact his girlfriend?

3  Q   Yes.

4  A   I don't know.

5  Q   Did Walter Johnson's girlfriend contact Harry Mathews?

6  A   I don't know.

7  Q   Well, we know, based upon the testimony of the two young

8      individuals that stole the firearms, that Harry's—Excuse

9      me.—Walter's girlfriend told them to get ahold of Sam Steel;

10     is that correct?

11 A   Yes.

12 Q   And so it was obvious, or should have been obvious, that

13     Walter was—Was it obvious that Walter was relaying information

14     to his girlfriend?

15 A   (No audible response)

16 Q   Did you have information that Walter Johnson was forwarding

17     information to his girlfriend?

18 A   In November of 2008, when Mark and Paige were interviewed,

19     they both told me that they turned on to Sam through his

20     girlfriend, yes.

21 Q   Do you know if A. J. Mathews or Steve Brown had any other

22     phones available to them?

23 A   A. J. had two phones that I became aware of—the 364-3238 and

24     then the other one—Both area codes were (269).—the other one

25     was 348—I don't recall the last four.

```
 1              Steve Brown had various—Well, various numbers that

 2        he would call from people's houses.

 3   Q    Going back to the cellphone towers, did you check to see where

 4        the originating cells were and where the terminating cells

 5        were located?

 6   A    Yes, that's on the records.

 7   Q    And what type of signals were they?  Were they analog,

 8        digital?

 9   A    These records don't tell you that.

10   Q    Were cellphone towers in the area down at the time?

11   A    These records don't—

12              THE COURT:  I'm sorry.  Were they what?

13              MR. CHAMPION:  Down.

14   BY MR. CHAMPION:

15   Q    Do you know the band length of the various phones that we're

16        using?

17   A    No, I don't, sir.

18              MR. CUSICK:  Your Honor, . . . (inaudible)

19              THE COURT:  Is that an objection?

20              MR. CUSICK:  No, . . . (inaudible)

21              THE COURT:  All right.  Go ahead, Mr. Champion.

22              MR. CHAMPION:  Could I see exhibit number three,

23        please.  Would you enlarge that in the shortcut area, if

24        possible.

25
```

BY MR. CHAMPION:

Q   Now the shortcut we're talking about, I'm pointing towards; is
    that correct?

A   Correct.

Q   And it actually curves around; is that correct?  This is what
    I'm pointing to.

A   It goes through that open field, yes.

Q   And over here is 626 Mabel; is that correct?

A   Where that white car is at to your right, that's the address
    right there.  Correct.

Q   It appears, by line of sight, that the house—

            And what's the address of this house?

A   623.

Q   —is blocking any vision in that area.

A   From the pictures that were shown from Woodbury, you can see
    through to 626.

Q   Does it depend on how you're taking the photograph whether you
    can see or not?

A   Does it depend how you're taking the photograph?

Q   Yeah, what angle.

            MR. CUSICK:   Your Honor, he didn't take the
    photographs.  How can he testify to that?

            THE COURT:   Overruled.  If he knows, he can answer.

BY MR. CHAMPION:

Q   Does it matter?

```
1    A    It would depend on where you're standing, yes.

2    Q    Now, during the course of the investigation, you had

3         information that Melvin Johnson was possibly the killer—Is

4         that correct?

5    A    Yes.

6    Q    —and also another individual Los Pratt; is that correct?

7    A    Yeah, Los—Carlos—Albert Carlos Pratt was a friend of

8         Melvin Johnson's, and the information was that the two of them

9         were possibly involved in the homicide.

10   Q    Now you also testified that Walter Johnson said nothing about

11        the gun being torn apart and destroyed; is that correct?  It

12        was just A. J. Mathews?

13   A    Walter didn't have any knowledge of where the gun went to.

14   Q    According to your police report, Walter told you the gun was

15        taken apart and thrown between Kalamazoo and Jackson,

16        Michigan; do you recall that?

17   A    Yeah—

18                  MR. CUSICK:   Your Honor—

19                  THE WITNESS:  —I recall—

20                  MR. CUSICK:   —this is hearsay because this isn't

21        being—I don't see how this is being answered as to just why

22        Detective Beauchamp did the investigation.  He's asking what

23        Walter Johnson said and whether or not it was basically

24        truthful.

25                  MR. CHAMPION:   I'm impeaching the witness,
```

```
 1        your Honor.  He's already testified through the prosecutor
 2        that Walter Johnson allegedly had no knowledge of how the gun
 3        was destroyed, and that's contrary to what's in the police
 4        report.
 5                    THE COURT:   Overruled.
 6                    MR. CHAMPION:   Thank you.
 7                    THE COURT:   I'll allow him to ask the question.
 8                    THE WITNESS:   Walter Johnson told me that Sam Steel
 9        told him in a phone call that he threw—he cut the gun down and
10        threw it along the highway between Kalamazoo and Jackson.
11   BY MR. CHAMPION:
12   Q    So Walter Johnson allegedly did have information; is that
13        right?
14   A    Yeah, not good information, though.
15   Q    How late were you on the scene on April 24th, 2011?
16   A    I worked until probably 10:00 in the morning.  I wasn't at the
17        scene probably except for the first—I believe I probably
18        arrived up there around 11:00 and was there probably 11:30,
19        quarter to 12:00.
20   Q    Until 11:30, quarter to 12:00?
21   A    For about 45 minutes.
22   Q    That's the whole time you were in that area, the
23        Mabel/Florence/Elizabeth area?
24   A    On the 24th.
25                    On the 25th, I canvassed in the early morning hours.
```

```
 1   Q   What time did you get there?

 2   A   What time did I get where?

 3   Q   In the early morning hours, what time did you arrive at the

 4       location when you—

 5   A   When it was sun—When the sun rose.

 6   Q   What time was that?

 7   A   Seven, 8:00 o'clock.

 8   Q   Was there officers still on the scene and in the area securing

 9       the scene at that time?

10   A   I don't recall that.

11   Q   Was the lab person still there?

12   A   I don't recall.

13   Q   Did you see any—Did you see Sam Steel or Walter Johnson in the

14       area?

15   A   On the morning of the 25th, no.

16   Q   That's correct.

17   A   No, I did not.

18   Q   When was the arrest warrant issued?

19   A   December 22nd, 2011.

20   Q   And did you notify the news media immediately of that?

21   A   I don't notify news media.  My supervisors do.

22   Q   Is that normal?

23   A   Yes.

24   Q   You always, when a search warrant—or arrest warrant is issued,

25       you publicize it?
```

| | | |
|---|---|---|
| 1 | A | Nine times out of ten, yes. |
| 2 | Q | Did you tell the news media on December 22nd that you had seen |
| 3 | | Samuel Steel in the area on that day? |
| 4 | A | Did I tell the news media? |
| 5 | Q | Pardon? |
| 6 | A | Did I tell the news media? |
| 7 | Q | Yes. |
| 8 | A | I didn't— |
| 9 | Q | Did you or anybody from the department tell that on |
| 10 | | December 22nd Sam Steel was in Kalamazoo? |
| 11 | A | I didn't talk to the news media. |
| 12 | Q | Did anyone from your department? |
| 13 | A | I don't know. |
| 14 | Q | Where was Sam Steel's cellphone at the time these clothes were |
| 15 | | actually being burned? |
| 16 | A | His phone was turned off during that time. |
| 17 | Q | It was turned off? |
| 18 | A | Yes. |
| 19 | Q | Are you certain? |
| 20 | A | Yes. |
| 21 | Q | Why? |
| 22 | A | Because, from my contacts with Sprint®, when I asked the |
| 23 | | question why would there be no incoming or outgoing calls, and |
| 24 | | they say that's indicative of a person who has turned their |
| 25 | | phone off. |

```
 1              Same thing goes when you're doing a live ping, if
 2      there is no data coming back, that means the phone is turned
 3      off.
 4   Q  Well, I've been in court now for eight hours and I've received
 5      no phone calls.
 6              THE COURT:   Hold on a second.  Is that a question?
 7              MR. CHAMPION:   I'm getting there.
 8              THE COURT:   And how would he know that?
 9              MR. CHAMPION:   Pardon?
10              May I—
11              THE COURT:   Yes.
12              MR. CHAMPION:   —continue?
13   BY MR. CHAMPION:
14   Q  Is that indicative of my phone being off or, in fact, that I
15      may be doing something else or—
16              MR. CUSICK:   Your Honor—
17   BY MR. CHAMPION:
18   Q  —Sam Steel doing something else?
19              MR. CUSICK:   —there's so many objections to that.
20      Speculation is—
21              THE COURT:   Yeah, I—
22              MR. CUSICK:   —one of them.
23              THE COURT:   —will sustain that.
24   BY MR. CHAMPION:
25   Q  There's no way for you to know if the phone is off; is that
```

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | Sir, I'm telling you what the phone company— |
| 3 | Q | Okay. |
| 4 | A | —has told me. |
| 5 | Q | There is no way for you to know if that phone was off or if he |
| 6 | | was just not using it; is that correct? |
| 7 | A | No, it's not correct.  I'm telling you what I've testified to |
| 8 | | before in court from other cases that the phone company has |
| 9 | | told me this is what it's indicative of. |
| 10 | Q | Well, you're not checking the—if the phone was pinging or not; |
| 11 | | is that correct? |
| 12 | A | Not on April 24th, no. |
| 13 | Q | All you're saying is that he received no phone calls in that |
| 14 | | period of time; is that correct? |
| 15 | A | He made—He did not make or receive any phone calls during that |
| 16 | | time. |
| 17 | Q | So the phone company told you that when a person does not |
| 18 | | receive or make any phone calls from 9:15 on a Sunday night |
| 19 | | until 3:00 a.m. on a Sunday night, that's an indication their |
| 20 | | phone is off? |
| 21 | A | The other thing I did was go back through his records— |
| 22 | Q | Okay. |
| 23 | A | —during—I'm answering— |
| 24 | Q | Is that when they— |
| 25 | A | I'm answering your question. |

1    MR. CUSICK:   Your Honor, I would ask that he answer
2    the question.
3              MR. CHAMPION:   And I'm asking—
4              THE COURT:   He's entitled—
5              Hold on a second.
6              You got to answer his question.  It's—He's entitled
7    to an answer to that—
8              MR. CHAMPION:   Thank you.
9              THE COURT:   —question.
10             MR. CUSICK:   No, did he—he give him time to answer
11   that?
12             THE COURT:   I'd like an answer to the question
13   asked, I think.
14             MR. CUSICK:   Okay.
15             THE COURT:   Why don't you repeat that question.
16   BY MR. CHAMPION:
17   Q   When a person on a Sunday night from 9:15 p.m. till 3:30 in
18       the a.m., the phone company told you—And that's six hours and
19       45-minute period.—that's indicative of a person with their
20       phone off?
21   A   No, I'm telling you, from prior experiences, that's what the
22       phone companies tell me that's indicative of.  Okay.
23             Also, on this, I went into Sam's records and looked
24       at the commonality of how late he normally would be making or
25       receiving phone calls.  And I didn't find any days where he

                              1044

```
 1          didn't stop making or receiving calls at 9:00 p.m. at night.
 2    Q    How many homicides had he been at prior to that—
 3                    THE COURT:    I'm sorry.
 4    BY MR. CHAMPION:
 5    Q    —April 24th—
 6                    THE COURT:    How many what?
 7    BY MR. CHAMPION:
 8    Q    —homicides on April 24th, two thousand—
 9    A    Who?
10    Q    —and eleven?
11                    Sam Steel.
12                    How many?
13    A    I have no idea, sir.
14    Q    He was right across the street, correct?  That was his house
15         where this occurred; is that correct?
16    A    He owns it.  It's his mom's house.
17    Q    Pardon?
18    A    He owns the house.  It was his mother's house.
19    Q    Mom wasn't living there yet; is that correct?
20                    MR. CUSICK:    Your Honor, how can
21         Detective Beauchamp testify to where—to what was happening
22         before he even arrived on the scene—
23                    THE COURT:    Hold on a second.
24                    MR. CUSICK:    —and make him—
25                    THE COURT:    Hold on.  Hold on.
```

1    The question is his mom wasn't living there at the
2    house yet, correct. That's the question.
3        MR. CUSICK:   But—
4        THE COURT:   So I don't know—
5        MR. CUSICK:   Well, the previous—
6        THE COURT:   I think—
7        MR. CUSICK:   —question I was objecting to. I'd ask
8    for that to be—when he answered, if there was an answer, be
9    stricken. He cannot testify to observations that others may
10   have made on August—on April 24th of 2011.
11       THE COURT:   The previous question—Is this the how
12   many homicides had Sam Steel been on—
13       MR. CUSICK:   Yeah.
14       THE COURT:   —at before?
15       I agree with that. I don't know how he would know
16   that, if any.
17       So I will sustain that objection. The jury's to
18   disregard that question and that answer.
19       The question we now have is—
20       MR. CHAMPION:   I'll—I'll—I'm going to give it back,
21   your Honor. I'll withdraw that question.
22       THE COURT:   Okay.
23       MR. CHAMPION:   Okay.
24   BY MR. CHAMPION:
25   Q   On April 24th, 2011, there was a homicide right across from the

                                1046

```
 1         property that Sam Steel owns; is that right?
 2    A    Yes.
 3    Q    And Sam Steel had been there that evening; is that correct?
 4    A    Yes.
 5    Q    In fact, you had information that Sam Steel was there at the
 6         time of the shooting; is that correct?
 7    A    Yes.
 8    Q    So his—In fact, he was on the news media that night at that
 9         location or in that area the night of the homicide or the
10         early morning night; is that correct?
11                   THE COURT:   Who's he, Sam Steel?
12                   MR. CHAMPION:   Sam Steel.
13                   THE COURT:   If you know.
14                   THE WITNESS:   I didn't see that.
15    BY MR. CHAMPION:
16    Q    You wouldn't disagree with it, you just haven't seen it; is
17         that right?
18    A    I didn't see it.
19    Q    You didn't see it.  Okay.
20    A    Correct.
21    Q    So wouldn't you agree that the evening after April 24th, 2011,
22         would have been rather unusual in Sam Steel's normal course of
23         action, wouldn't be the same as it was the day before or the
24         day before that?
25                   MR. CUSICK:   This is all speculation, your Honor.
                                 1047
```

```
1          MR. CHAMPION:   Your Honor, he's already testified

2    to speculation.  He's testi—

3               THE COURT:   Counsel, will you approach, please.

4               (At 4:53 p.m., bench conference as follows:

5                  THE COURT:   Where are we going with this line

6               of questioning?  Because right now the question is

7               that his life—

8                  MR. CHAMPION:   What he testified—

9                  THE COURT:   —would have changed—

10                 MR. CHAMPION:   —the reason that—

11                 THE COURT:   —a little bit.

12                 MR. CHAMPION:   —he didn't get any phone calls

13              in that six-hour period because his phone was turned

14              off implicating—indicating that he was hiding

15              someplace rather than to—

16                 THE COURT:   Well, I think—

17                 MR. CHAMPION:   —deal with the issue—

18                 THE COURT:   Okay.  So I understand that he

19              said that that was based on information he received

20              from the phone company.  So, at this point—

21              But where are we going with—

22                 MR. CHAMPION:   I'm almost done with it—

23                 THE COURT:   Okay.

24                 MR. CHAMPION:   —but I'm just trying to impeach

25              what he's testified to.
```

```
 1                    THE COURT:   Okay.  I'll let you answer [sic]
 2          that question—
 3                    MR. CUSICK:   I'm sorry.
 4                    THE COURT:   —or him—
 5                    MR. CUSICK:   What . . . (inaudible)
 6                    THE COURT:   —answer that question then—
 7                    MR. CUSICK:   Okay.
 8                    THE COURT:   —if he knows, based on what he
 9          testified to.
10                    Do you have any idea approximately how long
11          you'll be?  Are you close or no?
12                    MR. CHAMPION:   I'm getting awfully close.
13                    THE COURT:   You are?
14                    MR. CHAMPION:  Yeah.
15                    THE COURT:   Okay.  Keep going.)
16               THE COURT:   I'll allow it.
17               Go ahead.  Next—Why don't you repeat that question.
18               MR. CHAMPION:   I'll rephrase it.
19               THE COURT:   Okay.
20     BY MR. CHAMPION:
21     Q    Wouldn't you agree that the evening of April 24th, 2011, was
22          rather unusual and stressful for anyone living in that area?
23     A    Sure.
24     Q    And their pattern of behavior would have changed as a result
25          of that?
```
1049

```
 1  A    That's a hypothetical.

 2  Q    Well—

 3              THE COURT:   I missed it.  I missed it.

 4              THE WITNESS:   It's a hypothetical question.  I

 5       can't answer what—

 6  BY MR. CHAMPION:

 7  Q    You can't answer that.

 8  A    —other people would do.

 9  Q    You can say that, based upon his prior actions, he typically

10       would have received phone calls; is that right?

11              MR. CUSICK:   Your Honor, it's speculation as to—

12              THE COURT:   Sustained.  I agree with that.  I don't

13       know how he would be able to answer that question.

14  BY MR. CHAMPION:

15  Q    What you testified to is that the phone company indicated that

16       that period of time between roughly 9:15 till 3:30 a.m. was an

17       indication that the phone was turned off; is that correct?

18  A    From the previous cases I've investigated involving phone

19       records—

20  Q    Did the phone company tell you—

21              MR. CUSICK:   Your Honor, I would just ask that the

22       witness be allowed to answer the question.

23              MR. CHAMPION:   . . . (inaudible)

24              THE COURT:   I think he did.

25              Go ahead.  Next question.
```

1    MR. CUSICK:   Well, I think he was still saying

2    something before Mr. Champion cut him off.

3    THE COURT:   All right.   Look, it's

4    cross-examination.  He's entitled to, frankly, a yes or no;

5    and I think sometimes we're not getting that.

6    But, anyway, I don't recall in this particular case

7    if he was done with the answer as far as what I understood.

8    We are getting somewhat repetitive, I will say that,

9    too.  So just be careful about your questions.

10   Go ahead, Mr. Champion.

11   MR. CHAMPION:   I will, your Honor.

12   BY MR. CHAMPION:

13   Q    Did the phone company tell you that was an indication that the

14        phone was off, or is that your conclusion that the phone was

15        off?

16   A    That's my conclusion.

17   MR. CHAMPION:   Thank you.

18   I have no other questions.

19                    REDIRECT EXAMINATION

20   BY MR. CUSICK:

21   Q    You indicated Sam Steel left a hostile message to you—And what

22        day was that?—after the homicide.

23   A    After the homicide, yes.

24   Q    How long?  Approximately how long?

25   A    Two to four days.

                              1051

1  Q   Okay.  What type of hostile message was that?

2  A   Just a yelling message.

3  Q   Do you remember exactly what he said?

4  A   I don't remember exactly what he said.

5  Q   February 2nd, Harry Mathews pled guilty.  Would you agree with

6      that?

7  A   Yes.

8  Q   I think that's been testified to.  Okay.

9          Did you—Did you promise him anything when you

10     interviewed him on February 8th?

11         THE COURT:   Harry Mathews?  Is that who we're

12     talking about still?

13         MR. CUSICK:   Yes.

14         MR. CHAMPION:   Your Honor, I believe there's been

15     no testimony that Harry Mathews pled guilty to anything on

16     February 2nd.

17         MR. CUSICK:   Well, Harry Mathews testified to that.

18         MR. CHAMPION:   No, I believe the testimony he was

19     bound over on February 2nd.  He didn't plead—

20         MR. CUSICK:   He—

21         THE COURT:   Okay.

22         MR. CUSICK:   I'm—

23         THE COURT:   Okay.

24         MR. CUSICK:   He had the agreement with the

25     prosecutor's office, I believe . . . (inaudible)

1052

```
 1              THE COURT:    The jury can sort through what their
 2        recollection is of the testimony.  I don't think we need to be
 3        arguing about who said what.  That's up to them to sort
 4        through.
 5              MR. CUSICK:    Fair enough.
 6              THE COURT:    So he's allowed to ask his questions.
 7        If it was wrong, then they can figure that one out.
 8              MR. CUSICK:    Fair enough.
 9   BY MR. CUSICK:
10   Q    Was there, at least, an agreement on February 2nd with the
11        prosecutor's office?
12   A    Yes.
13   Q    Okay.  And, based on that information, do you have your
14        interview with Harry Mathews?
15   A    On February 8th.
16   Q    Was anything promised or anything to Harry Mathews?
17   A    No.
18   Q    A. J. Mathews had two phones.  The other—The other phone
19        number that's not listed on exhibit 99, how are you able to
20        identify that?
21   A    From my contact with A. J.
22   Q    You indicated that you can see Florence Street—I'm sorry.—you
23        can see Mabel Street from Florence Street in certain
24        locations.
25   A    Correct.
```

```
 1   Q    Is that certain locations behind 623 Mabel?

 2   A    Correct.

 3   Q    Albert Carlos Pratt, was there any credible information

 4        regarding that he was involved with the homicide?

 5   A    No.

 6   Q    Was there any credible information other than the statement—

 7                    MR. CHAMPION:   Your Honor, I'm going to object.

 8                    May we approach?

 9                    THE COURT:   Yes.

10                    (At 4:59 p.m., bench conference as follows:

11                        MR. CHAMPION:   Credible evidence—

12                        MR. CUSICK:   Well—

13                        MR. CHAMPION:   —that's an improper question.

14                        MR. CUSICK:   What he believed to be credible.

15                    I can rephrase that.

16                        MR. CHAMPION:   And, again, that's a leading

17                    question.

18                        THE COURT:   It is.  I have somewhat—I guess

19                    you can rephrase it and ask was there any evidence

20                    that—

21                        MR. CUSICK:   Okay.

22                        THE COURT:   —backed up that information or

23                    something to that effect.

24                        MR. CUSICK:   Okay.

25                        THE COURT:   So—)
```

1054

BY MR. CUSICK:

Q    Was there any information that backed up—that you received

     regarding Melvin Johnson and the homicide other than

     Steven Brown—Brown's statement?

A    Could you repeat the question.

Q    Other than Steven Brown's statement, was there any information

     that you received that indicated Melvin Johnson's involvement

     with the homicide?

A    Nothing.

Q    And I believe just—The previous question with regards to

     Albert Carlos Pratt, was there any information that you

     received that indicated that he was involved with the

     homicide?

A    No.

                    MR. CUSICK:    . . . (inaudible)

                         RECROSS-EXAMINATION

BY MR. CHAMPION:

Q    Was there any information that Sam Steel was involved in these

     other armed robberies and burglaries?

A    No.

Q    However, the same gun was used in the homicide, the same shell

     casings, was also used in these other armed robberies and

     burglaries—Is that correct?—or at least one of those; is that

     correct?

A    Correct.

                              1055

```
 1  Q    And Carlos Pratt was a victim in that case; is that right?

 2  A    That's wrong.

 3  Q    And that's where the shell was found; is that correct?

 4  A    Carlos Pratt was not the victim in that other case.

 5  Q    No, but somebody else was—

 6  A    Correct.

 7  Q    —is that correct?

 8                 THE COURT:   Are you done, Mr. Champion?

 9                 MR. CHAMPION:   Yes, I am.

10                 No further questions.

11                        REREDIRECT EXAMINATION

12  BY MR. CUSICK:

13  Q    Samuel Steel was a victim in one of those cases as well,

14       wasn't he?

15  A    Yes.

16                 THE COURT:   Mr. Champion, anything else?

17                 MR. CHAMPION:   No, your Honor.

18                 THE COURT:   Ladies and gentlemen, do any of you

19       have any questions for this witness?

20                 It looks like we do have some questions.

21                 I believe it's Mr. Cusick's turn.

22                 MR. CHAMPION:   I believe it is, your Honor.

23                 THE COURT:   Okay.

24                 MR. CHAMPION:   Thank you.

25                 MR. CUSICK:   . . . (inaudible) Mr. Champion's turn?
```

1   THE COURT:   Oh, is it Mr. Champion's?  Okay.

2   MR. CUSICK:   . . . (inaudible) at least try.

3   THE COURT:   Would one of you please gather the

4   questions.

5       (At 5:01 p.m., bench conference as follows:

6       THE COURT:   I can't believe we finished.  I

7   certainly don't want to—

8       MR. CUSICK:   Okay.

9       THE COURT:   —speed the officer.  If you need

10  more time to get through it, we'll be back tomorrow

11  morning.

12      Okay.  These are . . . (inaudible) questions.

13      MR. CUSICK:   . . . (inaudible)

14      THE COURT:   I think we're getting into expert

15  witness testimony—

16      MR. CHAMPION:   Yeah, we—

17      THE COURT:   —here.

18      MR. CUSICK:   Okay.  That's—

19      THE COURT:   Does everyone—

20      MR. CUSICK:   —fair enough.

21      THE COURT:   —agree?

22      MR. CUSICK:   I don't—I don't have any

23  objection if you don't want to use that question.

24      THE COURT:   This is the same—

25      MR. CUSICK:   We don't need to use that

1    question.

2         THE COURT:   I think this is the same—

3         MR. CHAMPION:   Yeah—

4         THE COURT:   —thing here.

5         MR. CHAMPION:   —I think that's—

6         THE COURT:   Oopsie!

7         MR. CUSICK:   That's the same one?

8         THE COURT:   Apparently, we don't need an

9    expert.  Apparently, it's just everyone has

10   knowledge of how these things work.

11        MR. CHAMPION:   That's—Again, that's an expert.

12   We'll be dealing with that.

13        THE COURT:   Apparently not.  Apparently, it's

14   common knowledge, but I'm not going to ask him the

15   question because I think it does take some

16   expertise.

17        MR. CUSICK:   Yeah.

18        THE COURT:   We're not going to ask—

19        MR. CUSICK:   I—

20        THE COURT:   —that one.

21        MR. CUSICK:   No, that's fine.  That's fine.

22   We don't have to ask that.

23        THE COURT:   You agree.

24        Okay.  This one, everyone agrees is okay,

25   right?

1058

1   And—And this one's okay.

2   I don't know if he can say it's a call to a

3   voicemail or just how long was it.

4   MR. CHAMPION:   It was how long.  It wasn't a

5   voicemail.  It was incoming and outgoing.

6   THE COURT:   Do you want me to ask him how long

7   it was, or do you want me to ask that question?

8   MR. CHAMPION:   It goes into voice—It does say—

9   THE COURT:   It does say voicemail.

10  MR. CUSICK:   . . . (inaudible)

11  MR. CHAMPION:   . . . (inaudible)

12  THE COURT:   Okay.)

13  THE COURT:   Was the first activity on Sam's phone

14  after the six-hour window of no activity a call to his

15  voicemail, if you know from looking at the records?

16  THE WITNESS:   Yes, it was.

17  THE COURT:   While you were canvassing the

18  neighborhood on April 25th, did you see Sam Steel at the house

19  on Mabel Street?

20  THE WITNESS:   No, I did not.

21  THE COURT:   And I should say the question refers to

22  Maple Street, and I think it's hard to see.  Is it Mabel or

23  Maple?

24  THE WITNESS:   Mabel, with a b, boy.

25  THE COURT:   Can you spell that.

1059

```
 1              THE WITNESS:   M-a-b-e-l.

 2              THE COURT:   M-a-b-e-l.  Is that what you said?

 3              THE WITNESS:   Correct.

 4              THE COURT:   All right.  Any further questions,

 5      then, Counsel?

 6              Mr. Cusick, your witness, so any further questions

 7      based on those questions?

 8              MR. CUSICK:   Not based on those questions,

 9      your Honor.

10              MR. CHAMPION:   No, your Honor.

11              THE COURT:   All right.  Counsel, will you approach

12      a moment.

13              (At 5:04 p.m., bench conference as follows:

14                  MR. CUSICK:   Judge, I don't know if you want

15                  to indicate for the other two that there may be

16                  testimony later on regarding cellphone towers.  I

17                  anticipate a Sprint®—I don't know if they just want—

18                      THE COURT:   I don't.

19                  MR. CUSICK:   —to be left—

20                  THE COURT:   I give them the instruction that

21                  says, if they're not read, don't consider it.  I

22                  don't know if it's coming in or not.

23                  MR. CHAMPION:   Right.

24                  MR. CUSICK:   Okay.  I just—

25                  THE COURT:   So—

                              1060
```

1          MR. CUSICK:   —want them—Okay.  That's fine.

2          MR. CHAMPION:   Okay.

3          THE COURT:   Okay.  So, again—I mean, given the

4  hour—I certainly don't want to push either one of

5  you.  Do either one of you have any follow-up

6  questions, or are we all set?

7          MR. CUSICK:   Have—

8          MR. CHAMPION:   I'm all set.

9          MR. CUSICK:   —any what?

10          THE COURT:   Okay.  You're all—

11          MR. CUSICK:   I don't have any questions—

12          THE COURT:   Okay.

13          MR. CUSICK:   — . . . (inaudible)

14          THE COURT:   So I'm going to go ahead, and I'm

15  going to read those instructions to them again just

16  with regards—just a reminder not to—you know, the

17  main questions [*sic*]—or instructions about not to

18  review anyone—anything on TV, et cetera, et cetera.

19  And then I'm going to have them report at

20  9:00 o'clock on Wednesday.

21          Is that correct?  We don't—We have—

22          MR. CHAMPION:   That's fine.

23          THE COURT:   —nothing tomorrow, right?

24          MR. CHAMPION:   Right.

25          THE COURT:   And your two witnesses are not

1  available until Wednesday, correct?

2        MR. CUSICK:    Yeah, Wednesday morning—

3        MR. CHAMPION:    Right.

4        MR. CUSICK:    —yeah.

5        MR. CHAMPION:    Thank you.)

6        THE COURT:    All right.  Thank you, sir.  You may

7  step down.

8        All right.  Ladies and gentlemen, we are done for

9  the day, and we're done for the week.  So you do not have to

10  report tomorrow.

11        I'm going to review with you a couple of the

12  instructions that I have read before.  Obviously, they're very

13  important.  And I know you've heard these, but bear with me.

14        You must not discuss this case with anyone,

15  including your family and friends.  You must not even discuss

16  it with the other jurors until the time comes for you to

17  decide this case.

18        If I call for a recess, I will either send you back

19  to the jury room or allow you to leave the courtroom on your

20  own and go about your business.

21        Do not let anyone discuss this case with you.  If he

22  or she does that, just let them know you're not allowed to

23  discuss the case.  If they continue, leave the area

24  immediately and report the incident to us as soon as you

25  return to court.  And, again, you would do that by letting

1  Ms. Wint know what happened.

2          You must not talk to the defendant or the lawyers or

3  the witnesses about anything at all, even if it has nothing to

4  do with this case.

5          During this trial, do not read or listen to or watch

6  or look up any news accounts about the case, past or present.

7          As I indicated before, witnesses must be, for

8  example, sworn to tell the truth.  They must be under oath,

9  and the attorneys must have the opportunity to cross-examine

10  witnesses; and, therefore, you might get information that you

11  should not otherwise hear or be aware of or it may be

12  incorrect information if you look up or listen to anything

13  about this case.  The only information that you receive about

14  this case must come to you in this courtroom.  You must not

15  consider any information that comes from anywhere else.

16          Make sure that you do not use a computer or

17  cellphone or other electronic device with communication

18  capabilities at anytime to look up or obtain or disclose any

19  information about a party or a witness or an attorney or a

20  court officer or any news accounts about this case or any

21  information collected through any research on any topic raised

22  or testimony offered or look up any information about any

23  witness or an exhibit.

24          Do not visit the scene of—or the area of where this

25  incident occurred.  So please don't drive by this area or try

1063

```
1    to do that on your own over the next couple days when you're
2    not going to be with us.
3            Do not do any investigations on your own or conduct
4    any experiments of any kind.  And, again, this includes using
5    the Internet for any purpose related to this case.
6            Don't contact each other on any social network site
7    either.
8            Don't talk to each other by e-mail or by phone.
9            If you discover that any juror has violated any of
10   these instructions, make sure that you report that to us as
11   soon as you return to court.
12           So I know you've heard that before.  It's just very
13   important that you don't look up or try to find out any
14   information about this case over the weekend.
15           So we do have a lengthy period of time here because
16   we have a holiday over the weekend, so I won't see you on
17   Monday.  On Tuesday, you are not going to report.  I
18   apologize.  I have a full docket of other cases that we deal
19   with.  That's technically our Monday, and that's why I'm not
20   having you report.
21           So Wednesday at 9:00 o'clock upstairs on the fourth
22   floor.
23           Be careful when you enter and exit the building.
24   Again, just so that you're aware of that.
25           We will have other jurors reporting on Wednesday, so
```

1064

1 just make sure that you get here early enough so that you can

2 be here on time. And, as soon as we get word that everyone's

3 here, we will bring you down.

4 So have a wonderful weekend. Enjoy your holiday

5 off, also, and we will see you on Wednesday.

6 All rise.

7 (At 5:10 p.m., jury exits courtroom)

8 You may be seated.

9 All right. Counsel, the jury has left the courtroom

10 and the door is shut.

11 Is there—Let me just indicate for the record, too—I

12 know it's getting late in the day here. And I did make sure

13 and clarified with you, when you came to the bench the last

14 conference, that I didn't want to rush anyone. We could

15 certainly go into tomorrow or continue. And you both

16 indicated that you were done with your questions.

17 Is that correct, Counsel?

18 MR. CHAMPION: It is, your Honor.

19 MR. CUSICK: It is, your Honor.

20 THE COURT: Okay. So, with that, is there anything

21 else that we need to address before we recess for the day?

22 MR. CHAMPION: No, your Honor.

23 MR. CUSICK: No, your Honor.

24 THE COURT: No. Okay.

25 Folks, those of you in the courtroom, I will just

```
 1    indicate that the building is locked at 5:00 o'clock.  Please

 2    do not talk out in the hallway.  When you are excused, you

 3    need to leave the building immediately.  And I'm sure the

 4    deputies will make sure, also, that you leave the area

 5    immediately.  So just so that you're aware of that.  Don't

 6    hang around and talk to each other.  Do that outside.  Okay?

 7         Ma'am, I would prefer that you not make contact with

 8    anyone involved in the case, too, while we're still on the

 9    record or while we're communicating.  Okay.

10         Is there anything else that we need to address,

11    then, Counsel?

12         MR. CHAMPION:   No, your Honor.

13         MR. CUSICK:   No, your Honor.

14         THE COURT:   No.

15         MR. CUSICK:   Thank you.

16         THE COURT:   All right.  I appreciate everyone's

17    patience this week.  Have a wonderful weekend.

18         Court's in recess.

19         (At 5:12 p.m., proceedings adjourned)

20

21

22

23

24

25
```