STATE OF MICHIGAN

9TH CIRCUIT COURT—TRIAL DIVISION

**F I L E D**

Dec 26, 2013

**9TH JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN**

THE PEOPLE OF THE
STATE OF MICHIGAN

   v                                        File No. 2011-1983 FC

SAMUEL STEEL, III,

        Defendant.

Jury Trial - Volume V of VII
Before Honorable Pamela L. Lightvoet P47677, Circuit Judge
Kalamazoo, Michigan — Wednesday, September 4, 2013

APPEARANCES:

For the People:           Paul John Cusick P70895
                              Assistant Attorney General
                              Michigan Department of Attorney General
                              Criminal Division
                              3030 West Grand Boulevard, Suite 10-361
                              Detroit, Michigan 48202
                              (313) 456-0089

For the Defendant:      Robert A. Champion P52726
                              124 East Bridge Street, Suite C
                              Plainwell, Michigan 49080
                              (269) 685-9220

Recorded by:           Digitally recorded

Transcribed by:        Brenda K. Foley CER 4956
                              Foley Transcription Service
                              8165 Valleywood Lane
                              Portage, Michigan 49024
                              (269) 303-9680
                                  * * * * *

1                              TABLE OF CONTENTS

2    WITNESSES: <u>People</u>                                        PAGE

3    JEFFREY STROHM

4         Direct examination by Mr. Cusick . . . . . . . . . . . .   1070
          Cross-examination by Mr. Champion . . . . . . . . . . .    1078
5         Redirect examination by Mr. Cusick . . . . . . . . . .     1087
          Recross-examination by Mr. Champion . . . . . . . . . .    1088
6
     NICHOLAS BOBO
7
          Direct examination by Mr. Cusick . . . . . . . . . . . .   1089
8         Cross-examination by Mr. Champion . . . . . . . . . . .    1095

9    BRIAN BEAUCHAMP

10        Direct examination by Mr. Cusick . . . . . . . . . . . .   1097
          Cross-examination by Mr. Champion . . . . . . . . . . .    1098
11
     People rest . . . . . . . . . . . . . . . . . . . . . . . .    1100
12
     Opening statement by Mr. Champion . . . . . . . . . . . . .    1105
13
     WITNESSES: <u>Defense</u>
14
     TOMMY MORGAN
15
          Direct examination by Mr. Champion . . . . . . . . . .     1109
16        Cross-examination by Mr. Cusick  . . . . . . . . . . .     1120
          Redirect examination by Mr. Champion . . . . . . . . .     1128
17        Recross-examination by Mr. Cusick  . . . . . . . . . .     1130

18   CHARLES THOMAS

19        Direct examination by Mr. Champion . . . . . . . . . .     1133
          Cross-examination by Mr. Cusick  . . . . . . . . . . .     1146
20        Redirect examination by Mr. Champion . . . . . . . . .     1160
          Recross-examination by Mr. Cusick  . . . . . . . . . .     1167
21        Reredirect examination by Mr. Champion . . . . . . . .     1178
          Rerecross-examination by Mr. Cusick  . . . . . . . . .     1182
22        Further reredirect examination by Mr. Champion . . . . .   1186

23   LEE LOGAN

24        Direct examination by Mr. Champion . . . . . . . . . .     1193
          Cross-examination by Mr. Cusick  . . . . . . . . . . .     1199
25        Redirect examination by Mr. Champion . . . . . . . . .     1208

TABLE OF CONTENTS (cont.)

WITNESSES: <u>Defense</u>                                              PAGE

LEE LOGAN (cont.)

    Recross-examination by Mr. Cusick . . . . . . . . . .   1209
    Reredirect examination by Mr. Champion . . . . . .     1210
    Further reredirect examination by Mr. Champion . . . . .  1213
    Rerecross-examination by Mr. Cusick . . . . . . . . .    1216

R. B. DAVENPORT

    Direct examination by Mr. Champion . . . . . . . . . .   1219
    Cross-examination by Mr. Cusick . . . . . . . . . . .    1231
    Redirect examination by Mr. Champion . . . . . . . .     1249
    Recross-examination by Mr. Cusick . . . . . . . . . .    1250
    Further recross-examination by Mr. Cusick . . . . . . .  1255
    Further redirect examination by Mr. Champion . . . . . .  1256

EARNEST WYNN

    Direct examination by Mr. Champion . . . . . . . . . .   1259
    Cross-examination by Mr. Cusick . . . . . . . . . . .    1261
    Redirect examination by Mr. Champion . . . . . . . . .   1264

ANTONIO WILLAMS

    Direct examination by Mr. Champion . . . . . . . . . .   1267
    Cross-examination by Mr. Cusick . . . . . . . . . . .    1274
    Redirect examination by Mr. Champion . . . . . . . . .   1281
    Recross-examination by Mr. Cusick . . . . . . . . . .    1283
    Further redirect examination by Mr. Champion . . . . . .  1286
    Further recross-examination by Mr. Cusick . . . . . . .  1289
    Further redirect examination by Mr. Champion . . . . . .  1289


EXHIBITS: <u>People</u>                          IDENTIFIED     RECEIVED

    110   tether printout for Devon Smith      1090          1091

EXHIBITS: <u>Defense</u>

    A     map                                  1178          1225

```
1           Kalamazoo, Michigan

2           Wednesday, September 4, 2013 - 9:18 a.m.

3           THE CLERK:   The court calls the matter of People of

4    the State of Michigan versus Samuel Steel, III, case number

5    C11-1983 FC.

6           Parties, please state appearances for the record.

7           MR. CUSICK:   Good morning, your Honor.

8           Paul Cusick on behalf of the People,

9    Assistant Attorney General.

10          MR. CHAMPION:   May it please the Court,

11   Robert Champion appearing on behalf of Samuel Steel.

12          THE COURT:   All right.  And the jury is here.

13          Just a reminder for all of those in the court, make

14   sure your electronic devices and cellphones are turned off.

15          Mr. Cusick, I will turn it over to you for your next

16   witness.

17          MR. CUSICK:   Your Honor, we have video testimony of

18   Jeffrey Strohm.

19          THE COURT:   All right.  Sir, are you Jeffrey Strum?

20          MR. STROHM:   Yes.

21          THE COURT:   All right.  And so the jury is present

22   in the court, and you have been called as the next witness,

23   sir.

24          If, at anytime throughout these proceedings, you

25   cannot hear what any—what we're saying over here, just make
```

```
 1    sure you let us know.  Okay?

 2              MR. STROHM:   Okay.  Thank you.

 3              THE COURT:   All right.  Please raise your right

 4    hand, sir.  We'll swear you in.  Do you solemnly swear or

 5    affirm that the testimony you're about to give will be the

 6    truth, the whole truth, and nothing but the truth, so help you

 7    God?

 8              MR. STROHM:   I do.

 9              THE COURT:   Thank you, sir.  You can put your hand

10    down.

11              Will you please state and spell your first and last

12    name for the record, sir.

13              THE WITNESS:   My name is Jeffrey Strohm—J-e-f-f-r-

14    e-y S-t-r-o-h-m, as in Mary.

15                        JEFFREY STROHM,

16    called at 9:20 a.m., and sworn by the Court, testified:

17                      DIRECT EXAMINATION

18   BY MR. CUSICK:

19   Q    Good morning, Mr. Strohm.

20   A    Good morning.

21   Q    Mr. Strohm, how are you employed?

22   A    I'm a custodian of records for Sprint-Nextel

23        Telecommunications.

24   Q    How long have you worked for Sprint®?

25   A    Since March of 2008.
```

1070

| | | |
|---|---|---|
| 1 | Q | Okay. And have you testified before? |
| 2 | A | Yes. |
| 3 | Q | Have you testified regarding cellphone towers before? |
| 4 | A | Yes, I have. |
| 5 | Q | Okay. Have you taken any courses or training regarding the |
| 6 | | use of cellphone towers? |
| 7 | A | Yes. |
| 8 | Q | What type of training and courses have you taken? |
| 9 | A | Upon my arrival at Sprint® back in 2008, I took a four-week |
| 10 | | training course, getting familiar with the different systems |
| 11 | | that we use to pull these different types of phone records. |
| 12 | | I've taken several online courses and courses |
| 13 | | mentored by radio frequency engineers, getting an |
| 14 | | understanding of how our network works and how cellphone |
| 15 | | towers interact with one another. |
| 16 | Q | And how cellphone towers interact with what, sir? |
| 17 | A | With one another. |
| 18 | Q | Okay. Have you testified regarding cellphone towers before? |
| 19 | A | Yes. |
| 20 | Q | How often have you testified regarding cellphone towers? |
| 21 | A | Since May of 2009, I've testified somewhere around 300 times, |
| 22 | | all of those times testifying about phone records and cell |
| 23 | | site information and the information—the location information |
| 24 | | you can glean from cell site information. |
| 25 | | MR. CUSICK: Your Honor, at this point, I would ask |

1    that Mr. Strohm be qualified as an expert in the analysis of
2    cellphone towers.
3              MR. CHAMPION:   I would object to that.  I don't
4    believe that's the area that he's been testifying to or his
5    expertise.
6              THE COURT:   Why don't you lay a little bit more
7    foundation for that.
8    BY MR. CUSICK:
9    Q    Have you testified, sir, before regarding the use of cellphone
10        towers?
11   A    Yes.
12   Q    Have you testified before—Have you been qualified as an expert
13        before regarding the use of cellphone towers?
14   A    Yes.
15   Q    How many times have you been qualified as an expert regarding
16        the use of cellphone towers?
17   A    Formally qualified as an expert, somewhere around 20 times in
18        different states.
19   Q    Okay.  And did your testimony have to do with how
20        cell—cellphone towers—Let me strike that.
21              Regarding your experience in cellphone towers, this
22        four-week course and training, how many hours total was that?
23   A    It would have been 40 hours a week, so 160 hours.
24   Q    Okay.  And how often do you deal with cellphone towers and
25        analyze cellphone towers with your job at Sprint®?

1   A    A couple times a week.

2            MR. CUSICK:   Okay.  Your Honor, at this point, I

3   think I've laid a foundation regarding his expertise in the

4   analysis of cellphone towers.

5            THE COURT:   I have a question, sir.  You indicated

6   that you testified in the past as an expert.  Are you saying

7   with regards to cell side [*sic*] information or site

8   information?

9            THE WITNESS:   Site—s-i-t-e.

10           THE COURT:   What does that mean, sir?

11           THE WITNESS:   Cell site is basically the same thing

12  as a cellphone tower.  It's the physical mechanism that's

13  responsible for fielding the radio frequency waves that come

14  to and from our cellphones.  It's essentially what allows us

15  to communicate wirelessly.

16           THE COURT:   All right.  Thank you.

17           Any objections to him being qualified to serve as an

18  expert in the area of cellphone towers?  Is that what you're

19  asking for, location of or use of?

20           MR. CUSICK:   Cellphone site information and

21  cellphone tower information.

22           MR. CHAMPION:   I would have no objection to

23  cellphone site information.

24           THE COURT:   Based on the additional information, I

25  believe he's qualified under 702.

                            1073

1                   MR. CUSICK:   Thank you, your Honor.

2    BY MR. CUSICK:

3    Q    Sir, can you tell the jury what is a cellphone tower?

4    A    You can find cellphone towers anywhere.  But what they are is

5         a physical mechanism, a large structure of some sort that's

6         responsible for fielding the radio frequency waves that come

7         to and from our cellphones.

8    Q    Okay.  How is a cellphone tower activated?

9    A    Well, on our network—on the Sprint® network—what your phone is

10        doing whether it's receiving a phone call or initiating a

11        phone call is constantly searching for the cellphone tower

12        that's emitting the strongest signal.  A phone in our network

13        is going to connect to whatever tower's emitting the strongest

14        signal.  And there's different factors that go into what

15        tower's emitting the strongest signal.

16   Q    Sir—

17   A    So a cellphone tower—

18              I'm sorry.

19   Q    I'm sorry to interrupt.  I was just going to ask what are

20        those factors.  I didn't mean to interrupt.

21   A    No, you're fine.

22              The different factors that go into deciding what

23        tower your phone is going to utilize is, first of all,

24        proximity, first and foremost proximity or how far away you

25        are from a tower.

1    Other factors include line of sight.  If there's a

2    building or mountain between you and a tower, that can impede

3    on your ability to connect to it.

4    Another factor being other radio frequency traffic

5    activity.  If a cell tower's fielding a high volume of

6    cellphone calls, that can diminish its signal and, again,

7    impede on your ability to connect to it.

8    And, finally, the overall strength of a cellphone

9    tower.

10  Q   So you indicated proximity is first—is the first and foremost

11       factor; is that correct?

12  A   Correct.

13  Q   Okay.  Through your experience, if I call—if I make a call

14       with my cellphone, is it more likely that it would be attached

15       to the closest tower in the area?

16  A   Generally speaking, the closer you are to a tower, the more

17       likely you are to connect to it, so, yes.

18  Q   Sometimes that may not be the case—

19  A   Correct.

20  Q   —based on the factors that you just talked about with the

21       jury?

22  A   Yes.

23  Q   Now, in that case, would another cellphone tower be activated

24       if—if prox—if something impeded the cellphone tower that's

25       closest to the person making the call or receiving the call,

1    would—another cellphone tower would be activated—Correct?—if

2    there was one—

3  A  Assuming there's one in the—

4  Q  Okay.  Go ahead.

5  A  Go ahead.  I'm sorry.

6  Q  —if—if one of those factors that you mentioned that might

7    impede the activation of a cellphone tower, correct?  So—So

8    one—

9  A  Yes.

10 Q  So, if one of those factors are in play, the cellphone would

11   go to another tower or activate another tower; is that fair to

12   say?

13 A  Assuming there's one in the area that can provide service,

14   yes, that is the way the network is designed.

15 Q  But, generally speaking, it's the closest tower that's

16   activated when a phone call is made?

17 A  Correct.

18 Q  Does it matter whether or not a call is being made in a city

19   or in a rural area or whatever type of area?  Does that matter

20   as to—

21 A  The dynamics of connecting to a tower are still going to be

22   the same whether it's in an urban area or rural area.

23 Q  Have you taken occasion to look at the records with regards to

24   the Samuel Steel case—the cellphone records?

25 A  Yes, I have.

```
 1   Q   Okay.  Now there are latitude and longitude signals on those
 2       records; is that fair?
 3   A   Yes.
 4   Q   Okay.  And what does that indicate?  If you can tell the jury
 5       what that indicates.
 6   A   The latitudes and longitudes that are provided—that Sprint®
 7       provided pursuant to the legal demand that we received,
 8       indicates the exact geographic location of our towers, of our
 9       physical mechanisms responsible for fielding radio traffic.
10   Q   Now is there a maximum distance—If I make a call, say, in the
11       city, is there a maximum distance as—as to where that
12       cellphone tower—or which cellphone tower can be activated?
13   A   Yes.
14   Q   Can you explain to the jury what that is.
15   A   As far as urban areas are concerned, there's a maximum
16       distance between the phone and the cellphone tower of two
17       miles, two miles again representing urban areas.
18              Now that's a nationwide average maximum distance
19       that also includes rural areas—Well—I'm sorry.—let me
20       backtrack.
21              Two miles is a maximum in urban areas.  If you were
22       in a rural area, the maximum distance would be ten
23       miles—again, maximum distance.  Obviously, your phone can be
24       right underneath a tower and connect to it accordingly.
25   Q   So proximity is the first and foremost factor, correct?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay. Two-mile maximum in a city in which an cellphone can |
| 3 | | activate a tower, correct? |
| 4 | A | Correct. |
| 5 | Q | And the latitude and longitude lines that were in these phone |
| 6 | | records that were submitted in this case dealt with where the |
| 7 | | cellphone tower that was being activated was located, correct? |
| 8 | A | Yes. |
| 9 | | MR. CUSICK: I have nothing further. |
| 10 | | Thank you, your Honor. |
| 11 | | THE COURT: Mr. Champion? |
| 12 | | CROSS-EXAMINATION |
| 13 | BY MR. CHAMPION: |
| 14 | Q | Sir, you said you took a four-week course on, if I understand |
| 15 | | this, recordkeeping and computer systems house phone records; |
| 16 | | is that correct? |
| 17 | A | The four-week training course was designated for learning the |
| 18 | | different systems that we use to provide the different types |
| 19 | | of phone records, the call records, the cell site information |
| 20 | | that we release. The course was designed to educate us on, |
| 21 | | first of all, how those records are retrieved, how they're |
| 22 | | maintained, and the information one can glean from them. |
| 23 | Q | So it dealt more with the records keeping aspect of your job; |
| 24 | | is that correct? |
| 25 | A | It had to do with the recordkeeping practices, but it also |

| | | |
|---|---|---|
| 1 | | taught us what one can glean from the records. And, by that, |
| 2 | | we were educated on cell site technology, how cellphone towers |
| 3 | | work and operate. |
| 4 | Q | Who provided that training? |
| 5 | A | Sprint®. |
| 6 | Q | And who taught the courses? |
| 7 | A | We had different trainers, two trainers in my class. |
| 8 | Q | What were their certifications or qualifications? |
| 9 | A | They worked in the legal compliance department with me. |
| 10 | | As far as their educational background, I really |
| 11 | | don't remember. |
| 12 | Q | So they weren't engineers of any type; is that correct? |
| 13 | A | Correct. |
| 14 | Q | And do you have an engineering degree in this field? |
| 15 | A | No, I do not. |
| 16 | Q | Have you ever taught any courses during the course of your |
| 17 | | career involving radio frequency or cell tower technology? |
| 18 | A | No, I have not. |
| 19 | Q | Now you stated that there's a number of factors that affect |
| 20 | | the operation of a cellphone tower; is that correct? |
| 21 | A | Correct. |
| 22 | Q | How—What is the wattage as it applies to a cellphone? |
| 23 | A | I'm sorry. Can you repeat that. |
| 24 | Q | What is—As far as what is and what does wattage do to affect |
| 25 | | the signal of a cellphone? |

```
 1   A   The wattage for a cellphone tower—

 2   Q   Or the cell—

 3   A   —that has to do with the—

 4   Q   Okay.  Go ahead.

 5   A   I'm sorry.  I missed what you said.

 6   Q   Go ahead.

 7   A   Okay.

 8   Q   Finish your answer, please.

 9   A   Wattage of a cellphone tower has to do with the overall

10       strength of a cellphone tower, that being one of the factors I

11       listed.  If a field tech were to increase the wattage of a

12       cellphone tower, that can increase the radius of cellphone

13       traffic that it's capable of handling.

14   Q   Are there studies that show that cellphone towers can receive

15       signals anywhere from four to 24 miles?

16   A   Twenty-four miles, I've never heard of that far.

17   Q   What's the farthest you've heard?

18   A   Ten miles.

19   Q   You've heard of that or—Through what?  Training, education,

20       experience, what?

21   A   Through my training and education, yes, ten miles is the

22       maximum.  Through questions I've bounced back and forth off of

23       radio frequency engineers at Sprint®, I understand the maximum

24       distance on our network being ten miles.

25   Q   Other networks?
```

```
 1  A    I can only speak to Sprint®.

 2  Q    Is there a difference between what type of signal is being

 3       emitted by a cellphone?

 4  A    I'm not sure what you mean by that.

 5  Q    Well, there's different types of systems—Correct?—cellphone

 6       system?

 7  A    Yes.

 8  Q    In the United States, how many different systems for cellphone

 9       operations are there?

10  A    Off the top of my head, obviously, there's Sprint®, who uses

11       CDMA technology.

12            We also have Nextel, which uses what's called

13       IDEN technology.

14            I also know GSM technology that's out there.

15            There's LTE.

16            There's WiMAX.

17            But those are the only systems I'm familiar with.

18  Q    Are you familiar with a CDMA system?

19  A    Yes, that's what we use on Sprint®.

20  Q    And there's also TDMA; is that correct?

21  A    Yes, there is.

22  Q    And UMTS?

23  A    Yes, I've heard of that.

24  Q    Now what is G technology?

25  A    If you're referring to GSM, I'm not familiar with it.  It's
```

```
 1        not unique to Sprint®.

 2   Q    So 1G, 2G, 2.5G, 3G, you're not familiar with that type of

 3        technology?

 4   A    Okay.  Now I know what you mean.  There's been different sort

 5        of generations of technology going way back to 1G, then

 6        progressing to 2G, 3G, 4G.  There's no strict definition for

 7        each of the Gs.  But, going into 3G, you start dealing with

 8        e-mail and different data that a phone's capable of sending

 9        and receiving; and 4G just capitalizes on that and makes it

10        faster.

11   Q    What's the difference between the analog systems and the

12        digital systems?

13   A    I really don't know.  That's—I don't know.

14   Q    Now antenna height affect the signal of a cellphone?

15   A    Yes, it can.

16   Q    And how do city buildings affect the signal of a cellphone?

17   A    That could be a line of sight issue.  If there's a big

18        building between you and a tower, a big city building can

19        impede on your ability to connect with.

20   Q    What is a cell tower dump?  You ever heard that—that phrase

21        before?

22   A    Yes.

23   Q    What is it?

24   A    What it is, as far as my experience as Sprint® is concerned,

25        we'll receive legal demands for a tower dump.  Upon receipt of
```

1    a valid legal demand requesting that, we provide all of the

2    incoming and outgoing phone calls that a specific tower was

3    sending and receiving, was responsible for transmitting.  So

4    it's a single call report off an individual tower.

5  Q  And why, typically, do you receive that request?

6  A  I'm not on the investigative end of it.  I don't know.  I just

7    comply with the legal demand.

8  Q  What's the difference between the cell tower address and the

9    latitude and longitude?

10 A  Latitude and longitude is a bit more specific than an address.

11   An address can be the corner of a block—It can stretch out

12   several yards.—whereas, the latitude and longitude is an exact

13   position.

14 Q  Now does a cellphone tower have different zones or sectors?

15 A  A standard cellphone tower will have three different sectors,

16   each of the sectors responsible for fielding different radio

17   frequency traffic, yes.

18 Q  What causes a cellphone signal to jump over another cell

19   tower?

20 A  Like I mentioned earlier, what your phone is doing is

21   constantly searching for the cell tower that's emitting the

22   strongest signal.  And I highlighted proximity as being the

23   primary indicator as to what tower you're going to use.

24           If you're moving—Whether you're on a bike, walking,

25   in a car, if you're moving, because of that constant search

```
 1        and because proximity is such a major factor, that can cause
 2        you to connect to one tower at the beginning of a phone call
 3        and another tower at the end.
 4   Q    Well, that's jumping from one tower.  What would cause one to
 5        jump over a tower?
 6   A    Oh, okay.  I'm sorry.  An individual tower could be overloaded
 7        with phone calls.
 8                  There could be a line of sight issue.
 9                  The overall strength of the cellphone tower could be
10        turned down.
11   Q    Now there's a term called cell-splitting zones.  What is that?
12   A    I don't want to make a guess as to what that is.  I—Can you
13        explain that a little bit more.
14   Q    What is a cell-splitting zone or overlapping coverage for an
15        area?
16   A    Sure.  You talked about sectors a second ago.  Each sector on
17        an individual tower is responsible for 130 degrees of radio
18        frequency traffic activity.  And, if you add that up, that
19        doesn't make any sense really because that's over 360 degrees.
20        Well, that's because—The reason it's more than 360 degrees is
21        because each individual sector is responsible for 65 degrees
22        in each direction.  The reason for the excess degrees—those
23        five extra degrees on each side is for overlap.
24   Q    What's the range or the space between the cell-splitting zones
25        in Kalamazoo?
```

1084

```
1   A   I don't know.

2   Q   How many towers—cell towers can a cell signal jump over?

3   A   Depends on the area, and I wouldn't be able to give specifics.

4   Q   So it could jump over more than one?

5   A   That can happen, yes, in an urban area.

6   Q   More than two?

7   A   That can happen in an extremely populated urban area, yes.

8   Q   Now does beam width affect the signal of a cellphone?

9   A   Yes, it does.

10  Q   How about the tilt of the antennas for a tower, does that

11      affect?

12  A   Yes, it does.

13  Q   And how does it affect it?

14  A   Beam width and the way an antenna stands, if those are

15      altered, that's going to affect the ability of the antenna to

16      cover or to field one area of radio frequency traffic activity

17      compared to another.  It's simply dictating which areas of

18      radio frequency activity it is capable of handling.

19  Q   Going back to your other—the—a follow-up question about

20      jumping over cellphone towers, is it—When a call is placed or

21      received, can a cellphone be in a different cell or sector

22      than where it's electronically captured?

23  A   Can you repeat that.

24  Q   Simply put, when a call on a cellphone is made or received,

25      can the cellphone be in another location than where the—the
```

1085

1   signal was electronically captured?

2   A   Well, yes.

3   Q   Now you provided records in this case—Is that

4       correct?—pursuant to a subpoena?

5   A   Correct.

6   Q   What records—

7   A   Yes.

8   Q   —did—What records did you provide?

9   A   Subscriber information, call detail records, cell site

10      information, and then the locations of cellphone towers.

11  Q   When you say cell tower information, what specific information

12      did you provide?

13  A   On the call detail record reports, there are two columns on

14      the very right-hand part of the document.  Those columns—first

15      and last cell or originating and terminating cell site—those

16      indicate the specific cellphone towers that a target number

17      was using at the beginning and end of the respective phone

18      calls.

19  Q   As part of the discovery, did you provide tower height, tower

20      location, elevations, downward—downward tilt information

21      specific to each tower?

22  A   No.

23  Q   Is there any additional cellphone information available that

24      was not requested to identify the locations where a cellphone

25      was registered or captured at the time that call was made or

1086

```
 1    received?

 2              MR. CUSICK:   Your Honor, I don't think he can

 3    testify to that.  There's no way that he has knowledge as to

 4    is there any other information that was not requested.

 5              MR. CHAMPION:   He's the keeper of—

 6              THE COURT:   Mr. Champion?

 7              MR. CHAMPION:   He's the keeper of the cellphone

 8    records.

 9              THE COURT:   If you know.

10              Overruled.

11              THE WITNESS:   I'm not aware of any, no.

12              MR. CHAMPION:   Thank you.

13              I have no objection information—or questions.

14              MR. CUSICK:   Very briefly.

15                        REDIRECT EXAMINATION

16   BY MR. CUSICK:

17   Q    With regards to the height of a tower or specific information

18        regarding a tower, would that regularly be within the phone

19        records that are given based on a subpoena?

20   A    No.

21              MR. CUSICK:   Nothing further.

22              Thank you, your Honor.

23              THE COURT:   Any rebuttal, Mr. Champion?

24

25
```

RECROSS-EXAMINATION
BY MR. CHAMPION:

Q     Wouldn't that be useful information to determine where a
      cellphone may or may not be located—the height of a tower, the
      beam width, the strength of the signal, the activity—

A     It might—

Q     —on the cell?

A     —be of assistance, yes.

                    MR. CHAMPION:   Thank you.

                    MR. CUSICK:   Nothing further, your Honor.

                    THE COURT:   Ladies and gentlemen, any questions for
      this witness?  If so, raise your hand.

                    And no hands are raised.

                    Thank you, sir.

                    I'm assuming he's excused from his subpoena, yes?

                    MR. CUSICK:   Yes, your Honor.

                    THE COURT:   Mr. Champion, any objections to that?

                    MR. CHAMPION:   No objection, your Honor.

                    THE COURT:   All right.  Thank you, sir.

                    MR. CUSICK:   Your Honor, at this time—

                    Can I call my next witness or—

                    THE COURT:   Just give me one second—

                    MR. CUSICK:   Okay.

                    THE COURT:   —if you would.

                    Go ahead.

1    MR. CUSICK:   Your Honor, at this time, we'd like to

2    call Nicholas Bobo.

3          THE COURT:   Before you have a seat, sir, please

4    raise your right hand.  Do you solemnly swear or affirm that

5    the testimony you're about to give will be the truth, the

6    whole truth, and nothing but the truth, so help you God?

7          MR. BOBO:   Yes, I do.

8          THE COURT:   Please have a seat, sir.

9          With that microphone, you need to pull it down so

10   it's right in line with your mouth.

11         I need you to state and spell your first and last

12   name for the record, please.

13         THE WITNESS:   Nicholas Bobo—N-i-c-h-o-l-a-s; last

14   name is Bobo—B-o-b-o.

                    NICHOLAS BOBO,

16   called at 9:50 a.m., and sworn by the Court, testified:

                 DIRECT EXAMINATION

18   BY MR. CUSICK:

19   Q   Good morning, sir.

20   A   Good morning.

21   Q   Mr. Bobo, how are you employed?

22   A   I'm employed as a U.S. probation and pretrial services

23       officer.

24   Q   Is that—That's with the federal government of the

25       United States?

                         1089

```
 1   A   Yes, sir, that's correct.

 2   Q   And did you have occasion to come into contact with a

 3       Devon Smith?

 4   A   Yes, I did.

 5   Q   Was he on bond to you?

 6   A   Yes, sir, he was.

 7   Q   And when was he on bond to you?

 8   A   He began his bond September 6$^{th}$ of 2011.

 9   Q   And until when?

10   A   Until January 17$^{th}$ of 2012.

11   Q   Did you have occasion to speak with a

12       Detective Brian Beauchamp?

13   A   Yes, I did.

14   Q   Was that pertaining to an investigation of a Samuel Steel?

15   A   Yes, it was.

16   Q   Were you asked to do anything by Detective Beauchamp?

17   A   Yes, I was asked to verify whereabouts of Mr. Smith in

18       November of 2011.

19   Q   Okay.  And, specifically, did Detective Beauchamp give you any

20       information as to what location to look at?

21   A   Yes, he did.  He told me to look at an address off of

22       Mabel Street in Kalamazoo.

23   Q   Okay.  Did you do so?

24   A   I did.

25   Q   I'm handing you People's exhibit 110—proposed exhibit
```

| | |
|---|---|
| 1 | number 110. Do you know what that is? |
| 2 | A Yes, this is the printout I provided Detective Beauchamp. |
| 3 | Q Okay. And does that indicate—What does that indicate? |
| 4 | A Mr. Smith was actually wearing a tether or a location |
| 5 | monitoring device on his ankle. So this actually shows the |
| 6 | whereabouts of where he was on November 19th of 2011 between |
| 7 | the hours of 1800 and 1823. |
| 8 | MR. CUSICK: Your Honor, I'd ask that People's |
| 9 | proposed exhibit 110 be admitted into evidence— |
| 10 | MR. CHAMPION: No objection. |
| 11 | MR. CUSICK: —and be published— |
| 12 | THE COURT: Give me— |
| 13 | MR. CUSICK: —to the jury. |
| 14 | THE COURT: —one second. |
| 15 | One-ten—Exhibit 110 is received. |
| 16 | BY MR. CUSICK: |
| 17 | Q If you can turn around, sir— |
| 18 | MR. CUSICK: I don't know if we have a stick or— |
| 19 | MS. HYBEL: Here. |
| 20 | THE COURT: Pardon? |
| 21 | BY MR. CUSICK: |
| 22 | Q Sir, now let me just ask you straightforward. Are you |
| 23 | familiar with this area? |
| 24 | A Not really, no. |
| 25 | Q Okay. I'm not going to ask you anything about the area |

```
 1        itself, but you indicated a time and location of Devon Smith.
 2        What time was this?
 3   A    What time was he at this location?
 4   Q    Yes.
 5   A    He was there from, it would be 6:00 o'clock p.m. until
 6        6:23 p.m.
 7   Q    Okay.  And this was—Mr. Smith, was he on a tether at the time?
 8   A    That's correct.
 9   Q    Okay.  It was a GPS tether?
10   A    That's correct.
11   Q    Okay.  So you can know, basically, his exact whereabouts at
12        that time; is that fair to say?
13   A    Within a few hundred feet, yeah.
14              MR. CUSICK:   May I approach, your Honor?
15              THE COURT:   Yes.
16   BY MR. CUSICK:
17   Q    Can you point—There are little green areas at that location,
18        little green dots all around south of Mabel Street.  Do you
19        see that?
20   A    Yes, I do.
21   Q    Describe to the jury what that is.
22   A    These green dots—
23              THE COURT:   Hold on a second.  Why don't you grab
24        that microphone right there, please, and talk into that so we
25        can hear you.
```

1      Go ahead, sir.

2            THE WITNESS:   These green dots right here

3      represents approximately where the defendant was—this case

4      being Mr. Smith—at this date and time.  So these green

5      dots—the grouping of them represent that he was most likely at

6      this house or this house on that date.

7  BY MR. CUSICK:

8  Q    Is there a reason why those dots are outside or—outside on the

9      right-hand side outside of the left-hand side by the tree in

10      the far left?

11  A    That dot there is most likely him either coming or going from

12      the residence.  If you were to take this screen and expand it

13      backwards, it would actually show me a path of the way he took

14      into the house.  So he'd either be going east on Mabel Street

15      or west on Mabel Street there on his way into the house.

16      You'd actually have to bring the screen back to be able to see

17      that.

18            When I was asked to pull this up, I was asked to

19      pull up where he was on Mabel Street; and this was the

20      location where he was at.

21  Q    Okay.  Did you look for the entire area or time that

22      Detective Beauchamp asked you to look for?

23  A    I had the whole day printout, yes.

24  Q    The whole what?

25  A    The whole day printout.  Yes, I did.

| | | |
|---|---|---|
| 1 | Q | And were you able to verify one way or the other if he was |
| 2 | | ever back on Mabel Street anytime in November or December? |
| 3 | A | No, he was not. |
| 4 | Q | Were you able to verify that or you just don't know if he was? |
| 5 | A | I was able to verify that. |
| 6 | Q | Okay. So he was on Mabel Street sometime in—This is |
| 7 | | November 19th, correct? |
| 8 | A | That's correct. |
| 9 | Q | Okay. |
| 10 | A | He was in the area of Mabel Street on three other dates that |
| 11 | | I'm aware of— |
| 12 | Q | Okay. |
| 13 | A | —but he was not— |
| 14 | Q | In November— |
| 15 | A | —at this residence. |
| 16 | Q | I'm sorry, sir. In November or December of 2011, correct? |
| 17 | A | Three dates in November and one date—December 5th, I believe it |
| 18 | | was.—he was in the area but not on Mabel Street. |
| 19 | Q | Okay. Does that indicate that he was traveling at all because |
| 20 | | of those green dots? |
| 21 | A | I'm assuming that, yeah, he was moving around. That's what it |
| 22 | | would indicate to me. |
| 23 | | MR. CUSICK: I have nothing further. |
| 24 | | Thank you. |
| 25 | | THE COURT: Mr. Champion, any questions? |

```
 1              MR. CHAMPION:   Yes.

 2                        CROSS-EXAMINATION

 3   BY MR. CHAMPION:

 4   Q   Good morning.

 5   A   Good morning, sir.

 6   Q   So, if I understand it correctly, on November 19th between

 7       6:00 p.m. and 6:23 p.m., he was at this location—

 8   A   Yes, sir, that's correct.

 9   Q   —for about 23 minutes?

10   A   Yes, that's correct.

11   Q   And looking at the map, it appears he was in this—around this

12       location right here?

13   A   Yes.

14   Q   In fact, it looks like he was inside this house?

15   A   I would say he was inside that house and into the yard of the

16       next house, as well as the alleyway in between.

17   Q   Do you know who resides at that house?

18   A   No, I don't.

19   Q   Did he register to go to any specific location?

20   A   On November 19th?

21   Q   On November 19th.

22   A   No, he was allowed to go to Kalamazoo, Michigan.

23              MR. CHAMPION:   Thank you.

24              I have no other questions.

25              MR. CUSICK:   I have nothing further.
```

```
 1                THE COURT:   Ladies and gentlemen, do you have any
 2       questions for this witness?  If so, just raise your hand.
 3                No hands are raised.
 4                Thank you, sir.  You may—
 5                THE WITNESS:   Thank you, your Honor.
 6                THE COURT:   —step down.
 7                He's excused from his subpoena, Counsel?
 8                MR. CUSICK:   Yes, your Honor.
 9                THE COURT:   Any objections to that, Mr. Champion?
10                MR. CHAMPION:   Pardon?
11                THE COURT:   He's excused?
12                MR. CHAMPION:   Yes, your Honor.
13                THE COURT:   You don't need to recall him.
14                Thank you.
15                Next witness?
16                MR. CUSICK:   Your Honor, for a very limited
17       purpose, we have one last witness.  That's
18       Detective Beauchamp.
19                THE COURT:   Before you have a seat, sir, please
20       raise your right hand.  Do you solemnly swear or affirm that
21       the testimony you're about to give will be the truth, the
22       whole truth, and nothing but the truth, so help you God?
23                MR. BEAUCHAMP:   I do.
24                THE COURT:   Please have a seat, sir.
25                I just need you to state your full name for the
```

| | |
|---|---|
| 1 | record this time, not spell it. |
| 2 | THE WITNESS:  Brian Beauchamp. |
| 3 | BRIAN BEAUCHAMP, |
| 4 | recalled at 9:58 a.m., and resworn by the Court, |
| 5 | testified: |
| 6 | DIRECT EXAMINATION |
| 7 | BY MR. CUSICK: |
| 8 | Q    Detective Beauchamp, are you familiar with the area of |
| 9 | Mabel Street? |
| 10 | A    Yes, I am. |
| 11 | Q    How often have you been to that area? |
| 12 | A    Several times in my career. |
| 13 | Q    Okay.  Now I want to point to . . . (inaudible) stick.  Are |
| 14 | you aware of what this house is? |
| 15 | A    That is 626 Mabel. |
| 16 | Q    Okay.  Are you aware of—I don't want to block anybody |
| 17 | here.—this house right here? |
| 18 | A    That's 623 Mabel. |
| 19 | Q    This house right here? |
| 20 | A    629. |
| 21 | Q    Do you know whose house this is? |
| 22 | A    That's Sam Steel's mother's residence— |
| 23 | Q    Okay. |
| 24 | A    —at the time of the investigation. |
| 25 | MR. CUSICK:   Okay.  I have nothing further. |

1097

```
 1                    CROSS-EXAMINATION

 2  BY MR. CHAMPION:

 3  Q    Detective, as I understand it—

 4               MR. CHAMPION:   . . . (inaudible)

 5  BY MR. CHAMPION:

 6  Q    —in November of 2011, was Sam Steel living at this residence?

 7  A    I don't believe so.

 8  Q    And, if you know, who lived in this residence next door?

 9  A    That was the residence of J.P. Jones.

10  Q    Is that the godfather to—if you know—to Devon Smith?

11  A    I don't know.

12               MR. CHAMPION:   Thank you.

13               I have no other questions.

14               MR. CUSICK:   I have nothing further.

15               THE COURT:   Thank you, sir.

16               Oh, I'm sorry.  Ladies and gentlemen, any questions

17      for this witness?

18               No hands are raised.

19               Thank you, sir.  You may step down.

20               THE WITNESS:   Thank you.

21               MR. CUSICK:   Can we approach, your Honor?

22               THE COURT:   Yes.

23               (At 10:00 a.m., bench conference as follows:

24                  MR. CUSICK:   Your Honor, we're going to rest.

25               I don't think we officially put on the record—I
```

```
 1           think we did it in preliminary jury
 2           instructions.—but the felon in possession of a
 3           firearm.
 4                 THE COURT:   You did—
 5                 MR. CUSICK:   There's—
 6                 THE COURT:   I don't think you have either.
 7                 MR. CUSICK:   There's a stipulation.  So I
 8           would just ask that I can state the stipulation or
 9           the Court can, but there's a stipulation the
10           defendant was convicted of a specified felony and
11           was not eligible to carry a firearm on April 24th of
12           2011.
13                 THE COURT:   And you agree with that?
14                 MR. CHAMPION:   Yeah.
15                 THE COURT:   Why don't you just indicate
16           that—before you rest, then, that there is a
17           stipulation of the parties indicating that—
18                 MR. CUSICK:   Okay.
19                 THE COURT:   —and then we can add that to the
20           jury instructions if we need, I mean—
21                 MR. CUSICK:   Okay.
22                 THE COURT:   —as a stipulation later—
23                 MR. CUSICK:   Okay.
24                 THE COURT:   —certainly.)
25           THE COURT:   Any—Anything further—
```

```
 1          MR. CUSICK:   Yes, your Honor.

 2          THE COURT:   —Mr. Cusick?

 3          MR. CUSICK:   There is a stipulation between defense

 4     counsel and the People, and that is that the defendant

 5     Samuel Steel was convicted of a specified felony and was not

 6     eligible to possess a firearm as of—on April 24th of 2011.

 7          THE COURT:   Mr. Champion, do you agree with that?

 8          MR. CHAMPION:   I do, your Honor.

 9          MR. CUSICK:   And that's for count three.

10          THE COURT:   I'm sorry?

11          MR. CUSICK:   That's for count three.

12          THE COURT:   Thank you.

13          Anything else, Mr. Cusick?

14          MR. CUSICK:   Your Honor, at this time, the People

15     would rest.

16          THE COURT:   Counsel, will you approach again,

17     please.

18          (At 10:02 a.m., bench conference as follows:

19          THE COURT:   Okay.  Anything we need to address

20          before we go into your witnesses?

21          MR. CHAMPION:   Could I have just a short

22          recess?  One of my witnesses just showed up.

23          . . . (inaudible) to speak to him briefly.

24          THE COURT:   Ten, 15 minutes or so?

25          MR. CHAMPION:   Pardon?
```

```
 1                    THE COURT:   Ten, 15 minutes?

 2                    MR. CHAMPION:   . . . (inaudible)

 3                    THE COURT:   Okay.  And then you have how many?

 4                    MR. CHAMPION:   I have two.

 5                    THE COURT:   This morning?

 6                    MR. CHAMPION:   Two this morning.  I had four,

 7             I have two.

 8                    THE COURT:   How long do you think you're going

 9             to be?

10                    MR. CHAMPION:   Charles Thompson [sic] will

11             probably be 45 minutes to an hour.

12                    MR. CUSICK:   . . . (inaudible)

13                    THE COURT:   For both?

14                    MR. CHAMPION:   Pardon?

15                    THE COURT:   Both together or each?

16                    MR. CHAMPION:   Each.

17                    THE COURT:   Oh, okay.  So that'll get us up to

18             lunch.

19                    MR. CHAMPION:   . . . (inaudible)

20                    THE COURT:   What do you have this afternoon?

21                    MR. CHAMPION:   I have five witnesses.

22                    THE COURT:   Okay.)

23             THE COURT:   All right.  We're going to take a quick

24       break.  So about ten, 15 minutes I'll bring you back down.

25                    Please remember all of my prior instructions.
```

1   Ms. Wint should be here momentarily.

2   Just keep your notebooks on your chairs.

3   All rise.

4   (At 10:03 a.m., jury exits courtroom)

5   You may be seated.

6   MR. CUSICK:   The door's closed, your Honor.

7   THE COURT:   Thank you.

8   MR. CUSICK:   . . . (inaudible)

9   THE COURT:   Anything we need to address, then,

10  Counsel, before we take a break?

11  MR. CUSICK:   No, your Honor.

12  MR. CHAMPION:   No, your Honor.

13  THE COURT:   Mr. Champion?

14  All right.  We'll take a quick break.

15  Court's in recess.

16  (At 10:04 a.m., court recessed)

17  (At 10:25 a.m., proceedings reconvened)

18  THE CLERK:   The court recalls the case of People of

19  the State of Michigan versus Samuel Steel, III, case number

20  C11-1983 FC.

21  Parties, please restate appearances for the record.

22  MR. CUSICK:   Paul Cusick on behalf of the People,

23  your Honor.

24  MR. CHAMPION:   May it please the Court,

25  Robert Champion appearing on behalf of Sam Steel.

1102

1  THE COURT:  All right.  Counsel, we do have one

2  thing to place on the record.  We did have a discussion in

3  chambers.  It's our understanding that, when Mr. Steel was

4  leaving the court and going into the stairway, apparently, the

5  jurors were a little bit delayed in going up the stairway.  So

6  my understanding is that the deputy opened the door, Mr. Steel

7  was behind him.  Ms. Wint and one juror were actually the last

8  two, then, on their way up the stairwell from what we

9  understand in speaking with Ms. Wint.

10  And she indicated that the juror—who I believe is

11  the juror in seat—seat number seven—We moved—He's the last one

12  in the front row.  And my recollection is, also, he was the

13  last one out of the courtroom, also, because we moved the

14  juror in seat number eight closer to the juror in seat number

15  one.

16  But she—He said something to the effect of

17  Mr. Steel—the defendant is—was just about to come up the

18  stairs with us or something to that effect.

19  She asked—kind of away from the other jurors from

20  what I understand—what did you see, are you sure that was him.

21  And he said he saw the deputy and he saw Mr. Steel's

22  foot or something to that effect, but that was the only thing

23  that she believed that he saw.

24  And I think that's kind of everyone's recollection

25  based on the information that we have.

1    Is the door open or shut?

2    MR. CUSICK:  It's shut.

3    THE COURT:  Okay.

4    We did have a discussion about whether we should do

5    anything about the situation, if it needs to be addressed, if

6    we need to bring the juror in; and my understanding is that

7    everyone's satisfied that they don't believe the juror saw

8    Mr. Steel's face or his body—

9    And Mr. Steel's shaking his head in agreement with

10   that, too.

11   THE DEFENDANT:  He was in and out.  He couldn't see

12   anything.

13   THE COURT:  He was in and out.  Door open and shut.

14   All right.

15   THE DEFENDANT:  . . . (inaudible) blocked

16   basically.  They didn't see . . . (inaudible)

17   MR. CHAMPION:  Yeah—

18   THE COURT:  So—

19   MR. CHAMPION:  —that's my understanding that all he

20   saw was a pant leg, didn't see handcuffs, didn't see anything

21   of that nature.  Really couldn't tell who it was other than he

22   recognized the deputy.

23   THE COURT:  Okay.  So I appreciate that.  It sounds

24   like you had a conversation with Mr. Steel about his version

25   of events, too.

1      So we're all comfortable moving forward then; is

2 that correct?

3           MR. CUSICK:   Yes, your Honor.

4           MR. CHAMPION:   Yes, your Honor.

5           THE COURT:   And so I appreciate that, Counsel.

6           Are they out in the hall?  Does—Did she open the

7 door?  No.  . . . (inaudible) heard the door open.  Now she's

8 here.

9           All rise.

10          (At 10:27 a.m., jury returns to courtroom)

11          You may be seated.

12          All right.  Welcome back, ladies and gentlemen.

13          So Mr. Cusick rested his case then when we took the

14 break, so I'm going to turn it over to Mr. Champion at this

15 point.

16          You recall that, when I gave you the initial

17 instructions, Mr. Champion had the option of giving an opening

18 statement at the beginning or reserving and giving it later or

19 not giving one at all.  So I don't—I will turn it over to him

20 as to whether or not he plans to give an opening statement at

21 this point.

22          MR. CHAMPION:   I do, your Honor.

23          THE COURT:   All right.  So go ahead, sir.

24          MR. CHAMPION:   Good morning.

25          UNIDENTIFIED JURORS:   Good morning.

1    THE COURT:   As the Court stated, we have no
2    obligation in a criminal case to even present a defense
3    because the prosecution has the burden in this case.

4         What you're going to hear from the defense is,
5    first, you're going to hear from Charles Thomas.
6    Charles Thomas, it was actually his house where the shooting
7    took place.

8         Charles Thomas looked at Sam Steel, you'll hear, as
9    his big brother.  He looked at Milo Conklin as his little
10   brother.  He will tell you he was there at the time.  He saw
11   the individual walk back through the cut right by the car.  In
12   fact, he'll tell you that he initially thought the person in
13   this black sweatshirt was getting out of the vehicle that
14   Milo Conklin had just arrived in.  He'll tell you that the
15   person walked up, shot Milo four to five times, and then went
16   across the street as we've heard.  That's what—That's what
17   Charles will tell you.  He'll tell you it was not Sam Steel.

18        He's—He has known Sam Steel for 30 years.  He will
19   tell you that evening they were having, in essence, a block
20   party for all practical purposes.  Charles Thompson [*sic*] had
21   Milo . . . (inaudible) individuals over.  Sam Steel was doing
22   a barbecue and had a group of individuals over.  They were
23   milling about, going back and forth, sharing food, sharing
24   beers and that, at the time of the shooting, Sam Steel was
25   across the street at his mother's residence.

1106

And Charles Thompson [*sic*]—Excuse me.—will absolutely tell you it was not Sam Steel; that the individual that he saw—He didn't see his face clearly; but his size, his stature, and what he did see, it was not Sam Steel.

Then you'll hear from Tommy Morgan.  Tommy Morgan will say he was at Sam Steel's that day.  He was part of . . . (inaudible).  He was part of the—the party.  He will say at the time of the shooting he was standing right next to Sam Steel, right next . . . (inaudible) and that Sam Steel was not part of the shooting.

You'll hear from Jerry Davenport.  Again, he was at the party.  He was there.  He was across the street at Sam's, and he'll tell you the same thing . . . (inaudible) Charles Thomas . . . (inaudible); that it was not Sam Steel who came from the shadow, shot Milo, and continued on.  It was not.

You'll hear from other individuals, including Lee Logan, who will say that he was in Newaygo with Walter Johnson.  He was in Newaygo with Devon Smith.  He was in Newaygo with Richard Smith.  And he will tell you that Walter Johnson and Devon Smith did have conversations, did talk about how to reduce their sentences and what they had to do in the situation.

You will hear from Antonio Williams and Marcus Pearce who will, again, basically, give you the same

1    information: it's—it was not Sam Steel, he was not involved

2    with this.  He was on the porch, as we've heard from

3    Detective Beauchamp.  He was on the porch at the time of the

4    shooting.

5              And, when you hear all this evidence, you will find

6    my client not guilty.

7              Thank you.

8              THE COURT:    Thank you, Mr. Champion.

9              Your first witness, sir?

10             MR. CHAMPION:    Your Honor, we'd call—Let me check

11   in the hallway just a moment.

12             (At 10:33 a.m., Mr. Champion exits courtroom and

13                  returns momentarily)

14             Call Tommy Morgan to the stand, your Honor.

15             THE COURT:    Right over here, sir.  Right over here,

16   sir.

17             Before you have a seat, please raise your right

18   hand.  Do you solemnly swear or affirm that the testimony

19   you're about to give will be the truth, the whole truth, and

20   nothing but the truth, so help you God?

21             MR. MORGAN:    Yes.

22             THE COURT:    Please have a seat, sir.

23             With that microphone, you need to stay—Scoot up

24   closer to the microphone.  Speak right in the end of it.

25             THE WITNESS:    Okay.

```
 1            THE COURT:  If you pull back too far or move to
 2      either side, it won't pick up what you're saying, just so that
 3      you know that.  It's very hard to hear in this court.
 4            I need you to state and spell your first and last
 5      name for the record, please.
 6            THE WITNESS:   Tommy Morgan—T-o-m-m-y M-o-r-g-a-n.
 7            THE COURT:   Mr. Champion?
 8            MR. CHAMPION:   Thank you, your Honor.
 9                         TOMMY MORGAN,
10      called at 10:34 a.m., and sworn by the Court, testified:
11                       DIRECT EXAMINATION
12 BY MR. CHAMPION:
13 Q    Charles [sic], directing your attention to April 24th, 2011, do
14      you recall where you were at at that time?
15 A    Yes.
16 Q    Where were you?
17 A    On Mabel Street.
18 Q    And do you know the address?
19 A    I'm not really sure of the address.
20 Q    Whose house were you at?
21 A    At Sam's mother house.
22 Q    And, when you say Sam, is that Sam Steel?
23 A    Yes.
24 Q    Is he present in the courtroom today?
25 A    Yes.
```

1    Q    Where is he located, and what is he wearing?

2    A    Over at the table in the right-hand corner.

3    Q    Now, if you recall, on April 24th, 2011, was Sam Steel—did he

4         have the same facial hair that he has today, or did he have a

5         goatee of some sort?

6    A    He had a beard.

7    Q    Pardon?  A beard?

8    A    Yeah, goatee.

9    Q    And it was pretty obvious?

10   A    Yes.

11   Q    So, on April 24th, 2011, you were at Sam Steel's.  Do you

12        recall what time you arrived there?

13   A    It was pretty early.  Sam had picked me up early that morning,

14        so we had been out—He picked me up about 10:00 o'clock that

15        morning, and we went and got meat and stuff 'cause we barbecue

16        it for his mother for Easter.  So it was a all-day thing.

17   Q    And this was at his address on Mabel Street?

18   A    Yes, it was.

19   Q    So you had a barbecue.  Was there—How many individuals were at

20        this gathering?

21   A    I want to say roughly maybe ten people.

22   Q    And was there also a gathering across the street?

23   A    I do recall something going on across the street.

24   Q    Do you know a Charles Thomas?

25   A    Yes, I do.

| 1  | Q | And was this gathering at Charles Thomas's house? |
| 2  | A | Yes, it was. |
| 3  | Q | And do you know who was at that? |
| 4  | A | Well, Chuck—We call him Charles.  We all call him Charles. |
| 5  |   | Chuck, Milo, and it was three or four other guys out there, |
| 6  |   | but I didn't know them. |
| 7  | Q | Were there girls—women there, also? |
| 8  | A | I don't recall seeing any females.  I remember the guys. |
| 9  | Q | There could have been, but that was two years ago; is that |
| 10 |   | correct? |
| 11 | A | Correct. |
| 12 | Q | So do you know who was at—Was a Jerry Davenport at Sam Steel's |
| 13 |   | mother's house? |
| 14 | A | I remember seeing Jerry Davenport. |
| 15 | Q | Now at some point in time something happened across the street |
| 16 |   | from Sam's house—a shooting.  Do you recall that? |
| 17 | A | Yes, I do. |
| 18 | Q | Do you recall what time that was? |
| 19 | A | I can't recall the— |
| 20 | Q | Was it— |
| 21 | A | —exact time. |
| 22 | Q | Was it light, dark out?  Do you recall? |
| 23 | A | It was just starting to get like dark. |
| 24 | Q | Could it have been approximately 9:00 o'clock or sometime in |
| 25 |   | that area? |

| | | |
|---|---|---|
| 1 | A | I want to say it was in the—in the time frame between 9:00, |
| 2 | | 9:30. |
| 3 | Q | Somewhere in that area? |
| 4 | A | Yeah. |
| 5 | Q | Now what did you see? |
| 6 | A | I seen a guy coming from Florence Street dressed in a black |
| 7 | | hoodie, black sweatpants, a light-skinneded [*sic*] guy with |
| 8 | | light facial hair walking across the street. I nods my head |
| 9 | | at him as he was approaching across the street to Chuck's |
| 10 | | house. The next thing I know, I heard gunshots; and we all |
| 11 | | dived on Sam's mother porch for shelter. |
| 12 | Q | When you say you, who was with you at that time? |
| 13 | A | Me—There was quite a few people on the porch. Sam was around. |
| 14 | | Like I say, it was—it was dark on the porch, so all I know is |
| 15 | | that Sam was present at the time of the shooting. |
| 16 | Q | Now you said you actually saw the person that— |
| 17 | A | I caught a glimpse of him. |
| 18 | Q | Okay. You nodded at him; is that your testimony? |
| 19 | A | Just like nods my head at him and he nods his head back, and |
| 20 | | he went across the street; and, a couple minutes later, I |
| 21 | | heard gunshots. |
| 22 | Q | Did you actually see the shooting or you just heard the |
| 23 | | gunshots? |
| 24 | A | I—I'm right across the street from it, so I seen the guy when |
| 25 | | he brandished the gun and he started shooting. And then, |

1112

1    after the shooting, he turnt [*sic*] around.  He didn't—didn't

2    run, he walked back through the cut on Florence Street and

3    proceeded to get in a truck and speeded off.

4  Q  What type of truck, if you saw, did he get into?

5  A  I know it was a white truck.  I don't know exactly what kind

6    of truck it was.

7  Q  Did you know this individual?

8  A  No, I didn't.

9  Q  Would you recognize him if you saw him again?

10  A  No, I didn't.

11  Q  So you just saw a glimpse of him.  Was it Sam Steel?

12  A  No, it wasn't.

13  Q  He was with you?

14  A  Sam was on Mabel Street the night of the shooting.

15  Q  And, as it was going down, he was next to you on the porch; is

16    that—

17  A  That's correct.

18  Q  — . . . (inaudible)

19        Now how long have you known Sam?

20  A  I been knowing Sam since 1992.

21  Q  So you're pretty close with him?

22  A  Yes.

23  Q  Now has anyone offered you anything to testify here today?

24  A  No, they haven't.

25  Q  Have they threatened you?

1113

```
1   A    No, they haven't.

2   Q    It's your own choice?

3   A    Yes, sir.

4   Q    No promises, anything of that nature?

5   A    None of the sort.

6   Q    Now you said that Sam lived across the street from where the

7        shooting took place.  If you know, did Sam have any bad blood

8        with Charles Thomas or Milo Conklin?

9   A    Not to my knowledge.

10  Q    Now you've known Sam for quite some time?

11  A    That's correct.

12  Q    Since 1992, so 30 years, thereabouts?

13  A    Exactly.

14  Q    Does he have a reputation in the community as far as

15       peacefulness?

16  A    Like I say, I been knowing Sam since '92; and I have never

17       ever seen the guy get into a confrontation with anybody,

18       arguments.  He's a pleasant guy.  You know what I'm saying?

19  Q    You ever seen him with a gun?

20  A    No.

21  Q    Ever known him to have a gun?

22  A    No, sir.

23  Q    So you say you've never seen him get into confrontations, so

24       his reputation is one of peacefulness?

25  A    Sam ain't never had no disturbancies far as I know in
```

```
 1        Kalamazoo.  He may be a lot of things, but a murderer, he's

 2        not.

 3   Q    He's not violent is what you're saying?

 4   A    No.

 5   Q    So this evening that you're—On April 24th, you're having a

 6        barbecue, drinking beers; is that correct?

 7   A    That's correct.

 8   Q    Now in the community that you live—Okay.—in the Mabel Street

 9        area, are there certain codes of ethics, in essence, or

10        standards that people abide by?

11   A    You mean far as the street conduct code?

12   Q    Yes.

13   A    Yeah, I mean, you know, certain people got certain things that

14        they honor far as street conduct.

15   Q    Would doing something like this in front of your mother's

16        house, would that be normal in your community?

17   A    No.

18   Q    Why?

19   A    Because, for one, like I say, Sam got a lot of respect for his

20        mother.  And then, you know, the people that he associate with

21        got a lot of respect for his mother.  So that kind of thing

22        just—you know, in my eyesight, it just—it wouldn't happen.

23   Q    They wouldn't bring it to Sam's mother's front door?

24   A    No, sir.

25   Q    Did you see what type of gun was used?
```

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | Just heard it? |
| 3 | A | Just heard the boom. |
| 4 | Q | And you saw the person walk towards Florence Street and get |
| 5 | | into a white vehicle? |
| 6 | A | Yes, sir. |
| 7 | Q | When you say a white vehicle, was it a truck, a car—Do you |
| 8 | | know?—SUV? |
| 9 | A | I want to say a SUV. |
| 10 | Q | And could you see who was driving? |
| 11 | A | No, sir. |
| 12 | Q | Now you were on the porch when this occurred.  Did you get off |
| 13 | | the porch to see where that person went, or did you stay on |
| 14 | | the porch? |
| 15 | A | I stayed on the porch, 'cause I was in quite a bit of shock |
| 16 | | after the situation had happened—the incident. |
| 17 | Q | How would you describe the shooter?  How old was the person? |
| 18 | A | I would say he was a young guy, 26, maybe 27 years old. |
| 19 | Q | How tall? |
| 20 | A | Five-eight maybe. |
| 21 | Q | And thin, heavy, stocky? |
| 22 | A | Hundred and seventy-five pounds— |
| 23 | Q | Thereabouts? |
| 24 | A | —may 180 pounds at the most. |
| 25 | Q | Slim, would you characterize it, or average build? |

```
1   A    Average build.

2   Q    So you're on the porch at Sam's mother's house—

3   A    That's correct.

4   Q    —when the shooting took place—

5   A    That's correct.

6   Q    —and Sam was right next to you?

7   A    Yes, he was.

8   Q    Has anyone told you what to say here today?

9   A    No, they haven't.

10  Q    Were you ever interviewed by the police?

11  A    No, sir.

12  Q    Now, if you know, is there any bad blood between Sam Steel and

13       Detective Beauchamp?

14              THE COURT:   I'm sorry.  Who?

15              MR. CHAMPION:   Detective Beauchamp.

16              THE WITNESS:   Beauchamp been trying—been having it

17       out for Sam for years.

18  BY MR. CHAMPION:

19  Q    Is that personal knowledge, or is that just rumor that you

20       have?

21  A    I don't—I don't believe it's a rumor.  I think there's some

22       truth to it.

23              MR. CUSICK:   Your Honor, if he doesn't have

24       personal knowledge, I'd ask that testimony be stricken from

25       the record.  . . . (inaudible)
```

```
 1              THE COURT:   Wait.  Hold on.

 2              What's your response to the objection?

 3              MR. CHAMPION:   I asked the question.  I guess he

 4       wasn't finished.

 5  BY MR. CHAMPION:

 6  Q    Do you have personal knowledge of that?

 7              THE COURT:   Wait.  Hold on a second.

 8              What's the response to the objection?

 9              MR. CHAMPION:   I agree he hasn't—I was trying to

10       get to that.

11              THE COURT:   Okay.

12              MR. CHAMPION:   . . . (inaudible)

13              THE COURT:   So the jury is to disregard the last

14       question and his response.

15              Go ahead, Mr. Champion.

16  BY MR. CHAMPION:

17  Q    Do you have any personal knowledge of that information?

18  A    I done heard a lot of talk from the street.

19              MR. CUSICK:   Again, your Honor, any hearsay

20       testimony from what he hears from the street . . . (inaudible)

21              MR. CHAMPION:   Well, he was just saying where he

22       received information.  He wasn't saying . . . (inaudible) He's

23       explaining.

24              THE COURT:   Okay.  I think the question is does he

25       have personal knowledge.
```

```
 1                    MR. CHAMPION:   Exactly.

 2                    THE COURT:   You need to answer that question

 3        specifically.

 4                    THE WITNESS:   No, sir.

 5                    THE COURT:   Okay.  Thank you.

 6   BY MR. CHAMPION:

 7   Q    Now, after the shooting took place, did you stay at that

 8        location?  Did you leave?  What did you do?

 9   A    I stayed at the location.

10   Q    And did the police ever come to speak to you at that point in

11        time?

12   A    No, the only one I ever talked to was the Channel 3 news

13        reports.

14   Q    No one else?

15   A    No one else.

16   Q    So, at the time of the shooting, do you recall what Sam was

17        wearing?

18   A    I want to say blue jeans.  It's kind of hard to remember; but,

19        you know, Sam usually a blue jean type wearing guy, T-shirt.

20   Q    So you don't recall.  Was he wearing a black hoodie and black

21        sweats?

22   A    No.  No, sir.

23   Q    And he had full facial hair?

24   A    Yes, sir.

25   Q    It was very obvious.
```

```
 1   A    Yes, sir.

 2   Q    Did you ever see Sam and Milo have an argument that evening?

 3   A    No, I didn't.

 4   Q    Was anything ever said by Sam saying I'm upset with Milo?

 5   A    Not to my knowledge.

 6   Q    You never saw anything like that?

 7   A    Never seen it.

 8                  MR. CHAMPION:    Thank you.

 9                         CROSS-EXAMINATION

10   BY MR. CUSICK:

11   Q    Good morning.

12                  Have you been convicted of a crime—And I want you to

13        listen to my question.—a crime of theft, dishonesty, or fraud

14        in the last ten years?

15   A    No, sir.

16   Q    So you weren't convicted of retail fraud?

17   A    Retail fraud, yes.

18   Q    Okay.  Is that a crime of theft, dishonesty—

19   A    Okay.

20   Q    —or fraud?

21   A    Yes.  Yeah.  Okay, yes.

22   Q    How many times have you been convicted of retail fraud?

23   A    Maybe about seven, eight times.

24   Q    Are there any other crimes of theft, dishonesty, or fraud in

25        the last ten years that you've been convicted of?
```

1120

| 1 | A | I had a uttering and publishing case. |
| 2 | Q | That was recent, correct? |
| 3 | A | Yes. |
| 4 | Q | It's a felony, correct? |
| 5 | A | Yes. |
| 6 | Q | And that was in 2013— |
| 7 | A | Yes. |
| 8 | Q | —correct? |
| 9 | | That was on June 4th of 2013? |
| 10 | A | Yes. |
| 11 | Q | You never talked with the police; is that correct? |
| 12 | A | That's correct. |
| 13 | Q | So you're friends with Sam Steel, right? |
| 14 | A | Yes. |
| 15 | Q | Known him since 1992, right? |
| 16 | A | That's correct. |
| 17 | Q | He's close with you, fair to say then? |
| 18 | A | That's correct. |
| 19 | Q | You live—You lived on Mabel Street on April 24th of 2011, |
| 20 | | correct? |
| 21 | A | No, I don't live on Mabel Street.  I was at that address that |
| 22 | | night— |
| 23 | Q | Okay. |
| 24 | A | —of the incident. |
| 25 | Q | So do you hang out at Mabel Street a lot? |

```
 1  A   No, I don't.

 2  Q   So how can you testify to the code of conduct on Mabel Street

 3      if you never went there?

 4  A   I mean, 'cause I'm a street person—

 5  Q   Okay.

 6  A   —you know.  I'm a street guy, so I know pretty much, you know,

 7      the talk of the street and what goes on in the street 'cause

 8      I'm a street person.

 9  Q   Do you know the term snitch?

10  A   Pardon me?

11  Q   Do you know what the term snitch is?

12  A   Yes, I know what a snitch is.

13  Q   What is a snitch?

14  A   A person that rats on his friends or other people.

15  Q   It's somebody that comes to court and testifies?

16  A   If that's what you want to call it.

17  Q   Okay.  What happens to snitches?

18  A   They get stitches.

19  Q   So April 24th, 2011, you didn't talk to the police that day?

20  A   No, sir.

21  Q   Came a time that you found out Sam Steel was charged with

22      homicide, charged with murder; is that correct?

23  A   Correct.

24  Q   That was in December of 2011; would you agree with that?

25  A   I guess that's when they picked him up.
```

1    Q    Okay.  From December of 2011 until all of the rest of 2012—all

2         of 2012—were you aware that Sam Steel was in Georgia?

3    A    No, I wasn't.

4    Q    Okay.  Were you aware that the police were looking for

5         Sam Steel at the time?

6    A    Yes, I was.

7    Q    So the police were looking for Sam Steel for murder—for the

8         murder of Milo Conklin, correct?

9    A    That's what I was told, yes.

10   Q    Okay.  And not at all did you come forward and say, hey, I

11        have information that might be important that Sam Steel didn't

12        do it?  You never came forward and told the police that?

13   A    Well, that reason was because—You know, first of all, I wasn't

14        contacted any—with any police officers about the incident, you

15        know.  And then, you know, I work; so I, you know, I really

16        didn't want to be taken off of my jobs and, you know—'cause I

17        had just got this job, so, you know.

18   Q    So you didn't want to take the time away from your job, call

19        the police and say, hey, I have information about a homicide

20        that occurred?

21   A    Well, I felt like if it was that—that important to the police

22        officers that they would have contacted me.  I was never

23        contacted until about a month ago.

24   Q    Who contacted you?

25   A    I'm not—can't recall the officer name, but—

                                1123

| | | |
|---|---|---|
| 1 | Q | Was it Carl Clatterbuck? |
| 2 | A | I'm not sure.  But I did receive a call from |
| 3 | | Detective Beauchamp one day last week in my home.  My wife had |
| 4 | | told me that he called. |
| 5 | Q | Did you call him back? |
| 6 | A | No, I didn't. |
| 7 | Q | Okay.  So did you ever talk with anybody from the Kalamazoo |
| 8 | | police department and give a statement? |
| 9 | A | No, I didn't. |
| 10 | Q | So, after the defendant was apprehended and arrested August of |
| 11 | | 2012, you were aware that he was arrested in Georgia? |
| 12 | A | Yes, I was. |
| 13 | Q | For a whole year you didn't come forward and say, hey, you got |
| 14 | | the wrong guy, this is what happened? |
| 15 | A | Well, I'm sure if the justice system is fair and it's right, |
| 16 | | I'm sure they will find out that he—that he was a innocent |
| 17 | | man. |
| 18 | Q | What does Sam Steel do for a living? |
| 19 | A | I can't tell you—Dogs, far as I know.  Breed and sell dogs. |
| 20 | Q | Okay.  You indicated that he was a upstanding citizen in the |
| 21 | | community.  Well— |
| 22 | | MR. CHAMPION:  Your Honor, I'm going to object to |
| 23 | | that question.  That's not the testimony that he gave.  He |
| 24 | | said he was not violent, but— |
| 25 | | MR. CUSICK:  I'll—I'll rephrase the question. |

```
 1                    THE COURT:    Thank you.

 2   BY MR. CUSICK:

 3   Q     Did you know Milo Conklin?

 4   A     Yes, I do.

 5   Q     Do you know Walter Johnson?

 6   A     Yes, I do.

 7   Q     Do you know A. J. Mathews?

 8   A     Yes, I do.

 9   Q     Did you see Walter Johnson that day?

10   A     Yes, I did.

11   Q     Okay.  Where did you see him?

12   A     Like about 45 minutes or a hour after the murder took place.

13   Q     You saw him?

14   A     Yes, I did.

15   Q     Okay.  On Mabel Street?

16   A     Yes, I did.

17   Q     What about A. J. Mathews?  You see him that day?

18   A     Yes, I did.

19   Q     And when did you see him?

20   A     Forty-five minutes or a hour after the murder.

21   Q     Okay.  You ever tell police that?

22   A     No, I didn't.

23   Q     Now you said that the individual that shot Milo Conklin got

24         out on Florence Street, correct?

25   A     That's correct.
```

```
 1   Q   Then he got back in the car at Florence Street?

 2   A   He walked from Mabel Street back through the cut of Florence

 3       and jumped in a vehicle and speeded off.

 4   Q   And you saw what happened?  You were on the porch, right?

 5   A   That's correct.

 6   Q   You were on 623 Mabel Street?

 7   A   That's correct.

 8   Q   And you were on this porch the entire time?

 9   A   That's correct.

10   Q   How can you see what's happening on Florence when you're on

11       the porch the entire time?

12   A   Because it's a cut—It's a porch where it's—the screen is tore

13       out.  And my head was peeking like around the corner.  When

14       the guy walked through Mabel—I mean, walked from

15       Florence Street, then, like I said, as I stated, when he

16       walked from Florence, we was all standing out there on the

17       porch, on the sidewalk—

18   Q   So you said that he got in a car—a white car, a white truck.

19       Was that—

20   A   Some kind of white vehicle, a SUV.

21   Q   After the shooting?

22   A   After the shooting.

23   Q   And you were standing on the front porch?

24   A   I was on the porch.

25   Q   The front porch?
```

| | | |
|---|---|---|
| 1 | A | On the porch. |
| 2 | Q | And you saw that happen? |
| 3 | A | That's correct. |
| 4 | Q | A hundred and seventy pounds was the shooter—175 pounds? |
| 5 | A | Between 170, 175 pounds. |
| 6 | Q | Now you said Sam Steel was wearing blue jeans and a white |
| 7 | | shirt; is that correct? |
| 8 | A | To my knowledge.  I'm not really—I can't really recall, but I |
| 9 | | know how Sam usually dress.  So, for the most part, that's |
| 10 | | usually what he wear, T-shirts and jeans. |
| 11 | Q | Sir, if you don't recall, that's fine.  Do you remember |
| 12 | | exactly was he wearing that? |
| 13 | A | No, I don't. |
| 14 | Q | Have you spoken with anybody in Sam's family regarding this |
| 15 | | incident? |
| 16 | A | No, I haven't. |
| 17 | Q | Did you speak with Sam after April 24th of 2011 about this |
| 18 | | incident? |
| 19 | A | No. |
| 20 | Q | So you just testified that murders at that area just not—not |
| 21 | | something that you would—people wanted to see in the |
| 22 | | neighborhood, right? |
| 23 | A | That's correct. |
| 24 | Q | And you never spoke to Sam Steel at all after April 24th of |
| 25 | | 2011. |

```
 1                    How often—How—

 2                    Go ahead.

 3  A    Never seen Sam or never heard from him from that day forward.

 4  Q    Okay.  Did you go to Mabel Street after that?

 5  A    Yeah, I went to Mabel Street a few times after that.

 6  Q    Who else was on the porch with you?

 7  A    Steven Brown.  Like I say, I remember seeing Jerry Davenport.

 8       I just—I just can't remember if he was on the porch that night

 9       or if he was at the house next door.

10  Q    Do you think it would have helped if you came forward with the

11       information and told the police what happened?

12  A    I'm sure it would of.

13  Q    So why didn't—

14  A    Like I say, I wasn't asked.  So I figured whenever they wanted

15       to ask me some questions they know how to get in contact with

16       me.

17                    MR. CUSICK:   I have nothing further.

18                    Thanks.

19                    THE COURT:   Mr. Champion?

20                         REDIRECT EXAMINATION

21  BY MR. CHAMPION:

22  Q    Mr. Morgan, you were at the scene at the time of the shooting.

23       Were you there when the police showed up?

24  A    Yes, I was.

25  Q    Did they come over and interview you?
```

| | | |
|---|---|---|
| 1 | A | No, they didn't. |
| 2 | Q | Did they come and take your name? |
| 3 | A | No, they didn't. |
| 4 | Q | Did you go anywhere?  Did you flee them in any way? |
| 5 | A | I—After the murder took place, when the Channel 3 news |
| 6 | | reporters, when they came to the scene, they was the only ones |
| 7 | | that asked me some questions and pretty—you know, gave me a |
| 8 | | little brief interview about what took place the night. |
| 9 | Q | So you were actually interviewed by the news media, correct? |
| 10 | A | That's correct. |
| 11 | Q | And the whole time the police were there, you were there; and |
| 12 | | no one took your name down? |
| 13 | A | Never took my name down. |
| 14 | Q | . . . (inaudible) over to the house and ask anyone any |
| 15 | | questions? |
| 16 | A | Never. |
| 17 | Q | Now you said Steve Brown was actually there with you at the |
| 18 | | time? |
| 19 | A | Yes, he was. |
| 20 | Q | Did Steve Brown say anything to you during the shooting? |
| 21 | A | Nothing that I can recall. |
| 22 | Q | He never said, oh, did you see Sam just shoot somebody, |
| 23 | | nothing of that nature? |
| 24 | A | No. |
| 25 | Q | Now you're friends with Sam? |

1129

1   A   That's correct.

2   Q   Has Sam told you to come in and say this?

3   A   No, he didn't.

4   Q   And no one's come to your house—Even after you've been placed

5       on a witness list, no one's come to your house to interview

6       you, you received one phone call; is that right?

7   A   That's correct.

8           MR. CHAMPION:   Thank you.

9           I have no other questions.

10                          RECROSS-EXAMINATION

11  BY MR. CUSICK:

12  Q   But you were contacted by the defense in this case, correct?

13  A   That's correct.

14  Q   Okay.  And how are the police supposed to know about you, that

15      you exist?

16  A   Like I said, no one—no one never contacted me about anything.

17      It wasn't till a couple of weeks ago that I just start getting

18      calls.

19  Q   From the defense.

20  A   Some detective, and then last week I got a call from

21      Detective Beauchamp.

22  Q   And you don't recall who you spoke with before

23      Detective Beauchamp?

24  A   No, I don't.

25  Q   Do you disagree that would have been Carl Clatterbuck, the

| | | |
|---|---|---|
| 1 | | investigator for defense? |
| 2 | A | I'm not sure. My wife answered the phone. |
| 3 | Q | And you spoke to him? |
| 4 | A | Pardon me? |
| 5 | Q | You spoke to him, correct? |
| 6 | A | No, I never spoke to him. My wife told me that he called. |
| 7 | Q | You never spoke to Carl Clatterbuck? |
| 8 | A | Not that I can recall. |
| 9 | Q | So, if there's a report indicating what you would testify to |
| 10 | | from Carl Clatterbuck indicating that he interviewed you on |
| 11 | | April—on August— |
| 12 | A | Oh—Okay.—yeah, the light-skinneded [*sic*] guy, yeah. Okay. |
| 13 | | I'm—I'm not too good with names and stuff. But I remember a |
| 14 | | guy came to my house—Some guy came to my house and said he was |
| 15 | | pertaining to Sam's case and asked me some questions. That |
| 16 | | was like last week, week before last. |
| 17 | Q | Okay. So he was the first person that you told what happened— |
| 18 | A | Exactly. |
| 19 | Q | —on August 14th of 2013? |
| 20 | A | That's correct. |
| 21 | | MR. CUSICK: Thank you. |
| 22 | | MR. CHAMPION: I have no other questions, |
| 23 | | your Honor. |
| 24 | | THE COURT: Ladies and gentlemen, do any of you |
| 25 | | have any questions for this witness? If so, raise your hand. |

1131

1   No hands are raised.

2   Thank you, sir.  You may step down.

3   Is he excused from any subpoena, Counsel?

4   MR. CHAMPION:   I have no objection, your Honor.

5   MR. CUSICK:   No objection.

6   THE COURT:   Next witness, Mr. Champion?

7   MR. CHAMPION:   Your Honor, I'll call Charles Thomas

8   to the stand.

9   (At 11:01 a.m., Mr. Champion exits courtroom and

10   returns momentarily)

11   THE COURT:   Before you have a seat, sir, please

12   raise your right hand.  Do you solemnly swear or affirm that

13   the testimony you're about to give will be the truth, the

14   whole truth, and nothing but the truth, so help you God?

15   MR. THOMAS:   Yes.

16   THE COURT:   Please have a seat, sir.

17   . . . (inaudible) speak right in—into the end of the

18   microphone.  Please don't pull back too far.

19   THE WITNESS:   This good?

20   THE COURT:   It might not pick up what you're

21   saying.  I think you're too far back right there.  You have to

22   get close.

23   I need you to state and spell your first and last

24   name for the record, please.

25   THE WITNESS:   Charles Thomas—C-h-a-r-l-e-s

1    T-h-o-m-a-s.

2                          CHARLES THOMAS,

3         called at 11:02 a.m., and sworn by the Court, testified:

4                          DIRECT EXAMINATION

5    BY MR. CHAMPION:

6    Q    Charles, I'm going to direct your attention back to April 24th,

7         2011.  Where were you living at that time?

8    A    626 Mabel.

9    Q    And that's here in the city of Kalamazoo; is that correct?

10   A    Yes.

11   Q    Who did you live there with?

12   A    Cynthia Gray.

13   Q    Pardon?

14   A    Cynthia Gray.

15   Q    Cynthia Gray.

16                    Was she your wife, girlfriend?

17   A    Yes.

18   Q    I asked two questions, I guess.  Was she your wife?

19   A    No.

20   Q    Girlfriend?

21   A    Yes.

22   Q    Okay.  Now were you at your residence on April 24th, 2011?

23   A    Yes.

24   Q    Who was there?

25   A    Me, her stepfather, his date, and a couple friends.

                              1133

```
1    Q    Was Milo Conklin there?

2    A    Yes.

3    Q    Do you know Sam Steel?

4    A    Yes.

5    Q    How do you know Sam?

6    A    I been knowing Sam Steel for 30, 35 years.

7    Q    A long time?

8    A    Yes.

9    Q    Do you—How do you look to him, as a friend, as a big brother?

10        How do you exactly look at . . . (inaudible)

11   A    As a big brother.

12   Q    Big brother to you?

13   A    Yes.

14   Q    How about Milo Conklin?

15   A    That's my little brother.

16   Q    So you had a good relationship with both individuals?

17   A    Yes.

18   Q    How would you describe Sam's relationship with Milo?

19   A    It wasn't hostile.

20   Q    It wasn't?

21   A    No.

22   Q    Did they talk?

23   A    Yes.

24   Q    Now, on April 24th, 2011, what was going on in the neighborhood

25        that day?
```

```
 1   A   Around what time?

 2   Q   Let's—In the evening/afternoon hours?

 3   A   Celebration, Easter Sunday.  Sam's still on his side of the

 4       street.  I'm on my side of the street.  Just celebrating,

 5       drinking beers, eating.

 6   Q   Was there a barbecue going on or something of that nature?

 7   A   No, we had plates that we just went and get from everybody

 8       instead of cooking ourselves.  We all, like, had plates.

 9   Q   So people are sharing food?

10   A   Yes.

11   Q   When you say sharing food, the people were people from Sam's

12       house—

13   A   Yes.

14   Q   —and people from yours?

15   A   Yes.

16   Q   Did Sam share any drinks or food with you and Milo?

17   A   Yes.

18   Q   At some point in time something tragic happened; is that

19       correct?

20   A   Correct.

21   Q   And could you tell the jury what happened.

22   A   Well, between like—I want to say like 9:00, 9:10, somewhere up

23       in—at that time, I told—I got a phone call from my fiancée

24       telling me she's on her way back from out of town for Easter

25       Sunday with her family.
```

1        So everyone came outside the house so I can start

2    cleaning up the house so, when she got back, I wouldn't have

3    no problems.

4    Q   And then what happened?

5    A   Milo went to the store.  They made a beer run.  When they came

6    back with the beer, they pulled in the driveway and they got

7    out.  They hand me some beers.  They hand me some beers.  I

8    was putting them in the refrigerator.  As I put them in the

9    refrigerator and as I'm walking back, I'm on my front porch.

10       And, as I'm on the front porch, there's people by

11   the car out—There's a lot of people out.  So people was like

12   coming through my back yard.  So I seen someone come through

13   my back yard with a hoodie on—with a hoodie on and shot Milo.

14   Q   Now did you think the person came from the back yard at first,

15   or could they have gotten out of the vehicle?

16   A   I said—I originally said they could have got out the vehicle

17   because they come off the passenger side.  And, where the car

18   was positioned at in my driveway, my windows to my front porch

19   can see anyone coming out the car or like in the area of the

20   car, because it was people—it was like four people with him.

21   Q   So you saw this person walk beside your house?

22   A   Yes.

23   Q   What were they wearing?

24   A   They was wearing like a dark hoodie and their face was like at

25   the bottom like covered with the hoodie a little.

                            1136

| | | |
|---|---|---|
| 1 | Q | Could you tell how old the person was, anything about the |
| 2 | | person? |
| 3 | A | Yes, the person was a young person.  He was young.  He |
| 4 | | wasn't—He wasn't old. |
| 5 | Q | Now you know Sam? |
| 6 | A | Yes. |
| 7 | Q | Okay.  At the time, do you recall—What did Sam look like?  Did |
| 8 | | he have the mustache?  What type—Was he clean-shaven, have a |
| 9 | | beard?  Do you recall? |
| 10 | A | He's always clean-shaved, bald head— |
| 11 | Q | Did he— |
| 12 | A | —had a mustache. |
| 13 | Q | Did he ever have a goatee sort of— |
| 14 | A | No. |
| 15 | Q | —like yours? |
| 16 | A | Not at that time, I don't recall him having a goatee— |
| 17 | Q | You don't recall.  Is it possible? |
| 18 | A | —having his goatee.  He—You know, 'cause he wear it low like I |
| 19 | | would wear it, so— |
| 20 | Q | Like you do? |
| 21 | A | Yes. |
| 22 | Q | Okay.  Now—So you see this go on.  Do you know where Sam is at |
| 23 | | this point in time? |
| 24 | A | At that—At that point, Sam was across the street. |
| 25 | Q | He was across the street. |

1137

```
1    A    Yes, at his residence over there.

2    Q    It wasn't Sam that walked up and shot Milo?

3    A    No, the description don't fit him.

4    Q    It doesn't fit him.

5    A    Doesn't fit him.  I've been knowing Sam for over 30, 35 years.

6         And it can be pitch dark, I know what Sam built is and how he

7         would move and walk.  I know that.

8    Q    And he was across the street?

9    A    Yes.

10   Q    And, if you recall, when's the last time you saw Sam across

11        the street?

12                  THE COURT:   Before the—

13                  MR. CHAMPION:   Before the—

14                  THE COURT:   —shooting?

15                  MR. CHAMPION:   —shooting.  Excuse me.

16                  THE WITNESS:   Before the shooting, he was across

17        the street.

18   BY MR. CHAMPION:

19   Q    No question about it?

20   A    No question about that.

21   Q    Now do you know Walter Johnson

22   A    Yes, I'm familiar with him.

23   Q    How do you know Walter?

24   A    I been knowing him through the Kalamazoo area for about

25        30 years almost myself.
```

                                1138

| | | |
|---|---|---|
| 1 | Q | Now was Walter over at Sam's that evening? |
| 2 | A | No, I don't recall seeing him at that time. |
| 3 | Q | You don't recall. |
| 4 | | Do you know where Walter was staying at that time? |
| 5 | A | No, because I don't have no association with him. |
| 6 | Q | Nothing? |
| 7 | A | Nothing. |
| 8 | Q | Do you know where his father lives or his cousin, any of those |
| 9 | | individuals? |
| 10 | A | No. |
| 11 | Q | So the shooting takes place. What do you do? |
| 12 | A | When the shooting took place? |
| 13 | Q | Yes. You see—You see this person. What do you see exactly? |
| 14 | A | As I'm on the front porch and they're in front of the house on |
| 15 | | the sidewalk area, walk up to Milo—Milo did like this, what's |
| 16 | | up.—and he pulled the gun out, shot him once in the chest. |
| 17 | | And he went like to turn; and when he—and hit him in the back |
| 18 | | as he was—before he was falling; and, when he fell, shot down |
| 19 | | like twice more. |
| 20 | Q | Was anyone else hit? |
| 21 | A | One—One person was wounded—a ricochet from a bullet—like |
| 22 | | across his butt cheek. |
| 23 | Q | Who was that? |
| 24 | A | My fiancée's stepfather. |
| 25 | Q | And what's his name? |

```
1   A    Ricky.

2   Q    And his last name?

3   A    I don't recall.

4   Q    You don't recall.

5   A    No, I don't.

6   Q    What do you do after you see the shooting?

7   A    I called 9-1-1.

8   Q    You called?

9   A    Yes.

10  Q    If you know, how much of a delay was there between the time of

11       the shots being fired and the time you picked up the phone and

12       called 9-1-1?

13  A    Seconds.

14  Q    Seconds.

15  A    Within—Within less than a minute.  It was seconds 'cause my

16       phone was on my porch being charged.  I was charging my phone

17       up because it had been on all day, basically, and so it was

18       dying.  So I had it charged up on my front porch.

19  Q    So there was a small delay, but you called right away?

20  A    It was right away call, basically.

21  Q    And what did you do at that point in time?

22  A    I ran in my bedroom—'cause I have a bottom bedroom—grabbed

23       blankets and whatever I could off my bed in the area and

24       start, like, wrapping them up around the blood—

25  Q    So—
```

1  A  —around like the pressure points.

2  Q  —you—you went to the aid of Milo; is that correct?

3  A  Excuse me?

4  Q  You went to the aid of Milo to start administering first aid

5     of some sort?

6  A  Yes.

7  Q  You brought out some sheets and whatever you could?

8  A  Right.

9  Q  Who was present at the time of the shooting at your location,

10    if you recall?

11 A  To the best of my knowledge, who was outside.

12 Q  I see.

13 A  Some people I didn't know personally.

14 Q  Okay.

15 A  'cause Milo—

16 Q  The ones you know.

17 A  Ricky, his girlfriend, his date—I can't—I can't remember her

18    name.—and Pedro and—That's basically all I knew of them.

19 Q  And there was other individuals there?

20 A  There was other individuals who had came over with Milo, and

21    we was all—and they was all outside.

22 Q  And the reason they were outside?

23 A  Because I don't want no one in the house while I'm getting the

24    house together.  I don't drink beer or smoke cigarettes, and

25    there was beer bottles and cigarette butts like around.  So I

```
 1        wanted to clean it out of the house and let everyone celebrate
 2        like on the steps, listen to the music, right there at the
 3        porch area.  It was a nice day, so it wasn't no need for
 4        everyone being in my house.
 5    Q   So you were actually cleaning up the house—
 6    A   Yes.
 7    Q   —and people were outside?
 8    A   Like straighten up, you know, walk through, pick up stuff,
 9        basically.
10    Q   Your girlfriend was on the way home?
11    A   Correct.
12    Q   And you were afraid of getting in trouble because the house
13        might have been a little too dirty?
14    A   No, I was going to get in trouble anyway 'cause I didn't go
15        with her for Easter Sunday.  'Cause I wasn't supposed to be
16        home.  We just got into a argument.  So I—I didn't leave and
17        go Easter Sunday with her family.
18    Q   So you knew you were going to get in trouble one way or
19        another?
20    A   One way or the other, I was—But I was going to just clean my
21        house up so I ain't got to hear that part.
22    Q   Okay.  Now did the police interview you?
23    A   Yes.
24    Q   When did they interview you?
25    A   The next day.
```

| | | |
|---|---|---|
| 1 | Q | How many times were you interviewed? |
| 2 | A | Three. |
| 3 | Q | Have you ever changed your story? |
| 4 | A | No. |
| 5 | Q | Now have you been threatened . . . (inaudible) |
| 6 | A | No. |
| 7 | Q | Have you talked to Sam about what your testimony |
| 8 | | . . . (inaudible) |
| 9 | A | No, I haven't seen Sam since 2011 before I was incarcerated. |
| 10 | Q | You've been in jail or prison; is that correct? |
| 11 | A | Yes. |
| 12 | Q | For what? |
| 13 | A | Drugs and attempt murder. |
| 14 | Q | So you've been in trouble? |
| 15 | A | Yes. |
| 16 | Q | Any reason to lie for Sam? |
| 17 | A | No. |
| 18 | Q | You haven't seen him in—What?—two years? |
| 19 | A | Correct. |
| 20 | Q | Have you seen Walter Johnson in that period of time? |
| 21 | A | No. |
| 22 | Q | A. J. Mathews? |
| 23 | A | No. |
| 24 | Q | Do you know Devon Smith? |
| 25 | A | Yes. |

```
 1   Q   How do you know Devon?

 2   A   I grew up with him.  He's younger than me.  He went to school

 3       with my young sister.

 4   Q   Now we were talking about Walter Johnson.  You know who

 5       Walter is?

 6   A   Correct.

 7   Q   Do you like Walter?

 8   A   I don't associate with him.

 9   Q   Is that what that means, you don't like him when you say you

10       don't associate?

11   A   I don't associate with him.  It's not about who I like.  If I

12       don't associate with you, I just don't deal with you.

13   Q   Okay.  Did Walter and Sam get along, if you know?

14   A   Yes, to my knowledge they did.

15   Q   Now you've known Sam Steel for 30-plus years?

16   A   Yes.

17   Q   What is his reputation in the community as far as

18       peacefulness?  Is he a violent person, a peaceful person?

19       What type of person . . . (inaudible)

20   A   Personally, I never seen him violent at any time.  I know he

21       was peacemaker.  I ain't never—never, not once, ever in my

22       life.

23   Q   Did you ever see him with a gun?

24   A   Never.

25   Q   So, in the community, he's known as a peacemaker?
```

1144

1   A    Yes.

2   Q    Typically talks things out?

3   A    Correct.

4   Q    Does he intercede, meaning, get in the middle of disputes and

5       try to calm them down?

6   A    Yes.

7   Q    Would it be typical for someone in your neighborhood—like

8       Sam—to commit an act like this in front of his mother's house?

9   A    No, and not in front of my house.  He shouldn't violate me

10      like that either.

11   Q   And, when you say he shouldn't, would—

12   A   I don't—I don't think he would—I don't think he would have

13      done that at my house in front of his mother house or anything

14      to that nature.  It's just not his personality.  It's just not

15      his character.

16   Q   Is there a unwritten rule or a street code of conduct that

17      says you don't bring things like that to your mother's house

18      or your family's house or your friend's house?

19   A   You can say that.  You can say that.

20   Q   You and Sam are friends, correct?

21   A   Correct.

22   Q   And you and Milo were friends?

23   A   Correct.

24   Q   In fact, Milo was at your house that evening?

25   A   Correct.

```
 1   Q    And you looked at Milo as your—

 2   A    Younger brother.

 3   Q    —little brother?

 4             Did you give him guidance, try to talk to—

 5   A    Yes.

 6   Q    Now, after the shooting, you went to Milo's aid.  Was he still

 7        alive at that point in time?

 8   A    Yes, he was just talking lightly.  You know, you couldn't

 9        figure out all the words that he was saying, but—

10   Q    Did he say anything . . . (inaudible)

11   A    No, not—not to that—not really speaking to us like we is—But

12        we told him, don't talk, don't talk, 'cause blood was coming

13        out his mouth.  So we was like, don't talk.

14   Q    He didn't say who shot him or anything—

15   A    No.

16   Q    —of that nature?

17   A    No.

18   Q    Did Sam Steel shoot Milo?

19   A    No.

20             MR. CHAMPION:   Thank you.

21             I have no other questions.

22             THE COURT:   Go ahead.

23                     CROSS-EXAMINATION

24   BY MR. CUSICK:

25   Q    Good morning, sir.
```

1    A    Good morning.

2    Q    Now do you remember being interviewed shortly after the

3         incident and telling the police the shooter came from

4         Elizabeth—

5    A    Yes.

6    Q    —shot at Mabel—shot Milo on Mabel and then went to Florence?

7    A    That's—That's the direction I thought they went.  That's my

8         direction where—

9    Q    Okay.

10   A    —I thought they went.

11   Q    You just testified here today that the person might have come

12        out of a car.

13   A    No.  No, I did—I said maybe.  But the shooter come from my

14        back yard.  That is Elizabeth.  My back yard is Elizabeth.

15   Q    Right.

16   A    So, if you're walking out the back yard of my house—Coming

17        from the back yard, you're coming from Elizabeth.  I don't

18        care which direction it is, that's Elizabeth.  And, if

19        you—And, if you walk on the side of my house and there's a car

20        in my driveway, if a person don't see you get out that car,

21        you could think that they got out their car like I had

22        explained to Beauchamp.

23   Q    Okay.  So is it possible the individual came from—came out—got

24        out of the car that Milo was in and shot him?

25   A    No, because I don't think the ones with him's going to shoot

                              1147

1    him.

2  Q   Okay.  So the individual that shot Milo came from Elizabeth—

3  A   Correct.

4  Q   —shot on Mabel, went to Florence?

5  A   To my—To my understanding and what I seen he maybe went

6      through Mabel, 'cause you can just go right through the other

7      cut from Mabel to Florence.

8  Q   Now, at the time of the shooting when it occurred, where were

9      you standing?

10 A   On my front porch.

11 Q   Okay.  And, on your front porch, could you see the person—what

12     direction the person was coming from?

13 A   Coming from?

14 Q   Yeah.

15 A   Elizabeth.

16 Q   You saw the person turn the corner?

17 A   No.  What—Turn the corner which way? Of my house?

18 Q   From—

19 A   From the corner—

20 Q   From Elizabeth—

21 A   —of my house?

22 Q   If you're standing from the—It'd be the east of your house

23     coming from Elizabeth to Mabel.  Did you see the person come

24     around the corner through that cut?

25 A   If you're coming through my back yard, you're coming from

                              1148

```
 1        Elizabeth.  I don't understand your question.  If you're
 2        coming from my back yard, that is Elizabeth.  There's no other
 3        way around that one.
 4    Q   Okay.  And you saw him come from the back yard?  That's all
 5        I'm trying—
 6    A   If you—
 7    Q   —to get at.
 8    A   Yes, if you come—Yes, you're coming from that direction.  So
 9        you're coming out of my back yard from Elizabeth Street.
10    Q   Okay.  You saw Sam that day, correct?
11    A   Correct.
12    Q   And you saw him basically hanging out the whole day?
13    A   Correct.
14    Q   Did you see—Did you see Walter Johnson that day?
15    A   Yes, I seen him earlier.
16    Q   Okay.  Did you see A. J. Mathews that day?
17    A   I don't recall seeing him that day.  I really don't.
18    Q   Now you don't—You didn't tell the police where Sam was at the
19        time of the shooting, correct?
20    A   Cor—
21    Q   You never told the police exactly where he was, right?
22    A   Sam wasn't a suspect at that time and—at that time.  He didn't
23        ask about no suspect.
24    Q   Okay.  But do you remember being interviewed on November 10th
25        of 2011?
```

1   A   November 10th—Oh, he come—I was in prison.

2   Q   Yeah.

3   A   Yes.

4   Q   You remember being interviewed then?

5   A   Yes.

6   Q   You never told the police Sam was across the street at the

7       time of the shooting, did you?

8   A   He never asked me anything about Sam.  When he came up to see

9       me—When he came up to see me, he came up to see me about some

10      phone records and some stuff that don't have anything to do

11      with me.

12  Q   Okay.  And I'm referring to—This is he, being

13      Detective Beauchamp?

14  A   Yes.

15  Q   He interviewed you on November 10th of 2011?

16  A   Correct.

17  Q   Okay.  And you indicated to him that Sam's a big brother to

18      you, right?

19  A   Yes.

20  Q   Okay.  You said that he lived across the street at his mom's

21      house, right?  Do you recall saying that?

22  A   Excuse me?

23  Q   Do you recall telling Detective Beauchamp that Sam Steel lived

24      across the street at his mother's house?

25  A   I don't know about live, but that's his family's residence, so

| | | |
|---|---|---|
| 1 | | he's there taking care of his mother. |
| 2 | Q | Okay. And you and Sam made a lot of phone calls and talked a |
| 3 | | lot on the phone; is that a fair assessment? |
| 4 | A | It's been like that since I come home from prison. He helped, |
| 5 | | you know. |
| 6 | Q | And throughout your whole life? I mean, he's— |
| 7 | A | Yes. |
| 8 | Q | Okay. |
| 9 | A | That's just friendship. |
| 10 | Q | Okay. Now you did say that there was a problem between |
| 11 | | Milo and Sam and it began when you were locked up? |
| 12 | A | Correct. |
| 13 | Q | Okay. And what was that problem? |
| 14 | A | It was a problem, basically, someone's talking about that |
| 15 | | Milo was trying to rob him; and Milo told me that that ain't |
| 16 | | true. |
| 17 | | Sam told me that wasn't true. They—They got |
| 18 | | together—me—us three—and we solved that issue because—I was |
| 19 | | locked up during that time, but— |
| 20 | Q | Okay. So there was some bad blood between Milo and Sam? |
| 21 | A | No, that was rumors— |
| 22 | Q | Okay. But you— |
| 23 | A | —period. That was a rumor. It wasn't no bad blood. |
| 24 | Q | Okay. Do you recall what kind of truck A. J. Mathews had? |
| 25 | A | He had a white truck. |

```
 1   Q   Okay.  Now can you describe the shooter again.  You indicated
 2       that he had a black hoodie; is that correct?
 3   A   Yes.
 4   Q   The hoodie was covering his face, sir; is that—
 5   A   Slightly, yes.
 6   Q   Slightly covering his face.
 7               And you gave a description, and the description
 8       was—Tell me if this is correct.  Do you remember giving a
 9       description?
10   A   Yes, I know exactly the description—
11   Q   Okay.
12   A   —I gave.
13   Q   That he was five-nine.
14   A   No, I didn't.  I never used five-nine.
15   Q   And that—And I'm just going to ask the question.  You can
16       answer it.  Okay, sir?
17   A   Okay.
18   Q   You said that he was five-nine and that Sam had sort of a
19       beer belly and this person did not, correct?
20   A   I never said five-nine.
21   Q   Okay.
22   A   I said between six foot and maybe six-two, slender, and that
23       don't fit Sam description, 'cause Sam is kind of chubby and
24       short.  And, when he walk, he walk with like a—a little like
25       hump like in his back, and he walk heavy.
```

| | | |
|---|---|---|
| 1 | Q | So you never—You never told anything in the report or on video |
| 2 | | or anything like that indicating that the person—the |
| 3 | | perpetrator was five-nine? |
| 4 | A | I don't recall saying five-nine. |
| 5 | Q | Could you have said that? |
| 6 | A | Possibility, but I know it wasn't five-nine. |
| 7 | Q | Okay.  So you said possibly you could have said that, but now |
| 8 | | you're saying it's not five-nine.  Could you have said to |
| 9 | | Detective Beauchamp that it was five-nine— |
| 10 | A | I don't recall. |
| 11 | Q | —the perpetrator? |
| 12 | A | I don't recall. |
| 13 | Q | If it's in his report, would you disagree that you said that? |
| 14 | A | Yes, I disagree because I don't recall saying five-nine. |
| 15 | Q | Okay.  Now you said that the difference between the |
| 16 | | shooter—Tell me if you disagree.—is that Sam Steel is |
| 17 | | five-eight—Do you remember saying that? |
| 18 | A | Yes. |
| 19 | Q | —and that Sam Steel had a beer belly and the perpetrator |
| 20 | | didn't.  Do you remember saying that? |
| 21 | A | Correct. |
| 22 | Q | Okay.  And the other description, you didn't go into any other |
| 23 | | detail as to what the individual looked like—Correct?—what the |
| 24 | | shooter looked like? |
| 25 | A | I gave him the description of just the height—the height that |

1153

```
 1      I seen—the height that I seen and the way they moved.  When he

 2      came to my house, we had a walk through my house; and he was

 3      with other detectives.  And my description as walking through

 4      and showing him position that I was standing in and the visual

 5      that I seen—

 6   Q  Okay.

 7   A  —did not—

 8   Q  You didn't—

 9           Go ahead.  I'm sorry, sir.  Finish.

10   A  The visual that I seen of the guy, he had to be young and he

11      was taller and slender.

12   Q  Okay.  But you didn't describe that in any of the interviews

13      between yourself and Detective Beauchamp, did you?

14   A  Yes, I did.  I just told you we had a walk-through through my

15      house.  He was with other detectives.  And he had a little pen

16      and paper, and he was doing like this as I was walking through

17      my house saying that to him.

18   Q  Okay.  Now did Sam Steel give you money the next day—$40 the

19      next day?

20   A  I had to get a motel room.

21   Q  Okay.  And I'm just going back.  You said that you

22      never—During this time November 10ᵗʰ of 2011, you didn't talk

23      about Sam Steel.  You did talk a lot about Sam Steel on this

24      interview, didn't you?

25   A  With this interview?
```

1154

| | | |
|---|---|---|
| 1 | Q | Yeah, with Detective Beauchamp. |
| 2 | A | On 2010? |
| 3 | Q | Yeah. |
| 4 | A | No, not— |
| 5 | Q | In 2011— |
| 6 | A | 2011. |
| 7 | Q | —November—Yes.  November 10th of 2011 when he interviewed you, |
| 8 | | you did talk a lot about Sam Steel, didn't you? |
| 9 | A | We talked—He kept questioning me, asking me about Sam. |
| 10 | Q | And, at that interview, did you give a specific description as |
| 11 | | to his face? |
| 12 | A | Of the shooter's face? |
| 13 | Q | Yeah. |
| 14 | A | No. |
| 15 | Q | And did you at that time give a specific description at that |
| 16 | | time as to what—how tall he was other than— |
| 17 | A | Yes, I always—I always told the same thing from the day he's |
| 18 | | interviewed me, and that was the next day. |
| 19 | Q | Okay. |
| 20 | A | All three interviews remained the same, as well as today. |
| 21 | Q | Now did Sam Steel tell you not to talk to the police at all? |
| 22 | A | No. |
| 23 | Q | Okay.  So, if it's in a report indicating that Sam Steel told |
| 24 | | you don't talk to the police, would that be incorrect? |
| 25 | A | Of course.  Sam never said anything to me about don't talk to |

1155

1   no police.

2   Q   Okay.  Now have you been convicted, sir, of a crime of theft,

3       dishonesty, or fraud in the last ten years?

4   A   Yes.

5   Q   What was that?

6   A   I had some property from Sam's Club.

7   Q   Okay.  And was the crime retail fraud in the first degree—

8   A   Yes.

9   Q   —a felony?

10  A   Yes.

11  Q   Any others that you recall in the last ten years?

12  A   In the last ten years?  That was my last one.  Counter—I had a

13      counterfeit one.

14  Q   Okay.  Counterfeiting.

15  A   Yeah, a twenty-dollar bill.

16  Q   Anything else?

17  A   No, that I can remember right then and there.

18  Q   You said you—you didn't see A. J. there.  Do you doubt that—Do

19      you dispute that he could have been there or not?

20  A   I don't remember seeing him, 'cause he—I don't remember seeing

21      him at all, 'cause his truck—I don't remember seeing his truck

22      parked out there on the street or anything.

23  Q   Did you see—You saw the shooter—where the shooter ran to is

24      Florence, right?  Did you see him run—the shooter run to

25      Florence?

```
 1   A    No.  What my—What I said to Beauchamp—I'm going to say it

 2        again—

 3   Q    I just want you—

 4   A    —that—

 5   Q    I'm sorry.  I just want you to testify as to what you saw and

 6        remember seeing.  Okay.

 7   A    And that's what I'm doing.

 8   Q    Okay.  So did the defendant—I'm sorry.  Did the shooter run

 9        to—to Florence?  Did you see that?

10   A    No . . . (inaudible)

11   Q    Now do you remember telling the police that the gun was more

12        likely to be a revolver 'cause you didn't see any casings?  Do

13        you remember telling that—

14   A    Yes.

15   Q    —to the police?

16   A    Yes, he—

17   Q    Okay.

18   A    —asked me.

19   Q    And there weren't any casings around the scene?

20   A    Well, att night—But they did—The police, they might have got

21        them; but I told him I did not see any—no shells.  Maybe I was

22        still looking on the ground for shells in front of my house in

23        the daylight; and he told me, no, that the lab—whatever—came

24        and got casings.  And I said, oh, I didn't know that.  That

25        was my understanding of that.
```

```
 1   Q   Okay.  Do you remember telling Detective Beauchamp that
 2       Sam Steel was oftentimes on the phone?
 3   A   Oftentimes on the phone?
 4   Q   Yeah, that he used his phone a lot in what he did.
 5   A   No, I don't understand that question.
 6   Q   Okay.  So did you ever tell Detective Beauchamp that Sam Steel
 7       used his phone a lot?
 8   A   I use my phone a lot.  No, I don't—
 9   Q   I'm asking you—
10   A   —no.
11   Q   —to answer—
12   A   No.
13   Q   —my question, sir.
14   A   No.  I said no.
15   Q   You never told Detective—
16   A   No.
17   Q   —Beauchamp that.
18            Did you ever tell him that you thought it was
19       suspicious if he hadn't used his phone from 9:00 o'clock p.m.
20       until sometime the next day?  Said for him not to use his
21       phone in seven hours would be suspicious?
22   A   No.
23   Q   Do you remember telling—
24   A   No—
25   Q   —Detective Beauchamp—
```

1158

1   A   —I don't.

2   Q   —that?  Okay.

3             But you never, the entire time in the interview on

4      November 10th, 2011, said that Sam Steel was across the street,

5      did you?  You never told him that?

6   A   Yes, I did.

7   Q   Okay.  So would it be in the reports?

8   A   That's his job.

9   Q   Okay.  You never actually told anybody—any police officer that

10     Sam Steel was across the street at anytime in all three

11     interviews.

12   A   I never talked to no polices but Beauchamp.  I never had no

13     other conversation about this incident with no one but

14     Beauchamp.

15          MR. CUSICK:   May I have a second, your Honor?

16  BY MR. CUSICK:

17   Q   Do you remember telling Detective Beauchamp that there, in

18     fact—that he was—the defendant was giving faces to

19     Milo Conklin earlier that day on April 24th of 2011?

20   A   No.  No, I never told him he was giving him no faces.

21   Q   Okay.  But you said—

22   A   . . . (unintelligible)

23   Q   —it might—Excuse me, sir.—that—You said it might have been a

24     ploy on the part of Sam Steel?  Remember saying that?

25   A   I never said no things of that nature.

| | |
|---|---|
| 1 | MR. CUSICK: I have nothing further. |
| 2 | THE COURT: Mr. Champion, anything further? |
| 3 | MR. CHAMPION: Thank you. |
| 4 | REDIRECT EXAMINATION |
| 5 | BY MR. CHAMPION: |
| 6 | Q You haven't reviewed the police reports; is that correct? |
| 7 | A Excuse me? |
| 8 | Q You haven't read the police reports, have you? |
| 9 | A I haven't seen not one piece of nothing concerning this case. |
| 10 | Q And you're just testifying from your memory; is that right? |
| 11 | A Correct. |
| 12 | Q On November 10th, 2011, when you were interviewed by |
| 13 | Detective Beauchamp, he was telling you information about the |
| 14 | case; is that correct? |
| 15 | A That's where I got all of the information from Mr. Beauchamp. |
| 16 | Q About how long Sam was on the phone, things of that nature? |
| 17 | A He never talked to me about Sam being on no phone, how long he |
| 18 | be on the phone and a ploy. I never heard those things come |
| 19 | out his mouth. I don't know where that come from. |
| 20 | Q In reviewing the report, it appears that, in fact, you did |
| 21 | tell Detective Beauchamp that you saw Sam across the street, |
| 22 | about— |
| 23 | A Correct. I know what I talked to him about. |
| 24 | Q In fact—I want to make this clear.—the next day you were |
| 25 | interviewed by Detective Beauchamp and other officers; is that |

1160

```
 1      right?
 2                  THE COURT:   I'm sorry.  After 4/24, are we—
 3                  MR. CHAMPION:   Twenty—
 4                  THE COURT:   —or are we—
 5                  MR. CHAMPION:   April 24th—
 6                  THE COURT:   —in November?
 7                  MR. CHAMPION:   —2011.
 8   BY MR. CHAMPION:
 9   Q   The next day you were interviewed by the police—Is that
10       correct?
11   A   Correct.
12   Q   —at your residence—
13   A   Correct.
14   Q   —is that right?
15   A   Correct.
16   Q   And I think on cross-examination you said you actually walked
17       the people through the—
18   A   I walked them through my whole house, the back yard, the front
19       yard, and showed them how a person could come from my back
20       yard from Elizabeth and could come across.  It's just like a
21       cut people just use to cut—get to their destination quicker.
22       And I walked them through the whole incident of my house.  Him
23       and other detectives had little pads and they was taking
24       notes.
25   Q   In fact, you had borrowed earlier $40 from Sam Steel, correct?
```

1  A   No, that was the day of—

2  Q   The day of?

3  A   —the interview.

4  Q   The day of the shooting or the day of the interview?

5  A   The day after the shooting, I asked him can I get about 40,

6      50 dollars so I can get a motel room 'cause I didn't—My older

7      brother wasn't able to bring me the money—some money down,

8      because my wife and children—well, fiancée—we didn't want to

9      stay in the house.

10 Q   Because of what had happened?

11 A   Because what had happened, we didn't want to be in that

12     location because it was—it wasn't no telling what occurred and

13     who it could have been.  So, to be safe for the family and the

14     kids, is to go get a motel room, let things calm down, figure

15     things out, and find a different area to live in at this time.

16 Q   And you didn't spend the night there the night of the

17     shooting, correct?

18 A   The night of the shooting?

19 Q   April 24th, 2011.

20 A   No, I didn't—I didn't stay there.

21 Q   No one . . . (inaudible)

22 A   No one stayed at the house.

23 Q   So the next day you go back to the house, you walk the police

24     through the whole incident.  Did they ever ask you, did

25     Sam Steel do this?

                              1162

1  A  He asked one thing.  He say what's—what's the relationship,

2     something to that effect.  Just—And it was real quick.—what is

3     the relationship with me and Sam and the people across the

4     street, because they're familiar with who he is, and I said

5     nothing good.  It wasn't.

6  Q  In fact, I think in one of your interviews in November you

7     said, when you get out of prison, typically, it'd be Sam and

8     Milo meeting—together meeting you; is that correct?

9  A  Excuse me?

10 Q  You had such a close relationship with Sam and Milo that it

11    was not uncommon for the two of them, if you were to get out

12    of jail or prison, to meet you together?

13 A  Of course.  Of course.

14 Q  That's how close the three of you were?

15 A  Of course.  It was—

16            Can I clear one thing and say this?  Our three

17    relationships was totally different—me and Milo relationship,

18    mine's and Sam's relationship.  But any bad blood among the

19    three of us or between them, it wasn't.  So if—if I was to

20    come home from prison, if I'd have called Sam and he was on

21    the streets, I need you to come pick me up, I don't want to

22    get on the bus, he would have did it; Milo would have done it.

23 Q  That's what you meant when you told the—

24 A  That's what—

25 Q  —officer—

```
 1   A    —I—So you understand—

 2   Q    Okay.

 3   A    —that part.

 4   Q    And that's what I was trying to understand.

 5             So you were interviewed a number of times and you

 6        never—As I understand it, did they ever ask was Sam Steel

 7        across the street?

 8   A    Never.

 9   Q    Did they ever ask if Sam Steel was the shooter?

10   A    His last interview was—

11   Q    And when—

12   A    And he told me that a Walter Johnson has gave him information,

13        enough to get arrest warrants for Sam.

14   Q    So he told you that?

15   A    Yes, he told me that.

16   Q    You never read any police reports—

17   A    No.

18   Q    —or anything of that—

19   A    No.

20   Q    And that was in November of 2011; is that—

21   A    Correct.

22   Q    Has anyone promised you anything to be here today?

23   A    No.

24   Q    Threatened you?

25   A    No.
```

```
 1   Q    Did you want to be here today?

 2   A    Truthfully?

 3   Q    Yes.

 4   A    Me, one of the codes of the streets, personally, I really

 5        don't deal with stuff like this.  If I'm in a court, it's for

 6        me.  It's because something I done.  But ain't no one

 7        threatened me and no one done—I'm just telling you how that's

 8        from the beginning, from all three interviews, to now of what

 9        it is, what I seen and how it was at that residence that

10        night.  That's about it.

11   Q    You were questioned a lot about Milo's activities—Is that

12        correct?—by Detective Beauchamp—

13   A    Correct.

14   Q    —and about other crimes he may have been committing, including

15        the gun that was used to shoot Milo; is that correct?

16   A    When he was questioning me about other people's activities—And

17        my exact words is that don't got nothing to do with me.  I'm

18        locked up in prison.  I'm not answering no question about what

19        nobody else done.  Don't ask me about what nobody else done.

20   Q    And you originally said you thought it was a revolver because

21        you didn't see any casings around?

22   A    That's correct.

23   Q    So you just assumed that?

24   A    I assumed.  I told them that.  And he cleared that up the

25        second—the day after—and said—I said, oh, I didn't know that.
```

```
 1   Q   And that made sense to you then . . . (inaudible)

 2   A   It made sense.  I'm not CSI.  I just—When you look down and

 3       you don't—I ain't see no casings, you know, I didn't see no

 4       casings, that's why I said that.

 5   Q   Did Sam Steel shoot Milo?

 6   A   No.

 7   Q   You're absolutely sure?

 8   A   I'm positive.  That description don't fit Sam.

 9   Q   And you saw Sam in the area?

10   A   He was in the area.

11   Q   You saw him later that evening?

12   A   Yes.

13   Q   And I think he was interviewed by the news media in the area;

14       is that correct?

15   A   Me?

16   Q   No, Sam.

17   A   I don't know.

18   Q   You don't know that.

19   A   I don't know about none of that.

20   Q   And you've been cooperative with the police—

21   A   Correct.

22   Q   —correct?

23              You've told them what occurred—

24   A   What occurred.

25   Q   —is that right?
```

```
 1   A    Correct.

 2   Q    And the first time I've spoke to you was today—

 3   A    Today.

 4   Q    —is that correct?

 5   A    Correct.

 6   Q    And I'm the only one that asked you to come in court and give

 7        your—what you saw, what happened at your house, correct?

 8   A    Correct.

 9              MR. CHAMPION:    Thank you.

10                         RECROSS-EXAMINATION

11   BY MR. CUSICK:

12   Q    Just going back to the relationship that you had with Sam, you

13        said that he would do anything for you?

14   A    Correct.

15   Q    And you'd do anything for him, correct?

16   A    Correct.

17   Q    Okay.  And, if he's in trouble, you're going to help him out,

18        correct?

19   A    I'm not going to lie for him.  I'm not going to lie and

20        perjure myself for him, if that's what you're getting at, no.

21   Q    Well, let me ask you this.  You said—You know that was—this

22        wasn't Sam—the shooter—you said, because the description

23        doesn't fit Sam, right?

24   A    Correct.

25   Q    Okay.  And that's why you know?
```

```
 1   A   That's why I know because the descrip—I can know Sam if Sam
 2       was coming down the street dark—pitch dark street.  I been
 3       knowing him for 35 years.  He just like my wife.  If my wife
 4       was coming down the street at night, I know how she walk; I
 5       know how she move.  And—
 6   Q   Well—
 7   A   —the description don't fit his—fit him at all.
 8   Q   And that's the reason that you know?
 9   A   Correct.
10   Q   What about the fact that you saw him across the—the street
11       that same day during the shooting at the time of the shooting?
12   A   But that still—He had gray jogging pantses [sic] on.
13   Q   So did—
14   A   I recall—
15   Q   —you see—
16   A   —him have—
17   Q   Did you see him across the street at the time of the shooting?
18   A   At the exact time of the shooting, my eyes didn't see nobody—
19   Q   Okay.
20   A   —like close up.  Was he across there?  Yes.  Where at?
21   Q   So you didn't see him at the time of the shooting; is that
22       correct?
23   A   No.
24   Q   You saw him earlier in the day there—the whole—most of the
25       day, right?
```

1168

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | Okay.  And you didn't get a good look at the face of the |
| 3 | | shooter.  You said that in the report.  You just testified to |
| 4 | | that today.  You didn't get a good look at the face of the |
| 5 | | shooter, correct? |
| 6 | A | Correct. |
| 7 | Q | Okay.  So you really don't know what the shooter looks like? |
| 8 | A | Correct. |
| 9 | Q | Okay.  And you didn't see Sam Steel at the time of the |
| 10 | | shooting, correct? |
| 11 | A | Correct. |
| 12 | Q | Okay.  So you really don't know for sure who that was, right? |
| 13 | A | It wasn't Sam. |
| 14 | Q | Okay.  Even though you said to Detective Beauchamp he was |
| 15 | | five-nine and Sam had a little bit of a big—bigger beer belly? |
| 16 | A | Look at his report.  It should say six—between six foot and |
| 17 | | six-two.  Five-nine—I'm about five-seven.  I know Sam is like |
| 18 | | a couple inches taller than me.  And that description do not |
| 19 | | fit Sam. |
| 20 | Q | How long did you get a chance to look at the shooter? |
| 21 | A | I looked up—I looked—When the shooter come from the side— |
| 22 | | Is there a picture of my house so I can show the |
| 23 | | jury at least how my windows is or something to where you can |
| 24 | | understand more what I'm saying? |
| 25 | | MR. CUSICK:   I'd ask—Your Honor, can I have a |

```
 1      moment to show him a picture of the house?

 2                   THE COURT:   Sure.

 3                   MR. CUSICK:   We have our technical lady

 4      . . . (inaudible)

 5                   THE WITNESS:   Okay.  I would like to see that, and

 6      I will explain more.

 7                   MR. CUSICK:   Well, I'm going to help you.

 8 BY MR. CUSICK:

 9 Q    Sir, I'm showing you People's exhibit number ten.  There's a

10      picture.  What's that a picture of?

11 A    That's a picture of my house—

12 Q    Okay.

13 A    —the way it was.

14 Q    Okay.  Now you indicated—Where were you standing at the time

15      of the shooting?

16 A    I was standing in the middle of my window right here.  The

17      shooter came from this side.  I have windows, also, right

18      here.

19 Q    Okay.

20 A    So, for me to see someone as they're coming from the side of

21      my house, I would be able to see them—if it's dark—I would

22      still be able to see their build, the way they move, and

23      everything coming right here on the side of my house.

24 Q    Did you indicate in any of the reports or any statements that

25      you saw the shooter coming when you were through the house
```

1170

```
 1        looking through the windows?

 2   A    No, I never said no shooter was looking through my windows.

 3   Q    No, that you were looking through the window at the shooter

 4        when he was coming . . . (inaudible)

 5   A    That is my front window right here—

 6   Q    Okay.

 7   A    —my porch.

 8   Q    Okay.  I just want to be clear.  I don't want to—

 9   A    Okay.

10   Q    I'm not going to argue with you, sir.  I just want to be

11        clear.  Okay?

12                You said that there are windows at the side of your

13        house, right?

14   A    Correct.  Right here on the side of this house.

15   Q    And did you see the shooter through those windows?

16   A    No, because—

17   Q    Okay.

18   A    —my bedroom's connected right here to my front porch.  If I'm

19        in my bedroom, I also have a window to the driveway.

20   Q    So you saw the shooter through your front porch?

21   A    Through the side—Through the front porch side windows—

22   Q    Okay.

23   A    —as well to when they walked in front of the house about right

24        here because I was speaking with Milo through the window on

25        the celebration, you good.  We just having conversation.
```

```
 1   Q    There was no—There was no glass or anything in the window?
 2        The window was open?
 3   A    No, I can—You can slide it.
 4   Q    It was—
 5   A    I can just slide it.
 6   Q    Okay.  The window was open?
 7   A    Yeah, it was—you know, it was open.
 8   Q    Okay.
 9   A    And, as we—As he's right here in front of my house talking—As
10        I'm on my porch, I see—The car was in the driveway.  And, as I
11        see people like around the car and all—And, when a person
12        walks from the back from Elizabeth area towards—towards the
13        front, and when the body got right there, I looked, because
14        it's my house and that's—And I do like this and look over,
15        because they coming—because I wanted to see who coming through
16        the cut.  It's dark, and it's—
17   Q    So you did see him briefly come through the cut
18        . . . (inaudible)
19   A    Come through—Yes, coming through the cut.
20   Q    Beside your house?
21   A    Yes.
22   Q    Okay.  And for a split second, fair to say?
23   A    Yes, it's like—It's a celebration.  It's like nothing is going
24        wrong.  It's not like—
25   Q    Right.
```

| | | |
|---|---|---|
| 1 | A | It's a celebration.  People was moving around.  So me seeing— |
| 2 | Q | Okay. |
| 3 | A | —where everybody at is—at all times—It's a celebration that's |
| 4 | | going on. |
| 5 | Q | So, for a split second, you saw the shooter at the side of |
| 6 | | your house and you saw him just at the very front of your |
| 7 | | house, right? |
| 8 | A | Correct. |
| 9 | Q | Did you see the shooter—You didn't see the shooter after that, |
| 10 | | where the shooter went? |
| 11 | A | This is what I told Beauchamp.  I'm going to give you what I |
| 12 | | said. |
| 13 | Q | I just want you to tell—tell the Court what you saw, yeah. |
| 14 | A | That's what I'm doing. |
| 15 | Q | Okay. |
| 16 | A | I'm telling exactly what I saw.  When the—When the—When the |
| 17 | | shooting—Milo was standing here.  He had a 40-ounce of beer in |
| 18 | | his hand.  He said, what's up—like this—to the guy—whoever it |
| 19 | | was—and they pulled a gun out the hoodie and shot him like in |
| 20 | | the chest area.  He went to turn—went to turn like that to go |
| 21 | | towards this way direction, which is the opposite of Mabel, |
| 22 | | and he shot him again in the back by the steps area.  And, |
| 23 | | when he fell from the—from the shot from the back it knocked |
| 24 | | him over.  And, when he fell between the steps right here |
| 25 | | area, the shooter shot down, shot him once in the back again |

1173

1    or stomach or somewhere in the back area and another time.

2  Q  Okay.  Was your focus on the shooter, or was your focus on

3     Milo?

4  A  What do you mean?

5  Q  When Milo was shot, did your focus turn to Milo or did your

6     focus turn—turn to the shooter?

7  A  My focus—My focus—After the shooting, everyone got down.

8     Because, when the shots went off—When the shots went off,

9     people didn't—people just thought it was shooting first in the

10    air.  The people outside did not even realize Milo was being

11    shot, because everyone—It was a celebration.  It happened so

12    quick.

13 Q  Okay.

14 A  So my attention after me—right here on the porch, so I get—so

15    I gets down.  I kneeled down like by my door-like area on the

16    porch.  And I only hear the shooting, then I hear someone

17    scream 9-1-1.  So, when I opened the door, I seen Milo laying

18    down that way.

19 Q  Okay.  Now how long did you get a chance to look at the

20    shooter walking?

21 A  Walking which direction?

22 Q  Walking from Elizabeth to the first shot at Milo.  How long

23    was that?  Was that a split second?  Was that five seconds?  I

24    just want to know—

25 A  I—

                          1174

1    Q    —how long.

2    A    Is you talking the coming from the cut and the whole incident—

3    Q    Yeah.

4    A    —how long it took?

5    Q    From the first shot against—at Milo coming from Elizabeth, how

6         long did that—how long did you get a chance to observe the

7         shooter?

8    A    A good—A couple good seconds—

9    Q    Okay.  Was it—

10   A    —to be able to see—before the shooting to be able to see—

11   Q    Did you—

12   A    —like that—

13   Q    Did you—Okay.  Did you get a chance to see the shooter walk?

14   A    That's what I'm—

15   Q    Okay.

16   A    —saying.  Once I see—Once I seen the shooter when he came from

17        the side of my house until like—Once he got right here and

18        those first shots went off—when the first shots, I could see

19        his build, I know how he's moving.

20   Q    Okay.  For a couple seconds?

21   A    Yes.

22   Q    And then, after that, you don't recall exactly where the

23        shooter went, though?  You didn't see him go past—toward

24        Flor—You saw him go slightly in the area of

25        Florence—Right—toward Florence?

                              1175

```
 1   A    This is what—Yes.

 2   Q    Yeah.

 3   A    —I'm testifying—

 4   Q    Okay.

 5   A    —to what I told Beauchamp.

 6   Q    Yeah.

 7   A    I told him the shooter, I think, may ran through the other

 8        cut, because it's dark and it's like—Cuts, you can just come

 9        from—

10   Q    Okay.

11   A    —you can come from Mabel and go over to there.  He could have

12        went through the back.  He could have ran to the—

13   Q    Yeah.

14   A    —side.

15   Q    You didn't—You didn't know exactly where the shooter went?

16   A    I told Beauchamp that.   I—

17   Q    So, for a couple of seconds, you saw the shooter come from the

18        cut at Elizabeth, shoot Milo, and then you don't necessarily

19        know where he went after that?  Is that a fair statement?

20   A    That is true.

21   Q    You never got a good look at the shooter's face, right?

22   A    No.

23   Q    Okay.  Now, when Sam was in Georgia—Did you have any contact

24        with him when he was in Georgia?

25   A    I never knew he was in Georgia.  I been sitting in prison.  I
```

1176

```
 1        just was—
 2   Q    Oh.
 3   A    I just got out of prison the same day this trial start, so—
 4   Q    Okay.
 5   A    —I don't know nothing about anything—
 6   Q    That's fine.
 7   A    —outside of what I'm testifying against—
 8   Q    Okay.
 9   A    —to.
10   Q    Now are you at Mabel Street?  Do you still go to Mabel Street
11        now?
12   A    I haven't been over to Mabel as of right yet.
13   Q    Now you talk about things in the neighborhood and that you
14        don't get involved in testifying for other people or in other
15        situations, you only come to court if it's for you is what you
16        testified to; is that correct?
17   A    If I'm—Yes, I testified to that.  I don't get in nobody else
18        business.  Ain't nobody else business is mine.  I'm older—
19   Q    Right.
20   A    —to the street, so I don't get in nobody business.  I don't
21        want to be in nobody business.
22   Q    Are you aware of what snitches are?
23   A    Correct.
24   Q    Are you aware?
25   A    Yes.
```

```
 1   Q    Okay.  What are snitches?

 2   A    Snitches are people who telling on people.

 3   Q    Okay.  And what happens to snitches?

 4   A    I don't know.

 5   Q    Have you ever heard the term snitches get stitches?

 6   A    No.

 7   Q    You've never heard that term before?

 8   A    No.  No.

 9   Q    Okay.

10   A    No.  I just call people Sammy the Bull.  I keep it old term.

11                MR. CUSICK:   I have nothing further, your Honor.

12                      REREDIRECT EXAMINATION

13   BY MR. CHAMPION:

14   Q    Charles, I'm showing you what's been marked as defendant's

15        proposed exhibit A.  Do you recognize that?

16   A    I wear glasses, so I don't know what—You got a lot of dots.

17   Q    This is—

18   A    Well—

19   Q    —Mabel Street.

20   A    Okay.  There we go.  I see Mabel.

21                THE COURT:   Also, is this a—

22                THE WITNESS:   That's—

23                THE COURT:   —copy of—

24                MR. CHAMPION:   It's just a bigger version of—

25                THE COURT:   Exhibit three, I think it is.
```

1178

```
 1              Hold on a second.

 2                   MR. CHAMPION:   It's a little bit different

 3         . . . (inaudible) Just—It came from the same location.  It's

 4         just different.

 5                   MR. CUSICK:   I've never—Mr. Champion, if I just

 6         could see . . . (inaudible)

 7   BY MR. CHAMPION:

 8   Q    Could you point out to the jury where your house was located

 9        at the time on April 24th.

10   A    It look like that would be 626 Mabel, I think, if that's to

11        this side of the street.  If that's correct.

12   Q    It was 626; is that correct?

13   A    Correct.

14   Q    Now you saw Sam Steel across the street that evening.

15   A    Correct.

16   Q    Between the time you last saw Sam Steel and the time the

17        shooting took place, how much time had elapsed?

18   A    From the last time I seen him?

19   Q    Right.  When you can say Sam Steel was across the street.

20        Minutes, hours, what was it?

21   A    What I told—I would say between—I want to say about ten

22        minutes, because he had a plate with some wings on it—

23   Q    Ten minutes earlier?

24   A    Within ten—Yes.—he said he had got from his sister house.  And

25        it was chicken wings on it and some stuff, and I ran over to
```

```
 1        it and grabbed some wings off his plate.
 2   Q    And that was within—
 3   A    That was—Yes, that's—That was—
 4   Q    —within ten minutes?
 5   A    That was about—I give it within—about ten minutes.  I'd say
 6        about ten minutes.  It was before—It was a little—just a
 7        little before maybe 9:00.  It was just a little before 9:00.
 8        So I would say between 8:55 and—
 9   Q    Time—
10   A    —which would be about—Yes.
11   Q    So—
12   A    Because I guess—I wasn't keeping up with the time.  I was just
13        waiting on a phone call from my wife.  That's it.  I want
14        nothing more.
15   Q    So then the shooting take place.  And you really don't know
16        who and where everyone is at the moment the shooting takes
17        place because you were focused on what's occurring?
18   A    That's—That's all.
19   Q    You're focused on the individual pulling the trigger and
20        shooting Milo; is that right?
21   A    My—My focus was after—
22   Q    After the—
23   A    —was Milo.
24   Q    That was Milo.
25   A    Really nothing else to where—When that happened,
```

| | | |
|---|---|---|
| 1 | | people—everybody's running everywhere, and people's going in |
| 2 | | every direction.  So my attention at that time was strictly |
| 3 | | Milo. |
| 4 | Q | Strictly Milo. |
| 5 | | There was somebody else there helping Milo, wasn't |
| 6 | | there?  Somebody going through— |
| 7 | A | Yes. |
| 8 | Q | —his pockets . . . (inaudible) |
| 9 | A | No.  No.  Nobody didn't go through his pockets.  The only |
| 10 | | thing that—at that time his family was—his glasses.  So, when |
| 11 | | he fell, his glasses could have fell down— |
| 12 | Q | Okay. |
| 13 | A | —off his face. |
| 14 | Q | People were looking for those? |
| 15 | A | At that time? |
| 16 | Q | Yeah. |
| 17 | A | No.  I'm saying wasn't no one going through his pockets or |
| 18 | | anything. |
| 19 | Q | That you saw? |
| 20 | A | No, that I saw. |
| 21 | Q | Now you've always talked to the police, you've always been |
| 22 | | cooperative in this case— |
| 23 | A | Correct. |
| 24 | Q | —correct? |
| 25 | | And they've interviewed you at least three times. |

1181

```
 1        In fact, did a very extended recording of one of your
 2        conversations; is that right?
 3   A    I have—If so, that was the one at downtown Crosstown.
 4   Q    Okay.  And you've always said the same thing?
 5   A    Yes, my story never changed from what I'm saying today.
 6   Q    Is there any doubt that Sam Steel was the—Is there any doubt
 7        that Sam Steel did the shooting?  Do you believe Sam Steel did
 8        it, or do you think it's possible?
 9                   THE COURT:   Wait.  Hold on—
10                   THE WITNESS:   It's not—
11                   THE COURT:   —a second.  Hold on a second.
12                   MR. CHAMPION:   I'll rephrase—
13                   THE COURT:   Yeah.  Thank you.
14                   MR. CHAMPION:   —the question.
15   BY MR. CHAMPION:
16   Q    Did Sam Steel do the shooting?
17   A    No.
18   Q    Any doubt in your mind about that?
19   A    No.
20                   MR. CHAMPION:   Thank you.
21                        RERECROSS-EXAMINATION
22   BY MR. CUSICK:
23   Q    Did you use Milo Conklin's phone at all right after Milo was
24        shot?
25   A    Yes.
```

```
1   Q    Okay.  What did you do with Milo's phone?

2   A    I tried to contact his family, which I was going through his

3        contacts trying to find someone to—to let them aware of what

4        occurred because his phone was right like laying beside him,

5        'cause he kept it like on his hip.

6   Q    You said 8:50, 8:55 you last saw Sam Steel?

7   A    Correct.

8   Q    Who else was in the house again that day?

9                    THE COURT:   Let's—You know what?

10                   MR. CUSICK:   Okay.

11                   THE COURT:   Let's stick—

12                   MR. CUSICK:   Well—

13                   THE COURT:   —with rebuttal.  We've—

14                   MR. CUSICK:   Well, let's just—I'll—

15                   THE COURT:   Is this rebuttal, or has this been

16       asked and answered?

17                   MR. CUSICK:   Well, I'll—It's specifically rebuttal

18       based on—

19  BY MR. CUSICK:

20  Q    Do you remember the last time you saw Walter Johnson that day?

21  A    Walter, that was earlier.  It was daylight, way earlier.  And

22       I really don't deal with him, so I really—you know, he's not

23       allowed in my area.

24  Q    Okay.  Lashontay Kyles, was she at your house?

25  A    Who?
```

1183

```
1    Q    Lashontay Kyles, Tay.

2    A    At my—

3    Q    Yeah—

4    A    In my house?

5    Q    —around your house.

6    A    I don't know that name.

7    Q    Okay.

8    A    I don't know that name.

9    Q    So you specifically know the last time you saw Sam Steel on

10        April 24th of 2011?

11   A    Yes.

12   Q    That was 8:50 or 55?

13   A    Yes, when I took some food off his plate.  That should be in

14        my interview I gave Beauchamp.  I told him the same thing.

15   Q    Okay.  It should be.  But that's what you told the police?

16   A    Correct.

17             MR. CUSICK:   I have nothing further.

18             MR. CHAMPION:   Nothing further, your Honor.

19             May this witness be excused?

20             THE COURT:   I need to ask the jurors—

21             MR. CHAMPION:   I'm sorry.

22             THE COURT:   —if they have any questions.

23             Ladies and gentlemen, do any of you have any

24        questions for this witness?

25             It looks like we do have a couple questions.
```

1184

```
 1              Go ahead, Mr. Cusick, if you would take those
 2    questions.
 3              (At 11:57 a.m., bench conference as follows:
 4                   THE COURT:   And then we'll have a lesson in
 5                   rebuttal for both of you afterwards.  Okay?
 6                   MR. CUSICK:   Yeah, that's fine.
 7                   THE COURT:   And in rebuttal—
 8                   MR. CUSICK:   I didn't see that one.  I don't
 9                   have any problem.
10                   THE COURT:   — . . . (inaudible)
11                   And any questions need to be . . . (inaudible))
12              THE COURT:   How long have you known Milo?
13              THE WITNESS:   I been knowing Milo, I want to say,
14    at least 24 or five years.  Milo—Milo was young, and he come
15    from, I want to say Florida here.
16              THE COURT:   I think you answered the question.
17              Thank you, sir
18              Did you see Walter or A. J. after the murder?
19              THE WITNESS:   After, no.
20              THE COURT:   All right.  How long were you in the
21    house cleaning prior to the shooting?
22              THE WITNESS:   I want to just say I was walking
23    back—like picking up instead of like mopping and—picking up,
24    basically, is my cleaning.  I want to call it cleaning.
25              THE COURT:   Okay.  How long were you doing that
```

1    before or prior to the shooting?

2              THE WITNESS:   I want to say about—My wife, when she

3    called me, it was about—I started picking up between—I want to

4    say about 8:30 to like 8:40 somewhere, 'cause I got the phone

5    call that said she was on her way—over halfway off the

6    highway.

7              THE COURT:   Okay.  Thank you, sir.

8              Your witness, Mr. Champion.  Any follow-up questions

9    based on those questions?

10                   FURTHER REREDIRECT EXAMINATION

11   BY MR. CHAMPION:

12   Q   You stated you had known Milo for about 25 or so years?

13   A   Yes.  I want to say roughly within that—somewhere around in

14       there.

15   Q   And he was a good friend; is that correct?

16   A   Yes.

17   Q   Now, as far as in the house cleaning, you were in there

18       picking up.  Were you also going in and out of the house at

19       that time?

20   A   Yes.  It's—I was going like picking up, talking, still

21       celebrating.  You know, I ain't doing no picking up—picking

22       up—if I see cigarette butts and ashes, using my little rag and

23       just—that's what I'm doing.  And I see beer bottles or

24       something, I put them in a bag or—little stuff like that, but—

25   Q   But you were continuing on with your celebration; is that

                                 1186

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | Yes. |
| 3 | Q | And it sounds like your cleaning was pretty well done prior to |
| 4 | | the shooting occurring? |
| 5 | A | Oh, yes.  Yes.  It wasn't no major major clean-up, you know, |
| 6 | | like—It wasn't a major major clean-up. |
| 7 | Q | So you were just picking up throughout the evening? |
| 8 | A | Yes, I'm just picking up through the house.  That's basically |
| 9 | | what I'm doing. |
| 10 | | MR. CHAMPION:   Thank you. |
| 11 | | I have no other questions. |
| 12 | | MR. CUSICK:   I have nothing further, your Honor. |
| 13 | | THE COURT:   Any other questions, ladies and |
| 14 | | gentlemen?  If so, raise your hand. |
| 15 | | No.  All right. |
| 16 | | Thank you, sir.  You may step down. |
| 17 | | Is he excused from his subpoena then? |
| 18 | | MR. CHAMPION:   No objection, your Honor. |
| 19 | | MR. CUSICK:   No objection. |
| 20 | | THE COURT:   All right.  Thank you, sir. |
| 21 | | THE WITNESS:   . . . (inaudible) |
| 22 | | THE COURT:   You can . . . (inaudible) |
| 23 | | All right.  Ladies and gentlemen, we will break for |
| 24 | | the noon hour. |
| 25 | | I'm just going to read to you again just some |

1 reminder instructions.  I know you've heard these before, but
2 just please listen carefully again.

3 You must not discuss the case with anyone, and that
4 includes among yourselves or your family or friends.  And, if
5 someone tries to discuss the case with you, make sure you
6 leave the area immediately and report the incident to us as
7 soon as you return to court.  Let them know that you are not
8 allowed to discuss the case and then leave the area
9 immediately.

10 Be careful—Again, you must not talk to the defendant
11 or the lawyers or any of the witnesses or anyone that you
12 might recognize being in and out of the court.  And, when you
13 enter and exit the building, just a reminder, you might pass
14 each other in the hall or ride up the elevator with someone.
15 And just please ignore them, and they should be ignoring you,
16 also.

17 Be careful, also, if you're using any electronic
18 devices.  Make sure you're not looking up anyone, anything,
19 any terms, anything related to this case.

20 Make sure you don't do any investigation on your
21 own.

22 So just a reminder about that.

23 With that, I'm going to ask that you return upstairs
24 at 1:30.

25 I indicated last week that we thought we were on

track, and I believe we are on track. And I'm expecting that we will wrap things up tomorrow morning, just so that you're aware of that. So we are on track.

Be careful, also, when you exit and enter the building.

And, again, just a reminder, please don't ever come to the second floor just in case folks are talking about the case. They're entitled to do that, but we just want to make sure that you don't overhear anything that you're not supposed to hear.

So you are excused out this door with Ms. Wint.

We'll see you in about an hour and a half.

All rise.

(At 12:03 p.m., jury exits courtroom)

You may be seated.

MR. CHAMPION: We're all set.

THE COURT: Just a reminder for those in the courtroom, please don't make any communications with any of the parties or the attorneys. Just be careful about that. I don't want anything to be distracting from what the jury is observing, and that's why we do that. So I think there's been some attempts at communication. Please don't do that, or I'll ask you to leave. Just a reminder about that.

Please also pass along—I keep taking phones. And I don't want to be the phone collector, but I seem to be. So

1  please make sure that everyone's aware you're not allowed to

2  use phones during the trial.  Pass that along to your friends

3  or family members that might be coming in, because it's just

4  distracting.  And we had another incident again today.  It's

5  just—I'm trying my best to keep the jury on track with what's

6  going on here and not have other interruptions.  So that's why

7  we do that.

8          Okay.  Counsel, jury's out.  Anything we need to

9  address, then, before we break for the noon hour?

10         Mr. Cusick?

11         MR. CUSICK:   No, your Honor.  Thank you.

12         THE COURT:   Mr.—

13         MR. CHAMPION:   No, your Honor.  Thank you.

14         THE COURT:   —Champion?

15         All right.  Court's in recess.

16         (At 12:04 p.m., court recessed)

17         (At 1:45 p.m., proceedings reconvened)

18         THE CLERK:   The court recalls the case of People of

19  the State of Michigan versus Samuel Steel, III, case number

20  C11-1983 FC.

21         Parties, please restate appearances for the record.

22         MR. CUSICK:   Good afternoon, your Honor.

23         Paul Cusick on behalf of the People,

24  Assistant Attorney General.

25         THE COURT:   May it please the Court,

1190

```
 1      Robert Champion appearing on behalf of Samuel Steel.

 2                 THE COURT:   All right.  Counsel, before the jury

 3      comes in, is there anything we need to address?

 4                 MR. CUSICK:   No, your Honor.

 5                 THE COURT:   Mr. Champion?

 6                 MR. CHAMPION:   No, your Honor.

 7                 THE COURT:   Just a reminder, folks, make sure your

 8      phones and cellphones, all electronic devices are turned off.

 9                 THE COURT:   Counsel, will you approach a moment.

10                 (At 1:49 p.m., bench conference as follows:

11                     THE COURT:   Do I need to remind you what the

12                 definition of rebuttal is or no?

13                     MR. CUSICK:   I'm sorry, Judge.

14                     THE COURT:   Do I need to remind you what the

15                 definition of rebuttal is or not?

16                     MR. CUSICK:   No, I think I know.

17                     THE COURT:   Oh, okay.  Let's do rebuttal, not

18                 repeatal [sic]—

19                     MR. CUSICK:   Okay.

20                     THE COURT:   —for the next couple of witnesses.

21                     MR. CUSICK:   Okay.

22                     THE COURT:   And you have five, you think?  Do

23                 you think we're going to get done a little early?

24                     MR. CHAMPION:   I have five—

25                     THE COURT:   Ready.
```

```
1        MR. CHAMPION:  I know I have four—

2        THE COURT:  Okay.

3        MR. CHAMPION:  —here.  One I'm waiting.

4        THE COURT:  Okay.

5        MR. CHAMPION:  So this will be one, of course

6   . . . (inaudible).  I've got two in custody.  I've

7   got one that's—

8        THE COURT:  Okay.

9        MR. CHAMPION:  —here now . . . (inaudible)

10       THE COURT:  We'll see.

11       My guess is we might get done a little early

12  today.

13       MR. CUSICK:  We should.

14       MR. CHAMPION:  Yeah.

15       THE COURT:  Okay.)

16  THE COURT:  All rise.

17  (At 1:49 p.m., jury returns to courtroom)

18  You may be seated.

19  Welcome back, ladies and gentlemen.

20  I'll turn it back over to Mr. Champion.

21  Any other witnesses, sir?

22       MR. CHAMPION:  Yes, your Honor.  I'd call

23  Lee Logan.

24       THE COURT:  All right.  Are you Lee Logan?

25       MR. LOGAN:  Yes, ma'am.
```

1    THE COURT:  All right.  Looks like we have the

2    audio on now.

3    All right.  Sir, we are in court, and the jury is

4    here.  I'm going to have you state your name and spell your

5    last name for the record.  I'm sorry.  State your first and

6    last name and spell your first and last name for the record,

7    please.

8    MR. LOGAN:  Lee Logan—L-e-e L-o-g-a-n.

9    THE COURT:  All right.  I appreciate that, sir.

10    I'm going to swear you in.  And, just a reminder,

11    sir, if, at anytime during these proceedings you cannot hear

12    what we are saying, just let us know.  Okay?

13    MR. LOGAN:  All right.

14    THE COURT:  All right.  Raise your right hand, sir.

15    Do you solemnly swear or affirm that the testimony you're

16    about to give will be the truth, the whole truth, and nothing

17    but the truth, so help you God?

18    MR. LOGAN:  Yes, ma'am.

19    THE COURT:  You can put your hand down, sir, and

20    I'll turn it over to Mr. Champion.

21                        LEE LOGAN,

22    called at 1:51 p.m., and sworn by the Court, testified:

23                    DIRECT EXAMINATION

24  BY MR. CHAMPION:

25  Q    Good afternoon, Mr. Logan.  Can you hear me okay?

1193

```
1    A    Yes, sir.

2    Q    Mr. Logan, do you know Sam Steel?

3    A    Yes, sir.

4    Q    How do you know Sam?

5    A    For a very long time.

6    Q    For a very long time?

7    A    Yeah.

8    Q    How many years would you guess?

9    A    Twenty.

10   Q    Directing your attention back to April 24th of 2011, were you

11        on Mabel Street in the afternoon or evening?

12   A    On which day?

13   Q    April 24th, a Sunday—It would have been Easter.—in 2011.

14   A    No, sir.

15   Q    You weren't there for any type of shooting?

16   A    No, sir.

17   Q    Now do you know a Walter Johnson?

18   A    Yes, sir.

19   Q    How do you know Walter?

20   A    I know him through his father.

21   Q    Pardon?

22   A    I know him through his father.

23   Q    His father?

24   A    Yes.

25   Q    How about Harry or A. J. Mathews?  Do you know either one of
```

```
 1        those individuals?
 2    A   Yes, sir.
 3    Q   How about Devon Smith?
 4    A   Yes.
 5    Q   Now you're incarcerated, correct?
 6    A   Yes, sir.
 7    Q   Were you incarcerated in Newaygo for a period of time?
 8    A   Yes, sir.
 9    Q   During that time did you—When—What period are we looking at?
10        When were you in Newaygo?
11    A   From June to like September.
12    Q   Of what year, 2012?
13    A   2011.  2011.
14    Q   During that time, was Walter Johnson also incarcerated with
15        you?
16    A   Yes, sir, we went to court together.
17    Q   During that time was Devon Smith in Newaygo?
18    A   Yes.
19    Q   If you know, did Devon Smith and Walter Johnson discuss a case
20        involving Sam Steel?
21    A   Walter discussed, but not that Sam did anything.  We all had
22        discussions on what had happened to the guy Milo.
23    Q   Did Walter discuss it with Devon at any point in time?
24    A   Yes, they was both in D-unit.  I was in D-unit, too, till I
25        got moved to B.
```

| | | |
|---|---|---|
| 1 | Q | So they were actually in the same unit together, Devon and |
| 2 | | Walter? |
| 3 | A | Walter, yes. |
| 4 | Q | Were you privy to any discussions about testifying or giving |
| 5 | | information about Sam Steel and the homicide involving |
| 6 | | Milo Conklin? |
| 7 | A | Later on, Walt decided that—He asked me if I get my time, what |
| 8 | | was I going to do.  I told him, I'm going to pill it.  And he |
| 9 | | was discussing more the less of his options that he thought he |
| 10 | | was going to beat his case.  We be discussing our cases |
| 11 | | together; and, in the process, he kept asking me had they came |
| 12 | | to me asking me about Sam; and I told him no.  He said, well, |
| 13 | | they keep coming to him and asking about Sam; and he told them |
| 14 | | he didn't know anything. |
| 15 | Q | At anytime did he discuss with Devon Martin [*sic*], if you |
| 16 | | know, testifying or giving information about Sam, if you were |
| 17 | | present? |
| 18 | A | Not present with them two talking about testifying on Sam, but |
| 19 | | they was talking about one another.  If they say, I'm buying |
| 20 | | something from you, you say you buy from me, and we'll get a |
| 21 | | three point deduction. |
| 22 | Q | So they were discussing how to reduce their sentence; is that |
| 23 | | correct? |
| 24 | A | Yes—Yes, sir. |
| 25 | Q | And you left Newaygo in September of that year? |

1196

```
 1   A   Yes, and went to Van Buren County.

 2   Q   Now did you ever see Sam after the shooting in April 2011?

 3   A   No, I talked to him on the phone, though.

 4   Q   Was Sam ever—Did you know Sam left the state and went to

 5       Georgia?

 6   A   No.

 7   Q   Did you know that he left the state at some point in time?

 8   A   I didn't—At the time, no.  I just—I had talked to him last

 9       around the holidays, around about December.

10   Q   Now did you ever see an A. J. Mathews after you were

11       incarcerated?

12   A   Yes, I came to Kalamazoo County January—I mean December the

13       24ᵗʰ of 2011, and he was in hold one and I was in holding two.

14   Q   Did you have a conversation with him?

15   A   Yes.

16   Q   If you know, was A. J. aware that Walter Johnson had given

17       information about him and Sam?

18   A   Yes, he told me that one of the guys that came to his house

19       hold him that he'd been—should have came and got him and Sam

20       and that Walt said his name and stuff.  So A. J. start asking

21       me what was Walt saying in Newaygo and why is he putting his

22       name in anything, he ain't got nothing to do with nothing.

23   Q   And that was in December of 2011; is that correct?

24   A   Yes.  Yes.

25   Q   If you know—Did you know Milo?
```

```
 1   A    Yeah, I knew of him.

 2   Q    You knew of him.

 3                 Did you know if there was any beef—

 4   A    Yeah.

 5   Q    —between Sam and Milo?

 6   A    Not that I ever knew of.

 7   Q    Has anyone promised you anything to testify today?

 8   A    No, sir.

 9   Q    Threatened you in any way?

10   A    No, sir.

11   Q    So, in between June and September of 2011, you were

12        incarcerated with Walter Johnson—Correct?—in Newaygo?

13   A    Yes.  Yes, sir, I was in D-1—I was in D-2, and he was in D-3.

14   Q    And you went to court together, you spoke, you hung out

15        together as much as you can; is that correct?

16   A    Yeah, we went to the yard, hung out.  He's—When I called to

17        get some money, Sam had him give me a couple dollars.

18   Q    And then Devon Smith came up and was incarcerated with—with

19        all of you at the same time and was in the same unit as

20        Walter Johnson; is that right?

21   A    Yes, sir.

22                 MR. CHAMPION:   Thank you.

23                 I have no other questions.

24

25
```

BY MR. CUSICK:

Q   Good afternoon, sir.

A   Good afternoon.

Q   Have you been convicted of a crime of theft,
    honesty—dishonesty, or fraud in the last ten years?

A   No.

Q   What's the answer, sir?

A   No.

Q   Now you've been friends with Sam Steel for 20 years?

A   Yes.

Q   How long have you known Harry Mathews?

A   About the same.

Q   Okay.  And how long have you known Devon Smith?

A   About the same.

Q   And how long have you known Walter Johnson?

A   I pretty much know them all about the same length of time.

Q   Okay.  You were incarcerated in Newaygo County Jail—Is it fair
    to say?—from June 20th of 2011 to September 9th, 2011?

A   Yes, sir.

Q   Okay.  When these conversations occurred between you and
    Walter Johnson and Devon Smith, where did they occur?

A   On the yard.  They give us yard three times a week there.

Q   So you saw them three times a week in the yard?

A   Yes.

1  Q  Now, from June 20ᵗʰ of 2011 to September—I'm sorry.—to July 10ᵗʰ

2     of 2011, you were in D-2—pod D-2; is that correct?

3  A  Yes, sir.

4  Q  Okay.  And from July 10ᵗʰ of 2011 to September 9ᵗʰ, 2011, you

5     were in B-4, correct?

6  A  Yes, sir.

7  Q  Okay.  Now was Walter Johnson—From June 15ᵗʰ of 2011 to

8     October 7ᵗʰ of 2011, would you agree that he was in pod D-3?

9  A  Yes, sir.

10 Q  So he was not in the same pod as you, correct?

11 A  You can—The way those pods are set up, we can talk back and

12    forth to each other.

13 Q  Okay.  But it's—I mean, you'd have to yell; is that fair—a

14    fair statement?  You'd have to yell pretty loud to be able to

15    talk?

16 A  No, they have the things open.

17 Q  They have what things open?

18 A  All I got to do is hit—All I got to do is hit the hall, and

19    he'll come right to the—to the little hole, and we can talk

20    all day.

21 Q  Is that when you talked about the case with Walter?

22 A  No, on the small yard.

23 Q  Okay.  You never talked to him inside the jail?

24 A  Not inside from my cell to his cell.  We go to yard three

25    times a week.

                          1200

```
1    Q    Okay.  And Devon Smith, he was in D-1—pod D-1 from August 26th
2         of 2011 to September 6th of 2011; is that correct?
3    A    I don't know where he had left.
4    Q    Okay.  But he wasn't in the same pod as you when he was
5         incarcerated, was he?
6                    THE COURT:   He was or was not?
7                    MR. CUSICK:   He was not.
8                    THE WITNESS:   I—
9                    MR. CUSICK:   He was not.
10                   THE COURT:   Why don't you repeat the question.
11                   Hold on—
12                   THE WITNESS:   No, I—
13                   THE COURT:   Wait a second—
14                   MR. CUSICK:   I'm—I'm—
15                   THE COURT:   —sir.  I'm going to have him repeat the
16        question.  Okay?  Hold on.
17                   Go ahead.
18                   MR. CUSICK:   Thanks, Judge.
19   BY MR. CUSICK:
20   Q    From—When Devon Smith was incarcerated, he wasn't in the same
21        pod as you, correct?
22   A    No, sir, he wasn't.
23   Q    Okay.  Now how do you—Are you an associate of Sam Steel?
24   A    I'm associate of all of them.
25   Q    Okay.  And have you spoken with his family at all since
```

1    April 24th of 2011?

2 A  No.

3 Q  How did you come forward and tell—come forward and decide to

4    tell what you knew about Walter Johnson and Devon Smith?

5 A  We was talking in the jail, and Walt started asking all these

6    crazy questions.  And he keep asking me about what I'm going

7    to do and how the people be asking about Sam and they wouldn't

8    let a guy do anything.  And he was like, shit, you better get

9    you a ticket.

10          I'm like, a ticket.  He trying to get me to say

11   something to get out of my time, 'cause they gave me 17 years

12   in the feds.  I like, I ain't got nothing to say about him.

13 Q  Okay.

14 A  And he's like, man, I'm going to do what I have to do.

15 Q  Okay.  So did you tell—

16 A  And so—

17 Q  Did you tell the authorities about this?  If somebody's going

18   to, you know, lie about some—somebody or do whatever they need

19   to do, did you tell the authorities about this?

20 A  Before he said it, he never tell me far as he told this

21   information yet.  He was saying this what his plan was to do.

22          And so, when I found out that they had charged him,

23   I'm sitting in Newaygo—I mean, sitting in Van Buren County,

24   and I look up on TV on the 23rd of December and I see Sam and

25   A. J. on TV.

1   Q   Okay.

2   A   And that's when they wrote me, yeah.

3   Q   So, at that point, did you tell any authorities, hey, look,

4       somebody told me that they were going to make up something?

5       You ever say, you know, I have information I want to tell you

6       because, you know, I think it's important?

7   A   Actually, I did—wrote a letter, and I was trying to get ahold

8       to find out who to talk to—the judge or the attorney—and I end

9       up getting information to just write the letter to let the

10      attorney know.

11  Q   Okay.  When did you write the letter?

12  A   I want to say—'Cause I went—Since then, I came back, I been to

13      three different prisons.  So I want to say probably—I can't

14      really remember.  I don't want to make . . . (unintelligible)

15      but I think it's since I been here at this facility, though,

16      because all my other letters keep coming back.  Every time I

17      wrote—I wrote—I been writing since I went back to—I been

18      writing since I came back.  January 25th I think I came back of

19      2012 to Coldwater, and I've been trying to get in touch with

20      somebody ever—ever since.

21  Q   Okay.

22  A   So I been writing letters, and it was coming back.

23  Q   Who did you write the letter to?

24  A   I wrote—I wrote a letter to Sam.

25  Q   Okay.  So have you been communicating with Sam Steel since

                                 1203

```
 1        you've been incarcerated?
 2   A    Yes, I wrote him and let him know that I don't know what's
 3        going on but I let him know who I need to holler at because
 4        Walt had came to me with this information and was trying to
 5        get me to make up some stuff.  And I'm like, I'm not doing it.
 6   Q    Okay.  Did you provide that letter, or did you write to
 7        anybody else other than Sam Steel?  Did you tell the police or
 8        did you tell the prison officials?
 9   A    No, I did—I wrote a federal judge—I mean, a federal lawyer and
10        a state lawyer.
11   Q    Okay.  Do you have those letters or do you—Have you ever—
12   A    I don't—
13   Q    —heard back?
14                    THE COURT:   We have two—
15                    THE WITNESS:   No, but someone's—
16                    MR. CUSICK:   Okay.  Let me—Let me rephrase.
17                    THE WITNESS:   Someone's—
18                    MR. CUSICK:   Sir, I'm sorry.  Let me rephase.
19   BY MR. CUSICK:
20   Q    Did you ever hear back?
21   A    Yes, about a couple weeks ago, I think.  They never wrote me
22        back or anything, so I thought—I didn't know what was going
23        on.  So I wrote—I never got no—another response; and then,
24        finally, they came up and seen me.
25   Q    I'm sorry.  You keep on looking down.  Is there anything in
```

| | | |
|---|---|---|
| 1 | | front of you at the—on the table? |
| 2 | A | A microphone. |
| 3 | Q | Okay.  I just wanted to make sure 'cause you keep on |
| 4 | | looking—looking down. |
| 5 | | So who else did you communicate with other than the |
| 6 | | defendant about the fact that Walter Johnson said this to you? |
| 7 | A | Well, actually, it was—it was more people there than me when |
| 8 | | Walt and us had this conversation; but I told guys that's |
| 9 | | here.  I called to the streets and talked to just regular |
| 10 | | random people and said stuff about him.  And I called—I even |
| 11 | | talked to his father. |
| 12 | Q | So you told regular random people, right? |
| 13 | A | Yeah. |
| 14 | Q | You told people on the street is what you said; is that |
| 15 | | correct? |
| 16 | A | Yes. |
| 17 | Q | But you really never did anything more to contact authorities |
| 18 | | as to what happened? |
| 19 | | MR. CHAMPION:   Your Honor, may we approach? |
| 20 | | THE COURT:   Hold on a second, Mr. Lee. |
| 21 | | (At 2:08 p.m., bench conference as follows: |
| 22 | | MR. CHAMPION:   He did contact feds. |
| 23 | | MR. CUSICK:   Okay. |
| 24 | | MR. CHAMPION:   That's how I got the |
| 25 | | information. |

1205

1      THE COURT:   Pardon?

2      MR. CUSICK:   Okay.  Okay.

3      Well, you see I need to—I need to know some of

4      this stuff, because, once again, I didn't have any

5      report . . . (inaudible) So I'll take Mr. Champion

6      at his word, but—

7      MR. CHAMPION:   That's fine.

8      MR. CUSICK:   —like I said, I had

9      . . . (inaudible) Logan and, therefore, I have no

10     information as to how he got this information up

11     until I'm asking questions today.  So—

12     THE COURT:   How come?

13     MR. CHAMPION:   I got contacted by his federal—

14     THE COURT:   Okay.

15     MR. CHAMPION:   —defender.  It was part of the

16     federal case.  That's who he contacted.  So

17     that—Susan went up and interviewed him.

18     THE COURT:   Okay.  Don't you guys talk

19     . . . (inaudible)

20     MR. CUSICK:   Yeah, I asked Mr. Champion, and I

21     got a sentence of Lee Logan.

22     THE COURT:   Well, that's what I thought you—

23     MR. CUSICK:   I interviewed him—

24     THE COURT:   I thought you—

25     MR. CUSICK:   —and that's it.

1          THE COURT:   I thought yours was to have

2      updates by yesterday.

3          MR. CHAMPION:   I had the updates. He's already

4      been interviewed by Susan and Carl at the same time.

5      That was part of the trial.

6          THE COURT:   While Carl's there, it's no

7      longer—

8          MR. CHAMPION:   Pardon?

9          THE COURT:   I said, while Carl's there he

10     should get the information.   If Carl's there, he

11     should get the information.

12         MR. CHAMPION:   Susan was the one interviewing,

13     and Carl was—just went up with her.

14         THE COURT:   Oh, okay.

15         MR. CHAMPION:   That was—So—

16         THE COURT:   Okay.  So where are we at here?

17     . . . (inaudible)

18         MR. CUSICK:   I'm just going to ask him a few

19     more questions.

20         THE COURT:   Okay.

21         MR. CHAMPION:   . . . (inaudible) federal

22     prosecutor had the same information.

23         THE COURT:   Pardon?

24         MR. CHAMPION:   The prosecutor had the same

25     information.  I'm surprised they didn't forward that

```
 1                    on to you.
 2                         MR. CUSICK:   Well, I mean—
 3                         MR. CHAMPION:   He's been on the witness list
 4                    since—
 5                         MR. CUSICK:   All right.  . . . (inaudible))
 6                    THE COURT:   Go ahead, Mr. Cusick.
 7   BY MR. CUSICK:
 8   Q    Did you contact the Kalamazoo police department ever, the
 9        inves—the chief investigating agency in this case?
10   A    No.
11   Q    Okay.  So you told, you indicated, your attorney, right?
12   A    Yes.
13   Q    And nobody else other than the people that were on the street
14        and the people that were randomly around?
15   A    Yeah, I didn't know far as no procedure who you talk to in
16        them type of matters.
17                    MR. CUSICK:   I have nothing further.
18                    Thanks.
19                    THE COURT:   Mr. Champion?
20                         REDIRECT EXAMINATION
21   BY MR. CHAMPION:
22   Q    Lee, you're involved in a federal case; is that correct?
23   A    Yes, sir.
24   Q    And so was Walter Johnson; is that correct?
25   A    Yes—Yes, sir.
```

1   Q    And you communicated this information that you received to the

2        federal authorities and attorneys; is that correct?

3   A    Yes, sir.

4              MR. CHAMPION:  Thank you.

5              THE COURT:  Anything else?  Any other questions?

6              MR. CUSICK:  One more, your Honor.

7                    RECROSS-EXAMINATION

8 BY MR. CUSICK:

9   Q    Is there any way to verify the yard time, where this occurred?

10       Is there any way to verify that you were with Sam—that you

11       were with Devon Smith and Walter Johnson?

12   A    Yes.  I wasn't with Devon Smith on the yards, I was with

13       Walter Johnson on the yard; and that's when we was in D unit.

14       It was me, Kanandrae (phonetic), Kimbo (phonetic), and

15       Solomon.

16   Q    Okay.

17   A    It was a lot of us.  The whole D go together.  We all go

18       together.  It's documented the way they let us out—

19   Q    Okay.

20   A    —for yard.

21   Q    So the D goes together on its own, right?

22   A    Yes, the whole D.

23   Q    Okay.  And you were in B when Devon Smith was in D?

24   A    Yes.

25   Q    So did you talk to Devon Smith about this?

| 1 | A | No, I talked—Him—His cousin— |
| 2 | Q | Okay. Just— |
| 3 | A | —which is Cuckoo, he was there— |
| 4 | Q | Okay. |
| 5 | A | —also, with me in B unit. |

6          MR. CUSICK:   I have nothing further, your Honor.

7                 REREDIRECT EXAMINATION

8 BY MR. CHAMPION:

| 9 | Q | Cuckoo would also be Richard Smith; is that correct? |
| 10 | A | Yes, sir. |
| 11 | Q | And he's cousin of Devon Smith; is that correct? |
| 12 | A | Yes, sir. Yes, sir. |

13          MR. CHAMPION:   Thank you.

14          THE COURT:   Ladies and gentlemen, do any of you

15 have any questions for this witness? Raise your hand if you

16 do.

17          It looks like there are some questions.

18          And, Mr. Champion, I believe it's your turn to

19 collect those.

20          (At 2:13 p.m., bench conference as follows:

21               THE COURT:   Did you see it?

22               MR. CUSICK:   Yeah.  I didn't—Just the last

23               sentence of that one.

24               THE COURT:   You want me to just ask him what

25               better get your ticket means, 'cause they have no

```
 1              clue what a ticket is.  The question why
 2              . . . (inaudible) means one of two things, and I
 3              don't think it means either one of those things.
 4                   MR. CUSICK:   I don't know if we can ask that
 5              question.
 6                   THE COURT:   Huh?
 7                   MR. CUSICK:   I mean—You know, there was
 8              objections last week what he's—
 9                   Well, I guess you could ask the question what
10              does that mean.
11                   THE COURT:   He brought it up.  It's his
12              testimony.
13                   MR. CUSICK:   Yeah.
14                   THE COURT:   Does better—What does better get
15              your ticket mean.
16                   MR. CUSICK:   Yeah.
17                   THE COURT:   I'll ask him that.
18                   MR. CUSICK:   Okay.
19                   THE COURT:   . . . (inaudible) about the
20              conversation dealing with Mr. Steel and what
21              evidence of the conversation with the attorney.
22              I don't understand the question.
23                   MR. CUSICK:   When did you—When did he first
24              come forward, I think, is what I—
25                   MR. CHAMPION:   When did he go federal to the
```
1211

1    federal and how did he go forward.

2              THE COURT:   I'll just ask him when did he

3         inform the federal attorney about—

4              MR. CUSICK:   About what it is.

5              THE COURT:   — . . . (inaudible) about this

6         case or something about the conversations—

7              MR. CUSICK:   About Walter Johnson.

8              THE COURT:   —related to this case.

9         How's that?)

10         THE COURT:   A couple more questions, Mr. Logan.

11         When did you inform—

12         THE WITNESS:   Yes.

13         THE COURT:   —the federal attorney about the

14    conversations related to this case, sir?

15         THE WITNESS:   I want to say probably November

16    sometime, I think.

17         THE COURT:   November—

18         THE WITNESS:   I'm not sure.

19         THE COURT:   Do you recall November of 2011 or 2012?

20         THE WITNESS:   2012.  'Cause I been—I been at this

21    facility since—Yeah, November.  Yeah, November.

22         THE COURT:   What does—quote—better get your

23    ticket—end quote—mean?

24         THE WITNESS:   Because—They got a little standard

25    phrase, you know, guys, they get charged with cases.

```
 1    Everybody just jump on—jump on—on their cases and get their
 2    time cut.  So he trying to inform me I better say what they
 3    want to hear to get me a time cut.  But I was like, I'm not
 4    with it.
 5              THE COURT:  Okay.  Mr. Champion, your witness.  Any
 6    rebuttal questions based on those questions?
 7              MR. CHAMPION:  I do have follow-up questions for
 8    this witness based upon this testimony.
 9                         REDIRECT EXAMINATION
10  BY MR. CHAMPION:
11  Q    The question was presented to you, you contacted the federal
12       attorneys—Is that correct?—involv—
13  A    Yes, sir.
14  Q    And you wrote those attorneys letters; is that right?
15  A    Yes.
16  Q    And that's a whole separate case from what we're here today
17       for; is that right?
18  A    Yes.  I wrote them, and I told them to fax it—On the back of
19       my letter I told them to fax it, and I gave them your office
20       number and fax number.
21  Q    In November of 2012, were you aware that I wasn't his
22       attorney—Sam's attorney?
23  A    I end up finding out the federal and the state attorneys
24       around the same time, and I only had one stamp.  So I wrote
25       the letter, and I told—I sent it to that attorney which—'cause
```

1    I knew about the federal offense 'cause I was dealing with my

2    federal attorney.  I was still fighting my federal case far as

3    on appeal.  So I told him—that federal attorney to forward

4    that letter—a copy to you, also.

5    Q   Do you know when that—You said that was in November of last

6        year?

7    A   I want to say it was November or December.

8    Q   Now, when you say make your ticket or better your ticket, are

9        you talking about reducing your sentence—

10   A   Yes.

11   Q   —by giving—What?—information to the federal authorities?

12   A   Yes.

13   Q   And, in this case, Sam was asking—or not Sam—Excuse me.—Walter

14       Johnson was asking you or telling you to better your ticket by

15       giving information on who?

16   A   On Sam, yes.

17   Q   Did he tell you to be—

18   A   He—

19   Q   —truthful?

20   A   He was—He was trying to be hypothetically to see what I wanted

21       to do, and he started asking these questions.  He never at the

22       time said anything about a murder, though.  He just kept

23       giving me these hypothetic questions.  He never was

24       straightforward.  And so I'm telling him to stop beating

25       around the bush what you're talking about.

                          1214

```
 1              Then he told me he was going out the dude—he got the

 2      dude, because they just want Sam and he can't get no other

 3      way, 'cause Chew—talk is—I go to court with him, too.  If you

 4      look at the dates, me and him go to court at the same time.

 5   Q  When you say Chew, who is Chew?  Is that Devon Smith?

 6   A  Yes.

 7   Q  And Choo-Choo is Richard Smith his cousin?

 8   A  Yeah, Cuckoo his cousin.

 9   Q  Cuckoo.

10   A  Yes, sir.

11   Q  Excuse me.

12              What I'm—As far as bettering your ticket and giving

13      information, was Walter telling you to be truthful or just

14      make up a story?

15              MR. CUSICK:   Your Honor, this is—

16              THE WITNESS:   He just—

17              MR. CUSICK:   This is—

18              THE WITNESS:   He flat—

19              THE COURT:   Wait.  Hold on—

20              THE WITNESS:   He flat-out told me—

21              THE COURT:   Hold on a second, Mr. Logan.

22              MR. CUSICK:   This is really getting into hearsay.

23              THE COURT:   I'm going to sustain that objection.  I

24      don't know how he would know what's in someone else's mind,

25      so—
```

BY MR. CHAMPION:

Q    Did Walter Johnson tell you to lie or to tell the truth?

A    He said, tell them whatever they want to hear.  That's his
     exact words.

          MR. CHAMPION:    Thank you.

          I have no other questions.

                    RERECROSS-EXAMINATION

BY MR. CUSICK:

Q    You came forward on November 2012, right?

A    Yes, sir.

Q    So a year and a half before you had this discussion with
     Walter Johnson, right?

A    Yes.

Q    And you didn't say anything for a year and a half, right?

A    At the time, there was no charges.  I never knew about these
     charges until December of two thousand—December 23rd—

Q    Of 2011?

A    —when I seent it on the news.

Q    Of 2011, right?

A    Yes.

Q    Okay.  And you were in communication with Samuel Steel during
     this period of time, correct?

A    Yes.  And I was writing back to Newaygo, too.

Q    Did Walter ever say anything—You don't have to tell me.  Did
     he ever discuss the murder and the specifics about the murder

                              1216

```
 1        with you—
 2   A    No.
 3   Q    —or any—
 4   A    We talked about the murder—We talked about it before, but—
 5   Q    Okay.
 6   A    —we was all trying to find out who did it.  He was like—He was
 7        in awe about he didn't know who did it.
 8   Q    Okay.  And now you said that you were—you never talked about
 9        Sam Steel with Walter Johnson, correct?  That's what you
10        initially—
11   A    Excuse me?  Not about—Not about him—Not about him committing a
12        murder.
13   Q    Okay.  Other issues that you dealt with him—
14   A    Who—
15   Q    —that you talked about with Sam Steel?  Did you talk about—
16   A    Excuse me?
17   Q    Did you talk about Sam Steel with Walter Johnson at all?
18   A    Yes.
19   Q    Okay.  Was that pertaining to what?
20   A    He was asking me, was the police and detectives asking me
21        questions about Sam—
22   Q    Okay.
23   A    —and I told him no.
24                   MR. CUSICK:   I have nothing further.
25                   MR. CHAMPION:   I have nothing further.
```

1          THE COURT:   Any further questions, ladies and
2     gentlemen?  If so, just raise your hand.
3               No hands are raised.
4               All right.  Thank you, sir.  We are going to shut
5     off the teleconference equipment then.  Okay?
6               Any other witnesses, Mr. Champion?
7               MR. CHAMPION:   Yes, your Honor.  I'd call
8     Jerry Davenport.
9               I call Mr. Davenport to the stand.
10              THE COURT:   Right over there, sir.
11              Before you have a seat, please raise your right
12    hand.  Do you solemnly swear or affirm that the testimony
13    you're about to give will be the truth, the whole truth, and
14    nothing but the truth, so help you God?
15              MR. DAVENPORT:   Yes, your Honor.
16              THE COURT:   Please have a seat, sir.
17              With that microphone, you really need to speak right
18    in the end of the microphone.  If you pull too far back, it
19    might not pick up what you're saying.
20              I need you to state and spell your first and last
21    name for the record, please, sir.
22              THE WITNESS:   R period B period Davenport—D-a-v-e-
23    n-p-o-r-t.
24              THE COURT:   I'm sorry.  I missed it.  It's—
25              THE WITNESS:   D-a-v-e-n-p-o-r-t.

```
 1                    THE COURT:   I missed your first initials, sir.
 2                    THE WITNESS:   R and B.
 3                    THE COURT:   R period B period?
 4                    THE WITNESS:   Yes.
 5                    THE COURT:   Okay.  Do you go by Jerry, also, or—
 6                    THE WITNESS:   Sometimes, yeah.
 7                    THE COURT:   Okay.  I'm sorry.
 8                    I thought that's how you introduced him, so—
 9                    Appreciate it.
10                    Go ahead, Mr. Champion.
11                    MR. CHAMPION:   Thank you.
12                            R. B. DAVENPORT,
13          called at 2:25 p.m., and sworn by the Court, testified:
14                         DIRECT EXAMINATION
15   BY MR. CHAMPION:
16   Q    Mr. Davenport, do you know Sam Steel?
17   A    Yes.
18   Q    How long have you known Mr. Steel?
19   A    Probably since like '77, '78.
20   Q    How old are you now?
21   A    Fifty-two.
22   Q    So you've known him for a long time?
23   A    Yeah.
24   Q    Directing your attention to April 24th, 2011, did you have any
25        contact with Sam Steel?
```

```
1   A   Yes.

2   Q   Where did you have that contact?

3   A   In his mother's front yard on Mabel Street.

4   Q   What time did you initially have contact or see Mr. Steel?

5   A   The afternoon, close—evening, afternoon.

6   Q   Three, four?

7   A   Yeah.

8   Q   What was going on at that time?

9   A   Me and Sam was discussing about putting a basketball

10      tournament together and just, basically, just chatting as

11      friends.

12  Q   How long were you with Sam during that time?

13  A   Fifteen, 20 minutes.

14  Q   At some point, in time did you leave?

15  A   Yes.

16  Q   Had anything occurred in front of Sam's house, a shooting?

17  A   No.

18  Q   Did a shooting occur while you were present?

19  A   No.

20  Q   Were you—Had you left?

21  A   Just prior—prior to talking to Sam, about maybe three minutes,

22      two minutes.

23  Q   And, when you left Sam, where was he?

24  A   He was standing at the bottom of the—the ramp in front of his

25      mom's house—him, along with, you know, three or four, five
```

1220

| | | |
|---|---|---|
| 1 | | other guys. |
| 2 | Q | So there was other people there? |
| 3 | A | Yes. |
| 4 | Q | If you know, was there a Tommy Morgan there?  Do you know |
| 5 | | Tommy? |
| 6 | A | No.  I know him, but I'm not sure if he was there or not.  He |
| 7 | | may have been. |
| 8 | Q | He may have been, but you don't know? |
| 9 | A | No. |
| 10 | Q | What—Tell the jury what you saw and heard that evening around |
| 11 | | the time of the shooting. |
| 12 | A | Well, me and Sam, we were talking.  And, like I said before, |
| 13 | | we were discussing about putting a basketball tournament |
| 14 | | together, 'cause I do a lot of community-based stuff on |
| 15 | | Douglas and things like that. |
| 16 | | However, during the time that we were talking in his |
| 17 | | mother's yard, it couldn't have been no more than—After I got |
| 18 | | done talking with Sam, it was like two minutes later or three |
| 19 | | minutes—two to three minutes later tops that, when I came up |
| 20 | | on the porch back to the other house to step in, that's when |
| 21 | | the shots went off. |
| 22 | Q | Where were you when you heard the shots? |
| 23 | A | I was right—I was in the door coming in. |
| 24 | Q | And where did you live? |
| 25 | A | Hmm? |

```
1    Q    Where—Where do you live?

2    A    Where do I live?

3    Q    Yeah, where—what door—

4    A    I was next door.  It's 619 Mabel.

5    Q    So you were right next door at 619?

6    A    Yeah, doing some work for a friend.

7    Q    So you leave Sam, you just walk next door, you're walking into

8         619 Mabel—

9    A    Yes.

10   Q    —when you heard the shots?

11   A    Yes.

12   Q    Did you see who fired the shots?

13   A    No.

14   Q    What did you see when you heard the shots?

15   A    The only thing I seen was people—When I came up on the porch

16        and initially closed the screen door, the shots sounded then

17        right—I mean, like—Like I said, like two minutes.  So we were

18        all standing out there.  And the only thing I can say is it's

19        impossible.

20   Q    When you say it's impossible, what's impossible?

21                    THE COURT:   Hold on a second.

22                    Counsel, will you approach.

23                    (At 2:29 p.m., bench conference as follows:

24                       THE COURT:   I'm confused.  I thought he

25                    initially said that he was not there.
```

1    MR. CUSICK:   He did.

2    THE COURT:   Did he say he was there?

3    MR. CHAMPION:   He was next door.  He wasn't

4    with Sam is what—And I'll clarify.

5    THE COURT:   Okay.  All right.

6    All right.  Thank you for this.  I'm confused

7    as what's going on here.

8    Reword your question.  He can't speculate about

9    what happened.  That's for the jury to put together.

10   So you can't ask him it's impossible.  If you're

11   going—

12   MR. CHAMPION:   Pardon?  Which—

13   THE COURT:   You can't ask him to draw

14   conclusions about why is it impossible.  That's the

15   jury's—

16   MR. CHAMPION:   . . . (inaudible)

17   THE COURT:   —responsibility.  Reword your

18   question.  I'm not going to allow that question.

19   MR. CHAMPION:   Which question?

20   THE COURT:   Your question, I think, is how was

21   it impossible when he's—

22   MR. CHAMPION:   No, he's—He said it was

23   impossible, and that's why I was saying what was

24   impossible.  I didn't understand that part.

25   THE COURT:   Okay.  Well, you need to reword

1223

```
 1                    that question and . . . (inaudible) Okay.)

 2   BY MR. CHAMPION:

 3   Q    Now, when you say you weren't there, what are you referring

 4        to?

 5   A    I wasn't there during the initial shooting, but I was in the

 6        doorway.  So—And when I said it's impossible, because I had

 7        just left him like two minutes ago.  So I can't see—

 8                    THE COURT:   Wait.  Hold—

 9   BY MR. CHAMPION:

10   Q    So let's—

11                    THE COURT:   Yeah, you got to have—

12   BY MR. CHAMPION:

13   Q    Let's—

14                    THE COURT:   —a specific question here.

15   BY MR. CHAMPION:

16   Q    Let's go back.  Okay.  So you're at Sam's house—at Sam's

17        mother's house, correct?

18   A    Yeah.

19   Q    And you're speaking—

20   A    We're all standing in a group just standing on the street as

21        was my friends at the house next door.

22   Q    Next door meaning across the street or—

23   A    No, next door—

24   Q    At—

25   A    —to his mom, 619—
```

```
 1  Q    —619?

 2  A    —yes.

 3  Q    I'm showing you what's been marked as defendant's exhibit A.

 4            THE COURT:   Counsel, I don't think this exhibit is

 5       in, but—

 6            MR. CHAMPION:   Proposed exhibit A.

 7            MR. CUSICK:   I'll stipulate, your Honor.

 8            THE COURT:   Thank you.  I appreciate that.

 9            I'd rather have it in if we—We keep addressing it.

10       So, just so I'm clear, it's proposed exhibit A, and it sounds

11       like there's a stipulation, then, that we can admit that.  So

12       exhibit A—

13            Go ahead.  Thank you.

14  BY MR. CHAMPION:

15  Q    On this map, where would you have been when you were with

16       Sam Steel?

17  A    Right here.

18  Q    That would have been six-twenty—

19  A    No, 619.

20  Q    Is where you were at?

21  A    Yeah.

22  Q    And where did you go?

23  A    I just went—I left Sam right—We all was standing out here in

24       the yard.

25            This is the front of the house here, right?
```

```
 1  Q    This is the back of the house.

 2  A    Okay.  So the front of the house is here.  We all—We all right

 3       here in the front right here.

 4  Q    So right in between—

 5  A    So right—

 6  Q    —the two?

 7  A    —here, yeah.  We was right here.

 8                   THE COURT:    When you say you went in a—a door,

 9       sir—entering a door—which house are you talking about?

10                   THE WITNESS:    619.

11                   THE COURT:    Okay.

12                   THE WITNESS:    Not his mom's house.

13                   THE COURT:    So the same house that you were at—

14                   THE WITNESS:    Prior to talking to Sam.

15                   THE COURT:    Thank you.

16                   THE WITNESS:    Prior to coming outside talking to

17       him.

18  BY MR. CHAMPION:

19  Q    So you went outside to talk to Sam, who was next door to his

20       mother's house?

21  A    Yes.  And he was—All of them was standing outside in the yard.

22  Q    And there was a bunch of people out—

23  A    Yeah.

24  Q    —there?

25  A    About—Yeah, probably like, say, five to eight—five—about
```

```
1         eight.
2    Q    Were they eating, drinking, have a—
3    A    Yeah, just socializing.
4    Q    Did you notice anyone across the street at 626,
5         Charles Thompson's residence?
6    A    Yeah, just people just sitting on the steps across the street.
7         But I didn't—I wasn't really like paying attention or
8         anything.
9    Q    You weren't paying to them?
10   A    Yeah.
11   Q    So you're out with Sam.  You're discussing what had
12        occur—discussing—
13   A    No, we were—
14   Q    —a basketball—
15   A    —we were discussing putting a tournament together.
16   Q    Okay.  After you have the discussion, you walk back to
17        619 Mabel?
18   A    Yeah.
19   Q    You're walking into the door when you hear the shots?
20   A    Exactly.
21   Q    And the time you left Sam to the point that you went to 619
22        was only a minute or two?
23   A    Couldn't have been more than like two minutes.
24   Q    Did you turn around when you heard the shots fired?
25   A    No, we basically just kind of like ducked a little bit.
```

1  Q    Did you see Sam after that?

2  A    Yes, he was standing outside during the time.

3  Q    When I say after—

4            THE COURT:   I'm sorry.  I didn't hear the—the

5        answer to—

6            The last question, I think, was did you turn around

7        when the shots were fired or something to that effect.  What

8        did you say with that?  Did you say you ducked down?

9            THE WITNESS:   Yeah, we just kind of ducked when we

10       heard—When I—Soon as—I initially went in the house, and then

11       the shots was fired.  We just kind of like ducked down.

12           THE COURT:   Okay.

13           THE WITNESS:   You know, we looked outside and—

14           THE COURT:   Okay.  That's what I didn't hear.

15           THE WITNESS:   —everybody was—

16           THE COURT:   Thank you.

17           THE WITNESS:   —still standing out there.

18  BY MR. CHAMPION:

19  Q    And then you saw Sam shortly thereafter?

20  A    He was already there.

21  Q    You went outside and Sam was there?

22  A    Yeah.

23  Q    Were the police—Had the police arrived at that point in time?

24  A    No.

25  Q    Did you see Sam leave at all?

                              1228

| 1 | A | No. |
| 2 | Q | What was Sam wearing that evening, if you recall? |
| 3 | A | Probably jeans and a polo shirt or something. |
| 4 | Q | Did you ever see Sam wearing a black hoodie and black |
| 5 | | sweatpants? |
| 6 | A | No. |
| 7 | Q | Have you ever seen Sam with a gun of any type? |
| 8 | A | No. |
| 9 | Q | You've known Sam since you were seven years old? |
| 10 | A | Yeah. |
| 11 | Q | What's Sam's reputation in the community as far as |
| 12 | | peacefulness or violence? |
| 13 | A | It's a very good individual that, you know, that try to, you |
| 14 | | know, be helpful to people. |
| 15 | | And, you know, it's just like me and him—like I was |
| 16 | | speaking to him about the basketball tournament, somebody that |
| 17 | | can, you know, put something together for the—the youth and |
| 18 | | the young adults in the community, just talking and speaking |
| 19 | | about things like that, to get some type of basketball camps |
| 20 | | and programs going. |
| 21 | Q | You've never seen him with a gun? |
| 22 | A | No. |
| 23 | Q | Reputation of being a— |
| 24 | A | No. |
| 25 | Q | —peaceful person? |

```
 1              Now did you speak to the police that evening or
 2       anytime after that?
 3    A  No.
 4    Q  Did anyone ever come to your residence and talk to you about
 5       this?
 6    A  No.
 7    Q  Do you know an A. J. Mathews?
 8    A  No.
 9    Q  Walter Johnson?
10    A  No.
11    Q  So you wouldn't even know what they look like; is that
12       correct?
13    A  No.
14    Q  You know Sam but not these other individuals?
15    A  No.
16    Q  How about did you know Milo Conklin?
17    A  No.
18    Q  Did anyone threaten you to appear today?
19    A  No, sir.
20    Q  Made you any promises?
21    A  No, sir.
22    Q  Have you talked to Sam about what your testimony was going to
23       be?
24    A  No, sir.
25    Q  You're testifying on your own behalf; is that correct?
```

```
 1   A      Yes, sir.
 2                    MR. CHAMPION:    Thank you.
 3                            CROSS-EXAMINATION
 4   BY MR. CUSICK:
 5   Q      Good afternoon, sir.
 6   A      Good afternoon.
 7   Q      I just want to be clear, you were at 619 Mabel, right?
 8   A      Yes.
 9   Q      Outside?
10   A      Yes.
11   Q      Talking to Sam Steel, right?
12   A      Yes.
13   Q      And you hear gunshots when you're inside 619 Mabel?
14   A      Yeah, it was just prior to me going in the house.
15   Q      Okay.  And then you run inside when you heard gunshots?
16   A      Nope, I did not run inside.  I said I was—I was initially
17          going in—After leaving Sam, initially getting in the house and
18          closing the screen door, which couldn't have been no more than
19          two minutes.  That's when the shots went off.
20   Q      Okay.  Do you—You didn't see the shooter, though, right?
21   A      No.
22   Q      Okay.  You didn't see where the shooter went or anything,
23          right?
24   A      No.
25   Q      Okay.  So you saw Sam Steel and—
```

| 1 | A | Group of individuals. |
| 2 | Q | —and— |
| 3 | A | We were all— |
| 4 | Q | Okay. |
| 5 | A | —still standing on— |
| 6 | Q | Let me ask—Okay.  Fair enough.  I just want to ask the |
| 7 |   | question. |
| 8 |   | You said there was no way Sam Steel could have |
| 9 |   | committed the murder because you just saw him two minutes—You |
| 10 |   | told—You told Carl Clatterbuck five minutes or less, right? |
| 11 | A | Yeah, five minutes or less.  So I just— |
| 12 | Q | Okay.  So there's no— |
| 13 | A | —rounded this.  I figure like between like—What?—two to three |
| 14 |   | minutes. |
| 15 | Q | So you're saying now that there's no way, under any |
| 16 |   | circumstances, that Sam Steel could have gone across the |
| 17 |   | street and shot somebody within five minutes? |
| 18 | A | No, he couldn't have.  Not—Not with a—with a polo shirt and |
| 19 |   | some jeans on. |
| 20 | Q | Okay.  What were you wearing that day? |
| 21 | A | Probably much the same thing, jeans— |
| 22 | Q | What kind— |
| 23 | A | —short sleeves. |
| 24 | Q | What kind of shirt were you wearing that day? |
| 25 | A | Pretty much . . . (inaudible), button up. |

1232

```
 1   Q    Button-up shirt?

 2   A    Yeah.

 3   Q    What were you—Who else were you with that day?

 4   A    Friends next door.

 5   Q    Okay.  Who—Who are they?

 6   A    Is that relevant?

 7              THE COURT:   You have to ask [sic]—or answer his

 8        questions.  You don't get to ask the questions, sir.

 9              THE WITNESS:   I was visiting my friend J. B. and a

10        few other friends.

11   BY MR. CUSICK:

12   Q    Okay.  Who are the other friends?

13   A    Hey, it's been a while.  I can't probably pretty much

14        remember.  It was only like two or three of us.

15   Q    Okay.  What was J. B. wearing that day?

16   A    I'm not sure.

17   Q    Okay.  But you know for sure that you were wearing a

18        button-down and pants?

19   A    And jeans.

20   Q    And jeans.  And the defendant was wearing jeans and a

21        polo shirt, correct?

22   A    Exactly.

23   Q    What were you wearing on April 25th, the next day?

24   A    The next day?

25   Q    Yeah.
```

1233

```
 1  A   Probably something different.

 2  Q   Okay.  What about April 23rd, 2011, the day before the

 3      shooting, what were you wearing?

 4  A   Something different from the day before.

 5  Q   Okay.  But you know exactly what you were wearing on April 24th

 6      of 2011?

 7  A   Yes.

 8  Q   And you know exactly what the defendant was wearing on

 9      April 24th of 2011?

10  A   Exactly.

11  Q   But you don't know what you were wearing the next day?

12  A   No, 'cause it wasn't relevant.

13  Q   Okay.  And you don't know what you were wearing the day

14      before?

15  A   No.

16  Q   Sir, have you been convicted of a crime involving theft,

17      dishonesty, or fraud in the last ten years?

18  A   Maybe.

19  Q   Maybe.  The answer is yes or no.

20  A   Yes.

21  Q   Okay.  And what is that?

22  A   What is what?

23  Q   What crime were you convicted of?

24  A   I wasn't convicted of no crime.  I pled guilty because I was

25      with another accomplice.
```

| 1 | Q | Okay. I don't—You don't have to go into more detail. |
| 2 | A | Thank you. |
| 3 | Q | Now are you good friends—Were you good friends with Sam Steel |
| 4 | | at the time on April 24th of 2011? |
| 5 | A | Would you repeat that? |
| 6 | Q | On April 24th of 2011—the time the shooting occurred—were you |
| 7 | | good friends with Samuel Steel? |
| 8 | A | Yes. |
| 9 | Q | And you're still good friends with him— |
| 10 | A | Yes. |
| 11 | Q | —is that fair? |
| 12 | | And were you aware on December 22nd of 2011 that he |
| 13 | | was charged with murder? |
| 14 | A | Yes, I seen it on the news. |
| 15 | Q | I'm sorry. I didn't get— |
| 16 | A | Yes, we—Yeah, I seen it on the news. |
| 17 | Q | Okay. And did you call the police and say, wait, you got the |
| 18 | | wrong guy, there's no way that he could have gone across the |
| 19 | | street in less than five minutes and shot somebody? Did you |
| 20 | | tell the police that? |
| 21 | A | No, sir. |
| 22 | Q | Okay. And did you tell them at all in 2012—ever tell any |
| 23 | | authorities, the Kalamazoo police department—hey, you got the |
| 24 | | wrong guy? |
| 25 | A | No, sir. I didn't think it was my job to. |

1235

| 1 | Q | Okay.  So up until August 19th, 2013, before you talked to |
| | | Carl Clatterbuck, the investigator for the defense, you never |
| | | came forward and told anybody that, did you? |
| 4 | A | No. |
| 5 | Q | So you came forward a week before trial and said, hey, I have |
| | | this information, correct? |
| 7 | A | No. |
| 8 | Q | Okay.  Who did you talk to before then? |
| 9 | A | Nobody else except Carl up until this point here— |
| 10 | Q | Okay. |
| 11 | A | —when you got ahold—in contact with me. |
| 12 | Q | Up until August 19th of— |
| 13 | A | Exactly. |
| 14 | Q | How do you come into contact with Carl Clatterbuck? |
| 15 | A | Through Sam's family. |
| 16 | Q | Okay.  So you have been in contact with Samuel Steel's family? |
| 17 | A | Yes, one of his sisters, one or two of his sisters. |
| 18 | Q | Okay. |
| 19 | A | See them— |
| 20 | Q | And you— |
| 21 | A | Just see them out periodically at the store or somewhere |
| | | eating, yeah. |
| 23 | Q | And you've talked about the case with her? |
| 24 | A | No. |
| 25 | Q | Okay. |

| | | |
|---|---|---|
| 1 | A | They just asked me to come and testify due to the fact that we |
| 2 | | were outside speaking about the basketball tournament during |
| 3 | | that time. |
| 4 | Q | Okay. But you said that you—just you and another person were |
| 5 | | outside. You just testified that it was only you and another |
| 6 | | person outside that you were with, right? |
| 7 | A | No. |
| 8 | Q | Oh, okay. So who was outside with you before the shooting |
| 9 | | occurred? |
| 10 | A | I guess it was like—like four or five guys on his side, and |
| 11 | | there was me and one other guy—me and probably—I think |
| 12 | | probably Ryan Dunnigan or somebody like that. |
| 13 | Q | Okay. I'm asking you one more time this question. Who was |
| 14 | | with you? |
| 15 | A | Who was with me? |
| 16 | Q | Yeah. |
| 17 | A | Nobody when I was talking to Sam. Me and him was standing and |
| 18 | | talking by ourself together. |
| 19 | Q | Specifically, who was outside at the time; do you recall? |
| 20 | A | I don't know. I can't—I can't remember that. |
| 21 | Q | But you remember what clothes you were wearing? |
| 22 | A | Yes. |
| 23 | Q | You didn't talk with Sam's sister—What's her name? Sam's |
| 24 | | sister's name that you talked with? |
| 25 | A | Florence. |

```
 1   Q   Okay.  You didn't talk to her about the specifics of the case?

 2   A   No.

 3   Q   Just said, oh, yeah, I'll be happy to come forward?

 4   A   Nope, I didn't say—Nah—No.

 5   Q   I'm sorry?

 6   A   They asked me was I there during that time.  And I didn't go,

 7       ah, yeah, I want to volunteer.  So don't throw trick questions

 8       at me.

 9               MR. CUSICK:   Can we approach, your Honor?

10               THE COURT:   Yes.

11               (At 2:44 p.m., bench conference as follows:

12                   MR. CUSICK:   He brought it up, has he ever

13                   owned a gun.  He was convicted of a felony,

14                   possession of a gun.  That can be brought up.

15                       He brings up character for violence and whether

16                   or not he's ever had a gun.  I can bring up the fact

17                   he has been convicted and had a gun.

18                   MR. CHAMPION:   No—

19                   THE COURT:   Is that—

20                   MR. CHAMPION:   —I asked if he ever—

21                   THE COURT:   —him or—

22                   MR. CHAMPION:   —seen him with a gun.

23                   THE COURT:   —the defendant?

24                   MR. CUSICK:   Huh?

25                   MR. CHAMPION:   I asked—
```

1238

```
 1                    THE COURT:   Him or the defendant?
 2                    MR. CUSICK:   Mr. Champion said—asked, have you
 3        ever seen the defendant with a gun.
 4                    MR. CHAMPION:   Correct.
 5                    MR. CUSICK:   And he said, no.
 6                    And he brought up his character in the
 7        community.
 8                    THE COURT:   Right.
 9                    MR. CUSICK:   I can go into the fact that he
10        was—that he has had a conviction—
11                    THE COURT:   Who's he—
12                    MR. CUSICK:   —for a gun—
13                    THE COURT:   —Samuel Steel?
14                    MR. CUSICK:   — . . . (inaudible)
15                    THE COURT:   Yes, you can.  I agree with that.
16        It's come up—
17                    MR. CHAMPION:   What's that?
18                    THE COURT:   —two or three times.
19                    MR. CHAMPION:   Pardon?
20                    THE COURT:   That he's been convicted of
21        carrying a concealed weapon.
22                    MR. CUSICK:   You've opened the door.
23                    MR. CHAMPION:   That's not proper.
24                    THE COURT:   I'm sorry?
25                    MR. CHAMPION:   That's not a . . . (inaudible)
```

THE COURT: You've asked two or three different witnesses if he'd ever been seen with a gun, and the implication is—

MR. CHAMPION: Right.

THE COURT: —that he doesn't carry guns.

MR. CHAMPION: Have they ever seen him with a gun.

When was he convicted?

THE COURT: I agree you can bring it up.

MR. CHAMPION: . . . (inaudible)

MR. CUSICK: This one's in 1996.

MR. CHAMPION: 1996.

MR. CUSICK: It doesn't matter. I didn't bring it up. I wasn't—I didn't just ask him now without—you know, bringing it up now. I just—I think it's appropriate now that the defense brought it up that I can do it now.

THE COURT: What are you going to do? Are you going to ask him—

MR. CUSICK: I'm just going to ask him—

THE COURT: —if he's aware that he had a prior conviction for—

MR. CUSICK: No, I'm going to ask him, are you sure that he's never had—have you ever seen him with a gun.

1    He's going to say no.

2    And I'm going to say, and do you know whether

3    or not he ever possessed any firearms.

4    And I'll assume what the answer is that—based

5    on that, and I can at least ask him, well, has he

6    been convicted—are you aware that he's been

7    convicted of a felony.

8    THE COURT:   I have to think about that one.

9    We'll take a break.)

10   THE COURT:   We're going to take about a ten-minute

11   break, and I'll bring you back down.

12   Ms. Wint should be here in a moment.

13   All rise.

14   (At 2:47 p.m., jury exits courtroom)

15   You may be seated.

16   Door shut?

17   MR. CUSICK:   Yes, your Honor.

18   THE COURT:   We'll take about a ten-minute break.

19   We'll—I'll let you put your arguments on the record with

20   regards to the issue that we addressed by way of the bench

21   conference, and then we'll bring Mr. Davenport back to the

22   stand.

23   So we'll just need you in a few minutes, sir; but,

24   until then, you can step down.

25   Anything else we need to address at this time,

1      Counsel?

2                  THE WITNESS:   No, your Honor.

3                  Are you talking to me or talk—

4                  THE COURT:   You can step down.

5                  He doesn't have anything else to address, so that's

6      good.

7                  Counsel, what about either of you?  Do either of you

8      have anything we need to address?

9                  MR. CUSICK:   No, your Honor.

10                 THE COURT:   All right.

11                 MR. CHAMPION:   Not at this time, your Honor.

12                 THE COURT:   Court's in recess for about ten

13     minutes.

14                 (At 2:48 p.m., court recessed)

15                 (At 3:16 p.m., proceedings reconvened)

16                 THE CLERK:   The court recalls the case of People of

17     the State of Michigan versus Samuel Steel, III, case number

18     C11-1983 FC.

19                 Parties, please restate appearances for the record.

20                 MR. CUSICK:   Paul Cusick on behalf of the People,

21     your Honor.

22                 MR. CHAMPION:   Robert Champion appearing on behalf

23     of Samuel Steel.

24                 THE COURT:   All right.  Counsel, we're—

25                 The jury is not here.

                              1242

1    And I understand—Well, we had a discussion at the

2    bench; and I'll let you outline your arguments on the record

3    outside of the jury before we bring them down, and I will give

4    you my decision.

5         So go ahead, Mr. Cusick.

6         MR. CUSICK:   Thank you, your Honor.

7         Mr. Champion has asked, not only this witness but

8    other witnesses, whether or not he was—the witness is aware

9    of—or ever saw the defendant with a gun.

10        Right after, he asked the questions what's the

11   character of the defendant in the community.

12        Now the witness testified that he has never seen the

13   defendant with a gun.  Other witnesses—Or, at least, one other

14   witness has testified they'd never seen the defendant with a

15   gun.

16        Under rule 404(a)(1)—And I'm quoting, your Honor.—it

17   says:

18        "Character evidence generally.  Evidence of a

19        person's character or a trait of character is not

20        admissible for the purpose of proving action in

21        conformity therewith on a particular occasion,

22        except"—

23        Subsection (1), the "character of the accused.

24        Evidence of a pertinent trait of character offered

25        by an accused"—

1243

In this case, the defendant doesn't use or possess or has ever been seen by these witnesses with a firearm.

—"or by the prosecution to rebut the same. . ."

And it is our ability, when that is brought up by the defense—And it has been brought up in this case.—to at least ask questions about a conviction regarding firearms. And that's what I seek to do.

MR. CHAMPION: Your Honor, first of all, I haven't raised the issue of character involving a gun. The questions were very specific, have you ever seen Samuel Steel with a gun. That is not general character evidence. That is nothing more than asking a very specific question.

The questions that I asked regarding character was does he have a general reputation regarding peacefulness in the community, and I made that very clear.

Regardless, though, 404(b) specifically states evidence of other crimes, wrongs, or acts are not admissible to prove the character of a person.

Additionally, under People v Williams and People v Champion, 97 Mich App 25 (1980); People v Hill; People v Johnson 409 Mich 552 (1980); People v Perez, 66 Mich App [*sic*] (1976) states that where the defendant puts his or her character in issue by proof of general reputation, rebuttal offered by the prosecution cannot be proven by specific bad acts.

1                Here, we're having the prosecution wanting to

2 cross-examination a witness on a specific bad act, that being,

3 carrying a concealed weapon back in 1996. We don't even know

4 what the weapon was in 1996.

5                Also what is cited is McCormick's Evidence,

6 Fifth Edition, section 40, et seq, pages 150 through 175.

7                MR. CUSICK:   Your Honor—

8                THE COURT:   Go ahead.

9                MR. CUSICK:   —very briefly.

10                I agree with Mr. Champion with regards to 404(b).

11 Obviously, if I wanted to bring this evidence forward, I would

12 have to file a 404(b) motion and I'd have to indicate that was

13 our intent.

14                But, with regards to 404(a), which is when the

15 defense brings up these issues, I can bring it up as rebuttal.

16                The defense—The defense cannot just ask, well, have

17 you ever seen the defendant with a gun and—obviously,

18 inferring that his character is that he doesn't possess

19 firearms—and then not allow us to cross-examine or confront

20 the witness with a specific conviction.

21                I mean, what if—To assume that we can't

22 cross-examine on anything that the defense brings up when they

23 bring up the character of the witness [*sic*], that's exactly

24 what's being brought up here is the character of the

25 witness [*sic*], specifically, oh, that he doesn't possess

firearms or doesn't use firearms.

I mean, we obviously, have the ability to say, no, he actually—to, at least, confront the witness and say, are you aware that he has been convicted.

MR. CHAMPION: My question wasn't does he have a reputation of carrying any weapons. My question was very specific, have you ever seen Samuel Steel with a gun, not does he have a reputation, which is a whole different issue which often is asked in a trial.

THE COURT: Yeah, that's probably not going to work, ma'am. You probably are going to need to—Children in court during a murder case are probably not the best place for them anyway.

I'm not going to allow the evidence in. I certainly—I will just state for the record, I'm concerned that the door is open somewhat in that we're not only addressing the question of whether or not the defendant carries a gun but, also, his character for peacefulness. And I think that that, certainly, could arguably be used to rebut that, too.

I—My main concern—And I guess if it was a more recent offense, I likely would have allowed it in. I also have to look at a 403 balancing test here, and a conviction back in 1996—17 years ago—whether that's probative to what's going on back in 2011, I don't necessarily think that that is the case.

1          So I would just indicate, Mr. Champion, you better
2     be careful.  If we keep going in this—along this route, then I
3     think you might very well reach the point that it may come in.
4     I don't know necessarily that the questions regarding whether
5     they've seen him carry a gun in the past are proper anyway as
6     to what's going on as far as April 24th of 2011.
7          But I certainly think, given the circumstances and
8     the fact that the offense is in 1996—And, also, I guess, as
9     Mr. Champion pointed out, we don't know specifically the type
10    weapon at this point—I don't have any information about
11    that.—or a firearm.
12         For all those reasons, I'm not going to let you ask
13    the question of this particular witness.
14              MR. CUSICK:   Thank you, Judge.
15         I think I'm done with this witness, too.
16              THE COURT:   I'm sorry?
17              MR. CUSICK:   I believe I'm done—finished with this
18    witness.
19              THE COURT:   All right.  Is he here still?  We need—
20              MR. CHAMPION:   He should be.
21              THE COURT:   Why don't we bring him back on the
22    stand in a second.
23         The jury's on their way here.
24              THE WITNESS:   May I approach?
25              THE COURT:   Yes.  Go ahead and have a seat, sir.

1247

1     Give me one second.

2           Let me just indicate one other thing, also.  I was

3     reviewing an unpublished case of People v Hawkins.  It's a

4     March 30, 1999, case.  And, in that case, it was also a—the

5     defendant was charged and convicted with first-degree felony

6     murder.

7           The defense was trying to—or requested to be allowed

8     to ask a witness if he had—if a gun was carried for protection

9     in the past.

10          The court excluded that question, and there is some

11    discussion with regards to whether or not that's proper

12    character evidence or even a proper question in that

13    particular case.  And the trial court was affirmed in that

14    particular case.

15          And, again, I don't want to say anything more

16    without looking at that in further detail.  But that's why I

17    mentioned the fact that let's not ask that question if you

18    have another witness, Mr. Champion, so—

19          MR. CHAMPION:    I will not, your Honor.

20          THE COURT:    Okay.  The jury is here.

21          All rise.

22          (At 3:29 p.m., jury returns to courtroom)

23          You may be seated.

24

25

1  REDIRECT EXAMINATION

2  BY MR. CHAMPION:

3  Q    Mr. Davenport, the prosecution—

4                 THE COURT:   Hold on a second, please.

5                 All right.  Ladies and gentlemen, welcome back.

6                 When we took a break, Mr. Davenport was on the

7       stand; and he's back on the stand now.

8                 And, sir, you do understand you are still under

9       oath?  You understand that?

10                THE WITNESS:   Yes, your Honor.

11                THE COURT:   All right.  Just state your full name

12      again for the record, if you would, sir.  You don't have to

13      spell it this time.

14                THE WITNESS:   R period B period Davenport.

15                THE COURT:   All right.  Go ahead, Mr. Champion.

16                MR. CHAMPION:   Thank you.

17  BY MR. CHAMPION:

18  Q    Mr. Davenport, the prosecution asked you in December of 2011

19      did you come forward after seeing news reports of Samuel Steel

20      being charged with murder.  Did you?

21  A    No.

22  Q    Did you know any of the facts surrounding Mr. Steel or A. J.

23      being charged with these—this specific crime?

24  A    No, sir.

25  Q    Was any of that ever released?

1    A    No.

2    Q    Did you know what involvement at all that Sam would have had

3         in the case alleged by the prosecution?

4    A    No.

5    Q    In December of last year, did you know any of the facts?

6    A    No, sir.

7    Q    Have you ever talked to the police about this?

8    A    No, sir.

9    Q    Have they ever come to your house?

10   A    No.

11   Q    Did they ever come to 619 Mabel to interview you or anyone

12        else that was—

13   A    No.

14   Q    —in that house?

15             Thank you.

16             MR. CUSICK:    Just one or two questions.

17                        RECROSS-EXAMINATION

18   BY MR. CUSICK:

19   Q    Did you live at Mabel at that time?

20   A    No, I was visiting a friend there.

21   Q    So you don't know if anybody came by that area, correct?

22             THE COURT:    I missed it.

23             THE WITNESS:    Would you—

24             THE COURT:    Hold on a second.  I didn't hear it.

25

1250

BY MR. CUSICK:

Q    You don't know if anybody came by that area to talk to you, correct?

A    No, that's a trick question.

            THE COURT:    Sir, you have to answer the question. We make the rulings—

            THE WITNESS:    What is he talking about about—

            THE COURT:    Hold on.  We make the rulings.  So you do need to answer the question.  Okay?

            THE WITNESS:    Repeat the question again.

            THE COURT:    The question is you don't know whether anyone came by to talk to you.  That was his question.

            THE WITNESS:    No one didn't.

            THE COURT:    Next question.

BY MR. CUSICK:

Q    But you don't live there, correct?

A    No, I was—My friend lives there.

Q    And you know that your friend Sam Steel got charged with murder on December 22nd of 2011, correct?

A    Yeah, I seen it on the news.

Q    Okay.  And you didn't come forward after that, right?

A    No, because I didn't think it was my duty to.

            MR. CHAMPION:    I have no other questions, your Honor.

            THE COURT:    Ladies and gentlemen, any questions for

this witness?  It looks like we do have a question.

I think it's Mr.—

Mr. Cusick, I think it's your turn.

(At 3:33 p.m., bench conference as follows:

THE COURT:  Okay.  Now, when I give you an opportunity for rebuttal after this, we're sticking with rebuttal, not repeatal.  Let's not repeat . . . (inaudible)

MR. CUSICK:  Okay.

THE COURT:  I'm going to start being a little bit more particular about that.  We are just going over and over the same thing.

MR. CUSICK:  Okay.)

THE COURT:  Are you sure you saw Sam after the murder?

THE WITNESS:  Yes, we all were still standing outside.

THE COURT:  Did you talk to him after the murder is the question.

THE WITNESS:  I think maybe I might have said a word or two.  We was—But we was all on both sides.  He was at his mother's house, and we was over there on this side.  And this is initially after the ambulance had came and—you know, and people came back out of the house.  And so we all was still standing there.

1       THE COURT:   What did he say to you when you spoke

2   at that time?

3       THE WITNESS:   We were still speaking in reference

4   to the basketball tournament.

5       THE COURT:   I'm going to jump in.  I need a

6   clarification here.

7       You indicated that you were at 619.  That's your

8   friend's home—

9       THE WITNESS:   Uhm-hmm.

10      THE COURT:   —is that correct, sir?

11      THE WITNESS:   Yes, your Honor.

12      THE COURT:   All right.  What house—Can you point on

13  exhibit A where that house is again and where Mr. Steel's

14  mom's house is.  Well, let me—

15      THE WITNESS:   . . . (inaudible)

16      THE COURT:   Let me just stop.  Is 619 Mr. Steel's

17  mom's house?

18      THE WITNESS:   No.

19      THE COURT:   All right.  They're next door to each

20  other; is—

21      THE WITNESS:   Yes.

22      THE COURT:   —that right?

23      THE WITNESS:   Yes.

24      THE COURT:   All right.  I'm sorry.  I was a little

25  confused.

1253

1    THE WITNESS:  I can see her driveway.

2    THE COURT:  Okay.  Can you take exhibit A and just

3    point that out for my purposes; and, if you can stand back—

4    There should be a pointer right there,

5    Mr. Davenport.  That pen.

6    THE WITNESS:  Uhm-hmm.

7    THE COURT:  It extends out.  If you could pull it.

8    Thank you.

9    Now grab that microphone right there in case you

10   need to move—The one setting right there.

11   All right.  If you could please point—You can use

12   that so that you can get up out of your chair and point—

13   THE WITNESS:  . . . (inaudible)

14   THE COURT:  —but you have to speak into that

15   microphone.

16   Can you point to where 619 is on this map, if you

17   know.

18   And I'm also going to ask you to stand to the side

19   so all the jurors can see where you're pointing, sir.

20   THE WITNESS:  619 is here.

21   THE COURT:  All right.  And then where is

22   Mr. Steel's mom's house?

23   THE WITNESS:  I would assume it would be right

24   here.

25   THE COURT:  Okay.  You're looking at that map

1254

```
 1        correctly.  That—

 2                    THE WITNESS:   This is going towards Cobb, right?

 3                    THE COURT:   You can't ask me a question.

 4                    THE WITNESS:   Oh.

 5                    THE COURT:   All right.  Is Cobb—

 6                    THE WITNESS:   Yeah.

 7                    THE COURT:   —referenced—

 8                    THE WITNESS:   Yeah.

 9                    THE COURT:   —over there?

10                    THE WITNESS:   Yes, ma'am.  Wanted to make sure I

11        wasn't going the wrong way.

12                    THE COURT:   Thank you.

13                    THE WITNESS:   I didn't want to point to the wrong

14        house.

15                    THE COURT:   All right.  Thank you.

16                    You may have another seat, sir.

17                    Mr. Champion, any rebuttal questions based on those

18        questions?

19                    MR. CHAMPION:   I have no redirect questions,

20        your Honor.

21                             RECROSS-EXAMINATION

22   BY MR. CUSICK:

23   Q    So there's—

24                    MR. CUSICK:   This is directly related to that

25        question.
```

```
 1                    THE COURT:   Okay.
 2   BY MR. CUSICK:
 3   Q    So, at the time that the dead body's in front of 626,
 4        you—626 Mabel, you and Sam Steel are still talking about
 5        basketball?
 6   A    No, I didn't say that.
 7   Q    You just said what—
 8   A    I said we were talking about basketball prior to that;
 9        and—and, initially, after the ambulance had came and everybody
10        was outside surrounded, I came back out and we talked again
11        about basketball.
12   Q    Okay.
13   A    Thank you.
14   Q    So—
15                    MR. CUSICK:   I think you answered my question.
16                    THE WITNESS:   Thank you.
17                    THE COURT:   Anything else, then, Mr. Champion?
18                         REDIRECT EXAMINATION
19   BY MR. CHAMPION:
20   Q    Did you discuss anything else?  The time when you came back
21        out after you heard the shots, did you and Sam Steel have
22        other discussions?
23   A    No, we just basically talked about putting the tournament
24        together and—
25   Q    And that was—
                              1256
```

```
 1   A      —for—

 2   Q      —after the ambulance and everything—

 3   A      Yeah.

 4   Q      —left, correct?

 5   A      Exactly.

 6                  MR. CHAMPION:   Thank you.

 7                  MR. CUSICK:   Nothing.

 8                  THE COURT:   Any other questions, ladies and

 9        gentlemen?

10                  Oh, we have one more.

11                  Mr. Champion, is it your turn?

12                  (At 3:37 p.m., bench conference as follows:

13                       THE COURT:   . . . (inaudible)

14                       MR. CHAMPION:   We, obviously, don't have it

15                  operating right now.

16                       THE COURT:   We've got the exhibits—

17                       MR. CUSICK:   No, but I think Cathy can—

18                       THE COURT:   I don't know what—

19                       MR. CUSICK:   —be available . . . (inaudible)

20                       THE COURT:   I don't know what the question is.

21                       MR. CUSICK:   Do you want Cathy

22                  . . . (inaudible) ask you for the monitor?

23                       THE COURT:   Please turn the TV—

24                       MR. CHAMPION:   Yes.

25                       THE COURT:   — . . . (inaudible)
```

1    Well, now you know that for future, but I'm not

2    going to ask the question because it's not a

3    question—

4        MR. CUSICK:   Okay.)

5        THE COURT:   All right.  Thank you, sir.  You may

6    step down.

7        And is he excused then, Counsel?

8        MR. CHAMPION:   Yes, your Honor.

9        THE COURT:   Any objections to that?

10       MR. CUSICK:   No.

11       THE COURT:   All right.  Thank you.

12       MR. CHAMPION:   May I have just a moment?

13       THE COURT:   Yes.

14       (At 3:38 p.m., Mr. Champion exits courtroom and

15       returns momentarily)

16       MR. CHAMPION:   Your Honor, I would call

17   Earnest Wynn to the stand.

18       THE COURT:   Before you have a seat, sir, please

19   raise your right hand as best you can.  Do you solemnly swear

20   or affirm that the testimony you're about to give will be the

21   truth, the whole truth, and nothing but the truth, so help you

22   God?

23       MR. WINN:   I do.

24       THE COURT:   Please have a seat.  Be careful

25   stepping up there, sir, but have a seat.

```
 1              Now you're going to need to pull that microphone

 2      down so it's right in line with your mouth, if you can.

 3              Mr. Champion, maybe you can help him.  Just make

 4      sure that's right in line with his mouth, please.

 5              Sir, you need to speak right—

 6              Go down . . . (inaudible)

 7              You need to speak right in the end of that

 8      microphone.  If you move too—too far back, it's hard to hear.

 9              I need you to state and spell your first and last

10      name for the record, please.

11              THE WITNESS:   Earnest Wynn—E-a-r-n-e-s-t W-y-n-n.

12              MR. CHAMPION:   Thank you.

13              THE WITNESS:   Uhm-hmm.

14                          EARNEST WYNN,

15      called at 3:40 p.m., and sworn by the Court, testified:

16                        DIRECT EXAMINATION

17  BY MR. CHAMPION:

18  Q    Mr. Wynn, you're currently incarcerated in the

19       Kalamazoo County Jail; is that correct?

20  A    Yes, I am.

21  Q    What for, if I may ask?

22  A    Retail fraud first.

23  Q    Now do you know Sam Steel?

24  A    I do.

25  Q    How do you know Sam Steel?
```

```
 1   A   Grew up with him.

 2   Q   Do you know Walter Johnson?

 3   A   I do.

 4   Q   On August [sic] 24th, 2011, were you on Mabel Street or in the

 5       vicinity at 9:00 p.m.?

 6   A   No, I wasn't.

 7   Q   Do you have any information about a shooting involving

 8       Milo Conklin?

 9   A   No.

10   Q   Have you ever had any conversations with Walter Johnson

11       regarding Sam Steel and his participation in the shooting of

12       Milo Conklin?

13   A   No, but I had a conversation with Walter Johnson, yes.

14   Q   What did Walter tell you?

15   A   Walt called me from a federal prison twice.  We had a couple

16       conversations, but, on one, in particular, we got to talking.

17               And I asked him, was he telling on Sam.

18               Walt said, well, Sam tried to throw me under the bus

19       first.

20               So he sent Beauchamp up to the federal prison to

21       talk to him.

22               So I said, so you telling on him.

23               So, in the end, he was like, well, just say this:

24       I'm the point guard for the prosecutor and Beauchamp.

25   Q   Did he talk about getting a reduction as a result of his
```

| 1 | | sentence—a reduction in his sentence as a result of his |
| 2 | | testimony? |
| 3 | A | Pretty much— |
| 4 | Q | He did— |
| 5 | A | —he did. |
| 6 | Q | —to you? |
| 7 | | So he was aware, if he testified, he was going to |
| 8 | | get a reduction—a substantial or some type of reduction; is |
| 9 | | that correct? |
| 10 | A | Well, when a person tell you that the feds, they're not |
| 11 | | concerned with drugs, guns, and money, they want bodies, yeah, |
| 12 | | that's how I took it. |
| 13 | | MR. CHAMPION:   That's how you took it. |
| 14 | | Thank you. |
| 15 | | I have no other questions. |
| 16 | | THE WITNESS:   Oh. |
| 17 | | CROSS-EXAMINATION |
| 18 | BY MR. CUSICK: |
| 19 | Q | When did this conversation happen, sir? |
| 20 | A | I would say January of this year. |
| 21 | Q | And what number did he call you? |
| 22 | A | Excuse me? |
| 23 | Q | What was the number that Walter Johnson used to call you? |
| 24 | A | (269) 744-2996. |
| 25 | Q | Okay.  Now are you good friends with Samuel Steel? |

```
 1   A    I am.

 2   Q    Are you good friends with Walter Johnson?

 3   A    I am.

 4   Q    Okay.  How long have you known Sam Steel?

 5   A    Fifteen plus years.

 6   Q    Okay.  How long have you known Walter Johnson?

 7   A    About the same, 15 plus years.

 8   Q    When you heard about this, what did you do when—when

 9        Walter told you this?

10   A    I just looked at the phone, like, wow, for real.

11   Q    Okay.  And what do you do after that?  Who did you tell?

12   A    Did I what?

13   Q    Who did you tell after that?

14   A    I ain't tell nobody.

15   Q    Okay.  Did you ever make a statement to the police about this?

16   A    No.

17   Q    You ever make a statement to Carl Clatterbuck, the

18        investigator for the defense?

19   A    I don't know him.  Never met him.

20   Q    So who was the first person that you told when you came

21        forward with this information?  Did you talk to Sam Steel at

22        all?

23              THE COURT:   I didn't get an answer to the last

24        question.

25              MR. CUSICK:   Okay.
```

BY MR. CUSICK:

Q    Who is the first person you told when you came forward?

A    Eventually, I end up telling Sam, yes.

Q    Okay.  Anybody else you told before that?

A    My—My fiancée and my children.

Q    Okay.

A    They—They were there, yeah, when I received the phone call.

Q    Okay.

A    I didn't—Initially, I didn't tell them right then; but I ended up telling them, yes.

Q    And you reached out to Sam and told Sam this is what happened—

A    Eventually, yes.

Q    —or did Sam call you?

A    Sam never called me.

Q    Okay.  So you called Sam Steel, correct?

A    No, I never called him.

Q    How did you tell Sam—Well, you—I asked you did you reach out or tell Sam Steel.  How do you tell him?

A    We talk.

Q    How did you talk?

A    Face to face.

Q    Were you in the jail together?

A    Yeah, that's when I initially told him, yes.

Q    Okay.  And were you in the jail together here in Kalamazoo County?

```
1   A   When I told him, yes.

2   Q   Okay.  And that was recent, correct?

3   A   Yes.

4   Q   When did that conversation take place?

5   A   I'm not going to lie on the stand.  I can't remember the exact

6       date.

7   Q   Was it in the last two weeks?

8   A   No, no, no, no.

9   Q   Was it in the last two months?

10  A   Probably, yeah.

11  Q   Okay.  And, based on that conversation, what did you do?  Did

12      you tell anybody else after that?

13  A   No.

14  Q   You just came here to testify on September 5th—September 4th and

15      never told anybody else before?

16  A   No.

17              MR. CUSICK:   I have nothing further.

18              THE COURT:   Mr. Champion?

19                    REDIRECT EXAMINATION

20  BY MR. CHAMPION:

21  Q   Were you aware you've been on a witness list for some period

22      of time?  That's been a court document.

23  A   Yeah, he served me in the county jail.

24  Q   You've known Walter Johnson as long as you've known Sam Steel;

25      is that—
```

```
 1   A     Yeah.

 2   Q     —your testimony?

 3   A     Yes.

 4   Q     When was the next time you were going to see Walter Johnson,

 5         if you know?

 6   A     Well, from that phone conversation, he also stated when

 7         everything blows over.

 8               I'm like, what you mean blow over.

 9               He said, well, after Sam trial, I see you in two or

10         three years.

11               MR. CHAMPION:   Thank you.

12               THE WITNESS:   That's what he told me.

13               MR. CUSICK:   I have nothing further, your Honor.

14               Thank you.

15               THE COURT:   Ladies and gentlemen, do any of you

16         have any questions for this witness?  If so, raise your hand.

17               No hands are raised.

18               Thank you, sir.  Be very careful when you step down.

19         You're excused.

20               THE WITNESS:   I'm dismissed?

21               THE COURT:   Yes.

22               THE WITNESS:   All right.

23               THE COURT:   Is he released, then, from his

24         subpoena, Counsel?

25               (No audible response)
```

```
 1                    Yes?  Is he released?

 2                    MR. CUSICK:   Yes, your Honor.

 3                    THE COURT:   Any objection?

 4                    Mr. Champion?

 5                    MR. CHAMPION:   May I check, your Honor?  I have one

 6       other witness.

 7                    (At 3:48 p.m., Mr. Champion exits courtroom and

 8                    returns momentarily)

 9                    MR. CHAMPION:   Your Honor, I'd call Antonio Willams

10       to the stand.

11                    THE COURT:   Right over here, sir.

12                    Before you have a seat, please raise your right

13       hand.

14                    MR. WILLAMS:   I affirm.

15                    THE COURT:   Raise your right hand, sir.

16                    MR. WILLAMS:   I'll raise my right hand, and I

17       affirm.

18                    THE COURT:   I need to give you the oath, sir, so

19       raise your right hand.  Do you solemnly swear or affirm that

20       the testimony that you are about to give will be the truth,

21       the whole truth, and nothing but the truth, sir?

22                    MR. WILLAMS:   I affirm.

23                    THE COURT:   Thank you.

24                    You may have a seat.

25                    All right.  Now, with that microphone, you really
```

1266

```
 1        need to speak right in the end of the microphone there.  I
 2        need you to state and spell your first and last name for the
 3        record, please, sir.
 4                 THE WITNESS:   Antonio Willams—A-n-t-o-n-i-o
 5        W-i-l-l-a-m-s.
 6                 THE COURT:   Let me just—It's W-i-l-l-a-m-s; is
 7        that—
 8                 THE WITNESS:   Yes.
 9                 THE COURT:   —correct?  All right.
10                          ANTONIO WILLAMS,
11        called at 3:49 p.m., and sworn by the Court, testified:
12                        DIRECT EXAMINATION
13   BY MR. CHAMPION:
14   Q    Mr. Willams, do you know Sam Steel?
15   A    Yes.
16   Q    Do you know Walter Johnson?
17   A    Yes.
18   Q    A. J. Mathews?
19   A    Yeah, familiar.
20   Q    And Devon Smith?
21   A    Devon Smith?
22   Q    Yeah.
23   A    Yeah, I'm familiar.
24   Q    Familiar with him.  Do you know him well?
25   A    No, I don't know—know him well.
```

1   Q   Directing your attention back to April 24th of 2011—It was

2        Easter Sunday.—do you recall where you were at that time,

3        let's say, at 9:00 o'clock at night?

4   A   On Mabel.

5   Q   On Mabel Street?

6   A   Yeah.

7   Q   Did you observe anything involving a shooting at that time?

8   A   Yes.

9   Q   What did you observe?

10   A   Well, I was sitting on the porch on Mabel, and I heard some

11       gunshots.

12   Q   What porch were you sitting on?

13   A   I don't know the address, but me and Sam was sitting on the

14       porch of his mother house.

15   Q   At his mother's house?

16   A   Yeah.

17   Q   And, when you say Sam, you're talking about Sam Steel—

18   A   Yes.

19   Q   —who's present in the courtroom, correct?

20   A   Yes.

21   Q   Where did the shots come from, if you know?

22   A   Across the street.

23   Q   Did you see what happened?

24   A   Not really, because I wasn't concentrating on basically

25       looking that way or anything like that.  But there was—there

1    was a crowd, like, across the street sitting on a car in a

2    driveway.

3  Q  So were you facing that direction, or was your back to—

4  A  Of course, I was.  I was facing that direction, the only way

5    you can face.

6  Q  Did you see the shooting take place, or did you look over that

7    direction after the shots were fired?

8  A  After the shots was fired.

9  Q  Did you see who was shooting the weapon?

10 A  No, I wear glasses.  I couldn't see that far away like that.

11 Q  You couldn't see that far?

12 A  No, not at all.

13 Q  How many shots did you hear?

14 A  Probably like four or three.

15 Q  So you're on the porch—You're on the porch with Sam.  What was

16   going on before the shots being fired?

17 A  We was talking.

18 Q  Were there other people there?

19 A  It was like—I think like one person or—Yeah, about one person,

20   two people like in the area.

21 Q  Pardon?

22 A  In the area.

23 Q  In the area.  Was there people across the street, also?

24 A  Yes.

25 Q  Do you know a R. B. Davenport?

```
 1   A   No.

 2   Q   Were people coming and going during that time?

 3   A   Yeah.

 4   Q   So you hear the shots.  You're talking to Sam Steel.  How long

 5       had you been there?

 6   A   All day.

 7   Q   All day.  So people are coming and going during that period of

 8       time?

 9   A   Yeah, I stay on Mabel.

10   Q   Pardon?

11   A   I stay on Mabel.

12   Q   You stay on Mabel.

13   A   Yeah.

14   Q   Where do you stay?

15   A   517.

16   Q   Pardon?

17   A   517 Mabel.

18   Q   You stay at 517?

19   A   Yeah.

20   Q   So about a block down?

21   A   No, it's not even about a block.

22   Q   About—

23   A   It's probably about like seven houses down.

24   Q   Seven houses down.

25               How long had you been at Sam Steel's house—mother's
```

```
 1      house?

 2   A  All day—

 3   Q  All day?

 4   A  —till the nighttime.

 5   Q  And had there been drinking and people eating food during that

 6      time?

 7   A  Exactly.

 8   Q  Sort of a small party or celebration?

 9   A  Basically, a normal thing.

10   Q  Now, after you heard the shots, did you see anything else?

11      Did you see anybody run or flee the area?

12   A  Seen somebody flee the area.

13   Q  Where did you see them go?

14   A  Back the other direction.

15   Q  When you say the other direction, what does that mean?

16   A  That mean that I'm right here and they right there across the

17      street that way.  I'm basically like this.

18   Q  So, if the shooting occurred on the north side of

19      Mabel Street, did they run north or south?

20   A  North.

21   Q  Away from you?

22   A  Yeah.

23   Q  But there was other individuals in the area, too; is that

24      correct?

25   A  Right.
```

```
 1    Q    Did you see a Steve Brown that evening, if you know
 2         Steve Brown?
 3    A    I seen him earlier that day.  Ain't out there.
 4    Q    Did you run into Steve Brown at any point in time after
 5         you—Did you leave after the shooting?
 6    A    Yes.
 7    Q    Did you see Steve Brown after that?
 8    A    Of course, I did.
 9    Q    What did you see?
10    A    He was fighting on the next street.
11    Q    The next street.  What street would that be?
12    A    That'd be . . . (unintelligible) by Ada . . . (unintelligible)
13    Q    Ada area?
14    A    Yeah.
15    Q    How long after the shooting did you get into the Ada area
16         where you ran into Steve Brown?
17    A    It was like right after.  After I heard the gunshots, we took
18         off.  So then I was going through the back cut going towards
19         Polar Bear.
20    Q    So that'd be going south from—
21    A    Going towards Ada.
22    Q    And you saw Steve Brown in a fight?
23    A    Yeah.
24    Q    So the—
25              THE COURT:   Let me just—Can I just jump in a
                              1272
```

```
 1        second.
 2                    You indicated that you were going toward Polar Bear;
 3        is that correct, sir?
 4                      THE WITNESS:   Yeah.
 5                      THE COURT:   Is that a store?
 6                      THE WITNESS:   Yes.
 7                      THE COURT:   Thank you.
 8                      Go ahead.
 9   BY MR. CHAMPION:
10   Q    Polar Bear, is that at the corner of North and Ada—
11   A    No.
12   Q    —or it's on North—
13   A    It's on Westnedge at—Yeah.
14   Q    It's on North and Westnedge, correct.  Thank you.
15   A    Yeah.
16   Q    So, at the time the shooting took place, you were speaking
17        with Sam Steel?
18   A    Yes.
19   Q    And he was on the porch with you?
20   A    Yes.
21   Q    Any question about that?  Do you—
22   A    Any questions about—
23   Q    —have any doubt?
24   A    —what?
25   Q    Do you have any doubt about that?
```

```
 1   A    It can't be no doubt about it.

 2                   MR. CHAMPION:   Thank you.

 3                   I have no other questions.

 4                        CROSS-EXAMINATION

 5   BY MR. CUSICK:

 6   Q    Good afternoon, sir.

 7                   Sir, what's your date of birth?

 8   A    8/26/78.

 9   Q    Okay.  Now you are located in BS-22 in the area of

10        Kalamazoo County Jail, correct?

11   A    What?

12   Q    You're—You—You've been incarcerated in the Kalamazoo County

13        Jail, correct?

14   A    Yeah.

15   Q    And you've spent time in the BS-22 section, correct?

16   A    BS—Yeah.

17   Q    Okay.  And Sam Steel's also incarcerated in the

18        Kalamazoo County Steel [*sic*]; is that—County Jail; is that

19        correct?

20   A    Yeah.

21   Q    Okay.  And you see him at the—You've seen him at the

22        Kalamazoo County Jail, have you not?

23   A    Yeah.

24   Q    And you've talked about this case with him, correct?

25   A    No.
```

```
 1  Q   Okay.  Did you ever tell him that—
 2  A   Only today.  I talked to him today.
 3  Q   You talked to him today?
 4  A   I seen him other times—
 5  Q   Okay.  During the—
 6  A   —and had knowledge about him being in that jail.
 7  Q   During the other times that you—that you were with—So let me
 8      just get this straight.  You said that you saw him today in
 9      the jail, right?
10  A   Yeah.
11  Q   And you never saw him before this day in the jail?
12  A   Yeah, I seen him before again.
13  Q   Okay.  And how many times in the past—How many times have you
14      spoken with Sam Steel in the last three months?
15  A   The only time when I seen him when I was delivering a tray
16      while a officer was there with me.
17  Q   Okay.  But you're in the same area in the jail, correct?
18  A   No, not at all.  I was trusty.  I just got kicked off.
19  Q   Okay.  So, when you've had—How many conversations—You had that
20      conver—You had a conversation, you saw him then, right?
21  A   They tell us not to talk to the inmates or we get kicked off.
22      That's why I'm kicked off now for doing other—
23  Q   Okay.
24  A   —but not talking to nobody.
25  Q   So did you talk to him that day at all?  Have you ever talked
```

| | | |
|---|---|---|
| 1 | | to Sam Steel about this case? |
| 2 | A | No. |
| 3 | Q | Okay. How did you come forward today and testify? |
| 4 | A | How did I come forward? |
| 5 | Q | Yeah, who did you first tell and say I have information? |
| 6 | A | Because he know that me and him actually was together and |
| 7 | | everything else was fabricated— |
| 8 | Q | Okay. |
| 9 | A | —by other people. |
| 10 | Q | Okay. |
| 11 | A | That's why. |
| 12 | Q | Now—But you've had occasion to spend time with him in the |
| 13 | | jail, that's fair, right? |
| 14 | A | No, we don't—You don't—It's nothing like that. I been on |
| 15 | | trusty, I told you. I just got kicked off about like two days |
| 16 | | ago. I'm on lock-down— |
| 17 | Q | Okay. |
| 18 | A | —so I don't even get to move around. |
| 19 | Q | But you've been—You've been in the Kalamazoo County Jail on a |
| 20 | | number of occasions since February of this year, correct? |
| 21 | A | No, I was in Roscommon. |
| 22 | Q | Okay. |
| 23 | A | I was in Roscommon since February down to like June 10th. |
| 24 | Q | Were you—In February of this year, were you in the Kalamazoo— |
| 25 | A | And I got proof of incarceration. Yeah, I was in the |

| | |
|---|---|
| 1 | Roscommon Jail.  I got sent off to another county. |
| 2  Q | Okay.  So you were not—Just listen to my question.  Okay?  You |
| 3 | were not in Kalamazoo County Jail in February of this year? |
| 4  A | Would be January, February—Yes. |
| 5  Q | Okay.  You were.  Sam Steel was in the Kalamazoo County Jail |
| 6 | at that time, too, correct? |
| 7  A | Yes. |
| 8  Q | You ever see him then?  You ever talk to him then? |
| 9  A | No, I was in the dorms.  And then I went to A-West-1.  I got |
| 10 | kicked out of the dorms because I got written up.  So, again, |
| 11 | they rode me to Roscommon Jail. |
| 12  Q | Okay.  You came back to Kalamazoo County Jail in March of this |
| 13 | year, didn't you? |
| 14  A | No, that's when I left Kalamazoo County Jail, from A-West.  I |
| 15 | been—I been back to Kalamazoo since June 10th from |
| 16 | Roscommon Jail. |
| 17  Q | Okay. |
| 18  A | Never ran across him? |
| 19  Q | Okay.  So who contacted you regarding your testimony today? |
| 20  A | Some—Some detective. |
| 21  Q | Okay.  Is that Carl Clatterbuck? |
| 22  A | I'm not good with names.  I don't really recall the name.  I |
| 23 | just asked to see his badge. |
| 24  Q | Okay.  It's—And did you speak with Mr. Clatterbuck? |
| 25  A | I'm not good with names.  If you can point— |

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | —to him, I can probably address him then. |
| 3 | Q | Sir— |
| 4 | A | I'm not good with names.  Sometimes I call people different |
| 5 | | names myself.  I call them Sport or something like that or |
| 6 | | anything like— |
| 7 | Q | You spoke with somebody— |
| 8 | A | Yeah, I asked to see his badge, some guy with a—a clear-cut |
| 9 | | face with glasses. |
| 10 | Q | Okay.  And he's—Was he an investigator for the defense in this |
| 11 | | case? |
| 12 | A | Yes. |
| 13 | Q | Okay.  And did you make a statement—give him a statement? |
| 14 | A | Yes, he asked me some things. |
| 15 | Q | Okay.  And when did this occur? |
| 16 | A | About like the day before yesterday. |
| 17 | Q | Okay.  So— |
| 18 | A | It's in the county jail records. |
| 19 | Q | Okay.  No, I know.  I'm just— |
| 20 | | So you talked to him yesterday or two days ago? |
| 21 | A | Yeah. |
| 22 | Q | And, up until this time when you talked to this individual, |
| 23 | | had you ever talked to any other investigator before this |
| 24 | | about this case? |
| 25 | A | No. |

```
 1  Q   Okay.  So you see a shooting that took place, right?

 2  A   Yeah.

 3  Q   Okay.  And do you ever contact the Kalamazoo police

 4      department?

 5  A   No.

 6  Q   And do you ever contact anybody else regarding the fact that

 7      there was a shooting or that you had seen something that day?

 8  A   No.

 9  Q   Okay.  Now how long have you known Sam Steel?

10  A   About like two years since I been out of prison.

11  Q   Are you friends with Sam Steel?

12  A   Not—Not really friends; you know, occasionally—occasionally

13      tight.

14  Q   And were you aware—

15  A   I ain't got no friends.  I don't—I don't play friends' game

16      anyway.

17  Q   Okay.

18  A   I don't call nobody my friends.

19  Q   Fair enough.

20              December 22nd, 2011, were you aware that the

21      defendant Sam Steel was charged with murder?

22  A   What's that?

23  Q   Were you aware that Samuel Steel—the defendant—was charged

24      with murder on December 22nd of 2011? Were you aware that he

25      was charged with murder?
```

```
 1   A    Yes.

 2   Q    And were you aware that he was charged with murder pertaining

 3        to the incident that happened on April 24th of 2011?

 4   A    Of course, I was.  I was seeing all the posters up everywhere.

 5        Didn't have no other choice but to know.

 6   Q    And you never reached out to anybody and said, hey, this guy

 7        that's being charged with murder, he was actually right next

 8        to me the whole time?

 9   A    Not—No.

10   Q    Okay.  Okay.  Now—I don't want to rehash this.—I want to ask

11        you one more question regarding this.  How many conversations

12        or how many times—How many times have you seen the defendant

13        in the last four months?

14   A    Probably about like two or three times—

15   Q    Okay.  And—

16   A    —delivering a tray.

17   Q    Okay.  And you ever talk to him at all?  You ever say anything

18        to him?

19   A    Hey, what's up.

20   Q    Okay.

21   A    Slop on the rock.  . . . (unintelligible) That's it.

22                  MR. CUSICK:   I have nothing further.

23                  Thank you.

24

25

                              1280
```

BY MR. CHAMPION:

Q    In December of 2011 you found out that Sam was wanted for
     murder; is that correct?

A    Yeah.

Q    Did you know any of the facts surrounding why the police
     charged Sam Steel with the murder?

A    No.

Q    And you didn't come forward; is that correct?

A    No.

Q    You were afraid of getting in trouble; is that correct?

A    Yeah, and more.

Q    Pardon?

A    And more.

Q    And more.

A    Yeah.

Q    And I think you said soon as the shooting took place you left
     the area—

A    You can believe—

Q    —correct?

A    —that, yeah.  You think not?

Q    You didn't do any—You didn't do the shooting; is that correct?

A    No.

Q    You just left because you thought you might get in trouble,
     correct?

| | | |
|---|---|---|
| 1 | A | No, you just know naturally in your heart you know to get |
| 2 | | away.  You know to get gone.  You ain't going to sit there. |
| 3 | Q | And, when you were incarcerated with Sam Steel in the |
| 4 | | Kalamazoo County Jail, you had no conversation about this case |
| 5 | | . . . (inaudible) |
| 6 | A | Not at all.  Like I said—It's all in the transcripts out at |
| 7 | | the Kalamazoo County Jail, you know, that I been in A-West and |
| 8 | | in the dorms and then I got sent to Roscommon Jail.  I never |
| 9 | | ran across him, not once. |
| 10 | Q | And you were aware that you were a witness on a witness list |
| 11 | | to testify in this trial, correct? |
| 12 | A | No, I didn't know till after a officer came up to me, and then |
| 13 | | that was it. |
| 14 | Q | Gave you a subpoena? |
| 15 | A | Yeah.  Yeah. |
| 16 | Q | Police ever come to interview you? |
| 17 | A | What's that? |
| 18 | Q | Police ever come and interview you? |
| 19 | A | Well, a detective got on the elevator with me one time and |
| 20 | | told me—and said something to me. |
| 21 | Q | What detective, if you know? |
| 22 | A | Beauchamp. |
| 23 | Q | Other than that, have you had any other— |
| 24 | | When you say said something to you, what did he say? |
| 25 | A | You better stop hanging with Sam. |

```
1   Q    And when was that, if you know?

2   A    It was back—I think it's before that I got sent off to

3        Roscommon Jail before I got sentenced.

4   Q    Did they ever interview you or come—ask you to come forward

5        and give any information?

6   A    No.

7                    MR. CHAMPION:   Thank you.

8                    I have no other questions.

9                       RECROSS-EXAMINATION

10  BY MR. CHAMPION:

11  Q    When did—Do you know exactly what the date was when this—

12  A    No, but—

13  Q    —conver—

14  A    —to the best of my—

15  Q    Sir—

16  A    —knowledge—

17  Q    —I'm just—

18  A    —and understanding—

19  Q    —going to—

20  A    —the court's got it—

21                   THE COURT:   Hold on.

22                   THE WITNESS:   —on record.

23                   THE COURT:   Hold on.  Hold on.  You—I can't have

24       you both talk at the same time.

25                   You got to repeat the question.
```

1283

```
 1                    Just a minute, sir, before you give your answer.
 2   BY MR. CUSICK:
 3   Q    Just—I'm sorry, sir.  Just let me finish the question.
 4                    Do you know what date or the time was when
 5        Detective Beauchamp and you talked?
 6   A    No, but the courts should have it on record—
 7   Q    Okay.
 8   A    —because they know when it—they know when you're down here and
 9        they know when you got to come and so other.
10   Q    Did you ever tell him about what you knew at that point?
11   A    No.
12   Q    Okay.
13   A    He spooked me.
14   Q    Okay.  And you don't know where that was?
15   A    What's that?
16   Q    Where was this conversation?
17   A    It was on the elevator with two other officers.
18   Q    Okay.  And—
19   A    He stepped on—He stepped on the elevator while two officers
20        were bringing me down to court.
21   Q    Which—Which jail was this?
22   A    It was here.
23   Q    Okay.  And was this in the last six months?
24   A    About seven—Well, like I say, I don't even want to say the
25        date because it should be on record that's when they brought
```

| | | |
|---|---|---|
| 1 | | me down here to go to get sentenced. |
| 2 | Q | So you don't remember what day that was? |
| 3 | A | No, not actually the date.  Not actually, no. |
| 4 | Q | Okay.  Have you been convicted of a crime of theft, |
| 5 | | dishonesty, or fraud in the last ten years? |
| 6 | A | Yes. |
| 7 | Q | Okay.  And what is that? |
| 8 | A | I've been convicted for a few—a few crimes— |
| 9 | Q | Okay. |
| 10 | A | —within the last ten years. |
| 11 | Q | Regarding theft, dishonesty, and fraud, correct? |
| 12 | A | No, there ain't no dishonesty nothing. |
| 13 | Q | With regards to fraud? |
| 14 | A | Yeah.  That's dishonesty? |
| 15 | | MR. CUSICK:   I have nothing further. |
| 16 | | THE COURT:   Mr. Champion? |
| 17 | | MR. CHAMPION:   Nothing further, your Honor. |
| 18 | | May this—Oh. |
| 19 | | THE COURT:   Ladies and gentlemen, any questions for |
| 20 | | this witness? |
| 21 | | It looks like we do have some questions. |
| 22 | | Mr. Cusick, I believe it's your turn. |
| 23 | | (At 4:09 p.m., bench conference as follows: |
| 24 | | THE COURT:   . . . (inaudible) |
| 25 | | MR. CUSICK:   I'm sorry? |

1      THE COURT:   . . . (inaudible)

2      MR. CUSICK:   Yes.)

3      THE COURT:   Had you been drinking alcohol on

4 April 24, 2011?

5      THE WITNESS:   Yes.

6      THE COURT:   You testified that you couldn't see the

7 shooter when the shots were fired.  How were you able to see

8 the direction the shooter left the scene?

9      THE WITNESS:   The same way as I said, that I was

10 sitting this way and . . . (unintelligible) the house and the

11 people across the street.  There's no other way that you—the

12 windows are on the porch if you go observe where the porch at

13 and how I said I was sitting—

14      THE COURT:   Any follow-up questions?

15      THE WITNESS:   —especially when you hear sounds that

16 loud come.  You know, your body or your—You don't look anyway.

17 That's like somebody going up the door, I'm like, whoa,

18 somebody just came in the back door.  I'm going to look that

19 way.

20      THE COURT:   Thank you.

21      Any follow-up questions based on those questions?

22      Mr. Champion, your witness.

23                 FURTHER REDIRECT EXAMINATION

24 BY MR. CHAMPION:

25 Q    Just to clarify, you wear glasses; is that correct?

1286

```
 1   A   Yeah.

 2   Q   Are you—Are you nearsighted?

 3   A   No—

 4   Q   Pardon?

 5   A   Yeah.

 6   Q   I think your testimony was that you weren't able to see the

 7       shooter, meaning were you able to identify the person; or

 8       could you just see a—could you see—

 9   A   They weren't—

10   Q   —anything?

11   A   They weren't close enough for me to basically identify them—

12   Q   You—

13   A   —from light from the street from where they was at—

14   Q   So you—

15   A   —no.

16   Q   You—Could you see a shadow or a figure or something?

17   A   Basically, a image.

18   Q   An image?

19   A   Yeah.

20   Q   But it wasn't clear—

21   A   No—

22   Q   —is that correct?

23   A   —not at all.

24   Q   And you—You saw that same—

25   A   That so quick—It was just—It happened so much like off guard
```

1   and so on like that and took place, so it wasn't really no

2   concentration on me actually looking and seeing where they was

3   taking off from or what they was doing, you know.

4   Q   It's just what you think may have happened?  You saw an image

5       going—

6   A   It's not—

7   Q   —in that direct—

8   A   —that I think or may what happened, it's that—that's what I

9       seen what happened.  Ain't no think about it, it can't be, you

10      know.  If I'm thinking about it, then I got to be totally

11      wrong.

12                  MR. CHAMPION:   Okay.  Thank you.

13                  MR. CUSICK:   Your Honor, I have no questions

14      pertaining to that question.

15                  May we approach?

16                  THE COURT:   Yes.

17                  (At 4:11 p.m., bench conference as follows:

18                      MR. CUSICK:   Judge, I apologize.  I have one

19                  more question or two more questions I wanted to ask

20                  regarding A. J. Mathews and Walter Johnson, if he

21                  saw them.  I'm just asking if I can ask those

22                  questions.  If I can't, I can't.  I think it's

23                  really relevant that I just ask.  And I apologize.

24                      It's up to—

25                      THE COURT:   Any position?  No?  I'll allow it.

                              1288

1     Go ahead.

2                    Mr. CUSICK:   Thank you. )

3                    FURTHER RECROSS-EXAMINATION

4  BY MR. CUSICK:

5  Q    Sir, do you know an A. J. Mathews?

6  A    Familiar.

7  Q    Was he there that day that you recall?

8  A    Earlier that day.

9  Q    Okay.  Walter Johnson, was he—Do you know him?

10 A    Yes.

11 Q    Was he there that day that you recall?

12 A    Earlier that day.

13                   MR. CUSICK:   Okay.  I have—

14 BY MR. CUSICK:

15 Q    And was he there when the shooting occurred?  Were they there?

16 A    No.

17                   MR. CUSICK:   Okay.  Nothing further.

18                   FURTHER REDIRECT EXAMINATION

19 BY MR. CHAMPION:

20 Q    So A. J. Mathews and Walter Johnson were at Sam Steel's

21      earlier in the—the evening or day; is that correct?

22 A    A. J. was.

23 Q    Was Walter?

24 A    He came after.

25 Q    After?

```
1   A    Probably after we was all there for a minute of time, and then

2        he came.

3   Q    Was—When you say after, was that after the shooting or just—

4   A    Before—

5   Q    —later—

6   A    —the shooting.

7   Q    —later?

8             And did Walter Johnson leave before the shooting?

9   A    Yes.

10  Q    Did A. J. Mathews leave before the shooting?

11  A    Yes.

12            MR. CHAMPION:   Thank you.

13            MR. CUSICK:   I have nothing further.

14            THE COURT:   Any questions for this witness?  Raise

15       your hand if you have any.

16            No.  All right.

17            Thank you, sir.  You may step down.  Be careful of

18       that step when you step down.  Okay?

19            MR. CHAMPION:   May we approach, your Honor?

20            THE COURT:   Yes.

21       (At 4:13 p.m., bench conference as follows:

22            MR. CHAMPION:   I have one more witness, but

23            he's failed to appear.  He was served, and I did

24            have contact with . . . (inaudible) supposed to be

25            here.  I'm going to try to get ahold of him tonight,
```

1    see if he'll be here tomorrow.  But he would have
2    been my last witness today.
3        THE COURT:   And then you are going to have
4    your person testify tomorrow at 9:00?
5        MR. CHAMPION:   At 9:00 o'clock.
6        THE COURT:   Okay.  So you're going to have
7    one, maybe two, maybe three if your—
8        MR. CHAMPION:   There will be the possibility
9    of my client.
10       THE COURT:   Right.  Okay.
11       Are you planning—I don't know if you even know
12   right now.—on rebuttal, but—
13       MR. CUSICK:   I'm sorry?
14       THE COURT:   I don't even know if you have any
15   idea on rebuttal or not right now.
16       MR. CUSICK:   One or two.  We'll be able to get
17   it within an hour—
18       THE COURT:   Okay.
19       MR. CUSICK:   —hour and a half.  We're not
20   going to have long, drawn-out rebuttal.
21       THE COURT:   All right.  So I'll excuse them
22   for the day, and we can work on jury instructions
23   right now . . . (inaudible)
24       MR. CUSICK:   So we just have—we have that one
25   witness and we have that guy from—your expert—and

1    possibly your—your client?

2              MR. CHAMPION:   Yes.

3              MR. CUSICK:   Okay.

4              THE COURT:   Okay.)

5         THE COURT:   All right.  Ladies and gentlemen, we

6    are going to break for the day.  We have some things that we

7    need to address, and we can use the rest of the day to do that

8    here—the attorneys and myself.

9              We are on track.  I'm projecting that we will finish

10   either tomorrow before lunch or early afternoon with all the

11   testimony.  And then, of course, we move into the closing

12   arguments and the jury instructions.

13             So please remember all of my prior instructions.

14             Make sure you don't do any investigations on your

15   own.  Don't look up anyone, anything.

16             Don't communicate with each other or anyone else

17   about the case.

18             And, certainly, be careful when you enter the

19   building, also.

20             I'm going to have you check in tomorrow morning at

21   9:00 o'clock.

22             Just leave your notebooks on your chairs.

23             And have a good evening.

24             All rise.

25             (At 4:16 p.m., jury exits courtroom)

1    You may be seated.

2    All right.  The jury has left the court, and the
3    door is shut.

4    Anything else we need at address at this time,
5    Mr. Cusick?

6    MR. CUSICK:   No, your Honor.  Thank you.

7    THE COURT:   Mr. Champion?

8    MR. CHAMPION:   No, your Honor.

9    THE COURT:   All right.  Counsel, just stick around
10   for a few minutes, and we'll see what a plan is for us.

11   And, other than that, we are in recess.

12   MR. CHAMPION:   Thank you.

13   (At 4:17 p.m., proceedings adjourned)

14

15

16

17

18

19

20

21

22

23

24

25