**F I L E D**

**Dec 26, 2013**

9TH JUDICIAL CIRCUIT
COUNTY OF KALAMAZOO
KALAMAZOO, MICHIGAN

1    STATE OF MICHIGAN

2    9TH CIRCUIT COURT—TRIAL DIVISION

3

4    THE PEOPLE OF THE
     STATE OF MICHIGAN

5
                                              File No. 2011-1983 FC
6        v

SAMUEL STEEL, III,

7
              Defendant.
8

9

10                    Jury Trial - Volume VI of VII
         Before Honorable Pamela L. Lightvoet P47677, Circuit Judge
11          Kalamazoo, Michigan — Thursday, September 5, 2013

12

13

14   APPEARANCES:

15   For the People:        Paul John Cusick P70895
                            Assistant Attorney General
16                          Michigan Department of Attorney General
                            Criminal Division
17                          3030 West Grand Boulevard, Suite 10-361
                            Detroit, Michigan 48202
18                          (313) 456-0089

19   For the Defendant:     Robert A. Champion P52726
                            124 East Bridge Street, Suite C
20                          Plainwell, Michigan 49080
                            (269) 685-9220
21
     Recorded by:           Digitally recorded
22
     Transcribed by:        Brenda K. Foley CER 4956
23                          Foley Transcription Service
                            8165 Valleywood Lane
24                          Portage, Michigan 49024
                            (269) 303-9680
25                                 * * * * *

                              1294

1                      TABLE OF CONTENTS

2    WITNESSES: <u>Defense</u>                                      PAGE

3    MICHAEL O'KELLY

4         Direct examination by Mr. Champion . . . . . . . . . . .   1304
          Voir dire examination by Mr. Cusick  . . . . . . . . .    1308
5         Voir dire examination (cont.) by Mr. Cusick  . . . . .    1315
          Voir dire examination (cont.) by Mr. Cusick  . . . . . .  1322
6         Direct examination (cont.) by Mr. Champion . . . . . . .  1328
          Cross-examination by Mr. Cusick  . . . . . . . . . . .    1344
7         Redirect examination by Mr. Champion . . . . . . . . . .  1352
          Recross-examination by Mr. Cusick  . . . . . . . . . .    1355

8    Defense rests . . . . . . . . . . . . . . . . . . . . . . .   1357

9    People rest . . . . . . . . . . . . . . . . . . . . . . . .   1357

10   Closing argument by Mr. Cusick  . . . . . . . . . . . . . .   1362

11   Closing argument by Mr. Champion  . . . . . . . . . . . . .   1399

12   Rebuttal argument by Mr. Cusick . . . . . . . . . . . . . .   1411

13   Jury instructions  . . . . . . . . . . . . . . . . . . . .   1424

14

15

16

17

18

19

20

21

22

23

24

25

                              1295

```
 1              Kalamazoo, Michigan
 2              Thursday, September 5, 2013 - 10:41 a.m.
 3              THE CLERK:   The court calls the matter of People of
 4     the State of Michigan versus Samuel Steel, III, case number
 5     C11-1983 FC.
 6              Parties, please state appearances for the record.
 7              MR. CUSICK:   Good morning, your Honor.
 8              Paul Cusick on behalf of the People,
 9     Assistant Attorney General.
10              (At 10:41 a.m., defendant enters courtroom)
11              MR. CHAMPION:   Robert Champion appearing on behalf
12     of Samuel Steel, who's in the courtroom.
13              THE COURT:   All right.   And Mr. Steel's here.
14              We've just called the case, Mr. Steel.   We haven't
15     done anything else.
16              Counsel, I have the jury instructions in order, and
17     so they're just making sure that your instructions are in the
18     same order as I plan to read them.
19              MR. CUSICK:   Okay.
20              THE COURT:   And then you'll each be given a copy of
21     the jury instructions.
22              And we did—
23              For the record, the jury's not here.
24              We did review those instructions.   And I don't
25     believe we have any objections that need to be placed on the
```

1296

1        record with regards to those instructions.

2                      Is that correct, Counsel?

3                      MR. CUSICK:   That's correct, your Honor.

4                      MR. CHAMPION:   It is, your Honor.

5                      THE COURT:   Mr. Steel, you can have a seat, if you

6        want.

7                      THE DEFENDANT:   Oh.

8                      THE COURT:   You don't have to stand.

9                      And we also reviewed the verdict form, and everyone

10       has a copy of the verdict form, and everyone has approved

11       that.

12                     Is that correct, Counsel?

13                     MR. CUSICK:   We have.

14                     MR. CHAMPION:   Yes, your Honor.

15                     THE COURT:   All right.  So my understanding is that

16       we have a witness who will appear by way of teleconference.

17                     And I just need you to approach a moment with

18       regards to closings.

19                         (At 10:42 a.m., bench conference as follows:

20                            THE COURT:   How long are you projecting your

21                            closings to be?  I'm a little concerned by the—

22                            MR. CUSICK:   I'll be—

23                            THE COURT:   —judges meeting—

24                            MR. CUSICK:   —about 45 minutes.

25                            THE COURT:   —at 1:00.

1              MR. CUSICK:    I might be half an hour to 45

2        minutes.

3              THE COURT:    I'm sorry?

4              MR. CUSICK:    I might be half an hour to 40

5        minutes.

6              THE COURT:    Any idea?

7              MR. CHAMPION:    Probably about the same.

8              MR. CUSICK:    I mean, it's hard to—hard to say.

9        It could even be slightly longer.

10             THE COURT:    All right.  I think what we'll do

11       is do this witness.  I'll check in then.

12             MR. CUSICK:    Whatever your decision is, Judge.

13       I do think it's probably better if we just do

14       closings all at one time.

15             THE COURT:    That's what I think, too.  That's

16       why I'm trying to figure out—I'll have them probably

17       report at 1:15 and see if I can get started.  I

18       don't know if they'll have him back here or not

19       . . . (inaudible)

20             I think it's better probably to do this way.

21       Then you can both look at the jury instructions—make

22       sure they're appropriate—one more time.

23             MR. CHAMPION:    Then come back this afternoon?

24             THE COURT:    They can come back at 1:30.  We'll

25       still have . . . (inaudible)

```
 1                    MR. CHAMPION:   Okay.

 2                    MR. CUSICK:   Okay.)

 3              THE COURT:   Counsel.

 4              (At 10:44 a.m., bench conference as follows:

 5                    THE COURT:   As long as we have time,

 6              also—They're not here.—the other issue we have is

 7              that the one juror has to leave at 2:00 o'clock

 8              tomorrow for the wedding.  I don't know if you've

 9              had an opportunity to speak with Mr. Steel about

10              this or how he wants to handle it.

11                    My preference would be let's just use him as an

12              alternate because, if we go into tomorrow, I don't

13              want to have to bring another panel or, you know,

14              restart deliberations—

15                    MR. CHAMPION:   Right.

16                    THE COURT:   —all over again.  I'd rather just

17              have him be an alternate, also, and then select the

18              two other alternates from there so that they can

19              just continue on.

20                    I don't know what you—

21                    MR. CUSICK:   I think he's a very attentive

22              juror—

23                    THE COURT:   I—

24                    MR. CUSICK:   —and, I mean—I don't—I mean, I

25              think that, if they're going to reach a verdict
```

1    tomorrow, it'll be at 2:00—at 2:00—if they leave at

2    2:00 or 5:00—leave at 5:00.  That's usually how

3    things work.  You know, if they have the—if they get

4    it today, so I don't know.

5         THE COURT:   They would—I wasn't going to keep

6    them late today.  I was going to keep them late

7    tomorrow, if necessary.

8         But the other—I'm gone next week.  So, if they

9    go into next week, I can answer questions by phone

10   possibly; but there's going to be a delay and I

11   can't do anything in the court.  That's the problem.

12        MR. CUSICK:   Okay.

13        THE COURT:   Well, we can think about that and

14   talk about that right before lunch.

15        MR. CUSICK:   Okay.  I'll think about that.

16        MR. CHAMPION:   . . . (inaudible)

17        THE COURT:   And I guess it would be 2:30,

18   3:30—They're not going to get it until 3:30, 4:00

19   o'clock.

20        MR. CUSICK:   Okay.  Okay.)

21   (At 10:46 a.m., off record discussion between Court

22   and unknown person)

23   UNIDENTIFIED SPEAKER:   Do we have our audio now?

24   THE COURT:   Yes, we do.

25   Can you hear us?

1300

1          UNIDENTIFIED SPEAKER:   Fantastic!  Yes.

2          THE COURT:   Okay.

3          MR. O'KELLY:   You want to tell them we

4     . . . (inaudible)

5          UNIDENTIFIED SPEAKER:   We went into our second

6     videoconferencing room.  We're not exactly sure what the

7     disconnect on the audio was in the other room, but we thought

8     we'd try this room.

9          Mr. O'Kelly's going to be moving his things into

10     this room.  He thought it would just take him a minute or two

11     to get it there; and, hopefully, we won't have any more

12     glitches.

13          THE COURT:   I'm waiting for the witness to sit

14     down.  Just give me one second here.

15          I don't know if we lost them.  They're no longer on

16     my screen.

17          MR. O'KELLY:   You lost the screen?

18          THE COURT:   Okay.  Now we're back.

19          We're waiting for the jury to come in.  So, as soon

20     as you sit down, I'll bring the jury in.

21          MR. O'KELLY:   Okay.  I need another couple minutes

22     yet.

23          THE COURT:   A couple minutes or a couple seconds?

24          MR. O'KELLY:   About two minutes, three minutes.

25          THE COURT:   All right.  I'm going to bring the jury

1    in.

2              All rise.

3              (At 10:49 a.m., jury enters courtroom)

4              MR. O'KELLY:   I may have to have your help.

5              UNIDENTIFIED SPEAKER:   I'll be happy to help you.

6              MR. O'KELLY:   Okay.

7              THE COURT:   You may be seated.

8              And, again, just a reminder to everyone in the

9    court, make sure your cellphones and other electronic devices

10   are turned off, please.

11             Ladies and gentlemen, I'm going to turn it over to

12   Mr. Champion in a moment.  We are—Our next witness will be by

13   way of teleconference, as you can see.

14             Are you all set, sir?

15             MR. O'KELLY:   I am, your Honor.

16             Good morning.

17             THE COURT:   Okay.  Good morning.

18             I'll turn it over to Mr. Champion then.

19             MR. CHAMPION:   Your Honor, I would call

20   Michael J. O'Kelly as a witness.

21             THE COURT:   Okay.

22             MR. O'KELLY:   . . . (inaudible) to swear me in?

23             THE COURT:   Yes.  Raise your right hand.  I see

24   that you have done so.  And please listen carefully.  Do you

25   solemnly swear or affirm that the testimony you're about to

1302

1    give will be the truth, the whole truth, and nothing but the

2    truth, so help you God?

3                    MR. O'KELLY:   I do, your Honor.

4                    THE COURT:   Please have a seat, sir.

5                    If at anytime—

6                    THE WITNESS:   Good morning.

7                    THE COURT:   I'm sorry?

8                    THE WITNESS:   I said good morning.

9                    THE COURT:   Good morning.

10                    If, at anytime, you cannot hear what is going on in

11    the court or questions, then please just let us know so that

12    we can address that or have a question repeated.

13                    I think there might be a little bit of a delay on

14    occasion, so I would just caution everyone about that.

15                    Sir, I need you to state and spell your first and

16    last name for the record, please.

17                    THE WITNESS:   Yes.  Michael O'Kelly—O-apostrophe-k-

18    e-l-l-y.

19                    THE COURT:   And Michael is M-i-c-h-a-e-l?

20                    THE WITNESS:   Yes, your Honor—I'm sorry.—M-i-c-h-a-

21    e-l.

22                    THE COURT:   All right.  Thank you.

23                    Go ahead, Mr. Champion.

24

25

1303

1                          MICHAEL O'KELLY,

2          called at 10:51 a.m., and sworn by the Court, testified:

3                          DIRECT EXAMINATION

4    BY MR. CHAMPION:

5    Q    Good morning, Mr. O'Kelly.

6    A    Good morning, Mr. Champion.

7                 Good morning—Good morning, Mr. Cusick.

8                 And good morning, ladies and gentlemen of the jury.

9    Q    Sir, what is your area of expertise or training when it comes

10        to cellphones or cellphone towers?

11   A    I have training in both cell tower data analysis and cellphone

12        forensics.

13                Would you like an explanation of each one of those?

14   Q    Yes, please.

15   A    Cellphone data analysis is in two different fields—or two

16        different areas, rather.

17                The first is examining, reviewing, and analyzing

18        records that are historical records.  In other words, when

19        someone places an activity—whether it's accessing the Internet

20        from their cellphone, whether it's sending a text message, or

21        placing a call or the reverse for incoming data—that will

22        create a record; and it's those records that we analyze.

23                The second is actually cell tower mapping.  We go

24        into the field, and we actually process calls and map where

25        cell signals can be acquired and processed by both a cellphone

                                  1304

1       and a cell tower.  You can go in the field and you might have

2       five bars; but that doesn't mean that you actually can make a

3       connection, so you would not have a cell processable action.

4       So you'd have it in a dead zone even though you have five

5       bars.  That's possible.

6    Q  Now what type of education and training and experience do you

7       have in this area—cellphone analysis and—

8    A  Starting—

9    Q  Go ahead.

10   A  I believe—I believe—Can I refer to my CV?

11   Q  Yes.

12   A  I believe in 2007 or '8.  Let me get to that part, if I might.

13      And I'll direct you to the right page eventually.  It looks

14      like November of 2008 appears to be my first class.  I thought

15      it was '07.  I guess it is '07—I'm sorry.—'08.  And we spent

16      three weeks in Salt Lake City covering both cellphone

17      forensics and also cell tower analysis.

18   Q  When you say we, what type of training course was this and who

19      presented the course?

20   A  The course was put on by Public Agency Training Council.  It's

21      known as PATC.  It trains 99% law enforcement and one percent

22      private agencies.

23   Q  And have you had additional training and education in the area

24      of forensic or cellphone examination and tower—cell tower

25      operations?

1305

1    A    Yes.  I actually—I actually have to correct my earlier

2         testimony.  That was a two-day course, and I don't recall

3         where that was.  It might have been in Indianapolis.

4                   The second course was Paraben®, and that began the

5         three-week course, from what I—No, that was another two-day

6         course—three-day course, and that was in San Diego.  And

7         Paraben® is both a software manufacturer and a training agency

8         for both law enforcement and the private sector.

9                   The next course I attended was April—And this is my

10        three-week course that I attended in Salt Lake City.—with

11        Paraben® again.  And this covered, again, how cell towers

12        interact, how they operate, the different systems, and also

13        the cellphone forensics.  And we also covered, in the last

14        week, it was mapping.

15                   The next course I have listed is through Susteen®.

16        And I believe that was an online course.  It was one afternoon

17        covering, I believe, two or three hours—It might have been two

18        hours.—and that was understanding and working within the

19        data—data pilot program.

20                   The next was July of '10, and that was

21        Public Agency Training again.  That was another five-day

22        course.

23                   The next is February of '11, back to Susteen® again.

24                   In March of 2011, there was a two-day course.  And,

25        again, that was on cellphone forensics and how to preserve the

1306

1    data and also how to obtain records from the wireless

2    providers.

3                In April of '11, it was dealing with the IP address

4    and criminal investigations through PATC.

5                And the following day was obtaining cellular

6    records, again, with PATC.

7                In November of '11, it was the advanced cellphone

8    forensics—That was a four-day course, from what I remember.

9  Q    So—

10 A    —and that was in Las Vegas.

11 Q    So, Mr. O'Kelly, you've had considerable training in this

12       area; is that correct?

13 A    Yes.  And, actually, I'm coming up to Los Angeles to do—to

14       learn how to JTAG and chip-off, which means, if you have a

15       device that's been destructed, we can actually go inside, find

16       the—find the chip that has the flash memory, remove it, and

17       obtain all the data that has previously been unable to access.

18 Q    Have you testified as an expert before in federal and state

19       courts?

20 A    I've testified off the record in federal, on the record in

21       state.

22 Q    How many times?  Have you been—How many times have you been

23       qualified as an expert in cellphone analysis and cell tower

24       analysis?

25 A    At least two that I can clearly recall.  One is

1307

1   Missouri v Anderson and the second was Texas v Peck—P-e-c-k.

2   Q   So in two different states at this point?

3   A   And they were—Yes.  They were both homicide matters.

4       Oh, and I also testified in Wisconsin, and that was

5       on polygraph examinations, 'cause I'm also a polygraph

6       examiner.

7       MR. CHAMPION:   I would move to qualify this witness

8       as an expert in forensic cell tower analysis and cellphone

9       analysis.

10      MR. CUSICK:   Your Honor, I'd ask to voir dire

11      . . . (inaudible)

12      THE COURT:   Go ahead.

13                  VOIR DIRE EXAMINATION

14  BY MR. CUSICK:

15  Q   Good morning, sir.

16  A   Good morning, Mr. Cusick.

17      I presume you're Mr. Cusick?

18  Q   Yes, sir, I am.  Thank you.

19      I'm just going to ask you a couple questions.

20      I received your curriculum vitae—your résumé.  It's

21      16 pages; is that correct?

22  A   Actually, I thought it was longer than that.  I've got, I

23      think, 29 here.

24  Q   Okay.  Well, we'll just move forward then.

25      The training that you discussed in 2008, was that

1308

1    cell tower analysis?

2  A   Yes, that—I believe it was.  Let me go back to that page, if I

3      may.

4  Q   And can you refer to what page it is on your curriculum vitae?

5  A   Yes.  I believe we're looking at page 11.

6  Q   Okay.

7  A   Are we there at the bottom?  It says Public Agency Training

8      Council.

9              MR. CUSICK:   Your Honor, may we approach?

10             THE COURT:   Yes.

11             (At 11:00 a.m., bench conference as follows:

12                 THE COURT:   What he's testifying to, I haven't

13                 seen any of what I received.  This is page 11, and

14                 he's talking about 2008.  This is 2004.

15                 MR. CHAMPION:   So you might have an outdated

16                 one.

17                 MR. CUSICK:   And, on that, nothing really—one

18                 or two things on cellphone tower.  All this other

19                 stuff is about 20 different—20 other things.

20             THE COURT:   Do you have the updated one?

21                 MR. CHAMPION:   Pardon?  No, I don't.  I know

22                 he sent another one yesterday, but I did not open it

23                 up.

24                 THE COURT:   Okay.  I'll bring the jury out,

25                 and we'll see where we're at and—

1          MR. CUSICK:   Well, I think it's—I think I need

2      to have . . . (inaudible)

3          THE COURT:   I agree.

4          Do you want to—)

5      THE COURT:   Counsel.

6      (At 11:01 a.m., bench conference as follows:

7          THE COURT:   When did he send it yesterday?

8          MR. CHAMPION:   Pardon?

9          THE COURT:   When did he send it yesterday?

10         MR. CHAMPION:   We got a bunch of things

11     yesterday morning by e-mail.

12         THE COURT:   What else did you get?  Have you

13     provided him . . . (inaudible)

14         MR. CUSICK:   No—Well, no, defense counsel

15     provided me—

16         THE COURT:   Okay.

17         MR. CUSICK:   On August 16th, they provided me

18     with his curriculum vitae.

19         THE COURT:   He just said he got a bunch of

20     stuff yesterday.

21         MR. CUSICK:   I'm sorry?

22         THE COURT:   He just said he got a bunch of

23     stuff yesterday.

24         MR. CHAMPION:   It was—It was stuff for

25     questioning their—their expert.

1310

1          THE COURT:   Oh, okay.

2          MR. CHAMPION:   And I didn't get a curriculum

3     vitae for their expert until the night before.

4          MR. CUSICK:   It's fine.  It was in the middle

5     of trial.

6          Look, I'm not—I'm not trying to make this

7     difficult for Mr. Champion.  He's been very—He's

8     given me everything he has, and they gave me this.

9     So I'm not blaming this on Mr. Champion.

10    Mr. Champion's . . . (inaudible)

11         THE COURT:   Do you want to open—

12         MR. CUSICK:   I'm blaming it—

13         THE COURT:   Do you have—

14         MR. CUSICK:   —on this guy.  He gives

15    Mr. Champion this—Mr. Champion gives it to me.—and

16    he's talking about a 29-page curriculum vitae.

17    That's all I'm saying.

18         MR. CHAMPION:   I can have the proper one sent

19    here.

20         MR. CUSICK:   Okay.  That's fine.

21         And, like I said, I don't think it's

22    Mr. Champion's fault.  I don't—I don't mean to

23    impugn on him.  Their guy gives a twice as long

24    curriculum vitae than the one given to him—

25         THE COURT:   Okay.

                              1311

1              MR. CUSICK:   —and given to me.

2              THE COURT:   Well, we'll do it this way.  I

3         don't know if you want—I'll give you an opportunity

4         to ask him his credentials outside of the jury, if

5         you want, and we can see where it goes.

6              I'm not going to take the time to stop this

7         trial to get the updated CV.  It's just not coming

8         in.  So it'll have to be based on what he's

9         testifying to.

10             MR. CHAMPION:   Yeah, I'm not going to move to

11        admit the CV.  That wasn't my point.

12             MR. CUSICK:   Okay.  So you want to just

13        continue now . . . (inaudible)

14             THE COURT:   Well, I'll let you question him

15        outside the jury—We can see how to handle it from

16        there.—if you want.

17             I don't know what else is on there, but I'm not

18        going to stop the trial at this point and allow him

19        to testify to stuff you're not comfortable

20        proceeding with.

21             MR. CUSICK:   Okay.

22             THE COURT:   So do you want to remove the jury,

23        or do you want to just—

24             MR. CUSICK:   I can—

25             THE COURT:   —keep going from—

1312

1       MR. CUSICK:   I can—

2       THE COURT:   —and then we'll see if we need to

3       take a break.

4       MR. CUSICK:   We'll just keep going from here.

5       We'll just keep going from here.

6       Because you don't have this, right?

7    . . . (inaudible)

8       MR. CHAMPION:   I know he . . . (inaudible)

9       THE COURT:   Why don't I have the jurors step

10      out in the hallway and we'll see what the difference

11      is between the two.)

12      THE COURT:   We're going to have the jurors step out

13   a moment.

14      (At 11:04 a.m., off record discussion between Court

15      and unknown person)

16      All rise.

17      (At 11:04 a.m., jury exits courtroom)

18      You may be seated.

19      Let me know when the door's shut.

20      All rise.  So, Mr. O'Kelly, there's a little issue

21   here.  Apparently, the attorneys only have a CV that was sent,

22   I think it was August 16 or something, and so they don't have

23   the full documentation or your full CV.

24      When did you update it, sir?

25      THE WITNESS:   Jeez, if you have a 16-page CV,

1313

1    your Honor, the only way that could happen is if it's not

2    completely printed.  I've had—I've been in the—I've always had

3    a complete CV for years.

4              THE COURT:   Okay.  Well—

5              THE WITNESS:   I can—

6              THE COURT:   — . . . (inaudible)

7              THE WITNESS:   —e-mail the Court if you—

8              THE COURT:   I'm not going to take the time to do

9    that at this point, so that's—I'm just trying to figure out

10   what's going on here.

11             Okay.  So how long has your CV been approximately

12   29 pages?  That's what I'm asking.

13             THE WITNESS:   Several years, I would guess,

14   your Honor.

15             THE COURT:   Okay.  So it's not—It's not as though

16   you updated recently over the last couple months and then

17   added a substantial amount of information; is that what you're

18   saying, sir?

19             THE WITNESS:   Oh, no, not at all, your Honor.  What

20   I do is when I—when I attend a class, I update my CV at that

21   point in time—

22             THE COURT:   All right.

23             THE WITNESS:   —and so—and so my current CV is

24   actually updated August 27th, I believe.  The one prior—prior

25   to that was July 20th or thereabouts.

1314

1          THE COURT:   All right.  Okay.  I'm going to turn it

2     back over to Mr. Cusick.

3          The jury has left the court, just so that you know.

4     We're just going to get some additional background

5     information.  We'll go from there.  So I'm going to allow him

6     to continue questioning.

7          Go ahead.

8          MR. CUSICK:   Thank you, your Honor.

9               VOIR DIRE EXAMINATION (cont.)

10    BY MR. CUSICK:

11    Q    Sir, page 11 you indicated, is that the 2008 cellphone tower

12         analysis?

13    A    It is.  It is, to the best of my recollection, yes.

14    Q    And you have a C—Okay.  Well, I have a CV here that says

15         page 11's 2004.

16    A    Oh.  One of us has a copy that—I'm looking at—Mine is 29 pages

17         long.  I don't know what CV you have.  Where did you get

18         your—Did you get it from me?

19    Q    Well, I received it from Mr. Champion, which I assume that you

20         gave to Mr. Champion.

21              THE COURT:   What are you referencing exactly in

22         2008, sir?  What—What seminar or conference so that they can

23         see if they can locate where that's at?

24              THE WITNESS:   It's November 3rd, 2008, to

25         November the 4th, 2008, and it's titled Public Agency Training

1315

1       Council Cellphone Forensics—comma—GPS and Cellular Data

2       Analysis.  And that covers the bottom, almost, half of the

3       page.

4                  THE COURT:   Counsel, do ether of you have that

5       reference or no?

6                  MR. CHAMPION:   No.

7                  THE COURT:   Let me just ask the attorneys how—When

8       is the information that you have on the CV, when does it end?

9       I don't know if it's in chronological order or we just don't

10      have all the—

11                 MR. CUSICK:   It basically ends, your Honor—2004,

12      two thousand—

13                 MR. CHAMPION:   It looks like 2007.

14                 MR. CUSICK:   Yeah.  I agree with Mr. Champion.

15                 MR. CHAMPION:   Looks like we have the wrong CV.

16                 THE COURT:   Go ahead, Mr. Cusick.  You can

17      continue.

18   BY MR. CUSICK:

19   Q   Okay.  So do you ever send people a—or attorneys, before

20       testifying, a 16-page CV?

21   A   I usually send my CV prior to accepting the case so the

22       attorney has my background when he's going to compare it to

23       other experts.

24   Q   Okay.  And did you send Mr. Champion a 16-page

25       curriculum vitae in this case?

1316

1   A   It's entirely possible but doubtful.  I can certainly go

2       through the e-mails and I can pull the exact one up that I

3       sent.

4   Q   Well, you're not aware of any CV that you have that's only

5       16 pages, that's correct?

6   A   No, sir.  Not at all, Mr. Cusick.

7   Q   Okay.  And—

8   A   Mr. Cusick, let me ask you this.  What do you have on the

9       first page?

10  Q   It has your educa—

11  A   . . . (unintelligible)

12  Q   Michael J. O'Kelly—

13  A   And—

14  Q   —it has—

15  A   At the very bottom, do you have Dräger Alcohol and Drug

16      Screener 5000?

17  Q   No, I do not.

18  A   Okay.  Do you have Katana Forensics first responder

19      certification—Forensic lab certification?

20  Q   No, sir.  I have a 16-page CV that you sent Mr. Champion that

21      doesn't—

22  A   All right.

23  Q   —indicate—Excuse me.—that doesn't indicate any of the things

24      that you testified to just now.

25  A   I humbly apologize to everyone.  I don't know how that

1317

1    happened.  I don't recall ever doing that before.  I have a

2    much—There is no reason for me, even, to cut back my CV.

3  Q    Okay.

4  A    I don't know how to explain this.

5              MR. CUSICK:  Well, your Honor, number—

6              THE WITNESS:   I—I can—

7              MR. CUSICK:  Can we approach?

8              THE COURT:   Yes.

9              THE WITNESS:  I can e-mail it.

10             (At 11:10 a.m., bench conference as follows:

11              MR. CUSICK:  I don't want to delay this trial

12             anymore either.  And I think Mr. Champion

13             doesn't—And, like I said, he didn't know—He gave me

14             what he has, and my beef isn't with Mr. Champion.

15              I can impeach him with all this stuff.  I can

16             ask what CV he provided and—

17              THE COURT:  Do you want—Do you want to bring

18             the jury back in and go from there?

19              MR. CUSICK:  Yeah, I can impeach him with

20             that, and then I can renew my objection possibly for

21             expert.  And . . . (inaudible) that out of the

22             presence of the jury.  I do think I have a right to

23             ask these questions—some of these questions in front

24             of the jury—

25              THE COURT:  You do—

                           1318

1           MR. CUSICK:    —about his expertise.

2           THE COURT:    —absolutely.  I just didn't know

3    how—

4           MR. CHAMPION:    It appears there was an e-mail

5    file sent to us and, obviously, the wrong file got

6    sent.

7           MR. CUSICK:    Okay.  I'm just going to ask some

8    questions.

9           THE COURT:    So the information that you have,

10   is that—does that have anything to do with cellphone

11   tower—

12          MR. CUSICK:    Well, it's—

13          THE COURT:    —information?

14          MR. CUSICK:    —numbered.  That's the problem.

15   They're numbered pages.  So the pages that he's

16   referring to—like page 11—

17          MR. CHAMPION:    Right.

18          MR. CUSICK:    —is for 2008.  Page 11 here is

19   2004.  So it's not like—

20          THE COURT:    Right.  But it looks like your

21   materials end—

22          MR. CUSICK:    It's completely—

23          THE COURT:    —as of—

24          MR. CUSICK:    —different.

25          THE COURT:    —2007.  It looks like his—

                              1319

1          MR. CHAMPION:   Or it looks like—

2          THE COURT:   That's when he started

3     . . . (inaudible)—

4          MR. CUSICK:   Right.

5          THE COURT:   —this stuff.

6          MR. CUSICK:   Okay.

7          MR. CHAMPION:   It looks like the wrong file

8     was sent to us.

9          THE COURT:   So—

10         MR. CUSICK:   So I'm going to . . . (inaudible)

11    —you know, I'm going to ask him some of these

12    questions in front of the jury and then I'll—through

13    my voir dire, if I can.

14         THE COURT:   All right.

15         MR. CUSICK:   And then we can move on.)

16    THE COURT:   Okay.  Mr. O'Kelly—

17    THE WITNESS:   Your Honor—

18    THE COURT:   —we're going to bring the jury back in.

19    And, just so that you know, the attorneys do not have your

20    updated CV.  It looks like their information ends as of 2007.

21         So, when you're answering questions, you're going to

22    need to identify courses and so forth, because we don't have

23    the materials that you have in front of you, just so that

24    you're aware of that.

25         Everyone's in agreement we need to move this trial

1320

1    along, so we're bringing the jury back in.

2              THE WITNESS:    Your Honor, I have figured out what

3    happened.

4              THE COURT:    All right.

5              THE WITNESS:    Your Honor—

6              THE COURT:    Go ahead.

7              THE WITNESS:    What happened is I gave my CV years

8    ago to an investigator named Carl Clatterbuck—

9              THE COURT:    Okay.

10             THE WITNESS:    —and that's—

11             THE COURT:    That explains it then.  Okay.  Thank

12   you.

13             We're bringing the jury in.

14             All rise.

15             (At 11:13 a.m., jury returns to courtroom)

16             You may be seated.

17             All right.  So the jury's back in the court.

18             And there was a mix-up with regards to

19   documentation.

20             I'll turn it back over to Mr. Cusick, then, for

21   continued questioning.

22             Go ahead, sir.

23             MR. CUSICK:    Thank you, your Honor.

24

25

```
 1                 VOIR DIRE EXAMINATION (cont.)

 2   BY MR. CUSICK:

 3   Q    Sir, just referring back to your CV, you—I'm in receipt of a

 4        16-page curriculum vitae; is that correct?  Are you aware—

 5   A    Yes.

 6   Q    —of that?

 7   A    Yes, Mr. Cusick.

 8   Q    Okay.  And that's—

 9   A    Yes.

10   Q    And that's what was given to—to me and to defense counsel,

11        correct?

12   A    Yes.  And that is a—That's about—What?—seven years—five—six

13        years old.

14   Q    Okay.  So the curriculum vitae that you provided both the

15        prosecution in this case as well as the defense is seven years

16        old, correct?

17   A    I did not provide that to—to the defense.  That was given

18        by—by somebody else.

19   Q    Did you provide any curriculum vitae to the defense other than

20        that?

21   A    I—My recollection is—I send a package out to all the attorneys

22        who hire me; and, in that package, there's 11 items, one of

23        which is a current CV.

24   Q    Okay.  But it's fair to say you don't disagree that the CV

25        that both defense and the prosecution have in this case, you
```

```
 1        don't disagree that that is not the updated version, correct?
 2   A    Oh, that's an old version, and it was not provided by myself—
 3   Q    Okay.
 4   A    —to the—to the defense.
 5   Q    Okay.  So all of the things that you're testifying to are not
 6        in your curriculum vitae, correct?  On the—
 7   A    They're not in the—
 8   Q    —curriculum—
 9   A    —one that you have—
10   Q    —vitae—
11   A    —in front of you.
12   Q    —that you—I'm sorry.—on the curriculum vitae that you
13        provided—that the prosecution was provided, correct?
14   A    And, again, yes.  But, clarification, I did not provide that
15        to the defense or the prosecution.
16   Q    You didn't provide anything to the defense or the prosecution—
17   A    I—
18   Q    —correct?
19   A    —only for clarification, I sent an e-mail out that had
20        11 items, one of which was a current CV.  The one you have is
21        not the one I sent.
22   Q    Okay.  But you never sent me anything, correct?  Is that fair
23        to say?
24   A    No, Mr. Cusick, I—
25   Q    Okay.
```

1   A   —have had no communication with you whatsoever.

2   Q   Okay.

3   A   This is our first time meeting and talking.

4   Q   Okay.  So, because it's not on your CV—I apologize for going

5       over all of this, but I want to clarify.

6           2008 you received—you took training and a course?

7   A   I did.  It was a two-day course.  It began November the 3rd.

8       It was concluded on November the 4th.

9           Would you like me to read the items that I have

10      listed in my—in my CV?

11  Q   Just did you deal—did it deal specifically with cellphone

12      tower analysis or cellphone tower analysis and other issues?

13  A   It dealt specifically with cell tower analysis, including all

14      the subsets, such as TDMA, CMA [*sic*], GSM, and the

15      iDEN system.

16  Q   Okay.  And, once again, what was your next class?  That was

17      2008.  Anything before 2008 that you are aware of?

18  A   I—I thought I had a 2007 class; but evidently it was in

19      computer forensics, it wasn't in the cell towers.

20          Would you like me to continue on to my next class?

21  Q   Yes, sir, please.

22  A   November the 18th, 2008, including November the 19th, 2008, it

23      was for Paraben® Corporation this time.  And it dealt with

24      cellphone forensics, GPS, and cellular data analysis.  And—

25  Q   So a part—

1324

1  A    —this was—

2  Q    So a part of that was cellphone towers over the two days,

3       correct?

4  A    The entire course was—was—was just cell towers.  It was not

5       cellphone forensics.

6  Q    Okay.  Next one, sir?

7  A    April 12th of 2010 through the 17th, Paraben® Corporation, and

8       we dealt with cell tower analysis both in tracking and call

9       detail analysis and GPS.

10 Q    That was—

11 A    On—

12 Q    —this year?

13 A    —April—

14                 THE COURT:   2010.

15                 THE WITNESS:   That was 2010.

16                 MR. CUSICK:   Sorry.  Okay.

17                 THE WITNESS:   And the following week—This is my

18      Salt Lake City course I attended.—April 21st through the 23rd,

19      we did analysis of a cellphone, how to extract the data, what

20      to find and what tools to use.

21                 On April 24th through the 25th, we did the

22      GPS cellular data and record analysis and—and triangulation.

23      And that was a level three course, again, Paraben®.

24                 July 23rd, 2010, that was in an afternoon.  That was

25      for Susteen®.  That was an online course.  I believe it was at

1325

1    least two hours.  It may have been longer.

2              July 26th, 2010, through the 30th, that was with

3    Public Agency Training Council; and, again, that was cell

4    tower analysis.

5              On February 2nd, 2011, it was with Susteen®, and that

6    was how to analyze a cellphone using their particular tool

7    called Secure View 2.

8              On February the 9th, 2011, it was with a firm called

9    i2.  It involved mobile telephony.  It was The Next Wave in

10   Cyber Crime.

11             On March 23rd—

12   BY MR. CUSICK:

13   Q    Now do these deal with specifically cellphone tower analysis?

14   A    Yes, it is.

15   Q    Okay.  But it's called cyber crime training.  So it deals—

16   A    As I recall—

17   Q    It deals—

18   A    From what I recall, that—

19   Q    Sir, it deals with specifically cellphone tower analysis, but

20        the title of the course is cyber training?

21   A    It was cyber crime.  And, from my recollection, that involved

22        using of a cellphone.  And—And, again, that would be involving

23        the cell connections.

24   Q    Sir, have you ever worked in a police department as a

25        detective regarding cellphone towers?

1326

1   A    No, I have not.

2   Q    Have you ever worked with the FBI regarding cellphone towers

3        as a agent?

4   A    No, I have not.

5   Q    Have you ever worked with Sprint®, Verison, MC—any other phone

6        company?

7   A    No, I have not.

8   Q    And you've testified twice before as an expert?

9   A    That is correct.

10  Q    Do you have any other experience other than taking training

11       courses?

12  A    No, I do not.

13            MR. CUSICK:   Your Honor, I renew my objection.

14            THE COURT:   I'm sorry?

15            MR. CUSICK:   I renew my objection.

16            THE COURT:   I have a couple follow-ups.

17            The two times that you testified as an expert, sir,

18       what year or years were those events?

19            THE WITNESS:   I believe the Missouri case was about

20       a year, year and a half ago; and the Texas case was just about

21       a year ago, also.

22            THE COURT:   And what is the subject matter that you

23       testified to in each of those cases?

24            THE WITNESS:   Both cases involved cell tower

25       analysis.

1327

```
 1                    THE COURT:   Mr. Champion, any additional questions

 2        or—

 3                    MR. CHAMPION:   Yes.

 4                    THE COURT:   —response to the objection?

 5                    MR. CHAMPION:   May I lay some more foundation?

 6                    THE COURT:   You may.

 7                    DIRECT EXAMINATION (cont.)

 8   BY MR. CHAMPION:

 9   Q    Mr. O'Kelly, how many analyses have you conducted over the

10        course of the last five to six years?

11   A    Are you asking for the private sector, or can I include the

12        law enforcement sector, also, that I've done analysis for?

13   Q    Let's start with law enforcement.  How many have you done for

14        law enforcement?

15   A    Probably about a dozen in the last two years—three years.

16   Q    And that's where you're working for the law enforcement

17        agency; is that correct?

18   A    Yes.  However, clarification, I don't work for the law

19        enforcement agency.  My service is pro bono for law

20        enforcement because they're usually my students.

21   Q    And you teach in this area, also, as far as cell tower

22        analysis?

23   A    That is correct.

24   Q    Now in the private sector, how many analyses have you

25        conducted over the last six years?
```

1   A   Upwards of probably 40 to 40-plus.

2   Q   And what do you look at when you are doing such an analysis

3       for cellphone towers?

4   A   Every case is different.  You have to, first of all, determine

5       what—what the issues are; and then you look—then you look at

6       what—the cell system that you're working with, whether it's

7       going to be a GSM, iDEN system, or a CDMA system.

8   Q   So you've had extensive training in this area.  You have

9       conducted in excess of 50 to 60 analyses for both the private

10      sector and law enforcement; and, additionally, you do training

11      in cellphone cell tower analysis?

12  A   Yes, my training is limited to law enforcement students only.

13      I do not teach the private sector.

14              MR. CHAMPION:   I'd move to qualify this as an

15      expert in cell tower—

16              THE COURT:   Any response?

17              MR. CHAMPION:   —analysis.

18              MR. CUSICK:   Your Honor, . . . (inaudible) my

19      objection.  The fact is is that a police officer who

20      testifies—I didn't qualify a police officer who's had

21      experience in cellphone towers through the criminal

22      investigation.  I didn't move to qualify that individual as an

23      expert.

24              And, in fact, just being—having 12 cases you've

25      helped to handle regarding investigations when this is a daily

1    occurrence of police departments, I don't think gives him any

2    more knowledge or expertise about cellphone towers as anybody

3    else.  So I renew my objection.

4              THE COURT:   Any response to that?

5              MR. CHAMPION:   Your Honor, he's had specific

6    training in analysis.  He does education in that specific

7    area.  He specifically does analysis of cell tower data and

8    cellphone.  I believe he does qualify as an expert.

9              THE COURT:   I'll find him qualified under 702.

10   And, certainly, the jury will receive an instruction later on

11   with regards to an expert's background and so forth.  And so

12   they can take it from there.

13             Go ahead, Mr. Champion.  I—

14             MR. CHAMPION:   Thank—

15             THE COURT:   —find him qualified.

16             MR. CHAMPION:   Thank you.

17   BY MR. CHAMPION:

18   Q   Now could you explain to the jury how does data from a

19       cellphone reach a tower in a very specif—or very simplistic

20       way.  Let's say you start out by pushing the green button on a

21       phone.  What occurs?

22   A   Well, the simplest thing to do is to look and see on your

23       cellphone if you have any bars.  If you even have one bar, you

24       can actually process a call.  So, as long as you can see a

25       signal, that's the beginning.

                                1330

1          The next thing is to start dialing in, which is

2     punching buttons.  If this was a computer, there'd actually be

3     a keylogger and we can actually see what stroke the

4     person—which key the person was punching each time.  However,

5     this is a cellphone and this is where they start separating

6     from computers into cellphones.

7          There is no logging, and so we actually can't

8     determine if there was a mistake made or not.  However, once

9     they select the keys and they press the green button, the

10    first thing that happens is the—the cell system is going to

11    determine whether or not the account is able to process the

12    call.  In other words, have they paid their bill.

13         If it's an open account, the next thing that happens

14    is it will physically measure the distance between the tower

15    it's connecting on and where the handset's located.  That

16    produces a radial measurement.  That's not a GPS location,

17    that's a radial measurement.

18  Q  When you say a radial measurement, it means that within a

19    specific radius that call is originating from; is that

20    correct?

21  A  On the compass, if—if we are 523 feet, as an example, when I

22    press the green button from the cell tower it connects to, it

23    will actually record 523 feet, give or take a few feet.

24  Q  Now is that data preserved by the cellphone companies, if you

25    know?

1331

```
 1   A   That data is sitting there at the carrier for a period between
 2       72 hours and 30 days, again, depending upon the system and the
 3       location of the system.  Oddly enough, the places in central
 4       Kansas, we have records going back several years, whereas, you
 5       can go to Detroit, Michigan, and you have records only lasting
 6       one week.
 7   Q   So it depends—
 8   A   It's just how that partic—
 9   Q   So it depends upon the carrier; is that correct?
10   A   Upon the carrier and the location.
11   Q   Now, when looking at cellphone and cell tower analysis, I
12       believe you testified that you've had training in mapping.
13   A   Can I—Can I—Do you want to finish the green button, or do you
14       want to continue into a different area?
15   Q   We'll continue with the green button.  Tell us more about—
16   A   The next thing that hap—The next thing that happens when the
17       green button is pressed and the call is being processed after
18       the measure, which is—That measurement is called several
19       things: RTT, RTD—round-trip delay—or PCMD, which is per call
20       measurement data.  Depending upon the carrier, it's going to
21       have a different acronym.
22           When the call is processed, we're looking at what we
23       call seizure time.  Some of the carriers will register your
24       seizure time so we can actually see in the records how long
25       the call was ringing before it was picked up.
```

1332

```
 1              The next—The next thing that occurs is, when you
 2      have the open connection on the other end, is the call
 3      duration begins.  So we have a new time record beginning at
 4      this point in time, and the seizure has been closed off.  The
 5      length of the call is measured in seconds.
 6   Q  So, if you make a phone call to another cell—you make one cell
 7      to another—what happens if that second phone—the destination
 8      phone—doesn't pick up or doesn't answer?
 9   A  The call would go to voicemail; and, depending upon the
10      carrier, it should register as a zero for a cell tower
11      indicating that it was processed into voicemail and the cell
12      tower did not register.
13              Depending upon the system and how that system is set
14      up, it may—and, also, the year it occurred—it may register a
15      cell tower.  Again, the records will change from carrier to
16      carrier and from year to year.
17              Now, when it does register on a cell tower, that was
18      the tower that had the best signal, not necessarily the
19      closest tower.
20   Q  What do you mean by that?
21   A  The cell carrier is very much aware that they don't want to
22      lose customers, and the best way to lose a customer is to
23      continually drop a call.  So, in order to not drop the call,
24      they'll look for the best signal, which may not be the closest
25      tower.  It may be actually several towers away.  And that
```

1333

1    tower, as long as it has the cleanest, clearest signal for

2    transmission at the time that it is actually captured, it will

3    connect on that tower.  That's why the RTD is so critical,

4    because, irrespective of what tower it connects on, it will

5    give you the radial measurement.

6  Q   Now—

7  A   Then the next—

8  Q   Go ahead.

9  A   Then, while you're—while you're talking on that particular

10   cell tower, you can actually stand still, be in a

11   cell-splitting zone covering as many as five cell towers—I've

12   seen this occur.—and, as you spin around in a circle, you can

13   actually—without moving, you can actually start collecting

14   signals from a different cell tower; and, when the call is

15   finally terminated—again, depending upon the carrier—it will

16   register the last sector of the last tower that you connected

17   on to.  It does not show the intervening towers at all.

18 Q   Now—

19 A   There is no system that I know of that does that.

20 Q   —a cellphone tower for a specific system, such as Sprint®,

21   does the geographic location affect how they set up their

22   towers?

23 A   I'm not an engineer, so I don't know the specifics.  I can

24   give you generalities; and that is, again, they look at what

25   areas they want to cover.  And my recollection of being in

1334

1          Kalamazoo is you have some hills and valleys; and, on the

2          southeast side, you have a large body of water—

3     Q    So how does that—

4     A    —and—

5     Q    —how does that affect or what—what changes, based upon your

6          experience and training, does a cellphone company do to

7          increase their signals or to assure that signals are being

8          met?

9     A    Well, they have several options.  They can—They can add

10         towers.

11              The next option would be to address the downward

12         tilt.  And a downward tilt is when you take one of the

13         paddles—

14              Can you—Can you see the cell tower?

15    Q    Yes.

16    A    Can you see my—Can you see my hand?

17    Q    Yes.

18    A    Okay.  These are paddles up here.  And the downward tilt would

19         mean we're going to turn this paddle at a downward area here,

20         and we're going to confine the signal in this area here.  The

21         downward tilt, if it's at—if it's perpendicular, it'll stretch

22         out here and you can actually cover more ground.  But the

23         issue, then, is what is the wattage, because you need power to

24         start getting out here.  So you have to look at the downward

25         tilt and you'll know how far you can get your signal out.

                                    1335

1  Q    How far will a signal reach from a cellphone to a tower?

2  A    We're going to speak to the current system, which is digital

3       analog; am I correct?

4  Q    That's correct.

5                 THE COURT:   Wait.  Hold on a second.

6                 Counsel, will you approach?

7                 You can't answer questions.

8                 The jury is to disregard his question and the

9       response of the attorney's.

10                (At 11:34 a.m., bench conference as follows:

11                     THE COURT:   Okay.  You can't answer questions.

12                You can't testify.

13                     I have a question.  Has he ever been to

14                Kalamazoo?

15                     MR. CHAMPION:   Yes.

16                     THE COURT:   Okay.  Did he do that as part of

17                his case?

18                     MR. CHAMPION:   No.

19                     THE COURT:   So he's been here before.

20                     MR. CHAMPION:   On other cases, yes.

21                     THE COURT:   The concern that I have is we are

22                getting . . . (inaudible) specific and, I think, off

23                the mark here.

24                     I thought the whole purpose of his testimony

25                was to, number one, either analyze the phone

                              1336

1   records, which I don't know—Has he done that at all?

2         MR. CHAMPION:   He's not received them from

3   Sprint® or . . . (inaudible)

4         MR. CUSICK:   What I was—

5         MR. CHAMPION:   . . . (inaudible) getting into

6   the general, such as what the—what their expert—

7         THE COURT:   Okay.

8         MR. CHAMPION:   —testified to.

9         THE COURT:   The concern, though, I have is

10  we're talking in these huge generalities where you

11  could be, I'm assuming, out in New Mexico or

12  somewhere—

13        MR. CHAMPION:   And I'm going to be—

14        THE COURT:   —or you can be in New York City

15  and have five cell towers that they're bouncing off

16  of.

17        I think we're losing the whole sight of what

18  we're here for.  And, what he's testifying to, we're

19  getting into way more specific than what we need in

20  this particular case.

21        If you want to focus on this case, fine.  But

22  we're going to be here all day having him explain on

23  his own what happens from the time you pick up a

24  phone until—

25        MR. CHAMPION:   Well, that's part of the issue

1337

1      . . . (inaudible) Their expert testified the first

2      issue is the closest phone and signal strength, and

3      they didn't go into those areas.  And they're saying

4      my client was in a given air way, and it was based

5      upon the cellphone tower data.

6      MR. CUSICK:  Well, actually, I was speaking—I

7      mean, we just had that as corroborating evidence.

8      Obviously, he can bring in the expert to testify.

9      This isn't even an issue in the case.  Sam Steel and

10     his witnesses put himself at that area.  So I don't

11     even know why we're getting into this.  I just—

12     THE COURT:  That's a good point, too.  But, I

13     mean, you can always say someone's cellphone is

14     there, but you can't—I don't even think they ever

15     linked the cellphone to him at this point, so I

16     don't even know as far as the evidence is

17     considered.

18     But you can walk him through this.  I'm not

19     going to let him just sit there and talk all day—

20     MR. CHAMPION:  . . . (inaudible)

21     THE COURT:  —about what is going on between

22     the time you make a call and the time you pick up

23     another receiver.

24     If he's not going to relate it to the records

25     in any way, there's no need for us to go down that

1           road.

2                     If you want to talk about, you know,

3           generalities in Kalamazoo about how the cellphone

4           tower works from his experience here—But I guess I

5           have concern when he said we have a huge body of

6           water on the southeast.  I don't know what he's

7           talking about, what body of water on the southeast

8           side of Kalamazoo.

9                     MR. CUSICK:   Yeah.

10                    THE COURT:   We've got lakes here, but it's not

11          like you got an ocean to pass through.

12                    MR. CHAMPION:   I know.

13                    THE COURT:   I don't know what he's talking

14          about.

15                    MR. CHAMPION:   . . . (inaudible)

16                    THE COURT:   So you've got to lead him down and

17          get him—

18                    MR. CHAMPION:   I'm trying.

19                    THE COURT:   —on track because I'm not going to

20          . . . (inaudible))

21   BY MR. CHAMPION:

22   Q    Let's focus in on the Kalamazoo area.  The way a cellphone

23        tower is set up, let's say, in the city of Kalamazoo, is that

24        different than to the north side of Kalamazoo?  As you get

25        into the—

                              1339

```
 1                    MR. CUSICK:   He has to lay a foundation that he
 2          specifically knows.  Being in Kalamazoo one day, two days, or
 3          whatever, doesn't mean he understands the area.  He has to lay
 4          a foundation he understands the streets of Kalamazoo, the—
 5                    THE COURT:   I will—
 6                    MR. CUSICK:   —area.
 7                    THE COURT:   I will sustain that.
 8                    MR. CHAMPION:   Okay.
 9                    THE COURT:   . . . (inaudible)
10   BY MR. CHAMPION:
11   Q    Have you been to Kalamazoo?
12   A    Yes, I have.
13   Q    Have you looked at maps around Kalamazoo?
14   A    Yes.
15   Q    In fact, have you looked at some of the maps that were
16        provided by the prosecution as to cellphone tower locations?
17   A    There were—There were just two maps is my recollection.
18   Q    But you have—you have seen those maps and the location,
19        correct?
20   A    Yes.
21   Q    Now, looking at those maps and locations, there is one to the
22        north near D Avenue.  Is that—Based upon your experience and
23        training, is that cellphone tower likely to be set up
24        differently than ones on Ransom or Willard Street?
25   A    There's a strong possibility, yes, because the density of the
```

1340

```
1          population.

2    Q     How does that affect how a cellphone tower on D Avenue—When

3          you say density, what's the difference?  What would make that

4          tower different than one on Willard or Ransom?

5    A     Oh.  I don't have the answer for that.

6    Q     Do they have the same wattage?  Are they pointed in the same

7          angle as you get into a less denser area?

8    A     From what I was able to determine on the records, the—the

9          azimuth, which is what side of the tower, how it's facing,

10         they are different.  And I don't have the wattage information,

11         and I wasn't provided the beam width.

12   Q     So you—you weren't provided that information, so you can't

13         specifically say.

14                In general terms, typically, what would happen to a

15         cellphone tower in a rural area as compared to a urban area?

16   A     The difference, generally speaking, is going to be the

17         downward tilt.

18   Q     Is there any difference in the wattage?

19   A     There may be.  There should be.  But then, again, each tower

20         by itself within a switch is going to be set for that specific

21         general area for the coverage.

22   Q     So a cellphone tower, as I understand it, specifically, if one

23         is registering on Ransom or Willard Street, does that have a

24         specific bearing as to where the location of the cellphone is

25         when making that cellphone—that call?
```

1341

1   A   No, because you—you're forgetting one ingredient, and that is

2       the cell-splitting zone; and that, in your wording, would be

3       the overlap area.  In order to keep the call active and keep

4       processed, you're going to have a physical area where

5       mult—well, at least two and sometimes up to five that I

6       experienced cell towers can cover one area.

7   Q   Now you also testified that a cellphone can actually skip a

8       cellphone tower and go to another one; is that correct?

9   A   Yes, and I've actually worked the cases involving that—that

10      occurring, yes.

11  Q   Now, specifically, the—There is a cellphone tower on

12      Ransom Street.  Are you familiar with that?

13  A   Can I—

14  Q   Are—

15  A   —go to a map?

16  Q   Are you familiar with that, yes or no?

17  A   No, I—No, I am not.

18  Q   Did you look at some records to indicate where the cellphone

19      tower is located on Ransom Street here in the city of

20      Kalamazoo?

21  A   My recollection are the—are the cell towers on Mabel—I'm

22      sorry.—Willard and Fulford are the two areas I focused in on.

23  Q   On the Fulford, did you find that the physical address and the

24      mailing address to be two different issues?

25  A   That would be a common occurrence, yes.

1342

1    Q    And, in this particular case, did that occur?

2    A    Yes, it did.

3    Q    What did you find?

4    A    Well, the cell tower that Detective Beauchamp referred to was

5         actually a different carrier.  He's looking at the one right

6         behind the physical address of the front door of 1000 Fulford,

7         which is four blocks from Walter Johnson's residence when, in

8         fact, the actual cell tower is—is, I believe, more than a half

9         a mile to the southeast; on the same property, but it's a

10        little bit—about six-tenths of a mile, as I recall, southeast

11        of the actual location.

12   Q    Of the actual mailing address—Is that correct?—of the street

13        address?

14   A    Yes.  And when I—When I say mailing address, it's actually for

15        where the—where the assessor's records go to.  In this

16        particular case, it's 1000 Fulford.  If you go to

17        1000 Fulford, I think the front door—It's actually a vacant

18        building.

19   Q    Where is the cellphone tower located on Fulford for the

20        Sprint® carrier?

21   A    It's at least six blocks to the south and one block to the

22        east, and it's down an alleyway behind the loading dock of

23        Trinity Warehouse.

24   Q    And—

25   A    And it's on a smokestack.  It's on a smokestack.

1343

1   Q    When you get into a rural area, are there more or less

2        cellphone towers?

3   A    Generally speaking, there's going to be fewer because the

4        downward tilt is going to be more perpendicular—

5   Q    And in an urban—

6   A    —so the cell tower, it can reach out further.

7   Q    And how far will a cellphone tower reach out to receive a

8        signal?  What's the maximum distance based upon your

9        experience and training?

10  A    Twenty-eight, but that's stretching it.  It's more feasible at

11       the 20 to 24 range.

12  Q    Twenty to 24 mile—

13  A    We've got—Yes, we've gotten them out to 44 miles, but the

14       44 miles is when you're hitting northern California from

15       mountaintop to mountaintop, and that certainly is not your

16       area.

17                    MR. CHAMPION:   Thank you.

18                    I have no other questions.

19                    THE COURT:   Mr. Cusick?

20                    MR. CUSICK:   Thank you, your Honor.

21                         CROSS-EXAMINATION

22  BY MR. CUSICK:

23  Q    Sir, what are some of the factors in determining how a

24       cellphone tower's activated?

25  A    Can you repeat your question, please.

                                    1344

1    Q    How are some of the—What are some of the factors in

2         determining how a cellphone tower is activated?

3    A    Activated by a cell handset, the cellphone?

4    Q    Yeah, the cellphone.

5    A    You have to have the power turned on.  And the cell tower is

6         actually controlling the level of power coming from the

7         cellphone.  The cell tower actually reads the cellphone and

8         looks at the power level that it's exhibiting and tells it

9         conserve—you're very close to us, therefore, conserve power;

10        power—lower your power range, conserve your battery.

11             If you're further away, it's going to tell it to

12        increase the battery life.

13             Did I answer your question?  I'm not sure I did.

14   Q    Okay.  Well, is it—Would you agree that the clearest

15        signal—the cellphone would activate the tower that has the

16        clearest signal for the cellphone?  Is that—Would you agree—

17   A    That's my—

18   Q    —with that?

19   A    —training.  Yes, that is my training.

20   Q    Okay.  And would you agree that proximity would be the most

21        important factor in determining which cellphone tower

22        has—gives the clearest signal?  Would you agree with that?

23   A    When you're using the word proximity, are you using the word

24        the closest cell tower or are you saying in the general

25        vicinity?

1345

1    Q   The closest cell tower to determining which tower has the

2        clearest signal.

3    A   My under—My understanding—the training I've gone to—is that

4        the clearest signal is the first option; the closest tower

5        would be the second option.

6    Q   Okay.  And sometimes they can be the same one?

7    A   Oh, yes, of course.  Yes, sir.

8    Q   Okay.

9    A   By all means.

10   Q   And you would agree that proximity would be probably the most

11       important factor in determining which tower has the clearest

12       signal?  Would you agree with that?

13   A   Yes, it's going to—It's going to choose a tower in the cell

14       neighborhood that it—that it can see.

15   Q   Okay.  Thank you, sir

16              Sir, I'm going to give you a hypothetical, if you

17       don't mind.  If there is a missing person—Okay?—and if there's

18       a hundred investigators who are ready to find this missing

19       person and that person's cellphone tower—Sorry.—that person's

20       cellphone signals a cell tower in a particular area, where

21       would you first look for that missing person?

22   A   It would depend on the cell system itself, number one.

23              Number two, it would depend on how many cell towers

24       you're triangulating off of.

25              If you are, in fact, pinging, as opposed to looking

1346

1    at live data, you're going to be 15 minutes behind that

2    signal.  So the next issue is do we have the victim, is the

3    victim in transition; is it in vehicle—

4  Q  Well—

5  A  —walking, driving.

6  Q  Okay, sir.  So, if a person's cellphone—a missing person's

7    cellphone activates a cell tower—And that's the information

8    that's given to the investigators in a case.—wouldn't you look

9    in the area where the cellphone tower is being activated?

10   Wouldn't that be the first place you would go if you were part

11   of that investigation?

12 A  Well, we had a case in—in Iowa like that, and we went out

13   24 miles where we thought the phone was activated on the

14   missing person; and it turned out the person was four miles

15   away on the other side of the tower.

16 Q  Sir, I'm just asking you a direct question.  If that's the

17   information that you had that a cell tower was activated by

18   that missing person's cellphone and that's the information the

19   investigators had, would you not go to that cell tower?  Would

20   that not be the first place you go?

21 A  If that was my only piece of information as you describe it,

22   the answer is yes.

23 Q  Okay.  Thank you, sir

24 A  But that's not enough information.

25 Q  Well, exactly.  Sometimes you don't have all the information

1347

| | | |
|---|---|---|
| 1 | | in an investigation—Correct?—that you would like? |
| 2 | A | That is correct. |
| 3 | Q | Okay.  Thank you. |
| 4 | A | Yes. |
| 5 | Q | You've been to Kalamazoo? |
| 6 | A | Several times, yes, I have. |
| 7 | Q | How many times?  How many times, sir? |
| 8 | A | Fifteen, maybe more. |
| 9 | Q | Where are the hills and valleys that you were referring to? |
| 10 | A | The hills and valleys that I'm familiar with are on the north |
| 11 | | side—northwest side—'cause I stay at the Holiday Inn Express |
| 12 | | out there out on Stadium.  And I believe to the northeast, my |
| 13 | | recollection is the downtown area of Kalamazoo is relatively |
| 14 | | flat heading out to the—the highway. |
| 15 | Q | Okay.  Thank you, sir |
| 16 | | And do you know where Mabel Street is in proximity |
| 17 | | to downtown? |
| 18 | A | It's several blocks north.  I want to say maybe eight, ten |
| 19 | | blocks north. |
| 20 | Q | And, sir, you were provided information from Sprint®, correct? |
| 21 | A | No, I was not. |
| 22 | Q | Well, you were provided—Were you provided the latitude and |
| 23 | | longitude lines that were given on Fulford that you just |
| 24 | | testified to? |
| 25 | A | I—Yes.  And the documents were crooked.  They were difficult |

1348

1    to read.  I believe that came from Detective Beauchamp.

2  Q  Okay.  Well, the latitude and longitude lines at

3    1000 Fulford Road, do you know how—are you aware that they

4    came directly from the Google map that was directed to that

5    area?

6  A  Yeah—Well, I use Google Google Maps to do that, also; and we

7    do have the latitude and longitude, which actually puts

8    me—puts you on that—on the smokestack six blocks south of

9    1000 Fulford.

10          And Detective Beauchamp's indicates it was four

11   blocks from the residence.  And there is a cell tower four

12   blocks from the Johnson residence, but that's not the same

13   cell tower.

14  Q  Okay.  But the Sprint® records that you have—Correct?—indicate

15    the—

16  A  Yes.

17  Q  —specific—indicate the specific latitude and longitude where

18    the cell tower is being activated.  Do you agree with that?

19  A  I do.  And I went in to Google Earth and I found the—I found

20    the tower on the smokestack as described.

21  Q  Okay.  Well, you agree that—Well, I'll just leave it at that.

22          Now—Now—And I'll be brief.  You have the CV that you

23    described that you gave to us.  You said that you have crime

24    scene forensic reconstruction and analysis, polygraph

25    examination; is that correct?  You have training in that?

1349

```
 1   A   Yes.

 2   Q   It says that you have two—

 3   A   Yes.

 4   Q   It says you have 2D and 3D incident, you took training for

 5       fire, accident, and crime scene computerized animation; is

 6       that correct?

 7   A   Yes.  Yes.

 8   Q   You took training in computer and electronic media storage

 9       forensic analysis; is that correct?

10   A   Yes, over at Eastern Michigan University in—Yes.

11   Q   Okay.  Forensic linguistic analysis, correct?

12   A   Yes, I was—Yes.

13   Q   Court and deposition legal videographer; took training in

14       that?

15   A   I did.

16   Q   Felony and death penalty mitigation; you took training in

17       that?

18   A   I did.

19   Q   Forensic diagramming; you took training in that?

20   A   Yes, I like going to school.

21   Q   You went to law school, correct?

22   A   I did for a year and a half.

23   Q   Okay.  Are you a member of the bar?

24   A   Oh, no, not at all.  I quit law school.

25   Q   Okay.  So—
```

1   A   My wife got—My wife got pregnant and that put the—put the end

2       of it.

3   Q   I understand.  So you—

4                    And are you paid to testify today?

5   A   Yes, I am.  I haven't been paid yet, but I'm going to submit

6       an invoice to the court.

7   Q   Okay.  How much do you usually get paid for testifying?

8   A   On your matter, I reduce my rate by 50 percent; and the

9       billable rate to the court is one-forty-two-fifty.

10  Q   Okay.  So one-forty—$142.50—

11  A   That's correct.

12  Q   —is what you're going to get paid?

13  A   By the court, yes.

14  Q   Okay.  By—

15  A   Or by the—by the county.

16  Q   Okay.  Are you going to get paid any more than that, do you

17      anticipate?

18  A   I might have a parking ticket downstairs when I leave this

19      deposition.

20  Q   Okay.  And you have—And your profession—What you do is, on all

21      these things—on polygraphs, on forensic linguistic analysis,

22      on cell tower analysis—you fly around the country or you

23      testify in a office regarding—and get—That's what you

24      do.—regarding these things that you take training courses in;

25      is that—is that fair?

1351

```
 1   A    Not exactly.  There's two things I do.  I do the cellphone
 2        forensics and the—and the cell tower analysis, and I also
 3        teach through Midwest Counterdrug Training for law
 4        enforcement.
 5                 When I leave here, I'm preparing for my El Paso
 6        Sheriffs Academy course.  I'll be there for approximately one
 7        week.
 8                 MR. CUSICK:   Sir, thank you.
 9                 I have nothing further.
10                 THE COURT:   Mr. Champion, any questions?
11                 MR. CHAMPION:   I'll be brief.
12                        REDIRECT EXAMINATION
13   BY MR. CHAMPION:
14   Q    Sir, directing your attention back to the hypothetical that
15        the prosecution presented, what information would you need to
16        identify where a person is located from the cellphone tower
17        records?
18   A    If you're looking for—Would you reask the question, please.
19   Q    What information from a cellphone tower would you need to
20        locate an individual?
21   A    Are you going to be talking live or historical?
22   Q    Pardon?  Going back to the hy—
23   A    Are you talking—
24   Q    Live.
25   A    If you're talking live, bear in mind, if you ping a phone, the
```

1352

1    phone must be turned on and all carriers are going to be

2    15 minutes behind that ping.

3              If you're going to do it live and a person is

4    actually—has an activity in progress, depending upon the

5    number of towers, law enforcement may—well, the carrier, that

6    is—may be able to get within 12 feet of that handset.

7  Q   And how would they do that?

8  A   The more towers triangulating, if you will, will hone in on

9    the person's location.  If you have two towers, as an example,

10   you're probably going to get within maybe 50 to 80 feet.  If

11   you're going to get three towers, you're going to close in

12   under that 50 rather rapidly.

13 Q   And, if you have only one tower, are you talking about a

14   radius?

15 A   If you only have one tower—If you only have one tower, you're

16   going to be in, most likely, the beam width of that sector.

17   Most beam width is 120 degrees.  Most of them are.  Some are

18   narrow, some are more wider.  And then, depending upon the

19   wattage—how far it can reach out—that's going to be your

20   coverage.  And then you haven't considered the cell-splitting

21   zones on each side right and left of that beam width.

22 Q   Okay.  Going now to—

23 A   So—

24 Q   Let's go—

25 A   —you may very—

1353

1    Q    Let's stop there for a moment.  Let's go historically.  When

2         you just have a latitude and longitude for a cell tower that's

3         been activated, what area would that cover?

4    A    That's going to cover the side of the—the side of the tower,

5         primarily, that has that sector, that zone.

6    Q    However—

7    A    But that's not enough, because you have to understand that you

8         can be several towers away when you process that particular

9         call.  So you really don't know, other than the fact that

10        you're in Kalamazoo when that call was made, you really don't

11        know where that tower—where that connection is.

12                  Now—

13   Q    Thank you.

14   A    —if you do a survey—a field mapping, you can narrow

15        possibilities down—And I've done that.

16   Q    But—

17   A    —but that's post crime scene.

18   Q    —based upon just the latitude and longitude of historical data

19        that the cellphone companies typically provide, you're not

20        able to give a location, if I understand correctly, the

21        location of where that cellphone call originated from; is that

22        correct?

23   A    If you're looking at the downtown Kalamazoo towers, I would

24        say you're within ten miles of that cell tower.  If you're on

25        the outskirts, you're up to 24 miles of that cell tower.

1354

```
 1                    MR. CHAMPION:   Thank you.

 2                    THE COURT:   Any further questions, Mr. Cusick?

 3                    MR. CUSICK:   Just on that last point.

 4                              RECROSS-EXAMINATION

 5  BY MR. CUSICK:

 6  Q    So, with your training and analysis, you have not heard that

 7       the—or you have not learned that the—in the city the maximum

 8       would be two miles for a cellphone connection?

 9  A    It is not.  It is not.  That's a fallacy.

10  Q    Okay.  And, for a rural area, it can be over 24—it can be up

11       to 24 miles?

12  A    I've seen them out to 28, but 20 to 24 is a safe area for the

13       rural areas.

14  Q    Now it's—It's not common, correct?  You'll agree with that?

15  A    No, but, if you're traveling between—between Kalamazoo and

16       Detroit, you're going to have fewer towers because they're

17       going to cover primarily the traffic on—on the highway.

18                    MR. CUSICK:   Thank you, sir.  I appreciate it.

19                    MR. CHAMPION:   No other questions.

20                    THE COURT:   Ladies and gentlemen, any questions for

21       this witness?

22                    And no hands are raised.

23                    Okay.  Thank you, sir.  Thank you—

24                    THE WITNESS:   Thank you—

25                    THE COURT:   —sir.
```

1              THE WITNESS:   —your Honor.

2              THE COURT:   You're all done.  And it's going to

3    take us a moment to turn off the video, I think.  So, just so

4    that you know, we're still in court here.  Okay?

5              THE WITNESS:   Thank you, your Honor.

6              THE COURT:   Okay.  With that, ladies and gentlemen,

7    we will break for the noon hour.  I'm going to need you to

8    report at 1:30 upstairs.

9              Actually, Counsel, will you approach a moment.

10             (At 12:00 noon, bench conference as follows:

11                  THE COURT:   Are you—Do you know for sure that

12             he's going to—

13                  MR. CHAMPION:   Yes.

14                  THE COURT:   He's not going to testify?

15                  MR. CHAMPION:   . . . (inaudible)

16                  THE COURT:   Okay.  I'm going to turn it over

17             to you, then, to rest.

18                  And then are you going to call any rebuttal?

19                  MR. CUSICK:   No.

20                  THE COURT:   All right.  Then I'll turn it over

21             to you for any rebuttal so that I can explain to

22             them what we're going to do afterwards.)

23             THE COURT:   All right.  I'm sorry.

24             Mr. Champion, any other witnesses at this time?

25             MR. CHAMPION:   No, your Honor.  At this time, the

                                    1356

1        defense rests.

2                 THE COURT:    Any rebuttal, Mr. Cusick?

3                 MR. CUSICK:    Your Honor, we have no rebuttal.

4        Thank you.

5                 THE COURT:    All right.  So what that means is, when

6        you return after lunch, we will go immediately into closing

7        arguments; and then I'll give you my—the final jury

8        instructions.  Then we'll select the alternates, and then

9        you'll begin your deliberations.  So I wanted you to know that

10       before you go to lunch so you knew where we were at.  So I

11       apologize for that.

12                Okay.  So I need you to check in upstairs at 1:30,

13       and we should be able to start pretty close to 1:30.  That's

14       my estimate at this point.

15                Please remember all my prior instructions.

16                Be careful when you're entering and exiting the

17       building.

18                Make sure you're not looking up anyone, anything,

19       any terms related to the case.

20                Make sure you're not talking to anyone about the

21       case and all the other instructions that you've heard.

22                You can follow Ms. Wint out.

23                Have a good lunch.  We'll see you about 1:30.

24                All rise.

25                (At 12:02 p.m., jury exits courtroom)

1357

1              You may be seated.

2              MR. CUSICK:   Judge, . . . (inaudible)

3              THE COURT:   Thank you.

4              All right.  Counsel, I have a copy of all the

5       instructions.  Then you're going to be receiving a copy over

6       the noon hour.  And we put them in the order that I'm going to

7       read them, just so that you're aware of that.

8              I do have a issue with regards to three or four of

9       those, and just meet me here about 1:15 so that we can address

10      those really quickly before—and just make sure that we

11      finalize the language of those.

12             Is there anything else that we need to address,

13      then, at this time?

14             MR. CUSICK:   May we approach, your Honor?

15             THE COURT:   Yes.

16             (At 12:03 p.m., bench conference as follows:

17                 MR. CUSICK:   . . . (inaudible) voir dire the

18                 defendant regarding his right to testify?

19                 THE COURT:   Yeah, did you want to place that

20                 on the record.

21                 MR. CHAMPION:   Sure.  . . . (inaudible)

22                 THE COURT:   I'll give you an opportunity to

23                 address that if you want.  I'll just turn it over—

24                 MR. CHAMPION:   . . . (inaudible)

25                 THE COURT:   —to you and indicate if you want

                              1358

1              to inquire.

2                   So thank you for that.  Okay.)

3              THE COURT:   Mr. Champion, you indicated that you

4      were resting your case.  I don't know if you want to inquire

5      of Mr. Steel—

6              MR. CHAMPION:   Mr.—

7              THE COURT:   —with regards to his testimony or not.

8              MR. CHAMPION:   Mr. Steel, you understand you have

9      the right to testify or the right to remain silent; is that

10     correct?

11             THE DEFENDANT:   Yes.

12             MR. CHAMPION:   And we've discussed this a number of

13     times over the last few days; is that correct?

14             THE DEFENDANT:   Yes.

15             MR. CHAMPION:   And you decided to exercise your

16     right to remain silent—

17             THE DEFENDANT:   Yes.

18             MR. CHAMPION:   —is that correct?

19             THE COURT:   Thank you.

20             Anything else, then, that we need to address at this

21     time, Counsel?

22             MR. CUSICK:   No, your Honor.

23             THE COURT:   Mr. Champion?

24             MR. CHAMPION:   No, your Honor.

25             THE COURT:   All right.  We'll see you in a little

                              1359

1    over an hour.

2              Court's in recess.

3              (At 12:04 p.m., court recessed)

4              (At 1:41 p.m., proceedings reconvened)

5              THE CLERK:   The court recalls the case of People of

6    the State of Michigan versus Samuel Steel, III, case number

7    C11-1983 FC.

8              Parties, please restate appearances for the record.

9              MR. CUSICK:   Good afternoon, your Honor.

10             Paul Cusick on behalf of the People,

11   Assistant Attorney General.

12             MR. CHAMPION:   May it please the Court,

13   Robert Champion appearing on behalf of Samuel Steel.

14             THE COURT:   All right.  Counsel, the jury's on

15   their way down.

16             We'll move to closing arguments.

17             In discussions, my understanding is the People have

18   estimated maybe about 40 minutes or so.  So I will just

19   indicate I will give you a max of one hour.  So I'll give you

20   a heads up if we're getting close to that time.

21             MR. CUSICK:   Your Honor, I did mention to

22   Mr. Champion, there's two exhibits, one, a sketch that was

23   taken from Samuel Steel, the defendant, and another from

24   Gerald Luedecking.  I'm going to have a comparison

25   side-by-side sketch of those two exhibits.  I don't believe

1360

1    that Mr. Champion had any objection to that.

2              MR. CHAMPION:   I'm not aware of any objection that

3    I could raise.

4              THE COURT:   So you've just taken those and blown

5    them up—

6              MR. CUSICK:   Right.

7              THE COURT:   —to compare them.  So—

8              MR. CUSICK:   Right.

9              THE COURT:   They're admitted.  So that's fine.

10             MR. CUSICK:   And I have the elements, also, on the

11   screen.

12             THE COURT:   Okay.

13        Jury's here.

14        Make sure your cellphones and other electronic

15   devices are turned off.

16        All rise.

17        (At 1:42 p.m., jury returns to courtroom)

18        You may be seated.

19        Welcome back, ladies and gentlemen.

20        As I indicated before, all of the evidence has been

21   admitted; so, when you deliberate, please don't send us a note

22   asking for something else.  Everything has been received into

23   evidence.

24        So I will turn it over to the attorneys now for

25   their closing arguments.

1              Mr. Cusick?

2              MR. CUSICK:    Thank you, your Honor.

3              Good afternoon.

4              First of all, I want to thank you for your time and

5    your attention, taking time away from your busy schedule to

6    serve on this jury over the last two weeks and on August 6th

7    during jury selection.  And I want to thank you for your

8    attentiveness during the proceedings.

9              There's been a lot of evidence introduced, a lot of

10   testimony, both from the prosecution and the defense.  And I'm

11   going to go through that testimony.

12             But your job as a jury is to determine what

13   happened.  Your job is to be what we refer to as the trier of

14   fact.  You decide who you believe is telling the truth, who

15   you believe may be lying; and, most importantly, you will

16   decide whether I have proven—the prosecution has proven beyond

17   a reasonable doubt whether Samuel Steel shot and killed

18   Milo Conklin.  That's what you'll determine.

19             And the standard that I have is just that: I have to

20   prove beyond a reasonable doubt.  And, as I've mentioned

21   before, it's not beyond a shadow of a doubt; it's not more

22   likely than not.  I have to prove to each and every one of you

23   beyond a reasonable doubt.

24             And what does a reasonable doubt mean?  The judge is

25   going to give you that instruction.  But a reasonable—a

1362

1       reasonable doubt is a doubt that has to be based on reason and

2       common sense.  I'm not going to be asking you to leave your

3       reason and your common sense at the door.  I'm asking you to

4       evaluate the evidence using reason and common sense.  And,

5       using reason and common sense, the evidence shows that, on

6       April 24th of 2011, the defendant Samuel Steel was dropped off

7       on Elizabeth Street, went to Mabel Street, shot and killed

8       Milo Conklin and ran over to Florence Street.  That's what the

9       evidence shows.

10              And common sense and reason indicates that the

11      witness who testified to that, that the corroborating evidence

12      of that testimony—the phone records; the cellphone towers; the

13      gun that was recovered; the photos that you've seen; the other

14      witnesses that came forward after the initial witnesses,

15      comparing that, also, to the defense witnesses—using reason

16      and using common sense, it's pretty clear—It's crystal

17      clear.—that it was the defendant who shot Milo Conklin.

18              What do we know in this case?  What is the evidence

19      that came forward?  I'm going to go over that.  There's some

20      things that are simply not in dispute.

21              April 24th of 2011 Milo Conklin was killed, and he

22      was shot several times, and that's what killed him.

23              There were casings that were at the scene at

24      626 Mabel Street.

25              It occurred a little after 9:00 o'clock on

1363

1    Easter Sunday.

2              The description of the perpetrator, somewhat varied,

3    but, primarily, it was an African-American male who was

4    wearing a black hoodie and black pants.

5              There were interviews that were conducted.  There

6    was a thorough investigation that occurred.  Whenever there

7    was a lead, the Kalamazoo Public Safety Department and

8    Detective Beauchamp, who was the officer in charge of the

9    case, went to determine whether or not there was any

10   evidence—or any further investigation that needed to take

11   place.

12             That's what the evidence showed.  That is

13   undisputed.

14             For a few months, the perpetrator was at large.

15   Then Walter Johnson comes forward.

16             Now I'll go back a little bit, and I'll come to this

17   later.  Sam Steel's name did come up early on in the

18   investigation, but I'll—I'll come back to that.

19             But the main break in the case, so to speak,

20   occurred when Walter Johnson came forward on his own volition,

21   on his own accord, and said in September of 2011 going forward

22   into November and making a statement to Detective Beauchamp in

23   November of 2011—November 2nd, 2011—I have information about a

24   homicide—the homicide that occurred at 626 Mabel Street.

25             He told his attorney.  A meeting was set up with

1364

1    Detective Beauchamp, and he gave a statement.

2         He had an agreement with the federal government.

3    It's important to know what that agreement was.  The agreement

4    was to give truthful information regarding criminal activity

5    that he was aware of.  I'm going to repeat that: truthful

6    information regarding criminal activity that he was aware of.

7         The agreement wasn't to make up a story and to try

8    to get some guy whatever you want.  The agreement was not to

9    come up with a lie.  The agreement was that it had to be

10   truthful.  And so Walter Johnson came forward.

11        He has a minimum sentence of 20 years.  The federal

12   government—The testimony was clear.—could have asked for even

13   less than that, but they did not—they did not agree to go

14   below 20 years.  For a 43-year-old man—I think he testified

15   he's around 43.—20-year minimum sentence.  That was the

16   agreement, to give truthful information on criminal activity.

17        So what did he say in that interview on November 2nd

18   of 2011?  And what—More importantly, what he testified to is

19   what I'm—I'm going to talk about.  But, basically, what he

20   told Detective Beauchamp and what he testified to in court was

21   that, on April 24th of 2011, earlier in the afternoon

22   A. J. Mathews—Harry Mathews—and the defendant Samuel Steel

23   picked him up on William Street where he was.

24        And I am going to refer to my best recollection of

25   the evidence.  All of us listened to a lot of evidence.  So

1365

1    I'm do—I'm going to—And I know Mr. Champion will.—refer to the

2    best recollection of our evidence—of the evidence that was

3    presented.

4         On William Street, he was picked up earlier in the

5    day and they went joyriding.  When I say they, it's the three

6    of them.  A. J. Mathews was driving his white truck,

7    Samuel Steel was there, and Walter Johnson was there.  That's

8    what the testimony shows.  They went to Mabel Street.  They

9    went to Daysha's, hung out at Mabel Street.

10        Samuel Steel indicated that he was having some type

11   of problem and didn't like Milo Conklin—made a statement

12   regarding how he didn't like him—and told Walter Johnson—and

13   asked Walter Johnson if he could borrow his gun.

14        They—When I say they—A. J. Mathews driving—go to

15   William Street.  And Walter Johnson was very frank and very

16   straightforward.  He didn't specifically remember if he had

17   the gun on him or if he went to get the gun, but he handed the

18   gun to the defendant.

19        They drove over to Elizabeth Street, dropped off the

20   defendant.  A. J. Mathews driving, Walter Johnson was in the

21   front seat, the defendant was in the back.

22        And the defendant was dropped off, and he said, I'll

23   see you in a bit—see you in a minute or a bit.

24        A. J. Mathews drives to Woodbury, which is just

25   around the—just south of that, and parks at Walter Johnson's

                              1366

1    father's house.

2            Guns are heard—Gunshots are heard.  A. J. pulls out

3    of the driveway, goes to Florence Street and sees the

4    defendant coming along through the cut.  Defendant's wearing a

5    black hoodie and black pants.

6            They then go west, go to Douglas Street.  The

7    defendant's telling him where to go.  He throws out the gun

8    that he was given by A. J. Mathews—I'm sorry.—by

9    Walter Johnson.  Throws out the gun in that vicinity, goes to

10   Douglas Street, changes clothes, go to Stockbridge, and then

11   Walter Johnson and Samuel Steel burn the clothes.  That's what

12   he testified to, and that's why he came forward.

13           Now what did Detective Beauchamp, the officer in

14   charge of the case, and the Kalamazoo police department do

15   when he had that information?  He wanted to verify whether or

16   not Walter Johnson was telling him the truth.  And, based on

17   that conversation and that interview with Walter Johnson, he

18   verified that what Walter Johnson told him was, in fact,

19   corroborated.

20           How did he get the gun?  People by the name of

21   Paige Bowers and Mark Sprague stole the gun on Cressey Road

22   from a guy by the name of Michael—He didn't know the guy's

23   name; but stole the gun, a .40 caliber H & K; a couple other

24   guns; stole money—cash—and they gave it to him.  They gave the

25   gun—for cash and for drugs—They gave the gun to

1367

1       Walter Johnson.

2               No dispute the gun was stolen.  Michael Bork

3       testified the gun was stolen.

4               There was casing tests from that gun and the crime

5       scene.  The casing tests that were taken from Michael Bork's

6       house, the casing tests that were taken from the crime scene

7       came from the same gun.

8               So Walter Johnson indicated this was the gun I used;

9       I don't know where the gun was dropped off; I think it was

10      someplace between Kalamazoo and Jackson, but I don't know

11      'cause he wasn't there.  He heard that the gun had been picked

12      up someplace from where it was originally dropped off.  So he

13      didn't give Detective Beauchamp that information 'cause he

14      didn't know.  So that was verified.  The casings were

15      verified.

16              What about his home on Stockbridge?

17      Detective Matthew Bombich went to the home on Stockbridge.

18      And what did he find?  He found a burnt area with burnt

19      clothes.

20              Michael Wilson, who was across the street around the

21      same time, indicated that he saw a controlled fire.  That's

22      exactly what Walter Johnson indicated but, also, what

23      Detective Bombich saw, a controlled area, a controlled fire

24      with the burnt materials—burnt clothing.

25              The gun, the casings, and the clothing, that was

1    corroborated.

2          Then there are the phone records that came forward.

3    All of the phone records for Walter Johnson, for

4    A. J. Mathews, for Sam Steel, for Melvin Johnson and

5    Kario Pritchett, all these phone records were admitted.  And

6    this exhibit—exhibit 100—was admitted indicating the phone

7    calls that were made throughout April 24th of 2011 and

8    April 25th of 2011.

9          And who's the central figure in all these phone

10   calls?  Most of the phone calls were between Harry Mathews and

11   Sam Steel and between Sam Steel and Walter Johnson, not a lot

12   between Harry Mathews and Walter Johnson.

13         Who was Harry calling—I'm sorry.  Who was

14   Samuel Steel calling around the time of the homicide?  Is

15   calling Tommy Morgan, who testified yesterday who he was with

16   and he was hanging out with?  No.

17         Was he calling Mr. Davenport, who he was just

18   hanging out with all day going in and outside the house?  No.

19         Was he calling Charles Thomas?  No.

20         Who was he hanging out with the next day after the

21   homicide?  Who was he hanging out with right after the

22   homicide occurred?  Who was he calling throughout that day?

23   Right when the homicide occurred, there were phone calls

24   exchanged between Walter Johnson and Samuel Steel.

25         The next morning Samuel Steel and Harry Mathews.

1          Oh, look at this.  Detective Beauchamp said
2     that—indicated his phone was turned off during this six hours.
3     In the middle of the night at 3:54—47 a.m. Sam Steel makes a
4     call to his voicemail.  Walter Johnson, Harry Mathews didn't
5     do it.
6          Why would you wake up in the middle of night—in the
7     night after having your phone off and just say—and just make a
8     call to your voicemail.  It doesn't happen too often.  The
9     guys that are implicating you in a homicide, you're calling
10    and they're calling you.  Is that a coincidence?  Common sense
11    and reason.  Why were they calling?  Because what
12    Walter Johnson was testifying to is true.
13         And so what else did Detective Beauchamp do after
14    that?  He went and he talked to A. J. Mathews.  A. J. Mathews,
15    initially, in the first interview, did not come forward, was
16    not as forthcoming—I don't believe even really made much of a
17    statement.
18         And I urge you to go over the phone records for
19    Harry Mathews and Walter Johnson.  It explains a lot.  It's in
20    evidence.
21         But what—What did A. J. Mathews have to tell
22    Detective Beauchamp eventually?  Well, he was charged on
23    December 22nd of 2011 for accessory after the fact, along with
24    other charges; and Samuel Steel was charged with this homicide
25    case—this murder case on December 22nd of 2011.  Very—Two

1    different reactions to being charged.

2            What did A. J. Mathews do?  The literally minute

3    that he was charged, he walked down to the police department

4    and he turned himself in minutes of when he was charged.

5            What did Samuel Steel do?  He left the state.  He

6    went to Chicago.  He then went to Georgia.  He became

7    Sammy Gunn.  He got new phones.  He told Kristine Wilkerson,

8    who he lived with for four months—never told her that he's

9    from Michigan.  He wanted to put all this mess that he created

10   behind him.  He wanted to put Sam Steel and what he did behind

11   him and wanted to become Sammy Gunn.

12           Well, obviously, Kristine Wilkerson, she admitted,

13   still has some feelings or, at least, was in love with him.

14   But a lot could be seen from her testimony.  And one thing's

15   unequivocal.  He came up with a new name, tried to come up

16   with a new life, and tried to evade capture.

17           The FBI saw him running on August 6th, 2011—I'm

18   sorry.—2012.  He couldn't run far.—and then he was compliant.

19           May we have exhibit 99.

20           This is exhibit 99 that was admitted, and it

21   indicates the phone—the phones that Sam Steel ad.  And I'm not

22   going to continue to go over all the testimony that

23   Detective Beauchamp indicated, but he indicated why he knew

24   that Nick Jake was registered under Nick Jake, why Sam Steel

25   used that phone; why Tim Jones, when it was registered under

                            1371

1    Tim Jones, that Sam Steel used that phone.  He indicated why

2    he knew the name of Tim Jones and why it was registered under

3    Tim Jones for Sam Steel.  He indicated Sam Steel used all

4    these phones under the name of Nick Jake, Tim Jones, and

5    Tim Johnson.

6         And, when he was arrested with the MetroPCS phone,

7    what name did Sam Steel have?  What name was the phone

8    registered to?  Tim Johnson.  So that testimony's already been

9    testified to.

10        So April 2011, this phone goes dead.

11        September 2011 to December of 2011, this phone goes

12   dead.

13        It's new phone December 9th, December 22nd.

14        What happened on December 22nd?  He was charged with

15   murder, fled the state, went to Chicago.

16        Wendell Montgomery testified, got a new phone.

17   Tim Jones—Got a new phone under Tim Jones May 2012/August 3rd.

18        August 3rd was the Friday that you heard the FBI

19   agent testify to—Ron Campbell.  They were getting close to

20   Sam Steel.  Sam Steel knew it.  And, as a result of the FBI

21   getting close, he changed his phone again, had a new phone.

22   And that's the phone that's been admitted into evidence and

23   the phone that he was using when he was arrested.

24        Why would he change his phone?  Well, to, once

25   again, evade capture.

1          There's going to be an instruction that the judge
2     gives you; and, on that instruction, it says flight can show
3     consciousness of guilt.
4          And I would suggest to you that Samuel Steel wanted
5     a new life, wanted a new identity, wanted all these new
6     phones, wanted a new girlfriend, wanted a new home, didn't
7     want anything to do with Michigan—certainly, didn't want to
8     have anything to do with what he did on April 24th of 2011 at
9     626 Mabel.  Shows consciousness of guilt.
10         A. J. Mathews turns himself in; Samuel Steel took
11    the train to Georgia.
12         Now Harry Mathews did come forward and did give a
13    statement.  And what did he say?  Said basically the same
14    thing that Walter Johnson said.  Some minuscule differences.
15    You're not going to have an exact memory.  Nobody does.  But,
16    basically, almost said the exact same thing Walter Johnson
17    testified to.
18         And he knew where the gun was.  He said that the
19    next day on April 25th of 2011 that he called Samuel Steel and
20    Samuel Steel called him back and Samuel Steel called him back
21    again, and they had a phone call and it was—a decision was
22    made and the defendant asked to get the gun that he just
23    dropped off right by the crime scene to go and drop it off
24    someplace else.
25         So, during the ride up to D Avenue and

                              1373

1    12th Street—eight—ten miles away from—from where the homicide

2    occurred—Samuel Steel was in the passenger side, took the gun

3    apart, and then dropped it on D Avenue and 12th Street.

4         Well, guess where the gun was found?  D Avenue and

5    12th Street.  Detective Beauchamp was able to find the gun, and

6    that was admitted into evidence.

7         So we now have phone records.  We now have casings.

8    We now have where the gun was from originally, who it was

9    from, how Walter Johnson got the gun, how Samuel Steel got the

10   gun.  That's corroborated.  Where the gun was found is now

11   corroborated.

12        The defendant's no place to be seen in Michigan.

13   Phone records, once again, specifically corroborate what both

14   A. J. Mathews and Walter Johnson said.  That's what we have

15   now.  Reason and common sense.

16        What does that indicate to you?  It was the

17   defendant who committed the murder.  His acts beforehand, his

18   acts at the time of the incident, and his acts afterward show

19   that he committed the murder.

20        What else did Detective Beauchamp do?  Did he

21   just—just take the statements of Harry Mathews?  No, he

22   investigated further.  He investigated further.

23        Megan Erickson testified.

24        He wanted to make sure—believe—Obviously, the

25   testimony was believable regarding A. J. Mathews and

1374

1    Walter Johnson.  But, just to verify, he wanted to make sure

2    that, when Walter Johnson was incarcerated from June of 2011

3    until March of 2012—First, he was in Kalamazoo; then he went

4    to Newaygo jail; then he was in Mecosta County jail; then he

5    was in Newaygo jail again.—he wanted to make sure that there

6    were no calls made to the known number for A. J. Mathews and

7    another number that was known to be used by A. J. Mathews.

8            So he asked Megan Erickson from Mecosta County jail

9    between October 7th of 2011 and February 3rd of 2012—This is

10   during the period that Walter comes forward, makes a

11   statement.  A. J. Mathews is implicated, comes forward and

12   makes a statement.  He wanted to make sure there's no phone

13   calls between (269)—be it from that facility—anywhere in that

14   facility to (269) 364-3238 or (269) 348-8781, and there were

15   not.

16           Did he stop there?  No.  The other times when he was

17   in Kalamazoo and Newaygo—Walter Johnson—Detective Beauchamp

18   looked to see if any numbers [*sic*] were made from those

19   facilities—any calls were made from those facilities to those

20   numbers.  Were there?  No.

21           Well, why did A. J. Mathews and Walter Johnson's

22   testimony seem so similar?  Because they were there.  Because

23   they're telling the truth.  They didn't concoct this story.

24   They came forward.

25           Were they reluctant to come forward?  Absolutely.

1375

1    You've heard the testimony.  Were they scared?  The only

2    person I think that said they weren't scared was A. J. Mathews

3    of the defendant.  But he, I think, indicated that he was

4    scared to come forward.  And a lot of the witnesses indicated

5    they were scared to come forward.

6         Tommy Morgan even testified yesterday, what happens

7    to snitches, they get stitches.

8         But their testimony makes sense because they were

9    there.

10        Devon Smith came forward.  Devon Smith indicated

11   that, in mid November to December of 2011, he was at 629 Mabel

12   and at Sam's house at 623 Mabel, which is Sam's mom's house,

13   and that he was with Sam Steel and that Sam—And I think Devon

14   said that his son was there as well.

15        But Sam Steel called Devon over and said, let me

16   holler at you.  I think he said that they went outside or by

17   the side of the house.  And Sam Steel indicated to Devon Smith

18   that he had to kill Milo Conklin 'cause he was stealing from

19   him and that he was with A. J. Mathews and Walter Johnson and

20   they went to Florence—and they—he was picked up at

21   Florence Street.

22        What did Detective Beauchamp do?  He just said,

23   okay, I believe you.  He could have.  Certainly, when he came

24   to testify, Devon Smith is very believable.  But he did want

25   to verify.  Was he in the area of 626 Mabel—I'm

1376

1    sorry.—629 Mabel, 623 Mabel, in that area?  Yes, he was.

2            And was he in that area between mid to late November

3    and December?  Absolutely.

4            Can I have exhibit 112.

5            I'm sorry.  This is—

6            Now this was introduced into evidence and testified

7    to, this being 626 Mabel, this being 623 Mabel, this being

8    629 Mabel.

9            Devon's testimony was he—he was in the area of

10   629 Mabel beside the house, probably dropped off here.  This

11   is a GPS, this isn't a cellphone tower specifically says where

12   he is.  He's around this area at the time—around the time that

13   he said defendant made the statement.  So that corroborates

14   what Devon Smith had said.

15           Now I want to be very clear.  There is no testimony

16   on the record at all that Walter Johnson or Devon Smith ever

17   got together and made up this story or, by the way, all the

18   evidence; unfortunately for the defendant, it's just a

19   coincidence.  There's no indication of that whatsoever.

20           When Walter Johnson came forward in September

21   initially and then made the statement in November of 2011,

22   there was no indication he ever shared a cell with Devon Smith

23   or he was even in the same pod as Devon Smith.  And

24   Devon Smith didn't come forward until later.

25           And, if Devon Smith were to make up everything

1377

1    completely like Walter Johnson did, all Devon Smith said was,

2    yes, the defendant said he had to kill him because he

3    stole—Milo—because he stole from him—from me and A. J. Mathews

4    and Walter Johnson picked me up on Florence Street.  He didn't

5    go into any other detail.

6            I asked him, well, did he say anything else.

7            No.

8            If you're going to make up a story—He basically

9    said, this is all the defendant told me.  I don't know

10   anything more.  And, of course, he was at the area at the time

11   that he . . . (inaudible)

12           So, once again, witness corroborated testimony.

13   Walter Johnson's corroborated.  Perry [*sic*] Smith's

14   corroborated—Devon Smith's corroborated.  The police officers

15   who's testified and who have testified, that testimony's

16   corroborated by the evidence.  Reason and common sense

17   indicates who shot him.  Nobody but Sam Steel.  That's who

18   killed Milo Conklin.

19           David Lee came forward.  Who does David Lee know?

20   Didn't know Devon Smith.  Didn't know A. J. Mathews.  Didn't

21   know Steven Brown.  Didn't know Walter Johnson.  The only

22   person he knew in this entire case was the defendant.

23           Why did he come forward in July of this year?  Had

24   nothing to do with the case.  He wrote a letter to the

25   U.S. Marshals saying that he was concerned based on what the

1    defendant told him that witnesses in the case were going to be

2    harmed.

3        What do those actions tell you?  What do those

4    statements by the defendant tell you?  That he was just—try to

5    have people come and tell the truth?  Oh, no.  David Lee said

6    he was going to have people—family members—to come on this

7    stand and to be dishonest and to make up stuff for him.

8    That's what David Lee testified to.

9        And I want to be very clear because I know

10   there—there was a couple questions—And I had to verify it.  I

11   wrote this down.  He did say that the defendant told him he

12   was in Georgia.  I don't know how he would know that if he

13   didn't say that when he doesn't know any of these other

14   witnesses.

15       But he said—He didn't say, Sam said I shot the

16   person; he said, Sam told me that somebody saw him shoot the

17   victim.  I would suggest that's an admission, just like the

18   admission to Devon Smith, just like the admission that I'll

19   talk about to Steven Brown, just like the admission that he

20   made to A. J. Mathews and Walter Johnson when he got in the

21   car and said, you didn't think I would do it, did you.

22       So I'll come back to David Lee in a second.

23       Steven Brown comes forward.  What—

24       So David Lee does corroborate that it was Sam Steel

25   that shot Milo.  No evidence indicates anybody else shot Milo.

1379

1          All the evidence here indicates one person did it: Sam Steel.

2                Steven Brown, May 10ᵗʰ, 2011, comes forward.  He said

3     Melvin Johnson did it.  It's not justified in any way, and

4     it's not defensible in any way that he came forward and said

5     that.  He said that he had a beef with Melvin Johnson.  I

6     cannot, and I will not justify him saying that to

7     Detective Beauchamp on May 10ᵗʰ.

8                Obviously—And Detective Beauchamp talked about

9     this.—none of the evidence in the case pointed to

10    Melvin Johnson.

11               And Steven Brown then said, no, I had a beef with

12    him.  I think that he was dating—They had an issue with a

13    woman that they were both dating, and he—he didn't tell the

14    truth about Melvin Johnson.  But he was there that day.  In

15    fact, even defense witnesses said he was there.

16               Now I'm not giving this and stating this as an

17    excuse.  I am offering a reason why he lied initially.  He was

18    very close friends with the defendant—very close—and that

19    friendship continued after the homicide.

20               And Steven Brown was getting scared.  He contacted

21    Detective Beauchamp in June of 2011 and wanted to make a

22    statement, I think he indicated, but then didn't make a

23    statement; and he left the state and then came forward later

24    on and implicated the defendant in the murder.

25               He broke down crying.  Detective Beauchamp testified

1380

1    to that.  Steven Brown also testified to that.  Grown man

2    sobbing when he indicated it was the defendant who murdered

3    Milo Conklin.

4         Sure—I believe he testified this—to this—And I

5    apologize if he hasn't.—but I'm sure he felt guilty for

6    implicating somebody else.  He certainly was scared.  He

7    testified to that.  How do we know he was scared?  Well,

8    number one, he left the state.

9         And I asked him why did he come forward.  He said he

10   talked with his mother and she told him to do the right thing.

11        Now you can take that one of two ways.  You can not

12   believe that; but, using your reason and common sense—which I

13   don't want you to leave at the door—talking to your mom

14   sometimes as to doing the right thing can have an effect on—on

15   somebody.

16        So Steven Brown did corroborate what happened, did

17   corroborate Walter Johnson, did corroborate Harry Mathews, did

18   corroborate the phone records, did corroborate where the gun

19   was found—not necessarily exactly where the gun was found but

20   did corroborate all of the surrounding evidence, did

21   corroborate the fact that the defendant went from Elizabeth

22   through to Mabel to Florence and was picked up.

23        Now this was—is exhibit 98.  Now there was a lot of

24   testimony on this today and a lot of testimony on this—or not

25   a lot but significant testimony about this during the trial.

1381

1          What do we know about cellphone towers through the

2     expert that the prosecution introduced yesterday, as well as

3     that the defense introduced today and through the phone

4     records?  When you make a call, you activate a cellphone

5     tower.  The tower with the clearest signal is primarily the

6     tower that's activated.

7          And what's the primary factor in determining what a

8     signal—how good a signal is?  Proximity is the primary factor.

9     Not only our expert but defense expert indicated that.

10         How was Sam Steel apprehended by the FBI?  Cellphone

11    towers led them to where he was.  Certainly think that, if

12    cellphone towers had all the witnesses in this case every

13    which way around the county, there might be a different

14    argument that they're not as accurate as they are.  But they

15    have corroboration of what the testimony is in this case.

16         If I asked you, here are the cellphone towers, this

17    is our case, obviously, you wouldn't buy in and of it—of that

18    evidence in and of itself.  That wouldn't be enough to show

19    anything other than certain people were in a certain area at

20    the time.

21         But this, along with the evidence in this case,

22    indicates that Walter Johnson, Harry Mathews, and everybody

23    else is telling the truth.  I want to be very specific on

24    three locations here.

25         I don't know if everybody can see me, so—

1382

1              Right here is where the shooting occurred, around

2       that area.  Walter Johnson's, Harry Mathews', Sam Steel's

3       phone was activated in that area.

4              And, by the way, after the testimony of defense

5       counsel's witnesses yesterday—the defendant's witnesses

6       yesterday—I don't think there's even a challenge that

7       Sam Steel wasn't in the area at the time.

8              Sam Steel, I would suggest, based on the evidence

9       and using common sense and reason, turned his phone off after

10      that and went to Stockbridge.  Walter Johnson and

11      Harry Mathews, that was activated.

12             The next day, when they got rid of the gun,

13      Sam Steel's phone was activated here on D Ave.  In and of

14      itself, does this tell you anything?  No.  Totality of the

15      circumstances, what does it tell you?  That the defendant was

16      in that area throwing away the gun.  He's in this area, along

17      with Walter Johnson and Harry Mathews at the homicide, and

18      this area, well, it corroborates where Walter Johnson and

19      Harry Mathews said they were.

20             I also think that there was some testimony today

21      about the address of the cellphone tower and that that was

22      different than somehow the latitude and longitude—I wrote that

23      down.—from what was given in the phone records.  The phone

24      records had the latitude and longitude.  And these are the

25      specific latitude and longitudinal—longitudinal area that's

1383

1    seen from Google Maps.  The address and general vicinity—is

2    the general vicinity is what Detective Bombich testified to,

3    the specific vicinity of where the latitude and longitudinal

4    lines are of the cellphone towers.  The—I should say the

5    specific vicinity is where the latitude and longitude lines

6    are.  That's what was testified to.

7             Are they GPS signals?  Can you identify exactly

8    where somebody is?  No.  But are they important?  Yeah.  And

9    this corroborates, once again, what the testimony was.

10            You know what else corroborates what the testimony

11   was?  A sketch—

12            Exhibit 102, please.

13            —that was found on Sam Steel on his trip from

14   Georgia to Michigan.  You can think one of two ways of this

15   sketch.  Maybe he was bored and wanted to draw and liked to

16   draw, or it might be relevant to this case.

17            Elizabeth's Street's right here.  It's the—I think

18   you can infer that this would be 626 Mabel—or this is

19   626 Mabel—This is Mabel here.—this—probably his mom's

20   house—623 Mabel.  Oh, and a little shortcut to Florence.  And

21   what's this area here?  Where he was picked up.

22            So he knew what he was doing that day.  How would he

23   know all this and why would he just randomly draw this?  He

24   knew a lot about the homicide because he committed the

25   homicide.

                          1384

1          Can we have the side-by-side sketch.

2          It's similar to the exhibits that have been

3     introduced.  Detective Luedecking—or Gerald Luedecking's

4     sketch indicates 626 Mabel, there's a path there, there's a

5     path there, shortcut.  It's not on here, but then this shows

6     the southernmost part of—of the area.

7          Now look at the map that was exhibit number three.

8     And, if you look at the map that was exhibit number three,

9     this is actually a pretty good sketch that the defendant made

10    of the area.  He certainly knew the area well.

11         So reason and common sense, cellphone towers, the

12    cellphone records, the gun that was recovered, statements by

13    Walter Johnson and Harry Mathews, the burned material that was

14    recovered, Michael Wilson's testimony that there was a fire in

15    the area at the time.  I think I mentioned phone records.

16    Harry Mathews' testimony after Walter Johnson, when he came

17    forward, Devon Smith, David Lee, Steven Brown.  All of it

18    paint a picture of one person committing this crime.  Using

19    your reason and your common sense, it was the defendant.

20    Nobody else but the defendant.

21         I would like to briefly compare that

22    corroboration—the testimony and the corroboration, the

23    totality of the circumstances.  Remember, during jury

24    selection, we agreed that it wasn't one witness's testimony in

25    a vacuum; it's all of the witnesses' testimony is what is to

                              1385

1    be evaluated.

2              I have pointed out there's a lot of evidence all

3    corroborating that the defendant did it.  That's what the

4    People presented.

5              Yesterday, the defendant presented his witnesses.

6    And what did we see yesterday?  Remember what David Lee said?

7    He warned us about this.  He said, yeah, the defendant said he

8    was going to just have people come and testify and he was

9    going to have them testify to whatever he wanted them to

10   testify to, obviously, in a dishonest way.

11             So what kind of testimony did we see yesterday?

12   Using your reason and common sense, do you believe that

13   testimony?  Let's go through what they testified to.

14             Tommy Morgan never came forward to the police,

15   didn't make any statements up until, within the month, made a

16   statement to a defense investigator; came and testified here

17   without ever talking to the police.

18             Supposedly, he thinks that the police officers are

19   supposed to pick names out of a hat to determine who was at

20   the scene.  There's no evidence that Tommy Morgan was at the

21   scene, necessarily, other than his testimony and maybe one or

22   two other witnesses that testified.

23             And what did he say?  First of all, he said that the

24   defendant had a beard at the time.  Interesting thing is is

25   that all of their witnesses, we have corroborating evidence,

                                1386

1    not only witness between witness and all the other evidence

2    that corroborates what they say, their witnesses don't even

3    corroborate one another.  A beard.

4         Was dropped off at Florence—the shooter—shot the

5    person at Mabel, then went to Florence.  He was the entire

6    time with Sam Steel at his house at 623 Mabel on the front

7    porch and that he was able to turn around and see from the

8    front porch the individual get in the car.  Of course, it

9    wasn't the defendant.

10        Defendant was arrested on August 6th of 2012.  He was

11   charged on December 11th—I'm sorry.—December 22nd, 2011.

12        The shooting happened on April 24th of 2011.  Never

13   comes forward—That goes for a lot of these witnesses.—and

14   says, look, I have important information.

15        Charles Thomas, what does he testify to?

16        First of all, he says that the defendant was—is like

17   a big brother to him, that he would do anything for him; and I

18   bet he would.  He said he was clean-shaven at the time of the

19   homicide.  Once again, they don't even corroborate one

20   another.

21        Had a couple of seconds to see the shooter's face.

22   One, two.  I'm sorry.  He had a couple of seconds to see the

23   shooter.  That's what—That's what he said.  One, two.  Didn't

24   get a good look at his face, black hoodie, black

25   pants—Obviously, there is an issue with the original

1387

1    description that he gave.—and didn't see where the shooter

2    went after that because he was focused on Milo Conklin after

3    Milo was shot, which certainly could have been the case that

4    he was focused on Milo Conklin.

5    But, amazingly, in one sitting of testimony, he

6    completely changed his story.  He initially said that the

7    defendant, at the time of the homicide, was across the street;

8    and then, over and over, through getting his—trying to get his

9    story straight, he said, well, maybe 15 or 20 minutes before

10    the homicide is when I last saw the defendant.

11    So he really didn't get any good look at the

12    shooter.  Saw him walk.  Well, I don't know if you can really

13    analyze somebody's walk in two seconds.  Saw somebody's walk

14    and said, oh, that just wasn't the way defendant walked.

15    Really, it's pretty clear he didn't see the shooter;

16    or, if he did, he's not telling.  And, even taking his

17    testimony at face value—just assuming everything that I just

18    said about his testimony is—and his credibility, put that

19    aside.  Assuming—Taking his testimony at face value, he didn't

20    know where the defendant was or didn't see the defendant at

21    the time of the homicide and didn't get a good look at the

22    shooter.  So, really, does he know anything about this case,

23    just even taking him at his word?  David Lee warned us about

24    this.  David Lee was right.

25    Jerry Davenport never came forward before.  First

1388

1      time came forward he was talking about basketball—some

2      community basketball involvement with the defendant.  He said

3      five minutes—He didn't see the shooting take place.  The

4      shooting occurred he was either walking into 619 Mabel just a

5      little bit—just close to 623 and 629.  Heard shots.  Went in,

6      didn't see any of the shooting, but the defendant could not

7      have been there is what he said because he just didn't have

8      enough time—between two and five minutes—to walk across the s

9      street and shoot Milo.

10             Remember, he didn't know if he came from

11     Elizabeth Street or Florence Street.  He didn't see any of the

12     shooting.  So how could he know how much time a defendant

13     needs to go from house across the street to house across the

14     street?  So that's what he said.  Obviously, he's close

15     friends with the defendant.

16             He remembers what clothes he was wearing on that

17     day—button-down shirt, jeans.  I can't even remember what

18     clothes I was wearing two days ago.  He remembers what clothes

19     the defendant was wearing that day.

20             I asked about April 23rd and April 25th, he doesn't

21     know.  He's making it up.  It's not—It's not a believable

22     story.

23             How did he come forward?  Oh, he was talking to the

24     defendant's sister.  He knows the defendant's family well.

25     He's known them for a long time.  Oh, yeah, I'll come forward

1389

1    and testify.  I'll say what I said.  Using your re—I'll say

2    what I saw.  Using your reason and common sense, it's not to

3    be believed.  David Lee warned us about this.  David Lee was

4    right.

5           Antonio Willams comes forward—just comes

6    forward—Never tells police this.—said that he was with the

7    defendant on the porch the day of the homicide and didn't see

8    Jerry Davenport.  Jerry Davenport, I think he said he wasn't

9    there.  Witnesses don't even corroborate one another.  They

10   don't even have their own story straight.

11          So he was with the defendant, didn't really see any

12   of the shooting take place.  He says, no, not in any of the

13   police reports, not in any—no statement whatsoever.

14          So he found out—How did you come forward?  How did

15   you know about this?  Who asked you?  Oh, he was in jail with

16   Sam Steel.  Common sense and reason.  Do you believe him?  I

17   suggest not.

18          Lee Logan—just like Charles Thomas—completely

19   changed his story in the middle of his testimony.  What did he

20   say initially?  Oh, yeah, I was with Devon Smith and

21   Walter Johnson; and I was together with them, and they both

22   were trying to find out ways to get a better deal for

23   themselves.  That's what—That's what he said.

24          Well, I then was able to have him agree to the dates

25   that he was at the facility—at the jail—and he was there

1390

1    June 20th, 2011, to September 9th of 2011.  He was in pod D-2

2    June 20th, 2011, to July 10th, 2011; and he was in B-4

3    July 10th, 2011, to September 9th of 2011.

4            He had the opportunity to talk to Walter Johnson,

5    possibly, even though they were in different pods.  So just

6    give him that for just the sake of argument.  Just give him

7    that.

8            So he first says that Walter Johnson and

9    Devon Smith, he talked—he talked to me—they both talked to me

10   and wanted to get better deals.  Then he admitted, oh, no, I

11   didn't see Devon Smith in jail.  In one sitting of testimony,

12   he changed his story.  A guy like that's not to be believable.

13           Walter Johnson didn't even come forward until later

14   on.  He didn't even tell his attorney till months later.

15           Devon Smith didn't come forward until—And

16   Devon Smith was very close with the defendant is what the

17   testimony was.  And Devon Smith didn't come forward until

18   after that.  There is no indication on the record that

19   Devon Smith or Walter Johnson ever were in cahoots or had the

20   opportunity to be in cahoots to come up with this.

21           And that Harry Mathews—say, if they were, that

22   Harry—if they were, which they're not—but, oh, and that

23   Harry Mathews, by the way, oh, he just said something and all

24   that corroborates what they said.  They're not.  They all came

25   forward independently.  They do have an agreement to have

1391

1      truthful testimony or truthful information regarding criminal

2      activity.

3              And then, finally, Earnest Wynn, he testified that,

4      in January, Walter Johnson called him and said that he wanted

5      to get a good deal.  Once again, never came forward, never

6      told the police this, never really told authorities this.  Any

7      corroborating evidence?  No, not at all.  January 2012, oh,

8      how do you come forward?  Oh, I was with Sam Steel in jail.

9      Okay.  You knew him beforehand, you were friends?  Yeah.

10             Interesting.  All these people—Or he and

11     Antonio Willams didn't come forward and just saw him in jail

12     and—Oh, they didn't talk to one another about this case.  Use

13     your reason and common sense.  You believe that?  I suggest

14     no.

15             Now I also ask you to look at the demeanor of the

16     witnesses to determine whether or not you think they were

17     telling the truth.

18             Devon Smith, A. J. Mathews, Walter Johnson,

19     Steven Brown, David Lee, were they argumentative?  Did they

20     try to evade questions?  No, they answered truthfully or—I

21     believe truthfully.  They answered directly defense counsel's

22     questions and my questions.

23             How were the witnesses yesterday?  Charles Thomas?

24     How was Antonio Willams?  How was Mr. Davenport?  They were

25     argumentative.  When they were caught up in a lie they just

                                1392

1     made up, they were upset.  I would suggest that the demeanor

2     of the witnesses is important.

3             And I want to now direct your attention to one

4     witness that was early on in this case.  Her name was

5     Alesha Caper.  She's an important witness because there's—She

6     came forward closely—very close after the homicide occurred in

7     April 2011, and she told the Kalamazoo Public Safety

8     Department what she remembers from that day.  She was

9     Milo Conklin's girlfriend.

10            And what did she say?  She said that she was with

11    Milo Conklin at 626 Mabel or on Mabel Street and that the

12    defendant was there—This is before Walter Johnson—This is

13    right after the homicide.—and that the defendant was

14    mean-mugging Milo Conklin.  They, obviously, had it in for

15    each other; or, at least, the defendant had it in for

16    Milo Conklin.

17            And what did Alesha Caper say?  She warned Milo,

18    Milo, don't go back there.  It's dangerous.  Don't go back to

19    Mabel Street.

20            Why did she say that?  Because she saw what the

21    defendant was doing.  She was worried.  She warned

22    Milo Conklin.

23            Unfortunately, Milo did go back.  That's when the

24    defendant murdered him.

25            I'm going to very briefly go over the elements of

1393

1    the offense, and then I'm going to close up here.

2            First-degree premeditated murder.  Defendant's

3    charged with open murder, and you can either find him guilty

4    of first-degree premeditated murder; you can find him guilty

5    of the lesser second-degree premeditated murder; or you can

6    find him not guilty.

7            First-degree premeditated murder.  I have to show

8    that the cause of death of Milo Conklin is that Milo Conklin

9    died as a result of the shooting.  No dispute there.  I don't

10   think there's any issue there based on the testimony.

11           Two, I have to show that the defendant intended to

12   kill Milo Conklin.

13           Well, he told Devon Smith he had to kill him.

14           He told Steven Brown early on that he had to kill

15   Milo.

16           He said to Walter Johnson and Harry Mathews, you

17   didn't think I'd do it.

18           He was upset with Milo because he felt—whether true

19   or not—that Milo had robbed him.  And you don't shoot at

20   somebody and put four bullets in them and shoot five to six

21   times at somebody unless you want to kill them.  He wanted to

22   do him in is what the testimony was.

23           So the defendant did intend, and all the evidence

24   shows he intended to kill Milo Conklin.

25           Three.

1394

```
 1              The intent to kill was premeditated; that is,
 2    thought out beforehand.  He told Steven Brown early on that he
 3    needed to—he wanted to get Milo Conklin.  He asked
 4    Walter Johnson for the gun.  He was dropped off at Elizabeth.
 5    He walked toward Mabel.  He thought about it beforehand.  He
 6    knew exactly what he was doing, and he knew exactly what he
 7    wanted to do and that is kill Milo Conklin.  He thought about
 8    it beforehand and, therefore, it was premeditated.
 9              Four.
10              That the killing was deliberate, which means that
11    the defendant considered the pros and cons of the killing and
12    thought about and chose his actions before he did it.  Had
13    enough time from the moment that he thought about getting that
14    gun, had enough time to think what he was going to do.  He
15    wanted to be dropped off on Elizabeth; told Harry and Walter,
16    I'll see you in a minute.
17              There must have been real and substantial reflection
18    for long enough to give a reasonable person a chance to think
19    twice about the intent to kill.  He had enough time to
20    say—during the car ride, the moment that he asked for the gun,
21    the moment that he walked from Elizabeth to Mabel, he had
22    enough time to think twice as to whether or not he wanted to
23    kill Milo Conklin.
24              The law does not say how much time is needed.  It is
25    for you to decide if enough time passed under the
```

1395

1    circumstances of the case.  I would suggest there was enough

2    time.

3           The killing cannot be the result of sudden impulse

4    without thought or reflection.  It wasn't instantaneously,

5    Milo Conklin upset him, and he just killed him.  No, it was

6    thought out beforehand.  He wanted to kill him, and that's

7    premeditated murder, first degree.

8           I'm asking you to find the defendant guilty of

9    premeditated first-degree murder based on the testimony.

10          Second-degree murder is a lesser offense.

11          Now, like I said, first-degree murder, the evidence

12   shows it; but there is the lesser included of second degree.

13   For second degree, the prosecution must show:

14          One, the defendant caused the death of Milo Conklin;

15   that is, that Milo Conklin died as a result of the shooting—No

16   doubt that he died a result of the shooting;

17          Two, defendant had one of three states of mind;

18          Three—

19          He intended to kill, which I already talked about—He

20   did intend to kill.

21          He intended to do great bodily harm to Milo;

22          He intended to kill him is clear.  Everything else,

23   really, the evidence doesn't show it.  He intended to kill

24   him.

25          Or he knowingly created a very high risk of death or

1396

1    great bodily harm to Milo Conklin, knowing that death or such

2    harm would be a likely to result of his actions.

3              First, the evidence shows the defendant committed

4    first-degree murder.  This is a second—This is a lesser

5    included that you can find him guilty of if you find not

6    guilty for first, but I would submit that the evidence shows

7    that the defendant is guilty of first-degree murder.

8              And then there are three other offenses.  Count two—

9              THE COURT:   You're close on—You're close on time,

10   Counsel.

11             MR. CUSICK:    Okay.

12             Count two, possession of a firearm at the time of

13   the commission of a felony.  At the time that he committed the

14   murder, he possessed a firearm.  That's felony firearm.

15             Three—I'm sorry.  Three is felon in possession of a

16   firearm, and that's not on the screen.  That's count three.

17   Indicates that—There was a stipulation the defendant was

18   convicted of a specified felony and, as a result, was not

19   eligible to have a—possess a firearm, and the evidence showed

20   that he did possess a firearm.  So I would ask you to find him

21   guilty of count three as well.

22             And then, finally, count four, is felony firearm

23   regarding count three; that, at the time that he committed the

24   crime of felon in possession of a firearm, that he was

25   committing a felony.

1397

1           So, first, the defendant committed the crime of

2    felon possessing a firearm, which has been defined for

3    you—will be defined.  It is not necessary, however, that the

4    defendant be convicted of that crime.  And the only thing we

5    have to show after that for count four is, at the time

6    defendant committed that crime, he knowingly carried or

7    possessed a firearm.

8           So felony firearm, count two, is for count one

9    murder.

10           Felony firearm, count four, is for the offense of

11    felony in possession of a firearm.

12           I have one more minute, and then I'm going to give

13    it over to defense counsel.

14           You can believe Walter Johnson just completely made

15    this up.

16           You can believe Harry Mathews just completely made

17    this up.

18           You can believe Devon Smith just completely made

19    this up.

20           You can believe Steven Brown just completely made

21    this up.

22           You can believe David Lee just completely made this

23    up.

24           You can believe that all of the officers that

25    testified are just completely making this up; that

1398

1       Alesha Caper is making this up.

2              And you can believe that all of this evidence that's

3       coming in is just a big, bad coincidence.

4              Or you can use your reason and your common sense.

5       And, based on reason and common sense, I ask you to find the

6       defendant guilty of premeditated first-degree murder and

7       guilty of counts two, three, and four.

8              Thank you.

9              THE COURT:   Thank you, Mr. Cusick.

10             Mr. Champion?

11             MR. CHAMPION:   Thank you, your Honor.

12             David Lee said that my client shot Milo Conklin with

13      an automatic weapon 20 to 25 times after Milo Conklin held my

14      client's son for ransom; and my client, after shooting

15      Milo Conklin with a automatic machine gun 20 or 25 times,

16      climbed into a Corvette and drove away.  That's what David Lee

17      said.

18             David Lee's story made no sense, wasn't even close,

19      even though it's been on the TV, it's been in the newspapers.

20      It made no sense whatsoever.

21             Ms. Capers never said, don't go back.  Look back at

22      the testimony.  Remember what was said.  Ms. Caper didn't tell

23      Milo to go back.  Ms. Capers confirms what the witnesses were

24      testifying to yesterday.  There was a party going on.  There

25      was individuals out there.  There's no question about that.

1399

1          What's really interesting—And, when you start

2     looking at the evidence—And I want you to look at the

3     evidence.  Look at the phone records and how detailed they

4     are.

5          Do you know it's—

6          They talk about the testimony was that my client

7     called Harry Mathews the next day; and, if you look at my

8     client's records, that's what you'll see.  However, then you

9     look at Harry Mathews' phone records, and you'll see that

10    Harry Mathews was calling and texting my client beginning

11    6:00 a.m.  However, for some mysterious reason, it doesn't

12    show up on my client's phone, according to the exhibit that

13    was produced.

14         Let's look at the testimony.  Here's what we know.

15    We know that Milo Conklin was shot.  There's no question about

16    it.  We know Milo Conklin was shot with a gun that

17    Walter Johnson had bought that was stolen.  Walter Johnson had

18    not only bought that gun, he had bought a machine gun, he had

19    bought a weapon that looked like an AK-47 with a 45-round

20    clip, he had bought a .22 with a water-cooled barrel or, in

21    other words, a silencer.

22         We know that the gun, the 40-millimeter that was

23    used to kill Milo Conklin, also, Milo Conklin was suspected of

24    using that same gun.  Milo Conklin was suspected of using that

25    same gun in a robbery and shooting before this

                              1400

1    . . . (inaudible) Who had the gun, allegedly, on April 24th?

2    Walter Johnson.

3          Reason and common sense is important here because

4    you need to look at all of the evidence. Reason and common

5    sense.

6          Walter Johnson—Isn't it interesting?—he was actually

7    in the same place as Richard Smith and Devon Smith.

8          Isn't it interesting on his testimony he entered

9    into a plea agreement with the government on the 16th of

10    September, 2011—signed it?

11          And part of that plea agreement is he went from a

12    mandatory minimum of life in prison to a minimum of 20 years.

13    But it didn't stop there, because his presentence came back

14    and said, oh, your guidelines are at 36 years—36. So his

15    sentencing is delayed. And he comes forward and says, oh, I

16    have information about Sam Steel. And guess what the

17    government does? They file a motion to reduce his sentence

18    even lower.

19          And was Walter Johnson truthful with that

20    information when he was testifying? Did I have to keep

21    pulling out documents and showing him those documents to

22    confirm that? And, even then, would he admit that? No.

23          A. J. Mathews—or Harry Mathews, known as A. J.—is

24    interviewed in November of 2011 and says he doesn't even know

25    Walter Johnson; hasn't—Let me correct that.—hasn't seen

1401

1    Walter Johnson in 20 years, doesn't know anything about this

2    case.

3            He is then charged and arrested and goes to court

4    and then comes forward saying Sam did it after he has the same

5    records—the same records that were used to charge him, and

6    that was Walter Johnson's story.  He has those.  That's what's

7    used to charge him with the crime.

8            And isn't it interesting, Walter Johnson, who

9    supplied the gun; who had stolen firearms; who, if you look at

10   his testimony, burned the clothes up at his house—Because that

11   was the testimony, Walter Johnson destroyed the clothes.—is

12   never charged with anything?

13           Isn't it interesting, according to Walter Johnson,

14   they went to his cousin's house—went to his cousin's house two

15   blocks from where the shooting takes place; and then, without

16   any conversation—without any conversation between A. J.

17   Mathews and Walter and Sam Steel, they just happen to drive

18   over to Walter Johnson's father's house and wait, yet

19   Walter Johnson is never charged with a single crime—a single

20   crime?

21           And A. J. Mathews, after reading Walter Johnson's

22   story—And you heard testimony yesterday contrary to what Harry

23   or A. J. wanted to say.—that he knew that Walter threw him

24   under the bus.  You heard that.

25           What's interesting also is, when you look at the

1402

1    exhibit of the cellphone towers, that Sam Steel's phone didn't

2    set off the tower, it was Walter Johnson's set off his tower

3    on Stockbridge.  That's what we—we heard.  That's why it's

4    important to look at all the evidence.  Take it in and look at

5    all the evidence and compare it—not just bits and pieces,

6    compare it.

7            When you look at the evidence, you'll see that there

8    is no way for Steven Brown to say—saw what he saw when you

9    look at the evidence.  When you look from the top and look

10   down, there is no way.  When you look at the two-year-old

11   photographs and the photographs that were taken that night,

12   there is no way.

13           Now let's look at common sense and reasoning here.

14   So, allegedly, Sam goes with Walter Johnson and A. J. Mathews.

15   They get into a car.  They drive over to Douglas Avenue to get

16   beer and whatever.  Then they come back.  Then they leave

17   again.  Then they drive two blocks to Walter Johnson's house,

18   let Sam out of the car without saying anything.  Isn't it

19   interesting without saying a word about what's going on?

20           Sam then goes to an area that there's a party going

21   on, that has been going on, and that's not in dispute.  Do you

22   realize that, that that's not in dispute that there was lots

23   of people there?  Sam goes to his mother's house and shoots

24   somebody right in front of him, and then walks right by his

25   house where there's people, and goes to a location where

1403

1    there's been no conversation to meet up with Walter Johnson

2    and A. J. Mathews.

3         Then he's so fearful that he takes the gun and

4    throws it at the scene.  He leaves it right there, right where

5    he just walked.  Right where he just walked.  And guess what?

6    They did tracking dog.  They found nothing.

7         You heard the lab technician talk about he went in

8    both directions—north and south—because the witnesses said

9    that the shooter could have went north or the shooter could

10   have went south.  So they checked both ways and found nothing.

11   They canvassed the area and found nothing.

12        But Sam is so concerned, by A. J. Mathews and

13   Walter Johnson's testimony, that he goes to his house over on

14   Douglas—all the way to Douglas—changes his clothes, puts it in

15   a bag, then goes from Douglas all the way back across town to

16   Walter Johnson's house and has Walter Johnson burn his

17   clothes, including his shoes.  Do you remember that, including

18   the shoes?  However, no parts of shoes were found.

19        And then somehow—somehow he recovers the gun while

20   the police are still in the area and destroys it the next

21   morning.  He goes back to the scene where lab technicians,

22   where dogs are located, where the news media is located and

23   retrieves the gun and then calls A. J. Mathews to have him

24   help him out.

25        Who was contacting who?  A. J. Mathews was

1404

1    contacting Sam Steel at 6:00 in the morning or a little

2    thereafter—was texting him—and Sam wasn't responding until

3    8:00 o'clock.

4        You know that Sam Steel was on the news.  The day of

5    the shooting, he was on the news.  And guess who else was on

6    the news the same time?  Tommy Morgan.  And guess who also

7    confirmed that?  A. J. Mathews.

8        Charles Thompson [*sic*]—or Thomas—Excuse me.

9    Charles Thomas—the place where the homicide occurred in front

10   of his house—who walked the police through the area, was fully

11   cooperative from day one and gave the same story from day one

12   through today, was never called to the stand.  Didn't change

13   his story, said it wasn't Sam Steel.  Over and over, it wasn't

14   Sam.

15       Jerry Davenport had no reason to lie, none

16   whatsoever.  He didn't say he was afraid of anyone.  He's

17   known Sam for a long time.

18       And, again, it's Sam's mother's house.  You have to

19   understand this.  It's Sam's mother's house, it's not his own.

20   He said Sam was there.  I was talking to him and I walked in,

21   heard the shots.

22       Tommy Morgan, Antonio Willams.  In fact,

23   Antonio Willams said that Steve Brown, who was there—And a

24   couple of the others said Steve Brown was there.—when he left

25   because he was afraid of getting in trouble after the

1405

1    shooting, he saw Steve Brown over at Ada and Burrell in a

2    fight.

3             And Steve Brown testified to that.  Steve Brown's

4    testimony is that he left—was Ada and Burrell—was walking

5    back—And this is where his story is kind of changing a little

6    bit.—walking back—And he may have been a block away at the

7    time or two blocks away.—when they heard the shots.  Then,

8    suddenly, he is right behind or just off of Mabel Street, just

9    off it.

10            Steve Brown said Melvin Johnson did this crime and

11   said the reason being is because Milo was ripping people off.

12   That's what he told the police, and that's what he had to

13   admit; that Melvin Johnson committed this crime because of

14   what Milo was doing.

15            Steven Brown, think of the number of felonies he

16   committed by—by lying.  He admits that he lied.  He gave a

17   false police report to a major felony, by his testimony.

18            Why did he go to Illinois?  Why did they have to go

19   to Illinois to get him in the first place and bring him back?

20   And, even then, he continues to say it's Melvin Johnson.

21            And, in fact, what's really interesting is

22   Walter Johnson comes to the police on November 2nd, 2011, and,

23   within a week, suddenly Steven Brown has the same story as

24   Walter Johnson within a week.

25            Now Walter Johnson's been in jail since June of 2011

                                   1406

1    on federal charges.  And we all know that many of these

2    individuals are facing federal charges.  You even heard it

3    about . . . (inaudible) that he is facing federal charges.

4           This is not about drugs.  This trial right now is

5    not about drugs.  Those are issues are going to be held at

6    some other time.  This trial is about whether or not the

7    prosecution proved each and every element beyond a reasonable

8    doubt—each and every element.

9           It's not a situation where you believe something

10   happened or you thought something happened.  The prosecution

11   must prove each and every element beyond a reasonable

12   doubt—not to a reasonable doubt, beyond a reasonable doubt.

13          Now why do I bring up the federal issue?  Because I

14   kept asking the—the FBI agents, were you aware that

15   Samuel Steel was charged with drugs.  No.

16          Samuel Steel had his house raided in November of

17   2011.  Were you aware of that?  No.

18          However, we do know that Walter Johnson has been

19   charged—in fact, in September, pled to drug charges.  And

20   where did Walter Johnson send his business to, allegedly, by

21   Sam Steel and by the witnesses—Excuse me.—by the witnesses

22   that testified?  Walter Johnson, through his wife, told

23   individuals to go see Sam Steel.  And we heard that testimony

24   from the people that sold the guns—We heard that.—the same

25   people who knew that Walter Johnson would buy those guns that

1407

1    they stole quickly.

2            So why would Sam Steel run when he also knows that

3    Devon Smith has also been arrested for drug charges?  He knows

4    that.  Isn't it interesting, here Devon Smith is arrested, out

5    on bond on tether for federal charges and allegedly he comes

6    over to Sam Smith's [*sic*] mother's house and Sam confesses to

7    him?  Really?  It doesn't make sense.

8            The other interesting thing is all the witnesses

9    that testified, including, if you listened to A. J. and

10   Walter, is, yes, they were at Sam's house.  Walter says he was

11   picked up at his cousin's house.  A. J. says that he went over

12   and picked up Walter at Walter's house on Stockbridge.  But

13   all the witnesses say the same thing, that A. J. and

14   Walter was at Sam's house—all the witnesses.  Ms. Caper even

15   said that.

16           And all the witnesses said that A. J. and

17   Walter left.  They all said that, and that's what happened.

18   And that's actually what the phone records indicate.  Because,

19   when you look at the phone records, Harry and Sam and Walter

20   are talking to one another at the times that they were

21   supposed to be together in a vehicle or on a front lawn, they

22   are talking with one another up to and including the time of

23   the shooting, talking with one another.

24           If you believe their story, then, so, at the time of

25   the shooting, Sam would have to have been walking down the

1408

1   street or through back yards chatting with them on the phone.

2   The first call, I think, was 28 seconds.  It looks like it was

3   terminated somehow.  And then the next was 30-some seconds.

4   Look at the phone records and start piecing the puzzle

5   together.

6           Sam Steel was in the front yard when the shooting

7   occurred.  Even the reputation—Even the street rules and even

8   common sense and reasoning leads you to know you wouldn't

9   commit a crime in front of your mother's house when there's

10  been a party going on and try to be secretive and disrespect

11  your friend and your family.  We heard that.

12          Where does all the evidence actually point?  Where's

13  all the physical evidence point?  Where do the cellphone

14  records point?  To the two individuals that knew what was

15  going on and only two individuals, A. J. Mathews and

16  Walter Johnson.

17          Didn't burn anything at Sam's house, didn't leave

18  anything in Sam's house.  Stolen guns, we know, go to

19  Walter Johnson's.  We know that clothing was found—Some type

20  of clothing, we don't know what, was found at

21  Walter Johnson's.

22          We know that they were talking when they were

23  supposed to be together on the phone.  We know that.

24          And we have several eyewitnesses.  Again, why would

25  all these witnesses suddenly come in and why . . . (inaudible)

1409

1    had to make up a story on April 24 saying that Sam Steel was

2    across the road, they were having beers and sharing food.

3    They were sharing food with Milo.

4            Reason and common sense.  That's really the issue

5    here.  The prosecution hasn't even come close to prove this

6    beyond a reasonable doubt if you look at the evidence.  We

7    have eyewitnesses.  We have people that were at the crime

8    scene, and no one dis—disagrees with this.  Everyone says that

9    Sam was there on the news.  That spoke for itself.  Was there.

10           Did Sam Steel run?  Yes.  He knew he was facing

11   federal charges.  Because, by the prosecution's statements, he

12   was already gone when the warrant came out for his arrest.  By

13   their cellphone records, he was gone.

14           No fingerprints.

15           Not even all the gun.  That's the interesting part.

16   Where's the barrel?  Where's the other parts of the gun?  And

17   why would you get rid of a gun when you live on Douglas Avenue

18   in that same area?  . . . (inaudible) map, same area.  So you

19   get rid of a gun in the same area that you live and not far,

20   not far at all?

21           When you look at all the testimony and how it has

22   changed each and every one—each and every one—and how trying

23   to get Walter Johnson to admit to things was impossible; how

24   A. J. Mathews, trying to get him to admit things was

25   impossible, even showing both of them documents and they still

1410

1    denied.

2              Having Steve Brown acknowledge that, yeah, I lied

3    and lied and lied . . . (inaudible) no, I'm not lying now.

4              When you look at the time line, you look at the

5    evidence, there is no choice but to find my client not guilty.

6              Thank you.

7              THE COURT:   Thank you, Mr. Champion.

8              Any rebuttal?

9              MR. CUSICK:   Yes, your Honor.

10             It's my time for rebuttal.  I'm not going to go over

11   all the arguments that I already made, I'm going to respond to

12   some of the issues that Mr. Champion talked about.

13             He said—indicated that David Lee had some kind of

14   motive to—basically said that David Lee's not telling the

15   truth.  He just came here and said what defendant told him.

16             Could defendant have been grandstanding a little—I

17   shot him 20 times.—yeah.  David Lee wasn't there.

18             What is David Lee's motive to lie?  He doesn't know

19   anything about this case, no agreement with anybody.  His only

20   motive that he had—I think it's very believable.—is that he

21   came forward and said, I'm concerned about what's going to

22   happen, I have information, and came forward.  How would he

23   even know that a shooting took place if he didn't speak with

24   the defendant?

25             Alesha Caper did, in fact, testify that she warned

                              1411

1    Milo to not go back to that location.  That is what she

2    testified to.  It's on the record.

3          Now I'm going to really quick go over these phone

4    calls and what defense counsel's arguments were.  These phone

5    records show a lot of calls between Sam Steel and

6    Harry Mathews and a lot of calls between Sam Steel and

7    Walter Johnson, not as much between Walter Johnson and

8    Harry Mathews at all.

9          So, yes, at about the time of the shooting—And, if

10   you remember, Walter Johnson's testimony is I could have been

11   talking on the phone.  I don't specifically know every single

12   minute of every single time on April 24th of 2011 I was talking

13   on the phone.  And there is a phone call between

14   Walter Johnson and Sam Steel basically at the time the

15   homicide occurred or thereafter.

16          You can take that for what it's worth.  I would

17   suggest that Walter Johnson and Sam Steel were communicating

18   at that time, possibly, where are you parked.  At this time,

19   the evidence shows Walter Johnson didn't know specifically

20   anything about the shooting.  He might have had a idea.  But

21   there was communication.  There was communication between

22   Sam Steel and Walter Johnson.

23          There was communication.  Who called the next

24   morning?  I said Harry Mathews called Sam Steel and then

25   Sam Steel calls Harry Mathews three times the next morning.

1412

1              There were continuous conversations between

2      Harry Mathews and Sam Steel, continuous conversations between

3      Walter Johnson and Sam Steel.

4              Here's what you have to believe to believe defense

5      counsel's argument: that, at the time of the shooting on

6      Mabel Street—you know what, according to defense counsel's

7      argument, would be, oh, hi, Walter, right around the time of

8      the shooting.  Walter wasn't around, according to their

9      witnesses.  Hi, Walter, there's a shooting that took place,

10     but I just want to talk.

11             Okay.  Well, that doesn't make any sense.  Reason

12     and common sense doesn't dictate that.

13             After the murder and before the murder, he also

14     talked to Harry Mathews.  Does that make any sense if he was

15     just at the scene?  No.  He wasn't just randomly calling

16     Walter Johnson and Harry Mathews.  Harry Mathews was the

17     driver, and Walter Johnson was the person that gave him the

18     gun.  And the fact that Walter Johnson gave him the gun,

19     that's not defensible either; but he gave him a gun.

20             Now Walter Johnson wasn't in any part of this

21     investigation, nor was A. J. Mathews, before he came forward.

22     So, to believe defense counsel, he came forward, implicated

23     himself in being a part or being with the defendant, giving

24     him a gun on his own volition and at his own accord.

25             Now he didn't just—He had an agreement to tell the

1413

1    truth and to come forward.  Do you think that if somehow

2    Walter Johnson wanted to lie that all of the evidence in the

3    case would have just for some reason been coincidental?

4         No, all of the evidence in the case indicates what

5    Walter Johnson said from where—how he got the gun, from where

6    A. J. Mathews said the defendant left the gun, phone records

7    indicate Walter Johnson was talking to Sam Steel and

8    vice versa and same thing with Harry Mathews.

9         Walter Johnson came forward because he had an

10   agreement what to do.  To lie?  No, to tell the truth.

11        Now if he just made up a story and it wasn't

12   corroborated, you think that would have been a good agreement

13   for him?  Probably not.

14        Did he have a motive to lie?  No, he didn't have a

15   motive to lie to the federal government.  He had a motive to

16   tell the truth.

17        Remember what Devon Smith said in response to

18   Mr. Champion's question?  Fifteen years, that's a deal?  A

19   minimum 15 years, that's a deal?

20        So I would agree with defense counsel, I want you to

21   look at these phone records; and they corroborate what

22   Walter Johnson said.

23        Was there a call possibly shortly after the homicide

24   occurred between Walter Johnson and Sam Steel?  Very

25   possible—Yes, there was.  And there's nothing Walter Johnson

1414

1    indicated otherwise or to say that that could never have

2    happened when he was on the stand.

3         Now there is no evidence on the record whatsoever

4    that Devon Smith and Walter Johnson were ever in the same cell

5    or the same pod.  That didn't come in.  Regard—Richard Smith,

6    his brother, they may have been.  No, that didn't come in.

7         It's inconvenient that both witnesses for the

8    defendant—It's inconvenient that both witnesses have testified

9    and that there's corroborating evidence on their part.  It's

10   inconvenient for the defendant.  It's inconvenient for him

11   because it is truthful.

12        Now some people were—I think it's fair to say, from

13   all of the testimony and all of the evidence in the case, were

14   people scared to come forward?  Yes.  Absolutely, they were

15   scared to come forward.

16        Look at what the defendant's statements were, not

17   only to David Lee, but also to other people.  Yeah, people

18   were scared to come forward.  Did people eventually come

19   forward?

20        Did the Kalamazoo police department—I'm sorry.—the

21   Kalamazoo Public Safety Department, did they look at all the

22   evidence, every lead?  Yes, they did.  And, just like a

23   puzzle, pieces started to fit, and it pointed to one person;

24   that was Samuel Steel.

25        The phone records the next

1415

1    day—April 25th—Harry Mathews, Sam Steel.  Not any—I barely see

2    any calls between Walter Johnson/Sam Steel or by—or

3    Harry Mathews and Walter Johnson.  Corroborates what they

4    said.  The phone records corroborate what they said.  Go over

5    them.

6          Who was the central figure in it?  Samuel Steel.

7          The testimony, from what I heard, was that both

8    Walter and Sam burned the clothes.  See, Walter Johnson was

9    pretty honest.  He could have said, oh, you know, I gave him—I

10   didn't give him a gun, somebody else gave him a gun and he—I

11   was with him; and, you know, I didn't burn the clothes, it was

12   only him and he forced me to—

13         No, he was completely, brutally honest.  Yeah, I

14   helped him burn—burn the clothes.  Yeah, I gave him the gun.

15   He was completely truthful in the testimony based on what we

16   know from what A. J. Mathews said, based on what we know from

17   what other witnesses said, based on what we know on other

18   evidence that was in the case.

19         So let me get this straight: the argument is that

20   defendant fled to Georgia because of a federal drug case, not

21   the homicide case?  He was charged on December 22nd, 2011, for

22   the homicide case, not any type of drug case defense counsel's

23   talking about, and he fled because of that.  He didn't want to

24   face the realty of what he did at 626 Mabel.  It wasn't about

25   drugs, it was about this homicide.

1416

1        Fingerprints.  You heard testimony as to why there

2   are not fingerprints on the gun.  One of the reasons, well, it

3   was in the middle of nowhere for a long time so it's unlikely

4   to get fingerprints.

5        Where did the other parts of the gun go, defense

6   counsel just referenced.  Well, Sam Steel, on the way to

7   D Avenue and 12th Street—It's not close to the scene.  It's

8   miles away.—he took the gun apart.  That was testified to by

9   Harry Mathews.  And what came—Was there a full, you know,

10  completely put together gun that was recovered?  No.  The gun

11  was taken apart.  Corroborates what he said.

12       I don't remember any testimony saying everybody saw

13  Samuel Steel on the news.  I don't remember that testimony.

14  So the fact that one or two witnesses may have said—their

15  witnesses may have said that they saw him on the news, either

16  way, all that—Assuming that that would even be the case, I

17  think the evidence points that he may have gone back later

18  that night to Mabel Street.  He did hang out there a lot.  I

19  think that's pretty clear from the evidence.

20       And, oh, he would never have done this in front of

21  his mother's house because his character's so great.  He was

22  trying to have community basketball.  Mr. Davenport testified

23  they were talking about community basketball and then, all of

24  a sudden, the homicide occurs.

25       And then remember when I asked him, well, what do

1417

1    you talk about after, oh, community basketball.  There's a

2    dead man at 626 Mabel, and you come up and say, hey, so let's

3    just talk about that community basketball we were just talking

4    about.  Believable?  Ridiculous, ridiculous, ridiculous,

5    ridiculous.

6         Same thing with Charles Thomas's testimony.  Same

7    thing with all of the other witnesses.  They don't add up.

8    Common sense and reason, no corroboration whatsoever.  It

9    makes no sense.

10        Don't know what the clothing was is what defense

11   counsel referenced at Stockbridge.  No, we don't, it was

12   burned.  It was burned a while ago before it came forward.  It

13   was burnt clothing.  We know they're not the same exact size

14   as it was or the same exact clothe—didn't look exactly the

15   same before they were burned.  They looked a little different

16   after they were burned.  It was burnt material.  Clothing

17   material, but burnt material.  Of course, it would be

18   different.

19        Now Devon came forward in an interview with

20   Detective Beauchamp, I do want to point out, on March 13th is

21   what the testimony was, of this year—March of 2013.  He came

22   forward before to his attorney.  He was out of state is what

23   the testimony was in federal prison, and the sit-down for the

24   interview wasn't until then.  That's what the

25   testimony—testimony is.  I want to just clarify that.

1          A reasonable doubt is doubt that's based on reason

2     and based on common sense.  I think the testimony was—Did

3     Walter Johnson even know who Steven Brown was?  I don't even

4     think he was—He might have known him as Khaki, but I don't

5     even know if he remembered him as Khaki.  They weren't,

6     obviously, close.

7          Steven Brown wasn't nearly as close, I think it can

8     be gleaned from the testimony, with these other witnesses as

9     he was with Sam Steel.

10          And he came forward, and he tried to get in contact

11     with Detective Beauchamp in June.  He was going to make a

12     statement and didn't.  But, in the end, I think it's clear he

13     did tell the truth.

14          Now, if you want to believe that the witnesses that

15     testified yesterday for the defense were with Sam Steel at the

16     time and just randomly came forward to testify today without

17     telling authorities, that's—that a belief that you can choose

18     to have.  I would suggest that your reason and common sense

19     would indicate that that's not the case.

20          Defense says there's a bunch of texts between

21     Harry Mathews and Sam Steel or Harry Mathews sent a bunch of

22     texts to Sam Steel.  I only saw one in the phone records.

23          The news media was at Mabel Street.  They weren't

24     where defendant dropped the gun off initially.  The canvass, I

25     believe, was in the morning is what the testimony was, I

1419

1    believe, around 7:00 or 8:00.  So was the canvass—It was a

2    block away, the canvass.  It wasn't specifically at Mabel.  So

3    the canvass did not recover the gun.

4              Who recovered the gun?  Sam Steel.  Because he

5    realized, initially, yeah, it was pretty dumb that I left the

6    gun just at the—at the scene—or close to the scene, not at the

7    scene, close to the scene.  So he got it, and he put it miles

8    away.

9              Yes, Sam Steel shot at 626 Mabel across the street

10   from his mother's house.

11             Yes, he was that arrogant and made that horrible of

12   a decision that an individual can make.

13             Yes, he knew that neighborhood.  He knew a lot of

14   the people.

15             Milo Conklin had stolen from him.  Milo Conklin

16   wasn't going to be allowed to do this anymore, and he was

17   going to make sure that this doesn't happen again.

18             Milo Conklin, a son, a brother, whatever mistakes he

19   may have made didn't deserve that.

20             All the testimony shows it was the defendant who had

21   a beef with him.  And, yes, it was across from his mother's

22   house.  That makes it all the more amazing that he would have

23   that much arrogance to do it.

24             But why did he do it there?  He knew the area.  You

25   saw that sketch.  He knew the area very well.  He was with

1420

1    Devon Smith at that area months later.  He hung around that

2    area a lot, knew everybody that lived there.  A lot of them

3    were his friends.

4         So it's at night, he had a hoodie on, and he was

5    going to make sure that Milo Conklin and everybody else knew

6    their lesson; and that's why he did what he did.

7         Once again, you can choose to believe that all the

8    testimony of Walter Johnson, A. J. Mathews, Steven Brown,

9    David Lee, Alesha Caper; you can believe that the

10   officers—specifically, Detective Beauchamp, who did an

11   extremely thorough job whenever a witness came forward;

12   Devon Smith, they all are making this up, and that, oh, just

13   it's a coincidence that the corroborating evidence indicates

14   it's Sam Steel.  Common sense and reason dictate that

15   Sam Steel did it beyond a reasonable doubt.

16        Thank you.

17        THE COURT:   Thank you, Mr. Cusick.

18        Ladies and gentlemen, I'm going to move into the

19   jury instructions.

20        Before I do that, I'm going to give you an

21   opportunity to stand and stretch a moment.  I have one thing

22   to address with the attorneys by way of a bench conference, so

23   you can stretch for a moment.

24        Counsel?

25        (At 3:31 p.m., bench conference as follows:

1421

1            THE COURT:   Okay.  So with regards to—

2            MR. CUSICK:   I'm sorry, Judge.

3            THE COURT:   It's okay.

4            With regards to Michael O'Kelly, I didn't

5       know—I put again when we're dealing with the expert

6       witnesses that he was an expert regarding cellphone

7       site operations and cellphone towers similar to

8       Jeffrey Strohm.  Is that okay?

9            MR. CHAMPION:   That's fine.

10           THE COURT:   Okay.  I just wanted to

11      double-check that.)

12      THE COURT:   All right.  Ladies and gentlemen, just

13  a couple things before I read the jury instructions.

14           First of all, as I said before, the evidence is in,

15  so please don't write us a note when you're deliberating

16  asking for another map or anything else.  All the evidence

17  that you need to—or have available to decide this case is—has

18  been introduced, so just so that you are aware of that.

19           Also, we do not transcribe each witness's testimony

20  as the trial progresses.  We, obviously, have an audio system,

21  as you know, and a video system.  So, if you are deliberating

22  and you decide that you would like to review someone's

23  testimony, I would just urge you to review your notes and your

24  collective memories; and then, if you do decide after all of

25  that that you really do need to view someone's testimony, what

1422

1      we usually do is I have Ms. Wint then copy that portion.

2            She will bring it up to your—the jury deliberation

3      room, then, and you have a monitor up there so it can be

4      played; but it has to be played from beginning to end.  You

5      can't ask her to stop and start the testimony because she

6      can't have any idea what you're talking about.  So we don't

7      want any clues about that or what portion of the testimony you

8      might be interested in, for example.  So you have to watch it

9      from beginning to end, no stopping and starting, and no

10     discussions, obviously, when Ms. Wint is in the room.  So that

11     is how that process works, just so that you are aware of that.

12           I indicated before all of the exhibits will be

13     brought to you.  You will have those and have the ability to

14     look at those.

15           If they're in a bag or contained in some way, do not

16     open up those bags.  They must remain sealed.  So you can view

17     them as is, but just so that you are aware of that.  And, of

18     course, don't write on them or anything to that effect.

19           You will be given a copy of my final instructions.

20     You'll be given one copy.  I don't have a copy for each of you

21     as we go along now, so you're going to have to listen

22     carefully.  You will receive one copy when you go to the jury

23     deliberation room.

24           You will also receive a verdict form.  It is a

25     two-page form, and I will review this with you in a moment at

1423

1    the end of the jury instructions, just so that you know that.

2    And this form needs to be filled out by the foreperson when

3    you've reached your verdict.

4         The elements, as we gave them to you before, have

5    not changed, so you have the elements.  When I get to the

6    portion of the jury instructions where I'm about ready to read

7    the elements, I'll let you know.  And, again, you can follow

8    along.  You can write on your copy of the elements; but,

9    again, please don't write on the preliminary instructions that

10   I gave you and please don't write on these final instructions

11   when you receive them.

12        So please listen carefully.

13        Members of the jury, the evidence and the arguments

14   in this case are finished, and I will now instruct you on the

15   law; that is, I will explain the law that applies to this

16   case.

17        Remember you have taken an oath to return a true and

18   just verdict based only on the evidence and my instructions on

19   the law.  You must not let sympathy or prejudice influence

20   your decision.

21        As jurors, you must decide what the facts of the

22   case are.  This is your job and nobody else's.  You must think

23   about all the evidence and then decide what each piece of

24   evidence means and how important you think it is, and this

25   includes whether you believe what each of the witnesses said.

                                  1424

1    What you decide about any fact in this case is final.

2         It is my duty to instruct you on the law.  You must

3    take the law as I give it to you.  If a lawyer has said

4    something different about the law, you must follow what I say.

5         At various times I have already given you some

6    instructions about the law.  You must take all of my

7    instructions together as the law you are to follow.  You

8    should not pay attention to some instructions and ignore

9    others.

10        To sum up, it is your duty to decide what the facts

11   of the case are, to apply the law as I give it to you and, in

12   that way, decide the case.

13        As I told you before, a person accused of a crime is

14   presumed to be innocent, and this means you must start with

15   the presumption that the defendant is innocent; and this

16   presumption continues throughout the trial and entitles the

17   defendant to a verdict of not guilty unless you are satisfied

18   beyond a reasonable doubt that he is guilty.

19        Every crime is made up of parts called elements, and

20   the prosecutor must prove each element of the crime beyond a

21   reasonable doubt.  The defendant is not required to prove his

22   innocence or to do anything.  If you find that the prosecutor

23   has not proven every element beyond a reasonable doubt, then

24   you must find the defendant not guilty.

25        A reasonable doubt is a fair, honest doubt growing

1425

1    out of the evidence or the lack of evidence.  It is not merely

2    an imaginary or a possible doubt but a doubt based on reason

3    and common sense.  A reasonable doubt is just that, a doubt

4    that is reasonable after a careful and considered examination

5    of the facts and the circumstances of this case.

6            Every defendant has the absolute right not to

7    testify.  When you decide the case, you must not consider the

8    fact that he did not testify.  It must not affect your verdict

9    in any way.

10           When you discuss the case and decide on your

11   verdict, you may only consider the evidence that was properly

12   admitted in the case.  Therefore, it is important for you to

13   understand what is evidence and what is not evidence.

14           Evidence includes only the sworn testimony of

15   witnesses, the exhibits admitted into evidence, and anything

16   else I told you to consider as evidence.

17           Many things are not evidence, and you must be

18   careful not to consider them as such.  I will now describe

19   some of the things that are not evidence.

20           The fact that the defendant is charged with a crime

21   and is on trial is not evidence.  Likewise, the fact that he

22   is charged with more than one crime is not evidence.

23           The lawyers' statements and their arguments are not

24   evidence.  They are only meant to help you understand the

25   evidence and each side's legal theories.  You should only

1426

1    accept things the lawyers say that are supported by the

2    evidence or by your own common sense and general knowledge.

3         The lawyers' questions to the witnesses, your

4    questions to the witnesses, and my questions to the witnesses

5    are also not evidence.  You should consider these questions

6    only as they give meaning to the witnesses' answers.

7         My comments, rulings, questions, and instructions

8    are also not evidence.

9         It is my duty to see that the trial is conducted

10   according to the law and to tell you the law that applies to

11   this case.  However, when I make a comment or give an

12   instruction, I am not trying to influence your vote or express

13   a personal opinion about the case.

14        If you believe that I have an opinion about how you

15   should decide this case, you must pay no attention to that

16   opinion.  You are the only judges of the facts, and you should

17   decide this case from the evidence.

18        At times during the trial, I have excluded evidence

19   that was offered or stricken testimony that was heard.  Do not

20   consider those things in deciding the case.  Make your

21   decision only on the evidence that I let in and nothing else.

22        Your decision should be based on all the evidence,

23   regardless of which party produced it.

24        You should use your own common sense and general

25   knowledge in weighing and judging the evidence, but you should

1    not use any personal knowledge you may have about a place or a

2    person or an event.

3         To repeat once more, you must decide this case based

4    only on the evidence admitted during this trial.

5         Facts can be proved by direct evidence from a

6    witness or an exhibit.  Direct evidence is evidence about what

7    we actually see or hear.  So, for example, if you look outside

8    and you see rain falling down, that would be direct evidence

9    that it is raining outside.

10        Facts can also be proved by indirect or

11   circumstantial evidence.  Circumstantial evidence is evidence

12   that normally or reasonably leads to other facts.  So, for

13   example, if you see a person coming in from the outside

14   wearing a raincoat with small drops of water on it, that would

15   be circumstantial evidence that it is raining outside.

16        You may consider circumstantial evidence.

17   Circumstantial evidence by itself or a combination of

18   circumstantial evidence and direct evidence can be used to

19   prove the elements of a crime.  In other words, you should

20   consider all of the evidence that you believe.

21        The prosecution has introduced evidence of a

22   statement or statements that it claims the defendant made.

23   Before you may consider such an out-of-court statement against

24   the defendant, you must first find that the defendant actually

25   made the statement as given to you.  If you find that the

1428

1    defendant did make the statement, you may give the statement

2    whatever weight you think it deserves.

3              In deciding this, you should think about how and

4    when the statement was made and about all the other evidence

5    in the case.  You may consider the statement in deciding the

6    facts of the case.

7              You have heard evidence that was introduced to show

8    that the defendant committed one or more crimes or bad acts

9    for which he is not on trial.  If you believe this evidence,

10   you must be very careful only to consider it for certain

11   purposes.  You may only think about whether this evidence

12   tends to show:

13             (A), that the defendant had a reason to commit the

14   crime; and/or

15             (B), who committed the crime that the defendant is

16   charged with; and/or

17             (C), how the witnesses knew the defendant.

18             You must not consider this evidence for any other

19   purpose.  For example, you must not decide that it shows that

20   the defendant is a bad person or that he is likely to commit

21   crimes.  You must not convict the defendant here because you

22   think he is guilty of other bad conduct.  All of the evidence

23   must convince you beyond a reasonable doubt that the defendant

24   committed the alleged crime or crimes or you must find him not

25   guilty.

1429

1          There has been some evidence that the defendant ran

2     away, hid, and/or left the state after he was accused of the

3     crime.  This evidence does not prove guilt.  A person may run

4     or hide for innocent reasons such as panic, mistake, or fear.

5     However, a person may also run or hide because of a

6     consciousness of guilt.  You must decide whether the evidence

7     is true and, if true, whether it shows that the defendant had

8     a guilty state of mind.

9          You have heard evidence about the defendant's

10    character for peacefulness.  You may consider this evidence

11    together with all the other evidence in the case in deciding

12    whether the defendant committed the crime or crimes which he

13    is charged.  Evidence of a good character alone may sometimes

14    create a reasonable doubt in your minds and lead you to find

15    the defendant not guilty.

16         As I told you before—You have this instruction, I

17    believe, in your preliminary instructions.—it is your job to

18    decide what the facts of the case are.  You must decide which

19    witnesses you believe and how important you think their

20    testimony is.  You do not have to accept or reject everything

21    a witness says.  You are free to believe all or none or any

22    part of any witness's testimony.

23         In deciding which testimony you believe, you should

24    rely on your own common sense and everyday experiences.

25    However, in deciding whether you believe a witness's

1   testimony, you must set aside any bias or prejudice you may

2   have based on the person's race or gender or national origin.

3          There are no fixed set of rules for judging whether

4   you believe a witness, but it may help you to think about

5   these questions:

6          Was the witness able to see or hear clearly?

7          How long was the witness watching or listening?

8          Was anything else going on that may have distracted

9   the witness?

10         Did the witness seem to have a good memory?

11         How did the witness look and act while testifying?

12  Did the witness seem to be making an honest effort to tell the

13  truth, or did the witness seem to evade the questions or argue

14  with the lawyers?

15         Does the witness's age or maturity affect how you

16  judge his or her testimony?

17         Does the witness have any bias or prejudice or

18  personal interest in how this case should be decided?

19         Have there been any promises, threats, suggestions,

20  or other influences that affected how the witness testified?

21         In general, does the witness have any special reason

22  to tell the truth or any special reason to lie?

23         All in all, how reasonable does the witness's

24  testimony seem when you think about all the other evidence in

25  the case?

1431

1              Sometimes the testimony of different witnesses will

2        not agree, and you must decide which testimony you accept.

3        You should think about whether the disagreement involves

4        something important or not and whether you think someone is

5        lying or is simply mistaken.  People see and hear things

6        differently, and the witnesses may testify honestly but simply

7        be wrong about what they thought they saw or remembered.

8              It is also a good idea to think about which

9        testimony agrees best with the other evidence in the case.

10             However, you may conclude that a witness

11       deliberately lied about something that is important to how you

12       decide the case.  If so, you may choose not to accept anything

13       that witness said.  On the other hand, if you think the

14       witness lied about some things but told the truth about

15       others, you may simply accept the part you think is true and

16       ignore the rest.

17             You have heard that a lawyer or a lawyer's

18       representative has talked to one or more of the witnesses.

19       There is nothing wrong with this.  A lawyer or lawyer's

20       representative may talk to a witness to find out what the

21       witness knows about the case and what the witness's testimony

22       will be.

23             If you believe that a witness previously made a

24       statement inconsistent with his or her testimony at this

25       trial, the only purpose for which that earlier statement can

                              1432

1    be considered by you is in deciding whether the witness

2    testified truthfully in court.  The earlier statement is not

3    evidence that what the witness said earlier is true.

4         You have heard that one or more of the witnesses has

5    been convicted of a crime or crimes in the past.  You should

6    judge these witnesses' testimony the same way you judge the

7    testimony of any other witness.  You may consider his or her

8    past criminal convictions along with all the other evidence

9    when you decide whether you believe his or her testimony and

10   how important you think it is.

11        You should not decide this case based on which side

12   presented more witnesses.  Instead, you should think about

13   each witness and each piece of evidence and whether you

14   believe them.  Then you must decide whether the testimony and

15   the evidence you believe proves beyond a reasonable doubt that

16   the defendant is guilty.

17        You have heard testimony from witnesses who have

18   given you their opinions as an expert:

19        Gerald Luedecking as an expert lab specialist;

20        Dr. John Bechinski as a forensic pathologist;

21        Ann Hunt regarding DNA analysis;

22        Stuart Burritt regarding firearm analysis;

23        Jeffrey Strohm regarding cellphone site operations

24   or cellphone towers; and

25        Michael O'Kelly regarding cellphone site operations

1433

1    or cellphone towers.

2          Experts are allowed to give opinions in court about

3    matters that they are experts on.  However, you do not have to

4    believe an expert's opinion.  Instead, you should decide

5    whether you believe it and how important you think it is.

6    When you decide whether you believe an expert's opinion, think

7    carefully about the reasons and the facts each witness gave

8    for their opinion and whether those facts are true.

9          You should also think about the expert's

10   qualifications and whether the expert's opinion makes sense

11   when you think about the other evidence in the case.

12         You have heard testimony from witnesses who are

13   police officers.  That testimony is to be judged by the same

14   standards you use to evaluate the testimony of any other

15   witness.

16         You have heard testimony that one or more of the

17   witnesses may have made an agreement with the government in

18   their case and/or have had discussions about possible

19   reduction of a sentence in their case.  You are to consider

20   this evidence only as it relates to that witness's credibility

21   and as it may tend to show that witness's bias or

22   self-interest.

23         Now I'm going to read the elements, and you have

24   these elements in your binders.  If you want to follow along

25   with me—Again, these elements have not changed.

1434

1          In count one, there are three options: first-degree

2     premeditated murder, second-degree murder, or not guilty.  And

3     you will see that when you look at the verdict form.

4          The elements of first-degree premeditated murder are

5     as follows:

6          The defendant is charged with the crime of

7     first-degree premeditated murder.  To prove this charge, the

8     prosecutor must prove each of the following elements beyond a

9     reasonable doubt:

10         First, that the defendant caused the death of

11    Milo Conklin; that is, that Milo Conklin died as a result of

12    the shooting.

13         Second, that the defendant intended to kill

14    Milo Conklin.

15         Third, that this intent to kill was premeditated;

16    that is, thought out beforehand.

17         Fourth, that the killing was deliberate, which means

18    that the defendant considered the pros and cons of the killing

19    and thought about and chose his actions before he did it.

20    There must have been real and substantial reflection for long

21    enough to give a reasonable person a chance to think twice

22    about the intent to kill.

23         The law does not say how much time is needed.  It is

24    for you to decide if enough time has passed under the

25    circumstances of this case.  The killing cannot be the result

1435

1    of a sudden impulse without thought or reflection.

2         You may also consider the lesser charge of

3    second-degree murder.  To prove this charge, the prosecutor

4    must prove each of the following elements beyond a reasonable

5    doubt:

6         First, that the defendant caused the death of

7    Milo Conklin; that is, that Milo Conklin died as a result of

8    the shooting.

9         Second, that the defendant had one of these three

10   states of mind:

11        He intended to kill; or

12        He intended to do great bodily harm to Milo Conklin;

13   or

14        He knowingly created a very high risk of death or

15   great bodily harm knowing that death or such harm would be the

16   likely result of his actions.

17        Count two.  The defendant is also charged in count

18   two with a separate crime of possessing a firearm at the time

19   he committed the crime of first-degree premeditated murder or

20   second-degree murder.  This is also called felony firearm.  To

21   prove this charge, the prosecutor must prove each of the

22   following elements beyond a reasonable doubt:

23        First, that the defendant committed the crime of

24   first-degree premeditated murder or second-degree murder,

25   which have already been defined for you.  It is not necessary,

1    however, that the defendant be convicted of that crime.

2         Second, that at the time the defendant committed the

3    crime, he knowingly carried or possessed a firearm.

4         Count three, the title is felon possessing a

5    firearm.  Defendant is also charged with the crime of

6    possessing a firearm in this state after having been convicted

7    of a specified felony.  To prove this charge, the prosecutor

8    must prove each of the following elements beyond a reasonable

9    doubt:

10         First, that the defendant possessed a firearm in

11    this state.

12         Second, that the defendant was convicted of a

13    specified felony.

14         Count four—Again, the title is felony firearm.  The

15    defendant is also charged with a separate crime of possessing

16    a firearm at the time he committed the crime of felon

17    possessing a firearm.  To prove this charge, the prosecutor

18    must prove each of the following elements beyond a reasonable

19    doubt:

20         First, that the defendant committed the crime of

21    felon possessing a firearm, which has already been defined for

22    you.  It is not necessary, however, that the defendant be

23    convicted of that crime.

24         Second, that, at the time the defendant committed

25    that crime, he knowingly carried or possessed a firearm.

1437

1    Possession does not necessarily mean ownership.

2    Possession means either that the person has—has actual

3    physical control of the thing—as I do this pen that I'm now

4    holding—or the person knows the location of the firearm and

5    has reasonable access to it.

6    Possession may be sole, where one person alone

7    possesses the firearm; possession may be joint where two or

8    more people share possession.

9    You may consider whether the defendant had a reason

10   to commit the alleged crime, but a reason by itself is not

11   enough to find a person guilty of a crime. The prosecutor

12   does not have to prove that the defendant had a reason to

13   commit the alleged crime. He only has to show that the

14   defendant actually committed the crime and that he meant to do

15   so.

16   The defendant's intent may be proved by what he

17   said, what he did, how he did it, or by any other facts and

18   circumstances in evidence.

19   You have heard evidence that the defendant could not

20   have committed the alleged crime because he was somewhere else

21   or across the street when the crime was committed. The

22   prosecutor must prove beyond a reasonable doubt that the

23   defendant was actually there when the alleged crime was

24   committed. The defendant does not have to prove he was

25   somewhere else.

1438

1        If, after carefully considering all the evidence,

2   you have a reasonable doubt about whether the defendant was

3   actually present when the alleged crime was committed, you

4   must find him not guilty.

5        When the lawyers agree on a statement of facts,

6   these are called stipulated facts.  You may regard such

7   stipulated facts as true, but you are not required to do so.

8   The parties stipulated that defendant had a prior specified

9   felony which made him ineligible to possess a firearm on

10  April 24, 2011.

11       The prosecutor must also prove beyond a reasonable

12  doubt that the crime occurred on or about April 24, 2011, in

13  Kalamazoo County.

14       Possible penalty should not influence your decision.

15  It is the duty of the judge to fix the penalty within the

16  limits provided by law if there is a guilty verdict.

17       The defendant is charged with four counts; that is,

18  in count one, with the crimes of first-degree,

19  second-degree murder;

20       In count two, felony firearm;

21       In count three, felon possessing a firearm; and,

22       In count four, felony firearm.

23       These are separate crimes, and the prosecutor is

24  charging that the defendant committed all of them.  You must

25  consider each crime separately in light of all the evidence in

1439

1     this case.  You may find the defendant guilty of all, any

2     combination, guilty of a less serious crime, or not guilty.

3            When you go to the jury room, you will be provided

4     with a written copy of the final instructions, as I've already

5     indicated to you.

6            You should first choose a foreperson.  The

7     foreperson should see to it that your discussions are carried

8     on in a businesslike manner and that everyone has a fair

9     chance to be heard.

10           During your deliberations, please keep your

11    cellphones turned off until we recess or break.

12           A verdict in a criminal case must be unanimous.

13    That means that, in order to return a verdict, it is necessary

14    that each of you agrees on that verdict.

15           In the jury room, you will discuss the case among

16    yourselves; but, ultimately, each one of you will have to make

17    up your own mind.

18           Any verdict must represent the individual,

19    considered judgment of each and every juror.

20           It is your duty as jurors to talk to each other and

21    make every reasonable effort to reach an agreement.  Express

22    your opinions and the reasons for them, but keep an open mind

23    as you listen to your fellow jurors.  Rethink your opinions

24    and do not hesitate to change your mind if you decide you were

25    wrong.

1440

1          Try your best to work out your differences.

2     However, although you should try to reach an agreement, none

3     of you should give up your honest opinion about the case just

4     because the other jurors disagree with you or just for the

5     sake of reaching a verdict.  In the end, your vote must be

6     your own and you must vote honestly and in good conscience.

7          In count one, there are several different crimes

8     that you may consider.  When you discuss count one, you must

9     consider the crime of first-degree premeditated murder first.

10    If you all agree that the defendant is guilty of that crime,

11    there is no need to consider the lesser charge of

12    second-degree murder.

13         If you believe that the defendant is not guilty of

14    first-degree premeditated murder or if you cannot agree about

15    that crime, you should consider the less serious crime of

16    second-degree murder.  You may decide how long to spend on

17    first-degree premeditated murder before discussing

18    second-degree murder.  You can go back to first-degree murder

19    after discussing second-degree murder if you want to.

20         If you have any questions about the jury

21    instructions before you begin deliberations or questions about

22    the instructions that arise during deliberations, you may

23    submit them in writing in a sealed envelope to the bailiff.

24         And Ms. Wint will explain when she brings you

25    upstairs.  We actually have a buzzer system.  We don't have an

1441

1    envelope for you to place them in.  You buzz a certain number

2    of times if you have a question or if you need a break or

3    recess or when you've reached your verdict.

4         If you want to communicate with me while you are in

5    the jury room, please have your foreperson write a note and

6    give it to Ms. Wint.

7         It is not proper for you to talk directly with the

8    judge or the lawyers or other court officers or other people

9    involved in the case.

10         Ms. Wint will also explain, when you go upstairs,

11   there are—there's a piece of paper that you can use.  You can

12   place the—It has a place for the name of the case, and then

13   you can write down your question on that.  And then, when you

14   buzz for her, she will come and get the question, bring it

15   down to us, and then we'll address it from there.

16         As you discuss the case, you must not let

17   anyone—even me or Ms. Wint—know how your voting stands.  And,

18   again, please don't indicate in a jury question how your

19   voting stands either.  That is improper.  Just don't ever let

20   us know how your voting stands until you return with a

21   unanimous verdict.  Until you return with a unanimous verdict,

22   do not reveal this to anyone outside the jury room.

23         And, as I indicated, when you go to the jury room,

24   you will be given a written copy of the instructions you have

25   just heard.

1442

```
 1              You should think about all my instructions together
 2      as the law you are to follow.
 3              Counsel, do we need to address anything with regards
 4      to those instructions as read?
 5              MR. CHAMPION:   No, your Honor.
 6              MR. CUSICK:   No, your Honor.  Thank you.
 7              Your Honor, I think you said Stuart Burritt.  His
 8      name's Michael Burritt.
 9              THE COURT:   Did I say it wrong?
10              MR. CUSICK:   No, it's listed—It's not—It's listed
11      as Stuart Burritt.  You didn't say it wrong.  It's
12      Michael Burritt.  That's all.  Just for the record.
13              THE COURT:   Okay.  Now I also indicated to you—
14              All right.  I also indicated to you that you will be
15      receiving a verdict form.  The verdict form needs—It's two
16      pages.  It needs to be filled out by the foreperson before you
17      buzz us and indicate that you have reached a verdict.  So I'm
18      going to review that with you.
19              It helps you kind of walk through what you need to
20      decide here.  So, at the top, it just has the name of the
21      case, the file number.
22              And then, on the first page in the middle, it says
23      verdict form.  And it says, we, the jury, find the defendant;
24      and then, in parentheses, it says, mark only one box.
25              Now I caution you because, under count one, remember
```

1443

1    you have three options.  The title to count one is open

2    murder.  There are three options: not guilty, guilty of

3    first-degree murder, or guilty of second-degree murder.  Only

4    one box should be marked.

5         So, as you discuss count one, as I indicated in the

6    instructions—

7         If you find the defendant is not guilty of count

8    one, then you put a check or a mark inside the box just to the

9    left of where not guilty is indicated;

10        If you find that he is guilty of first-degree

11   murder, you mark inside the box just to the left of where

12   that's indicated; or,

13        If you find that he is guilty of

14   second-degree murder, then you mark or check inside the box

15   just to the left of where guilty of second-degree murder is

16   indicated.

17        So only one of those boxes should be marked under

18   count one.  And I also caution you that sometimes the actual

19   title of the counts does not match up with the instructions,

20   and that's why we're very careful in the instructions to

21   indicate what count one is and what count two is and what

22   count three is.

23        Count two, the title is weapons felony firearm, or

24   felony firearm it's referenced in the instructions.  Count two

25   is related to count one.  There are two counts titled felony

                              1444

1    firearm.  Count two relates with count one, and then count

2    four relates with count three; and that's indicated on this

3    verdict form.  So, if you find the defendant is guilty or—I'm

4    sorry.—is not guilty of count two, weapons felony firearm, you

5    mark inside the box where not guilty is indicated; and, if you

6    find that he's guilty of weapons felony firearm, you mark

7    inside the box next to where that is indicated.

8          Count three is on page two.  The title is weapons

9    firearm possession by a felon.  And, again, I'll just caution

10   you the title in the jury instructions is a little bit

11   different than that; but count three is certainly identified

12   in there.  If you find he's not guilty of count three, mark

13   inside the box next to that.  If you find that the defendant

14   is guilty of weapons firearm possession by felon, then you

15   mark inside the box where that's indicated.

16         Count four, the title again is weapons felony

17   firearm.  It indicates on the verdict form it's related to

18   count three.  If you find that he's not guilty of count four,

19   mark inside the box where that's indicated.  If you find that

20   he's guilty of weapons felony firearm in count four, mark

21   inside the box where that is indicated.

22         So one box should be marked or checked for each

23   count.

24         There is a place for the date, the signature of the

25   foreperson, and then the printed name of the foreperson.

1445

1           When you indicate to us that you have reached your

2    verdict, the foreperson needs—and we bring you back down to

3    the court, the foreperson needs to bring this down with them.

4    And then we will ask the foreperson questions off of this

5    form, and then the form is ultimately stamped and filed and

6    placed in the court file, just so that you are aware of how

7    that works.

8           So—All right.  Any questions related to the verdict

9    form or the jury instructions right now, ladies and gentlemen?

10   Raise your hand if you have any.  Okay.

11          And I will make a correction.  I checked the log,

12   and the name of—I have the expert listed or read the expert as

13   Stuart Burritt, and it's Michael Stuart Burritt.

14          All right.  Counsel, anything else we need to

15   address before we select the alternate jurors?

16          MR. CUSICK:  No, your Honor.

17          THE COURT:  Okay.  All right.  So what we're going

18   to do now is select the alternate jurors, and we have

19   15 jurors remaining.  I will indicate that the juror in seat

20   number 15 is actually number—seat—juror number 16 and that we

21   moved you over when we excused the juror in seat number 15.

22          So Ms. Johnson has a canister; and, inside the

23   canister, she has a little piece of paper that are numbered

24   one through 14, and then number 16 is also in there and that

25   represents the juror who is number 16 but seated in juror—in

1446

1       seat number 15.  So, if she selects your juror number, then

2       you will be an alternate.  So we will select three names.

3       Twelve of you will deliberate or begin your deliberation.

4              The other three whose names or whose numbers, I

5       should say, are selected, we need you to pull out a clean

6       piece of paper and state your—write your name and a contact

7       number on that piece of paper.

8              There are actually quite a few occasions where we

9       have to bring someone back to deliberate for various different

10      reasons.  So, if we need to do that, then we would randomly

11      select one of those three numbers or names and call that

12      person and indicate that you need to come back.  And then

13      you're on the jury, and deliberations start again; and that's

14      how that works.

15             So, for the three of you who are selected, you have

16      to follow all of my instructions.  You still—You're not

17      released.  You'll be excused for the day, but you're not

18      released from jury duty.

19             You have to make sure you're not talking to anyone.

20             You can't look up anyone, anything related to the

21      case.

22             So, all those instructions, you are still obligated

23      to follow, just so that you know that.

24             All right.  With that, I will turn it over to

25      Ms. Johnson to select three seat numbers.

                                1447

1          THE CLERK:    First alternate, seat number ten,

2    Katherine Lagoni.

3          THE COURT:    All right.  Ma'am, so just pull out a

4    clean piece of paper, if you would, and write your name and

5    contact number on there.

6          And then Ms. Wint will take your notebook.  She will

7    keep it safe.  No one ever looks at your notes in any—at any

8    time, again, just so that you know that.  And, if we need to

9    call you back in, then, we'll have your notebook here safe for

10   you.

11         THE CLERK:    Second alternate, seat number 12,

12   Jeffery Beatty.

13         Third alternate, seat number eight,

14   Rebecca Wiedmayer.

15         THE COURT:    All right.  And, as soon as we have all

16   of the names and telephone numbers, Ms. Wint will collect

17   those and your notebooks.

18         And you will hear from us one way or the other,

19   either by calling you and letting you know that we do need you

20   to come back in to deliberate, or, as soon as we take the

21   verdict in open court, then Ms. Wint will call you and let you

22   know that—what the verdict is and that you are excused at that

23   time; and then you can talk about the case once she authorizes

24   that after we've accepted the verdict.

25         If we don't see you again, thank you very much for

                              1448

1    your time over the last two weeks.  We greatly appreciate it.

2              And we'll just wait a second for Ms. Wint to come

3    back in.

4              All right.  So I have the jury instructions—I did

5    make the correction to—There was one other typo, and then I

6    also added Michael—the name Michael to Michael Stuart Burritt,

7    just so that you're aware of that.—and the verdict form.

8              We will gather the exhibits and have Ms. Wint bring

9    those up to you as soon as we confirm all of them.

10             And, with that, you can—

11             THE CLERK:    Swear . . . (inaudible)

12             THE COURT:    Oh—I'm sorry.—we do.  We have to swear

13   her in.

14             THE BAILIFF:    Oh, yeah.

15             THE COURT:    Thank you.

16             THE CLERK:    Do you solemnly swear or affirm that

17   you will, to the utmost of your ability, keep the persons

18   sworn as jurors on this trial from separating from each other;

19   that you will not suffer any communication to be made to them

20   or any of them, orally or otherwise; that you will not

21   communicate with them or any of them, orally or otherwise,

22   except by the order of this Court; or to ask them if they have

23   agreed on their verdict until they shall be discharged; and

24   that you will not, before they render their verdict,

25   communicate to any person the state of their deliberation or

                              1449

1    the verdict they have agreed upon, so help you God?

2                THE BAILIFF:   I do.

3                THE CLERK:   Thank you.

4                THE COURT:   All right.  Now you can follow Ms. Wint

5    upstairs, and you can take your notebooks.

6                Give me one second.

7                All rise.

8                (At 4:13 p.m., jury exits courtroom to commence

9                deliberations)

10               You may be seated.

11               MR. CHAMPION:   It's closed.

12               THE COURT:   Thank you.

13               All right.  Counsel, the jury has left the court.

14               And, just one last time, anything we need to place

15   on the record with regards to the jury instructions as read or

16   anything that we discussed in chambers?

17               MR. CHAMPION:   No, your Honor.

18               MR. CUSICK:   No, your Honor.

19               THE COURT:   I will indicate there were a number of

20   instructions that we did discuss; and the ones that were not

21   read, it was by agreement.  Everyone agreed that they

22   shouldn't have been read.  So I appreciate that.

23               The verdict form is okay.

24               And then is there anything else that we need to

25   address before we recess then, Counsel?

1450

1          Mr. Cusick?

2          MR. CUSICK:   No, your Honor.

3          THE COURT:   Mr. Champion?

4          MR. CHAMPION:   No, your Honor.

5          THE COURT:   All right.  I just do need you to stick

6     around and make sure that we have all of the exhibits in the

7     proper order so that she can bring them up to the jury

8     deliberation room.  They should be.  I think—I don't think we

9     pulled them out.

10          So, with that, court's in recess.

11          (At 4:15 p.m., proceedings adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1451