STATE OF MICHIGAN

9th JUDICIAL CIRCUIT COURT – TRIAL DIVISION

FOR THE COUNTY OF KALAMAZOO

PEOPLE OF THE STATE OF MICHIGAN,

v                                          Case No.:  2011-1983FC

SAMUEL STEEL, III

                    Defendant.
_____/

EVIDENTIARY HEARING - VOLUME I OF II

BEFORE THE HONORABLE PAMELA L. LIGHTVOET

Kalamazoo, Michigan – Thursday, August 21, 2014

APPEARANCES:

For the People:      PAUL JOHN CUSICK P70895
                     Michigan Dept. of General Criminal Division
                     3030 West Grand Boulevard, Suite 10-361
                     Detroit, Michigan  48202
                     (313) 456-0089

For the Defendant:   MARY ANNA OWENS P33896
                     124 Fulton Street East, Suite 100
                     Grand Rapids, Michigan  49503
                     (616) 742-0431

DIGITALLY RECORDED

TRANSCRIBED BY:      DAWN MORSE CER 4727
                     2003 Leigh Avenue
                     Kalamazoo, Michigan  49048
                     (269) 808-2343

1                    TABLE OF CONTENTS

2     WITNESSES:  DEFENSE                                PAGE

3     CARL CLATTERBUCK

4          Direct Examination by Ms. Owens                8
           Cross-Examination by Mr. Cusick               43
5
      PAUL PRATT
6
           Direct Examination by Ms. Owens               67
7
      JACOB BLETT
8
           Direct Examination by Ms. Owens               75
9          Cross-Examination by Mr. Cusick               88
           Redirect Examination by Ms. Owens            102
10

11    WITNESSES:  PEOPLE

12    DAVID LEE

13         Direct Examination by Mr. Cusick             107
           Cross-Examination by Ms. Owens               115
14         Redirect Examination by Mr. Cusick           125

15    WALTER JOHNSON

16         Direct Examination by Mr. Cusick             131
           Cross-Examination by Ms. Owens               134
17         Redirect Examination by Mr. Cusick           137
           Recross-Examination by Ms. Owens             137
18         Questioning by the Court                     138
           Redirect Examination by Mr. Cusick           140
19         Recross-Examination by Ms. Owens             140

20    DEVON SMITH

21         Direct Examination by Mr. Cusick             145
           Cross-Examination by Ms. Owens               148
22         Redirect Examination by Mr. Cusick           151
           Recross-Examination by Ms. Owens             152
23         Questioning by the Court                     153

24

25

1                    TABLE OF CONTENTS - CONTINUED

2

3    EXHIBITS:                              IDENTIFIED    RECEIVED

4        DX#A   Witness List                    11
         DX#D   Motion to Adjourn               26
5        DX#F   Motion to Appoint New
                Investigator                    33
6

7    OTHER INFORMATION IN THE TRIAL:                      PAGE

8        Opening Statement by the Defense                   4
         Statement by the Court Regarding
9           Status of the Case Prior to Trial              51

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              Kalamazoo, Michigan

 2              Thursday, August 21, 2014 - 9:24 a.m.

 3              MS. JOHNSON:  The court calls the matter of the

 4    People of the State of Michigan versus Samuel Steel, III,

 5    Case Number C2011-1983FC.

 6                  Parties, please state appearances for the record.

 7              MR. CUSICK:  Good morning, your Honor, Paul

 8    Cusick on behalf of the People, Assistant Attorney General.

 9              MS. OWENS:  Good morning, your Honor.  My name is

10    Mary Owens, on behalf of the Defendant Samuel Steel.

11              THE COURT:  Okay.  And Mr. Steel is here.

12                  And counsel, we have a hearing on--this is on

13    remand from the Court of Appeals.  So I will turn it over

14    to you for your first witness.

15              MS. OWENS:  Thank you, your Honor.

16              THE COURT:  I've reviewed your briefs and--

17              MS. OWENS:  May I make just a few introductory

18    remarks for the record?

19              THE COURT:  Yes, you may.  Sure, certainly.

20              MS. OWENS:  Your Honor, this matter was remanded

21    from the Court of Appeals to address the issues that we

22    filed in our motion to remand, which--which primarily

23    concern allegations that trial counsel was not prepared,

24    that there were witnesses who should have been called who

25    were not, and that the investigator who was appointed to
```

1    assist Mr. Steel in his defense was not prepared as well.

2            I have today several witnesses to present to

3    explore those issues, and my first witness is going to be

4    Mr. Carl Clatterbuck.

5            THE COURT:  Give me one moment, counsel.

6            (At 9:25 a.m., bench conference begins between

7    the Court and Ms. Johnson)

8            (At 9:26 a.m., bench conference ends)

9            THE COURT:  Just give me one moment, counsel.  We

10   have one other matter that was scheduled this morning.  If

11   they have a plea, I'm gonna take it real quick before you

12   call your first witness, but I don't know what the status

13   is of that so.

14           And it's either too hot or too cold in here, and

15   it's hot in here.

16           (At 9:27 a.m., unidentified female enters the

17   courtroom)

18           THE COURT:  You have a plea or not?

19           UNIDENTIFIED FEMALE:  Yeah.

20           THE COURT:  All right.  You can come up, and then

21   when she's ready.

22           UNIDENTIFIED FEMALE:  (Inaudible--speaking away

23   from the microphone.

24           THE COURT:  Sorry counsel.

25           (At 9:27 a.m., court recesses)

```
 1                    (At 9:33 a.m., court resumes)
 2              THE COURT:  The Court recalls the case of People
 3        v Sam Steel, File Number is 2011-1983FC.
 4              Counsel, please identify yourselves again for the
 5        record if you would please.
 6              MR. CUSICK:  Paul Cusick on behalf of the People,
 7        your Honor.
 8              MS. OWENS:  Mary Owens for the Defendant Sam
 9        Steel.
10              THE COURT:  Okay.  And I'm sorry, before I call
11        Mr. Clatterbuck then, did you want to make any comments or-
12        -I--I gave her an opportunity to.  I didn't give you an
13        opportunity.  I--I do--
14              MR. CUSICK:  No, your Honor.
15              I would just briefly indicate that--well I'll
16        wait to the--I'm not gonna make an opening statement.
17        We'll wait to see what the testimony is and go from there.
18              THE COURT:  Okay.  And I've reviewed the briefs,
19        so I understand what the arguments are.
20              Right up here, sir.  Pease raise your right hand.
21        Do you solemnly swear or affirm that the testimony you're
22        about to give will be the truth, the whole truth, and
23        nothing but the truth, so help you God?
24              MR. CLATTERBUCK:  I do.
25              THE COURT:  Please have a seat, sir.  Okay.
```

1    You're gonna need to pull that microphone back so it's

2    right in line with your mouth.  It's very hard to hear in

3    this court.  You do have to stay very close to the end of

4    that microphone.

5              I need you to state and spell your first and last

6    name for the record please, sir.

7              THE WITNESS:  It's Carl Clatterbuck, and it's

8    spelt (phonetic) Carl with a C-A--

9              THE COURT:  C-A--oh I'm sorry.

10             THE WITNESS:  --R-L, my last name is Clatterbuck,

11   C-L-A-T-T-E-R-B-U-C-K.

12             MS. OWENS:  Your Honor, before I begin my

13   examination of Mr. Clatterbuck, I've spoken with Mr. Cusick

14   and I'm gonna be referring to certain exhibits, and these

15   would be the exhibits that I attached to my motion to

16   remand.

17             THE COURT:  Okay.

18             MS. OWENS:  I don't know if you have a set, your

19   Honor.  I provided Mr. Clatterbuck with a set.  I've got an

20   extra set here for you, so for the convenience of the

21   Court, we're gonna be reusing the same number system that I

22   have here.

23             THE COURT:  Okay.  So just so that I am clear

24   then, you're--are the same exhibits that you attached to

25   your motion for a new trial?  The witness lists and so

```
 1        forth?
 2                    MS. OWENS:  I'm sure they are.
 3                    THE COURT:  Okay.  So I would have those then.
 4                    MS. OWENS:  Excellent, excellent.
 5                            CARL CLATTERBUCK
 6        (At 9:34 a.m., called by Ms. Owens and sworn by the Court,
 7        testified as follows)
 8                          DIRECT EXAMINATION
 9   BY MS. OWENS:
10   Q    Mr. Clatterbuck, can you give us a summary of your
11        background and education.
12   A    Sure.  I have a bachelor's degree from the University of
13        Michigan, and I have a master's degree from the University
14        of Montana.
15             I have been licensed as a private detective in
16        Michigan since 1984.  And my specialty in the world of
17        investigation is criminal defense investigations.
18             I have a full--full-service detective agency, but
19        it seems like the bulk of my practice is criminal defense
20        investigations.  And I have a robust business, and I work in
21        a lot of different jurisdictions.
22   Q    Throughout--throughout west Michigan?
23   A    Throughout west Michigan, throughout the country.
24   Q    When you say you have a robust practice, what does--what do
25        you mean by that?
```

1    A    It's a--it's an active business.  I am working full-time.

2         It's--I'm not retired from another agency.  It's a full-time

3         business and we have cases current--I'm--I'm--we have a

4         variety of different cases at any given time.

5    Q    As part of your role as a criminal defense investigator,

6         what do you do?

7    A    I will meet with the attorneys and review the facts of a

8         case and typically I will interview witnesses.  Make

9         judgments about who is a liable witness and who isn't.  I

10        will--I will flesh out a theory of defense by gathering

11        pieces of information from a variety of different witnesses

12        too through the--the defense.

13   Q    Mr. Clatterbuck, do you take both retained--retained cases

14        and cases in which you are appointed by the court?

15   A    I--I have both retained and appointed cases, yes.

16   Q    Sir, have you had experience in working on murder cases?

17   A    I've had an extensive experience working on murder cases.

18   Q    Approximately how many over your 30-year career?

19   A    Well I've never taken the time to sit down and arrive at

20        those numbers, but I would estimate that for the last five

21        years to ten years I--I have at least three to six cases a

22        year, three to six cases, major capital cases inver--volving

23        murder.

24   Q    Three to six a year?

25   A    Yeah, three to six a year.

| | | |
|---|---|---|
| 1 | Q | And sir, you have your own agency, the Carl-- |
| 2 | A | I have my own business.  My own agency, correct. |
| 3 | Q | Do you have other individuals that are employed by you or |
| 4 | | work with you? |
| 5 | A | I don't really have any.  I have some people who I rely on |
| 6 | | as subcontractors. |
| 7 | Q | Okay.  Now Mr. Clatterbuck, we're here on the case of Samuel |
| 8 | | Steel, as you know, right? |
| 9 | A | Mmm-hmm.  Yes. |
| 10 | Q | When did you first become involved in the defense of Samuel |
| 11 | | Steel? |
| 12 | A | I was first contacted by Michael Reisterer in--I'd have to |
| 13 | | look specifically-- |
| 14 | | (The witness looks at his notes) |
| 15 | A | --that was in November of 2012. |
| 16 | Q | And what did you do at first? |
| 17 | A | I met with him.  I--I talked--talked to him.  I opened a |
| 18 | | file.  We talked about where he was going with the |
| 19 | | investigation. |
| 20 | | He had one witness that he wanted me to talk to, |
| 21 | | and before I talked to that one witness, he wanted me to |
| 22 | | talk to a woman who could talk to me more about this one |
| 23 | | witness who might be a little bit--his understanding was the |
| 24 | | witness, whose name was Jerry Davenport, might be a little |
| 25 | | bit apprehensive but that he was important in the case.  And |

1      so I was to talk to this other witness first and that's--
2    Q  When you were--I'm sorry.  I'm sorry for interrupting you,
3      Mr. Clatterbuck.
4         When you were first contacted by Mr. Reisterer,
5      you sat down with him, and did you have an idea of what the
6      theory of the defense was going to be?
7    A  Well no.  All we had talked about was the fact that this--
8      the witness that he was interested in would say that Sam
9      Steel was on the porch talking to him during the time of the
10      shooting.  And that--and so the--that was basically the
11      theory of defense at that point, that Sam was not--he didn't
12      do the shooting.
13   Q  Mr. Clatterbuck, I'd like you to look at what's in front you
14      as Exhibit A, a list--the prosecutor's list of known
15      witnesses, dated September 19th, 2012.  Do you see that, sir?
16   A  Yes.
17   Q  Had--had you ever seen this document before?
18   A  I don't believe that I was given a copy of that by Mr.
19      Reisterer.  I--I don't recall.
20   Q  But it's your recollection he only wanted you to investigate
21      one witness?
22   A  Yeah, right.  We were--we were just focusing on the witness
23      for then, and then we were talking to the witness who was
24      gonna give me information about the witness.  So there was
25      two witnesses to talk to.

| | | |
|---|---|---|
| 1 | Q | Now at some point Mr. Reisterer was--had to bow out, |
| 2 | | correct? |
| 3 | A | Yes. |
| 4 | Q | And do you recall when that was? |
| 5 | A | I don't recall specifically, no. |
| 6 | Q | So between say November of 2012 when you were initially |
| 7 | | appointed--and you were appointed, correct, sir? |
| 8 | A | I was--he--he gave me the impression that--that I was |
| 9 | | authorized to do work on the case, that I was gonna be paid |
| 10 | | by the--the court, that I was authorized. Yeah. |
| 11 | Q | For the first few months after you began your work with Mr. |
| 12 | | Reisterer, what did you do? |
| 13 | A | I didn't do much of anything. We were kind of in a--a |
| 14 | | holding category it seemed like. |
| 15 | | I made some--I talked to--I initially talked to |
| 16 | | the woman, and then I began a process of trying to reach |
| 17 | | Jerry Davenport and I had a great difficulty trying to do |
| 18 | | that for some reason, and I don't know why. But it |
| 19 | | continued throughout the case I had difficulty reaching him. |
| 20 | Q | You say for the first few months, you didn't do much of |
| 21 | | anything. |
| 22 | A | No, not really. I-- |
| 23 | Q | And why is that? |
| 24 | A | Well it was kind of in limbo in that Reisterer was thinking |
| 25 | | that he might be taking the--the prosecutor position, and so |

```
 1        things were just up in the air.  And so I didn't get a sense
 2        of urgency from him, and so I--we were just kind of on hold.
 3    Q   How frequently were you communicating with Mike Reisterer
 4        during those initial few months?
 5    A   Infrequently, but we were communicating.  Yeah, it was
 6        infrequent but we would--we did communicate.
 7    Q   Did he give you some sort of direct instruction, don't do
 8        much of anything because we're--we're just waiting to see
 9        what's going on?
10    A   Well, yeah.  That was the general thought at the time, and I
11        don't know if he was absolutely, you know, specific don't do
12        anything, but it was.
13                We--we had actually done some things.  We--I
14        talked with Reisterer, we talked to the client.  We went
15        through the whole--the whole idea of--of--of what was going
16        on with the case.  And then I met with the client again on
17        my own and we went through additional witnesses, potential
18        witnesses, things like that.  And that's primarily all we
19        did.
20    Q   So during those first few months, as I understand it, you
21        did meet with Mr. Steel?
22    A   Yes, I did.
23    Q   Here--here in the jail?
24    A   Here at the jail.
25    Q   Okay.  How many--
```

```
 1   A    At least twice.

 2   Q    --how many times did you actually meet with Mr. Steel?

 3   A    Umm-

 4   Q    During those first few months.

 5   A    I'd have to review my notes, but at least two times.

 6   Q    Did--did--

 7   A    Possibly three times.

 8   Q    --did he give you the names of anyone to investigate?

 9   A     Yes.

10   Q    And were you able to formulate a more clear idea of what the

11        theory of the defense was?

12   A    Yeah, yes.

13             I--it--the--typically in a case, a murder case,

14        there's a--an actual theory of the defense, and the--no one

15        really addressed the theory of this defense other than the

16        fact that he didn't do it.  There was not a theory per se.

17        But as time moved on, a--a theory did emerge.

18   Q    Which was?

19   A    That--that he was not a violent person, that there were

20        other people who were aware of the fact that he did not do

21        the shooting, and that--that Walter Johnson was using this

22        opportunity to promote a situation for himself, a deal for

23        reduced time, and that it had to do with bad blood between

24        Walter Johnson and Sam Steel.

25                 THE COURT:  Can I just jump in and ask a question
```

1    real quick?  When you say a thir--a theory did emerge, are--
2    are we still talking about when Mr. Reisterer was handling
3    the defense or are we--
4              MS. OWENS:  Yes.
5              THE WITNESS:  Okay.
6              THE COURT:  Okay.  Is that your understand--
7              THE WITNESS:  No, no.
8              THE COURT:  Is that when that emerged?
9              THE WITNESS:  The--the theory did not emerge until
10   after--well the theory was embryonic at the time with Mr.
11   Reisterer.  Then it became--
12             THE COURT:  I'm sorry, you said embryonic, is
13   that--
14             THE WITNESS:  Embryonic.
15             THE COURT:  Okay.
16             THE WITNESS:  Yes.
17  Q  Now Mr. Clatterbuck, you understand that by the time of
18     trial the defense theory was that Sam was on the other side
19     of the street talking to a variety of people, who witnessed
20     him being on the other side of the street--
21  A  Yes.
22  Q  --while the actual shooter came up and shot Mr. Conklin and
23     fled away, correct?
24  A  Yes.  Correct.
25  Q  Now in your discussions with Mr. Steel in those first few

```
 1        months, did Mr. Steel give you the names of any individuals
 2        who could confirm that he was with them talking?
 3    A   Yes, he did.  Yes, he did.
 4    Q   Okay.  So he had--you had that in mind, correct?
 5    A   Yes, I did.
 6    Q   Now at some point Mr. Reisterer was removed from the case.
 7    A   Correct.
 8    Q   And your understanding of that was due to a conflict of
 9        interest?
10    A   Correct.  He took a job with the prosecutor's office here
11        in Kalamazoo County.
12    Q   Now did you understand that trial was initially set for May
13        of 2013?
14    A   I did.
15    Q   So between November of 2012 when you were appointed and May
16        of 2013, you considered the case to be hold?
17    A   It was kind of on hold because we're way--I--he had a--he
18        had a sense that he was gonna be taking this job.  We
19        didn't--I didn't know who was gonna be taking over the
20        case.  It--it's--there's no sense of an investigator going
21        off and just talking to people without having a clear
22        understanding of what this is leading to.
23    Q   That brings up--up another issue, Mr. Clatterbuck.  How do
24        you approach your investigation of various witnesses with
25        reference to an anticipated trial date, just in general.
```

|     |   |                                                                      |
| --- | - | -------------------------------------------------------------------- |
| 1   | A | Right.  I've done enough of these larger trials and cases            |
| 2   |   | to know that the most effective way to go about doing this           |
| 3   |   | type of investigation is closer to the date of the trial.           |
| 4   |   | And the problem is if you start too far out,                        |
| 5   |   | you have difficulty reaching people the second time or the          |
| 6   |   | third time, people's addresses change, their phone numbers          |
| 7   |   | change, and then there's a sense--the sense of the urgency          |
| 8   |   | of the trial allows me to have more credibility for the             |
| 9   |   | witnesses.                                                           |
| 10  |   | When it's this abstract concept months away,                        |
| 11  |   | people are less willing to participate in the process.  And         |
| 12  |   | I've learned that based on 30 years of experience.                  |
| 13  | Q | Did Mr. Reisterer tell you that--that don't worry, don't do         |
| 14  |   | much because this--                                                 |
| 15  | A | Right.                                                               |
| 16  | Q | --case is gonna be adjourned anyways?                               |
| 17  | A | Absolutely.  Absolutely.                                            |
| 18  | Q | So--                                                                |
| 19  | A | If I thought it was gonna go--I typically will always make          |
| 20  |   | the deadlines in the cases that I have.                             |
| 21  | Q | Did you feel that you were neglecting this case or falling          |
| 22  |   | down on the job by not doing anything--                             |
| 23  | A | No.                                                                 |
| 24  | Q | --between November and May?                                         |
| 25  | A | I--I did not.  I did not.                                           |

```
1           The--my rule is not to work independently to do

2      an investigation.  I'm not hired to independently

3      investigate this case.  I work with a defense attorney, and

4      my job is to make assessments of witnesses, look at what--

5      to work in--in harmony together.

6           We--we--we arrive at a theory of--of defense,

7      and then we analyze the witnesses--witnesses once I've gone

8      through the report and looked at all of the factors, and

9      that once the attorney has looked at all of the factors,

10     and then we pool those--that group of witness (phonetic)

11     together, and then we make decisions who is the most

12     important, who--you know, and we kind of rate their--their

13     importance, and those are the people I go to talk to.

14           With a witness list, a government witness list

15     like this with--with--you know, gee whiz, you know,

16     approaching, you know like a 100 people, you cannot talk to

17     everyone.

18           This case being a--an appointed case, was

19     authorized for 60 hours.  A retained case would probably be

20     about triple that in terms of the hours.  So I have to pick

21     and choose how I use my time.

22  Q  Stop right there.  First of all, did you in fact receive a

23     of the police reports in this case?

24  A  Late in the game I got a copy of the police reports once

25     Mr. Champion's office took over.
```

| | |
|---|---|
| 1 | Q And we'll discuss that in a few, but just in general, Mr. |
| 2 | Clatterbuck, do you feel that your performance in this |
| 3 | case, your investigation was in any way hampered by the |
| 4 | fact that you were approved only for 60 hours-worth of |
| 5 | work? |
| 6 | A Yes. I think that at 60 hours, though it seems like a lot |
| 7 | of hours, when you consider the amount of hours the law |
| 8 | enforcement and the prosecution put into this case, 60 |
| 9 | hours is laughable in terms of the--the amount of time. |
| 10 | Q You would consider this to be a major case, a major |
| 11 | investigation. |
| 12 | A It's a major case. It's--there's a lot at stake. There |
| 13 | were cases within cases in this case. There was a lot of |
| 14 | information to digest. |
| 15 | Q At some point, Mr. Clatterbuck, you learned that Bob |
| 16 | Champion was going to be taking over the defense. |
| 17 | A Correct. |
| 18 | Q And you were still on the case as an investigator? |
| 19 | A Correct. |
| 20 | Q When did you first speak to Mr. Champion about this case? |
| 21 | (The witness looks at his notes) |
| 22 | A Well I--I may have talked to him on the phone; it's prior |
| 23 | to any official meeting. You know, he may have said that |
| 24 | he was doing this, that he was taking over, and so. |
| 25 | Q If I tell you that Mr. Champion was appointed approximately |

```
 1        May--
 2   A    Yeah, some--
 3   Q    --of 2013, does that ring a bell?
 4   A    Yes.  Sometime in May I would have talked to him.
 5   Q    When did you first meet with him?
 6   A    I met with him--I had a--in June I had an actual meeting
 7        with him, and I--I think it might have been mid-June--mid-
 8        May, excuse me.
 9   Q    Have--had the theory of the defense evolved a little bit
10        more by that time?
11   A    No.  We never really discussed that.  We never really--we--
12        we talked about talking to witnesses, and--and I was just
13        going through a list of--of people who Sam Steele had
14        provided.
15   Q    And Sam provided a list of people to contact, correct?
16   A    Yes, yes.
17   Q    And--
18   A    And--and I met with the--the--the family.
19   Q    Did--did Sam ever say well look, I was on the other side of
20        the street, contact A, B, C, and D cause they all saw me
21        there?
22   A    Right.  Right, right.
23   Q    Now did Bob give you--Bob Champion, that is--any indication
24        that the case was gonna be adjourned?
25   A    Well yeah.  We had talked about the fact that we need an
```

| | |
|---|---|
| 1 | adjournment, and that there was just so much--so much |
| 2 | material and so much information. And I--I--I just said I- |
| 3 | -I just don't see how this can go to trial right now |
| 4 | because there's so many pieces to this puzzle that haven't |
| 5 | been, you know, figured out yet. |
| 6 | And so I was under the--the assumption that given |
| 7 | the magnitude of the--the case that we would--it--it--that |
| 8 | an adjournment would make perfect logical sense. Had--had |
| 9 | I been asked, I would have said professionally based on my- |
| 10 | -my years of experience that we me--need more time. |
| 11 | Q   What did-- |
| 12 | THE COURT: Counsel, I need to know timelines |
| 13 | here. I don't know whether you're talking about requesting |
| 14 | an adjournment before it actually went to trial, when your |
| 15 | first--when he first met with Mr. Champion. I--I don't |
| 16 | know when these discussions took place. |
| 17 | MS. OWENS: Okay. Thank-- |
| 18 | THE COURT: And I think that that's kind of |
| 19 | critical here too. |
| 20 | MS. OWENS: I agree, your Honor. |
| 21 | THE COURT: So I need--and I know he also--let me |
| 22 | just ask you, Mr. Clatterbuck, you said you met with the |
| 23 | family. When was it that you met with the family? Do you |
| 24 | know approximately? |
| 25 | THE WITNESS: Yes. That would have been in 2012, |

```
 1          with Florence Wilbon and--
 2                  THE COURT:  So Mr. Reisterer would have been the
 3          attorney--
 4                  THE WITNESS:  Yes, yes.
 5                  THE COURT:  --when you met with the family?
 6                  THE WITNESS:  Yes.
 7                  THE COURT:  So just so I'm clear then, when Mr.
 8          Reisterer first contacted you about the case, I think you
 9          said you met with Mr. Reisterer and Mr. Steel at one point,
10          Mr. Steel alone at one point--
11                  THE WITNESS:  Yes.  Yes.
12                  THE COURT:  --and you also met with the family at
13          that--
14                  THE WITNESS:  Yes, yes.
15                  THE COURT:  Okay.
16                  THE WITNESS:  Yes.
17                  THE COURT:  You did not get the police reports--
18                  THE WITNESS:  No.
19                  THE COURT:  Until Mr. Champion--
20                  THE WITNESS:  That's correct.
21                  THE COURT:  --came on board, is that correct?
22                  THE WITNESS:  Correct, correct.
23                  THE COURT:   All right.  Let me also indicate for
24          the record, just so we have a timeline here, I am showing
25          that the initial motion for expenses was filed by Mr.
```

1    Reisterer on October 18, 2012.

2              The motion outlined the rate that Mr. Clatterbuck

3    had apparently agreed upon, and it also requested approval

4    of up to 60 hours of investigation by Carl Clatterbuck.  So

5    that was the motion and a request made in the motion.

6              The Court entered the order, an ex parte order

7    for expenses, on November 2nd, 2012, granting up to 60 hours

8    as requested.

9              I'm looking back to I believe--just so we're

10   clear--there may have been additional--without going back

11   through the order, I don't--or the file, I don't recall

12   specifically--and maybe you do, Mr. Clatterbuck, did the

13   Court end up authorizing more time then or a payment over

14   and above the 60 hours?

15             THE WITNESS:  At the end.

16             THE COURT:  Okay.

17             THE WITNESS:  At the end.

18             THE COURT:  And I think that--

19             THE WITNESS:  As we went over.

20             THE COURT:  All right.  Do you--

21             THE WITNESS:  We went over.

22             THE COURT:  Do you recall how many hours you put

23   in?

24             THE WITNESS:  I put in--

25             THE COURT:  And--and I'm sure I have an order in

1    here then too.

2              THE WITNESS:  Yes.  I--I put in 75 hours.

3              THE COURT:  Okay.  And that was approved?

4              THE WITNESS:  Well it--I--it was not approved in

5    its entirety.

6              THE COURT:  Okay.

7              THE WITNESS:  It was--I discounted by about ten

8    hours.

9              THE COURT:  Okay.  All right.

10             THE WITNESS:  And so I ended up discounting about

11   ten hours.

12             THE COURT:  And let me just indicate for the

13   record again then, so was there some--were you contacted

14   then by the court administrator, was there--

15             THE WITNESS:  Deanna.

16             THE COURT:  DeVona Jones?

17             THE WITNESS:  DeVona.  DeVona Jones.

18             THE COURT:  Okay.  At the time.  All right.

19             And then was there discussion about--

20             THE WITNESS:  The--

21             THE COURT:  --or some agreement then with regards

22   to the number hour--hours there was?

23             THE WITNESS:  There--there were--there was.

24             THE COURT:  Okay.

25             THE WITNESS:  In fact, I presented my bill and as

1          I got toward--I knew that I was getting close to being over

2          the bill, and I told the attorney--and this was the

3          assistant attorney Susan Prentice-Sao--

4                    THE COURT:  Okay.

5                    THE WITNESS:  That I was over the--my--I was

6          getting close to being over my allotted hours, and she said

7          no problem, that the funds were available to proceed.  And

8          I said well typically there's a hearing or something for

9          additional funds, and she said, "No, all I'll do is file an

10         ex parte order.  It won't be a problem."  And then

11         apparently it was a problem.

12                   THE COURT:   Okay.  Go ahead.

13                   Thank you.

14    Q    Taking this--

15                   THE COURT:  Now I think--and--and so then just so

16         we're clear, I just--I still need clarification on when you

17         were talking about the adjournment.  Is that in May or was

18         that when the trial actually went, or what timeframe are

19         talking about?

20                   THE WITNESS:  The--yeah--the adjournment is after

21         Champion's office got involved.

22                   MS. OWENS:  And your Honor, I'm going to make

23         that very specific.  Thank you very much.

24                   THE COURT:  Thank you.

25                   All right, go ahead.

1    MS. OWENS:  And I'll trying to be more attentive

2        to that too.

3    Q    Mr. Clatterbuck, you're aware that in mid-May, May 13,

4        2013, Mr. Champion filed a motion to adjourn the trial?

5    A    I--I am.

6    Q    And that would be Exhibit D among the documents that I gave

7        you this morning?

8    A    Yes.  And I--I just saw these today in terms of--you know,

9        I didn't really--

10   Q    Had you had a discussion with Mr. Champion at approximately

11       that time, mid-May of 2013--

12   A    Yes.

13   Q    --about the necessity for an adjournment?

14   A    I said that--we talked about the nature of an adjournment.

15       I said, you know, there's so much information here, we need

16       an adjournment.  I said I don't know how to do this in--in

17       time for this trial.  There's so much--so many pieces.

18   Q    And at that point the trial was still set for May of 2013.

19   A    Correct.  Correct.

20   Q    Okay.  Now with reference to May 2013, Mr. Champion says

21       that you were never provided with copies of the police

22       report.  So I'm gonna be going over these items.

23   A    Okay.

24   Q    Did you have the police report as of May 2013?

25   A    I remember getting a copy of the police report from

| 1 | | Champion's office, and it might have been the first time |
| 2 | | that we met in person. I don't think I got a copy of it |
| 3 | | prior to that time. It may have--and--and I don't have an |
| 4 | | independent recollection of when I got a copy of that |
| 5 | | report. |
| 6 | Q | So up until May, you did not have a copy of the report. |
| 7 | A | No. No. |
| 8 | Q | And you understand, Mr. Clatterbuck, that the police report |
| 9 | | is pretty voluminous. |
| 10 | A | It's--it was a huge report, yeah. |
| 11 | Q | Mr. Champion says that you had--were not authorized to |
| 12 | | begin investigating the case or interviewing witnesses. So |
| 13 | | as of May 2013, did you believe that you were not yet |
| 14 | | authorized to begin investigating the case or interviewing |
| 15 | | witnesses? |
| 16 | A | I--prior to Mr. Champion taking over the case, I was not |
| 17 | | doing an aggressive investigation, correct. I was in the |
| 18 | | holding category. |
| 19 | Q | So is--is Mr. Champion essentially correct when he says |
| 20 | | that no investigation has taken place? |
| 21 | A | He is not correct in making that statement, no. |
| 22 | Q | Okay. Do you--did you have enough contact information in |
| 23 | | order to subpoena witnesses? |
| 24 | A | That's a whole other issue and I'd like to mention that. |
| 25 | | Typically, if--if I provide witnesses to be |

```
 1        Subpoenaed, I don't always provide--I don't have--I don't

 2        have good addresses for them.  Typically that is done with

 3        working with a process server at the time we decide who it

 4        is we're going to get the subpoenas out to.

 5               I mean we determine who we're gonna subpoena.

 6        Then we--at that point is when we get the addresses.  We

 7        don't get addresses when we have just a bunch of names.  It

 8        doesn't make any sense.

 9    Q   Let me ask you this, Mr. Clatterbuck.  Sam--you talked to

10        Sam Steel, and he said contact A, B, C, and D, they can

11        say--they can tell you, corroborate that I was not the

12        shooter.

13    A   Yeah.

14    Q   And you go out and talk to 'em, right?

15    A   Mmm-hmm.

16    Q   How do you find them?

17    A   Well--

18    Q   I mean you have some way of contacting them?

19    A   --well then I contact family members, I contact sources I

20        have in the community.  I have databases that I use and in-

21        -but sometimes I contact them on the phone, sometimes I

22        contact 'em in person.  It--it's all, you know, it all

23        varies, you know.

24               But generally speaking we--the--the addresses

25        change so frequently and the contact information changes so
```

1    frequently that having one address does not necessarily
2    mean that it--it's good.  And so we have to get a--a real
3    address.  We have to get something that--I don't know how
4    to say it.  We need to get the most current address and it
5    takes kind of being on the street to do that.
6  Q  Looking at paragraph 9 of his ex parte motion made in May
7    2013, Bob Champion says be contacted you at least six times
8    to follow up on the investigative process and obtain a
9    witness list and request a report.  By May 13 of 2013, had
10   he contacted you at least six times?
11 A  I don't know.  I know that his--his associate was calling
12   me, and saying that--that--you know, where are we on this
13   whole--whole deal, and I would say well, you know, this is-
14   -I kind of give him an update.
15          I can tell you what I did in that period of time,
16   you know.
17 Q  Sure.
18 A  That in I prepared a witness list by the way on April 25th
19   of 2013.
20 Q  And these were people that you had already contacted.
21 A  That--these are the--well those are people who were given
22   to me by Sam or given to me by--or that I had, you know,
23   developed on my own, and I may or may not have.  It was a
24   proposed witness list, you know, and so that was--
25 Q  And you gave that to Bob?

| | | |
|---|---|---|
| 1 | A | Yes, on 4-25 of '13, and I would have emailed that to him. |
| 2 | Q | In paragraph 10, Mr. Champion says the investigator did not |
| 3 | | follow through and interview or investigate any of these |
| 4 | | witnesses, presumably the witnesses that you had given him |
| 5 | | on the preliminary witness list, right? Is that true? |
| 6 | A | Well I had talked to a variety of these people, |
| 7 | | specifically Marcus Pierce and Valencia Moore, Sam's |
| 8 | | daughter, Renee Whitfield. Again, and attempts to reach |
| 9 | | Howard Hughes, attempts to reach Katherine Cartwright, and |
| 10 | | attempts to reach Jerry Davenport, all of that had been |
| 11 | | done prior to--you know, that's--that's what involved my |
| 12 | | witness list. |
| 13 | Q | That's before May of 2013, right? |
| 14 | A | Yes, yes, before May. |
| 15 | Q | When in your mind you're still on sort of a holding |
| 16 | | pattern-- |
| 17 | A | Yes, correct. |
| 18 | Q | --cause we don't know what Reisterer is gonna do. |
| 19 | A | Right, right. |
| 20 | | So I--I gave him the witness list and I caught |
| 21 | | him up with what I had done. |
| 22 | Q | So it's--it's not completely true when Mr. Champion says |
| 23 | | you did not follow through and interview or investigate any |
| 24 | | of these witnesses? |
| 25 | A | No, that would be inaccurate because I did interview some |

1    of these witnesses.  And specifically with Marcus Pierce, I
2    felt we had a very solid, good witness.
3              THE COURT:  I'm sorry, counsel, what paragraph
4    were you just addressing?
5              MS. OWENS:  I was addressing--this is in Exhibit
6    D, paragraph--
7              THE COURT:  I thought you said 12, but I'm not
8    seeing that in 12.
9              MS. OWENS:  Paragraph 10, the last sentence, your
10   Honor.
11             THE COURT:  Okay.
12             MS. OWENS:  Is it there?
13             THE COURT:  Yeah.  It says the investigator did
14   not follow through and interview or investigate any these
15   witnesses.
16             MS. OWENS:  This is with regard to his
17   preliminary witness list.
18   Q    Now hold on, Mr. Clatterbuck.
19   A    Surely.
20   Q    Did--did Bob ever tell you that he was gonna claim that you
21        were sort of falling down on the job and not doing
22        anything?
23   A    No.  No.  We--in fact, he--he told me that--well he was
24        kind of desperate for this adjournment and he threw me
25        under the bus, you know--

| | | |
|---|---|---|
| 1 | Q | Is that--are those his terms? |
| 2 | A | Those--those were his words, that he threw me under the |
| 3 | | bus, yeah.  And he said, "I'm sorry to have to throw you |
| 4 | | under the bus." |
| 5 | | But because we had had conversations about the |
| 6 | | fact that I felt an adjournment was--was necessary and he |
| 7 | | felt an adjournment was necessary, and I--I-- kind of puts |
| 8 | | the target up here on my-- |
| 9 | Q | Did--did he make any comments about whether he believed he |
| 10 | | was--the court was gonna grant an adjournment of the trial? |
| 11 | A | He was actually nervous about getting an adjournment.  He-- |
| 12 | | he thought that he may not get it. |
| 13 | | And so I was--I was under the impression that |
| 14 | | if worse came to worse, we had Marcus Pierce and I felt |
| 15 | | really strong about that, and I had every reason in the |
| 16 | | world to believe that Jerry Davenport, if he could be made |
| 17 | | available, you know, would be a strong witness. |
| 18 | | And so I--I wasn't comfortable with that, but it |
| 19 | | was--I felt--I felt like we had--we had some reasonable |
| 20 | | doubt at that point.  This is before the adjournment. |
| 21 | Q | So this is still in May. |
| 22 | A | Mmm-hmm. |
| 23 | Q | And you had developed Marcus Pierce as a witness. |
| 24 | A | Mmm-hmm.  Yes. |
| 25 | Q | And what was your understanding of what Marcus Pierce was |

```
 1        going to testify?

 2   A    Was that Sam wasn't there.

 3   Q    So you had developed at least one solid alibi.

 4   A    Yes.  Yes.  Absolutely.

 5   Q    Okay.

 6   A    Yes.

 7   Q    Now and so according to your understanding, Mr. Champion

 8        said he had to make you a sacrificial lamb in order to get

 9        an adjournment from the court?

10   A    That was my understanding, yes.

11   Q    And claimed that you had just been a lazy bum and not done

12        anything?

13   A    That was my impression, and it irritated me, and I had a

14        bad feeling about Mr. Champion as a result of that because

15        I knew that he knew the circumstances.

16   Q    Now going to Exhibit F, which you have in front of you, Mr.

17        Clatterbuck, just flip a few pages, ex parte motion for a

18        new investigator, do you see that?

19   A    Yes.

20   Q    Okay.  Did Mr. Champion tell you he was gonna be filing a

21        motion for a new investigator?

22   A    He never indicated that, no.

23   Q    Were you having personal difficulties with him?

24   A    We had some difficulties in terms of the way that he runs a

25        preparation for a major case, yes.
```

1  Q  How so?

2  A  Typically the way that I do this, based on years of

3     experience, is that we come up with a theory of defense,

4     we--the investigator and the attorney or attorneys provide

5     names of people who will move that forward, and we target

6     and we rate those people in terms of a level of importance,

7     and then I go out and talk to them.  I have a clear,

8     concise focus of why I'm talking to this person.  I'm just

9     not randomly talking to individuals.

10         In a--in a case like an appointed case like this,

11    you have to use your time wisely.  I can't talk to a

12    hundred people.  It's impossible for me to do that from a

13    financial and time standpoint.

14         But we did not have that kind of dialogue.  It

15    was--he kept saying, "Okay, give me the witnesses, give me

16    the witnesses."  And, you know, I said, "Well, you know, I

17    don't--I don't know.  I gave you the witnesses, you know,

18    the ones that I'm aware of."

19  Q  Well let me ask you this, Mr. Clatterbuck, stop right

20     there.  Are you saying that at no point between May of 2013

21     and October of 2013, the trial date, were you able to sit

22     down with Mr. Champion and prepare and analyze which of the

23     witnesses would be most critical?

24  A  I--I talked to his--his assistant Susan Prentice-Sao about-

25     -as--as the investigation unfolded what people were saying,

1     and we--but I would just give them ideas of how the
2     investigation was going.  I would tell, you know, a summary
3     of what was happening with the witnesses.
4              But we never came up with--you know, maybe--we
5     both'd been doing this for quite some time.  Maybe the
6     theory, it was obvious in his mind, and it--it needs to be
7     more concrete in my mind.
8  Q  As I understand it, you're saying that most of your contact
9     during let's say the six months between May and October
10    was--
11 A  Yes.
12 Q  --with Susan Prentice-Sao?
13 A  Correct.
14 Q  Did you have any person-to-person sit-downs with Bob
15    Champion during this time?
16 A  Once or twice.
17 Q  Okay.  Were you ever able to--during the six months that
18    Bob took over the case--have a sit-down and--and so-called
19    weight the witnesses and decide who was gonna be most
20    important and who would be less important?
21 A  Not--not the way that I would typically prepare a case, no.
22 Q  Okay.  Now going back to Exhibit F, the ex parte motion for
23    a new investigator, starting with paragraph 7.  This is a
24    motion that was filed in May of 2013.  Mr. Champion again
25    says that you were never provided with copies of the police

1    report nor authorized to begin investigating the case.

2              Now as I understand it, you first got copies of

3    the police report through Mr. Reisterer, or did I

4    misunderstand that?

5  A  No.  Excuse me, let's make that clear.  I think that Mr.

6    Reisterer gave me a copy of a prelim.  Would that have

7    been--would that--I don't know.  I--he gave me a copy of--

8    of maybe a prelim, I'm not sure.  I don't recall.  But it--

9    it kind of like had just the basic nuts and bolts of what

10   had taken place.

11             I never got the copy of the police report in its

12   entirety until Mr. Champion was appointed.

13 Q  Looking at paragraph 11, Mr. Clatterbuck, Bob Champion says

14   he needed a new investigator because you weren't doing your

15   job, right?

16 A  I--I read that and I hear what you--you said, and I feel as

17   if--I don't know what else I would have been doing up to

18   that point.  I--I felt very comfortable with my efforts to

19   that point.

20             I felt we needed more time to do this

21   investigation.

22 Q  But Mr. Champion had indicated to you that he was gonna be

23   filing this motion in order to get the judge to grant an

24   adjournment?

25 A  He--yes.  He--he never told me that he didn't want me to

| | |
|---|---|
| 1 | work on the case. In fact, he--he--he wanted me to do some |
| 2 | other work for some other cases of his during the same |
| 3 | time. |
| 4 | Q So he never indicated to you that he was dissatisfied with |
| 5 | your work? |
| 6 | A No. I never had--I never got that impression. Never, not |
| 7 | one time throughout this whole process I never got this-- |
| 8 | that impression whatsoever. |
| 9 | Q Mr.--Mr. Clatterbuck, you learned that in fact the judge |
| 10 | did grant an adjournment, correct? |
| 11 | A Correct. |
| 12 | Q And as I understand it, the trial date was set over to |
| 13 | October of 2013. |
| 14 | A Correct. |
| 15 | Q Now between May of 2013 and October of 2013-- |
| 16 | (Sidebar conversation between Mr. Cusick and Ms. |
| 17 | Owens) |
| 18 | Q He corrects me. |
| 19 | A Yeah. |
| 20 | Q I guess it was August. Between--in any event, between the |
| 21 | May-- |
| 22 | A Yeah. |
| 23 | Q --of 2013 and the trial date, how did you--how did your |
| 24 | duties with regard to investigating this case change, if at |
| 25 | all? |

| | | |
|---|---|---|
| 1 | A | At that point I began an aggressive investigation of the |
| 2 | | case, talking to witnesses, developing leads, developing |
| 3 | | addresses, and--and--and that part of--in this part of the |
| 4 | | investigation I talked to at least 17 witnesses all over |
| 5 | | the state, many in--like three or four of them in various |
| 6 | | institutions around the state. |
| 7 | Q | You'd go to the--to the prisons to visit people or jails? |
| 8 | A | Correct. Yeah, prisons or jails. |
| 9 | Q | So it's fair to state that in your mind the case was no |
| 10 | | longer on hold. |
| 11 | A | The case was no longer on hold. It was being actively, |
| 12 | | aggressively investigated, and I felt that we were |
| 13 | | developing very good, solid witnesses for the defense. |
| 14 | Q | After May of 2013, how many hours would you say that you |
| 15 | | would spend in a typical week investigating on Sam Steel's |
| 16 | | case? |
| 17 | A | Ten. |
| 18 | Q | Okay. |
| 19 | A | You know, I--I spend much more time doing the investigation |
| 20 | | than my bills reflect |
| 21 | Q | Okay. During this period of time, May to trial, did Mr. |
| 22 | | Champion ever indicate that he was dissatisfied with your |
| 23 | | work, that you were being lazy, negligent, falling down on |
| 24 | | the job, not aggressive enough? |
| 25 | A | I never got that impression whatsoever. In fact, it--it-- |

1    it seemed like he was pleased.  I--I--typically people are
        2    not displeased with my work product.
        3  Q  Now you mentioned that you had developed the name Marcus
        4    Pierce during Mike Reisterer's tenure as defense chief--
        5    defense attorney.  After Bob Champion came on, were you
        6    able to develop some additional defense witnesses?
        7  A  Yes, I did.
        8  Q  Do you recall their names?
        9  A  Yes.  I can just go through a list.
       10  Q  Just go through a list.
       11  A  Yeah.  And we want after May?
       12  Q  After May.
       13  A  After May.  Okay.
       14        Howard Hughes--these are not people--these are--
       15    do you want people I contacted or people who I attempted to
       16    contact or solid witnesses?
       17  Q  Well I don't want you to just read me a list of names and
       18    that probably was a poor question.
       19        You're aware, Mr. Clatterbuck, that ultimately
       20    there were six or seven alibi witnesses that testified for
       21    Mr. Steel at trial?
       22  A  Yes.  Okay.
       23  Q  Were these people that you had reached or contacted?
       24  A  Yes.  Yes.
       25  Q  After May of 2013?

```
1    A    Yes, absolutely.  Yes.

2    Q    Okay.

3    A    I can give you a list of those people if that would be of

4         value to you today.

5    Q    If you can do it real quick.

6    A    Yeah, quickly.

7                   James Morgan, Lee Logan, Tommy Morgan, Charles

8         Thomas, Kamesha Miles, Michael O'Kelly, Richard Smith, Ken

9         Newell, Antonio Williams, and Jerry Davenport, who I hadn't

10        talked to specifically until after May.

11   Q    Mr. Clatterbuck, are you aware that Mr. Champion filed

12        several witness lists?

13   A    I'm--yes.

14   Q    Okay.  Did he provide copies of those to you?

15   A    Yes.

16   Q    Now are you aware that he listed a gentleman by the name of

17        Paul Pratt on the witness list?

18   A    Yes.

19   Q    And did you have any idea what importance Mr. Pratt had for

20        the defense?

21   A    No, I did not.  And--no.

22   Q    I take it some of the names on the witness list were names

23        that Mr. Champion developed himself.

24   A    Yes, he did.  Yes.

25   Q    How does that work?  I mean you give him some names and
```

```
 1         then he comes up with his own?

 2   A     And then--yes.  And he incorporates some of his own,

 3         correct.

 4   Q     So the fact that someone is on a witness list, a defense

 5         witness list, doesn't mean that they were developed by you?

 6   A     No, and it doesn't mean that they'll be used and it doesn't

 7         mean anything ultimately.

 8   Q     Okay.  Did--did anyone ever ask you to contact Mr. Paul

 9         Pratt?

10   A     No one said specifically go see, locate Paul Pratt.  He's a

11         incredible witness, go see him.  Typically that's what

12         would happen if--especially at the time of trial or prior

13         to trial, just prior to trial.  In last minute

14         preparations, if there's a important witness, I'm always

15         advised to go talk to that witness, and no one said locate

16         Paul Pratt or do anything.

17   Q     So no one even brought it to your--to your attention.

18   A     No.

19   Q     How about a gentleman by the name of Jacob Blett?

20   A     No.  No.

21   Q     Is your practice to do written reports for the attorneys

22         that you work with?

23   A     Not necessarily.  In major capital crime trial preps, I

24         typically will meet with the attorney and provide oral

25         reports.
```

1   Q   Is that at the request of the lawyer?

2   A   Some lawyers request that.  It's been a habit and custom of

3       mine for, you know, 20 years.

4   Q   And Mr. Champion apparently didn't request written reports.

5   A   Well he--I--I told him that I typically don't produce

6       written reports.  And then my understanding was during some

7       hearing in court that it was requested by the judge or

8       there was some kind of agreement that reports would be

9       prepared, and so I provided summaries of the testimony of

10      witnesses.

11  Q   Mr. Clatterbuck, by the time of trial, summer of 2013, do

12      you feel that you had done enough work as far as

13      investigating and assisting Mr. Champion in getting ready

14      for trial?

15  A   Yes, I do.  And I--I felt at the time of trial we had some

16      very strong witnesses, and we had, I thought, some of the

17      best witnesses for the fact that he wasn't there.  I felt

18      very comfortable going into that trial with the people we

19      had.  I--I really did.

20              I tend to get really nervous at the end of a

21      trial and I always think there's more, always more to do,

22      and at this point I didn't have any indication that there

23      was more to do.  No one said oh, go talk to this person.

24              I will talk to anybody who anyone suggests that I

25      talk to.  I talk to people who I think are important, but I

1     rely on others to, you know, to--you know, if someone has a
2     name that they've heard about from some other source, then
3     by all means, I'm always willing to go do whatever I have
4     to do to talk to that person before the date of a trial.
5   Q  Okay.  I have nothing else.  Thank you, Mr. Clatterbuck.
6     Mr. Cusick has some questions.
7            THE COURT:  Mr. Cusick.
8            MR. CUSICK:  Your Honor, just for the record,
9     Detective Brian Beauchamp is present.  I'd ask that he be
10    allowed to sit at counsel table.
11                       CROSS-EXAMINATION
12  BY MR. CUSICK:
13  Q  Good morning.
14  A  Good morning.
15  Q  So you came out on the case, Mr. Clatterbuck, in August of
16    2012, is that correct?
17  A  Yeah--well my understanding--no.  It was in November of
18    2012.
19  Q  That's right.  November of 2012.  And that's when Mr.
20    Reisterer was still the defense attorney on the case,
21    correct?
22  A  Correct.
23  Q  And you had occasion to meet with Mr. Steel's family--
24  A  Yes.
25  Q  --around that time, correct?

```
1    A    Yes.  Yes.

2    Q    And you had occasion to meet with Mr. Steel, correct?

3    A    Yes.

4    Q    You also indicated that you met with Jerry Davenport?

5    A    Not prior--I attempted to meet with Jerry Davenport--

6    Q    Okay.

7    A    --prior to Mr. Champion's taking over, but I was never able

8         to reach--reach him.  I think I talked to him on the phone

9         a couple times.

10   Q    Okay.  And you were not given all the reports until May?

11   A    Correct.

12   Q    Did you ask Mr. Reisterer, I'm an investigator that's been

13        appointed, I would like to have all of the reports in the

14        case.

15   A    Since we were in this holding category, I--I--I was just

16        kind of in holding category, you know.  And I was just

17        waiting to know--to find out who was gonna take over the

18        case to start up the investigation.

19             THE COURT:  Counsel, will you approach a moment.

20             (At 10:27 a.m., bench conference begins between

21        the Court and counsel)

22             THE COURT:  I have not gone through the records

23        to see or the transcripts like you have, and I don't know

24        what is on the record, but I know we also had discussions

25        in chambers.
```

```
1          I was very upset with Reisterer because it was
2     very clear to me he was trying to get off this case and
3     delaying, and delaying, and delaying.  When we had the
4     motions also--and--and I--I knew, I got the impression he
5     was not working on this case.

6          There was an election in November and we got a
7     new prosecuting attorney.  He worked hard on that campaign.
8     I think he fully expected to go to the prosecuting
9     attorney's office.

10         So I don't know if this is on the record or not.
11    I'm guessing it happened in chambers.

12         MS. OWENS:  Mmm-hmm.

13         THE COURT:  There were two cases that he was
14    sitting on that I felt he was delaying, and I made him try
15    one and I said look, you're here, you've done all the prep
16    work, these cases need to get moving, they need to get
17    tried.  We tried the other case and then I know that there
18    were delays in this case.

19         I know that Champion was very upset when he first
20    got this case because he couldn't get the information from
21    Reisterer.  In fact, he was very upset Mr. Clatterbuck was
22    never provided with the police reports on this case.

23         And I think this is part of the discussion of why
24    nothing was done because I--the impression I had is that
25    Reisterer just never gave them to do anything.
```

1          MS. OWENS:  Yeah, that's that what he said.
2     Yeah.
3          MR. CUSICK:  Mmm-hmm.
4          THE COURT:  It's also my understanding that he
5     was working very heavily on another murder case that we had
6     going on here too.
7          And my discussions--and again, I don't know if
8     this is on the record or if it was in chambers.
9          Of course then when Reisterer went to the office,
10    then we have another delay because we're waiting for
11    somebody else to get appointed on the case, so there's
12    another two months there where nothing's going on in the
13    case--
14         MS. OWENS:  Mmm-hmm.
15         THE COURT:  --because we're waiting for Cusick--
16    somebody from the office to get appointed.
17         MR. CUSICK:  Mmm-hmm.
18         THE COURT:  So my--again, by history--and again,
19    I don't know if this is on the record or if this is in
20    chambers--I was very frustrated with Reisterer's lack of
21    movement on this case.
22         And by the time Champion got involved then, I
23    think he felt he kind of needed to start from scratch with
24    providing information and the police reports to him.
25         And there wasn't--my recollection is the reason

the motion for the new investigator was appointed, per our
discussions, was because he was heavily involved in this
other murder case, not him.  It was going to trial, it was
moving, and it was a big case also, and he just simply
didn't have the time if we were going to continue to have
the date that we had.

        MS. OWENS:  Oh I--I understand that, your Honor.

        THE COURT:  So--

        MS. OWENS:  I mean you may want to ask him a few
questions just to clarify that.

        THE COURT:  Yeah.  I don't--but I just--I don't
know if the record is clear with regards to that or if that
was--those were discussions in chambers.

        MR. CUSICK:  Mmm.

        THE COURT:  But I never got the impression that
he was lacking on this case.

        MS. OWENS:  No, he wasn't.

        THE COURT:  It was another case that he was
heavily involved in, and Mr. Reisterer had delayed and
basically not given him information--

        MS. OWENS:  Yeah.

        THE COURT:  --not asked him to do anything, not
really done a lot by the time Champion's involved.

        So I think--and that was what I was being told,
whether it's on the record or behind the scenes, about why

```
1        there was a delay in doing some work on this case.
2                MS. OWENS:  Your Honor, that's what he told me
3        this morning, and so I wanted to give him the opportunity
4        to explain that--
5                THE COURT:  Okay.
6                MS. OWENS:  --on the record.  And if you don't
7        think that I made it clear, then by all means clarify.
8                THE COURT:  Well I think--
9                MS. OWENS:  But you know, it's just that when he-
10       -when Champion filed those motions saying I'm not ready and
11       my investigator's slacking off, I gotta--
12               THE COURT:  I didn't--
13               MS. OWENS:  --I gotta clarify it.
14               THE COURT:  Yeah.  And I didn't get the record.
15       I think that there may have been some in-chambers
16       discussion then about why he wouldn't have been ready.
17               MS. OWENS:  Yeah.
18               THE COURT:  Not because of his own fault or his
19       slacking.
20               MR. CUSICK:  Right.
21               MS. OWENS:  No.
22               THE COURT:  But because of--
23               MR. CUSICK:  Okay.
24               THE COURT:  --this other case and because of--
25               MR. CUSICK:  Okay.
```

1          THE COURT:  --a lack of providing documentation
2     by the former attorney.
3          I was not happy with Reisterer's handling of this
4     case--
5          MS. OWENS:  Mmm-hmm.
6          THE COURT:  --because I think it was very clear
7     for about three or four months he was doing everything he
8     could to not work on the case--
9          MR. CUSICK:  Mmm-hmm.
10         THE COURT:  --and delay because he was fully
11    expecting--he was going through the interview process and
12    so forth--
13         MS. OWENS:  Okay.
14         THE COURT:  --with the prosecuting attorney's
15    office, and I didn't feel he was working on the case.
16         So then when Champion got involved, I think he
17    was scrambling because he didn't know what the Court was
18    going to do.  I had an adjournment at that point.
19         But I don't know if that is clear from the record
20    but those were our discussions in chambers and I think you
21    needed to know that.
22         MS. OWENS:  You--you know what I would appreciate
23    then, your Honor, if that is the case, I would like you to
24    put that on the record.
25         THE COURT:  Well it's on the record now.

1           MS. OWENS:  Okay.

2           THE COURT:  And I can certainly--

3           MR. CUSICK:  Okay.

4           THE COURT:  --indicate and ask him.

5           MS. OWENS:  Okay.

6           THE COURT:  And I know from what was going on at

7     this time that we did have the other trial going on, and I

8     fully expected to give some additional time, and I didn't

9     want to get another investigator on the case because

10    obviously he had done some stuff on this case.

11          MR. CUSICK:  Right.

12          THE COURT:  And--but yeah.

13          MR. CUSICK:  Okay.

14          THE COURT:  I can certainly do that now--

15          MS. OWENS:  Okay.

16          THE COURT:  --if you want me to.

17          MR. CUSICK:  Yeah, that's fine.

18          MS. OWENS:  I would like you to.

19          THE COURT:  Again or--yeah.  Because I don't

20    know--I have--I don't have the transcripts at this point.

21    I don't know if--what's on the record and what's off--

22    what's not on the record.

23          MS. OWENS:  And I don't remember from the

24    transcripts whether or not that--that may have been in a

25    motion hearing transcript or what.  I didn't read through

1    the motion hearing transcripts.

2            THE COURT:  Or if it was just simply a discussion

3    in chambers.

4            MR. CUSICK:  Mmm-hmm.

5            THE COURT:  And then we--

6            MS. OWENS:  But I think--I do think we need to

7    make it clear on the record--

8            THE COURT:  Yeah.

9            MS. OWENS:  --for the Court of Appeals.

10           THE COURT:  Yeah, I can do that too.

11           MS. OWENS:  Okay.

12           MR. CUSICK:  Yeah.

13           THE COURT:  So all right.

14           MS. OWENS:  Thank you.

15           MR. CUSICK:  Thanks.

16           THE COURT:  All right.

17           (At 10:34 a.m., bench conference ends)

18           THE COURT:  Okay.  So we just had a discussion,

19   which should be recorded as a bench conference here because

20   of some of the questions.

21           And counsel, I indicated I don't have a copy of

22   the complete transcript of the file, and obviously you do

23   and I have not gone over that for the purpose of this

24   hearing, but I think I need to expand a little bit about

25   what was going on during the timeframe between Mr.

1   Reisterer leaving and Mr. Champion then being appointed to
2   the case because I don't know if some of this was simply
3   information that we discussed in chambers with the
4   attorneys or if it's on the record or not.
5           So just to reiterate what we just talked about, I
6   indicated to counsel I was frankly--the Court was frankly
7   somewhat frustrated with Mr. Reisterer because I didn't
8   feel as though towards the end of 2013--or '12 and the
9   beginning of 2013, I didn't feel as though the case was
10  moving forward.
11          What's happening in--at the time is that we had
12  an election.  We got a new prosecuting attorney.
13          Mr. Reisterer had been handling the case for a
14  period of time and I felt he was doing whatever he could to
15  get out of the case.
16          He was planning on I think going to the
17  prosecuting attorney's office, and we had a number of
18  discussions about letting him off the case, and that didn't
19  happen because he hadn't--he was going through an interview
20  process I think with the prosecuting attorney, the new
21  prosecuting attorney, and he indicated he was gonna get a
22  job or what not.
23          And I said well until you get the job, I'm not
24  gonna address--I'm not gonna take you off the case.  You're
25  on the case.  Work the case.  We had those discussions I

1    think with--in counsel with chamber--in chambers.

2         And then he obviously got the job.  I let him off

3    the case obviously at that point.

4         And then we needed to--I think there was some

5    delay for a month or two because at that point we obviously

6    needed a new prosecuting attorney because then we had a

7    conflict I think with everything that was going on with Mr.

8    Steel and number of the defense attorneys that were moving

9    to the prosecuting attorney's office.

10        So then we had to wait to have Mr. Cusick or his

11   office, someone from his office appointed to handle the

12   matter.

13        So I will indicate I was a little frustrated with

14   the fact that I didn't feel that the case was being worked

15   up properly, and obviously Mr. Steel had every right to get

16   his case moving.

17        At that point I do know that there were some

18   discussions in chambers because Mr. Champion's office was

19   trying to get some information or boxes from Mr. Reisterer,

20   the file materials.  And then it was indicated to me, and I

21   think in the motion too, that Mr. Clatterbuck wasn't even

22   given a copy of the police reports.

23        So at about the same time when this is coming up

24   and the trial was coming up, I also was made aware that--

25   and I don't know if this is on the record--Mr. Clatterbuck

1    I understand was working very hard on another murder case,

2    the Aguilar case that was going on in Judge Johnson's

3    courtroom, which is a very high publicity case too.

4         And again, I don't know if that's on the record

5    or if that was discussed in chambers, the fact that I did

6    not get the impression Mr. Clatterbuck wasn't working on

7    the case.  I got the impression that he was not told to do

8    anything on the case, and then was heavily involved in this

9    other case, so he simply couldn't work on this case during

10   the time that this trial was coming up.

11        And again, I don't know if that is discussion in

12   chambers with the attorneys at this point or if it's on the

13   record.

14        So there were discussions about Mr. Champion

15   obviously felt he needed to do--or his office--whether it

16   was him or Miss Prentice-Sao, and I think they were both

17   working on the file--you know, what they should do, how

18   they should handle it, and I think there discussions about,

19   you know, file whatever motions you need to file, we'll

20   address 'em.

21        And I will say obviously given the delay, I had

22   some concerns obviously about delaying the case, but I

23   think the record is clear that we--the Court did obviously

24   have a concern about preparation and so forth.  So we did

25   move the trial date out to August because of everything

1    that was going on and to give Mr. Champion an opportunity
2    to obviously prepare.
3            I know it was a very voluminous case.  There were
4    a couple cases I think tied into this.  And every--I think
5    everyone was concerned about making sure that there was
6    enough preparation time by both the private investigator
7    Mr. Clatterbuck and Mr. Champion's office.
8            So I will just indicate for the record, whether
9    it's on the record at the time of the motions or whether we
10   had discussions in chambers, the Court was not given any
11   information that Mr. Clatterbuck was I guess slacking.  I
12   think there was some questions about that.
13           The discussion had been a great concern about--
14   the impression I got was he was not necessarily being asked
15   to do a lot of investigation because of the fact that one
16   attorney was planning on getting out of the case, and then
17   of course he had other work to do.
18           So I--I'm just gonna state that on the record.
19           I don't know if that was clear or not, but we
20   certainly had some delays, unfortunately, with Mr.
21   Reisterer leaving, and--and then we had to appoint another
22   attorney, and then I know we were bumping I think right up
23   against the trial date at that point, which we obviously
24   then pushed out a few months.
25           Let me just ask you, Mr. Clatterbuck, again, just

for the record, you were working on the Aguilar case?

                    THE WITNESS:  Yes, I was.

                    THE COURT:  Do you recall that that was--

                    THE WITNESS:  It was.

                    THE COURT:  about the same time that this was

         coming up to trial?  If--

                    THE WITNESS:  Yes, yes it was.

                    And to--to buttress what you had said previously,

         I remember attempting to call Reisterer like three or four

         times and saying what's going on here.  This thing is

         getting close to trial and we're--I--I'm still in limbo.

         What--what's going on, and what's going on.

                    And either he didn't have a clear understanding

         or I just didn't get a call back, but it was kind of--I

         didn't know what to do.

                    THE COURT:  So I think the record needs to be

         clear about there was a lot of stuff going on.

                    And maybe--it's probably not all on the record,

         but we did have a number of discussions in chambers, and

         the Court certainly did have concerns about things not

         moving on, and--and those were--the discussions were had

         about why things may not have been moving forward.

                    But okay, so that's clear then about--I guess

         that's some additional information for the record then

         about it's not on the record what was happening during the

1    bench conferences--or the conferences in chambers about
2    some of the stuff that's going on behind the scenes then.
3           Do you have any other questions for Mr.
4    Clatterbuck?  I know Mr. Cusick is up, but based on what
5    has been placed on the record then, do you have any other
6    follow-up questions or--that you want to address at this
7    time?
8           MS. OWENS:  No, your Honor.
9           THE COURT:  Okay.
10           MS. OWENS:  I think you've done a very good job
11    of making clear what perhaps my questioning did not make
12    clear.
13           THE COURT:  Okay.
14           MS. OWENS:  And I certainly was not implying that
15    Mr. Clatterbuck was a slacker.  If anything, my use of that
16    term is--
17           THE COURT:  Well yeah.
18           MS. OWENS:  --was said facetiously, but I'm glad
19    that your Honor clarified it.
20           THE COURT:  And I think that from reading some
21    of the materials, they're--I--I can--I think I can see how
22    maybe that might come across that there was some concern or
23    some conflict maybe between Mr. Champion and Mr.
24    Clatterbuck.
25           And I think, again, that in all fairness with

1    regards to what happened here, I think that Mr.--it was my

2    innerpresh--impression Mr. Champion was doing what he

3    needed to to cover himself obviously cause he had these

4    concerns, and he had some concerns about if the case was

5    going to go to trial, he needed another private

6    investigator from what I understood in--in our discussions,

7    because Mr. Clatterbuck was heavily involved in another

8    murder case, and trying to get those witnesses--and I--I

9    know that that was a very big case also at the same time,

10   and he was concerned that he just wouldn't be able to

11   handle both cases at the same time.

12            And so I don't know that the motion makes clear,

13   and I really honestly don't know how detailed we got on the

14   record with regards to that, but we certainly did have

15   discussions in chambers about what was really happening

16   there.

17            So okay.  I'll turn it back over to you then, Mr.

18   Cusick.

19            MR. CUSICK:  Your Honor, thank you very much.

20            THE COURT:  For follow-up questions.

21            MR. CUSICK:  I'm gonna be quick.  I don't think--

22 Q  So I'll go forward until February I think of 2013 when Mr.

23   Champion got on the case I believe and you were still the

24   investigator, correct?

25 A  Correct.

```
 1   Q   Okay.  And at that--at that point there came a time where
 2       you were able to review all the reports, correct?
 3   A   Correct.
 4   Q   Okay.  And that was probably around May of 2013?
 5   A   Yes.
 6   Q   Okay.  You had--had the occasion to look at the reports
 7       before that, some reports, correct?
 8   A   Some--some pieces of information, but not the--not the
 9       police report in its entirety.
10   Q   Okay.  Is it fair to say that in May you read the file?
11   A   Yes.
12   Q   Okay.  And you were concerned, is it fair to say that you
13       were concerned about possibly having a trial in May?
14   A   Oh absolutely.
15   Q   Okay.
16   A   Absolutely.
17   Q   It's fair to say Mr. Champion also was concerned about
18       that, correct?
19   A   Absolutely.  Yes.
20   Q   Okay.  So you were both in agreement that--
21   A   Absolutely, totally.
22   Q   And so you both were hoping the court, asking the court for
23       an adjournment, correct?
24   A   Absolutely.
25   Q   Okay.
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And the trial was then scheduled for the end of August of |
| 3 | | 2013, correct? |
| 4 | A | Yes. |
| 5 | Q | Okay.  So that gave you another three months to kind of do |
| 6 | | the investigation and do the things that you may not have |
| 7 | | been able to do when Mr. Reisterer was the attorney, is |
| 8 | | that correct? |
| 9 | A | Yes. |
| 10 | Q | Okay.  Now you indicated that you did interview a number of |
| 11 | | witnesses. |
| 12 | A | Yes. |
| 13 | Q | Okay.  How many witnesses in total do you interview for |
| 14 | | this case? |
| 15 | A | A minimum of 17. |
| 16 | Q | Minimum of 17. |
| 17 | A | Yeah.  And it probably is closer to 20. |
| 18 | Q | So--and as a private investigator or as a court-appointed |
| 19 | | investigator, your job--I think you've already indicated-- |
| 20 | | was to form a defense, a theory of the case, right? |
| 21 | A | Yes. |
| 22 | Q | And by August of 2013, is it fair to say that there was a |
| 23 | | theory to the defense and there was certainly a theory to |
| 24 | | the case? |
| 25 | A | I--I had a very clear understanding of a theory of defense |

```
 1      had been formed.  I--it--I had a working understanding of
 2      where we were going with this whole defense, and I was very
 3      comfortable in August of going to trial.
 4              THE COURT:  Let me just back up.  Your question
 5      was specifically with regards to in August or about the
 6      time of the trial?
 7              MR. CUSICK:  In August.
 8              THE WITNESS:  Yeah.
 9              THE COURT:  All right.
10   A  About the time of--I--I took it to mean that your--the--
11      just prior to trial.
12   Q  You were uncomfortable having to go to trial in May?
13   A  Yes.
14   Q  You were comfortable having to go to trial--
15   A  I was comfortable in August; I wasn't comfortable in May.
16   Q  And in--in May, you were not comfortable having Mr.
17      Champion at that time representing the Defendant because he
18      didn't have the occasion to speak with you about the case,
19      is that correct?
20   A  Right.  I--yes.
21   Q  Okay.
22   A  We--we--it was--
23   Q  But in August, after reviewing or after interviewing the
24      witnesses, preparing reports, and speaking with Mr.
25      Champion, you--do you believe that he was much more
```

```
 1        prepared when we actually went to trial?

 2   A    Yes.

 3   Q    Okay.

 4   A    Yes.  I was very comfortable going into this trial.

 5   Q    And in fact Tommy Morgan, that you indicated, Charles

 6        Thomas, R.B. Davenport--is that Jerry Davenport?

 7   A    Jerry Davenport.

 8   Q    Antonio Williams, Michael Kelly, Lee Logan, these are all

 9        individuals that did in fact testify, correct?

10   A    Yes.  I--I think so.

11   Q    Yeah.  And--

12   A    I wasn't--I was sequestered so I wasn't at the trial

13        itself.

14   Q    And is it fair to say the defend--the Defendant had the

15        opportunity to present his theory of the case with those

16        witnesses?

17   A    Yes.

18                 (Sidebar conversation between Mr. Cusick and Mr.

19        Beauchamp)

20                 MR. CUSICK:  I have nothing further.  Thank you.

21                 Thank you, sir.

22                 MS. OWENS:  I have nothing further, your Honor.

23                 THE COURT:  I don't have any further questions.

24        Thank you, sir.  You may step down.

25                 MS. OWENS:  Your Honor--
```

1          THE WITNESS:  Am I excused?

2          THE COURT:  Yes.

3          MS. OWENS:  --I'm satisfied if Mr. Clatterbuck is

4     released from his subpoena.

5          MR. CUSICK:  No objections.

6          THE COURT:  All right.  Thank you, sir.  You may

7     step down.

8          THE WITNESS:  Thank--thank you.

9          (At 10:49 a.m., the witness was excused)

10         THE COURT:  Next witness.

11         MS. OWENS:  Either Paul Pratt, who's in--

12    downstairs in a holding cell, or Jacob Blett, whichever's

13    most convenient--

14         THE COURT:  Okay.  Let--

15         MS. OWENS:  --who's telephonically available.

16         (At 10:49 a.m., bench conference begins between

17    the Court and Ms. Johnson)

18         (At 10:50 a.m., bench conference ends)

19         THE COURT:  All right.  So I'm--understanding is

20    that Blett is available, so we'll try to hook him up.  Is

21    that--is he by phone or teleconference?

22         MS. JOHNSON:  Phone.

23         THE COURT:  By a phone.

24         MS. JOHNSON:  Yes.

25         THE COURT:  Okay.  So I'm sorry.  I thought Blett

```
 1          was on the phone, but apparently we have Blett and Pratt
 2          downstairs?
 3                    MS. JOHNSON:  No, it's not.  It's just Pratt.
 4          It's not--it's just Pratt downstairs.
 5                    THE COURT:  Are we getting Blett?
 6                    (At 10:54 a.m., bench conference begins between
 7          the Court and Ms. Johnson)
 8                    (At 10:55 a.m., bench conference ends)
 9                    THE COURT:  If he's not ready, we can call Pratt
10          up.
11                    MS. JOHNSON:  Okay.
12                    THE COURT:  You want to do that and then just--
13                    MS. JOHNSON:  I--I can do that.  They're in
14          chambers.
15                    THE COURT:  Okay.  Why don't you call--we'll
16          move--
17                    MS. JOHNSON:  Just hang on.
18                    THE COURT:  We'll move forward with Pratt--
19                    MS. JOHNSON:  Okay.
20                    THE COURT:  And then we'll--we--he'll be a half-
21          hour, 45 minutes, something like that, estimated.
22                    MS. JOHNSON:  Okay.
23                    THE COURT:  Two hours, four hours, who knows?
24                    UNIDENTIFIED MALE:  (Inaudible--speaking away
25          from a microphone)
```

1          THE COURT:  We'll call--we'll call Pratt up, is
2     that okay?
3          MS. OWENS:  (Inaudible response)
4          THE COURT:  All right.  I'm sorry.  I thought I
5     had gotten an email on Blett, but.
6          Counsel, do we have any estimate from your end
7     on how long Pratt will be?
8          MS. OWENS:  15 minutes.
9          THE COURT:  All right.  What's your estimate?
10         MR. CUSICK:  Probably 15 minutes, your Honor.
11         (Sidebar conversation between Ms. Owens and the
12    Defendant)
13         THE COURT:  And is that gonna be the same with
14    Blett, do we think?
15         MS. OWENS:  Blett might be a little bit longer.
16    I--put it this way, your Honor, I don't think either of
17    them or both of them combined will not take as long as Carl
18    did.
19         THE COURT:  I'm gonna tell them to have the--
20    apparently they're looking for Blett.  I'm assuming we know
21    he's there hopefully, but anyway so I'm gonna tell 'em
22    about a half-an-hour, and then if we need to take break in
23    between, we can but we'll--
24         (Sidebar conversation between Mr. Cusick and Mr.
25    Beauchamp)

```
 1                    (Sidebar conversation between Ms. Owens and the
 2          Defendant)
 3                    THE COURT:  Thanks, Tim.
 4                    (At 10:59 a.m., Mr. Pratt enters the courtroom
 5          with the corrections officers)
 6                    THE COURT:  Before you have seat, sir, please
 7          raise your right hand as best you can.  Do you solemnly
 8          swear or affirm that the testimony you're about to give
 9          will be the truth, the whole truth, and nothing but the
10          truth, so help you God?
11                    MR. PRATT:  Yes.
12                    THE COURT:  Be very careful stepping up there,
13          sir.
14                    And counsel, you're gonna have to move his
15          microphone probably for him, if you would.
16                    With that microphone, you really need to stay
17          close to the end of it.
18                    If you'll move it toward the end of his mouth
19          please.
20                    (Ms. Owens moves the microphone in front of the
21          witness.
22                    THE COURT:  It should go down then.  Okay.
23                    So you're gonna probably have to scoot up a
24          little bit or lean forward when you talk.
25                    I need you to state and spell your first and last
```

```
 1        name for the record if you would, sir.

 2                    THE WITNESS:  Paul Pratt, P-A-U-L, P-R-A-T-T.

 3                    THE COURT:  All right.  Go ahead.

 4                    MS. OWENS:  Thank you.

 5                              PAUL PRATT

 6        (At 11:00 a.m., called by Ms. Owens and sworn by the Court,

 7        testified as follows)

 8                          DIRECT EXAMINATION

 9   BY MS. OWENS:

10   Q    Mr. Pratt, you and I met in February, correct?

11   A    Yes, ma'am.

12   Q    At the West Shoreline Correctional Facility?

13   A    Yes.

14   Q    And I told you I was the attorney, appellate attorney for

15        Mr. Steel, yes?

16   A    Yes.

17   Q    And we went over some issues or questions pertaining to what

18        happened the day that Milo Conklin was killed on Easter

19        Sunday of 2012.

20                    THE COURT:  '11

21   Q    2011.  Do you remember that?

22   A    Yes.

23   Q    Now were you in the vicinity that day?

24   A    Yes.

25   Q    Where were you?
```

```
 1    A    I was in back of a house.

 2    Q    Pardon me?

 3    A    I was in back of a house on--on Mabel Street.

 4    Q    Okay.  And do you know the Defendant Sam Steel?

 5    A    Yes.

 6    Q    How are you acquainted with him?

 7    A    Through growing up, childhood.

 8    Q    Okay.  So you've known him for a long time.

 9    A    Yes.

10    Q    You were in the back of a house?

11    A    Yes.

12    Q    Do you know which house you were in back of?

13    A    I don't know the address.

14    Q    What were you doing back there?

15    A    I was getting high back there.

16    Q    Did you see the incident that--where Milo Conklin was

17         killed?

18    A    No, I ain't see him get killed, but I know where he got

19         killed at.

20    Q    Were you with Sam Steel that night?

21    A    I was with him that day.

22    Q    You were with him that day?

23    A    I seen him that night also.

24    Q    Okay.  Did--did you--

25                   THE COURT:  I'm sorry.  You said you saw him that
```

```
 1        night also?
 2                    THE WITNESS:  And that day.
 3                    THE COURT:  And that day, okay.
 4                    THE WITNESS:  Yes.
 5    Q   Did you see the actual shooting?
 6    A   No.
 7    Q   Mr. Pratt, didn't you tell me that you saw the face of the
 8        shooter?
 9    A   No.
10    Q   Didn't you say, "I saw the face of the shooter and it was
11        not Sam Steel?"
12    A   No, I didn't tell you that.  I don't remember telling you
13        that.
14    Q   So you didn't see who--what actually happened?
15    A   No.
16    Q   You said you saw Sam that day.
17    A   Yes.
18    Q   When did you see him?
19    A   I seen him sometime in the evening like 4:00 or 5:00
20        o'clock.
21    Q   Okay.  What was he doing then?
22    A   Is in the front yard of his mother house.
23    Q   What was he doing?
24    A   Just standing there.
25    Q   Was he painting?
```

| | | |
|---|---|---|
| 1 | A | Yes.  He was doing some work around his mother house. |
| 2 | Q | Do you remember what he was wearing? |
| 3 | A | No.  At night I remember what he was wearing. |
| 4 | Q | Pardon me? |
| 5 | A | That night I remember what he was wearing. |
| 6 | Q | What was he wearing? |
| 7 | A | A white sweatshirt. |
| 8 | Q | When did you last see Sam Steel that day? |
| 9 | A | During the news conference that night. |
| 10 | Q | What did you see? |
| 11 | A | I just seen him come past.  He spoke to me and I spoke to |
| 12 | | him. |
| 13 | Q | What was he wearing then? |
| 14 | A | He was wearing the white sweatshirt. |
| 15 | Q | Mr. Pratt, didn't you tell me the guy came from Florence |
| 16 | | Street, walked through the shortcut, pulled a gun out, and |
| 17 | | returned the same way? |
| 18 | A | No, I don't remember saying that. |
| 19 | Q | You didn't tell me that? |
| 20 | A | No, I don't remember saying that. |
| 21 | Q | Didn't you-- |
| 22 | A | I probably remember telling you that I heard somebody say |
| 23 | | that, but I remember me per se saying that I seent |
| 24 | | (phonetic) that. |
| 25 | Q | So you're--you, yourself, didn't see anything? |

```
 1   A    No.

 2   Q    You didn't say the shooter had a black hoodie on?

 3   A    No.

 4              MS. OWENS:  I have nothing else.

 5              MR. CUSICK:  I have nothing further, your Honor

 6              (Sidebar conversation between Ms. Owens and the

 7         Defendant)

 8              THE COURT:  I don't have any questions.  You may

 9         step down, sir.  Be very careful of that step so you don't

10         fall.

11              Is he going to be recalled for any reason?

12              MS. OWENS:  No.

13              (At 11:04 a.m., the witness was excused)

14              THE COURT:  We need Mr. Blett, don't we?

15              UNIDENTIFIED MALE:  We all set?

16              THE COURT:  You're all set.  Thank you.

17              UNIDENTIFIED MALE:  Thank you.

18              THE COURT:  Why don't we take about a ten-minute

19         break then because I have a feeling that I think he--I had

20         told 'em a half-hour

21              MS. JOHNSON:  (Inaudible--speaking in a lowered

22         voice)

23              THE COURT:  Yeah.  So why don't we take about a

24         ten or 15-minute break and then we'll come back on as soon

25         as we get notice, unless you have something else--something
```

1    else?

2              MS. OWENS:  No.  I gotta run to the parking

3    meter.

4              THE COURT:  Okay.  Well then, we'll just delay

5    here for a while.

6              Court's in recess.

7              (At 11:05 a.m., court recesses)

8              (At 11:24 a.m., court resumes)

9              MS. JOHNSON:  The court recalls the case of the

10   People of the State of Michigan versus Samuel Steel, Case

11   Number C2011-1983FC.

12             Parties, please restate appearances for the

13   record.

14             MR. CUSICK:  Paul Cusick on behalf of the People,

15   your Honor.

16             MS. OWENS:  Mary Owens on behalf of the

17   Defendant.

18             THE COURT:  And I believe we're just waiting

19   patiently for a phone call.

20             (Sidebar conversation between Ms. Owens and the

21   Defendant)

22             (Sidebar conversation between the Court and Ms.

23   Johnson)

24             THE COURT:  Counsel, is there anything we need to

25   address while we're waiting or?

```
 1                    MR. CUSICK:  I'm sorry?

 2                    THE COURT:  Anything we need to address while

 3       we're waiting?

 4                    MR. CUSICK:  No, your Honor.  I'll just let the

 5       Court know that I--after Mr.--after Jacob Blett testifies,

 6       we just have three other witnesses that will be very brief.

 7                    And Detective Beauchamp may testify, but I may

 8       just ask him to testify the day that Mr. Champion is here

 9       as a rebuttal witness so.

10                    THE COURT:  Okay.

11                    (Sidebar conversation between Mr. Cusick and Mr.

12       Beauchamp)

13                    UNIDENTIFIED MALE:  I don't know what we're doing

14       with this stuff.

15                    MS. JOHNSON:  He's saying a test to see if he can

16       hear me yet?

17                    THE COURT:  Yeah.  Jacob Blett, can you hear us?

18                    UNIDENTIFIED MALE:  Stand by, I'll put him on the

19       line.

20                    MR. BLETT:  Hello?

21                    THE COURT:  Hi, Jacob Blett?

22                    MR. BLETT:  Yes, ma'am.

23                    THE COURT:  All right.  This is Judge Lightvoet.

24                    We are on the record in court, sir.  I'm going to

25       have the attorneys just state their names for the record.
```

1    I just want to make sure that you can hear them, okay?

2              MR. BLETT:  Yes, ma'am.

3              THE COURT:  All right.  Go ahead, counsel.

4              MR. CUSICK:  Paul Cusick on behalf of the People,

5    your Honor.

6              MS. OWENS:  Mary Owens on behalf of Sam Steel.

7              THE COURT:  All right.  Mr. Blett, are you able

8    to--to hear the attorneys, sir?

9              MR. BLETT:  Just--just a little bit.  It's--it

10   sounds like it's a little echo and distant from it.

11             THE COURT:  All right.  Will you go to the

12   podium, Miss Owens.

13             I'm gonna have 'em go to the podium a second and

14   see if you can hear, and I know it's hard to hear in this

15   court and sometimes by phone.  So I'm gonna have her

16   identify herself again, okay?

17             MR. BLETT:  Okay, thank you.

18             THE COURT:  Okay, go ahead.

19             MS. OWENS:  Your Honor, my name is Mary Owens, on

20   behalf of Sam Steel.

21             THE COURT:  Were you able to hear her better, Mr.

22   Blett?

23             MR. BLETT:  Yes, yes, ma'am.  Mary Owens on Mr.

24   Steel.

25             THE COURT:  Perfect.  Okay.  So during this

```
1          process, sir, if you cannot hear what we're saying, just

2          make sure you speak up so we can have something repeated

3          for you, okay?

4                     MR. BLETT:  All right.  Thank you.

5                     THE COURT:  All right.  I'm gonna put you under

6          oath.  I need you to raise your right hand, sir.

7                     MR. BLETT:  Okay.

8                     THE COURT:  Is it raised?

9                     MR. BLETT:  Yes, ma'am.

10                    THE COURT:  Do you solemnly swear or affirm that

11         the testimony you're about to give will be the truth, the

12         whole truth, and nothing but the truth, so help you God?

13                    MR. BLETT:  Yes, ma'am.

14                    THE COURT:  Okay.  You can put your hand down.

15                    I going to have you state and spell your first

16         and last name for the record please.

17                    THE WITNESS:  Okay.  J-A-C-O-B, B-L-E-T-T.

18                    THE COURT:  Okay.  And it's Jacob Blett, correct?

19                    THE WITNESS:  Yes, ma'am.

20                    THE COURT:  I'm gonna turn it over to Miss Owens.

21                    Go ahead.

22                              JACOB BLETT

23         (At 11:32 a.m., called by Ms. Owens and sworn by the Court,

24         testified as follows)

25                         DIRECT EXAMINATION
```

BY MS. OWENS:

Q    Mr. Blett, this is Mary Owens here.  I'm representing Sam
     Steel on appeal from his conviction, and I'm gonna ask you a
     few questions concerning a written statement that you gave
     back in March.

A    Yes, ma'am.

Q    Do you recall what statement that is?

A    Yeah.  I--I wrote like a--what I thought was like a
     affidavit form.

Q    Okay.  Do you have it in front of you?

A    No, ma'am.  They--we couldn't ride out with any of those
     type of items.  So we had to send 'em off to our families.

Q    Right now, sir, you're in federal prison, right?

A    Yes, ma'am.

Q    Where are you located?

A    Glen--Glenville, West Virginia, at FCI Gilmer.

Q    And what are you incarcerated for?

A    Distribution of more than 28 grams but cocaine-based.

Q    And how much of a sentence are you serving?

A    84 months.

Q    I'm sorry?

A    84 months.

Q    87 years?

A    Yes, ma'am.

Q    Now in August of 2013, you were in the Newaygo County Jail,

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | Yes, ma'am. |
| 3 | Q | Were you awaiting sentence at that time, or plea, or trial? |
| 4 | A | Yes, ma'am.  I was waiting plea and sentencing at that time. |
| 5 | Q | Had you already pleaded? |
| 6 | A | Yeah.  Yes, ma'am.  I just had went down and plea in August. |
| 7 | Q | And when exactly were you sentenced? |
| 8 | A | December 18, 2013. |
| 9 | Q | So the federal pre-sentence detention center, one of them is |
| 10 | | in Newaygo County. |
| 11 | A | Yes, ma'am. |
| 12 | Q | Did you have occasion to meet a couple of gentlemen by the |
| 13 | | name of Devon Smith and Walter Johnson? |
| 14 | A | Yes, ma'am. |
| 15 | Q | Had you known them before? |
| 16 | A | No, ma'am. |
| 17 | Q | Where are you from, Mr. Smith--Mr. Blett? |
| 18 | A | Kent County and--I was born in Kent County, but I was |
| 19 | | incarcerated out of Ingham County. |
| 20 | Q | Did--before being incarcerated in Newaygo County, did you |
| 21 | | know Mr. Sam Steel? |
| 22 | A | No, ma'am. |
| 23 | Q | So you had no prior knowledge of Sam Steel, Devon Smith, or |
| 24 | | Walter Johnson? |
| 25 | A | No, ma'am. |

```
1   Q    Now you were in the same unit as Devon Smith and Walter
2        Johnson?
3   A    Yes, ma'am.
4   Q    In your statement you said that Mr. Johnson and Mr. Smith
5        approached you about bartering information.  Do you recall
6        making that statement?
7   A    Yes, ma'am.  Yeah, they--
8   Q    What--explain what you mean by that.
9   A    They was telling me that--you know, that if I didn't--like I
10       was gonna cooperate or if I--you know, you don't cooperate,
11       there's a chance you could get a lot more time, but even if
12       you do go to prison, there's people there on the yard
13       that'll tell you about cases for certain money.  And they
14       tried to explain, they call hopping on each other cases, and
15       they'll explain--help you get 35 Ds is possible to get back
16       and get time off because they had just came back from some
17       prison institution, and they had testified on Mr. Steel.
18  Q    Now where were you when you had this conversation?
19  A    The first time we was in--in my room because that's where
20       Mr. Johnson was moved into, but I was going to court, so
21       they didn't open up the door for him.  But it was me, Mr.
22       Johnson, Mr. Smith, and another Mr. Smith in there.
23  Q    Richard Smith?
24  A    Yeah, Richard Smith.
25  Q    Now did they specifically reference the name Sam Steel?
```

1    A    Yes, ma'am.

2    Q    What did Mr. Johnson and Mr. Smith say, if anything, that

3         they had done with regard to Mr. Steel's case?

4    A    Well it was over a period of time as I got to know Mr.

5         Johnson that he became more forthcoming on it, but overall

6         he had told me that he--he had got sentenced for some stuff

7         and a delivery resulting in a overdose I think he said, and

8         he said he was initially looking at 30 years, but he

9         proffered and got ten years off about a murder that he knew.

10             And you know, basically he just started telling me

11        how even though that Sam didn't commit the murder, he knew

12        all the details and that was enough to get the detective and

13        everybody interested in it.

14             And once he got locked up, he started email his

15        friend Devon and Richard, but I guess Richard didn't get it

16        in time but Devon did.  He was giving 'em details and, you

17        know, plus a little bit of what they already knew, and he

18        was just filling 'em in on details so that they could all

19        come back and put the murder on Mr. Steel.

20   Q    Now you say that there were a variety of conversations that

21        you had with Mr. Johnson?

22   A    Yes, ma'am.

23   Q    Was--

24   A    He was in there--go ahead.

25   Q    Approximately how many if you--if you can tell me.

```
1   A   May--maybe at least ten.  May--maybe ten or more.

2   Q   Was Mr. Devon Smith a participant in all of these

3       conversations you had?

4   A   He--he participated maybe the first six and then he ended up

5       being shipped out.

6           And--and Mr. Johnson would say other stuff, you

7       know, about cooperation and telling me about, you know, how

8       the prison life would be.

9   Q   Did Mr. Johnson tell you how he had gained knowledge of the

10      facts underlying the incident for which Mr. Steel was

11      convicted?

12  A   Yeah.  He--well he didn't just come right out and say he did

13      it, but he said that he was there and, you know, he said

14      that he was there pretty much every step of the way.  So

15      whatever happened, you know, he knew everything about

16      burning the clothes, what kind of gun was used.  I don't

17      know if he say he knew where the gun was at cause he--he

18      ain't never tell me that I remember, but yeah, he told

19      actually about getting rid of the clothes, and why the

20      situation, how it stemmed from, and-

21  Q   What did Mr. Johnson tell you had happened?

22  A   He--he said that the guy who got killed--I can't

23      remember his name--but he said that he had did some prison

24      time, and Sam didn't look out for him while he was locked

25      up, which mean he didn't--he didn't give him any money or
```

1   anything.  So he came home and I guess he was out trying to
2   rob--rob Sam or all type of stuff like that.
3           And I guess Mr. Johnson said that Sam was his
4   friend, and, you know, he started having issue with--with
5   Milo behind that.  He made threats.  I guess Milo had made
6   threats before to Mr. Johnson, and they left it like that,
7   you know.
8           He didn't really say oh, I got--drove up and
9   killed the guy or nothing, but he did say he was like in
10  between the house.  They had went in between some houses and
11  he had caught the guy.  Guy never knew that they were there,
12  and you know, after everything happened, how the clothes got
13  burnt up.  That's--that's what he said.
14  Q   Did Mr. Johnson say that he had done the killing?
15  A   No.  He never directly came out and say--he insinuated it,
16      but he never directly said it, you know.
17  Q   Is there anything particular that Mr. Devon Smith said that
18      you can remember?
19  A   He--they--they--it was bashing really.  Like he said he
20      really didn't know nothing about it, you know.  He had heard
21      about it, but he said he didn't really know too many details
22      because he wasn't there when it happened.  He said it was
23      later on that--that Walt, Mr. Johnson had started emailing
24      his girlfriend or his family, and filling him in on--on what
25      all they say back in court.

```
 1              And you know, he was just telling me like if Sam
 2      would have got indicted with--with them and he would have
 3      been free, that he believes Sam would have to tried to do
 4      the same thing, and he don't know why Sam, you know, is mad
 5      about this because, you know, they didn't have nobody else
 6      that they could--they could tell on.  The detectives in
 7      Kalamazoo County wanted Sam bad enough that, you know, they
 8      was willing to believe anything they said without really
 9      doing too much investigation behind it.
10   Q  Mr.--Mr. Blett, did they--did they give you any indication
11      of why they wanted to pin this on Sam Steel?
12   A  Because they was all gonna get time reductions and they
13      wanted to get back out.
14              And Richard Smith, he--you know, he--he was
15      telling me that he didn't want to do no more time, that he
16      had did enough time.
17              They had lost they mothers, their mothers had
18      passed away, and you know, they just--they wanted to be back
19      out with they's family.  They mothers had passed away
20      recently, but they said that they didn't really have nobody
21      and they wanted to get out and be with their family.  They--
22   Q  When you were--I'm sorry, sir.
23   A  Huh?
24   Q  When you were talking to Mr. Smith and Mr. Johnson, did they
25      specifically use the name Sam Steel or were they just saying
```

1    this is how you can go about getting a time cut, by

2    providing information on someone else?

3  A  No, they--they said Sam Steel.  They even said Sam Steel

4    name.  They--they asked me would I write the prosecutor and

5    say that I heard him threatening.  They--that's what they

6    told me, I could write a detective by the name of Beau--

7    Beauchamp or something like that and whatever prosecutor,

8    and tell them that Mr. Steel--I heard Mr. Steel threatening

9    them and--and all of that.

10          And that I would--I would be able to get to get a

11    time cut if I--if I chose to do it.  And you know, that they

12    would tell me other things to say about him, you know, give

13    me some of his family member's names and stuff so that if

14    they ever ask me how did Sam look, they could tell me and

15    they could say what Sam remembers.  I could say I heard 'em

16    talking to him, all type of things.

17  Q  Mr. Blett, in your statement, you also say the following:

18    "They explained how they used the federal email to conspire

19    a concocted story."

20  A  Yes.

21  Q  Did--did Mr. Johnson and Mr. Smith tell you how they used

22    the federal email to do this?

23  A  Yeah.  The--yes, ma'am.  Miss--Mr. Johnson said that he was

24    emailing his girlfriend at the time, and he would turn

25    around have her call and email Mr. Smith's girlfriend with

```
 1        the--with the details of exactly what to say, what needed to
 2        be say--said on the stand, and you know, the little bit of
 3        information that he knew about, you know, from being
 4        acquainted with Sam.  Just that they was writing letters and
 5        sending emails to each other back and forth, and she--she
 6        would answer some questions and they were answering some
 7        other ones all through the email.
 8     Q  Mr. Blett, you also said that--and I'm reading to you from
 9        your statement, "Johnson explained how the lead detective
10        allowed both him and Smith to schedule visits to engage in
11        sexual exploits, prepare them on testimony, and special
12        perks to testify."  Do you recall writing that first, sir?
13     A  Yes, ma'am.  I remember exactly.  When Mr. Johnson got
14        there he had a big bag of--a bunch of stuff you couldn't
15        get from commissary and canteen.
16     Q  Now wait, just hold on.  I want to interrupt you for--
17     A  --
18     Q  When you say he first got there, got where?  Newaygo County
19        Jail or federal prison or--
20     A  Yes.  Yes, ma'am, Newaygo County Jail.  We was on D2
21        together.
22     Q  Okay.  And what did he have with him that he would not
23        otherwise be allowed to have?
24     A  He had like big bags of Kool-Aid, big bags of candy, chips,
25        deodorant, soaps, all--all type of snacks like that.
```

```
 1   Q   Did you--did you have occasion to personally witness Mr.
 2       Johnson getting like visits from--from female visitors?
 3   A   No, ma'am.  I didn't--it wasn't there.  He told me it was
 4       in this thing called Crosstown or something like that
 5       maybe, that's in between Kalamazoo and Paw Paw or
 6       something.  It's--I don't really know the name of it cause
 7       I'm not familiar with that area, but--
 8   Q   So Johnson was saying that he was allowed to get special
 9       visits, not in Newaygo County but some other place?
10   A   Yes, ma'am.  He--he said every time that they would be
11       coming back from court, they would be housed right there
12       and then they would let they family come there for a couple
13       hours and, you know, it wouldn't be nobody in the visiting
14       room, so they could engage in whatever exploits they wanted
15       to engage in.
16           And then before he was housed at Newaygo, the
17       detective allowed their family to go down to the Family
18       Dollar and purchase hundred dollars--purchase whatever they
19       wanted and bring it back to him, and detective was just
20       gonna say that it came from the last place they just came
21       from.  And he said that it was--
22   Q   Did he say what the name of this detective was?
23   A   I think it's a Beauchamp or a Beaucamp or something like
24       that.
25   Q   And this was before Mr. Johnson testified in Sam Steel's
```

1     case?

2  A   He said he was doing all this as he was testifying, and

3      that, you know, Mr. Beauchamp would come back and talk to

4      him, and there would be a chance for them not to be alone,

5      like you know, I need you to say what you had already been

6      telling us and, you know, I need you to continue to go on

7      because Mr. Johnson said that it was cons.

8          He had reservations of going out there cause it

9      was a lot of people in the courtroom, and he said, you

10     know, the detective was still telling him like you know, I

11     still need you to do to this and--you know, everything I

12     done did for you and, you know, pretty much basically, you

13     know, I washed your hands, wash mine now.

14 Q   Did Devon Smith say that he'd be given any special

15     privileges?

16 A   Yes, ma'am.  Yes, ma'am.  Said he had--he engaged in the

17     same special visits as Mr. Johnson, and that was out there

18     having sexual rendezvouses with they girlfriends, and they

19     family would come up there and sometimes they can get up to

20     six-hour visits.  And they would turn the cameras off for

21     'em sometimes so that, you know, it wouldn't be on the

22     cameras of them having sex or the girls sitting on their

23     lap, having--having sex.

24 Q   Now Mr. Blett, at some point you were in the Newaygo County

25     Jail with Sam Steel, right?

| | | |
|---|---|---|
| 1 | A | Yup.  After I had got sentenced and got sent to Jackson |
| 2 | | quarantine, I end up coming back, and he end up coming in |
| 3 | | the room with us in C8, and-- |
| 4 | Q | And how did it come that you wrote up this affidavit of |
| 5 | | facts?  I mean who told you to write it? |
| 6 | A | Say that one more time, ma'am. |
| 7 | Q | How did--how did you come to write this affidavit, this |
| 8 | | written statement? |
| 9 | A | Oh.  When--when he came in, you know, he--he really was |
| 10 | | quiet.  He didn't really talk to anybody.  And then I heard |
| 11 | | him say--say his name, I heard the police say his name, and |
| 12 | | I say--I say, "Hey," I say, "You know, it's--there was some |
| 13 | | guys downstairs I was--I was down there with now.  They was |
| 14 | | saying a lot of stuff," and this and this.  And you know, |
| 15 | | he just looked at me and pretty much and said, "Well is |
| 16 | | there any whatever you're saying to me that you could say |
| 17 | | to my lawyer?"  And I told him yeah, I would do that, you |
| 18 | | know. |
| 19 | | I felt like a life--a life bit or a life sentence |
| 20 | | for somebody you know, that's--that's very harsh, |
| 21 | | especially when I knew a little bit about what was going |
| 22 | | on.  And I wrote the--I don't know if I addressed it to |
| 23 | | you, but I wrote it and sent it to the lawyer.  And I |
| 24 | | never-- |
| 25 | Q | Well that would be me, Mr. Blett.  Now, it-- |

```
 1   A    Okay.  Okay.

 2   Q    Now did--

 3   A    Whatever.

 4   Q    --did you get any sort of special consideration, or a

 5        special privileges, or money, or anything of value from Sam

 6        Steel to write this?

 7   A    No, ma'am.  No.

 8   Q    So this is the absolute truth?  Sam didn't put you up to do

 9        this?

10   A    Oh no, no ma'am.  This--I did this on my own.  This is the-

11        -this is something that, you know, I don't think he ever

12        thought he would ever have, have a chance that somebody

13        would do something like this for him, and I resp--

14   Q    Thank you, Mr. Blett.  I've got no more questions, but the

15        prosecutor I'm sure has some questions for you.  So just

16        stay tuned.

17   A    Okay.  Okay.

18                    THE COURT:  Mr. Cusick.

19                    MR. CUSICK:  Thank you, your Honor.

20                         CROSS-EXAMINATION

21   BY MR. CUSICK:

22   Q    Mr. Blett, can you hear me?

23   A    Yes, yes, sir.

24   Q    Okay.  Is it fair to say that you were in the Newaygo

25        County Jail in the cellblock D2 between August 28$^{th}$ of 2013
```

1    and December 4th, 2013, would you agree with that?

2  A  Yeah.  Yes, sir, yes sir.

3  Q  Okay.  And would you agree that Walter Johnson was there in

4     that D block from September 19th, 2013, to May 22nd, 2014?

5     Would you have any reason to disagree with that?

6  A  No.  No, sir.

7  Q  And just regarding Devon Smith, that he was housed in the D

8     block from September 19th, 2013, to October 15th of 2013,

9     would you have any reason to disagree that he was housed

10     there during that time?

11  A  No, sir.  No, sir.

12  Q  So the three of you and Richard Smith, did you share a

13     cell?

14  A  I shared a cell with Richard Smith, and then another cell

15     became open and I went down there.  But we--the cells was

16     open all 24 hours.  It never closed.  So we'd go in and out

17     of each other's cells as we pleased.

18  Q  And I'm--

19         MR. CUSICK:  And your Honor, I'm sorry if I have

20     to ask some of the same questions.  I had a little trouble

21     hearing.

22         THE COURT:  That's fine.

23  Q  So I might ask you some of the same questions that Miss

24     Owens asked you.

25         But when you got to know Walter Johnson and Devon

| | | |
|---|---|---|
| 1 | | Smith, there came a point when there--when they mentioned a |
| 2 | | Sam Steel to you? |
| 3 | A | Yes, sir, yes sir. |
| 4 | Q | And Walter Johnson indicated that he testified at a trial |
| 5 | | against Sam Steel, is that correct? |
| 6 | A | Yes, sir.  Yes, sir. |
| 7 | Q | Now you said that--did he ever say that he went up on the |
| 8 | | stand and lied about Sam Steel, or did he just say that he |
| 9 | | testified at a trial? |
| 10 | A | Nah.  He told--he told me that he lied on the stand. |
| 11 | Q | What did he tell you he exactly lied about? |
| 12 | A | He didn't--he didn't say exactly word for word everything |
| 13 | | he lied about, but word for word what he said to me was he |
| 14 | | had been dealing with a detective, I think maybe a year or |
| 15 | | a little bit over a year, and you know, that that they had |
| 16 | | been getting they story together as far as what happened, |
| 17 | | what he knew that happened.  And you know, the things that |
| 18 | | he didn't know that happened, he pretty much filled in for |
| 19 | | him. |
| 20 | | And you know, he told me once he got up there he |
| 21 | | said Sam did a lot for him.  He said so it really did hurt |
| 22 | | him to get on the stand and know that he was lying and get |
| 23 | | him a life bit, but he didn't want to do the 20 years, and |
| 24 | | he said once he was-- |
| 25 | Q | Okay, I'm gonna--okay.  I just want--did--did he indicate |

|    |   |                                                                  |
|----|---|------------------------------------------------------------------|
| 1  |   | to you exactly what happened with regards to the victim in       |
| 2  |   | this case, Milo Conklin?  Did he indicate what happened to       |
| 3  |   | him?                                                             |
| 4  | A | He--he--he made like--like he made indications, but he           |
| 5  |   | never flat-out came out and said that he shot him, but he--      |
| 6  |   | he told me that, you know, he was pretty much out there          |
| 7  |   | selling heroin.  And when Milo came home, you know, he was       |
| 8  |   | causing a lot of problems with him getting his money, and        |
| 9  |   | Sam getting him money.  And he felt kind of away toward          |
| 10 |   | Sam, and he said everybody was damn soft.  So he was like        |
| 11 |   | pretty much nobody expected Sam to do anything about it.         |
| 12 | Q | Okay.                                                            |
| 13 | A | They expected him to do stuff about it.                          |
| 14 | Q | So he indicated--so he said, Mr. Blett, that Sam had a           |
| 15 |   | problem with Milo Conklin, as well as himself?                   |
| 16 | A | Yeah.  He said they both had problem with him, yep.              |
| 17 | Q | Okay.  And did he go into any more detail as to what             |
| 18 |   | happened during the murder?                                      |
| 19 | A | No.  He--he--he didn't go into all details.  He said that        |
| 20 |   | after everybody figured that Sam wasn't gonna do nothing         |
| 21 |   | that they--they was gonna have to catch Milo.  And I think       |
| 22 |   | he said they was just gonna at first jump on him, and you        |
| 23 |   | know.  He said that they--he end up going between some           |
| 24 |   | houses.  He said that--                                          |
| 25 | Q | Who?                                                            |

```
 1   A   It was gun.  He said--he said that he had got a gun, and
 2       they had went between some houses.
 3   Q   Okay.  Let me ask you this.  Did he--did he--did the name
 4       Harry Mathews come up?
 5   A   No.  I never heard Harry Mathews.
 6   Q   Did the name David Lee come up?
 7   A   Yeah, that's--that's a guy who was in Newaygo who--he's
 8       bragging about how he wrote the prosecutor on Sam and he
 9       was trying to get a 35D, a reduction for saying--he made up
10       some--
11   Q   Did the name David--did the name David Lee come up between-
12       -in your conversations with Sam Steel?
13   A   No.  We didn't really talk about--I--I think he said that
14       David--he said David Lee was downstairs, that's why he
15       couldn't move downstairs.  But it never came up as far
16       cause I never had conversations with David Lee until after
17       he came back from testifying on Sam Steel.
18   Q   When did Walter Johnson say that he concocted the story?
19   A   He said it was sort of common knowledge about--you know,
20       people in the streets who hung with.  The guy named Chew
21       was Evan Smith, and he said that he wasn't gonna never talk
22       about it, but once he got locked up and he seen how much
23       time they was facing, he didn't have no choice but to talk
24       about it cause cause that's what the detectives wanted to
25       talk about, cause they knew him and Sam Steel was real
```

1    tight.

2           So he said once he started making his proffer,

3    his proffer statements is when started really, you know,

4    going on.  He said he--he told them a little bit more than

5    just that, but he said, you know, that's what they really

6    was harping on.

7    Q    With regards to Devon Smith, you indicated Devon Smith told

8    you that he wasn't at the scene of the murder and didn't

9    really know what happened?

10   A    Yeah, he--yeah, he--he said he wasn't there when it

11   happened.

12   Q    But what did he say he testified to?

13   A    He said that--he really was saying that pretty much he was

14   testifying to his wasn't the--(Inaudible--speaking too

15   quickly).  He was pretty much saying like, you know, he was

16   just testifying to whatever he had first did.

17          I can't remember exactly what it was, but he said

18   that at one point the--the lawyer that--you know, the

19   lawyer was--had a weak argument, just kept on asking him,

20   "So are you doing this to get a time cut?"  And he said,

21   you know, he was laughing at him, like no, that's not what

22   I'm doing, but--

23   Q    Here, maybe I miss--maybe I misunderstood my question.

24   What did Devon Smith say about the incident?  What did he

25   tell you he testified to?

1    A    That's--

2    Q    What did Devon Smith tell you he testified to?

3    A    Maybe you didn't hear me.  I was explaining it to you what

4         he said he testified to.

5              He said that he got up there after getting the

6         details filled into him from Walter Johnson and testifying

7         about a homicide that he really didn't know no knowledge of

8         other than general knowledge of being in the streets.

9              Did you hear me that time, sir?

10   Q    Right.  But so did he just tell you that he testified to

11        what Walter Johnson testified to?

12   A    No.  He didn't say just that.  He said he had knew a

13        little--he had his own little information about it, about

14        what he had heard and his familiarity with Sam.

15   Q    Okay.

16   A    Okay.

17   Q    Okay.  So this--these conversations that you had with Devon

18        Smith and Walter Johnson, you said that you had about ten

19        conversations, is that correct?

20   A    Yeah, maybe even--I had maybe about six with Devon Smith,

21        and maybe--maybe even more than ten with Walter, but I

22        approximated that around ten.

23   Q    When you talked with--discussed with Devon Smith, is Walter

24        Johnson always there?

25   A    No, not--not always.  We--sometimes, you know, we would

| | | |
|---|---|---|
| 1 | | just all be standing around and then we would go in the |
| 2 | | room and start talking so that way other people couldn't |
| 3 | | overhear us. |
| 4 | Q | Okay. So in September--this was in September of 2013? |
| 5 | A | Yes, sir. The day--I think I had a PSI. It was the day |
| 6 | | that I had my PSI hearing that I came back and they were |
| 7 | | there. |
| 8 | Q | Okay. So when you found out these individuals were going-- |
| 9 | | or lied about a crime and lied about a defendant who--who |
| 10 | | was convicted, what did you do in September, and October, |
| 11 | | and November, and December of that year? |
| 12 | A | All the way up to December I was still in the unit with Mr. |
| 13 | | Johnson. So it was all the way--all the way up until I got |
| 14 | | to quarantine that I met another guy from Kalamazoo, said |
| 15 | | that he knew Sam. And I told him, you know, I--I was at |
| 16 | | the guys and stuff like that, and that's when he pretty was |
| 17 | | saying, you know, that it wasn't right, and I agreed with |
| 18 | | him. |
| 19 | Q | Well you--you-- |
| 20 | A | But it really wasn't much I could do. I didn't-- |
| 21 | Q | Well okay, let me ask you this. |
| 22 | A | I didn't-- |
| 23 | Q | So is it fair to say that up until December 4th of 2014 |
| 24 | | (sic), you really didn't discuss this with anybody or tell |
| 25 | | anybody. Did you tell anybody at the prison? |

| | | |
|---|---|---|
| 1 | A | No, not--no. Just me and--me and Mr. Johnson. |
| 2 | Q | Okay. So you left Newaygo on December 4th of 2013, correct? |

1   A   No, not--no.  Just me and--me and Mr. Johnson.

2   Q   Okay.  So you left Newaygo on December 4th of 2013, correct?

3   A   Yes, sir.  Yes, sir.

4   Q   And then where were you from December 4th of 2013, until

5       March 4th of 2014?

6   A   I was--I was in Kalamazoo County until maybe December 19th,

7       and got sent in--and then I got sent to Kent County, and I

8       was in Kent County for maybe a couple weeks, and then I

9       went to Jackson quarantine, RG and C, and then I came back

10      I think February 27th.

11  Q   Okay.  Before February 27th, who did you tell about what

12      Walter Johnson and Devon Smith told you?

13  A   Just one other guy that was in quarantine with me and from

14      Kalamazoo.

15  Q   What was his name?

16  A   They just called Nuck.

17  Q   Nuck?

18  A   Just a guy a named Nuck.  Like Nuck.

19  Q   Okay.

20  A   It was a just guy--

21  Q   You don't have his--his full name then?

22  A   No, no, sir.  I didn't never have his full name.

23  Q   Okay.  From--did you tell anybody else anything?

24  A   Naw, no.

25  Q   So February 27th--actually yeah, February 27th, you were

| | | |
|---|---|---|
| 1 | | moved then you indicated. |
| 2 | A | Yeah. I was brought back to Kalamazoo County and-- |
| 3 | Q | And then you came to Newaygo again-- |
| 4 | A | Yep. I came back to Newaygo. |
| 5 | Q | --in March--March 4th, right? |
| 6 | A | Say--say one more time, sir? March 4th? |
| 7 | Q | March 4th, you then returned to Newaygo County, right? |
| 8 | A | Yep, yep. March 3rd or March 4th, yes, sir. |
| 9 | Q | Okay. And before March 4th, that week, did you tell anybody |
| 10 | | about your conversations with Walter Johnson or Devon |
| 11 | | Smith? |
| 12 | A | No. |
| 13 | Q | And about the fact that they testified and got somebody |
| 14 | | convicted through lying? |
| 15 | A | No, sir. |
| 16 | Q | Okay. Then you come into contact at Newaygo County Jail |
| 17 | | with Sam Steel, is that correct? |
| 18 | A | Yes, sir. |
| 19 | Q | Okay. Would you disagree if I told you that he got there |
| 20 | | on March 14th of 2014? |
| 21 | A | No, I won't--I don't--I don't know when he got-- |
| 22 | Q | Okay. |
| 23 | A | --but he know he--when he came. |
| 24 | Q | Now he approached you and indicated--if I understand your |
| 25 | | testimony, if I'm not, please correct me--but he approached |

| | | |
|---|---|---|
| 1 | | and asked you about Walter Johnson and Devon Smith? |
| 2 | A | No, sir, he never approached him. I approached him. |
| 3 | Q | Okay. And what--what did you say? |
| 4 | A | After--like I said, I heard the CO call him to the slot, |
| 5 | | and I heard him say his name. I asked him--I said, "Is |
| 6 | | your name Sam Steel?" He said, "Yeah." And I told him--I |
| 7 | | said, "Well I was downstairs with Chew and Coo-Coo and |
| 8 | | Walt," and he said, "Yeah." I said, "Yeah, I was there |
| 9 | | when they came back from testifying against you." |
| 10 | | And you know, me and Walt had a rapport with each |
| 11 | | other as far as you know, we had got to know each other |
| 12 | | good. And you know, he just pretty much looked at me and |
| 13 | | he--he was sort of leery because the other guy was in the |
| 14 | | room with him who didn't know him had a--you know, just |
| 15 | | jumped on a case, the guy David Lee. |
| 16 | | So he didn't say nothing for a minute, and then, |
| 17 | | you know, he said, "Well what'd they say?" And I told him- |
| 18 | | -I said well--I said, "Man, you know they said that they-- |
| 19 | | they pretty much got off by using you and setting you up." |
| 20 | | And he said, "Well would you be willing to say this to my |
| 21 | | lawyer and to my attorney?" And I said, "Yeah." I said, |
| 22 | | "What, you gonna have her come up here and see me?" and he |
| 23 | | said, "Well I don't know. She might have to get in touch |
| 24 | | with your attorney," and-- |
| 25 | Q | Okay. I just want to stop you there, sir. |

```
1    A    Okay.
2    Q    So Sam Steel put you in touch with his attorney to make a
3         statement.
4    A    Yep, put me in touch with his attorney.
5    Q    Okay.  And this would be the first official statement that
6         you make about the case, correct?
7    A    Yes, yes, sir.
8    Q    For seven months, this will be the first one, right?
9    A    Yep.
10   Q    Okay.  And then you write a statement out?
11   A    I wrote a affidavit out, yep.
12   Q    Right.
13             What about David Lee?  What did the Defendant say
14        specifically about David Lee?
15   A    What did--what--who--what defendant?
16   Q    Did you say something about David Lee, or did the Defendant
17        not say anything about David Lee?
18   A    I had knew about David Lee because he came back, and he
19        was--he was in D3 while were in D2.
20   Q    Right.
21   A    And we all get to go to--we get to go to gym together.  And
22        Walt--
23   Q    But did you ever have conversations with David Lee between
24        you and Sam Steel--or about David Lee with--with your
25        conversations with Stam--Sam Steel?
```

| 1 | A | No. we never had conversations about him. He just told me |
| 2 | | he couldn't go downstairs because of him. |
| 3 | | Me and Walt had conversations about David Lee, |
| 4 | | and he was telling me that, you know, if I--if I do what |
| 5 | | they wanted me to do as far as buy in, say that Sam--I |
| 6 | | heard them say Sam threatened, I can get the same kind of |
| 7 | | time cut as David Lee got cause he didn't even know Sam, |
| 8 | | and he lied on him and got a chance at testifying, get a |
| 9 | | 5K1. |
| 10 | Q | Now Walter Johnson and Devon Smith, you said that they |
| 11 | | concocted this story together while over the federal email |
| 12 | | chain? |
| 13 | A | Yep. He's over--over--not just over the federal email |
| 14 | | chains, but I guess through letters as well and phone calls |
| 15 | | to their significant others and-- |
| 16 | Q | Can you-- |
| 17 | A | --even they--they was even housed together and stuff. |
| 18 | | They--they said they even got a chance to, you know, work |
| 19 | | on their story before when they was being housed to go-- |
| 20 | | before they got to go testify and stuff. |
| 21 | | MR. CUSICK: Can I have a moment, your Honor. |
| 22 | A | I couldn't hear you. |
| 23 | | THE COURT: I think he said he--he has no more |
| 24 | | questions. Is that correct? |
| 25 | | MR. CUSICK: No. May I have a moment, your |

1          Honor?

2                    THE COURT:  Oh, I'm sorry, okay.  He wants a

3          moment, so just give us a second, Mr. Blett.

4                    THE WITNESS:  Oh, okay.

5     Q    Sir?

6     A    Yeah?

7     Q    Can you email from Newaygo County?  Can you use email?

8     A    No.  You can do it from prison.  You can do it from--once

9          you leave Newaygo to come to prison, you can do it.

10    Q    Do you know when Walter Johnson proffered?

11    A    He didn't tell me exactly what date, but he did tell me

12         that he proffered and part of his proffer statement was the

13         homicide on Sam Steel.  And he said he got ten years just

14         for that consideration alone.  He ended up getting like a

15         ten-year reduction or he got 5K1 and 35D he told me.  Yes,

16         I do.

17    Q    Do you know when Walter--well do you know when Devon Smith

18         got sent to federal prison?

19    A    No, I--they told me that there were out on bond, that Walt

20         stayed in Newaygo and they were out on bond.  And I don't

21         know exactly when they got sent to prison.

22                    Hello?

23    Q    Yeah.  I'm---

24    A    Oh.

25    Q    Thank you, sir.  I'm just taking notes.

```
 1   A    Oh.
 2   Q    Did Sam Steel talk to you about the case at all?  About
 3        what happened to Milo Conklin?
 4   A    No, no.  He never--he never spoke to me about that.
 5   Q    Okay.  Did he indicate anything other than what you already
 6        testified to about his relationship with Walter Johnson or
 7        Devon Smith?
 8   A    No, no, sir.  Nothing at all.  He--he was, you know, pretty
 9        hurt, that he thought him and Walt was--was real good
10        friends, and he was confused behind it.  But he would--he
11        would even say things like, you know, that I thought was
12        crazy, like he still have love for Walt, and you know, he
13        wished it never went like this but.
14                 (Sidebar conversation between Mr. Cusick and Mr.
15        Beauchamp?
16   Q    I have nothing further.  Thank you.
17   A    Okay.
18                 THE COURT:  Just a second.  There might be some
19        more questions.
20                 Go ahead, Miss Owens.
21                      REDIRECT EXAMINATION
22   BY MS. OWENS:
23   Q    Mr. Blett, it's Mary Owens again.  I just have a couple
24        questions for you.
25   A    Okay.
```

| | |
|---|---|
| 1 | Q |
| 2 | |
| 3 | A |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |

Q    Did Walter Johnson ever say that Sam did not do the

shooting of Milo Conklin?

A    Yes, ma'am.  He said Sam was--was soft.  That that's not

what Sam was about.  Sam was about getting money.  Sam

wasn't no shooter

          THE COURT:  I--I missed it.  You said he said Sam

was?

          THE WITNESS:  Soft.  That Sam was--that Sam

didn't have the heart to shoot nobody.  That it was pretty

much--you know, he was the one who always had to start the

situation with the pistols and stuff like that.

          THE COURT:  I'm still missing the word.  Did you

say Sam was soft?

          THE WITNESS:  Yeah, soft like Sam was a coward.

Sam didn't have the heart to shoot nobody.  That he was

just a money man.  He was the one who was getting the

money.

          THE COURT:  Thank you.

          MS. OWENS:  Thank you, Mr. Blett.

          THE COURT:  Go ahead, Mr. (sic) Owen.

A    Yeah.

          MR. CUSICK:  Nothing further.

          THE COURT:  Any follow-up questions?

          MR. CUSICK:  Nothing further.

          THE COURT:  Okay.  So--and again, I'm sorry, Miss

1     Owens, anything further then?

2              MS. OWENS:  I have nothing else.  Thank you.

3              THE COURT:  Okay.  Thank you, sir.  We're gonna

4     hang up, okay?

5              THE WITNESS:  All right.  Thank you.

6              (At 12:09 p.m., the witness was excused)

7              THE COURT:  Okay.  Miss Owens, any further

8     witnesses?

9              MS. OWENS:  No, your Honor.

10             Oh, your Honor, I'm sorry, except for Bob

11    Champion and Mr. Roderick Ivey ever shows up, then we have

12    two.

13             THE COURT:  And--

14             MS. OWENS:  Roderick Ivey.

15             THE COURT:  Okay.  Hold one second.

16             (Bench conference between the Court and Ms.

17    Johnson)

18             THE COURT:  Okay.  So it looks like, just so that

19    you are aware, counsel, I think Mr. Champion is going into

20    closings and jury instructions this afternoon.  So we can

21    talk about continuing this later, just so that you're

22    aware.

23             What I'd like to do, I understand that Mr.--

24    you're gonna call Mr. Lee?

25             MR. CUSICK:  I was--it doesn't matter, any of the

```
 1          three.

 2                    THE COURT:  Okay.  I--

 3                    MR. CUSICK:  Walter Johnson, Devon Smith, or--or

 4          David Lee.

 5                    THE COURT:  Okay.  So I believe Mr. Lee is

 6          available here.  So I'd like to go into him a second.  So

 7          we'll just continue, knowing that you're reserving on a

 8          couple--

 9                    MS. OWENS:  Yes, your Honor.

10                    THE COURT:  --one or possibly two witnesses.

11                    So all right.  We're gonna put him on the phone

12          then.

13                    (Sidebar conversation between the Defendant and

14          Ms. Owens)

15                    MR. LEE:  I ain't got on this all together.

16                    THE COURT:  Okay.  Mr. Lee?

17                    MR. LEE:  Yes.

18                    THE COURT:  It's Judge Lightvoet.

19                    We're on the record in People v Sam Steel, and we

20          are going to proceed with your testimony, okay?

21                    MR. LEE:  Okay.

22                    THE COURT:  All right.  So what I'm going to do

23          first of all is just have the attorneys identify themselves

24          for the record a second to make sure that you can hear

25          everyone, okay?
```

```
 1                    MR. LEE:  Okay.
 2                    THE COURT:  All right.  Go ahead, counsel.
 3                    MR. CUSICK:  Paul Cusick on behalf of the People.
 4                    MS. OWENS:  Mary Owens on behalf of Sam Steel.
 5                    THE COURT:  All right.  Sir, were you able to
 6          hear the names of the attorneys?
 7                    MR. LEE:  No, your Honor.  I would like 'em
 8          repeat it.  I couldn't hear it.  I'm having trouble hearing
 9          it.
10                    MR. CUSICK:  Paul Cusick on behalf of the People.
11                    THE COURT:  Did you hear that, sir?
12                    MR. LEE:  I heard Paul.
13                    THE COURT:  Okay.  It's Paul Cusick.
14                    And I'm gonna have Miss Owens speak also, hold
15          on.
16                    MS. OWENS:  Mary Owens on behalf of Sam Steel.
17                    THE COURT:  Okay.  Can you hear that, sir?
18                    MR. LEE:  Yes, your Honor.
19                    THE COURT:  Okay.  So what I'm going to do is
20          just let you know if at any time during the proceedings you
21          can't hear what someone is saying, let us know, okay?
22                    MR. LEE:  Yes, your Honor.
23                    THE COURT:  So just speak up right away so we can
24          have something repeated.
25                    I am going to put you under oath a moment.  I
```

```
 1          need you to raise your right hand, okay?
 2                    MR. LEE:  Okay.
 3                    THE COURT:  Is it raised?
 4                    MR. LEE:  Yes, your Honor.
 5                    THE COURT:  All right.  So do you solemnly swear
 6          or affirm that the testimony you are about to give will be
 7          the truth, the whole truth, and nothing but the truth, so
 8          help you God?
 9                    MR. LEE:  Yes, your Honor.
10                    THE COURT:  All right.  So now what I need you to
11          do is state and spell your first and last name for the
12          record, okay?
13                    THE WITNESS:  Yes.
14                    THE COURT:  All right.  Go ahead.
15                    THE WITNESS:  David, D-A-V-I-D, Lee, L-E-E.
16                    THE COURT:  All right.  I'm going to turn it over
17          to Mr. Cusick for questions.
18                    Go ahead, counsel.
19                    MR. CUSICK:  Thank you, your Honor.
20                              DAVID LEE
21          (At 12:14 p.m., called by Mr. Cusick and sworn by the Court,
22          testified as follows)
23                          DIRECT EXAMINATION
24   BY MR. CUSICK:
25   Q    Good afternoon Mr. Lee, or--or--yes.
```

```
 1   A    Good afternoon.

 2   Q    I'm just going to specifically ask you some--ask you some

 3        specific questions regarding what's happened since you

 4        testified at trial, okay?

 5   A    Okay.

 6   Q    Has anybody approached you with regards to the Sam Steel

 7        case?

 8   A    Yes, they have.  When I was in Newaygo County.

 9   Q    Okay.  And when did they approach you or--or who--who

10        approached you, if you can tell the Court that.

11   A    A guy named--I don't know I supposed to say his name, but

12        I'll say his name--his name was Wal'le Al'din

13                 THE COURT:  I missed it.  What's his name?

14                 THE WITNESS:  Wal'le Al'din.

15                 THE COURT:  Can you say it one more time slower.

16                 THE WITNESS:  Wal'le Al'din.  W-A-L--I think W-A-

17        L' apostrophe, L-E, Al'din, A-L-', apostrophe, I-N or D-E-N,

18        one of the two.

19   Q    Wal'le Al'din?

20   A    Yes.

21                 THE COURT: All right.  Go ahead.

22   Q    And what--what did he approach you about?

23   A    Well he had went to court when Mr. Steel, he was tooken.  I

24        guess Mr. Steel was discussing it, what was going on with

25        his case, and he mentioned my name.  He asked Wal'le to tell
```

1    me could I come back to court and say that the government

2    and the prosecutors made be testify to those statements, and

3    that he'll pay me whatever I wanted cause money wasn't a

4    issue.

5 Q  Okay. Sir, just can you speak a little bit slower just

6    because of the audio--audio here, if you don't mind.

7 A  Okay. Well he approached Wal'le and he was telling Wal'le

8    about the case and stuff, and he asked him to have me come

9    back to court and say the government and the prosecutors

10   from Kalamazoo forced me to say all that stuff about him,

11   and stay with a lie to get on the stand, basically to commit

12   perjury.

13 Q  Okay.

14 A  And money wasn't an issue. He could pay me whatever I

15   wanted.

16 Q  Did he indicate to you that he was giving this message on

17   behalf of Sam Steel?

18 A  Yeah, he said it. He went to court with him. He rode on

19   the bus with him from the jail to the courthouse and back.

20 Q  Okay.

21 A  And then so after that--

22 Q  And then was there was anybody else--okay, go ahead, sir.

23   Did--did--what other discussion have you--did you have with

24   Malik (phonetic) Al'din.

25 A  I don't--let me see what see what--(Inaudible--speaking too

```
 1    quickly).  He just told that still I could say--you know,
 2    what I'm saying?
 3              I--so I told Wal'le I was like--so he want me to
 4    get back up there and then go up there and commit perjury?
 5    I was like man, I'm not fitting to do that.  Tell that
 6    nigger--I mean excuse--pardon the French--I said, "Tell him
 7    I'm not fitting to go back up there and I don't lie for him.
 8    He must be out of his mind."
 9  Q  Okay.
10  A  He told me after that--cause the message said since--
11              THE COURT:  Hold on a second, Mr. Lee.  You're
12    talking a little bit too fast.  I'm sorry, it's really hard
13    to hear.  So you have to slow down a little bit.
14              THE WITNESS:  All right.
15              THE COURT:  Can you repeat that, sir.
16  A  I said--and then after that it's a while.  He sent the
17    message down--cause they used to take kites through the--
18    some of the steels in the jail--and Wal'le told me that I
19    told him to tell him that I'm not fitting to go up there and
20    commit no perjury for him, and I'm not fitting to do no more
21    time for him.  He must be out of his mind.
22  Q  Did you have any other discussions with anybody else
23    regarding Sam Steel?
24  A  Yup.  I think his name--I think a Andre Smith, cause he was
25    sending me kites about one of my codefendant about what--
```

1    what--what Sam was saying about me, about he was gonna have

2    somebody get at my family and all this other stuff.  Who

3    else was it?

4  Q  So what did he--what did he indicate to you--and what's his

5    name again?

6  A  Andre Smith and Carlton Porter.  They were sending kites

7    cause they is one of my codefendant.

8  Q  And what did--what did he indicate to you Sam Steel said?

9  A  He basically told me--after my Carlton--I mean my

10    codefendant Carlton Porter was sharing a bunch of stuff, and

11    he said--Carlton told me to watch out for my family cause

12    he--I guess he got a address from when he was in the cell

13    with me, and one of the guys in the cell from me, and he

14    said he was gonna have somebody do something to my family,

15    you know.  So I had him moved so it wouldn't be no--no

16    repercussions or nothing behind that.

17  Q  Okay.  Did he say anything else regarding Sam Steel?

18  A  What else did he say?  Hold on, let me think for a second.

19    What'd I see to voice it.

20          Just that, you know, he was kind of mad at me

21    cause I wouldn't go back on my statement.

22  Q  Okay.

23  A  And I told him I wasn't fitting to get up there and commit

24    no perjury.

25  Q  Did you have discussions with anybody else regarding Sam

```
 1        Steel?
 2   A    I think Cory Morris, if I'm not mistaken.  I think he got
 3        word from it too.  He was just sending out threats cause he
 4        was upset, talking about he was--if--he wanted to come back
 5        to the same cell I was in, so we could fight.  And you know,
 6        he was just mad cause I wouldn't go back on my statement.
 7   Q    Who said this?
 8   A    Mr. Morris and Mr. Smith through Carlton Porter.
 9                   THE COURT:  I didn't hear the names.
10   A    Yeah.  Carlton Porter referred that to Mr. Smith, and I
11        think Mr. Morris was in the cell with Mr. Porter too.
12                   THE COURT:  Mr. Norris and Mr. Porter, is that
13        what you're saying?
14   A    Yep.  Mr. Porter was in the cell I guess with Mr. Steel too,
15        and--and Mr. Morris, and they--you know, he was talking
16        about it, so he was repeating all that stuff, and it got--
17        caught wind of it.
18   Q    Okay.  And they--and they indicated to you--
19   A    And it was Mr.--Mr. Porter was running a message to Andre
20        Smith.
21   Q    And--and on your--
22                   THE COURT:  And let me--I'm sorry, I've got to
23        jump in.
24                   Are you saying a gentleman named Andre Steel?
25                   THE WITNESS:  No, Smith.
```

```
 1                    MR. CUSICK:  Smith?

 2                    MS. OWENS:  Smith.

 3                    THE WITNESS:  Andre Smith.

 4                    THE COURT:  Yeah.

 5                    THE WITNESS:   He the guy was getting the message

 6          from Mr. Porter.

 7                    THE COURT:  Got it.  Thank you.

 8    A     Cause they was going to school.  I mean he was going with a

 9          guy that going to school with him.  He was going to school.

10    Q     Okay.  And so Mr. Smith reported to you what Mr. Norris and

11          Mr. Porter told--told him.

12    A     No.  Mr. Smith reported to me what the--what Mr. Porter told

13          him, and Mr.--Mr. Morris was in the cell with Mr. Porter and

14          he would just repeat stuff that--that Sam was telling him

15          and Mr. Porter.

16    Q     Okay.  Mr. Moore--and did you have contact with Mr. Morris?

17    A     Yeah.  He came down to the same unit I was in after he came

18          back off writ.

19    Q     Okay.  And what did he tell you about Sam Steel?

20    A     He just told me him and--so him and Porter was up there, you

21          know, just talking about a whole lot of stuff, and mentioned

22          certain stuff about the case, and that Sam was pissed off

23          because I had testified on him.  He was gonna try to have

24          some people (phonetic) done to my family , that he had my--

25          got--got a hold of my family member's address I guess from
```

| | | |
|---|---|---|
| 1 | | one of the guys in the cell we was in on C8, or I left some |
| 2 | | information there or somewhere. Somehow he got it like |
| 3 | | that, one of the two. |
| 4 | Q | Okay. Let me ask you this. Any--well--had--did he have any |
| 5 | | other conversations with anybody else that you recall in |
| 6 | | prison regarding Sam Steel? |
| 7 | A | Hoo, let me see. To be honest, I don't know. I mean it's |
| 8 | | been a while. |
| 9 | Q | Do you recall any other specific threats other than the ones |
| 10 | | you've already testified to? |
| 11 | A | Just he was gonna--he's gonna threaten on this guy name |
| 12 | | Chew. Sammy and his kid, they was gonna have something done |
| 13 | | to the people that was testifying against him in his state |
| 14 | | and his settle case. |
| 15 | Q | Okay. |
| 16 | A | Cause he said all of them was, you know, like they was like |
| 17 | | family. His kids, his wife, cousins or something. They was |
| 18 | | like family. He had kids by one of the guy's family. |
| 19 | Q | Okay. Sir, thank you very much. |
| 20 | | MR. CUSICK: I have nothing further. |
| 21 | A | Good--(Inaudible--speaking too quickly) |
| 22 | | THE COURT: Hold on a second. I've got another |
| 23 | | attorney that's going to ask you some questions, okay? |
| 24 | | THE WITNESS: Okay. |
| 25 | | THE COURT: All right. So go ahead Miss Owens. |

```
 1                        CROSS-EXAMINATION

 2   BY MS. OWENS:

 3   Q    Mr. Lee, this is Mary Owens.  I'm Sam Steel's attorney.

 4   A    Okay.

 5   Q    First of all, where are you talking to us from?

 6   A    I'm talking from a federal facility.

 7   Q    A federal facility where?

 8   A    Do I have to say that?

 9                  THE WITNESS:  Is it mandatory, your Honor?

10   Q    You know, Mr.--

11                  THE WITNESS:  Cause I really don't want to say

12        where I'm at for safety reasons.

13                  THE COURT:  Okay, hold on a second.

14                  Is there a reason that that needs to be

15        disclosed, no?

16                  MS. OWENS:  No.

17   Q    Mr. Lee, I'll withdrawn the question.

18   A    Yes, it is a reason it needs to be disclosed.

19   Q    But listen, you're gonna have to speak--

20                  THE COURT:  Mr.--hold--Mr. Lee, she's--

21                  THE WITNESS:  Yes.

22                  THE COURT:  --she is withdrawing the question,

23        okay?

24                  THE WITNESS:  Okay.

25                  THE COURT:  All right.  Go ahead.
```

| | | |
|---|---|---|
| 1 | Q | I'm gonna ask you to speak very slowly and very clearly |
| 2 | | because I can--I can't even make out what you've said for |
| 3 | | the last 20 minutes, okay? |
| 4 | A | Okay. |
| 5 | Q | You don't have to tell me where you are. |
| 6 | | Can you tell me what you're serving time for? |
| 7 | A | A drug--drug crime. |
| 8 | Q | A drug crime?  And how much time are you serving? |
| 9 | A | Eleven years. |
| 10 | Q | Eleven, okay. |
| 11 | | Now these conversations--first of all, you said |
| 12 | | you were approached by a man named Ali Ali (phonetic)? |
| 13 | A | Wal'le, with a W. |
| 14 | | THE COURT:  Wal'le. |
| 15 | Q | Wally, W-A-L-L-Y? |
| 16 | A | No.  It's W-A', apostrophe, -L-E-E. |
| 17 | Q | And what was his last name? |
| 18 | A | Al'din. |
| 19 | Q | Spell it. |
| 20 | A | I think it's A-L-D-I-N. |
| 21 | Q | Alean (phonetic), Wa'lee Alean. |
| 22 | A | Al'din.  Din with a D. |
| 23 | Q | Okay. |
| 24 | | THE COURT:  Is it A-L-E-E-D? |
| 25 | | THE WITNESS:  Al'din is spelled A-L-'-I think |

```
 1            apostrophe, -I-N or D-E-E-N.  I'm not--I'm not for sure.
 2    Q    Where was it that you--
 3    A    It's a Muslim name.
 4    Q    --where was it that you met this guy?
 5    A    Up in--what's the point at--D3.
 6    Q    What county?
 7    A    Newaygo.
 8    Q    And you were being held there before--before your federal
 9         proceedings terminated?
10    A    No.  I already I have--I--(Inaudible--speaking too
11         quickly)--and all that.  I already plead out and
12         everything.  I just was waiting on--
13    Q    Slow down, say it again.  Slow down.
14    A    I was just waiting.
15    Q    What were you waiting for?
16    A    I was waiting to get sentenced.  I already had pled guilty
17         and everything.  My case was over with.
18    Q    Slow down again.
19              So Mr. Alean (phonetic), is he a white guy-
20    A    Al'din--
21    Q    --an Arabic guy, or an African-American guy?
22    A    African-American.
23    Q    Okay.  And he just has a Muslim name?
24    A    Yes.  He's a Muslim.
25    Q    Do you know what his--do you know what his real name is?
```

```
 1   A    That's his real name.

 2   Q    Okay.

 3   A    I just told you.  He was born a Muslim.  He's a Muslim.

 4   Q    Okay.  And he said that--that he had a message for you?

 5   A    Yep.

 6   Q    From who?

 7   A    Sam Steel.

 8   Q    From Sam.

 9             Do you remember what month this was?

10   A    Ooo.  Let me see, oh let me think.  It was between October,

11        November of 2013.  It was when Mr. Al'din had to go to

12        court.  You just check his court records.

13   Q    So he said he had a message from Sam Steel that he--Sam

14        Steel wanted you to change your testimony, right?

15   A    Yes.

16   Q    Because you had testified at trial, right?

17   A    Yes.

18   Q    And as I recall the substance of your testimony, you said

19        that Sam had shot up a group of people with an Uzi.

20   A    No, I didn't say a group of people.

21   Q    Well it was something like that, right?

22   A    No.  It said--he said--he told me that he shot the guy up

23        that's supposed to been kipped (phonetic) out one of his

24        kids.

25   Q    Okay, got it.  I understand now.
```

```
 1              And so did Mr. Ali Waleed (phonetic) tell you
 2        what he--what Sam wanted you to say?
 3    A   Let me see.  No, he didn't tell me what he wanted to say.
 4        He just told me he wanted me to change the story and tell
 5        them that--that the--the government and the Kalamazoo
 6        police department made me say all that stuff.  And I told
 7        him he must be out of his mind cause I'm not fitting to go
 8        up there and commit no perjury for him.
 9    Q   Did--
10    A   And he told me he'd pay whatever he--I wanted, money is not
11        a issue.
12    Q   Where was--was Sam at the Newaygo County Jail at this time?
13    A   Yes, he was.
14    Q   Did Wa'lee Aleed (phonetic) say how he had gotten that
15        message from Sam?
16    A   Yes.  They went to court together on the writ--on the writ,
17        when you ride from the county jail to the courthouse.
18    Q   Did you ever personally talk to Sam while you were at the
19        Newaygo County Jail?
20    A   Not after I went to court.
21    Q   Then you said that you got a message from Andre Smith?
22    A   Yes, yes I did.
23    Q   Is this also while you were at the Newaygo County Jail?
24    A   Yes.
25    Q   You hadn't been sentenced yet?
```

```
 1  A   Let me see.  No.  No, I--no, ma'am, I hadn't been sentenced
 2      yet I don't think.  No.
 3  Q   And this would have been in what month?
 4  A   I think that--that in--around--I think around the same time
 5      where--November--I think October--between October and
 6      November.  All that stuff happened then before he left and
 7      went on his writ.
 8  Q   And as I heard you, Mr. Lee, the message from--that Mr.
 9      Smith said or what Mr. Smith's words were that someone was
10      going to get at your family--
11  A   Yep.
12  Q   --and they had your address.
13  A   Yep.  And that was the message that came down from Chew
14      too.  I forgot all about him.  One of the other guys had
15      testified against him.  He told me to have--
16  Q   That was--wait.  Slow down.  Stop, stop.
17          That was the message from Choo-choo?
18  A   Yes.  I forgot about him.  He was the guy that I guess that
19      testified on Mr. Steel too, one of the people that he said
20      he threatened the people's family.
21  Q   That he was gonna hurt Choo-choo's family?
22  A   Mine.  He told me to have my family move because he caught
23      word of it, they're saying that--that Mr. Steel was trying
24      to have something done to my family too.
25  Q   Do you know what the real name is of Choo-choo?
```

| | | |
|---|---|---|
| 1 | A | I know I ain't--I know--no, I don't. |
| 2 | Q | Okay. |
| 3 | A | I just know he's from Kalamazoo. |
| 4 | Q | And-- |
| 5 | A | He's one of the--one of the guys that testified against Mr. |
| 6 | | Steel. |
| 7 | Q | So Mr. Smith said-- |
| 8 | A | No, not Mr. Smith, Chew. |
| 9 | Q | Choo-choo's--what--I guess I'm totally confused. |
| 10 | A | I'm saying it's Chew, just like chewing gum. One chew, |
| 11 | | that's all I know. |
| 12 | Q | Chew. I'm totally confused. Who told you that Sam Steel |
| 13 | | was gonna get at your family? |
| 14 | A | Mr. Chew, and a message came. Mr. Smith too, through |
| 15 | | Carlton Porter, cause they was sending notes back through |
| 16 | | each other to give me notes. |
| 17 | | THE COURT: Let me just-- |
| 18 | A | I said Chew, just Mr. Smith. |
| 19 | | THE COURT: Let me just make sure --this is Judge |
| 20 | | Lightvoet. I just want to make sure I understand or I'm |
| 21 | | following you. |
| 22 | | Did you indicate that Mr. Smith told you that Sam |
| 23 | | Steel was trying to get at your family or something to that |
| 24 | | effect? |
| 25 | | THE WITNESS: Yes, through Mr. Porter though a |

```
 1    kite.
 2                    THE COURT:  Okay.  And--
 3                    THE WITNESS:  Chew.
 4                    THE COURT:  --Mr. Chew also told you that?
 5                    THE WITNESS:  Yes.
 6                    THE COURT:  And if I understand you, you did not
 7           speak with Mr. Smith or Mr. Chew directly, but you received
 8           this information though a kite?
 9                    THE WITNESS:  No.  Mr. Smith was in the same cell
10           as me in D3.
11                    Mr. Chew, after he came back from the writ to
12           testify against Sam Steel, was in D2.  So we was right
13           beside each other.
14                    When we went to writ, we went to writ to
15           together, that's when he was telling me.
16                    THE COURT:  Okay.  So they were--
17                    THE WITNESS:  And I--and I was in the cell with
18           Andre Smith.  He was getting the kites from Mr. Porter
19           cause Mr. Porter was supposed to be in the cell with Mr.
20           Steel too.
21                    THE COURT:  Okay.
22                    THE WITNESS:  So they was just getting the kites
23           back and forth from Mr. Smith to Mr. Porter.
24    Q    So this is just what you understand based on what Mr. Chew,
25           and Mr. Smith, and Mr. Porter have related to you?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay. |
| 3 | A | And because an incident happened with one of my kids. Two |
| 4 | | guys ran up on him and he ended up having to go get a gun |
| 5 | | from somewhere, and they took my son to jail   But he |
| 6 | | couldn't, they said he had to protect himself. |
| 7 | Q | So-- |
| 8 | A | Ain't-- |
| 9 | Q | Mr. Lee, say that--repeat that whole thing again. Did |
| 10 | | something happen to your family? |
| 11 | A | Yeah. One--some--one of my older sons, he lives in Grand |
| 12 | | Rapids. Some guys ran up on him, talking about they was |
| 13 | | gonna do some harm to him, and he got scared, and he end up |
| 14 | | going to get a gun from somewhere, and he ended up getting |
| 15 | | caught with a gun at school. They don't-- |
| 16 | Q | So your son got caught with a gun at school because he was |
| 17 | | carrying it for self-protection? |
| 18 | A | Yes. |
| 19 | Q | When did this happen? |
| 20 | A | I think February or March of 2014. |
| 21 | Q | Now what makes-- |
| 22 | A | All this-- |
| 23 | Q | Did--did-- |
| 24 | A | --and everything I'm saying could be confirmed. |
| 25 | Q | --did your son say that these guys that jumped him had said |

```
 1        they were doing it because of Sam Steel?

 2   A    No, ma'am, they did not.

 3   Q    So could--

 4   A    All he said that he--he--he really wouldn't want to talk

 5        about it cause he was kind of scared.  He really hasn't

 6        confirmed everything to me.  He just said on the phone that

 7        some guys ran up on him, you know, trying to do harm to

 8        him, and he got scared.  So he went and got a gun from one

 9        of his friends or whoever he got it from, and he ended up

10        get caught with it at school.  Cause he was scared and he

11        had to protect hisself.

12             And I asked him why he just, you know, tell

13        somebody about it.  And he was like, you know, people

14        around there, they--they really don't be telling on nobody.

15        He wanted to take care of his ownself, and he ended up

16        getting in trouble.  He on probation for it right now as we

17        speak.

18   Q    Has anything else happened to your family?

19   A    No.  The rest of 'em moved.

20   Q    Oh, they did move?

21   A    Yes.  The address he had was the address I was writing

22        about one of my kid's mother, and she moved.  She moved

23        right after I told her about all this stuff.  She moved to

24        a different place.

25   Q    Thank you, Mr. Lee.
```

```
 1    A     You welcome.

 2                    THE COURT:  Any follow-up?

 3                    MR. CUSICK:  Just one, one question.

 4                         REDIRECT EXAMINATION

 5    BY MR. CUSICK:

 6    Q     Sir, Jackie Fisher, does that name ring a bell to you?

 7    A     Oh yeah, I forgot about Mr. Fisher.  Yep.  I forgot all

 8          about him.

 9    Q     What did he tell you or who is he?  First of all, who is

10          he?

11    A     Mr. Fisher is a guy I met in the--in D3 and I seen him on--

12          on a writ when I first got indicted on this case I was on,

13          I'm serving time for right now.  I forgot all about Mr.

14          Fisher.

15    Q     Okay.  And what did he say regarding Sam Steel?

16    A     He said--he said Sam was talking crazy, talking about he

17          gonna have something done to my family.  He got my address.

18          He told me the same thing Mr. Smith told me and Mr. Chew

19          told me through Carlton Porter.

20                    Cause I guess they was around there together at

21          the same cell or whatnot.  And he told me a whole lot of

22          stuff the guy was saying.  He--he told me a whole lot of

23          stuff Mr. Porter was saying too, but you know, I know Mr.

24          Porter, so I really didn't believe some of the stuff he

25          said, but you know, anything is possible about what Mr.
```

| 1 | | Porter wanted to do, whatever, but I didn't take heed to |
| 2 | | that though cause I know Mr. Porter, so I really wasn't |
| 3 | | paying attention to what he was saying |
| 4 | Q | Okay.  Did--did Jackie say anything else? |
| 5 | A | Yeah, he just told me--when he--when he came and told me, |
| 6 | | we--we was talking in D3.  He just told me, "Man, look, you |
| 7 | | better move your family cause the guy got your address.  I |
| 8 | | don't know if he got it from one of the guys in the cell or |
| 9 | | you left notes behind with your address on one of your |
| 10 | | kid's mothers," to move your family because he wanted to |
| 11 | | retaliate against my family.  And he told me move-- |
| 12 | Q | And was this--did he say this because he spoke with Sam |
| 13 | | Steel? |
| 14 | A | I guess.  I don't--I don't know. |
| 15 | Q | Okay. |
| 16 | A | I'm not even gonna--I don't even give me the guess on the |
| 17 | | line. |
| 18 | Q | I don't want you to guess. |
| 19 | A | I think that's what he said.  He said--excuse me? |
| 20 | Q | I don't want you to guess. |
| 21 | | Did he say anything else? |
| 22 | A | Let me see.  It's a while ago.  I mean that's about it, you |
| 23 | | know.  Just watch my family, get my family out the way |
| 24 | | because the guy's kind of pissed. |
| 25 | Q | All right, sir.  Thank you. |

```
 1   A      He wanted--okay.

 2                   MS. OWENS:  Nothing else, your Honor.

 3                   THE COURT:  All right.  Thank you, sir, we are

 4          all set.  We're going to hang up with you, okay?

 5                   THE WITNESS:  Excuse me?  I couldn't hear you.

 6                   THE COURT:  We are all done.  So you can hang up,

 7          Mr. Lee.

 8                   THE WITNESS:  Okay.  Thank you.

 9                   (At 12:36 p.m., the witness was excused)

10                   UNIDENTIFIED MALE:  Is that it?

11                   MR. LEE:  Yeah, that's it.

12                   THE COURT:  Why don't we take about a half-an-

13          hour break and we'll come back about 1:00 o'clock.

14                   Will that give you enough time?

15                   MR. CUSICK:  (Inaudible--beeping phone)

16                   THE COURT:  About a half-hour?

17                   MS. OWENS:  Half-hour, sounds good.

18                   Your Honor, can I leave my stuff here?

19                   THE COURT:  We'll lock everything up.

20                   So we'll start again about 1:00 o'clock.

21                   MR. CUSICK:  Okay.

22                   THE COURT:  Shortly after.

23                   Court's in recess.

24                   (At 12:36 p.m., court recesses)

25                   (At 1:30 p.m., court resumes)
```

1          MS. JOHNSON:  The Court recalls the case of

2     People of the State of Michigan versus Samuel Steel, Case

3     Number 2011-1983FC.

4               Parties, please restate appearances for the

5     record.

6               MR. CUSICK:  Good afternoon, your Honor, Paul

7     Cusick on behalf of the People.

8               MS. OWENS:  Mary Owens on behalf of the Defendant

9     Sam Steel.

10              THE COURT:  We're still waiting for the witness

11     so--

12              MR. CUSICK:  For the witness or--

13              THE COURT:  Yeah.  They're still trying to get a

14     hold of Mr. Johnson.  So I understand we're close.

15              MR. CUSICK:  Okay.  We have the numbers of--

16              THE COURT:  I'm sorry?

17              MR. CUSICK:  You have the numbers to call?

18              THE COURT:  Yes.  He's got 'em and--

19              MR. CUSICK:  Okay.

20              THE COURT:  We did discuss, counsel, the fact

21     that we'll continue the hearing next Wednesday at 10:00

22     o'clock.  So I know, Miss Owens, you're gonna check and let

23     us know if there's a problem, but we'll continue the

24     hearing then too and wrap things up it looks like next

25     Wednesday at 10:00.

```
 1                    (Sidebar conversation between Ms. Owens and the

 2        Defendant)

 3                    MR. CUSICK:  Can I put my plug my phone in here,

 4        your Honor?  Can I just--(Inaudible--speaking away from the

 5        microphone).

 6                    THE COURT:  Is there a plug there?

 7                    MS. JOHNSON:  There is.

 8                    MR. CUSICK:  Yeah.  Actually, no there isn't.

 9        So--

10                    THE COURT:  As long as it doesn't go off.

11                    MR. CUSICK:  No, it's gonna be off.

12                    MS. JOHNSON:  There's one on the other side.

13                    MS. OWENS:  It's over here.

14                    THE COURT:  Yeah, I think there's one over here

15        too, if you're looking for one.  Maybe there's one over

16        there?

17                    MS. JOHNSON:  Is that one on the outside?

18                    THE COURT:  Or else right here?

19                    MR. CUSICK:  I'm turning it off, so it won't go

20        off.  Just charging it.

21                    THE COURT:  That--that goes to the attorney

22        general budget though, not ours.

23                    The electric bill's heading your way this month.

24                    MR. CUSICK:  Okay.  And those decisions are made

25        higher than me, so I don't care.
```

```
 1                    (Sidebar conversation between Ms. Owens and the

 2          Defendant)

 3                    THE COURT:  I bet if I entered that order, it

 4          wouldn't be followed though.

 5                    Mr. Johnson?

 6                    MR. JOHNSON:  Hello?

 7                    THE COURT:  Hi, Mr. Johnson?

 8                    MR. JOHNSON:  Yes.

 9                    THE COURT:  It's Judge Lightvoet.

10                    We are on the record in People v Sam Steel, sir.

11                    We will have you testify in a moment.  I'm just

12          going to have the attorneys state their names for the

13          record just to make sure that you can hear them, okay?

14                    MR. JOHNSON:  Yes.

15                    THE COURT:  And if at any time during this

16          process, you can't hear what someone is saying, just let us

17          know and go ahead and interrupt, okay?

18                    MR. JOHNSON:  Yup.

19                    MR. CUSICK:  Mr.--

20                    THE COURT:  All right.  Go ahead.

21                    MR. CUSICK:  Mr. Johnson, this is Paul Cusick for

22          the People.

23                    MR. JOHNSON:  Uh-huh.

24                    MS. OWENS:  Mr. Johnson, my name is Mary Owens

25          for Sam Steel.
```

```
 1                    THE COURT:  All right, sir, were you able to hear
 2         the names of the attorneys?
 3                    MR. JOHNSON:  Yes.
 4                    THE COURT:  Okay.  So please, we've had some
 5         difficulties with the phone lines, so just please speak
 6         slowly and loud so that we can hear what you're saying,
 7         sir.
 8                    First, I'm going to swear you in.  I need you to
 9         raise your right hand, sir.  Is it raised?
10                    MR. JOHNSON:  Yes.
11                    THE COURT:  All right.  I'm gonna give you the
12         oath.  Do you solemnly swear or affirm that the testimony
13         you are about to give will be the truth, the whole truth,
14         and nothing but the truth, so help you God?
15                    MR. JOHNSON:  Yes.
16                    THE COURT:  All right.  You can put your hand
17         down.
18                    I need you to state and spell your first and last
19         name for the record please.
20                    THE WITNESS:  Oh Walter Johnson, W-A-L-T-E-R, J-
21         O-H-N-S-O-N.
22                    THE COURT:  All right.  And just a reminder, make
23         sure you speak slowly.
24                    I'm gonna turn it over to Mr. Cusick.
25                             WALTER JOHNSON
```

```
 1           (At 1:39 p.m., called by Mr. Cusick and sworn by the Court,

 2           testified as follows)

 3                          DIRECT EXAMINATION

 4    BY MR. CUSICK:

 5    Q    Good afternoon, Mr. Johnson.

 6    A    How you doing?

 7    Q    Good.

 8               Just gonna ask you a few--a few questions

 9           regarding a Jacob Blett.  Do you--do you know who Jacob

10           Blett is?

11    A    Yes.

12    Q    And how do you know him?

13    A    He was in Newaygo County Jail.

14    Q    Okay.  Were you in the jail together in September of 2013?

15    A    I believe so, yes.

16    Q    And were you in Newaygo County Jail from September 19th,

17           2013, to May 22nd, 2014, in cellblock D2?

18    A    I think so, yes.

19    Q    Okay.  You don't disagree with those dates though.

20    A    No.

21    Q    Okay.  Now did you ever have a conversation with Jacob Blett

22           about Sam Steel?

23    A    The--the only conversation I had with him was the very first

24           day that I got to D2, and he was telling me that he went to

25           court with Sam, and that Sam was talking about me.  That was
```

| | | |
|---|---|---|
| 1 | | it. |
| 2 | Q | Okay. So he said that Sam--that he had actually gone to |
| 3 | | court with Sam? |
| 4 | A | Yeah. They was--I guess they conversated on the way back or |
| 5 | | there and back or whatever, I'm not sure. But he just was-- |
| 6 | | he was implying that I was--he was talking about me so, but |
| 7 | | that's about it though. |
| 8 | Q | Did you--did you ever talk to him about your testimony |
| 9 | | against Sam Steel? |
| 10 | A | No. |
| 11 | Q | Okay. Did you ever talk to him about Detective Beauchamp or |
| 12 | | anybody else from the police department engaging in sexual-- |
| 13 | | allowing you to engage in sexual exploits on visits? |
| 14 | A | No. |
| 15 | Q | Did that ever happen? |
| 16 | A | No, of course not. |
| 17 | Q | Did--okay. And did you--when you testified at the trial, |
| 18 | | did you testify truthfully? |
| 19 | A | Yes. |
| 20 | Q | And you never told him that you were gonna lie on behalf of |
| 21 | | Steel or that you did lie for Steel? |
| 22 | A | No. |
| 23 | Q | Against Steel. |
| 24 | A | No, uh-uh. |
| 25 | Q | Okay. That's it. Thank you, sir. |

```
 1    A     Mmm-hmm.

 2                   THE COURT:  Just a second, sir.  I'm gonna--going

 3          to turn it over to the next attorney, okay?

 4                   THE WITNESS:  All right.

 5                             CROSS-EXAMINATION

 6    BY MS. OWENS:

 7    Q     Mr. Johnson, this is Mary Owens.  I'm Sam's lawyer.

 8    A     Okay.

 9    Q     So I want to establish a few facts.  You were in jail, the

10          Newaygo County Jail, with Jacob Blett between September of

11          2013 to May of 2014.

12    A     Yeah, correct.

13    Q     And were you in the same unit?

14    A     Yes.

15    Q     Was Devon Smith there?

16    A     Yes.

17    Q     Was Devon Smith in the same unit?

18    A     Yes, ma'am.

19    Q     Would you have had the opportunity to talk to Mr. Blett?

20    A     Yeah.  He was--he wasn't someone that I associated with.

21    Q     But you--you would have had the opportunity to talk to him

22          on a daily basis, correct?

23    A     Yeah.  We in the same cell, yes.

24    Q     You're in the same cell, right?

25    A     Yeah, yeah.
```

| | | |
|---|---|---|
| 1 | Q | Okay. And who else was in the cell with you? |
| 2 | A | Excuse me? |
| 3 | Q | Who else was in the cell with you? |
| 4 | A | Like 20--22 other people. |
| 5 | Q | So you and Jacob were in the same cell. |
| 6 | A | No. |
| 7 | Q | How about Devon, was he in with you too? |
| 8 | A | Yes. It was 24 people in that cell. |
| 9 | Q | Okay. Do you know whether Devon Smith ever talked to Jacob |
| 10 | | Blett about Sam Steel? |
| 11 | A | I doubt he would. We didn't like Mr. Blett. |
| 12 | Q | Did you and Devon ever talk about Mr. Steel while you were |
| 13 | | in the jail? |
| 14 | A | No. |
| 15 | Q | Not once? |
| 16 | A | No. It was for--for what? We--it was--it was over with. |
| 17 | | What was there to talk about? |
| 18 | Q | Mr. Blett said he went to court one day with Sam Steel. |
| 19 | A | Uh-huh. |
| 20 | Q | Would that have been from the Newaygo County Jail to |
| 21 | | Kalamazoo? |
| 22 | A | No, I think it was to Grand Rapids and back. |
| 23 | Q | Federal court? |
| 24 | A | Yes. |
| 25 | Q | So was Sam Steel housed at the Newaygo County Jail? |

1   A    Yes.

2   Q    At the same time you were?

3   A    Yes, on a different--in a different area.

4   Q    So do you know when it was that Mr. Blett said he went to

5        court with Sam?

6   A    It was the very first day that--the very first day of

7        September that I arrived in Newaygo was the exact same day

8        they went to court.

9   Q    Okay.  Mr. Johnson, did you talk to anybody about your

10       testimony here today?

11  A    No.

12  Q    Have you talked to the prosecutor Mr. Cusick about at all?

13  A    No, I haven't.

14  Q    Did you talk to Detective Beauchamp?

15  A    No, I haven't.

16  Q    You said that--well let me ask you this.  Were you given any

17       sort of special visits while you were waiting in the jail to

18       testify?

19  A    I don't--what--what do you mean special visits?

20  Q    Like visits from family.

21  A    I don't know if that's considered special, but yeah, I had

22       visits from family, yes.

23  Q    Did you have any visits from any female friends?

24  A    Yes.

25  Q    Did you ever have a sexual encounter with any female visitor

```
 1        while you were at the jail?
 2   A    Never.  All the visits were--were on camera, so no.
 3   Q    Did you ever get any special telephone calls or any--
 4        anything out of the ordinary that was allowed to any other
 5        prisoner?
 6   A    No.
 7   Q    Thank you, Mr. Johnson.
 8   A    Yep.
 9                 THE COURT:  Go ahead, Mr. Cusick.
10                      REDIRECT EXAMINATION
11   BY MR. CUSICK:
12   Q    Mr. Johnson, with regards to the time that the Defen--Mr.--
13        the Defendant Mr. Steel and Jacob Blett were together,
14        that's just based on your conversations with Mr. Blett,
15        correct?
16   A    Correct.
17   Q    You don't know one way or the other if that's correct,
18        right?
19   A    True.  I don't--I'm not sure.
20   Q    Okay.  Thank you.
21                 MR. CUSICK:  Nothing further.
22                     RECROSS-EXAMINATION
23   BY MS. OWENS:
24   Q    Mr.--Mr. Johnson, while you were locked at the Newaygo
25        County Jail, did you ever go to another location for a
```

1      sexual encounter?

2   A  No.

3   Q  So never--Detective Beauchamp never arranged for you to be

4      taken somewhere else so you could visit privately?

5   A  No.  What--what do you mean?  What--what you mean have a

6      interview with me or something?

7   Q  Have a sexual encounter with a visitor.

8   A  Oh, no.  Never.

9   Q  Thank you.

10            MR. CUSICK:  I have nothing further, your Honor.

11            THE COURT:  Mr. Johnson, this is Judge Lightvoet.

12     I have a question.

13            There was some testimony earlier in this hearing

14     that you arrived at the Newaygo County Jail with some items

15     that included Kool-Aid, chips, soap, candy, snacks,

16     etcetera, that were not normally items that other inmates

17     would have access to.  Is that accurate, sir?

18            THE WITNESS:  Those items were brought from Paw

19     Paw County Jail.  They sell different items than Newaygo do.

20            THE COURT:  So you came from Paw Paw and then

21     you--in September of 2013 and then you were transferred to

22     Newaygo?

23            THE WITNESS:  Correct.

24            THE COURT:  So did you come with some of those

25     items?

1    THE WITNESS:  Yes, ma'am.  They don't let your
2    stuff-
3    THE COURT:  And how did you--how did you obtain
4    possession of those items?
5    THE WITNESS:  I purchased them on the store.
6    THE COURT:  So you brought them, they weren't
7    given to you by any detectives or officers or anything?
8    THE WITNESS:  No.  No, ma'am, they were not.
9    THE COURT:  There has been some testimony that
10   you indicated to somebody that you received some special
11   visits where--at Crosstown at or near Kalamazoo County,
12   where females would come in, and they would shut the
13   cameras off, and allow you to gay--engage in sexual
14   activities while you are in custody.  Is that true, sir?
15   THE WITNESS:  That's totally false, ma'am.
16   THE COURT:  So that did not happen?
17   THE WITNESS:  That definitely did not happen.
18   Only person I visited with was family and friends, and the
19   camera was on all the time.  Nothing sexual happened.
20   THE COURT:  And I believe the indication was that
21   in exchange for your testimony, you were able to engage in
22   those types of activities.  Is that true or false, sir?
23   THE WITNESS:  That's false.
24   THE COURT:  Are you aware of anyone else who may
25   have testified in Mr. Steel's trial that received that type

1      of treatment that you have heard of, sir?

2                    THE WITNESS:  Ma'am, that--no, that?  No.  No.

3      That's very--that's real unprofessional.  I--they did not--

4      no.  That's all false.  Somebody's making up stuff.

5                    THE COURT:  Give me a moment.  I'm going through

6      my notes.  Hold on a second, sir.

7                    All right.  I don't have any other questions.

8      Hold on a second, I'm gonna see if the attorneys have any

9      follow-up questions.

10                   Your witness, Mr. Cusick, any follow-up

11     questions, sir?

12                   MR. CUSICK:  Thank you, your Honor.

13                       REDIRECT EXAMINATION

14     BY MR. CUSICK:

15  Q  Mr. Johnson, you said you bought candy.  That--that wasn't-

16     -you weren't given any money by the Kalamazoo police

17     department to buy candy or anything, were you?

18  A  No, no sir.

19  Q  Okay.  Thank you, sir.

20                   THE COURT:  Miss Owens.

21                   MS. OWENS:  Thank you, your Honor.

22                      RECROSS-EXAMINATION

23     BY MS. OWENS:

24  Q  Mr. Johnson, did you get any visits while you were at

25     Crosstown?

```
 1    A     From family, yes.

 2    Q     Pardon me?

 3    A     Yes, yes, ma'am.

 4    Q     Was there from a female visitor named Tawalla (phonetic)?

 5    A     Yes, ma'am.

 6    Q     And who is she to you?

 7    A     She's my son's mother.

 8    Q     Okay.  And this was a private visit?

 9    A     What do you mean private?

10    Q     Well let's be--let me be real blunt.  Did you have sex with

11          her?  Any sort of sexual activity with her on that visit?

12    A     No.  Of course not.

13    Q     Okay.  Was it under a camera?

14    A     Yes.

15    Q     Was it being videotaped?

16    A     Yeah.  It was with--it was with her, as well as my mother

17          and my son, and other family members also.

18    Q     So it was not a private visit by any means?

19    A     No.

20    Q     Not secluded?

21    A     No

22    Q     Okay.  Thank you.

23                THE COURT:  Any other questions, Miss Owens?

24                MS. OWENS:  No, your Honor.  Thank you.

25                THE COURT:  Mr. Cusick, any questions?
```

1          MR. CUSICK:  No, your Honor.  Thank you.

2          THE COURT:  All right.  Mr. Johnson, thank you,

3     sir.  We are going to go ahead and shut off the phone.

4          THE WITNESS:  Oh okay.  I'm done?

5          THE COURT:  You are done.

6          THE WITNESS:  All right.  Thank you.

7          (At 1:51 p.m., the witness was excused)

8          THE COURT:  And we need to wait for another

9     witness.

10         (Sidebar conversation between Ms. Johnson and the

11    Court)

12         THE COURT:  Apparently we're moving the next

13    witness to a different room.  So we will need to contact

14    them as soon as they make those arrangements, and then

15    we'll--then they will contact them by phone, and then we'll

16    be all set.  But my understanding is it might be five to

17    ten minutes.

18         So I'm going to recess for five to ten minutes.

19    Court's in recess.

20         (At 1:54 p.m., court recesses)

21         (At 2:12 p.m., court resumes)

22         MS. JOHNSON:  The court recalls the case of the

23    People of the State of Michigan versus Samuel Steel, Case

24    Number 2011-1983FC.

25         Parties, please restate appearances for the

record.

MR. CUSICK:  Paul Cusick on behalf of the People, your Honor.

MS. OWENS:  Mary Owens on behalf of the Defendant.

THE COURT:  All right, counsel, we're just waiting for the witness to get on the phone.

(At 2:13 p.m., bench conference begins between the Court and Ms. Johnson)

(At 2:13 p.m., bench conference ends)

MR. SMITH:  Hello?

THE COURT:  Hi, Mr. Smith?

MR. SMITH:  Yes, how you doing?

THE COURT:  Good.

This is Judge Lightvoet.

We are on the record, sir.

Before I swear you in as our next witness, I'm going to have the attorneys identify themselves for the record just to make sure you can hear everyone, okay?

MR. SMITH:  Yes, ma'am.

THE COURT:  All right.  Go ahead, Mr. Cusick.

MR. CUSICK:  Thank you, your Honor.

Good afternoon, Mr. Smith.  This is Paul Cusick on behalf of the People.

MR. SMITH:  Yeah, how you doing?

MS. OWENS:  Mr. Smith, this is Mary Owens.  I'm
Sam's lawyer.

        MR. SMITH:  How you doing?

        THE COURT:  Okay.  So it sounds like you're able
to hear everyone, is that correct, Mr. Smith?

        MR. SMITH:  Yes, ma'am.

        THE COURT:  All right.  So if at any time during
this proceeding you can't hear what someone is saying, just
please jump in so that we can have make sure we have what
was said repeated, okay?

        MR. SMITH:  Yes, ma'am.

        THE COURT:  Please speak slowly and loud also.
We have been having some issues with the phones.  So we
just want to make sure everyone can hear what you're
saying.

        I'm going to ask you to raise your right hand
first of all.  Is it raised?

        MR. SMITH:  Yes, ma'am.

        THE COURT:  All right.  Do you solemnly swear or
affirm that the testimony you are about to give will be the
truth, the whole truth, and nothing but the truth, so help
you God?

        MR. SMITH:  Yes, ma'am.

        THE COURT:  All right.  You can put your hand
down, sir, and I will turn it over to Mr. Cusick.

```
 1              MR. CUSICK:  Thank you, your Honor.
 2              THE COURT:  Oh, I'm sorry.
 3              I need you to state and spell your first and last
 4         name for the record, sir.
 5              THE WITNESS:  Devon Smith, D-E-V-O-N, S-M-I-T-H.
 6              THE COURT:  Go ahead.
 7              MR. CUSICK:  Okay.  Thank you, your Honor.
 8                           DEVON SMITH
 9         (At 2:14 p.m., called by Mr. Cusick and sworn by the Court,
10         testified as follows)
11                        DIRECT EXAMINATION
12    BY MR. CUSICK:
13    Q    Mr. Smith, good afternoon.
14    A    Good afternoon.
15    Q    I'm just gonna ask you a few questions with regards to a
16         Jacob Blett.  Do you know Jacob Blett?
17    A    No, I don't.
18    Q    Okay.  Do you know--do you--do you--did you have contact
19         with anybody by that name that you recall?
20    A    No, I don't know a Jacob Blett.  No.
21    Q    Jake--Jacob Blett?  Okay.
22    A    No.
23    Q    Did--did--were you in a cell with Walter Johnson in
24         September of 2013 while you were at Newaygo County Jail
25         together?
```

| | | |
|---|---|---|
| 1 | A | 2013, let me remember.  Yes, yes. |
| 2 | Q | Okay.  And was Richard Smith there with you as well? |
| 3 | A | Yes, sir. |
| 4 | Q | Was there any other individual that was with you there? |
| 5 | A | It was a guy named--that I talked to was John McKenzie.  He |
| 6 | | was in there with us.  He was from Kalamazoo.  I didn't |
| 7 | | really know the other guy.  I didn't talk to nobody really. |
| 8 | | I was kind of like to my own.  Just like I talked to Richard |
| 9 | | and Walt, but nobody else.  The only one I can remember was |
| 10 | | John McKenzie. |
| 11 | Q | Okay.  So would it be fair to say that there may have been a |
| 12 | | Jacob Blett that was around you that you may have spoken |
| 13 | | with, you just didn't know his name? |
| 14 | A | Yeah.  I don't recall that name of Jacob Blett |
| 15 | Q | Okay. |
| 16 | A | Cause I really didn't talk to nobody like that.  You know, I |
| 17 | | was kind of personal with my business.  I don't really talk |
| 18 | | to anybody that I don't know. |
| 19 | Q | Right.  But you may have spoken to him and just not knowed-- |
| 20 | | known his name, correct? |
| 21 | A | I really couldn't say because I really didn't talk to--I was |
| 22 | | kind of, like I said, personal with myself regarding my |
| 23 | | situation-- |
| 24 | Q | Okay.  Did-- |
| 25 | A | --my situation.  So I really didn't talk to people. |

```
 1   Q   Okay.  Did you ever speak with anybody about the Sam Steel
 2       trial that you testified at?
 3   A   No, not that I--no.  I never--no.
 4   Q   Okay.  Did you--when you testified back in August of last
 5       year, did you tell the truth when you came on the stand?
 6   A   Yes, sir, always.
 7   Q   Okay.  And did--so you never told anybody that you lied,
 8       correct?
 9   A   No, no, no.  None of that
10   Q   And you never concoct--told anybody that you concocted a
11       story with Walter Johnson to go after the Defendant Sam
12       Steel, is that correct?
13   A   No.  I never had a chance to do nothing like that never.  I-
14       -I mean the truth is the truth, and that's what I spoke
15       during the trial.
16   Q   Okay.  And you never indicated that--wait.  Were you given
17       any type of special visits from Detective Beauchamp?
18   A   No.  The visits was just like any other prison visit, you
19       know.  It's just like--it wasn't nothing special about it.
20   Q   Right.
21   A   Just the same as you get from federal prison.
22   Q   You were never given an opportunity for any type of sexual
23       exploits with anybody?
24   A   Sexual?
25   Q   Yeah.  I'm just--I'm just asking, sir.
```

```
1    A    No.  No, no.  None of that.

2    Q    Okay.

3               MR. CUSICK:  I have nothing further, your Honor.

4         Thank you.

5               THE COURT:  Go ahead, Miss Owens.

6                         CROSS-EXAMINATION

7    BY MS. OWENS:

8    Q    Mr. Smith, this is Mary Owens, and I'm Sam's lawyer, and

9         I've got a few questions for you.

10              When exactly were you at the Newaygo County Jail,

11        between what months and what months?

12   A    The last time I was there?  Keep specific?

13   Q    Well approximately.

14   A    I was there September of last year of 2013 that I can

15        recall.

16   Q    Until when?

17   A    October.  I left there to come--

18   Q    So you were there approximately one month?

19   A    Yes.

20   Q    Do you know whether a David Lee was in the Newaygo County

21        Jail with you?

22   A    Yeah, he was in a different cell.  Yeah, I remember David

23        Lee.

24   Q    Do you go by the name of Chew?

25   A    Yes.
```

```
 1   Q    Is it like a chew your food or a choo-choo train?

 2   A    Choo-choo train.

 3   Q    Choo-choo train.  Did--was Sam Steel at the jail at the same

 4        time as you and David Lee?

 5   A    We--you'd hear rumors, but I never seen Sam.  But I heard

 6        rumors he was in the same--same jail.

 7   Q    You never had contact with him at the jail then I take it.

 8   A    With Sam?

 9   Q    Did you ever have contact with him at the jail?

10   A    With who?  David Lee or Sam?

11   Q    Sam.

12   A    No.

13   Q    Did Sam ever give you a kite or a message to give to David

14        Lee?

15   A    He gave me a kite to say--what is it--a kite that let me

16        know that he was there in the county, but like I said, I

17        never seent (phonetic) him.  It was like a message.

18   Q    A message to you or for you to give to David?

19   A    No, I never got a kite for me to give to--no.

20   Q    I--I want--it was a little bit unclear, Mr. Smith.  Can you

21        repeat that.  Sam gave you a kite to say what?

22   A    No, he--he never gave me a kite.

23   Q    Oh, he didn't give you a kite?

24   A    It--I just got--no.

25   Q    Did Sam ever ask you to pass a message to David Lee?
```

| | | |
|---|---|---|
| 1 | A | Through a trustee it was--it was a message to Sam or some-- |
| 2 | | like he will pay.  He said that he will pay David Lee, you |
| 3 | | know, like five or ten thousand dollars to lie and say that |
| 4 | | the Officer Beauchamp may--made up a story up on it, some-- |
| 5 | | something to that effect.  I can't actually remember the |
| 6 | | whole thing, but it was to that extent. |
| 7 | Q | Where did you hear that--who did you hear that from? |
| 8 | A | Don't know the trustee.  He going--I don't know.  It was a |
| 9 | | trustee in there that was serving our trays. |
| 10 | Q | So you heard that from some trustee at the jail and you |
| 11 | | don't remember his name? |
| 12 | A | No, I don't remember his name. |
| 13 | Q | But this trustee told you that Sam said he would pay someone |
| 14 | | five to ten thousand dollars to do what? |
| 15 | A | To lie and say that officer paid him to--to--somebody to |
| 16 | | make a story up to say that the officer gave--made him make |
| 17 | | up a story on it or something to that extent.  That's all I |
| 18 | | can remember. |
| 19 | Q | Okay.  So you were only in the--in the Newaygo County Jail |
| 20 | | about one month. |
| 21 | A | Yes. |
| 22 | Q | You were in the same unit as Walter Johnson. |
| 23 | A | Yes. |
| 24 | Q | You had heard the--you heard the name Jacob Blett, but you |
| 25 | | didn't talk to him. |

```
 1   A     Yeah.  I don't even know--I don't know the guy.  I don't
 2         even--I never heard his name in the cell.
 3   Q     I have nothing else.  Thank you.
 4                        REDIRECT EXAMINATION
 5   BY MR. CUSICK:
 6   Q     Mr. Smith?
 7   A     Yes.
 8   Q     Do you know a guy by the name of Butter?
 9   A     Yes, I know Butter.  Yes.
10   Q     Okay.  Who's Butter to you?  How do you know him?
11   A     Just through the cell people talking.  I never had contact
12         or nothing with the guy.  Just, you know, how you hear his
13         name in the--in the--in the cell, but nothing like as far as
14         me saying anything to him or any type of relationship.
15               The guy--when I first came in the cell, the guy--I
16         caught him looking at me in the shower, and I thought he was
17         a homosexual, so I wanted to beat him up.  So I never had
18         no--no words to him.
19   Q     Okay.  So now was--so you were in the same cell for a period
20         of time?
21   A     Yeah.  Yeah.
22   Q     Okay.  Was Walter Johnson and Richard Smith also there?
23   A     Yes.
24   Q     Okay.  Do you know Butter's real name?
25   A     No, I don't.
```

```
 1    Q    Okay.  And obviously just based on what you testified to,
 2         you never talked to him about Sam Steel at all?
 3    A    Never.
 4    Q    Okay.  Thank you, sir.
 5                   MR. CUSICK:   I have nothing further.
 6    A    Yes.
 7                   THE COURT:  Miss Owens.
 8                         RECROSS-EXAMINATION
 9    BY MS. OWENS:
10    Q    Mr. Smith, are you aware of a facility called Crosstown?
11    A    Crosstown?
12    Q    Police department in Kalamazoo?
13    A    Yes.  Yes.
14    Q    Did you ever get any visits there?
15    A    Yes.
16    Q    Were they arranged by Detective Beauchamp?
17    A    Yes.
18    Q    Were they unusual visits?
19    A    No.  They was--
20    Q    I mean in the sense that they were out of--were the out of
21         the ordinary?
22    A    No, ma'am.
23    Q    Did they--
24    A    It was right--it's a--that's like--like a regular visit you
25         get from a federal prison.
```

```
1    Q    Just a regular visit?

2    A    Yeah.  Like my--with your kids.  My kids come up, my

3         grandparents, just family visits, you know, that I get from

4         federal prison, same thing.

5    Q    No sexual visits or conjugal visits?

6    A    No, none of that.

7    Q    Okay.  Thank you.

8              MR. CUSICK:  I have nothing further, your Honor.

9              THE COURT:  Miss Owens, anything further?

10             MS. OWENS:  Nothing, your Honor.  Thank you.

11             THE COURT:  I just have one question, sir.

12             THE WITNESS:  Hello?

13             THE COURT:  Give me one moment.

14             Sir, there's been some testimony in this hearing

15        that we're involved in today that you--or that Detective

16        Beauchamp or someone else in Kalamazoo, the police

17        department here, set up some special visits at Crosstown so

18        that you could engage in sexual activities with whomever

19        you chose I guess in exchange for your testimony or

20        information on this case.

21             Is that true, sir?

22             THE WITNESS:  That's absolutely not true.

23             THE COURT:  There was also some testimony that

24        family members or friends of yours were given some money to

25        go to Family Dollar to buy things for you while you were
```

1     here in Kalamazoo before you left or were transferred to a
 2     different facility.  Is that accurate, sir?
 3             THE WITNESS:  No, it is not, ma'am.  That--no.
 4     We already--I already had item--items for when I had
 5     purchased from the Van Buren County Jail.
 6             THE COURT:  All right.  So I guess I had more
 7     than one question.  Sorry.
 8             You indicated that you were knew or heard of an
 9     individual named--or that was called Butter?
10             THE WITNESS:  Yes.
11             THE COURT:  Was he in the same cell as you in
12     Newaygo?
13             THE WITNESS:  Yes, ma'am.
14             THE COURT:  But you've never heard the word Jacob
15     Blett.
16             THE WITNESS:  Never.
17             THE COURT:  Did you have conversations with this
18     gentleman named Butter?
19             THE WITNESS:  No, I didn't.
20             THE COURT:  How many people were in the cell?
21             THE WITNESS:  Maybe 16 to 20.  Something like
22     that if I can remember.
23             THE COURT:  Would you associate or are--that's a
24     bad question.  Would you talk to everyone in the cell or
25     how'd that work?

```
1              THE WITNESS:  No.  I--I was in a cell with
2    Richard--Richard Smith.  So I already--and I talked to him
3    and Walter and John McKenzie.
4              THE COURT:  During the time that you were in
5    Newaygo, do you recall speaking with anyone about Sam Steel
6    or about the case, the trial?
7              THE WITNESS:  No, ma'am.
8              THE COURT:  All right.  I don't have any other
9    questions.  Hold on a second.
10             Mr. Cusick, your witness, any other questions?
11             MR. CUSICK:  I have no other questions, your
12   Honor.
13             THE COURT:  Miss Owens.
14             MS. OWENS:  I have no other questions, your
15   Honor.
16             THE COURT:  Okay.  Thank you, sir.  We're going
17   to hang up now.  We don't have any other questions for you.
18             THE WITNESS:  All right, thank you.  Have a good
19   day.
20             (At 2:28 p.m., the witness was excused)
21             THE COURT:  Okay.  So Mr. Cusick, any other
22   witness--witnesses at this time?
23             MR. CUSICK:  No, your Honor.  We just plan
24   probably after Mr. Champion testifies, Detective Beauchamp
25   will--will testify as a rebuttal witness possibly, and
```

```
1    that's all we would have.
2              THE COURT:  Okay.  And Miss Owens, anything else
3    we need to address?
4              MS. OWENS:  No, your Honor.  Except I will call
5    your office to confirm Wednesday at 10:00, and hopefully
6    that will result in us all reappearing together.
7              THE COURT:  Okay.  So we have a couple witnesses
8    that we still need to have testify for purposes of this
9    hearing.
10             My understanding is you might have one other
11   witness also, is that correct, or--
12             MS. OWENS:  Well there was--we filed a
13   supplemental--a supplement to our motion to remand, for our
14   motion to a new--for a new trial, for a gentleman by the
15   name of Roderick Ivey, whom I'm having difficulty in
16   securing his attendance.  He may very well appear.
17             I expect that his testimony would be brief, but I
18   would like the opportunity to present his testimony if, in
19   fact, we can find him.
20             THE COURT:  So there's potential there for
21   another witness.  All right.
22             So we are continuing the hearing then to, as I
23   indicated, next Wednesday at 10:00 o'clock.
24             If there's an issue, then Miss Owens, you'll--you
25   let us know--
```

```
1              MS. OWENS:  Absolutely.

2              THE COURT:  --but Mr. Champion is actually

3      supposed to be here on another matter at 9:00.

4              And so we'll continue then, and if there is a

5      problem, then obviously we'll have to get different notices

6      out and--and different writs and so forth.

7              So all right.  Anything else then that we need to

8      address at this time before we recess?

9              MR. CUSICK:  No, your Honor, thank you.

10             THE COURT:  No?

11             MS. OWENS:  Thank you very much.

12             THE COURT:  Okay.  All right.  Court's in recess

13     then.

14              (At 2:30 p.m., court recessed)

15
       STATE OF MICHIGAN    )
16                          )
       COUNTY OF KALAMAZOO  )
17

18
            I certify that this transcript, consisting of 157 pages, is
19
       a true and correct transcript of the proceedings and testimony
20
       taken in this case on August 21, 2014.
21

22
                   9-5-14
23     Date                        Dawn Morse CER 4727
                                   2003 Leigh Avenue
24                                 Kalamazoo, MI  49048
                                   (269) 808-2343
25
```