UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| SAMUEL STEEL, III, # 193624, | ) |
| | ) |
| Petitioner, | )     Case No. 1:16-cv-676 |
| | ) |
| v. | )     Honorable Paul L. Maloney |
| | ) |
| SHERMAN CAMPBELL, | ) |
| | ) |
| Respondent. | ) |

_____

## **REPORT AND RECOMMENDATION**

This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner's convictions stem from the April 24, 2011, killing of Milo Conklin. On September 6, 2013, a Kalamazoo County Circuit Court jury found petitioner guilty of first-degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), felon in possession of a firearm, MICH. COMP. LAWS § 750.224(f), and two counts of possession of a firearm during the commission of a felony (felony firearm), MICH. COMP. LAWS § 750.227b. The trial court sentenced petitioner as a fourth habitual offender to life imprisonment for the murder conviction, two to five years' imprisonment for the felon-in-possession conviction and two years' imprisonment for each felony firearm conviction.

On June 3, 2016, petitioner filed his habeas corpus petition. On July 15, 2016, petitioner filed his amended habeas corpus petition. Petitioner seeks federal habeas corpus relief on grounds that were raised and rejected in the Michigan Court of

Appeals:

I.      The trial court violated petitioner's due process right to fair trial by denying his motion for a change of venue because there was extensive inflammatory pretrial publicity.

II.      The trial court abused its discretion in granting the prosecution's motion to admit evidence regarding 404(b) acts, specifically evidence that petitioner was involved in the drug trade.

III.      The trial court committed reversible error and abused its discretion in allowing witness Kristine Wilkerson to testify "how she felt" after an agent told her that the FBI was looking for petitioner because the evidence was not relevant and was unfairly prejudicial and petitioner was denied a fair trial.

IV.      The prosecutor committed misconduct during closing argument in (1) vouching for the credibility of prosecution witnesses and (2) in violating a stipulation not to make reference to petitioner's alleged aliases.

V.      Petitioner received ineffective assistance of trial counsel because his attorney was unprepared for trial through failure to interview and present critical witnesses and failure to object to multiple instances of inadmissible and inflammatory testimony.

VI.      The petition should be granted on the basis of newly discovered evidence, or in the alternative, petitioner's trial counsel was ineffective in failing to interview, investigate, and/or call Paul Pratt and Jacob Blett as witnesses.

VII.      Petitioner's trial counsel was ineffective for failure to interview and present Roderick Ivey as a witness.

VIII.      The testimony of Jacob Blett constitutes newly discovered evidence entitling petitioner to a new trial.

IX.      Petitioner is entitled to a new trial where the trial court abused its discretion "by allowing the admittance of evidence when the court read a note from a juror asking what kind of drug [petitioner] was selling and then allowing its answer that clearly prejudiced [petitioner]."

X.      Petitioner is entitled to a new trial where the prosecutor committed misconduct by not correcting and allowing the

> prosecution's witness to give false and perjured testimony
> depriving petitioner of a fair trial.

(ECF No. 7, PageID.348-54; ECF No. 7-1, PageID.360-77).

Respondent argues that the petition should be denied because all grounds raised by petitioner lack merit.  Further, respondent argues that Grounds IV and X are also barred by procedural default.[1]  (ECF No. 10).

Judge Maloney has referred the matter to me for all purposes, including the issuance of a report and recommendation under 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Section 2254 Cases in the District Courts.  After review of the state-court record, I conclude petitioner has not established grounds for federal habeas corpus relief.  Petitioner has not shown that the state court decision rejecting the grounds raised in the petition was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" or that it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  I recommend that the petition be denied on the merits.

### **Standard of Review**

The Court's review of this petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214

---

[1]The Supreme Court has indicated that this Court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).  In the present case, the grounds raised by petitioner are meritless, so a detailed analysis of the complicated procedural default issues is unnecessary.

(AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (" '[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)). AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). It prohibits " 'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.' " *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (*per curiam*) (quoting *Renico v. Lett*, 559 U.S. 766, 779 (2010)).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "Section 2254(d) reflects that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Id.* at 102-03 (citation

and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *Davis v. Ayala*, 135 S. Ct. at 2198; *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings – not dicta – of Supreme Court decisions. *White v. Woodall*, 134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court.). "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Id.* (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)); *see Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (*per curiam*). Rather,

"[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103); *see also Dunn v. Madison*, 138 S. Ct. 9, 11 (2017) (*per curiam*).  "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' " and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Parker v. Matthews*, 567 U.S. at 48-49); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' ").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Section 2254(d)(2) requires that this Court accord the state trial court substantial deference.  If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination.  *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

## Proposed Findings of Fact

**A.    Circuit Court Proceedings**

1.    <u>Pretrial Motions</u>

On May 8, 2013, Kalamazoo County Circuit Court Judge Pamela Lightvoet conducted a hearing on a number of pretrial motions, including petitioner's motion for a change of venue.  Judge Lightvoet found that petitioner had not shown that pretrial publicity would prevent the seating of a fair and impartial jury.  The judge noted that more than two years had passed since Milo Conklin was shot and killed. (ECF No. 11-3, PageID.615-16).  Any problems stemming from potential jurors being exposed to news coverage could be addressed through the *voir dire* process.  (*Id.* at PageID.624-25).

2.    <u>Trial and Sentencing</u>

Petitioner's trial began on August 6, 2013, and it ended on September 6, 2013, with the jury's verdict convicting him of the offenses described above.  (Trial Transcripts TTI -TTVII, ECF No. 11-4, 11-6 through 11-11).  On August 6, 2013, jury selection began and ended,[2] with the jury to return and be sworn on August 27, 2013. (TTI, 4, ECF No. 11-4, PageID.651).  Judge Lightvoet adopted this schedule because she had some concern regarding the number of jurors capable of committing to a trial that could run for two weeks, and possibly three, if extended deliberations were

---

[2] *Voir dire* revealed that there were no problems related to pretrial publicity.  Only one potential juror had heard anything about this case, and that individual was excused through the use of a peremptory challenge.  (TTI, 154, 163-64, ECF No. 11-4, PageID.801, 810-11).

necessary. (*Id.* at 4, 38-42, PageID.651, 685-89).

Milo Conklin was shot multiple times on Easter Sunday, April 24, 2011, in front of a residence at 626 Mabel Street in Kalamazoo, Michigan. (TTII, 275-90, ECF No. 11-6, PageID.944-59). He later died at the hospital. (TTII, 271, 291-94, ECF No. 11-6, PageID.940, 960-63)

On April 24, 2011, two groups of people gathered at 626 Mabel and at 629 Mabel respectively. The homes were located across the street from each other. Charles Thomas owned 626 Mabel and petitioner's mother lived at 629 Mabel. (TTII, 275-341, ECF No. 11-6, PageID.944-1010; TTV, 1097, ECF No. 11-9, PageID.1771).

Milo Conklin and his girlfriend, Alesha Caper, arrived at 626 Mabel Street at approximately 4:00 p.m. (TTII, 326-29, ECF No. 11-6, PageID.995-98). Ms. Caper saw petitioner across the street. She testified that Milo Conklin waved to petitioner, but petitioner did not wave back. (*Id.* at 330, PageID.999). Ms. Caper testified that petitioner and Milo Conklin glared at each other and it was obvious to her that there was tension between the two men. (*Id.* at 331, PageID.1000).

Steven Brown, a friend of petitioner, testified that petitioner previously stated that he wanted to "get" Milo Conklin because he had broken into petitioner's house. (TTII, 441-42, ECF No. 11-6, PageID.1110-11). Walter Johnson, another friend of petitioner, testified that petitioner thought that Milo Conklin broke into his home. (TTII, 496-97, ECF No. 11-6, PageID.1165-66).

Sometime during the afternoon hours of April 24, 2011, petitioner left the residence with Walter Johnson and A. J. "Harry" Mathews in Mathews' white SUV.

Walter Johnson testified that at some point, petitioner told him that he wanted to see his gun. (TTII, 497-98, ECF No. 11-6, PageID.1166-67; TTIII, 569, ECF No. 11-7, PageID.1240). Mr. Mathews drove Walter Johnson and petitioner to the home of Johnson's cousin where Johnson retrieved a .40 caliber Heckler & Koch pistol from behind the home where it had been hidden. It was a stolen gun that Walter Johnson had obtained in exchange for narcotics. Walter Johnson gave petitioner the gun and the gun was loaded. (TTII, 498, 505, ECF No. 11-6, PageID.1167, 1174; TTIII 535, 541, 646-66; ECF No. 11-7, PageID.1206, 1212, 1317-37).

Harry Mathews dropped petitioner off on Elizabeth Street at petitioner's request. (TTIII, 570, ECF No. 11-7, PageID.1241). Walter Johnson thought that petitioner was going to "scare" Milo Conklin. (TTII, 498-99, ECF No. 11-6, PageID.1167-68; TTIII 540, ECF No. 11-7, PageID.1211). Harry Mathews drove over to Walter Johnson's father's house on Woodbury Street and parked his vehicle. (TTIII, 571, PageID.1242). (*Id.*). A few minutes later, both Walter Johnson and Harry Mathews heard multiple gunshots. (TTII, 499-500, ECF No. 11-6, PageID.1168-69; TTIII 542, 571, ECF No. 11-7, PageID.1213, 1242). The .40 caliber shell casings recovered at the scene of the shooting matched the shell casings from ammunition that had been stolen. (TTII, 344-70, 374-83, 404-06, ECF No. 11-6, PageID.1013-40, 1043-52, 1073-75; TTIII, 649, ECF No. 11-7, PageID.1320; TTIV, 1031, ECF No. 11-8, PageID.1704).

Steven Brown testified that he was at 626 Mabel Street with Milo Conklin and other friends from noon into the evening on the day of the shooting. Mr. Brown heard

gunshots and then saw petitioner walking across the street from 626 Mabel through a shortcut.  Petitioner was wearing a black hooded sweatshirt and black sweatpants. Steven Brown identified petitioner as the shooter.  Mr. Brown saw petitioner get into a white Suburban on Florence Street.  He saw Harry Mathews and another man inside the SUV.  (TTII, 427-82, ECF No. 11-6, PageID.1096-1151).

Walter Johnson testified that Mr. Matthews then picked up petitioner at Woodbury and Florence.  When petitioner got back in the SUV he asked the others whether they had heard the shots and commented that they did not think he would do it.  (TTII, 501, PageID.1170).

Harry Mathews testified that as he was driving he saw petitioner running through a field.  He pulled over to the side of the road and petitioner got into the SUV. According to Mr. Mathews, petitioner stated, "You didn't think I'd do it."  Mr. Mathews testified that petitioner instructed him to drive to his home on Douglas Street and as Matthews was driving, petitioner tossed the gun out the window. (TTIII, 572-76, ECF No. 11-7, PageID.1243-47).  Walter Johnson also testified that as they were driving away, petitioner tossed the gun out the window.  (TTII, 502, ECF No. 11-6, PageID.1171; TTIII, 576, ECF No. 11-7, PageID.1217).

They drove petitioner to his home on Douglas Street.  Petitioner went inside, changed clothes, and brought out the clothes that he had been wearing in a plastic bag.  They went to Walter Johnson's house and burned the clothes on the floor of Mr. Johnson's garage.  (TTII, 502-03, 509, ECF No. 11-6, PageID.1171-72, 1178; TTIII, 547, 576-79, ECF No. 11-7, PageID.1218; 1247-50).

Harry Mathews testified that on the day after the shooting, petitioner asked him for a ride to Grand Rapids.  Petitioner later disclosed that he did not need to go to Grand Rapids, he just needed to get rid of the gun.  Petitioner indicated that he had gone back and retrieved the gun.  He had the gun in pieces inside a bag.  As Mr. Matthews took an exit off the US-131 business loop, petitioner began tossing gun parts out the window.  (TTIII, 580-82, ECF No. 11-7, PageID.1251-53).

On November 2, 2011, Walter Johnson, was incarcerated on federal charges. He advised Detective Brian Beauchamp of the Kalamazoo Department of Public Safety, that he had information about Milo Conklin's murder.  Police later discovered a charred area two-feet in diameter on the floor of Mr. Johnson's garage.  The charred bits recovered from the garage included clothing remnants.  Both Walter Johnson and Harry Mathews cooperated in the investigation and agreed to testify at petitioner's trial as part of plea bargains.  Based on information from Mr. Mathews, police recovered part of a rusted .40 caliber Heckler & Koch pistol near a wooded area off of the highway exit.  (TTII, 505-08, ECF No. 11-6, PageID.1174-77; TTIII, 521-27, 553-55, 558, 581-88, 600-03, 727-35, ECF No. 11-7, PageID.1192-98, 1224-26, 1229, 1252-59, 1271-74, 1398-1406; TTIV, 940-64, 974-85, ECF No. 11-8, PageID.1613-37, 1647-58).

Devon Smith testified that, in November 2011, petitioner indicated that the police were "messing" with him about Milo Conklin's murder.  (TTIV, 865, ECF No. 11-8, PageID.1538).  Mr. Smith asked petitioner whether he shot and killed Milo Conklin.  Petitioner's response was, "That mother____ broke in my house, I had to."

(*Id.* at 869, PageID.1542).   Devon Smith testified regarding other details that petitioner supplied regarding the shooting.  Petitioner indicated that Harry Mathews and Walter Johnson dropped him off on Elizabeth Street.  Petitioner described how he "went through the shortcut on Elizabeth and I popped that mother_____ and kept running through there."  (*Id.* at 870, PageID.1543).  Petitioner told Devon Smith how he had burned his clothes after the shooting.  (*Id.* at 870-71, ECF No. 1543-44).

On December 22, 2011, a warrant was issued for petitioner's arrest.  (TTIV, 946, 1040, ECF No. 11-8, PageID.1619, 1713).  In the summer of 2012, FBI agents tracked petitioner to Atlanta, Georgia.

Kristine Wilkerson met petitioner in Atlanta in the spring of 2012.  Petitioner introduced himself as "Sammy Gunn."  (TTIV, 798-99, ECF No. 11-8, PageID.1471-72).  Petitioner began dating Ms. Wilkerson and she allowed him to move in with her and her daughter.  (*Id.* at 800, PageID.1473).  One morning on the way to work, she was stopped by an FBI agent.  The agent showed her a wanted poster with petitioner's picture on it.  Ms. Wilkerson testified that she was "freaking out" because before she had seen the poster, she had no idea that petitioner was being investigated by the FBI.  (*Id.* at 803-04, PageId.1476-77).  She testified that she made up the name of "Glenn Norris" for petitioner, but she had always called him Sammy Gunn.  (*Id.*).  The trial court judge overruled an objection as to the relevance of a question asking Ms. Wilkerson how she felt when she found out that petitioner was being investigated by the FBI.  (*Id.* at 804, PageID.1477).  Consistent with her earlier testimony about "freaking out," to which there had been no objection, Ms. Wilkerson stated: "I lost my

mind.  I wigged out.  I was scared to death." (*Id.* at 805, PageID.1478).  Atlanta, Georgia FBI special agents testified regarding the initial contact with Ms. Wilkerson and the details regarding how FBI agents and local law enforcement officers apprehended petitioner on August 6, 2012.  (*Id.* at 809-54, PageID.1482-1527).

David Lee testified that he and petitioner had been inmates at the Newaygo County Jail.  (TTIV, 893, ECF No. 11-8, PageID.1566).  Mr. Lee indicated that they had discussed petitioner's case.  According to Mr. Lee, petitioner stated that "some guy had seen him, or whatever, jump out the car and shoot the dude up and whatnot like 20–some times with a Uzi-looking type gun or something."  (*Id.* at 895, PageID.1568).  Petitioner related that, after the shooting, "he basically ran and he went to Georgia." (*Id.* at 896, PageID.1569).  Petitioner told David Lee that he was upset that witnesses were going to testify against him and stated that "he was just going to have to get in contact with his people that was locked up and ... whatever, I guess get rid of them, I guess."  (*Id.* at 897, PageID.1570).

The parties stipulated that petitioner "was convicted of a specified felony and was not eligible to possess a firearm as of – on April 24th of 2011."  (TTV, 1100, ECF No. 11-9, PageID.1774).

Petitioner's attorney gave an opening statement and called a number of witnesses in petitioner's defense.  (TTV, 1105-1290, ECF No. 11-9, PageID.1779-1964; TTVI, 1302-55, ECF No. 11-10, PageID.1976-2029).

On September 5, 2013, the attorneys delivered their closing arguments.  The prosecutor argued that the prosecution had proven all the elements of all the crimes

charged beyond a reasonable doubt.  He argued that the testimony of the prosecution's witnesses had been consistent with other evidence in the record.  He acknowledged that Walter Johnson had provided his testimony under a plea agreement.  He argued that the jury should not find the testimony of the defense witnesses credible because it was inconsistent and it was not supported by the other evidence.  (TTVI, 1362-99, ECF No. 11-10, PageID.2036-73).

Petitioner's attorney argued that it was undisputed that Milo Conklin was shot with the stolen gun that Walter Johnson had obtained.  He argued that petitioner would not commit crimes in front of his mother's house with a party going on.  He reminded the jury that petitioner was not on trial for being involved in drugs, but that may have been a reason he went to Georgia.  He argued that the testimony of Walter Johnson and Harry Matthews implicating petitioner was not credible and it had been provided in an attempts to reduce their sentences.  He argued that the prosecution had not carried its burden.  (TTVI at 1399-1411, PageID.2073-85).  The prosecutor gave a brief rebuttal.  (*Id.* at 1411-21, PageID.2085-95).

Judge Lightvoet gave the jury its instructions.  Among other things, she instructed the jury that it was to determine the facts of the case based on the evidence and that the lawyer's statements and arguments were not evidence.  There were no objections to the trial judge's instructions.  (*Id.* at 1422-46, 1450, PageID.2096-2120, 2124).

On September 6, 2013, the jury returned its verdict finding petitioner guilty of first-degree premeditated murder, felon in possession of a firearm, and two counts of

possession of a firearm during the commission of a felony.  (TTVII at 1455-59, ECF No. 11-11,  PageID.2129-33).   On September 30, 2013, the trial court conducted a sentencing hearing and sentenced petitioner as previously indicated.  (ECF No. 11-12; Judgment of Sentence Commitment to Department of Corrections, ECF No. 11-15, PageID.2526-27).

## B.    Subsequent Proceedings

Petitioner pursued a direct appeal.  The Michigan Court of Appeals granted petitioner's motion to remand to allow him to move for a new trial on grounds of ineffective assistance of counsel and newly discovered evidence.  (ECF No. 11-15, PageID.2664).  The Court of Appeals summarized the results on remand as follows:

> On remand, the trial court held a two-day evidentiary hearing.  At the hearing, Paul Pratt testified that on April 24, 2011, the day of the murder, he was using drugs at a house on Mabel Street.  Pratt stated that he saw defendant that day and that evening, but denied telling appellate counsel that he saw the person who shot Conklin and that defendant was not that person.
>
> Jacob Blett testified that in August 2013, he was incarcerated at the Newaygo County Jail with Johnson and Smith.  Blett stated that Johnson implied that he himself had killed Conklin.  Blett stated that Smith told him that detectives in Kalamazoo County wanted to make a case against defendant and were willing to believe information given to them without doing extensive investigation to verify the information.  Blett stated that Detective Beauchamp allowed Johnson and Smith special privileges when they went to court appearances.
>
> Lee testified that when he was in jail, he received a message that defendant wanted him to recant some previous statements.  Lee refused to do so.
>
> Johnson acknowledged that he spent time in jail with Blett, but denied speaking to Blett about his testimony at defendant's trial.  Johnson also denied receiving any special privileges in jail.  Smith also testified and agreed that he spent time in jail with Johnson, but could not recall speaking with Blett.  Smith stated that he never told anyone that he lied

at defendant's trial and denied that he received any special privileges in jail.

Roderick Ivey testified that he witnessed the Conklin shooting.  Ivey stated that he went to the location because he intended to borrow money from defendant for the purpose of buying heroin.  Ivey stated that he was standing next to defendant when the shooting occurred; Ivey identified Johnson as the shooter.   Ivey denied telling Detective Beauchamp that defendant shot Conklin.  Ivey stated that he was not contacted by defendant's trial attorney or private investigator.

Defendant's trial counsel testified that he was aware that Ivey told police that defendant did not shoot Conklin.  Trial counsel stated that he and his private investigator concluded that Ivey's statement was inconsistent with those given by better witnesses.  In addition, trial counsel stated that as he was preparing for trial, he was informed that Ivey had changed his statement and had identified defendant as the shooter.  Trial counsel did not object to testimony regarding defendant's activities as a drug dealer because he believed that evidence would be revealed regardless of any objections.  Trial counsel also stated that he believed that the evidence would be divulged by some defense witnesses.

Detective Beauchamp testified that Ivey's description of the route that the shooter took was inconsistent with statements given by other witnesses.  Ivey initially stated that he did not know the shooter, but subsequently identified defendant as the shooter.

The trial court denied defendant's motion for a new trial.  The court found that it was not reasonably probable that the result of the trial would have been different had defendant's trial counsel called Blett as a witness at trial.  Regarding Ivey, the trial court found that Ivey had credibility issues and that the decision to not call him as a witness was a matter of sound trial strategy.  The court concluded that given the circumstances, trial counsel did not render ineffective assistance.

(Op. at 4-5, ECF No. 11-15, PageID.2511-12; *see also* ECF No. 11-13 and 11-14).

Petitioner raised on direct appeal the issues that he is raising in his habeas corpus petition.  (ECF No. 11-15, PageID.2550-51, 2644).  On February 26, 2015, the Michigan Court of Appeals issued its decision rejecting all grounds raised by petitioner for lack of merit.  (Op., ECF No. 15-11, PageID.2508-23).

On September 9, 2015, the Michigan Supreme court denied leave to appeal because it was not persuaded that the questions presented should be reviewed by the court.  (ECF No. 11-16, PageID.2883).

On June 3, 2016, petitioner filed his habeas corpus petition.  (ECF No. 1).  On July 15, 2016, petitioner filed his amended habeas corpus petition.  (ECF No. 7).

## Discussion

### I.    Denial of a Motion for a Change of Venue

Ground I is petitioner's argument that the trial court violated his due process right to a fair trial by denying his motion for a change of venue.  (ECF No. 7-1 at 1, PageID.360; Petitioner's Brief at 19-23, ECF No. 11-15, PageID.2561-65; Reply Brief at 5-12, ECF No. 12, PageID.3103-3110).

" 'A fair trial in a fair tribunal is a basic requirement of due process.' " *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. . . .  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23.

Because the Michigan Court of Appeals rejected the arguments found in Ground I for lack of merit, petitioner faces a significant additional hurdle.  He must demonstrate either that the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d).

"The category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow. Indeed, the few cases in which the Court has presumed prejudice can only be termed extraordinary and it is well-settled that pretrial publicity itself – even pervasive adverse publicity – does not inevitably lead to an unfair trial." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (citations and quotations omitted). The Sixth Circuit describes the few cases where the Supreme Court has determined that an "across-the-board presumption of bias [was warranted] are *sui generis*[.]" *Id.* at 383.

Petitioner's argument that the decision of the Michigan Court of Appeals was contrary to the clearly established Federal law as determined by the Supreme Court's decisions in *Irvin v. Dowd*, 366 U.S. 717 (1961), *Murphy v. Florida*, 421 U.S. 794 (1975) and *Rideau v. Louisiana*, 373 U.S. 723 (1963) (Reply Brief at 6, ECF No. 12, PageID.3104), cannot withstand scrutiny. This case bears no resemblance to any of the extraordinary cases where the Supreme Court presumed prejudice. *See DeLisle*, 161 F.3d at 383-85.

In *Irvin v. Dowd*, Leslie Irvin was accused of the murder of six individuals in a rural community of approximately 30,000 inhabitants subjected to a barrage of inflammatory publicity immediately before his trial. This included information on Mr. Irvin's prior convictions, his confession to two dozen burglaries and six murders, including the one for which he was tried. 366 U.S. at 719-26. The panel of potential jurors consisted of 430 individuals, and the "court itself excused 268 of those on

challenges for cause as having fixed opinions as to the guilt of [Mr. Irvin]." *Id.* 727. The Supreme Court emphasized: "An examination of the 2,783-page *voir dire* record show[ed] that 370 prospective jurors or almost 90% of those examined on the point . . . [had] some opinion as to guilt – ranging in intensity from mere suspicion to absolute certainty." *Id.* Eight of the twelve individuals who served as jurors had formed an opinion that Mr. Irvin was guilty before his trial began and some went "so far as to say that it would take evidence to overcome their belief." *Id.* at 728. Suffice it to say that petitioner has not shown that he was tried in an atmosphere disturbed by an equally huge wave of pubic passion and a jury where "two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." *Id.*

In *Murphy v. Florida*, the Supreme Court rejected the petitioner's claims that his due process rights had been violated. The Court observed that the *voir dire* from this case indicated "no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." 421 U.S. at 800. Murphy's attempts to portray the pretrial publicity as inflammatory were unsuccessful. Most of the news articles were generated months before jury selection and they were largely factual in nature. *Id.* at 802. Excusing twenty individuals because they had an opinion as to Murphy's guilt was not sufficient to support his claim:

> In the present case, [] 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.

> In sum, we are unable to conclude, in the circumstances presented in this case, that petitioner did not receive a fair trial. Petitioner has failed

to show that the setting of the trial was inherently prejudicial or that the jury-selection process of which he complains permits an inference of actual prejudice.

*Id.* at 803.

Petitioner's Ground I is far weaker than the claim that the Supreme Court rejected in *Murphy v. Florida*. Here, only one potential juror had heard anything about petitioner's case, and that individual was removed from the jury through the exercise of a peremptory challenge.

Petitioner's case is nothing like *Rideau v. Louisiana*. Wilbert Rideau was arrested a few hours after allegedly robbing a bank, kidnapping three of its employees and killing one of them. 373 U.S. at 723-24. The next morning, a video and audio recording was created featuring the sheriff of Calcasieu Parish "interviewing" Mr. Rideau and his admissions "that he had perpetrated the bank robbery, kidnapping, and murder." *Id.* at 424. The local television station in a parish of only approximately 150,000 people, broadcast the interview on the date that it was recorded and twice thereafter. *Id.* Three members of the jury that convicted Mr. Rideau had heard his recorded "interview" with the sheriff on at least one occasion, and two of the members of his jury were deputy sheriffs of Calcasieu Parish. *Id.* at 725. The Supreme Court held that "it was a denial of due process of law to refuse a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to those crimes for which he was later to be charged." *Id.* at 726. "[T]he controlling factor in the decision was the fact that the public *viewed* the confession in a televised format, which of course was not the case here." *DeLisle*, 161 F.3d at 384. "[I]t was only 'the *televising* of a defendant in the

-20-

act of confessing to a crime' that the *Rideau* Court held 'was inherently invalid under the Due Process Clause of the Fourteenth Amendment.' " *DeLisle*, 161 F.3d at 384 (quoting *Estes v. Texas*, 381 U.S. 532, 538 (1965)).

The Michigan Court of Appeals found that pretrial publicity was not so extensive and so inflammatory that actual prejudice resulting from it should be presumed.  The latest articles on which petitioner relied were published ten months before his trial began.  Further, the articles "accurately cited the nature of the charges" against petitioner.  (Op. at 6, ECF No. 11-15, PageID.2513).  "The article from the website glhsreflection.org stated that [petitioner] had killed before and had 'gotten away with much more.'  However, these statements were made without attribution."  (*Id.*).  Another article "summarized the evidence produced at the preliminary examination and stated that petitioner had been ordered to stand trial.  The article was factual in nature and did not express an opinion about the case." (*Id.*).  Petitioner was not entitled to any presumption on prejudice.

Petitioner's claim of actual prejudice fares no better.  The Kalamazoo community is not as small as petitioner suggests; there is no evidence of news stories regarding any confession, and "unlike cases in which trial swiftly followed a widely reported crime," *see Skilling v. United States*, 561 U.S. 358, 383 (2010), over two years had passed since Milo Conklin had been shot and killed.  Petitioner has not shown that *voir dire* failed to adequately detect and diffuse any juror's bias.  The Supreme Court has "repeatedly emphasized" that jury selection is particularly within the province of the trial judge.  *Id.* at 386 ("[C]ourts making after-the-fact assessments of

the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges."). The Michigan Court of Appeals found no constitutional violation stemming from the trial court's denial of the motion for a change of venue. Among other things, the Court of Appeals noted that, during "*voir dire*, no potential juror indicated that he or she had formed an opinion about the case." (Op. at 6, ECF No. 11-15, PageID.2513). Only one potential juror remembered hearing a news story about the case, and that individual was excused through use of a peremptory challenge. (*Id*.). The Michigan Court of Appeals held that petitioner "ha[d] not demonstrated that pretrial publicity generated actual prejudice against him such that he did not receive a fair trial with impartial jurors." (*Id*.).

Petitioner has not carried his burden under 28 U.S.C. § 2254(d). I find that Ground I does not provide a basis for habeas corpus relief.

## II.    Evidentiary Rulings

In Grounds II, III, and IX, petitioner claims error in the trial court judge's evidentiary rulings. Ground II is a claim that the trial court abused its discretion in granting the prosecution's motion for admissibility of 404(b) acts, specifically, evidence that petitioner was involved in the drug trade. (ECF No. 7-1 at 1-3, PageID.360-62; Petitioner's Brief at 24-27, ECF No. 11-15, PageID.2566-69; Reply Brief at 12-21, ECF No. 12, PageID.3110-19). Ground III is a claim that the trial court committed reversible error and abused its discretion in allowing witness Kristine Wilkerson to testify "how she felt" after an agent told her that the FBI was

looking for petitioner because the evidence was not relevant and was unfairly prejudicial.  (ECF No. 7-1 at 3, PageID.362; Petitioner's Brief at 28-32, ECF No. 11-15,  PageID.2570-74;  Petitioner's  Supplemental  Brief  at  4-5,  ECF  No.  11-15, PageID.2648-49; Reply Brief at 15-21, ECF No. 12, PageID.3113-19).  Ground IX is petitioner's claim that the trial court judge abused her discretion by allowing a juror question asking what kind of drug petitioner was selling and then allowing an answer that  clearly  prejudiced  petitioner.   (ECF  No.  7-1  at  14,  PageID.374;  Petitioner's Supplemental Brief at 4-5, ECF No. 11-15, PageID.2648-49; Reply Brief at 17-21, ECF No. 12, PageID.3115-19).

It is well-established that this Court may not grant habeas relief on the basis of error in the application of state rules of evidence.  *See Estelle v. McGuire*, 502 U.S. 62  (1991).   An  inquiry  whether  evidence  was  properly  admitted  or  improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id*. at 67-68.

Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id*. at 68.   State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Petitioner cannot meet this difficult standard.

The Michigan Court of Appeals found error in two of the trial court's evidentiary rulings, but neither resulted in any prejudice.  Before trial, the prosecutor made a motion to allow admission of other-acts evidence under Rule 404(b) of the Michigan Rules of Evidence.  The prosecution's rationale for the evidence was that the state's theory of the case was that petitioner killed Milo Conklin because he believed that Conklin broke into his house and stole drugs from him.  The trial court ruled that it would allow the prosecutor to introduce evidence that petitioner's home was burglarized, that drugs were stolen, and that petitioner believed that the victim was the perpetrator.  The court reserved ruling on whether specific witnesses could testify to purchasing drugs from petitioner and it limited the scope of testimony by ruling that the "whole slew of [undercover] purchases" was not admissible.  (Op. at 6-7, ECF No. 11-15, PageID.2513-14).

The Court of Appeals then considered the testimony of each of the three witnesses, Paige Bowers, Mark Sprague and Sherry Hatfield,[3] who had provided testimony regarding petitioner's involvement with drugs.  (*Id.* at 7, PageID.2514).  The prosecution never established a link between prior drug sales and the burglary.  Steven Brown testified that defendant wanted to "get" Milo Conklin because Conklin broke into his house.  Walter Johnson testified that petitioner suspected that Conklin broke into his house.  This evidence supported that Conklin burglarized petitioner's

---

[3] "During [Ms. Hatfield's] testimony, a juror submitted a written question to the court asking what type of drugs [petitioner] supplied to her.  Hatfield responded to the question by stating that she purchased heroin from [petitioner]."  (Op. at 7, ECF No. 11-15, PageID.2514).

home and that petitioner had motive to retaliate against him, but it was wholly unrelated to previous drug transactions.

The Michigan Court of Appeals ruled that the evidence concerning drug sales was not admissible under Rules 404(b) and 403 of the Michigan Rules of Evidence. (Op. at 7, ECF No. 11-15, PageID.2514).  Petitioner could not demonstrate prejudice stemming from the trial court's evidentiary rulings, however, because there was "overwhelming evidence" of his guilt. (*See id.*, PageID.2514-15) (citations and quotation omitted).

The Michigan Court of Appeals also found that the trial court made an error in its evidentiary ruling in allowing Ms. Wilkerson to testify about how she felt after she learned that petitioner was wanted by the FBI because it was not relevant.  (Op. at 8-9, ECF No. 11-15, PageID.2515-16).  That error was harmless.  The court of appeals noted that her testimony "did not reveal any personal knowledge about [petitioner's] guilt or innocence of the charged offenses, and the prosecutor did not refer to [her] fear of [petitioner] during closing argument.  Moreover, the trial court instructed the jury that its verdict was to be based on the evidence, and not on prejudice or sympathy.  A jury is presumed to follow its instructions."  (*Id.* at 9, PageID.2516).

Petitioner has not carried his burden under 28 U.S.C. § 2254(d).  "[T]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Cooper v. Haas*, No. 17-

1235, 2018 WL 1224451, at *3 (6th Cir. Jan. 9, 2018) ("[T]he admission of other acts evidence was not contrary to, nor did it involve an unreasonable application of, clearly established federal law because '[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.' ") (quoting *Bugh*, 329 F.3d at 512). Further, the appellate findings that the trial court's errors were harmless because the evidence of petitioner's guilt was overwhelming are well supported.

Petitioner has not shown that the decision of the Michigan Court of Appeals rejecting the arguments found in Grounds II, III, and IX was " 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' " *Dunn v. Madison*, 138 S. Ct. at 11 (quoting *Harrington v. Richter*, 562 U.S. at 103). I find that Grounds II, III, and IX do not provide a basis for habeas corpus relief.

## III.  Prosecutorial Misconduct

In Ground IV, petitioner claims prosecutorial misconduct during closing argument in (1) vouching for the credibility of prosecution witnesses and (2) in violating a stipulation regarding petitioner's alleged aliases. (ECF No. 7-1 at 3-4, PageID.362-63; Petitioner's Brief at 32-37, ECF No. 11-15, PageID.2574-79; Reply Brief at 22-31, ECF No. 12, PageID.3120-29). Ground X is a claim of prosecutorial misconduct stemming from Devon Smith's testimony. (ECF No. 7-1 at 13-17, PageID.375-77; Petitioner's Supplemental Brief at 6-9, ECF No. 11-15, PageID.2650-53; Reply Brief at 22-31, ECF No. 12, PageID.3120-29).

The scope of review in a habeas action regarding allegations of prosecutorial misconduct is narrow.  "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  This court does "not possess supervisory powers over state court trials."  *Id.*  "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority."  *Id.*  "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.' "  *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (" '[T]he appropriate standard of review for ...a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.' ") (quoting *Darden*, 477 U.S. at 181).  To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181; *see Parker v. Matthews*, 567 U.S. 37, 45 (2012); *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).

Because the Michigan Court of Appeals rejected petitioner's claims for lack of merit, petitioner faces the significant additional hurdle of demonstrating that the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A. Ground IV

The Michigan Court of Appeals rejected petitioner's claim of prosecutorial

misconduct in closing argument.  (Op. at 9-12, ECF No. 11-15, PageID.2516-19).  It found no merit in petitioner's claim that the prosecutor improperly vouched for the credibility of prosecution witnesses:

> The prosecutor's comments concerning the credibility of its witnesses did not amount to misconduct.  The prosecutor asserted that their testimony was consistent with other evidence in the record and contended that the testimony was credible for that reason.  The prosecutor noted that Johnson and Mathews' testimony aligned and was therefore credible and he argued that Smith was believable because other evidence corroborated that he was in the neighborhood where he testified to have talked with defendant about the crime.  These arguments did not insinuate that the prosecutor had special knowledge about the truthfulness of its witnesses.  Similarly, the prosecutor argued that Detective Beauchamp was credible because he did not merely take the witnesses at face value during the investigation.  Rather, he went to great lengths to investigate the facts and circumstances and did not merely assume witnesses were credible.  This did not insinuate that Detective Beauchamp or the prosecutor had some special knowledge about the witnesses' truthfulness and it was not otherwise improper.
>
> With respect to the prosecutor's reference to Johnson's plea bargain, "simple reference to a plea agreement containing a promise of truthfulness is in itself [not] grounds for reversal.  A more accurate statement of the law appears to be that, although such agreements should be admitted with great caution, admissibility of such an agreement is not necessarily error unless it is used by the prosecution to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully.  In this case, the prosecutor did not insinuate that he had special knowledge of Johnson's truthfulness.  The jury was aware of Johnson's plea agreement.  Specifically, during trial, Johnson testified that he entered into a plea agreement with the federal government wherein he agreed to offer truthful testimony at [petitioner's] trial.  Thus, the argument did not amount to misconduct that denied defendant a fair trial.

(Op. at 10-11, PageID.2517-18) (citations and quotations omitted).  Further, the prosecutor's closing argument did not improperly denigrate the credibility of the defense witnesses.  (*Id.* at 11-12, PageID.2518-19).

The Court of Appeals held that prosecutor did not violate a stipulation

regarding petitioner's aliases:

> On the fourth day of trial, the prosecution sought to introduce People's Exhibit 99 to show that defendant used various telephone numbers after the murder. The parties agreed to redact the "a.k.a." referenced in the exhibit next to the names of the subscribers to the various telephone numbers. At trial, the prosecution presented police testimony that defendant used various telephone numbers issued to other individuals. During closing argument, the prosecutor argued as follows:
>
>> This is Exhibit 99 that was admitted, and it indicates the phone-the phones that Sam Steel ad [sic]. And I'm not going to continue to go over all the testimony that Detective Beauchamp indicated, but he indicated why he knew that Nick Jake was registered under Nick Jake, why Sam Steel used that phone; why Tim Jones, when it was registered under Tim Jones, that Sam Steel used that phone. He indicated why he knew the name of Tim Jones and why it was registered under Tim Jones for Sam Steel. He indicated Sam Steel used all these phones under the name of Nick Jake, Tim Jones, and Tim Johnson.
>
> The prosecutor did not commit misconduct by violating the parties' stipulation to refrain from characterizing names under which various cell phones used by defendant were registered as aliases used by defendant. During closing argument, the prosecutor referred to an exhibit that contained the names under which the phones were registered. The prosecutor mentioned the names, but did not state that defendant used the names as aliases.

(Op. at 12, PageID.2519).

The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x. 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to bolster the witness's credibility. *Francis*, 170 F.3d at 550. In the second type of impermissible

vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *Id*. at 551. Neither type is at issue here.

Moreover, the Supreme Court has never recognized "vouching" as a constitutional-level claim. "There is no 'clearly established Federal law, as determined by the Supreme Court of the United States' against 'vouching.'" *Vance v. Berghuis*, No. 1:09-cv-137, 2013 WL 3161326, at *23 (W.D. Mich. June 20, 2013) (quoting 28 U.S.C. § 2254(d)(1) and citing *Parker v. Matthews*, 567 U.S. at 47-48).

B. Ground X

The Michigan Court of Appeals rejected petitioner's argument that the prosecutor committed misconduct by failing to correct testimony given by Devon Smith to the effect that he did not receive a reduction in his federal sentence in exchange for testifying at petitioner's trial:

> [Devon] Smith was evasive, and while he admitted that the minimum term of his federal sentence was below the guidelines, he attempted to maintain that his agreement to testify in this case was not the reason why his minimum term was reduced. He asserted that he was not aware of his plea agreement, but then acknowledged that his signature was on the document.

(Op. at 12, ECF No. 11-15, PageID.2519). The questions posed "made clear that Smith was not being truthful about the agreement." (*Id*.). Petitioner cited "no authority to support his assertion that the prosecution committed misconduct by failing to say or do anything further." (*Id*.).

The Fourteenth Amendment right to due process prohibits a knowing and

deliberate use by a state of perjured evidence in order to obtain a conviction. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).  This claim encompasses use of testimony, whether elicited or left uncorrected, that the prosecutor knows or should know is false. *See Giglio v. United States*, 405 U.S. 150 (1972).  The presentation of perjured testimony, without more, does not rise to the level of a constitutional violation. *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983).  "In order to establish prosecutorial misconduct for presenting false testimony, [petitioner] must show that (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew that it was false." *Roby v. Burt*, No. 17-2043, 2018 WL 1176512, at *4 (6th Cir Feb. 14, 2018) (citing *Peoples v. Lafler*, 734 F.3d 503, 516 (6th Cir. 2013)). " 'The burden is on the [petitioner] to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.' " *Roby v. Burt*, 2018 WL 1176512, at *4 (quoting *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010)).  Petitioner has not demonstrated prosecutorial misconduct, much less overcome the deference to which the decision of the Michigan Court of Appeals is entitled under 28 U.S.C. § 2254(d).

Even assuming that petitioner had shown a constitutional violation, the "harmless-error standard announced in *Brecht v. Abrahamson*, 507 U.S. 619, 622-23 (1993), applies to prosecutorial misconduct claims on federal habeas review."[4] *Roby v. Burt*, No. 17-2043, 2018 WL 1176512, at *3 (6th Cir. Feb. 14, 2018) (citing *Bates v.*

---

[4] Constitutional errors are deemed harmless on habeas review unless the petitioner establishes that they "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 638.

*Bell*, 402 F.3d 635, 641 (6th Cir. 2005)); *see also Cooper v. Haas*, No. 17-1235, 2018 WL 1224451, at *3 (6th Cir. Jan. 9, 2018).   Further, the decision of the Michigan Court of Appeals finding that any prosecutorial misconduct that may have occurred was harmless error is entitled to AEDPA deference.  *See Miller v. Colson*, 694 F.3d 691, 699-700 (6th Cir. 2012) (state appellate court finding of harmless error entitled to AEDPA deference).  Thus, this Court "may not grant [petitioner]'s habeas petition ... if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003).

Petitioner has not carried his burden under 28 U.S.C. § 2254(d).  I find that Grounds IV and X do not provide a basis for habeas corpus relief.

## IV.   Assistance of Counsel

Grounds V, VI, VII, and VIII are claims of ineffective assistance of trial counsel.  Ground V is petitioner's claim that his trial counsel who was unprepared for trial, resulting in failure to interview and present critical witnesses and failed to object to multiple instances of inadmissible and inflammatory testimony.  (ECF No. 7-1 at 5-6, PageID.364-65; Petitioner's Brief at 37-44, ECF No. 11-15, PageID.2579-86; Reply Brief at 31-38, ECF No. 12, PageID.3129-36).   Ground VII is petitioner's claim that his trial counsel was ineffective for failing to interview and call Roderick Ivey as a witness.  (ECF No. 7-1 at 9-11, PageID.368-70; Petitioner's Supplemental Brief at 1-3, ECF No. 11-15, PageID.2645-47).   Grounds VI and VIII are claims of

error in the denial of his motion for a new trial based on newly discovered evidence, or in the alternative, ineffective assistance of trial counsel.  Ground VI is based on newly discovered evidence in the testimony of Paul Pratt and Jacob Blett.  (ECF No. 7-1 at 6-8, PageID.365-67, Petitioner's Brief at 44-47, ECF No. 11-15, PageID.2586-89; Reply Brief at 39-40, ECF No. 12, PageID.3131-38).  Ground VIII is a duplicative claim based on newly discovered evidence in the testimony of Mr. Blett.  (ECF No. 7-1 at 12-13, PageID.372-73).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  On the prejudice prong, petitioner "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Because the Michigan Court of Appeals decided petitioner's claims of ineffective assistance of counsel on their merits, its decision must be afforded

deference under AEDPA.  *See Burt v. Titlow*, 134 S. Ct. 10, 15-16 (2013); *Harrington v. Richter*, 562 U.S. at 98-102.  To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington.  See Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, petitioner must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner."  *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012).  This creates a "high burden" for petitioner.  *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Hodges v. Colson*, 727 F.3d 517, 534 (6th Cir. 2013).  "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The Supreme Court has described this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Woods v. Donald*, 135 S. Ct. at 1375-77; *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).  The question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Premo v. Moore*, 562 U.S. 115, 123 (2011); *see McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015).  Petitioner must show that the state court's

ruling on the claim being presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. at 103); *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (*per curiam*).

The Michigan Court of Appeals rejected all petitioner's claims of ineffective assistance of counsel. The Court of Appeals gave a summary of petitioner's attorney's extensive preparations for trial and found that petitioner failed to establish "what counsel should have done differently that would have altered the outcome of the proceeding and he [] failed to show that counsel was deficient in preparing for the case." (Op. at 13, ECF No.11-15, PageID.2520).

A. Ground V

The Michigan Court of Appeals rejected all petitioner's claims that his trial attorney failed to prepare for trial and investigate known exculpatory witnesses, failed to object to inflammatory and unfairly prejudicial testimony. The Court of Appeals noted that at one point, petitioner had claimed ineffective assistance of counsel for failure to call Paul Pratt was a witness at trial. Although petitioner filed a supplemental brief indicating that he was withdrawing the argument, the Court of Appeals "conclude[d] that declining to call Pratt as a witness amounted to reasonable trial strategy." (Op. at 15 n.5, ECF No. 11-15, PageID.2523).

The Court of Appeals found that petitioner's attorney was not ineffective in failing to object to various instances of testimony that petitioner characterized as

inflammatory. (*Id.* at 14-15, PageID.2521-22). For example, David Lee's testimony regarding petitioner's attempt to intimidate witnesses was evidence "relevant to prove consciousness of guilt." (*Id.* at 14, PageID.2521). The other statements were not a focal point of the prosecution's case and the jury was instructed not to consider sympathy in its deliberations. "It was reasonable for counsel to conclude that the trial court's instructions would be sufficient to cure any potential prejudice. In short, counsel did not act deficiently with respect to the statements." (*Id.*).

The Court of Appeals rejected petitioner's claim that counsel was ineffective with respect to his handling of the drug evidence. Before trial, petitioner's attorney moved to suppress evidence of the drug sales and the trial court denied the motion. "Thereafter, counsel attempted to use the drug evidence to [petitioner's] benefit by advancing the theory that [petitioner] left Michigan and went to Georgia because of the drug charges as opposed to fleeing the state because of the murder." (Op. at 14-15, ECF No. 11-15, PageID.2521-22). Further, petitioner failed to demonstrate prejudice. [A]dmission of the drug evidence did not impact the outcome of the proceedings." (*Id.* at 15, PageID.2522). Petitioner could not demonstrate that, "but for counsel's failure to raise contemporaneous objections, the result of the proceeding would have been different." (*Id.*).

The Michigan Court of Appeals rejected petitioner's argument that counsel was ineffective for failing to raise objections during the prosecutor's closing argument. "As discussed above, none of the challenged statements amounted to misconduct that denied defendant a fair trial. Therefore, defendant cannot show that counsel's failure

to object impacted the outcome of the proceedings." (*Id.*).

B. Ground VII

The Court of Appeals found no merit in petitioner's claim that trial counsel was ineffective because he failed to interview or call Roderick Ivey as a witness during petitioner's trial.

> Ivey testified at the evidentiary hearing that he told the police that Johnson shot Conklin. Ivey denied later telling Detective Beauchamp that defendant shot Conklin. Beauchamp, however, testified that Ivey initially told him that he did not know the shooter, but later identified defendant as the shooter. Counsel testified that he and his private investigator concluded that Ivey would not be a strong defense witness because he had changed his statement and because he had identified defendant as the shooter. Contrary to defendant's assertion, Ivey would not have served as an exculpatory witness. If Ivey had testified, the prosecution would have been able to impeach him with his statement to Detective Beauchamp that defendant was the shooter. Moreover, Ivey's description of the direction from which the shooter approached Conklin differed from that of other witnesses. Considering these weaknesses in Ivey's testimony, defense counsel's decision to not call him at trial amounted to reasonable trial strategy.

(Op. at 14, PageID.2521).

C. Grounds VI and VIII

In Grounds VI and VIII, petitioner claims error in the denial of his motion for a new trial based on newly discovered evidence or in the alternative that his trial attorney was ineffective for failure to investigate and/or call Paul Pratt and Jacob Blett as witnesses.

Petitioner's claims of error in the denial of his motion for a new trial do not provide a basis for federal habeas corpus relief. *See* 28 U.S.C. § 2254(a). The United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a

federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). State courts are the "ultimate expositors of state law." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  855, 862 (6th Cir. 2002).

Further, petitioner has made it clear that he "is *not* asserting 'freestanding' actual-innocence claim." (Reply Brief at 40, ECF No. 12, PageID.3138).  In any event, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

The Court of Appeals rejected petitioner's claims of ineffective assistance of counsel for lack of merit.  As previously indicated, "declining to call [Paul] Pratt as a witness amounted to reasonable trial strategy."  (Op. at 15 n.5, ECF No. 11-15, PageID.2522).  The Court of Appeals held that with regard to Jacob Blett, petitioner failed to overcome the presumption that his trial counsel rendered effective assistance.  (*Id.* at 14, PageID.2521).  Further, Mr. Blett did not come forward until "after the trial was concluded" and his testimony was "cumulative."  (*Id.* at 16, PageID.2523).

Petitioner has not shown that the decision of the Michigan Court of Appeals rejecting all the claims found in Grounds V, VI, VII, and VIII was "contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" under the "doubly deferential" standard of review.  28 U.S.C. § 2254(d).

## V.      Certificate of Appealability

Even though I have concluded that petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted.  A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under Slack, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's denial of petitioner's claims would be debatable or wrong.  Accordingly, I recommend that a certificate of appealability should be denied.

## **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.  I further recommend that a certificate of appealability be denied.

Dated:  May 9, 2018                        /s/  Phillip J. Green
                                                      PHILLIP J. GREEN
                                                      United States Magistrate Judge


## **NOTICE TO PARTIES**

ANY OBJECTIONS to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).